# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court



CIVIL DOCKET# **MICV2004-05046**

Lycos, Inc, Plaintiff(s)
vs.
Telefonica Data USA, Inc.

, Defendant(s)

## SUMMONS AND ORDER OF NOTICE

To the above-named:

You are hereby summoned and required to serve upon **Thomas O Bean, Esquire**, plaintiff's attorney, whose address is **Nutter McClennen & Fish World Trade Center West155 Seaport Boulevard  Boston, MA 02210,** an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Cambridge either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Middlesex County Superior Court, in Cambridge on **12/29/2004, at 02:00 PM in Rm 9A (Cambridge),** at which time you may appear and show cause why such application should not be granted.

**Witness, Barbara J. Rouse,** Esquire, Chief Justice of the Superior Court, at Cambridge, Massachusetts this 23rd day of December, 2004.

.................................................................

Clerk

### (AFFIX RETURN OF SERVICE ON BACK OF SUMMONS)

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.



SUPERIOR COURT DEPT.
C.A. No.      04-5046

LYCOS, INC.,

    Plaintiff,

v.

TELEFONICA DATA USA, INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

This is an action brought by Lycos, Inc. ("Lycos") relating to a master services

agreement entered into between Lycos and defendant Telefonica Data USA, Inc. ("T-Data")

("Master Services Agreement") and several exhibits and schedules with respect thereto

(collectively, the "Transaction Documents"). Pursuant to the Transaction Documents, T-Data

is to provide certain critical data storage, networking and communication services to Lycos.

By this action, Lycos seeks both a declaration that, if T-Data terminates the Transaction

Documents, it may not suspend services provided for thereunder but must provide the

Termination Assistance Services under section 7.4 of the Master Services Agreement for which

Lycos is willing to pay as provided therein, and preliminary and permanent injunctions barring

T-Data, if T-Data terminates the Transaction Documents, from suspending, terminating, or

otherwise ceasing to provide services under the Transaction Documents and from refusing to

provide Termination Assistance Services under Paragraph 7.4 of the Master Services

Agreement.

The preliminary injunctive relief sought by Lycos is simply intended to ensure that, in the event T-Data follows through on its threats to terminate the Transaction Documents, T-Data complies with the express terms of the Transaction Documents by providing appropriate Termination Assistance Services, without which Lycos's Internet business would "go dark," effectively shuttering its operations and putting it out of business.

## FACTUAL BACKGROUND

Lycos consists of a network of globally branded media properties and aggregated content distributed primarily through the World Wide Web. (Verified Compl. ¶ 9). On or about November 18, 2003, Lycos and T-Data entered into the Transaction Documents whereby T-Data agreed to provide to Lycos certain data storage, networking and communication services. (Id. at ¶ 12). Companies such as Lycos that depend on fast, reliable and uninterrupted access to its web sites by a large volume of users typically hire the services of a company offering high-capacity data and communication services, including web server housing and internet connectivity. (Id. at ¶ 10). T-Data houses Lycos' web servers, and employs a physical building or room with security systems, redundant power supply and climate and temperature controls, along network connectivity, to ensure that Lycos' servers never "go down." (Id. at ¶ 11).

As Lycos began receiving invoices from T-Data for services rendered under the Transaction Documents, Lycos began to notice recurrent errors and miscalculations in those invoices. (Id. at ¶ 13). T-Data often threatened to terminate services if Lycos did not pay the incorrect invoices in full, even while the parties were trying to resolve these errors. (Id.). The invoice covering September, 2004, was erroneous in that it failed to give Lycos a credit of approximately $130,000 for amounts Lycos had overpaid prior months. (Id. at ¶ 14). T-

Data's invoices for October, November and December of 2004 on December 14, 2004 also contained numerous errors, miscalculations and discrepancies. (*Id.* at ¶ 16).

Because Lycos did not receive the invoices covering the period from October through December until December 14, 2004, Lycos is not obligated to pay them until January 13, 2005. (*Id.* at ¶ 17). Despite this, and the numerous errors contained in all of these invoices, T-Data has threatened to terminate the Transaction Documents and immediately suspend services if Lycos had not paid the full amount of the September and October invoices on or before 3:00 p.m. EST on December 30, 2004. (*Id.* at ¶ 19). In response, Lycos has demanded that if T-Data insists on terminating the Transaction Documents, that T-Data provide Termination Assistance Services to Lycos under the terms of the Master Services Agreement. (*Id.* at ¶ 22). Lycos offered, even though it was not required to do so, to pay for Termination Assistance Services monthly in advance. (*Id.*). If T-Data terminates the Transaction Documents without providing Lycos with appropriate Termination Assistance Services, a majority of Lycos' internet content will "go dark" and Lycos would be unable to operate as an ongoing business. (*Id.* at ¶ 25).

ARGUMENT

Massachusetts law entitles a party to a preliminary injunction where (1) it is reasonably likely to succeed on the merits of its claim; (2) it will suffer irreparable harm in the absence of injunctive relief; and (3) such harm outweighs any injury which the other party will suffer if the injunction is granted. *See* Mass. R. Civ. P. 65(b); *T&D Video, Inc. v. City of Revere*, 423 Mass. 577, 580 (1996); *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980). In this case, an injunction is warranted.

A.    Lycos Is Likely To Succeed On The Merits Of Its Claims

In its Verified Complaint, Lycos has clearly established that it is entitled to a declaration under G.L. c. 231A, § 1 that even if T-Data may terminate the Transaction Documents, it may not suspend Services upon termination and must provide Termination Assistance Services provided Lycos is willing to pay for them.  As a preliminary matter, it is evident that Lycos has fulfilled its obligations under the Transaction Documents by both paying almost the entire amount outstanding under the September, 2004 invoice, and by standing ready, willing and able to make payment of all undisputed amounts under the October, November and December 2004 invoices when they become due and payable on January 13, 2005.  As a result, Lycos is not in material breach of the Transaction Documents, and T-Data has no justification for termination.

However, even if Lycos has not fulfilled its obligations such that T-Data may terminate the Transaction Documents, T-Data is obliged to provide and may not unilaterally suspend Termination Assistance Services because Lycos has offered to pay monthly in advance for such services.  Under the clear terms of section 7.4 of the Master Services Agreement, T-Data is required to provide Termination Assistance Services to Lycos for up to 18 months following the termination of the Master Services Agreement, upon such terms as are mutually agreed to by the parties. (Verified Compl., ¶ 22 and Exh. A, § 7.4).  Because Lycos has already offered to pay for the Termination Assistance Services in the event that T-Data wrongfully terminates the Transaction Documents, *see* Verified Compl. ¶ 22, Exh. J, T-Data must provide such services.

Under G.L. c. 231A, § 2, declaratory relief is an appropriate means to secure determinations of rights under a contract, such as the Transaction Documents. *See Sears,*

- 4 -

*Roebuck & Co. v. School Committee of Burlington*, 3 Mass. App. Ct. 399 (1975). A controversy or dispute exists between the parties concerning T-Data's right to immediately terminate the Transaction Documents and suspend all Services it provides to Lycos without offering Termination Assistance Services. Since September of 2004, T-Data often threatened to terminate services if Lycos did not pay its invoices in full, despite the fact that such invoices contained numerous errors and miscalculations. (Verified Compl. ¶ 13). T-Data recently escalated this dispute by sending a letter to Lycos on December 20, 2004 threatening to terminate the Transaction Documents if Lycos had not paid the full amount of the September and October invoices on or before 3:00 p.m. EST on December 30, 2004, even though both invoices contained errors and the October invoice was not even due and payable until January 13, 2005. (*Id.* at ¶¶ 15-19). Having not received any assurances from T-Data, Lycos is uncertain as to whether T-Data intends to provide Termination Assistance Services after T-Data wrongfully terminates the Transaction Documents on December 30, 2004. (*Id.* at ¶ 23). Lycos need not wait for catastrophe to strike before seeking injunctive relief. *See Dubois v. Selectmen of Dartmouth*, 2 Mass. App. Ct. 674, 679 (1974) ("One is not, of course, required to wait until he is injured before he can apply for injunctive relief.").

B.    Lycos Will Suffer Immediate And Irreparable Harm If T-Data Is Not Enjoined

Lycos will be immediately and irreparably harmed if T-Data is not enjoined from suspending, terminating, or otherwise ceasing to provide services under the Transaction Documents. Specifically, if T-Data terminates the Transaction Documents without providing Lycos with appropriate Termination Assistance Services, a majority of Lycos' internet content will "go dark." (Verified Compl. ¶ 25). Without an operating web server housing location, there would be no access to the majority of Lycos' web pages and Lycos would be unable to

operate as an ongoing business. (*Id.*). Upon termination of the Transaction Documents, Lycos will require several months to coordinate and put in place an alternate location for housing its web servers, which is presumably the reason the parties negotiated the Termination Assistance Services provision – to provide a "bridge" between T-Data and a successor company, thus ensuring that Lycos' web content remains online and accessible at all times. (*Id.* at ¶ 26). Lycos has advised T-Data and, upon information and belief, T-Data knows, that termination of the Transaction Documents without providing Termination Assistance Services would cause Lycos significant and irreparable harm. (*Id.* at ¶ 27). In circumstances such as this – where the action sought to be enjoined by the plaintiff would effectively put the plaintiff out of business – there can be no doubt that the plaintiff has met its burden of showing irreparable harm. *See Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Co.*, 399 Mass. 640, 643 (1987) (irreparable harm exists "where the loss threatens the very existence of the movant's business").

C.    The Balance Of Equities Favors Issuance Of The Requested Relief

The balancing of the potential harm to both sides further supports granting Lycos injunctive relief. The potential harm to Lycos if T-Data is allowed to suspend services upon termination of the Transaction Documents without providing Termination Assistance Services would be immediate and irreparable, as discussed above. On the other hand, T-Data would suffer no harm in providing Lycos with Termination Assistance Services required under the Master Services Agreement that Lycos has agreed to pay for in advance on a monthly basis. Particularly where the potential harm to Lycos is so catastrophic, the balance of equities tilts strongly in Lycos' favor. *See Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 622 (1980) (holding that any harm a party may suffer is "far outweighed" when the harm to

- 6 -

the other party has the potential to "seriously disrupt and probably wipe out [the party's] business").

Courts have broad discretion to fashion such relief as will address the harm being suffered in a given case, and are encouraged to utilize their creative equitable powers in fashioning an appropriate injunctive remedy. *See Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 649 (1976). Here, the Court is being asked to issue a narrowly-tailored injunction protecting Lycos' very existence without imposing any harm at all on T-Data by simply requiring T-Data to live up to the terms of the Transaction Documents. The public interest encourages enforcement of contracts such as the Transaction Documents, and will not be adversely affected by an injunction barring T-Data from suspending the services described in the Transaction Documents, and from refusing to negotiate terms under which T-Data will provide Termination Assistance Services requested by Lycos.

CONCLUSION

Because Lycos has clearly shown that it will likely prevail on the merits, that "immediate and irreparable injury" will result if Billings is not prevented from suspending services upon termination of the Transaction Documents without providing Termination Assistance Services, and that the balance of the equities rests in Lycos' favor, Lycos respectfully requests that the Court allow the Motion for Preliminary Injunction and grant Prayer B(2) of the Verified Complaint.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000

Dated: December 23, 2004

1389877.1

- 8 -

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPT.
C.A. No.

LYCOS, INC.,

     Plaintiff,

v.

TELEFONICA DATA USA, INC.,

     Defendant.

)
)
)
)
)
)
)
)
)
)



04-5046

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE

DEC 23 2004

CLERK

## MOTION FOR SHORT ORDER OF NOTICE FOR
## HEARING ON REQUEST FOR PRELIMINARY INJUNCTION

Pursuant to Mass. R. Civ. P. 65(b) and Superior Court Rule 9A(e)(1), plaintiff Lycos, Inc. ("Lycos") requests that this Court issue short order of notice of hearing on Lycos' request for preliminary injunction set forth in Prayer (B)(2) of its Verified Complaint.

Because the Defendant has threatened in writing to terminate on December 30, 2004 the contract pursuant to which the Defendant delivers Internet-related, the hearing on Lycos' Motion for Preliminary Injunction must be held no later than Wednesday, December 29, 2004.

An expedited hearing is needed to prevent the defendant from suspending, terminating, or otherwise ceasing to provide services pending further order of the Court and from refusing, if the Defendant terminates its contractual relationship with the Plaintiff, to negotiate, as provided under Paragraph 7.4 of their Master Services Agreement, delivery of Termination Assistance Services requested by Lycos.

In further support for this Motion, Lycos refers the Court to its Verified Complaint and Memorandum of Law.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000

Dated: December 23, 2004

1389915.1

COMMONWEALTH OF MASSACHUSETTS



MIDDLESEX, ss.                                          SUPERIOR COURT DEPT.
                                                        C.A. No.
                                                                    04-5046

LYCOS, INC.,                          )
                                      )
          Plaintiff,                  )
                                      )        FILED
                                      )   IN THE OFFICE OF THE
v.                                    )   CLERK OF THE COURTS
                                      )   FOR THE COUNTY OF MIDDLESEX
TELEFONICA DATA USA, INC.,            )        DEC 23 2004
                                      )
          Defendant.                  )   Edward J. Sullivan
                                      )                     CLERK

**MOTION TO APPOINT SPECIAL PROCESS SERVER**

Pursuant to Mass. R. Civ. P. 4(c), plaintiff, Lycos, Inc., hereby moves for
appointment of Esquire Express, Inc., 600 Brickell Ave., Miami, FL 33129, as special process
server and thereby authorizes it to serve all process in this action, including but not limited to,
service of summons, verified complaint, short order of notice, and court orders.

In support of this motion, plaintiff states that Esquire Express, Inc. is experienced in
service of process and disinterested in this action.  Upon information and belief, all process
servers employed by Esquire Express, Inc. are over the age of eighteen.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000

Dated: December 23, 2004

1389921.1

**Commonwealth of Massachusetts**
**SUPERIOR COURT DEPARTMENT**
**THE TRIAL COURT**
**CAMBRIDGE**

MICV2004-05046

I, Karen O'Connor, Deputy Assistant Clerk of the Superior Court, within and for said
County of Middlesex, do certify that the annexed papers are true copies made by
photographic process of pleadings entered in the Superior Court on the 23rd of Dec.,
in the year of our Lord, Two Thousand Four



In testimony whereof, I hereunto set my
hand and affix the seal of said Superior
Court, at Cambridge, in said County, this
29th of Dec., in the year of our Lord, Two
Thousand Four

_Karen A. O'Connor_
Deputy Assistant Clerk

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX ss.                                    SUPERIOR COURT
                                                 CIVL DOCKET # 04-5046

LYCOS, INC.,                          )
                                      )
              Plaintiff,              )
                                      )
v.                                    )
                                      )   **NOTICE OF FILING OF**
TELEFONICA DATA USA, INC.,            )   **NOTICE OF REMOVAL**
                                      )
              Defendant.              )

The defendant, Telefonica Data USA, Inc., hereby gives notice, pursuant to 28 U.S.C.

§1446(d), that it has filed in the United States District Court for the District of Massachusetts a

Notice of Removal, a copy of which is attached hereto as Exhibit 1. All proceedings in this

matter must therefore immediately cease unless and until the federal court remands this action.

                                   Respectfully submitted,

                                   DEFENDANT TELEFONICA DATA USA, INC.

                                   By its attorneys,

> FILED
> IN THE OFFICE OF THE
> CLERK OF THE COURTS
> FOR THE COUNTY OF MIDDLESEX
>
> DEC 2 9 2004
>
> CLERK

                                   Barry S. Pollack (BBO #642064)
                                   Jill Brenner Meixel (BBO #652501)
                                   DONNELLY, CONROY & GELHAAR, LLP
                                   One Beacon Street 33rd floor
                                   Boston, MA 02108
                                   (617) 720-2880

Dated: December 28, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of
the above document was served upon the
attorney of record for each party by mail/by hand

Date: 12/28/04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LYCOS, INC., | ) | **04 CV 12716 WGY** |
|  | ) |  |
| Plaintiff, | ) | (Removed from the Superior Court |
|  | ) | of the Commonwealth of Massachusetts, |
| v. | ) | Middlesex County, Civil Docket No. 04-5046) |
|  | ) |  |
| TELEFONICA DATA USA, INC., | ) | Case No. 04-        ( |
|  | ) |  |
| Defendant. | ) |  |

### NOTICE OF REMOVAL

TO:   The Honorable District Judges of the United States District Court for the District of Massachusetts, Eastern Section

Pursuant to 28 U.S.C. § 1441(c) and § 1446, defendant Telefonica Data USA, Inc. ("Telefonica") hereby removes the above-captioned action, including all counterclaims therein, from the Superior Court Department of the Trial Court for Middlesex County in the Commonwealth of Massachusetts to the United States District Court for the District of Massachusetts.  In support of this removal, Telefonica states as follows:

1.      On or about December 23, 2004, without prior notice, Plaintiff Lycos, Inc. ("Lycos") brought a civil action against Telefonica in the Superior Court Department of the Trial Court for Middlesex County in the Commonwealth of Massachusetts, styled *Lycos, Inc. v. Telefonica Data USA, Inc.*, Civil Action No. 04-5046.  Copies of the Verified Complaint (the "Complaint") and all other pleadings from that action are attached hereto as Exhibit A.

2.      This Court has jurisdiction over this action, as filed in state court, pursuant to 28 U.S.C. § 1332 and § 1441(c) because there is complete diversity of citizenship and the amount in dispute exceeds $75,000.00.

3.    Lycos is a citizen of the State of Virginia and of the Commonwealth of Massachusetts. *See* Complaint ¶ 4.

4.    Telefonica is a citizen of the State of Florida. *See id.*

5.    On the removal of a civil action from a state court, federal courts should liberally construe the amount in controversy in favor of exercising subject matter jurisdiction. *See Hunt v. Washington Apple Advert. Comm'n.*, 432 U.S. 333, 347 (1977) ("[i]n actions seeking declaratory or injunctive relief it is well established that the amount in controversy is measured by the value of the object of the litigation"); *Richard C. Young, & Co. Ltd. v. Leventhal*, 389 F.3d 1, 3 (1st Cir. 2004) (liberally construing "object of the litigation" to include avoidance of potential "additional costs"). Otherwise, plaintiffs could simply, artfully and improperly withhold facts from their initial pleadings to circumvent removal jurisdiction of a federal court that would undoubtedly possess subject matter jurisdiction over the actual dispute.

6.    In the present matter, the Complaint identifies at least $130,000 in dispute between Lycos and Telefonica arising from an invoice at issue from in or about September 2004. *See id.* ¶14. In addition, the Complaint identifies three other substantial invoices from Telefonica that have not been paid by Lycos. *See id.* ¶¶15-19.

7.    The value of injunctive and declaratory relief sought by Lycos also far exceeds $75,000.00. The object of the litigation is alleged by Lycos to include activities or events "effectively putting Lycos out of business." *Id.* ¶ 35. The exhibits attached to the Complaint reflect millions of dollars of outstanding potential obligations between the parties that remain in dispute and which could be enforced, eliminated and/or affected by the requested relief.

2

8.    Telefonica is the only defendant in this matter and it resides outside of the Commonwealth of Massachusetts.

9.    Pursuant to Local Rule 81.1(a), Telefonica will file with this Court certified or attested copies of all records and proceedings in the state court action and certified or attested copies of all docket entries therein within 30 days.

Respectfully submitted,

DEFENDANT TELEFONICA DATA USA, INC.

By its attorneys,

Barry S. Pollack (BBO #642064)
Jill Brenner Meixel (BBO #652501)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street  33rd floor
Boston, MA 02108
(617) 720-2880

Dated: December 28, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: _12/28/04_

3

**Commonwealth of Massachusetts**
**County of Middlesex**
**The Superior Court**

CIVIL DOCKET# **MICV2004-05046-F**

RE:   **Lycos, Inc v Telefonica Data USA, Inc.**

TO:Thomas O Bean, Esquire
    Nutter McClennen & Fish
    World Trade Center West
    155 Seaport Boulevard
    Boston, MA 02210

### TRACKING ORDER - A TRACK

You are hereby notified that this case is on the average (A) track as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | DEADLINE |
|---|---|
| Service of process made and return filed with the Court | 03/23/2005 |
| Response to the complaint filed (also see MRCP 12) | 05/22/2005 |
| All motions under MRCP 12, 19, and 20 filed | 05/22/2005 |
| All motions under MRCP 15 filed | 03/18/2006 |
| All discovery requests and depositions completed | 02/11/2007 |
| All motions under MRCP 56 served and heard | 04/12/2007 |
| Final pre-trial conference held and firm trial date set | 08/10/2007 |
| Case disposed | 12/23/2007 |

The final pre-trial deadline is **not the scheduled date of the conference.** You will be notified of that date at a later time.
**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to session F sitting **in Rm 10A (Cambridge), Middlesex Superior Court.**

Dated: 12/23/2004

Edward J. Sullivan
Clerk of the Courts

BY: Martha Fulham Brennan
Assistant Clerk

Location: Rm 10A (Cambridge)
Telephone: 617-494-4010 EXT 4281

**Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130**

Check website for status of case: http://ma-trialcourts.org/tcic
cvdtraca_2.wpd 2661294 inidoc01 gouveia1

| CIVIL ACTION COVER SHEET | Trial Court of Massachusetts SUPERIOR COURT DEPARTMENT County: | Docket Number 01-5046 |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE | ATTORNEY (if known) |
|---|---|

Board of Bar Overseers number:

## Origin code and track designation

Place an x in one box only:
[ ] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. c. 231, s.104
    (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript; relief from judgment/
    Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

| CODE NO. | TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) TYPE OF ACTION (specify)     TRACK     IS THIS A JURY CASE? |
|---|---|
| | (  )     (  ) Yes     (  ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

## TORT CLAIMS
### (Attach additional sheets as necessary)

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX
DEC 23 2004
_[signature]_
CLERK

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . $..............
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . $..............
3. Total chiropractic expenses . . . . . . . . . . . . . . . . $..............
4. Total physical therapy expenses . . . . . . . . . . . . . $..............
5. Total other expenses (describe) . . . . . . . . . . . . . $..............
                           Subtotal $..............

B. Documented lost wages and compensation to date . . . . . . . . $..............
C. Documented property damages to date . . . . . . . . . . . . . . . $..............
D. Reasonably anticipated future medical and hospital expenses . . $..............
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . $..............
F. Other documented items of damages (describe)

                                            $..............

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                            $..............
                                     TOTAL: $..............

## CONTRACT CLAIMS
### (Attach additional sheets as necessary)
Provide a detailed description of claim(s):

                                        TOTAL     $..............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."
Signature of Attorney of Record _____     DATE: _____

A.O.S.C. 2003

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

| | **CONTRACT** | |
|---|---|---|
| A01 | Services, labor and materials | (F) |
| A02 | Goods sold and delivered | (F) |
| A03 | Commercial Paper | (F) |
| A08 | Sale or lease of real estate | (F) |
| A12 | Construction Dispute | (A) |
| A99 | Other (Specify) | (F) |

| | **TORT** | |
|---|---|---|
| B03 | Motor Vehicle Negligence- | (F) |
| B04 | Personal Injury/Property Damage Other negligence- | (F) |
| B05 | personal injury/property damage Products Liability | (A) |
| B06 | Malpractice-Medical | (A) |
| B07 | Malpractice-Other (Specify) | (A) |
| B08 | Wrongful death, G.L.c.229,s.2A | (A) |
| B15 | Defamation (Libel-Slander) | (A) |
| B19 | Asbestos | (A) |
| B20 | Personal Injury-Slip&Fall | (F) |
| B21 | Environmental | (F) |
| B22 | Employment Discrimination | (F) |
| B99 | Other (Specify) | (F) |

| | **REAL PROPERTY** | |
|---|---|---|
| C01 | Land Taking (eminent domain) | (F) |
| C02 | Zoning Appeal, G.L.c.40A | (F) |
| C03 | Dispute concerning title | (F) |
| C04 | Foreclosure of Mortgage | (X) |
| C05 | Condominium lien &charges | (X) |
| C99 | Other (Specify) | (X) |

| | **EQUITABLE REMEDIES** | |
|---|---|---|
| D01 | Specific performance of contract | (A) |
| D02 | Reach and Apply | (F) |
| D06 | Contribution or Indemnification | (F) |
| D07 | Imposition of Trust | (A) |
| D08 | Minority Stockholder's Suit | (A) |
| D10 | Accounting | (A) |
| D12 | Dissolution of Partnership | (F) |
| D13 | Declaratory Judgment G.L.c. 231A | (A) |
| D99 | Other (Specify) | (F) |

| | **MISCELLANEOUS** | |
|---|---|---|
| E02 | Appeal from Administrative Agency G.L.c 30A | (X) |
| E03 | Action against Commonwealth /Municipality, G L.c.258 | (A) |
| E05 | All Arbitration | (X) |
| E07 | G.L. c.112,s.12S (Mary Moe) | (X) |
| E08 | Appointment of Receiver | (X) |
| E09 | General Contractor Bond, G.L.c149,s.29,29a | (A) |
| E11 | Workers' Compensation | (X) |
| E12 | G.L.c.123A,s.12 (SDP Commitment) | (X) |
| E14 | G.L.c. 123A, s. 9 (SDP Petition) | (X) |
| E15 | Abuse Petition, G.L.c.209A | (X) |
| E16 | Auto Surcharge Appeal | (X) |
| E17 | Civil Rights Act,G.L.c.12,s.11H | (A) |
| E18 | Foreign Discovery Proceeding | (X) |
| E19 | Sex Offender Registry G.L.c. 178M,s.6 | (X) |
| E25 | Pleural Registry (Asbestos cases) | |
| E95 | Forfeiture G.L.c. 94C,s.47 | (F) |
| E96 | Prisoner Cases | (F) |
| E97 | Prisoner Habeas Corpus | (X) |
| E99 | Other (Specify) | (X) |

### TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | [x] Yes [ ] No |

### SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

### A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT, BUFF COLOR PAPER.

### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

CIVIL DOCKET# **MICV2004-05046**

Lycos, Inc, Plaintiff(s)
vs.
Telefonica Data USA, Inc.

, Defendant(s)

## SUMMONS AND ORDER OF NOTICE

To the above-named:

You are hereby summoned and required to serve upon
**Thomas O Bean, Esquire**, plaintiff's attorney, whose address is **Nutter McClennen & Fish World Trade Center West155 Seaport Boulevard  Boston, MA 02210**, an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Cambridge either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application has been made in said action, as appears in the complaint, for a preliminary injunction and that a hearing upon such application will be held at the court house at said Middlesex County Superior Court, in Cambridge on **12/29/2004, at 02:00 PM in Rm 9A (Cambridge)**, at which time you may appear and show cause why such application should not be granted.

**Witness, Barbara J. Rouse**, Esquire, Chief Justice of the Superior Court, at Cambridge, Massachusetts this 23rd day of December, 2004.

.......................................................................
Clerk

**(AFFIX RETURN OF SERVICE ON BACK OF SUMMONS)**

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

LYCOS, INC.,

    Plaintiff,

v.

TELEFONICA DATA USA, INC.,

    Defendant.



FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

DEC 23 2004

CLERK

SUPERIOR COURT DEPT.
C.A. No.

## 04-5016

### VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

)
)
)
)
)
)
)
)
)
)

3149A000012/23/04CIVIL    240.
3149A000012/23/04SUR CHARGE  15.
3149A000012/23/04SECC    20.

## NATURE OF THE ACTION

1.    In November, 2003, plaintiff, Lycos, Inc. ("Lycos") and defendant Telefonica Data USA, Inc. ("T-Data") entered into a master services agreement ("Master Services Agreement") and several exhibits and schedules with respect thereto (collectively, the "Transaction Documents") pursuant to which T-Data agreed to provide certain specialized services for housing and operation of web servers owned by Lycos, as well as connections to the World Wide Web.

2.    On December 20, 2004, T-Data sent Lycos a letter threatening threat to terminate the Transaction Documents at 3:00 p.m. EST on December 30, 2004. Termination of the Transaction Documents and suspension of services without delivery of appropriate Termination Assistance Services would cause the majority of Lycos's Internet business to "go dark," effectively shuttering more than 50% its Internet operations and putting Lycos out of business.

3.    Accordingly, Lycos seeks:

A.    a declaration under G.L. c. 231A, § 1 that if T-Data terminates the Transaction Documents, it may not suspend services upon termination but must provide the Termination Assistance Services under section 7.4 of the Master Services Agreement for which Lycos is willing to pay as provided therein; and

B.    preliminary and permanent injunctions barring T-Data from suspending, terminating, or otherwise ceasing to provide Services (as that term is defined in the Transaction Documents) pending further order of the Court and from refusing, if T-Data terminates the Transaction Documents, to negotiate, as provided under Paragraph 7.4 of the Master Services Agreement, delivery of Termination Assistance Services requested by Lycos.

## PARTIES

4.    Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

5.    Defendant Telefonica Data USA, Inc. is a Florida corporation with a principal place of business at 1221 Brickell Avenue, Suite 600, Miami, Florida 33131.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this matter pursuant to G.L. c. 231A, § 1 and G.L. c. 214, § 1.

7.    This Court has personal jurisdiction over T-Data under G.L. c. 223A, § 3, because (a) T-Data transacts business in the Commonwealth as evidenced by, among other things, having entered into the Transaction Documents with Lycos, a Massachusetts

- 2 -

corporation, and having communicated with Lycos in Massachusetts concerning those documents; and (b) T-Data contracted to provide services in Massachusetts.

8.      Venue is proper in this county pursuant to G.L. c. 223, §§ 1, 8(2).

## FACTS

9.      Lycos consists of a network of globally branded media properties and aggregated content distributed primarily through the World Wide Web. Lycos provides web search and directory services, community and personalization features, and personal web publishing. Lycos seeks to draw viewers to its web sites by providing a one-stop destination for information and communication. Lycos generates revenue primarily through selling advertising and sponsorships on its web sites, electronic commerce, and by licensing its products and technology.

10.     Companies such as Lycos that depend on fast, reliable and uninterrupted access to its web sites by a large volume of users typically hire the services of a company offering high-capacity data and communication services, including web-server housing and internet connectivity. In layman's terms, a web host "broadcasts" its customer's web sites on the internet by electronically "warehousing" that customer's web site files and related web-based services (i.e., email, electronic commerce) on a web server. A web server is simply a computer built specifically for web hosting that runs a software program that systematically controls network access by distributing internet resources from a central point to other computers. A web server waits for and then fulfils requests from users' computers on the internet to access a particular web site.

- 3 -

11.    T-Data houses Lycos' web-servers.  It employs a physical building or room with security systems, redundant power supply and climate and temperature controls, along with network connectivity, to ensure that Lycos' servers never "go down."

12.    On or about November 18, 2003, Lycos and T-Data entered into the Transaction Documents whereby T-Data agreed to provide to Lycos certain data storage, web server housing, and networking and communication services, described in detail in the Transaction Documents (the services provided pursuant to the Transaction Documents, together, the "Services").  Under section 4.1 of the Master Services Agreement, T-Data is required to render invoices to Lycos on a monthly basis for Services, and Lycos is to make payment for those Services within 30 days.  A copy of the Transaction Documents attached hereto as Exhibit A.

13.    As Lycos began receiving invoices from T-Data for Services rendered under the Transaction Documents, Lycos began to notice recurrent errors and miscalculations in those invoices.  These invoicing errors and miscalculations caused significant discord between the parties.  T-Data often threatened to terminate Services if Lycos did not pay the incorrect invoices in full, even while the parties were trying to resolve the errors.  Notwithstanding these threats, the practice of the parties was to resolve the invoices before Lycos would make any payment.  As a result, Lycos often paid invoices more than thirty days after receiving them.

14.    Invoicing errors continued in Fall, 2004.  The invoice covering September, 2004, was erroneous in that it failed to give Lycos a credit of approximately $130,000 for amounts Lycos had overpaid in prior months.   A true and accurate copy of the September, 2004 invoice is attached hereto as Exhibit B.

15.   And, for reasons that are unclear, Lycos did not receive T-Data's invoices for October, November and December of 2004 until they were emailed and faxed to Lycos by T-Data on December 14, 2004.  A true and accurate copy of the December 14, 2004 email from Sam Ortiz at T-Data to Dean Batten at Lycos is attached hereto as Exhibit C, and true and accurate copies of the October, November and December, 2004 invoices are attached hereto as Exhibits D, E and F, respectively.  In fact, Bert Knorr, formerly Lycos' contact with T-Data, advised Lycos personnel before he left Lycos' employment on November 11, 2004, that he had not yet received the invoice for October.  See e-mail attached as Exhibit G.  (While T-Data maintains it sent the October-December invoices to Lycos prior to December 14, 2004, it has failed, despite several requests, to provide evidence of such delivery to Lycos.)

16.   When Lycos finally received the invoices covering the period from October through December, Lycos discovered numerous errors, miscalculations and discrepancies in each of them.

17.   Because Lycos did not receive the invoices covering the period from October through December until December 14, 2004, Lycos is not obligated to pay them until January 13, 2005.

18.   On December 16, 2004, two days after receiving the invoices covering October through December, Lycos advised T-Data of numerous errors in those invoices.  A true and accurate copy of the December 16, 2004 email from Dean Batten at Lycos to Sam Ortiz at T-Data is attached hereto as Exhibit H.

19.   T-Data then sent Lycos a letter dated December 20, 2004, threatening to terminate the Transaction Documents if Lycos did not pay the full amount of the September and October invoices on or before 3:00 p.m. EST on December 30, 2004, even though both

invoices contained errors and the October invoice was not due and payable until January 13,

2005. A true and accurate copy of the December 20, 2004 letter from T-Data to Dean Batten,

who works for Lycos in Massachusetts, is attached hereto as Exhibit I.

20.    In response to T-Data's letter, Lycos paid T-Data $154,751.06 on December

21, 2004, almost the entire amount T-Data had demanded with respect to the September

invoice after deducting the approximately $130,000 credit to which Lycos was entitled.

Approximately $600 remains in dispute with respect to the September invoice.

21.    Also on December 21, 2004, T-Data sent Lycos an e-mail in which it admitted

that the October, November, and December invoices contained errors. A true and accurate

copy of this e-mail is attached hereto as Exhibit J.

22.    On December 22, 2004, Lycos sent T-Data a letter advising T-Data that it (T-

Data) had no right to terminate the Transaction Documents on December 30, 2004 because

Lycos had paid the amount outstanding under the September invoice, and the October invoice,

which T-Data had admitted contained errors and miscalculations, was not due until January,

2005. The letter also demanded that if T-Data terminated the Transaction Documents, that T-

Data provide Termination Assistance Services to Lycos under section 7.4 of the Master

Services Agreement. That section provides, in pertinent part, as follows:

> Upon the termination . . . of th[is] Agreement, Telefonica Data agrees to
> provide Termination Assistance Services consisting of continuation of any part
> or all of the Services to [Lycos] for up to eighteen (18) months following
> termination . . . of this Agreement. Termination Assistance Services shall be
> provided subject to, and in accordance with, the terms and conditions of this
> Agreement, except for the charges for such Termination Assistance Services,
> which such charge the Parties will mutually agree upon prior to the
> commencement of the Termination Assistance Services. The Parties agree that
> the charges for such Termination Assistance Services will be in accordance with
> the pricing principles of [the Strategic Alliance Framework Agreement between
> Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003]. In the

event of termination resulting from an unremedied breach by [Lycos], Telefonica Data shall be obligated to provide Termination Assistance Services only so long as [Lycos] pays for Services that are part of such Termination Assistance Services monthly in advance of the date the Services are to be provided.

Lycos offered in its December 22, 2004 letter, even though it was not required to do so, to pay for Termination Assistance Services monthly in advance. A true and accurate copy of the letter from Lycos to T-Data dated December 22, 2004 is attached hereto as Exhibit K.

23.     Lycos is uncertain as to whether T-Data intends to provide Termination Assistance Services, as Lycos has requested, after T-Data terminates the Transaction Documents on December 30, 2004.

24.     Lycos at all times has been and remains ready, willing and able to pay all undisputed invoice amounts when they become due and payable, to negotiate in good faith with T-Data concerning all disputed amounts and, assuming T-Data terminates the Transaction Documents, to negotiate the delivery of the Termination Assistance Services.

25.     If T-Data were to terminate the Transaction Documents and immediately suspend Services without providing the Termination Assistance Services Lycos requires and for which section 7.4 of the Master Services Agreement provides, the majority of Lycos' Internet business would "go dark." Without an operating web server housing location, there would be no access to the majority of Lycos' web pages and Lycos would be unable to operate as an ongoing business.

26.     Upon termination of the Transaction Documents, Lycos will require several months to coordinate and put in place an alternate location for housing its web servers, which is presumably the reason the parties negotiated the Termination Assistance Services provision –

to provide a "bridge" between T-Data and a successor company, thus ensuring that Lycos' web content remains online and accessible at all times.

27.   Lycos has advised T-Data and, upon information and belief, T-Data knows, that termination of the Transaction Documents without providing Termination Assistance Services would cause Lycos significant and irreparable harm.

## COUNT I
## (Declaratory Relief)

28.   Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 27 above.

29.   A controversy or dispute exists between the parties concerning T-Data's right, after termination, to suspend the Services it provides to Lycos without providing Termination Assistance Services.

30.   Under G.L. c. 231A, § 2, declaratory relief is an appropriate means to secure determinations of rights under a contract, such as the Transaction Documents.

31.   Lycos seeks a declaration under G.L. c. 231A, § 1 that even if T-Data may terminate the Transaction Documents, it may not suspend Services upon termination and must provide the Termination Assistance Services under section 7.4 of the Master Services Agreement for which Lycos is willing to pay as provided therein.

WHEREFORE, Lycos requests the relief set forth below.

## Count II
## (Injunctive Relief)

32.   Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 31 above.

33.    Lycos has a reasonable likelihood of success on its claim for declaratory relief because Lycos has fulfilled its obligations under the Transaction Documents by both paying the amount outstanding under the September, 2004 invoice, and by standing ready, willing and able to make payment of all undisputed amounts under the October, November and December 2004 invoices when they become due and payable on January 13, 2005.

34.    Even if Lycos has not fulfilled its obligations such that T-Data may terminate the Transaction Documents, because Lycos has offered to pay monthly in advance for Termination Assistance Services, T-Data is obliged to provide such services and may not simply suspend Services.  See Exhibit A, § 7.4.

35.    Lycos will suffer irreparable harm if Services are suspended.  Specifically, if T-Data terminates the Transaction Documents without providing Lycos with appropriate Termination Assistance Services, a majority of Lycos' internet content will "go dark" and Lycos' customers will be unable to access a majority of its web site, effectively putting Lycos out of business, whereas T-Data would suffer no harm in providing Lycos with Termination Assistance Services required under the Master Services Agreement that Lycos has agreed to pay for in advance on a monthly basis.

36.    The harm to Lycos of suspension of Services far outweighs any harm to T-Data of having to provide and be paid for Termination Assistance Services.

37.    The public interest encourages enforcement of contracts such as the Transaction Documents, and will not be adversely affected by an injunction barring T-Data from suspending the Services described in the Transaction Documents, and from refusing to negotiate terms under which T-Data will provide Termination Assistance Services requested by Lycos.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT III
### (Attorneys' Fees)

38.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 37 above.

39.    Under section 11.12 of the Master Services Agreement, in any litigation between Lycos and T-Data, the non-prevailing party is required to pay the reasonable attorneys' fees and expenses of the prevailing party.  See Exhibit A, Master Services Agreement, § 11.12.

40.    Provided the Court enters the relief requested by Lycos in Counts I or II hereof, Lycos is a prevailing party, entitled to payment of its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.    On Count I, enter judgment declaring that even if T-Data may terminate the Transaction Documents, it may not suspend Services upon termination and must provide the Termination Assistance Services under section 7.4 of the Master Services Agreement for which Lycos is willing to pay as provided therein.

B.    On Count II,

1.    schedule a hearing on or before December 29, 2004 on Lycos' request for a preliminary injunction;

- 10 -

2.      after notice and hearing, enter an order preliminarily enjoining T-Data from suspending, terminating, or otherwise ceasing to provide Services (as that term is defined in the Transaction Documents) pending further order of the Court and from refusing, if T-Data terminates the Transaction Documents, to negotiate, as provided under Paragraph 7.4 of the Master Services Agreement, delivery of Termination Assistance Services requested by Lycos; and

3.      after notice and hearing, enter judgment permanently enjoining T-Data from suspending, terminating, or otherwise ceasing to provide Services (as that term is defined in the Transaction Documents) pending further order of the Court and from refusing, if T-Data terminates the Transaction Documents, to negotiate, as provided under Paragraph 7.4 of the Master Services Agreement, delivery of Termination Assistance Services requested by Lycos;

C.      On Count III, award Lycos its reasonable attorneys' fees and expenses incurred in prosecuting this action; and

D.      Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  December 23, 2004

## **VERIFICATION**

I, Dean Batten, hereby verify under oath that I have read the foregoing Verified Complaint. The facts contained therein are true and correct to the best of my knowledge, information, and belief based upon my personal knowledge and information collected and made available to me by agents, representative and employees of Lycos, Inc. and its predecessor-in-interest.

Subscribed and sworn to me under the penalties of perjury this 22nd day of December, 2004.

_____
Dean Batten

1389480.2

- 13 -





## MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is entered into by and between Lycos, Inc. ("Customer"), a Massachusetts corporation, and Telefonica Data USA, Inc., a Florida corporation

**1.    Telefonica Data Services; Terms & Conditions.** Customer requests the Telefonica Data services ("Services"), which are checked in the table below. Telefonica Data will render the Services pursuant to the terms and conditions contained in this Agreement and each applicable Exhibit. Telefonica Data may provide Customer with additional Services by executing additional Exhibits, which will be attached hereto and incorporated into this Agreement. All Services provided under this Agreement or any amendment thereto or to an Exhibit are subject to the attached Master Services Agreement Terms & Conditions, which are hereby incorporated by reference and made a part hereof.

| Exhibit A | ☐ Equipment Purchase | Exhibit G | ☐ Web Hosting |
|-----------|----------------------|-----------|----------------|
| Exhibit B | ☐ Equipment Lease | Exhibit H | ☐ Dial Access |
| Exhibit C | ☒ Collocation | Exhibit I | ☐ Frame Relay |
| Exhibit D | ☒ Data Storage | Exhibit J | ☐ IP Transit |
| Exhibit E | ☐ Operations & Maintenance | Exhibit K | ☒ Back-Up |
| Exhibit F | ☐ Virtual LAN | | |

**2.    Pricing.** All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 ("SAFA") and set forth in each Exhibit and Customer shall pay Telefonica Data all recurring and non-recurring fees and other charges for Services rendered in the amounts and in the manner specified therein and in the Master Services Agreement General Terms & Conditions. The Parties agree that the monthly recurring charges set forth in the Exhibits are subject to an annual price reduction of ten percent (10%) and Telefonica Data shall revise such charges accordingly on the anniversary date of each Service.

**3.    Benchmarking.** On or about each anniversary of the Effective Date (as defined below) during the Term of this Agreement, the Parties shall meet to review the pricing, quality and charges of the Services. If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA. If the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles, the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.

**4.    Term.** This Agreement shall commence on November 1, 2003 ("Effective Date") and shall continue until the third anniversary of the Effective Date, unless terminated earlier in accordance with the Transaction Documents.

**5.    Preferred Provider.** The Parties agree that Telefonica Data will be the preferred provider of data center and communications services to Customer during the term of the Agreement. In the event Customer requires the provision of services similar to the Services and Telefonica Data is willing to provide such services at prices and on terms and conditions similar to the Services, Customer agrees that it will engage Telefonica Data to provide such services.

**6.    Entire Agreement; Amendments.** The Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter in this Agreement, and supersede all prior agreements, whether written or oral, with respect to the subject matter contained therein. The Transaction Documents may be modified only by a written instrument executed by both parties.

**[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]**

## MASTER SERVICES AGREEMENT TERMS & CONDITIONS

### 1. DEFINITIONS.

**1.1. Certain Definitions.** The following terms shall have the following definitions:

(a) "Affiliate" shall mean, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity, whether directly or indirectly through one or more intermediaries.

(b) "Agreement" shall mean the Master Services Agreement, together with these Master Services Agreement General Terms and Conditions.

(c) "Business Day" or "business day" shall mean any day on which banks are open for the transaction of banking business in the State of New York, United States of America.

(d) "Confidential Information" shall mean all information, in any form, disclosed by the disclosing Party to the other Party which:

(i)    concerns the operations, plans, know-how, trade secrets, business affairs, personnel, customers or suppliers of the disclosing Party; or

(ii)    the receiving Party knows or might reasonably expect is regarded by the disclosing Party as the confidential information of the disclosing Party;

(iii)    is designated as confidential, restricted, proprietary, or with similar designation; or

(iv)    concerns any of the terms or conditions or other facts with respect to the Transaction Documents.

(e) "Control" and its derivatives shall mean legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding voting capital stock (or other ownership interest, if not a corporation) of an entity, or actual managerial or operational control over such entity.

(f) "Days" or "days" shall mean calendar days unless otherwise specified.

(g) "Effective Date" shall have the meaning set forth in Section 3 of the first page of the Master Service Agreement.

(h) "End User" shall mean the person or entity to which Customer resells or provides equipment, services or space pursuant to the terms of the Transaction Documents.

(i) "Equipment" shall mean the equipment, if any, provided by Telefonica to Customer pursuant to an Exhibit.

(j) "Events of Default" shall mean any of the following:

(i)    any representation or warranty made by a Party in the Transaction Documents which was incorrect in any respect when made and that could reasonably be expected to have a material adverse effect upon the other Party's ability to realize the benefits of the Transaction Documents;

(ii)    a material breach of the Transaction Documents that is capable of being cured on commercially reasonable terms within thirty (30) Days, which breach is not cured within thirty (30) Days after notice of breach to the breaching Party;

(iii)    a material breach of the Transaction Documents that is not capable of being cured within thirty (30) Days and the breaching Party fails to (A) proceed promptly and diligently after written notice to correct the breach, (B) develop within fifteen (15) Days following written notice of breach a complete plan for curing the breach, and (C) cure the breach within sixty (60) Days after notice thereof;

(iv)    Customer's failure to make any payment or any other amount when such payment or amount is due in accordance with any Transaction Document, which breach is not cured within five (5) business days after notice thereof, or

(v)    a material breach of the Transaction Documents that is not capable of being cured.

(k) "Intellectual Property Rights" shall mean all intellectual property rights, including by way of explanation, but not by limitation, those statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights.

(l) "Losses" shall mean liabilities, damages and related costs and expenses, including fines, levies, assessments, reasonable legal fees, and disbursements and costs of investigations, litigation, settlement, judgment, interest and penalties.

(m) "Parties" shall mean Customer and Telefonica Data, together.

(n) "Party" shall mean Customer or Telefonica Data, individually, as appropriate.

(o) "Service" shall mean any of the services Telefonica Data provides Customer pursuant to an Exhibit.

(p) "Telefonica Data Network" shall mean Telefonica Data's and/or its Affiliates IP backbone network.

(q) "Term" shall have the meaning set forth in Article 3 of the Master Service Agreement.

(r) "Transaction Documents" shall mean the Agreement, and all Exhibits and Schedules thereto.

**1.2. Other Definitions.** Other terms used in this Agreement are defined in the context in which they are used and have the meanings there stated or are defined in the applicable Transaction Document.

### 2. END USER CHARGES.

If, pursuant to the terms and conditions of the Transaction Documents, Customer resells the Service(s) ordered by Customer from Telefonica Data, Customer shall have the right to establish, in its sole discretion, the prices it charges End Users for the Service(s) resold pursuant to the Transaction Documents.

### 3. NETWORK INTEGRITY.

**3.1. Non-Interference.** Neither Customer nor its End Users, suppliers, contractors, licensors or licensees shall restrict or interfere with the Telefonica Data Network or the maintenance or use thereof. Upon notice, Customer shall promptly remove any hazard, interference or service obstruction that may be caused by equipment (including Equipment), hardware, software, content or connectivity, owned by or under the control of Customer or its End Users or transmitted through the Telefonica Data Network

**3.2. Remedy.** In the event that Customer or its End Users, suppliers, licensors or licensees restrict or interfere with the Telefonica Data Network or the use thereof, Telefonica Data may, after giving Customer reasonable notice, immediately modify, suspend, delay, condition, or cease until such restriction or interference is cured, performance of its obligations under the Transaction Documents, in whole or in part, to the extent reasonably necessary to remedy such restriction or interference.

**3.3. Liens.** Customer shall not, directly or indirectly, cause any Telefonica Data property (including the Telefonica Data Network) to become subject to any mechanic's lien, materialman's lien, vendor's lien or any similar lien, whether by operation of law or otherwise. If Customer becomes aware that it has breached its obligations under this Section, it shall promptly notify Telefonica Data in writing, cause such lien to be discharged and released of record without cost to the other, as soon as reasonably possible, and indemnify Telefonica Data against all related Losses.

### 4. PAYMENT TERMS.

**4.1. Payment.** Telefonica Data shall provide the Equipment and perform the Services set forth in the Exhibits in accordance with the provisions of the Transaction Documents and Customer shall pay all recurring, non-recurring and other charges for Equipment and/or Services as may be set forth in the Transaction Documents. Unless otherwise provided for in the attached Exhibits, the fees due pursuant to the Transaction Documents shall be payable in accordance with the payment terms in this Article 4. Telefonica Data shall render invoices for Services rendered to Customer on a monthly basis. Payment shall be due and payable no later than thirty (30) days after the date of the invoice. Customer shall make payments under the Transaction Documents by wire transfer of immediately available funds to the United States account or accounts designated by Telefonica Data. At

Telefonica Data's discretion, payments to be made pursuant to the Transaction Documents may be made by check or draft of immediately available funds delivered to the address designated in writing by Telefonica Data. Any amounts not paid when due shall be assessed interest at a monthly rate equal to one percent (1.0%) or the maximum rate allowed by law, whichever is less, from the date the payment was due. If Telefonica Data commences legal proceedings to collect any payment due to it under any of the Transaction Documents, Customer shall be responsible for and pay all reasonable attorneys' fees, court costs and other collection expenses incurred by Telefonica Data.

**4.2. Customer Responsibilities.** Except as specifically provided for in a Transaction Document, Customer shall have sole responsibility for the costs, expenses and deployment of any interconnection, installation and testing necessary to use the Equipment and Services provided herein. In no event will the untimely installation or faulty non-operation of Customer's equipment relieve Customer of its obligation to pay charges for the Services. In addition, delays or failures in obtaining payments from End Users shall not affect Customer's obligation to make payments hereunder to Telefonica Data. Customer is responsible for amounts it cannot collect from End Users.

**4.3. Taxes.** All charges to Customer are calculated exclusive of any applicable federal, state or local use, excise, value-added, gross receipts, sales and privilege taxes, duties, universal service assessments or similar liabilities (other than general income or property taxes imposed on Telefonica Data) associated with the Services or Equipment, whether charged to Telefonica Data, its suppliers or Affiliates, Customer or End User ("Additional Charges"). Such Additional Charges shall be paid by Customer in addition to all other charges provided for in the Transaction Documents, except to the extent Customer provides to Telefonica Data, prior to the shipping of Equipment or commencement of Services, as applicable, a valid tax exemption certificate for all federal, state and local jurisdictions relevant to the Equipment and/or Service.

**5.    INTELLECTUAL PROPERTY.** Each Party retains all right, title and interest in and to its respective Intellectual Property Rights. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property Rights, except as otherwise expressly authorized in the Transaction Documents

**6.    CONFIDENTIALITY.**

**6.1. Confidential Information.** Each Party acknowledges that after execution of the Transaction Documents, they may be furnished with, receive, or otherwise have access to Confidential Information of the other Party.

**6.2. Exclusion.** Confidential Information excludes any particular information that the receiving Party can demonstrate:

    (a)    at the time of disclosure, was in the public domain or in the possession of the receiving Party;

    (b)    after disclosure, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

    (c)    was received after disclosure from a third party who had a lawful right to disclose such information to the receiving Party without any obligation to restrict its further use or disclosure;

    (d)    was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; or

    (e)    was required to be disclosed to satisfy a legal requirement of a competent government body.

**6.3. Obligations.** The following obligations with respect to Confidential Information shall survive the expiration or termination of this Agreement for a period of three (3) years or such longer period as required by regulation, law or court order.

    (a)    Ongoing Obligation. Each Party's Confidential Information shall remain the property of that Party. Except as may otherwise be required by law or expressly authorized herein, neither Party shall disclose the confidential information of the other Party to any third party without the prior written consent of such other Party. Each Party shall use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent unauthorized disclosure of Confidential Information as it employs to avoid unauthorized disclosure of its own Confidential Information of a similar nature. Except as otherwise permitted hereunder, the Parties may disclose such information to entities performing services

required hereunder where: (i) use of such entity is authorized under the Transaction Documents, (ii) such disclosure is necessary or otherwise naturally occurs in that entity's scope of responsibility, and (iii) the entity agrees in writing to assume the obligations described in this Article. Any disclosure to such entity shall be under the terms and conditions of this Article.

    (b)    Remedial Measures for Disclosure. Each Party shall take reasonable steps to ensure that its employees comply with this Article. In the event of any disclosure or loss of, or inability to account for, any Confidential Information of the disclosing Party, the receiving Party shall promptly, and at its own expense notify the disclosing Party in writing, and take such actions as may be necessary and cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

    (c)    Permitted Disclosures. Except as otherwise provided herein, either Party may disclose the terms and conditions of these Transaction Documents to third parties that (i) have expressed a bona fide interest in consummating a significant financing, merger or acquisition transaction between such third parties and such Party, (ii) have a reasonable ability (financial and otherwise) to consummate such transaction, and (iii) have executed a nondisclosure agreement that includes within its scope the terms and conditions of this Article or substantially similar terms and conditions and also includes a procedure to limit the extent of copying and distribution of these Transaction Documents. Each Party shall endeavor to delay the disclosure of the terms and conditions of this Agreement until the status of discussions concerning such transaction warrants such disclosure.

    (d)    Required Disclosures. A Party receiving a request under Section 6.2(e) to disclose Confidential Information shall immediately upon receiving such request, and to the extent that it may legally do so, advise the disclosing Party promptly and prior to making such disclosure in order that the disclosing Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information

**6.4. No Implied Rights.** Nothing contained in this Article shall be construed as obligating a Party to disclose its Confidential Information to the other, or as granting to or conferring on a Party any express or implied right or license to the Confidential Information of the other Party.

**7.    TERMINATION.**

**7.1. Default.**

    (a)    In the event that either Party commits an Event of Default under Sections 1.1(j)(i), (iv) or (v), then the other Party may, by giving written notice to the defaulting Party, immediately terminate the applicable Transaction Document.

    (b)    In the event that either Party commits an Event of Default under Sections 1.1(j)(ii) or (iii), then the other Party may, by giving written notice to the defaulting Party, terminate the applicable Transaction Document upon the expiration of the applicable cure period.

    (c)    In addition to the right to terminate pursuant to subsections (a) and (b) above, the non-defaulting party may pursue any legal remedies it may have under applicable law or principles of equity relating to such breach and subject to the terms of this Section.

**7.2. Insolvency.** Either Party may immediately terminate the Transaction Documents if the other Party (a) ceases to do business in the normal course for a continuous period of at least thirty (30) Days; (b) becomes or is declared insolvent or bankrupt; (c) is the subject of any proceeding related to its liquidation or insolvency (whether voluntarily or involuntarily) which is not dismissed within ninety (90) Days; (d) makes an assignment for the benefit of creditors; (e) experiences a material adverse change in financial condition which may reasonably be expected to affect its ability to perform; or (f) fails to comply with a written request for reasonable assurances within ten (10) Days or otherwise repudiates the Transaction Documents.

**7.3. Effect of Termination.** Termination of the Transaction Documents refers to the termination of the Parties' respective commitments and obligations from and after the date of termination, but does not relieve the Parties of their payment and other obligations incurred prior to the date of termination.

**7.4 Termination Assistance Services.** Upon the termination or expiration of the Agreement, Telefonica Data agrees to provide Termination Assistance Services consisting of continuation of any part or all of the

Services to Customer for up to eighteen (18) months following the termination or expiration of this Agreement. Termination Assistance Services shall be provided subject to, and in accordance with, the terms and conditions of this Agreement, except for the charges for such Termination Assistance Services, which such charges the Parties will mutually agree upon prior to the commencement of the Termination Assistance Services. The Parties agree that the charges for such Termination Assistance Services will be in accordance with the pricing principles of SAFA. In the event of termination resulting from an unremedied breach by Customer, Telefonica Data shall be obligated to provide Termination Assistance Services only so long as Customer pays for Services that are part of such Termination Assistance Services monthly in advance of the date the Services are to be provided.

**7.5. Shutdown/Transfer of Data Center.** In the event that during the Term of the Agreement the Telefonica Data data center located at 1 1300 N.W. 25th Street, Miami, Florida 33172 (the "Data Center") is to be shutdown or transferred to a non-Affiliate of Telefonica Data requiring Customer to move its technology infrastructure located at the Data Center to another location, Telefonica Data agrees (a) to provide Customer with notice of such event as soon as practicable and in any event at least sixty (60) days prior to the shut down or transfer, and (b) pay Customer the lesser of (i) Customer's Migration Costs, as defined below, and (ii) One Million Dollars ($1,000,000). Telefonica Data agrees to pay such amount within thirty (30) days of its receipt of an itemized invoice from Customer, together with supporting documentation, of its Migration Costs. For purposes of this Section, "Migration Costs" means the reasonable migration costs actually incurred by Customer to move its infrastructure to the new location, including, but not limited to, the costs of the physical move of Customer's infrastructure (breakdown, package, transport, delivery and reassembly), the costs of communication links between the Data Center and the new location during the migration period, the costs of professional services to supervise and oversee the migration and the costs of any necessary "swing gear" purchased or leased by Customer in connection with the migration..

**7.6 Wrongful Termination of Transaction Documents by Customer.** In the event Customer wrongfully terminates the Transaction Documents at any time prior to the expiration of the Term, then, in addition to any other damages for which Customer may be liable under the terms of the Transaction Documents, Customer agrees to pay Telefonica Data the product of Five Hundred Thousand Dollars ($500,000) times a fraction, the denominator of which is thirty-four (34) and the numerator of which is thirty-four (34) minus the number of months since the inception of the Term that Customer has paid the undisputed monthly recurring charges under the Transaction Documents, as reimbursement for the capital expenditures made by Telefonica Data to provide Customer the Services. Customer agrees to pay such amount within thirty days of the date of Customer's wrongful termination of the Transaction Documents.

**8.    REPRESENTATIONS; WARRANTIES; DISCLAIMERS.**

**8.1    Representations.** Each Party represents and warrants to the other Party that:

(a)    it has the requisite corporate power and authority to enter into the Transaction Documents and to carry out the transactions contemplated by the Transaction Documents;

(b)    the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by the requisite corporate action on its part; and

(c)    the Transaction Documents have been duly executed and delivered, and create lawful, valid and legally binding obligations, in accordance with their respective terms.

Additionally, Telefonica Data represents and warrants to Customer that as of the Effective Date Telefonica Data possesses sufficient ownership rights, title, and interests, and/or licenses, and the ability to offer and provide the Services, including without limitation, all intellectual property rights and third party consents, during the Term.

**8.2    Third Party Warranties.** Telefonica Data shall pass through to Customer all warranties covering Equipment and/or Services provided under the Transaction Documents to the extent that Telefonica Data is able pursuant to the agreements under which it obtained the warranties.

**8.3    Restrictions.** CUSTOMER SHALL NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, WHETHER WRITTEN OR ORAL, TO THIRD PARTIES, INCLUDING WITHOUT LIMITATION, END USERS ON TELEFONICA DATA'S BEHALF THAT ARE NOT EXPRESSLY AUTHORIZED HEREIN OR THAT MATERIALLY DEPART FROM ANY APPLICABLE SERVICE LEVEL COMMITMENT IN ANY TRANSACTION DOCUMENT.

**8.4    Disclaimers.**

(a)    EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN A TRANSACTION DOCUMENT, ANY EQUIPMENT OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS ARE PROVIDED "AS IS" AND "AS AVAILABLE", AND NEITHER TELEFONICA DATA NOR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS MAKE ANY WARRANTIES TO CUSTOMER OR TO ANY OTHER THIRD PARTY INCUDING, WITHOUT LIMITATION, END USER, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, B Y W A Y O F E XAMPLE A N D N OT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT RELATING TO ANYTHING PROVIDED OR USED UNDER T HE T RANSACTION DOCUMENTS O R D ESCRIBED THEREIN, AND ANY SERVICES, EQUIPMENT, MATERIAL, GOODS, REAL ESTATE OR OTHER TANGIBLE OR INTANGIBLE ASSET THAT IS CONVEYED, HYPOTHECATED, LEASED, SOLD, OR OTHERWISE PROVIDED TO CUSTOMER IN ANY MANNER, OR AS TO ANY OTHER MATTER, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED.

(b)    WITHOUT LIMITING THE FOREOING DISCLAIMER, TELEFONICA DATA FURTHER MAKES NO WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, REGARDING ANY MERCHANDISE, INFORMATION, PRODUCTS OR SERVICES PROVIDED THROUGH THE INTERNET OR ANY OTHER NETWORK. FURTHERMORE, TELEFONICA DATA HEREBY DISCLAIMS THAT ANY EQUIPMENT, PRODUCTS OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS WILL BE UNINTERRUPTED OR ERROR FREE, O R T HAT C ERTAIN R ESULTS M AY B E O BTAINED BY ANYONE IN CONNECTION WITH THEIR USE.

**8.5    Use.** Telefonica Data shall provide, and Customer shall use, all Equipment and Services in accordance with all applicable laws and regulations.

**8.6    Provisioning Services.** Telefonica Data may, with the prior consent of Customer, which shall not be unreasonably, withheld, conditioned or delayed, provide or perform such Services through Affiliates, subcontractors or authorized agents. Notwithstanding the foregoing, Telefonica Data shall remain liable for the performance of its and its Affiliates', subcontractors' and authorized agents' obligations under the Transaction Documents.

**9.    LIABILITY.**

**9.1    General Intent.** Subject to the specific provisions of this Article, it is the intent of the Parties that each shall be liable to the other only for any direct damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by the Transaction Documents.

**9.2    Liability Restrictions.**

(a)    NOTWITHSTANDING ANYTHING IN THE TRANSACTION DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, LOSS OF REVENUE, INCOME, PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE, WHETHER SUCH CLAIM IS CHOATE OR INCHOATE, WHETHER BY STATUTE, IN TORT, OR IN CONTRACT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR CONTENT THAT IS TRANSMITTED BY CUSTOMER OR THIRD PARTIES INCLUDING, WITHOUT

Page 5

(c) IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR ANY DEFECT, ERROR, INTERRUPTION, DELAY, OR ATTENUATION OF SERVICES CAUSED BY OR RESULTING FROM ANY EQUIPMENT NOT OWNED BY TELEFONICA DATA AND USED BY CUSTOMER OR AN END USER.

(d) FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED UNDER ANY TRANSACTION DOCUMENT, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER. CUSTOMER'S REMEDIES SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID UNDER ANY TRANSACTION DOCUMENT ARE LIQUIDATED, CUSTOMER ACKNOWLEDGES THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OBTAINING AN ADEQUATE REMEDY IS OTHERWISE INCONVENIENT, AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONBALE APPROXIMATION OF THE HARM OR LOSS. CUSTOMER CONFIRMS THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THE TRANSACTION DOCUMENTS SATISFY THE ESSENTIAL PURPOSES THEREOF.

(e) EACH PARTY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF (I) ACTUAL DIRECT DAMAGES OR (II) TWO MILLION DOLLARS ($2,000,000).

(f) THE LIMITATION SET FORTH IN SECTION 9.2(e) SHALL NOT APPLY WITH RESPECT TO (I) THIRD PARTY CLAIMS SUBJECT TO INDEMNIFICATION PURSUANT TO THE TRANSACTION DOCUMENTS; (II) FEES DUE AND OWING UNDER THE TRANSACTION DOCUMENTS FOR SERVICES ALREADY RENDERED OR (III) CLAIMS ARISING OUT OF A BREACH OF ANY CONFIDENTIALITY PROVISIONS.

(g) FOR PURPOSES OF THIS SECTION AND SUBJECT TO SECTION 9.2(f), ALL AMOUNTS PAYABLE OR PAID TO THIRD PARTIES IN CONNECTION WITH CLAIMS THAT ARE ELIGIBLE FOR INDEMNIFICATION PURSUANT TO THIS AGREEMENT SHALL BE DEEMED DIRECT DAMAGES.

**9.3 Force Majeure.**

(a) Neither Party shall be liable for any default or delay in the performance of its obligations under the Transaction Documents if and to the extent such default or delay is caused, directly or indirectly, by fire, explosion, cable cuts, vandalism, sabotage, power outage, flood, lightning, earthquake, elements of nature or "acts of God", war, riots, any civil or military authority (by national emergency or acts of third parties), civil disorders, rebellions, revolutions, insurrections, or acts of terrorism, naturally occurring or man-made obstructions to transmissions, provided the existence of such obstructions is beyond the responsible Party's control, lack of or delay in transportation, government obstructions to transmissions, government codes, ordinances, laws, rules, regulations or restrictions, provided that such default or delay could not have been prevented by reasonable precautions by the Party with the obligation to perform and cannot be reasonably circumvented by the Party with the obligation to perform through the use of alternate sources, workaround plans or other means (a "Force Majeure Event").

(b) In such event, the Party with the obligation to perform shall as soon as practicable give written notice to the other Party specifying the nature and anticipated duration of the Force Majeure Event and outline its recovery plan, if any. The Party with the obligation to perform shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent reasonably practicable without delay.

(c) The other Party may terminate all or any portion of the applicable Transaction Document if a Force Majeure Event continues for forty-five (45) days. In the event of such a termination, the terminating Party shall be obligated to pay for services properly performed up through the date of termination.

**10. INDEMNIFICATION.**

**10.1 Parties' Obligations.**

(a) **Mutual Obligations.** Each Party shall, at its expense, indemnify, defend and hold harmless the other Party and its Affiliates, as well as its officers, directors, employees, managers, contractors, agents, successors, and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of the following:

(i) the death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of the indemnifying Party;

(ii) the damage, loss or destruction of any real or tangible personal property resulting from the negligence or willful misconduct of the indemnifying Party or from the malfunction or failure of the indemnifying Party's equipment;

(iii) taxes, together with interest and penalties, that are the responsibility of the other Party;

(iv) claims by government regulators or agencies for fines, penalties, sanctions or other remedies arising from or in connection with a Party's failure to perform its responsibilities under this Agreement; and

(v) breach of any representation or warranty set forth in the Transaction Documents.

(b) **Customer's Obligations.** Customer shall, at its expense, indemnify, defend and hold harmless Telefonica Data and its Affiliates, as well as their officers, directors, employees, managers, contractors, agents, successors and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of Customer's use of the Services, Equipment and Products provided under the Transaction Documents including without limitation, such Losses or threatened Losses arising from, related to, incurred in connection with, or based on allegations of any of the following:

(i) any misuse of the Equipment or Services by Customer or an End User;

(ii) any use by Customer or an End User of non-Telefonica Data furnished products or services, facilities, equipment and/or software with any Equipment or Service not recommended or otherwise approved in writing by Telefonica Data; or

(iii) any transmission of content not supplied by Telefonica Data over or through the Telefonica Data Network or system.

**10.2 Intellectual Property Rights.**

(a) **Obligations.** Each Party shall, at its expense, indemnify, defend and hold harmless the other Party, and the other Party's Affiliates, officers, directors, employees, managers, contractors, agents, successors, and assigns, from and against any Losses and threatened Losses arising from, in connection with or based on any allegations arising under the Transaction Documents of infringement or misappropriation of any Intellectual Property Rights of the owning or controlling Party or any third party, except to the extent that any such allegations arise from (i) modification of such products or services, or any component thereof, by the indemnified Party that is not recommended or otherwise approved by the indemnifying Party, or (ii) use of the products or services by indemnified Party in combination with deliverables furnished by third parties that is not recommended or otherwise approved by indemnifying Party, to the extent that any such claim or allegation is directed to such combination.

(b) **Exclusive Liability and Remedy.** If any Service provided under any Transaction Document has become (or in Telefonica Data's reasonable judgment is likely to become) the subject of a third party infringement claim, Telefonica Data may, at its sole discretion and without further liability, do any of the following, which, together with the obligations set forth under Section 10.2(a) above, shall constitute Telefonica Data's sole obligation to Customer hereunder and Customer's exclusive remedy against Telefonica Data:

(i) at Telefonica Data's cost, obtain for Customer the right to continue use of the Service; or

(ii) at Telefonica Data's cost, replace or modify the Service so that it no longer is subject to the third party infringement claim.

**10.3 Procedure.** The Party to be indemnified under Section 10.1 or 10.2 ("Indemnitee") shall promptly notify the indemnifying Party under Section 10.1 or 10.2 ("Indemnitor") in writing of any claim for indemnification.

The Indemnitor shall have sole control of the defense and all related settlement negotiations with respect to the claim. The Indemnitee shall have the right, but not the obligation, to participate in the defense of any such claim or action through counsel of its own choosing at its own expense; provided, however, that if the Indemnitor fails to promptly assume the defense of a claim, the Indemnitee may assume the defense at the Indemnitor's cost and expense. The Indemnitee shall cooperate fully and execute all documents necessary for the defense of such claim. The Indemnitee shall have the right to approve settlement of any claim, such approval not to be unreasonably withheld or delayed, provided that the Indemnitee shall not be required to approve any settlement that involves an admission of liability or wrongful conduct on the part of the Indemnitee or restricts its ability to conduct its business in any material respect. In the event the Parties agree to settle a claim, neither Party shall publicize the settlement without first obtaining the written permission of the other Party, which permission will not be unreasonably withheld or delayed.

## 11    GENERAL.

**11.1  Binding Nature and Assignment.**

(a)    The Transaction Documents shall accrue to the benefit of and be binding upon the Parties and any permitted purchaser or any successor entity into which either Party has been merged or consolidated or to which either Party has sold or transferred all or substantially all of its assets.

(b)    Except as otherwise expressly provided in a Transaction Document, neither Party may, or shall have the power to, assign the Transaction Documents or delegate such Party's obligations hereunder, in whole or in part, without the prior written consent of the other, except that either Party may assign its rights and obligations under the Transaction Documents without the approval of the other Party to

(i)    an entity that acquires all or substantially all of the assets of such Party,

(ii)    to any Affiliate, in which event the assignor shall remain liable as a guarantor of the assignee/Affiliate's performance of such Party's obligations hereunder, or

(iii)    to a successor in a merger or acquisition, provided that such an assignee has the financial, technical and management capacity to perform all of the assignor's obligations hereunder.

**11.2  Notices.**  Any notices, requests, demands, and determinations under this Agreement (other than routine operational communications), shall be in writing and shall be deemed duly given (a) when delivered by hand, (b) one (1) Business Day after being transmitted via an express, overnight courier with a reliable system for tracking delivery, delivery costs paid (c) when sent by confirmed facsimile or email with a copy delivered by another means specified in this Section, or (d) on the day an authorized employee of the receiving party accepts receipt in writing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, to the address listed on the first page of the Master Services Agreement. A Party may from time to time change its address or designee for notice purposes by giving the other prior written notice of the new address or designee and the date upon which it will become effective.

**11.3  Counterparts.**  The Transaction Documents may be executed in counterparts, all of which taken together shall constitute one single agreement between the Parties.

**11.4  Relationship of Parties.**  The Parties are independent contractors, bound to each other only as provided for herein. Neither Party has the authority to bind, act on behalf of or represent the other. Nothing in the Transaction Documents creates a relationship of partnership, employer and employee, principal and agent, master and servant, or franchisor and franchisee. Neither Party shall act or fail to act in a way that could reasonably cause others to believe that it has authority to act on behalf of the other beyond the authority expressly granted herein.

**11.5  Severability and Modification.**

(a)    In the event that any provision of the Transaction Documents conflicts with the law under which the Transaction Documents are to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision shall be deemed to be modified to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law. The remainder of the Transaction Documents shall remain in full force and effect.

(b)    If any state or federal body of competent jurisdiction determines that any provision of the Transaction Documents violates any applicable rules, policies, or regulations, both Parties shall make reasonable efforts to promptly bring the Transaction Documents into compliance and shall endeavor in those efforts to preserve for both Parties the economic benefits as reflected in the Transaction Documents to the maximum extent possible.

**11.6  Consents and Approval.**  Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under the Transaction Documents, such action shall not be unreasonably delayed, conditioned or withheld. An approval or consent given by a Party under the Transaction Documents shall not relieve the other Party from responsibility for complying with the requirements of the Transaction Documents, nor shall it be construed as a waiver of any rights under the Transaction Documents, except as and to the extent otherwise expressly provided in such approval or consent.

**11.7  Waiver of Default.**  No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced. A delay or omission by either Party hereto to exercise any right or power under the Transaction Documents shall not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant.

**11.8  Cumulative Remedies.**  Except as otherwise expressly provided, all remedies provided for in the Transaction Documents shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

**11.9  Survival.**  Any provision of the Transaction Documents that contemplates performance or observance subsequent to any termination or expiration of the Transaction Documents (in whole or in part) shall survive any termination or expiration of the Transaction Documents (in whole or in part, as applicable) and continue in full force and effect.

**11.10  Public Disclosures.**  Any public use of a Party's name, trademark, service mark or trade dress, as well as all media releases, public announcements, and public disclosures relating to this Agreement or the subject matter of this Agreement, including promotional or marketing material, but not including announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, shall be coordinated with and shall be subject to the prior written approval by each Party prior to release.

**11.11  Third Party Beneficiaries.**  Except as otherwise provided in the Transaction Documents, the Transaction Documents shall not be deemed to create any rights in third parties, including End Users, suppliers and customers of a Party, or to create any obligations of a Party to any such third parties, or to give any right to either Party to enforce this Agreement on behalf of a third party.

**11.12  Governing Law and Prevailing Party.**  The Transaction Documents and performance under them shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law principles or the Convention on Contracts for the International Sale of Goods. In the event of any dispute between the Parties concerning the Transaction Documents, the parties agree that the prevailing Party in any such dispute shall be reimbursed for, and the non-prevailing Party shall pay, the reasonable attorneys' fees and expenses of the prevailing Party.

**11.13  Amendment.**  The Transaction Documents shall not be modified, amended or in any way altered except by an instrument in writing signed by both Parties.

**11.14  Incorporation by Reference and Order of Precedence.**

(a)    All Exhibits and Schedules are incorporated by reference into this Agreement. Any amendments to this Agreement (including with respect to exhibits and schedules) that are agreed upon by the Parties subsequent to the Effective Date, shall likewise be incorporated by reference into this Agreement.

(b)    Any conflict among or between the documents making up the Transaction Documents will be resolved in accordance with the following order of precedence (in descending order of precedence):

(i)    the Schedules,

   (ii)  the Exhibits, and

   (iii)  this Agreement.

**11.15 Export Control.** The export and/or import of certain products, including items to be resold under any attached exhibits and/or Confidential Information may be subject to domestic and/or foreign government export and/or import laws, rules, policies, procedures, restrictions and regulations. The Parties represent and warrant that they will comply with all applicable governmental laws, statutes, ordinances, administrative orders, procedures, policies, rules, regulations and restrictions including, without limitation, those related to the export and/or import of encryption items and technical materials. Each Party shall provide the other Party with prompt written notice of any export or import restrictions relating to the products and/or Confidential Information.

*Telefonica*

ORIGINAL
COPY

## EXHIBIT C

## TO

## MASTER SERVICES AGREEMENT

## COLLOCATION

This COLLOCATION EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 18, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

   1.1.    **"Bandwidth"** shall mean the bandwidth provided to Customer to connect Customer Equipment to the public Internet. The baseline bandwidth shall be burstable as specified in Schedule C-1. Telefonica Data shall provide Bandwidth in accordance with the service level objectives set forth in Schedule C-2.

   1.2.    **"Customer Equipment"** shall mean telecommunications equipment and cabling provided by Customer that is housed in a Space.

   1.3.    **"Premises"** shall mean a specific commercial building in the United States in which Telefonica Data, owns, controls or has leasehold interests in certain office and storage space suitable for the placement and operation of telecommunications equipment.

   1.4.    **"Space"** shall mean an individual location within a Premises authorized by Telefonica Data for the housing of Customer Equipment.

2.    **RIGHT TO OCCUPY, COLLOCATION ADDENDUMS; PERMISSIBLE USE AND RELOCATION.**

   2.1.    **Obligation.** Telefonica Data shall provide Customer with Bandwidth, non-exclusive access to a Premises and exclusive access to Space for the purpose of installing, operating and supporting Customer Equipment. Customer shall collocate Customer Equipment only in the Space and at no other location within a Premises without Telefonica Data's prior written consent.

   2.2.    **Collocation Addenda.** This Exhibit shall become a binding agreement between Customer and Telefonica Data only upon execution by the Parties of a Collocation Addendum, in the form attached hereto as Schedule C-1. Each Collocation Addendum, and any amendments thereto, shall incorporate the terms and conditions of this Exhibit as well as the Agreement, and be made part of both by reference. Each Collocation Addendum may have attached thereto the following Appendices:

   (a)  Facility Drawings, identified as Appendix 1

   (b)  General Description of Work Tasks and Special Terms and Conditions, identified as Appendix 2; and

   (c)  Managed Services (if applicable), identified as Appendix 3.

   2.3.    **Demarcation Point Connection.** Telefonica Data shall provide and connect a cable from the core switch on its network to the demarcation point, which for each Space shall be the jack on the rack or cabinet provided for such connection.

   2.4.    **Support Services.** In connection with the Space made available hereunder, Telefonica Data or its designee shall perform services which support the overall operation of the Premises (e.g., janitorial services, environmental systems maintenance, and power plant maintenance) at no additional charge to Customer. However, Customer shall be required to maintain the Space in an orderly manner and shall be responsible for the removal of trash, packing, cartons, and related items from the Space. Further, Customer shall maintain the Space in a safe condition including, but not limited to, the preclusion of storing hazardous materials in the Space. Telefonica Data will have no operations or maintenance responsibilities with respect to Customer Equipment.

2.5.    **Limited License.** Customer acknowledges and agrees that it has been granted only a limited, non-exclusive license to occupy the Space for the period of time and under the terms and conditions set forth in the Agreement and herein, and that it has not been granted any real property interests of any kind in the Space or Premises.

2.6.    **Reservation of Rights.** Customer Equipment shall remain Customer's exclusive personal property throughout the Term.

2.7.    **Customer Obligations.**

(a)    Customer shall keep the Space, Premises and any equipment therein free from any liens arising from any work performed, materials furnished or obligations incurred by or at the request of Customer. All persons either contracting with Customer or furnishing or rendering labor and materials to Customer shall be notified in writing by Customer that they must look only to Customer for payment for any labor or materials. If any lien is filed against the Space, Premises, or any equipment therein as a result of the acts or omissions of Customer, its employees, agents or contractors or subcontractors, Customer shall discharge it or bond it off within thirty (30) Days after Customer learns that the lien has been filed.

(b)    Customer shall ensure (i) that Telefonica Data has access to the Customer Equipment so that Telefonica Data may perform its duties under this Exhibit; and (ii) that all existing Customer Equipment conforms to the manufacturer's specifications, which documentation shall be made available to Telefonica Data prior to Telefonica Data performing any maintenance services. If damage or destruction to any Telefonica Data equipment (e.g., test equipment/monitors) results from a breach of the foregoing, Customer shall promptly, at its option, either repair or replace the damaged or destroyed equipment to the extent any such damage is attributable to such breach.

3.    **TERM; TERMINATION.**

3.1.    **License Term.** This Exhibit shall commence on the date accepted by Telefonica Data and shall continue for the term set forth in the Addendum, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement (the "Term"). Customer's license to occupy each Space shall begin on the "Requested Service Date," as set forth in each fully executed individual Collocation Addendum or on the date Telefonica Data completes preparation of the Space, whichever is later, and shall continue for the lesser of the duration of the Term or Telefonica Data's underlying leasehold interest. In the event that Telefonica Data's underlying leasehold interest in the Premises expires prior to the expiration of the Term, Telefonica Data shall, at least one hundred twenty (120) Days before the expiration of such leasehold interest, make a good faith effort to renew the underlying leasehold interest to allow Customer to continue to occupy the Space for the duration of the Term.

3.2.    **Effect of Termination.** Promptly after termination or expiration of the license for each Space, Customer shall remove the Customer Equipment and other property that has been installed by Customer or Customer's suppliers or contractors (or by Telefonica Data on behalf of Customer, if Telefonica Data desires such Customer Equipment to be removed).

4.    **PRICES AND PAYMENT TERMS.**

4.1.    **Fees.** In consideration of the license and services provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule C-1 in accordance with the payment terms and conditions set forth in the Agreement.

4.2.    **Reimbursement.** Customer agrees to reimburse Telefonica Data promptly for all repair or restoration costs associated with damage or destruction caused by Customer's personnel, Customer's agents, Customer's suppliers/contractors or Customer's visitors during the Term or as a consequence of Customer's removal of the Customer Equipment or property installed in the Space.

4.3.    **Bandwidth Charges.** If the 95th Percentile Number (defined below) is equal to or less than the baseline bandwidth amount, Customer shall pay only the recurring monthly fee. If the 95th Percentile Number is more than the baseline bandwidth amount, Customer shall pay the recurring monthly fee plus an amount for the additional usage billed on a per-megabit basis as set forth on the applicable Collocation Addendum. Telefonica Data will use the 95th percentile level procedure described below each month to determine the applicable bandwidth charges for each month. Telefonica Data will:

(a)    measure actual inbound and outbound traffic levels into the applicable access port(s) during a standard measurement interval throughout the day (e.g., every 5 minutes);

(b) at the end of the month, sort all measurements for that month from highest to lowest;

(c) discard the top five percent (5%) of each month's measurements; and

(d) use the highest remaining measurement as the "95th Percentile Number" which will represent the Bandwidth usage for that month.

5.    **ADDITIONAL TERMS.**

5.1.    **Contractor Approval.** Before beginning any delivery, installation, replacement or removal work, Customer must obtain Telefonica Data's written approval with respect to Customer's choice of suppliers and contractors, which approval shall not be unreasonably withheld. Telefonica Data may request additional information before granting approval and may require substitution of suppliers and contractors, which are not Affiliates of Telefonica Data, as conditions of its approval. Approval by Telefonica Data is not an endorsement of Customer's supplier or contractor, and Customer will remain solely responsible for the selection of the supplier or contractor and all payments for construction work or any other work relating thereto.

5.2.    **Alterations.** Customer shall not make any construction changes or material alterations to the interior or exterior portions of the Space, including any cabling or power supplies for the Customer Equipment, without obtaining Telefonica Data's prior written approval for Customer to have the work performed or having Telefonica Data perform the work. Telefonica Data shall have the right to perform and manage any construction or material alterations within the Premises and Space areas at rates to be negotiated between the Parties.

5.3.    **Access.** Access to the Premises, use of the Space, installation of the Customer Equipment, and type of Customer Equipment installed, shall at all times be governed by generally accepted industry standards, applicable law and regulations, and such reasonable rules imposed by Telefonica Data. Customer shall promptly reimburse Telefonica Data for all costs associated with Customer's failure to follow such rules, including, without limitation, damage caused by End Users, suppliers, contractors or visitors, during the Term or, after termination or expiration, as a consequence of removal of the Customer Equipment or other property installed in the Space. Prior to first accessing the Premises, Customer shall provide and keep updated a list of its representatives authorized to access the Space and Telefonica Data shall provide photo-ID security badges for such individuals. Unless otherwise provided in a Collocation Addendum, each visit to the Space shall require the presentation of photo-ID security badges. Customer shall have access to the Space twenty-four hours a day, seven days a week.

5.4.    **Non-Interference.** Notwithstanding any other provisions of this Exhibit, Customer Equipment placed in the Space shall (a) not interfere with or impair service provided by Telefonica Data or by any other lessee of the Premises; (b) not unreasonably disturb any other lessee of the Premises; (c) not endanger or damage the facilities of Telefonica Data or of any authorized user of the Space, or the Premises; (d) not compromise the privacy of any communications carried in, from, or through the Premises; and (e) not create an unreasonable risk of injury or death to any individual or to the public. Customer shall not improperly restrict or interfere with the Telefonica Data Network or the use thereof. Upon notice by Telefonica Data, Customer shall promptly remove any hazard, interference, or service obstruction that may be caused by hardware, software or connectivity owned by or under the control of Customer. Nothing stated herein shall be construed to interfere with Customer's ability to comply with the rules, regulations or directives of any governmental or judicial authority. In the event that Customer improperly restricts or interferes with the Telefonica Data Network, or the use thereof, Telefonica Data may, after giving Customer notice, immediately modify, suspend, delay, condition, or cease until cured its obligations, in whole or in part, under this Exhibit.

5.5.    **Eminent Domain; Relocation.** Except as provided in subsection (a) and (b) below, Telefonica Data shall not arbitrarily require Customer to relocate the Customer Equipment.

(a)    In the event the Premises becomes the subject of a taking by eminent domain by any authority having such power, Telefonica Data shall have the right to terminate the affected Collocation Addendum. Telefonica Data shall give Customer prompt advance notice, to the extent practicable of the eminent domain proceedings. Customer shall have no claim against Telefonica Data for any relocation expenses, any part of any award that may be made for such taking or the value of any unexpired term or renewed periods that result from a termination by Telefonica Data under this provision, or any loss of business from full or partial interruption or interference due to any termination. However, nothing contained in this Exhibit shall prohibit Customer from seeking any relief or remedy against the condemning authority in the event of an eminent domain proceeding or condemnation that affects the Space.

(b)    Upon sixty (60) Days prior written notice or, in the event of an emergency (which shall not include

eminent domain), such time as may be reasonable, Telefonica Data reserves the right to change the location of the Space or the Premises to a site which shall afford comparable environmental conditions for the Customer Equipment and comparable accessibility to the Customer Equipment. Telefonica Data and Customer shall work together in good faith to minimize any disruption to Customer's services as a result of such relocation. Telefonica Data shall be responsible for the cost of improving the Space to which the Customer Equipment may be relocated, and for relocation of Customer Equipment interconnected to Telefonica Data services, except that Telefonica Data shall not be responsible for relocating facilities installed in violation of this Article 5.

6.    **INSURANCE.** Customer agrees to maintain during the Term, at Customer's expense, for each Space (a) Comprehensive General Liability Insurance in an amount not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury or property damage, (b) Employers Liability in an amount not less than Five Hundred Thousand Dollars ($500,000.00) per occurrence, and (c) Workers' Compensation in an amount not less than that prescribed by statutory limits. Prior to taking occupancy of the Space, Customer shall furnish Telefonica Data with certificates of insurance which evidence the minimum levels of insurance set forth herein, name Telefonica Data as an additional insured, and provide that the policy may not be canceled unless thirty days notice is provided to Telefonica Data. Telefonica Data will not obtain any insurance with respect to and will not assume the risk of loss for any Customer Equipment.

   **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER: LYCOS, INC. | | Accepted by Telefonica Data: TELEFONICA DATA USA, INC. | |
|---|---|---|---|
| By: | | By: | |
| Name: | | Name: | PETE R. Pizarro |
| Title: | CFO | Title: | CEO |
| Date: | 11/18/03 | Date: | 11-20-03 |
| Address: | | Address: | 1221 Brickell Avenue, Suite 600 |
| | | | Miami, Florida 33131 |
| | | | Attn: |
| Fax: | | Fax: | |
| Email: | | Email: | |

C-4

# SCHEDULE C-1
## TO
## COLLOCATION EXHIBIT
### Collocation Addendum No. 1

This Collocation Addendum is made October __, 2003 and subject to all definitions, terms and conditions of the Agreement and Exhibit.

---

**LOCATION AND SERVICE DATE**

Premises Address:    11300 N.W. 25th Street
                     Miami, FL 33172

Term:                34 months from the Requested Start Date.  Minimum commitments go into effect November 1, 2003.
Requested
Service Date:        September 1, 2003

---

**DESCRIPTION OF
SITE AND SPACE**

Site Type:           ___ Optical Amplifier  ___ Point of Presence  ___ Regenerator  ___ Termination Site
                     ___ Junction Site  ___ Other _____

Collocation Space:   4000 sq. ft. minimum
Space Required:

Power Required:      ___ amps per rack  ___ amps total  ___ DC convenience outlets #
Escort Services:     Escort Service is _____ REQUIRED ___ X ___ NOT REQUIRED

---

**BANDWIDTH**

Minimum 400 Mbps, burstable
Redundant port connections. 2

---

| **FEES** | Non-Recurring | Monthly Recurring |
|---|---|---|
| Set Up Fee | See Appendix 2 | |
| Collocation | See Appendix 2 | $27 per square foot |
| Bandwidth | See Appendix 2 | $100 per Mbps |
| Power | See Appendix 2 | $200 per 110, Volt 20 amp; and $300 per 208 Volt, 30 amp breaker position in excess of the first (2) 110-Volt, 20 amp provided in each rack/cabinet |

---

| **CUSTOMER:** | **Telefonica Data:** TELEFONICA DATA USA, INC. |
|---|---|
| By: | By: |
| Name: | Name: PETE D. 240 MO |
| Title: CFO | Title: C&O. |
| Date: 11\|18\|03 | Date: 11-20-03 |
| Address: | Address: 1221 Brickell Avenue, Suite 600 |
| | Miami, Florida 33131 |
| | Attn: |
| Fax: | Fax: |
| Email: | Email: |

C-5

## APPENDIX 1

## TO

## COLLOCATION ADDENDUM NO. 1

### Facility Drawings

# APPENDIX 2

## TO

## COLLOCATION ADDENDUM NO. 1

### General Description of Work Tasks and Special Terms and Conditions

**Pricing:** The charge for the Collocation is $27/sq ft/month for the Space. If Customer decreases its square footage below 4000 sq. ft., Telefonica Data will bill, and Customer shall pay for, 4000 sq. ft. In the event Customer desires to increase or reduce the square footage provided to it by Telefonica Data, Customer shall provide Telefonica Data at least 90 days written notice. The MRC for the Space includes 2 x 20 A breaker positions per rack/cabinet. Bandwidth monthly recurring charges are $100/Mbps/month with a 400Mbps minimum commitment. The minimums for bandwidth and space applies to the aggregate usage of Terra Lycos US and the Terra Lycos US MOC. This agreement supersedes and replaces previous agreements between Telefonica Data and the Terra Lycos MOC for bandwidth and space.

**Power:** Customer's average power consumption per sq. ft of floor space may not exceed 145 Watts per square foot for Server Room 3. Customer's actual monthly usage will be measured using Telefonica Data's building automation system, Johnson Controls' reporting and the Siemens WinPM power monitoring on the RPPs in Server Room 3 to determine the total power usage for the month. Such figure will be divided by the square footage Customer occupied in Server Room 3 during the month being measured. The credits and termination rights set forth herein shall not be applicable during the period that Customer's power consumption exceeds 145 Watts per square foot for Server Room 3.

**Installation of Racks and Cabinets:** Telefónica Data will provide and install the racks and Customer's cabinets at no additional charge to Customer. Customer must provide the cabinets to Telefonica Data and the wiring inside all cabinets and racks.

**Migration:** Subject to Customer's review of the proposed project plan and required Space layout, Telefónica Data will be the prime contractor for the migration of Customer's platform to the Premises Address. The Parties shall jointly produce a migration plan. Telefonica Data may subcontract some migration services from Cable and Wireless Internet Services, Inc. and its affiliates (collectively "C&W").

**Location of Servers:** Telefónica Data reserves the right to locate Customer's servers in Telefonica Data's data center where it reasonably deems appropriate, with the understanding and acknowledgement that Customer requests contiguous space.

**Benchmarking:** Telefonica Data will reduce the monthly recurring charges for bandwidth and collocation on each anniversary of the Service Start Date subject to further revisions in accordance with the Benchmarking provision contained in the Agreement.

**Invoices:** Telefonica Data shall begin invoicing the Customer as soon as the Space is ready for operation and the bandwidth connected. Notwithstanding anything to the contrary contained herein, minimum commitment billing will begin November 1, 2003.

# SCHEDULE C-2
# TO

## COLLOCATION EXHIBIT

### Service Level Agreement

**Notification**

#### _Event Notification to Customer_

- Telefonica Data shall provide initial notice to a designated Customer's representative by telephone, e-mail, pager or comparable notification service within 15 minutes of Telefonica Data becoming aware of a Severity One or Severity Two event (as defined below). If Customer first becomes aware of a Severity One or Severity Two event, Customer agrees to promptly notify Telefonica Data via the Customer Support Number [1-866-466-2872]. Status reports regarding the event will continue on the ½ hour until either the event has been resolved or the Parties have determined a course of action that does not require continued notification. Upon the resolution of a Severity One event, Telefonica Data will send Customer a written incident report within 48 hours. Telefonica Data will provide Customer monthly incident reports on all Severity Two events.

- Severity One event: The customer's suite has lost power or HVAC or all or a portion of Customer's network is not accessible.

    - Severity Two event: Customer's suite or network has experienced equipment failure resulting in degraded performance.

#### _Escalation (Internal)_

The following procedures define the escalation procedures that Telefonica Data will implement during an Unscheduled Outage (as defined below):

- Telefonica Data EMSC Level 1 Support shall use reasonable efforts to identify the cause of the event or outage and escalate to the Telefonica Data Maintenance Engineer during the first quarter hour of an outage.

- Telefonica Data will notify Customer as follows:

    - Telefonica Data will notify Customer's First Escalation Contact at the beginning of the second quarter hour;

    - If Telefonica Data is unable to contact Customer's First Escalation Contact, Telefonica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

    - If Telefonica Data is unable to contact Customer's Second Escalation Contact, Telefonica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

_"Unscheduled Outage"_ means an interruption in the Services arising from failures to achieve the service level objectives provided under this Schedule. An Unscheduled Outage excludes outages (and service level failures) due to (i) Scheduled Outages (as defined below); (ii) network or Service upgrades requiring a predefined outage; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer, (iv) Customer's equipment, hardware, facilities or software or (v) Force Majeure events.

## Change Management

- Unless otherwise provided in the Agreement, Exhibits, and Schedules, Telefonica Data will provide Customer at least five (5) business days prior written notice of any changes to be made by Telefonica Data that affect the Services provided under this Exhibit. However, if a shorter notification period is required as reasonably determined by Telefonica Data, changes may be made upon shorter notification to Customer. Telefonica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefonica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon the Customer's and Telefonica Data's requirements. If an outage is required, such outage will be considered a "Scheduled Outage." At the time Telefonica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Scheduled outage time may not exceed 8 hours total per month after which it will be considered to be unscheduled outage time. Telefonica Data agrees to work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefonica Data reserves the right, however, to proceed with any change if it is reasonably determined, by Telefonica Data, that the change will not cause harm to the Customer's specific environment and/or is otherwise necessary. Customer agrees to provide prior notification to Telefonica Data of any changes to Customer's configurations that interface with the Services provided under this Exhibit.

- Telefonica Data's Engagement Manager is responsible for the project management of all changes to Services provided to the Customer under this Exhibit.

## Power Service Level Objective

- Telefonica Data will provide 100% power availability to Customer on a 24*7*365 basis.

- If Telefonica Data fails to meet this Power objective, Customer may request a credit equal to the following:

| Power | SERVICE CREDIT |
|---|---|
| 1st loss of power within month | 50% of the monthly recurring charge (MRC) for the affected Service |
| 2nd loss of power within month (chronic failure) | an additional 75% of the MRC charge for the affected Service |
| 3rd loss of power within month (catastrophic failure) | an additional 100% of the MRC charge for the affected Service |

- If an Outage lasts more than eight (8) consecutive hours in any 30 day rolling period or the Customer suffers 3 or more complete power failures to the Customer suite(s) in any 30 day rolling period then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the power infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

## HVAC Service Level Objective

- Telefonica Data will provide a cooled environment for Customer's system. The ambient temperature of the room must not exceed 85 degrees Fahrenheit for more than an hour on a 7*24*365 basis.

- If Telefonica Data fails to meet this HVAC objective, Customer may request a credit equal to the following:

C-9

| HVAC | SERVICE CREDIT |
|---|---|
| 1st failure of temperature service level objective within month above 85° for 1 hour | 25 % of the MRC for the affected Service |
| 2nd failure of temperature service level objective within month above 85° for 1 hour | an additional 25% of the MRC for the affected Service |
| 3rd loss of temperature service level objective within month above 85° for 1 hour | an additional 50% of the MRC for the affected Service |
| 4th loss of temperature service level objective within month above 85° for 1 hour and substantial outage to Customer equipment occurs. | Option to terminate contract |

- If an Outage lasts more than eight (8) consecutive hours in any one 30 day rolling period or the Customer suffers 4 or more HVAC failures of above 85° for more than 1 hour per failure and in either case a substantial outage occurs to the Customer equipment, then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provides Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the HVAC infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

## Fire Suppression Service Level Objective

- Telefonica Data will provide the Customer with an industry standard fire suppression system that will protect the Customers equipment.
- If there is damage to the production equipment, as a result of the failure of Telefonica Data's fire detection or fire suppression systems, Telefonica Data will replace at its expense all damaged equipment with equipment of similar performance functionality. Notwithstanding the foregoing, if a fire is caused by Customer, Customer's End-User or Customer or its End-User's equipment and Telefonica Data's fire suppression system effectively suppresses the fire, Telefonica Data shall not be obligated to replace the damaged equipment.

- If Telefonica Data suffers any damage to the Premises Address or equipment located therein as a result of a fire caused by Customer or its End-Users or by Customer's or its End-User's equipment, Customer agrees to pay Telefonica Data for all costs reasonably incurred by Telefonica Data related to the repair, replacement and restoration of the Premises Address and its equipment located therein.

## Capacity Management Service Level Objective

- Telefonica Data agrees to provide written notice to Customer whenever a network circuit reaches 50% of such circuit's capacity over a period of fourteen days.

## Redundant Network Feed's Service Level Objective

- Telefonica Data will provide the Customer with redundant network feeds via different ISP's to alleviate the potential of a single point of failure within the Customer's access to the internet via Telefonica Data's infrastructure.

## Network Availability—Public Access Services Service Level Objective

- Telefonica Data will provide Public Access Services in accordance with the following network availability service level objective: Customer's ability to access the Telefonica Data network in the United States (i.e., "up-time"), will be no less than 99.95% during any calendar month. Network unavailability shall be determined by calculating network outages. For purposes of calculating network availability, a "Network Outage" shall mean a complete failure of Public Access Services. A Network Outage will be measured from the minute Customer notifies Telefonica Data of the Network Outage, or Telefonica Data otherwise becomes aware of the Network Outage, until the minute Telefonica

Data notifies Customer that the Network Outage has been resolved. Telefonica Data will provide Customer with monthly reports indicating up-time for all applicable Services.

- If a specific factor causes an Outage and the outage(s) caused by such factor lasts more than eight (8) consecutive hours in any 30 day rolling period (for purposes of this Network Availability -- Public Access Services Service Level Objective, an Outage is defined as a packet loss of greater than 40%), then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises. For purposes of clarification the following are examples that illustrate the intent of the Parties with respect to this provision:

    1. On the fifteenth (15th) day of a calendar month, Customer experiences a Network Outage that lasts for more than eight (8) hours. It is determined that a single factor caused the Network Outage. Under this scenario Customer would have the right to terminate the affected Service.

    2. On the twentieth (20th) day of a calendar month, Customer experiences a Network Outage that lasts for three (3) hours. On the twenty-fifth (25th) day of a calendar month, Customer experiences a Network Outage that lasts for six (6) hours. It is determined that precisely the same factor caused the Network Outages. Under this scenario Customer would have the right to terminate the affected Service.

    3. Same scenario as example 2 above except that it is determined that two different factors caused the Network Outages. Under this scenario Customer would not have the right to terminate the affected Service.

- Network Outages do not include failures due to: (i) regular maintenance during a scheduled window; (ii) network or service upgrades; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer; (v) Customer's equipment, hardware, facilities, or software; or (vi) Force Majeure events.

### Latency Service Level Objectives.

- Telefonica Data shall provide the Services in accordance with the following latency service level objectives 65 milliseconds or less round trip time between any two points in North America, (ii) 120 milliseconds or less round trip time between the United States and Europe, (iii) 120 milliseconds or less round trip time between the United States and South America, (iv) 500 milliseconds or less round trip time between the United States and any other point. Telefonica will continually measure latency between points on its network and will report the average latency in 15 minute periods. In the event that during a 30 day rolling period Telefonica Data fails to provide the Services in accordance with these Latency service level objectives (each such event a "Latency Miss"), Customer may request a credit in accordance with the following table:

| Latency Misses | SERVICE CREDIT |
|---|---|
| More than 3 but less than 10 Latency Misses in a month | 25 % of the MRC for the affected Service |
| 10 or more Latency Misses in a month | an additional 25% of the MRC for the affected Service |
| 2 independent Latency Misses individually greater than 20 times the latency service level objective | an additional 50% of the MRC for the affected Service |

- In addition to the credits above, in the event Customer experiences two independent Latency Misses where the transmission time is greater than 20 times the Latency service level objectives thresholds for which a Latency Miss occurs, Customer, in addition to its right to receive a credit, may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer must provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

### Packet Service Level Objective

- The packet loss service level objective for the Service is less than or equal to one percent (1%). Telefonica will measure the packet loss from anywhere on it's backbone into the Customer equipment and take the average loss in a

fifteen minute period. If for a 30 day rolling period, Telefonica Data fails to meet Packet Loss service level objective, Customer may request a credit as set forth below:

| Excess Packet Loss | SERVICE CREDIT |
|---|---|
| If the failure is >1% but < or = to 5% as measured above more than 3 times in a 30 day rolling period | 25 % of the MRC for the affected Service |
| If the failure is > 5% -but < or = to 30% as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service |
| If the failure is > 30% -but < or = to 40% as measured above more than twice in a 30 day rolling period. | 37.5% of the MRC for the affected Service for the first occurrence, then a further 37.5% for the second occurrence. |
| If the failure is > 40% + as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service for the first occurrence, then a further 50% for the second occurrence. |

- In the event the packet loss failure exceeds criteria four in the above table for two successive 30 day rolling periods, Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice to Telefonica Data; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

### Miscellaneous

- In order to receive any credits under this Schedule C-2, Customer must submit a written request to Telefonica Data no later than the last day of the month immediately following the month in which the service level objective was not met. Upon verification, Telefonica Data shall issue the credit on Customer's next monthly invoice.

- The availability, latency and packet loss service level objectives shall be measured over and between points on the Telefonica Data Network.

- An outage or failure to meet a Service Level Objective a second or multiple times must be for unrelated incidents and cannot be caused by continuation of an ongoing issue in any 72 hour period.

- **THE CREDITS AND TERMINATION RIGHTS SET FORTH HEREIN AND IN THE MSA CONSTITUTE TELEFONICA DATA'S SOLE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY FOR ANY FAILURE OF TELEFONICA DATA TO COMPLY WITH THE SERVICE LEVEL OBJECTIVES.**

- **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN THE CREDITS AND TERMINATION RIGHT SET FORTH HEREIN SHALL NOT BE APPLICABLE DURING ANY PERIOD THAT CUSTOMER HAS FAILED TO PAY UNDISPUTED CHARGES WITH RESPECT TO A TELEFONICA DATA INVOICE WHEN DUE AND SUCH UNDISPUTED CHARGES REMAIN OUTSTANDING.**

*Telefonica*

# EXHIBIT D

## TO

## MASTER SERVICES AGREEMENT

### DATA STORAGE

This DATA STORAGE EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated as of the _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

   1.1.   "Customer Data" shall mean all of the data Customer provides to Telefonica Data for Storage.

   1.2.   "Hardware, Software and Services" shall mean the hardware, software and services set forth in Schedule D-1.

   1.3.   "HBA" shall mean a host bus adapter.

   1.4.   "SAN" shall mean a storage area network.

   1.5.   "NAS" shall mean network attached storage.

   1.6.   "Storage" shall mean the storing of Customer Data on a SAN in accordance with this Exhibit.

   1.7.   "Allocated Storage" shall mean total amount of storage supported of which currently used storage is a subset.

2.    **STORAGE.**

   2.1.   **Orders.** Customer shall order Storage pursuant to the ordering provisions in Schedule D-2. Telefonica Data shall use reasonable efforts to provide Storage by the Customer-requested Service Date identified in Schedule D-3.

   2.2.   **Obligation.** Telefonica Data will provide Customer with non-exclusive Storage in accordance with Schedule D-3. Storage shall take place in Telefonica Data's Premises (as that term is defined in the applicable Collocation Exhibit).

   2.3.   **Inclusive Services.** The customer shall provide the equipment, software and services necessary to provide Storage, including, Storage tuning, Connectrix fiber switch installation and customization, SAN design and implementation, SAN software, and HBA cards installation. The foregoing notwithstanding, Customer shall be responsible for providing all HBA hardware directly to Telefonica Data or acquiring all HBA hardware from Telefonica Data. Customer shall pay Telefonica Data for all HBA hardware Telefonica Data obtains in connection with providing the Storage hereunder to Customer.

   2.4.   **Backups.** Customer is solely responsible for backup and archiving the Customer Data.

D-1

**2.5.    Scalability.**  Customer shall provide the necessary technical upgrades, such as additional cache memory, fiber channel directors or cables, switches, and similar items, to account for increased Customer demand for Storage, up to the maximum upgrade set forth in Schedule D-1; provided, however, that such upgrades incorporate the Hardware and Software.

**2.6.    Support Services.**  Telefonica Data will provide Customer support services for installation, reconfiguration and modification of the Storage capabilities.

**3.     TERM.**  This Exhibit shall commence on the Effective Date and continue in force during the Term set forth in Schedule D-2, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement.

**4.     PRICES AND PAYMENT TERMS.** In consideration of the Storage provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule D-2, pursuant to the terms and conditions set forth in the Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

CUSTOMER:                                    **TELEFONICA DATA USA, INC.**

By: _____                  By: _____

Name: _____                  Name: _____

Title: _____                 Title: _____

Date: _____                  Date: _____

Address:_____                 Address:    1221 Brickell Avenue, Suite 600
        _____                              Miami, Florida 33131
        _____                              Attn:

Fax: _____                  Fax:

Email: _____                  Email: _____

**SCHEDULE D-1**

**TO**

**DATA STORAGE EXHIBIT**

<u>Hardware, Software and Services Covered By This Agreement</u>

**Lycos Storage West Coast**

- <u>Direct Attached Storage</u>

    o   Hardware Type: Hitachi 9960 - fully redundant storage device.

    Supported Products

    | | | |
    |---|---|---|
    | o | MailCity – Data Bases | - 1 Tb |
    | o | HotStat – Data Warehouse | - 3 Tb |

- <u>Network Attached Storage ( NAS )</u>

    o   Hardware Type: NetApp 840 Filers.

    Supported Products

    | | | |
    |---|---|---|
    | o | AngelFire | - 6TB |

**Lycos Storage East Coast**

- <u>Direct Attached Storage</u>

    o   Hardware Type: Hitachi 9960 – fully redundant storage device.

    Supported Products

    | | | |
    |---|---|---|
    | o | MyLycos | - 700Gb |
    | o | Raging Bull | -170 Gb |
    | o | Data warehouse | - 420 Gb |
    | o | Portal | - 1.2 Tb |
    | o | Small Catalog Query | - 1.1 Tb |
    | o | TuCows' | - 270 Gb remove |

- <u>Network Attached Storage (NAS)</u>

    o   Hardware Type: NetApp 840 Filers.

    Supported Products

    | | | |
    |---|---|---|
    | o | Tripod | - 7Tb |
    | o | HTML Gear | - 350Gb |
    | o | MyLycos Staging | - 320Gb |
    | o | Photo Shop | - 375 Gb |

D-3

**Total Supported Storage in Terra Bytes (TB)**        - 21.905 TB

  **Maximum supported Storage in Terra Bytes supported  is 25TB of allocated storage.**

**SCHEDULE D-2**

**TO**

**DATA STORAGE EXHIBIT**

<u>**Data Storage**</u>

| | |
|---|---|
| **LOCATION AND SERVICE DATE** | |
| Premise Address 1: | Premise Address 2: |
| 11300 NW 25th Street<br>Miami<br>Florida<br>33172 | Insert SC8 address |

Requested Service Date: <u>June 1st 2003</u>

Term: <u>36 Months</u>

**DESCRIPTION OF STORAGE**

See details in section above

Maximum Capacity: <u>25 Terrabytes of allocated storage</u>

**FEES**

Non-Recurring Set-Up Fee:     <u>N/A</u>

Recurring Monthly Storage Fee: <u>$30,000 per month</u>

Minimum Commitment: <u>$30,000 per month</u>

# Service Level Objective

**I.    EVENT NOTIFICATION (TO CUSTOMER)**

Telefónica Data shall provide initial notice to a designated Customer representative by telephone, e-mail, pager or comparable notification within fifteen (15) minutes of Telefónica Data becoming aware of a Severity One or Severity Two event as defined below. Should Customer first become aware of such an event, Customer shall promptly provide initial notice to Telefónica Data via the Customer Support Number 1-866-466-2872. Status reports regarding the event will be forthcoming on the ½ hour until either the event has been resolved or both Telefónica data and Customer have determined a course of action that does not require continued notification. At the resolution of a Severity One event, the customer will be sent a written incident report within forty-eight (48) hours. Monthly incident reports will be provided on all other events.

"Severity One event" shall mean a portion of Customer's Data is not accessible.
"Severity Two event" shall mean that Customer's environment has experienced equipment failure resulting in degraded performance.

*Escalation (Internal)* - The following procedures define the escalation procedures that Telefónica Data will implement during an Unscheduled Outage as defined below:

*Telefónica Data EMSC* Level 1 Support shall use reasonable efforts to identify the cause of the outage and escalate to the Telefónica Data Maintenance Engineer during the first quarter hour of an outage.

*Telefónica Data* will notify Customer Level 2 Support as follows:

- Customer First Escalation Contact at the beginning of the second quarter hour;

-    If Telefónica Data is unable to contact Customer's First Escalation Contact, Telefónica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

-    If Telefónica Data is unable to contact Customer's Second Escalation Contact, Telefónica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

-    Customer's First, Second and Third Escalation Contacts are identified in Annex (TBA), attached hereto. Customer shall provide immediate written notice of any changes to Annex (TBA) to Telefónica Data.

"Unscheduled Outages" shall mean interruptions in services arising from failures associated with services provided by Telefónica Data or a Force Majeure Event.

## II.    CHANGE MANAGEMENT

Unless otherwise provided in the Agreement, Exhibits, or Schedules, Customer will be provided at least five (5) business days prior written notice of any changes to be made by Telefónica Data that affect the Services. However, if shorter notification period is required, changes will be made with the agreement of Customer. Telefónica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefónica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon Customer's and Telefónica Data's requirements. If an outage is required, such outage will be considered a Scheduled Outage. At the time Telefónica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Telefónica Data will work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefónica Data reserves the right, however, to proceed with any change if it is determined, by Telefónica Data, that the change will not cause harm to Customer's specific environment and/or is otherwise necessary. Customer is required to provide prior notification to Telefónica Data of any changes to its configurations

that interface with the provided Services.

Telefónica Data VP of Operations is responsible for the project management of all changes to services provided to the Customer.



# EXHIBIT G

## TO

## MASTER SERVICES AGREEMENT

### HOSTING SERVICES (Backup)

This HOSTING SERVICES EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

    **1.1 "End User Content"** shall mean all text, words, names, likenesses, trademarks, logos, artwork, graphics, video, audio, HTML coding, domain names, image maps, links, software applications, or other content that appear on, or are uploaded to, an End User Web site.

    **1.2 "Hosting Services"** shall mean those hosting services Telefonica Data provides to Customer as described herein. All hardware, software, materials, and other items associated with the delivery of Hosting Services to Customer by Telefonica Data will be operated and maintained, for the fees listed in Schedule G-1, by Telefonica Data, regardless of whether such hardware, software, materials, and other items are owned or leased by the Customer or Telefonica Data.

    **1.3 "Service Misuse"** shall mean use of the Hosting Service in a manner that (a) may or does expose Telefonica Data to legal liability, (b) that violates any applicable law or regulation or Telefonica Data's Internet Acceptable Use Policy attached hereto in Schedule G-3, (c) is illegal, unlawful or harassing, (d) infringes upon Telefonica Data's or another's Intellectual Property Rights, or (e) otherwise abuses the integrity of any applicable network.

2.    **GENERAL OBLIGATIONS.** Subject to the terms and conditions of this Exhibit and the Agreement, Telefonica Data and Customer shall have the following general obligations.

    **2.1 Telefonica Data.**

    **1.1.** Hosting Services. Telefonica Data will provide Hosting Services to Customer in accordance with this Exhibit. Customer may elect, at its sole discretion, to resell Hosting Services to End Users. Telefonica Data shall provide all necessary hardware, software, materials and other items (except End User Content) for implementing the Hosting Services.

        (a) End User Compliance. Telefonica Data reserves the right to review, using reasonable commercial means, and in its sole discretion, End User Content, including Web pages, to determine whether use thereof complies with the terms of this Exhibit.

        (b) Related Services.

            (i)    Maintenance. Telefonica Data shall provide maintenance services with respect to the Hosting Services in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

            (ii)   Support. Telefonica Data shall provide support services with respect to the Hosting Services solely in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

**2.2.    Customer**

(a) Content Development. Telefonica Data shall not be liable for any project management, development, operation, and End User content for the End User Web site(s), or any costs associated therewith. Customer or its End User shall be solely responsible for creating, coding, integrating, testing, and uploading End User Content. Customer and its End User shall be solely responsible for maintaining authorizations and secure means to access and transfer End User Content to End User's Web site(s) using a remote access option provided by Telefonica Data. Telefonica Data reserves the right to alter the access options at its discretion in order to maintain the integrity of Telefonica Data's Internet operations and the Web sites of other hosting customers. Telefonica Data will promptly inform Customer of such changes.

(b) Marketing. If Customer elects to resell the Hosting Services to End Users, then Customer will use its commercially reasonable efforts to promote the sale of Hosting Services to its End Users consistent with good business ethics and in a manner that will reflect favorably upon the Hosting Services. Customer shall identify Telefonica Data as the provider of Hosting Services by using, pursuant to Section 7.2 of this Exhibit, the Telefonica Data logo and the statement "Customer Web site hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify Customer from time to time. Customer shall refrain from engaging in any illegal, unfair, or deceptive trade practices, unethical business practices or making any representations or warrants inconsistent with the specifications provided by Telefonica Data with respect to the promotion or resale of the Hosting Services.

(c) End User Terms and Conditions. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to agree in writing to comply with and Customer shall cause each End User to so comply with an enforceable written agreement that is at least as protective as Telefonica Data and its rights and as least as limiting with respect to Telefonica Data's liability as the terms set forth herein and the Agreement.

(d) End User Content. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to grant to Customer a sub-licensable, worldwide, limited, royalty-free, non-exclusive license to upload, display, distribute, copy and store End User Content in connection with the Hosting Services. Customer shall automatically grant Telefonica Data a sublicense with respect to End User Content in connection with the Hosting Services. Customer shall incorporate into its agreements with End Users language stating the following:

> "Except for software provided by Customer or any of Customer's third-party partners that is bundled with the Hosting Services or purchased separately from Customer or any of Customer's third-party partners, End User hereby represents and warrants that: (i) End User is the owner, valid licensee, or authorized user of End User's Web site and each element thereof; (ii) the use of the End User's Web site will not infringe any Intellectual Property right of any third party, or constitute a defamation, invasion of privacy, or violation of any right of publicity or other third party right; (iii) End User's Web site complies with all legislation, rules, and regulations of all applicable jurisdictions; (iv) End User's Web site is and will remain accurate and correct in all respects; and (v) End User's Web site shall be free from viruses, worms, Trojan horses, and other malicious code."

(e) Service Misuses. If Customer elects to resell the Hosting Services to End Users, then Customer is responsible for providing an operations support function that operates on a 24 hour a day, seven day a week basis and is able to fully respond if any End User engages in Service Misuse including (i) giving Telefonica Data a telephone number and e-mail address to use to notify Customer if Telefonica Data becomes aware that an End User is engaging in Service Misuse, and (ii) having the ability to suspend or block access to Hosting Service for an End User within sixty (60) minutes of Customer's receipt of a call or e-mail from Telefonica Data stating that the End User is engaging in Service Misuse.

(f) Security and Privacy. If Customer elects to resell the Hosting Services to End Users, then Customer shall require an acknowledgment from each End User that there is no guarantee of security or privacy on the Internet, and Customer shall make no guarantee on behalf of Telefonica Data or for which Telefonica Data has any responsibility that an End User's Web site(s) or End User Content will be secure or private.

(g) Non-Telefonica Data Supported Software. If Customer elects to resell the Hosting Services to End Users, then Customer shall incorporate into its agreements with End Users language stating that all risks associated with the use of software on End User's Web site that is not supported by Telefonica Data is borne solely by the End User. Customer shall be solely liable for all damages resulting or arising from the use or loading of any software not supported by Telefonica Data onto End User's Web site which results in damages to End User's Web site or to any other Telefonica Data customer's Web site, or causes a failure or outage in the Hosting Services provided to End User or other End Users. CUSTOMER AGREES TO PAY TELEFONICA DATA ALL AMOUNTS INCURRED BY TELEFONICA DATA FOR WORK ARISING FROM CUSTOMER'S OR ANY END USER'S USE OF NON-SUPPORTED SOFTWARE.

(h) Customer Provided Support. If Customer elects to resell the Hosting Services to End Users, then Customer shall provide, at no cost to Telefonica Data, first level support via a Customer-provided toll-free number to End Users. First level support shall include, but is not limited to, issues related to account numbers, names, addresses, phone numbers, billing inquiries, cancellations, disconnections, reconnections of service, and access to Hosting Services, including interruption in Hosting Services caused by or under the control of Telefonica Data.

(i) Approvals, Licenses. If Customer elects to resell the Hosting Services to End Users, then Customer shall be responsible for having and keeping in place all licenses and other governmental approvals Customer needs, if any, for reselling Hosting Service. Customer shall comply with all applicable laws and regulations regarding reselling Hosting Service.

(j) Configuration. Telefonica Data's obligation to provide Hosting Services is contingent upon Customer providing its hardware and software configuration requirements to Telefonica Data in a manner reasonably acceptable to Telefonica Data. IN NO EVENT SHALL TELEFONICA DATA BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING AS A RESULT OF TELEFONICA DATA'S COMPLIANCE WITH CUSTOMER'S CONFIGURATION REQUIREMENTS.

2.3.    Mutual.

(a) General Obligations. Each Party shall: (i) notify the other promptly of any perceived degradation in the Hosting Services and cooperate with the other Party to the fullest extent possible in order to determine the cause of and resolve any such degradation; (ii) comply fully with all applicable federal, state and local laws including regulations and ordinances relating to the Hosting Services to be provided hereunder and the resale of the Hosting Services to the End Users, and (iii) otherwise comply with the terms and conditions as set forth herein.

(b) Customer Representative. The Parties each will provide a single point of contact for administration of this Exhibit. The Parties shall cooperate with each other in the performance and delivery of the Hosting Services hereunder.

3.    ORDERING. Customer shall order Hosting Services pursuant to the ordering provisions in Schedule G-1. Telefonica Data shall use commercially reasonable efforts to provide Hosting Services to Customer by the Customer-requested Service Start Date.

4.    BACKUPS. In exchange for the "Backup Services" fees set forth in Schedule G-1, Telefonica Data will regularly, and on at least a weekly basis, and upon termination of this Exhibit, backup all Customer software, content, and data. If Customer elects to resell the Hosting Services to End Users, then the aforementioned backup shall include End Users' Web sites. Upon termination of this Exhibit, Telefonica Data will place all servers containing Customer and End User data in suspended mode for a period of seven (7) Days, during which time Customer or End Users may, at their sole expense, backup their respective data. Customer shall advise End User to perform independent backups of Web site information; or alternatively, Telefonica Data will provide Customer with copies of Telefonica Data's backups, the cost of copying the backups to be paid by Customer in addition to the Hosting Services fees. Customer shall ensure that each End User understands that Telefonica Data has no duty of care to any End User to perform backups of End User's Web site. Customer shall ensure that End User further understands that no bailment is intended by archiving, and Telefonica Data has no duty of care to End User to safekeep the archival backup. THE COPY TO BE MADE AT CUSTOMER'S COST SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR ANY DAMAGE TO OR LOSS OF SOFTWARE, DATA, CONTENT, OR OTHER INFORMATION ON END USER'S WEB SITE.

## 5.    OWNERSHIP OF INTELLECTUAL PROPERTY.

**5.1.    Generally.** Except for End User Content, Telefonica Data shall own all right, title and interest, including Intellectual Property Rights, in and to the hardware, software, materials and other items (collectively, "Telefonica Data Equipment") necessary for implementing the Hosting Services.

**5.2.    Logo Use.**

(a) <u>Grant</u>. Telefonica Data grants to Customer a limited, nonexclusive, worldwide, royalty-free right to use the Telefonica Data logo provided by Telefonica Data to Customer on Customer's Web site and in promotional materials for Hosting Services during the term of this Exhibit solely for the purposes of (a) identifying Telefonica Data as the provider of Hosting Service, and (b) identifying Customer as a partner of Telefonica Data. Telefonica Data will provide Customer with a copy of Telefonica Data's logo (which may be in electronic form) and guidelines for its proper use. The Telefonica Data logo will be accompanied by the statement "Customer Web site Hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify to Customer from time to time. All references herein to the Telefonica Data logo shall include both the logo and the preceding statement.

(b) <u>Restrictions</u>. Use of Telefonica Data's logo by Customer shall be submitted to Telefonica Data for its prior review and approval. Customer will ensure that sufficient space, as agreed by the Parties, surrounds Telefonica Data's logo and that no graphic elements or text encroach upon Telefonica Data's logo, and that no text or graphics are hidden behind Telefonica Data's logo. Customer agrees to use Telefonica Data's logo only in the form and manner prescribed in Telefonica Data's guidelines for proper use of its logo. The Telefonica Data logo may be used by Customer as a link to a Telefonica Data Web site if so approved in advance by Telefonica Data. Under no circumstances will Customer use the Telefonica Data logo to link to any Web site other than a Telefonica Data Web site. Customer acknowledges that it shall not obtain any rights, title or interest in or to Telefonica Data's name or logo and any use of such name and logo shall inure solely to the benefit of Telefonica Data. Telefonica Data may withdraw Customer's right to use Telefonica Data's logo granted herein upon written notice to Customer. In the event of either Customer's receipt of notice from Telefonica Data withdrawing the right to use Telefonica Data's logo or termination of this Exhibit or the Agreement, Customer shall immediately cease all use of Telefonica Data's logo and remove Telefonica Data's logo from Customer's Web site.

## 6.    PRICES AND PAYMENT TERMS

**6.1.    Fee Schedule.** Customer shall pay Telefonica Data the fees specified in Schedule G-1 of this Exhibit for the Hosting Services pursuant to the payment provisions in the Agreement.

**6.2.    Adjustments.** Telefonica Data reserves the right to modify the fee schedule at any time by issuance of a revised fee schedule. Orders placed pursuant to Article 3 and received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all orders placed pursuant to Article 3 and accepted by Telefonica Data after the date of issuance of a revised fee schedule.

## 7.    TERM AND TERMINATION

**7.1.    Term.** This Exhibit shall become effective on the date that it is signed by both parties and shall continue until the third anniversary of the Full Service Start Date, unless earlier terminated in accordance with this Exhibit and the Agreement.

**7.2.    Suspension of End User Service.** If Customer elects to resell the Hosting Services to End Users, then in addition to its rights of termination, Telefonica Data may suspend the provision of Hosting Services to a specific End User immediately and indefinitely if Telefonica Data, in its sole discretion, determines any of the following: (a) End User's Web site or use of the End User's Web site could cause liability to Telefonica Data; (b) End User posts material on the Web site that is threatening, abusive, harassing, indecent, pornographic or otherwise obscene, or that is libelous, defamatory or that violates any privacy rights; (c) End User conducts business practices on and through the Web site that Telefonica Data in its sole discretion determines to be illegal, deceptive, or otherwise constitute a misuse of the Web site, including, but not limited to, the practices known as "spamming"; (d)

End User uses the Web site, or develops or operates the Web site so that third parties use the Web site, in violation of the Internet AUP; (e) End User operates the Web site in such a manner so as to interfere with the use of products or services by other Telefonica Data customers or with third party systems, networks or services, or to engage in use of another party's account without authorization, or to engage in any activity intended to defeat security measures, or to distribute or post software or other material in violation of any export law or other governmental regulation, or to intentionally distribute software containing malicious code such as viruses and hacker tools; (f) Customer fails to make payments due to Telefonica Data according to the payment provisions of the Agreement; (g) End User becomes insolvent or ceases its normal business operations, or fails to comply with any of the provisions in this Exhibit relating to financial responsibility; or (h) Telefonica Data reasonably suspects that End User is engaged in misuse of the Hosting Service. Telefonica Data's rights to suspend service above shall be in addition to, and shall not be superseded by, Telefonica Data's rights of suspension under the Digital Millennium Copyright Act provisions detailed below.

7.3.    **Resumption of Hosting Services.**  Upon cure by Customer or, if Customer elects to resell the Hosting Services to End Users, an End User of the cause for suspension of Hosting Services to the satisfaction of Telefonica Data, including the provision of reasonable assurances that the cause of suspension shall not reoccur, and upon Customer's request, Telefonica Data may reinstate the provision of Hosting Services, subject to the payment by Customer of additional charges incurred by Telefonica Data in reinstating the Hosting Services. Telefonica Data may terminate the Hosting Service if Customer or End User does not cure the cause of a Service suspension or Customer does not pay the associated additional charges for Telefonica Data resuming the Service.  In such an event, Customer (in addition to any other remedy available to Telefonica Data) will pay any termination fee described herein.

7.4.    **Termination Procedures.**  Upon termination of this Exhibit, Telefonica Data may immediately remove Customer's Web Site and, if Customer elects to resell the Hosting Services to End Users, End User's Web site from its servers and re-deploy its servers to other purposes subject to the provision giving End User the opportunity to backup the Web site during the seven (7) Day suspended mode period described in Section 4.

8.    **INDEMNITY.**  In addition to the indemnity provisions set forth in the Agreement, Customer agrees to indemnify and hold harmless Telefonica Data: (a) if Customer elects to resell the Hosting Services to End Users, against any claims by End User's Web site users or other third parties based on right of privacy, right of publicity, infringement of Intellectual Property Rights, misappropriation, or other claims, whether in contract or tort and whether statutory or at common law; (b) against all claims by End User's Web site users or other third parties arising from Telefonica Data's compliance with any subpoena or other judicial or governmental directive requesting information from Telefonica Data that is contained on End User's Web site; (c) against all claims by End Users whose Web site(s) reside on shared servers, for any claim by another customer sharing the same server with End User if such other customer's claim alleges damages arising out of or relating to use of End User's Web site(s) and/or End User Content; and (d) against claims arising from or related to Telefonica Data's compliance with Customer's configuration requirements.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:<br>LYCOS | | Telefonica Data:<br>TELEFONICA USA, INC. | |
|---|---|---|---|
| By: | _____ | By: | _____ |
| | *(Signature)* | | *(Signature)* |
| Printed Name: | _____ | Printed Name: | **Pete Pizarro** |
| Title: | _____ | Title: | **CEO** |
| Date: | _____ | Date: | _____ |
| Address: | _____ | Address: | **1221 Brickell Avenue, Suite 600** |
| | _____ | | **Miami, Florida 33131** |
| Fax: | _____ | Fax: | _____ |
| E-Mail: | _____ | E-Mail: | **ppizarro@us.telefonica-data.com** |

**SCHEDULE G-1**

**TO**

**HOSTING SERVICES EXHIBIT**

Pricing

The cost for Data back up is outlined below. Customer commits to a minimum monthly back-up of at least 4 TB of Data. For any month where the volume of Customer Data backed up by Telefonica Data is equal to or less than 4 TB, Customer will be billed for, and agrees to pay, charges equal to the back-up of 4TB of Data. This price is for all Customer Data backed up at Telefonica Data Miami data center.

Telefonica Data will make six standard daily incremental backups and these daily back-ups will be retained off site for one week. Telefonica Data will make full weekly backups that will be retained off site for a month. Telefonica Data will make 12 full monthly backups that will be retained off site.

This pricing for the Services to be provided under this Exhibit does not include any servers, cards or connections that may be needed to attach Customer's storage to the Telefonica Data solution. The Parties shall mutually determine what servers, cards or connections are necessary and the Parties shall mutually agree upon the charges that Customer shall pay for such servers, cards or connections.

Customer must purchase all tapes required for the rotation of backups.

| | Service | Backup/ GB |
|---|---|---|
| | 4 TerraBytes | $2.20 |
| | 5 TerraBytes | $2.00 |
| | 6 TerraBytes | $1.80 |
| | 7 TerraBytes | $1.65 |
| | 8 TerraBytes | $1.50 |
| | 9 TerraBytes | $1.35 |
| | 10 TerraBytes | $1.25 |

**SCHEDULE G-2**

**TO**

**HOSTING SERVICES EXHIBIT**

<u>**Service Level Agreement**</u>

## 1. Managed Backup

Telefonica Data will attempt to restart failed backups three times before notifying the customer of the failure. In the event that the backups continue to fail, Telefonica Data will notify Customer prior to 8:00am ET the following day to determine how Customer wishes to proceed. These times and numbers serve as a baseline and may be modified by the Parties during the creation of the Runbook.

- o Credits for failure to meet the Managed Backup Service Level Objectives are as follows

  - Customer shall receive a credit equal to $20 per failure to retry the job the appropriate number of times or failure to notify Customer within the appropriate time frame.

  - The credits for any one instance in a month can never exceed $1,000 and the total credits for a month may not exceed the monthly recurring charges for the affected Service for such month.

## SCHEDULE G-3

### TO

### HOSTING EXHIBIT G

### TELEFONICA DATA ACCEPTABLE USE POLICY

This acceptable use policy ("AUP") covers (1) TDUSA' customer's (the "Customer") (and the Customer's customers, agents and users) use of and access to TDUSA' facilities (e.g. Internet Data Centers); (2) Customer's (and its customers, agents and users) use of the TDUSA online services; and (3) TDUSA' maintenance of the services it provides to its Customers.

#### ACCESS TO INTERNET DATA CENTERS

Only those individuals identified in writing by Customer on the Customer Registration Form ("Representatives") may access the Internet Data Centers. Customer shall deliver prior written notice to TDUSA of any changes to the Customer Registration Form and the list of Representatives. Customer and its Representatives shall not allow any unauthorized persons to have access to or enter any Internet Data Centers. Customer and its Representatives may only access the Customer Area, unless otherwise approved and accompanied by an authorized TDUSA representative.

#### USE OF INTERNET DATA CENTER FACILITY

*Conduct at Internet Data Centers.* Customer and its Representatives agree to adhere to and abide by all security and safety measures established by TDUSA. Customer and its Representatives shall also not do or participate in any of the following: (1) misuse or abuse any TDUSA property or equipment or third party equipment; (2) make any unauthorized use of or interfere with any property or equipment of any other TDUSA Customer; (3) harass any individual, including TDUSA personnel and representatives of other TDUSA Customers; or (4) engage in any activity that is in violation of the law or aids or assists any criminal activity while on TDUSA property or in connection with the Internet Data Center Services.

*Prohibited Items.* Customer and its Representatives shall keep each Customer Area clean at all times. It is each Customer's responsibility to keep its area clean and free and clear of debris and refuse. Customer shall not, except as otherwise agreed to in writing by TDUSA, (1) place any computer hardware or other equipment in the Customer Area that has not been identified in writing to TDUSA; (2) store any paper products or other combustible materials of any kind in the Customer Area (other than equipment manuals); and (3) bring any Prohibited Materials (as defined below) into any Internet Data Center. "Prohibited Materials" shall include, but not limited to, the following and any similar items:

- food and drink;
- tobacco products;
- explosives and weapons;
- hazardous materials;
- alcohol, illegal drugs and other intoxicants;
- electro-magnetic devices which could unreasonably interfere with computer and telecommunications equipment;
- radioactive materials; and
- photographic or recording equipment of any kind (other than tape back-up equipment).

#### EQUIPMENT AND CONNECTIONS

*Customer Equipment.* Each connection to and from a piece of Customer Equipment shall be clearly labeled with Customer's name (or code name provided in writing to TDUSA) and the starting and ending point of the connection. Customer Equipment must be configured and run at all times in compliance with the manufacturer's specifications, including power outlet, power consumption and clearance requirements. Customer must use its best efforts to provide TDUSA with at least 48 hours prior notice any time it intends to connect or disconnect any Customer Equipment or other equipment.

## MAINTENANCE

TDUSA will conduct routine scheduled maintenance of its Data Center only according to its regularly scheduled maintenance schedule. In the event a mission critical maintenance situation arises, TDUSA may be required to perform emergency maintenance at any time. During these scheduled and emergency maintenance periods, Customer's Equipment may be unable to transmit and receive data, and Customer may be unable to access the Customer Equipment. Customer agrees to cooperate with TDUSA during the scheduled and emergency maintenance periods.

### ONLINE CONDUCT

*Customer Content.* Customer acknowledges that TDUSA exercises no control whatsoever over the content of the information passing through Customer's site(s) and that it is the sole responsibility of Customer to ensure that the information it and its users transmit and receive complies with all applicable laws and regulations and this AUP.

*Prohibited Activities.* Customer will not, and will not permit any persons ("Users") using Customer's online facilities and/or services, including, but not limited to, Customer's Web site(s) and transmission capabilities, to do any of the following ("Prohibited Activities"):

- send unsolicited commercial messages or communications in any form ("SPAM");

- engage in any activities or actions that infringe or misappropriate the intellectual property rights of others, including, but not limited to, using third party copyrighted materials without appropriate permission, using third party trademarks without appropriate permission or attribution, and using or distributing third party information protected as a trade secret information in violation of a duty of confidentiality;

- engage in any activities or actions that would violate the personal privacy rights of others, including, but not limited to, collecting and distributing information about Internet users without their permission, except as permitted by applicable law;

- send, post or host harassing, abusive, libelous or obscene materials or assist in any similar activities related thereto;

- intentionally omit, delete, forge or misrepresent transmission information, including headers, return mailing and Internet protocol addresses;

- engage in any activities or actions intended to withhold or cloak Customer's or its Users' identity or contact information;

- use the TDUSA connectivity services for any illegal purposes, in violation of any applicable laws or regulations or in violation of the rules of any other service providers, web sites, chat rooms or the like; and

- assist or permit any persons in engaging in any of the activities described above.

If Customer becomes aware of any Prohibited Activities, Customer will use best efforts to remedy such Prohibited Activities immediately, including, if necessary, limiting or terminating User's access to Customer's online facilities.

*Third Party Complaint Process.* TDUSA routinely receives written complaints ("Complaints") from third parties regarding Prohibited Activities allegedly being conducted by a Customer or its Users. Due to the nature of TDUSA' business, in TDUSA' experience, most legitimate complaints and actual Prohibited Activity is conducted by Customers and users of TDUSA' Customers, not by TDUSA' Customers themselves. TDUSA requires its Customers to use policies similar to this AUP and will work with its Customers to resolve violations. TDUSA will take the following actions to document and resolve each Complaint received by TDUSA related to a Customer or its Users.

First Complaint. Upon receipt of the initial complaint from a third party regarding Prohibited Activity by a Customer or its User, TDUSA will send a letter (the "First Letter") to the complaining third party that describes TDUSA' policies related to the Prohibited Activity and lists the contact information for the Customer and encloses a copy of the original Complaint received by TDUSA. TDUSA also will deliver notice of the Complaint to the Customer by sending a copy of the same letter to the Customer via e-mail to its abuse address so that Customer can identify and remedy the Prohibited Activity. TDUSA's goal is to put the complainant directly in touch with the party in the best position to remedy the problem, TDUSA' Customer who has the relationship with the alleged violator.

Second Complaint. Upon receipt of a second complaint after the date of the First Letter related to the same or similar Prohibited Activity of Customer described in the First Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a second letter (the "Second Letter") with a copy of the second complaint to the Customer and request that Customer respond in writing to TDUSA with an explanation and timeline of the actions to be taken by Customer to remedy Prohibited Activity. In the event that Customer does not respond to the TDUSA' Second Letter and remedy the

Prohibited Activity within ten (10) business days, TDUSA will bill Customer in the following month $500 to cover TDUSA' administrative costs associated with the Prohibited Activities of Customer.

<u>Third Complaint</u>. Upon receipt of a third complaint after the date of the Second Letter related to the same or similar Prohibited Activity of Customer described in the Second Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a third and final letter (the "Third Letter") with a copy of the third complaint to the Customer and request again that the Prohibited Activity cease immediately. In the event that the Prohibited Activity does not cease within five (5) business days, TDUSA will terminate or suspend its connectivity service to its Customer, and will only resume providing service when it receives adequate assurances that such activity will not continue. TDUSA will also bill its Customer $5,000 to cover TDUSA' administrative costs associated with the Prohibited Activities.

***Suspension and Termination of Service***. TDUSA reserves the right to suspend and/or terminate a Customer's Service at any time for any material failure of Customer, its Representatives or its Users to comply with these AUP.

SUPPLEMENTAL SERVICES

Subject to the terms and conditions set forth in the Agreement, TDUSA may, from time to time, provide Customer with certain limited services and equipment needed and requested by Customer on a "one-off" or emergency basis ("Supplemental Services") where such services are not included within the scope of the Services purchased by Customer. Customer will be charged for all Supplemental Services provided Customer. TDUSA has no obligation to determine the need for or provide Supplemental Services. All Supplemental Services are provided on an "as-is" basis and exclude warranties of any kind, whether express or implied.

*Telefonica*



# EXHIBIT I

## TO

## MASTER SERVICES AGREEMENT

## ATM

This ATM EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 20, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.  **DEFENITIONS**

    1.1.    **"Customer CPE"** shall mean all Customer premises equipment other than the Equipment and the Software.

    1.2.    **"ATM Service"** shall mean switched data asynchronous transfer mode service, including any Telefonica Data furnished equipment and software (respectively "Equipment and Software") used at the Customer's premises to provide the switched data ATM Service.

    1.3.    **"Service Start Date"** shall mean the date when the ATM Service is operational and ready for use between two of Customer's premises.

2.  **ORDERING, INSTALLATION, USE AND MAINTENANCE**

    2.1.    **Orders.** Customer shall order ATM Services pursuant to the ordering provisions in Schedule I-1.

    2.2.    **Service Start Date.** Telefonica Data shall use commercially reasonable efforts to provide the ATM Service by the applicable Customer-requested Service Start Date identified in Schedule I-1.

    2.3.    **Preparations.** To facilitate the installation and maintenance of the ATM Service, Customer shall: (i) prepare its premises as necessary; (ii) provide any inside wiring required to interconnect local access lines to the Equipment, and (iii) provide Telefonica Data with access to the Equipment and software and provide security as reasonably required by Telefonica Data.

    2.4.    **Acceptance.** Telefonica Data shall notify Customer of the Service Start Date. Unless Customer notifies Telefonica Data's network control personnel within five (5) Days after the Service Start Date that it has demonstrated that ATM Service is not operational and ready for Customer's use, ATM Service between such sites shall be deemed accepted by Customer as of the Service Start Date, and Customer shall pay for such ATM Service as of such date.

    2.5.    **Relocation.** Customer may request ATM Service to be moved (i.e., disconnected from one location and reconnected at another location) subject to reasonable ATM Service interruption and payment of Telefonica Data's then-standard applicable relocation charges.

    2.6.    **Maintenance.** Telefonica Data shall maintain the ATM Service, including establishing regularly scheduled maintenance periods. Maintenance of the Equipment and Software is provided as a part of the ATM Service at no additional charge to Customer unless such charges are (i) specifically set forth in this Exhibit, (ii) for maintenance which is necessitated by unauthorized maintenance or other acts or omissions of Customer or others, or (iii) for technical assistance or support with respect to any Customer CPE which is used in conjunction with the ATM Service, including, without limitation, assistance in connecting the Customer CPE to the Equipment and support in identifying and/or correcting problems within the Customer CPE. In the case of Subsections (ii) or (iii), Telefonica Data's then-standard dispatch ATM Service charge(s) shall apply.

I-1

**2.7.    Surrender of Equipment and Software.** Customer shall surrender the Equipment and Software to Telefonica Data promptly upon the discontinuance of the ATM Service for which it was being used, in the same condition as delivered, reasonable wear only excepted. If Equipment and Software is not so surrendered, Customer shall pay Telefonica Data any additional charges resulting therefrom.

**2.8.    Contingency.** Telefonica Data will operate and maintain the ATM Service, contingent upon Telefonica Data's (a) ability to maintain necessary licenses or permissions, and (b) availability of network capacity and connections.

## 3.    PRICES AND PAYMENT TERMS

**3.1.    Fees.** Customer shall pay Telefonica Data the recurring, non-recurring and other charges set forth in Schedule I-2 in accordance with the payment terms and conditions of the Agreement. Telefonica Data reserves the right to modify the fees at any time by issuance of a revised fee schedule, which such modifications will only apply to new Orders for Services as set forth in this Section 3.1. New Orders for Services received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance of the revised fee schedule, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all new Orders for Services accepted by Telefonica Data after the date of issuance of a revised fee schedule.

**3.2.    Commitment.** Charges for ATM Service for which Customer has made a minimum term commitment of twelve months shall remain fixed for the term commitment period; provided, however, that Telefonica Data may revise its charges upon thirty (30) advance written notice if the carrier(s) providing local access increase their charges to Telefonica Data. Unless otherwise provided for in the Order for Service, charges for ATM Service for which Customer has not made a term commitment of at least twelve (12) months are subject to modification by Telefonica Data upon at least sixty (60) Days prior written notice to Customer.

## 4.    TERM; TERMINATION; AND DELAY

**4.1. Term.** The term of this Exhibit shall commence on the date accepted by Telefonica Data (the "Effective Date") and shall continue until the second anniversary of the Effective Date, unless earlier terminated in accordance with this Exhibit or the Agreement.

**4.2.** **Termination.** This Exhibit may be terminated in accordance with the termination provisions of the Agreement. In addition, Customer may terminate a particular ATM Service upon sixty (60) Days advance written notice to Telefonica Data provided that termination occurs prior to the expiration date of that ATM Service's term commitment and Customer pays a termination charge (as an early discontinuance of ATM Service fee and not as a penalty) to Telefonica Data equal to the sum of the monthly charges for the ATM Service multiplied by the number of months remaining in the term commitment.

**4.3.    Effect.** Upon termination, Customer shall immediately (i) cease utilizing the ATM Service, (ii) pay Telefonica Data for all charges incurred by Customer through the date such ATM Service is discontinued, and (iii) pay any applicable termination charges (as an early discontinuance fee and not as a penalty) as set forth above and/or elsewhere in this Exhibit.

## 5.    LIABILITY, WARRANTY, SOFTWARE, TITLE AND RISK OF LOSS

**5.1.    Liability.** If the ATM Service or any portion thereof is unavailable to Customer due to a total or partial interruption of the ATM Service, Telefonica Data's sole obligation, and Customer's sole and exclusive remedy with respect to such interruption of ATM Services shall be for Customer to request and Telefonica Data to provide a pro rata credit for the period and for the portion of the ATM Service affected during which the ATM Service or any part thereof was unavailable to Customer. Telefonica Data's maximum liability for any damages arising out of or related to this Exhibit shall not exceed the total charges for the ATM Services provided under this Exhibit during the month in which such liability arises.

**5.2.    Software.** Customer shall use Software (whether embedded in hardware as firmware or otherwise) and any related documentation only with Equipment, if any, and the ATM Service. Customer shall not (i) reproduce, reverse engineer, disassemble, decompile, modify, adapt, translate, create derivative works from, or transfer or transmit the Software in any form or by any means, or (ii) use the Software for any purpose other than as set forth in

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

5.3.    **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

CUSTOMER:.      Lycos, Inc.

Accepted by Telefonica Data:
**TELEFONICA DATA USA, INC.**

By:               By:

Name: ~~Vish Yelsangikar~~ Brian J. Lacy    Name: AUTONIO BERNARDOS

Title: ~~Network Operations & Security Manager~~ CFO    Title: EVP

Date: 28 January, 2004      Date: 02/04/04

Address:              Address: 1221 Brickell Avenue, Suite 600
Miami, Florida 33131
Attn:

Fax:              Fax:

Email: ~~vish.yelsangikar@corp.terralycos.com~~    Email:

REVIEWED BY
TERRA LYCOS LEGAL  PDC

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

     5.3.    **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

     **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:. | | Accepted by Telefonica Data: |
|---|---|---|
| Lycos, Inc. | | **TELEFONICA DATA USA, INC.** |
| By: | ~~BDL~~ | By: |
| Name: | ~~Vish Yelsangikar~~ Brian D. Luy | Name: |
| Title: | ~~Network Operations & Security Manager~~ CFO | Title: |
| Date: | 28 January, 2004 | Date: |
| Address: | | Address: 1221 Brickell Avenue, Suite 600 |
| | | Miami, Florida 33131 |
| | | Attn: |
| Fax: | | Fax: |
| Email: | ~~vish.yelsangikar@corp.terralycos.com~~ | Email: |

REVIEWED BY
TERRA LYCOS LEGAL__PDL__

I-3

**SCHEDULE I-1**

**TO**

**EXHIBIT I**

<u>Order Form</u>



C:\Documents and
Settings\JRiggs\Desk

**Service Start Date: <u>9 January, 2004</u>**

I-4

**Telefónica Data**

| | | | | |
|---|---|---|---|---|
| Number of ord | | Order Form  GCU | | |
| GAM | | Zeke Rodriguez | | |
| GAE | | Jim Roque | | |
| Order Date | | | | |
| Term | 1 Year  1u | 2 Years | 3 Years | |

| COMPANY | Terra Lycos, Inc. | Billing Contact | Terra Lyoos | GPM | Pablo A. Gamham |
|---|---|---|---|---|---|
| Contact | Vish Yeksangkar | Phone | Vish Yeksangkar | Phone | 305-925-5224 |
| Phone | 650-434-5241 | Fax | | Cell | 305-915-3200 |
| Fax | | E-mail | vish.yeksangkar@corp.terralycos.com | Fax | |
| E-mail | vish.yeksangkar@corp.terralycos.com | | | E-mail | pgamham@us.telefonica-data.com |

| Address | | Billing | |
|---|---|---|---|
| NPA-Nxx | | Information | |
| Full Number | | & Contacts | |
| | | (All Countries) | |

| Customer Type: | | Change of service | Renewal | Upgrade | Add-on | Install Date: | |
|---|---|---|---|---|---|---|---|

**ATM**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5mbps ATM var-ed | | Emons | | 5mbps | DS3/E1 | $1,800.00 | $11,800.00 | USA |

See Schedule E I-1 to Exhibit I

**Installation Address**

| Location: | | Location: | |
|---|---|---|---|
| Country | USA | Country | Spain |
| State | MA | State | |
| City | Waltham | City | Madrid |
| Address | 100 Fifth Avenue | Address | avca de las dos Castillas, T. Poaucio de Abreon |
| Suite / Floor | | Suite / Floor | |
| Tie Down (Rack/Shelf, Position) | | Tie Down (Rack/Shelf, Position) | |

Note!: Connecting to Customer POP/Local Loop? If so CFM/LOA need to be issued (depending on who issues who.

| Name | | Name | |
|---|---|---|---|
| Phone | | Phone | |
| Number | | Number | |
| eMail | | eMail | |

| Port | | | | Port | | | |
|---|---|---|---|---|---|---|---|
| Interface: | GT03 crox | | (BNC, GT03, V35, SC-MM) | Interface: | GT03 crox | | (BNC, GT03, V35, SC-MM) |
| Framed: | | | (B8ZS-AMI, ESF-SF, Framed) | Framed: | | | (B8ZS-AMI, ESF-SF, Framed) |
| Cos, Class | VBR-nrt | QSR, VBR, Type QoS | | Cos, Class | 11,304 | | |

**Installation Fees**

| Circuit Installation costs | $1,000.00 |
|---|---|

**Customer Premise Equipment**

| | | | | |
|---|---|---|---|---|
| No Equipment | | | | |

**Technical Information**

| IP Address s | N/A | | Other | |
|---|---|---|---|---|
| IP Address | N/A | | Other | |

| Customer: Terra Lycos, Inc. | Telefónica USA, Inc. |
|---|---|
| Signature: | Signature: |

REVIEWED BY
TERRA LYCOS LEGAL PDK

| Name: John Yokington    Felix Luty | Name:    ANTONIO BERNARDON |
|---|---|
| Title: Network Optimization & Security Manager    CFO | Title:    EVP |
| Date: | Date:    02/04/04 |

**SCHEDULE I-2**

**TO**

**EXHIBIT I**

<u>**Pricing**</u>



C:\Documents and
Settings\JRiggs\Desk



**Service Type** | ATM

Currency: US
No taxes
Term: 1 year

| Circuit ID | Host Site | Host Address | Host # | Access Line Host | Remote Site | Remote Address | Remote # | Access Line Remote | CIR | Observation | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | USA | | | DS3 | Spain | | | DS3 | Embpx vb-vrl | No equipment | $11,000.00 | $7,000.00 |

**Conditions:** Prices without local (Spain) and US taxes.
1 year term.
Prices are subject to local loop feasibility.
Prices valid for 60 days.
Prices do not consider any Customer Equipment.

**SCHEDULE I-2**

**TO**

**EXHIBIT I**

**SERVICE LEVEL AGREEMENT**

C:\Documents and
Settings\JRiggs\Desk

*Telefonica*

# International ATM VBRnrt Service

## Service Level Agreement


# Statement of confidentiality

This documentation is property of Telefonica and is confidential. It may not be reproduced in whole or in part, processed by a computer, or transmitted in any way or by any electronic or mechanical means, photocopying, recording, or by any other means. It may not be lent out or rented and its use may not be assigned without the prior written permission of Telefonica, the Copyright holder. Failure to comply with the aforementioned restrictions by any person with access to the documentation will be prosecuted in accordance with the law.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or public communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

 **Telefonica Data**    **Telefonica DataCorp**

# CHART OF CONTENTS

1.    INTRODUCTION AND GENERAL CONDITIONS ........................................................ 4

2.    QUALITY OF SERVICE GUARANTEES ................................................................... 5

    2.1.    DEFINITIONS ............................................................................................ 5
    2.2.    SERVICE LEVEL GUARANTEES ................................................................... 5
        *Availability* ....................................................................................... 5
        *Mean Time to Deliver the Service* ...................................................... 6
        *Mean Time to Repair* ......................................................................... 7
        *Network Target Delays* ...................................................................... 7
    EXCLUSIONS AND EXCEPTIONS .......................................................................... 8

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

## 1.  INTRODUCTION AND GENERAL CONDITIONS

The following document describes the standard SLA ("Service Level Agreement") of the International ATM VBRnrt Service, in which Telefonica Data offers a set of guarantees for different key aspects in order to ensure the quality expected and demanded by Customer. The Guarantees that Telefonica Data assumes in relation to Customer are: Availability, Time to Deliver, Mean Time to Repair, and Network Target Delay.

If the International ATM Service does not comply with the parameters defined in this document, Customer will be entitled to demand from Telefonica Data a compensation in accordance with Section 2 of this document.

Any compensation from Telefonica Data to Customer shall take effect only if (i) Customer identifies an incident that may be deemed to be a failure or non performance of the International ATM Service provided by Telefonica Data, (ii) Customer notifies Telefonica Data the existence of such incident through the one stop procedure defined for that purpose in a period of 30 Days after such incident occurred, (iii) such incident is confirmed to be a failure or non performance of the International ATM Service by Telefonica Data. The incidents described in the Exclusions and Exceptions section are specifically excluded from the calculation of quality of service guarantees.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefonica*
*Data*

## 2.    QUALITY OF SERVICE GUARANTEES

### 2.1.    Definitions

- **Permanent Virtual Circuit (PVC):** defines a permanent logical connection established between two customer accesses over the Network to guarantee that sequence will be maintained in the order of the frames received by the Network.
- **Customer Network:** Set of connections contracted by the customer for the Service.
- **NNI:** Network to network Interconnection.

### 2.2    Service Level Guarantees

#### Availability

Availability is defined per each two locations and on a monthly basis, and means the total amount of time that the International ATM Service is not under any single outage between such two locations. Availability for each two locations shall be calculated according to the following formula:

$$Availability = \frac{Ttotal - Tunavail}{Ttotal} * 100\,(\%)$$

Where:

- $Ttotal$ = total time in minutes of the period considered, i.e. one calendar month.
- $Tunav$ = total time in minutes in which the service it is not available on a continuous basis within the Ttotal interval considered (total lack of communication through Telefonica Data's network). If an outage does not exceed the amount guaranteed by Telefonica Data in accordance to the chart below, the amount that shall account for Tunav shall be zero.

The SLA defined in the International ATM VBRnrt Service is defined in accordance to the following chart:

| Service Area | Scope of Service with details | Availability Guaranteed (AG) |
|---|---|---|
| TD Area | From Main Customer's Office in Location A to Main Customer's Office in Location B | 99.5 %* |

*This Availability value could be improved until a maximum of 99.7% depending on possible redundancy scenarios hired by Customer. Also, due to the constants improvements of the service, this objective will be revised and will periodically communicate to Customer.

## Compensations for non-compliance with the SLA defined for Availability

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or public communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.


### Data

If Telefonica Data fails to deliver the service in accordance with the chart above, then, as Customer's sole and exclusive remedy, Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following measures:

| Actual availability of Customer's network | Service Voucher in % of the monthly bill (on the Price of Sale to Customer of the PVC Segment affected) |
|---|---|
| 99.4 < A < A.G. | 5% |
| 99.3 < A < 99.4 | 10% |
| 99.2 < A < 99.3 | 15% |
| 99.1 < A < 99.2 | 20% |
| A < 99.1 | 25% |

Where A is the availability measured between each two Customer's locations and AG is the availability guaranteed.

### Mean Time to Deliver the Service

The Mean Time to Deliver the International ATM Service is defined by location according to the following chart:

| Origin/Destination | Mean Time to Deliver |
|---|---|
| TD Area | 65 Days |
| All others (target measure) | 85 Days |

### Compensations for non-compliance with the Mean Time to Deliver the Service

Should the installation date be delayed by TD beyond the Guaranteed Installation Date (possibly modified as defined above), then Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following chart:

| Percentage of delay with respect to the committed Mean Time to Deliver | Service Voucher in % of the Installation Charge for the location affected |
|---|---|
| For each complete business day of delay past the Guaranteed Installation Date | 5% |

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Teletonica*
*Data*

## Mean Time to Repair

Mean Time to Repair is defined on a monthly basis and means the average time in which the International ATM Service has been under a failure in accordance with the terms defined. Telefonica Data's Mean Time to Repair objective is 6 hours for TD Area locations.

Mean Time to Repair shall be calculated according to the following formula:

$$Mean\ Repair\ Time = \frac{\sum_{1}^{NI}[Tunav_i]}{NI}\ hours$$

Where:

- $Tunavi$ = Each of the times in hours that the service is not available during each of the events in which a failure has occurred in one calendar month
- $NI$ = Number of events in which a failure has occurred in one calendar month.

## Network Target Delays

The transit delay is the mean time that takes for a 100-byte packet to go through Telefonica Data's Network form POP to POP. Telefonica Data shall measure transit delay under ordinary operation conditions.

The specific origin and destination points to measure the transit delay shall be the POPs of Telefonica Data's International Network. For the avoidance of doubt the transit delay is not measured on an end-to-end basis.

The target transit delay values, Round Trip Delay, are specified in the chart below:

| Round trip Delay* (ms) | Europe | North America | South America** |
|---|---|---|---|
| Europe (London) | 95 | 130 | 250 |
| North America | 130 | 70 | 140 |
| South America** | 250 | 140 | 95 |

*The delays in the chart above vary depending on the country. For instance, in Europe (London) the delay is 25 ms for Madrid, Milan and Paris, and 50 ms when the destination is Rome and Vienna.
** Except for Colombia.

Due to the continuous improvements and upgrades in Telefonica Data's Network, the target transit delays are subject to continuous revision, change, and improvement

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.


## Exclusions and Exceptions

The exclusions and exceptions that shall not be consider under this Section 2 are the following ones:

1. Programmed Service Interruptions due to ordinary maintenance tasks within the schedule assigned to that end, and Service Interruptions for non-programmed maintenance tasks, as long as Customer has received prior notification from Telefonica Data.
2. Specific laws, regulations or customs dispositions in a specific country.
3. Service Interruptions that may occur due to Customer's act or omissions.
4. Service Interruptions due to Force Majeure or beyond Telefonica Data's control.
5. The delays caused by Customer if the personnel appointed by Telefonica to resolve an incident is not allowed to have access to Customer's premises.
6. Any interruption caused specifically by Customer's equipment or applications.
7. The access connection line equipment shall be turned on permanently for all Customer's Network interfaces.

The values of guaranteed Availability and to measure and calculate Time to Deliver the Service shall only be valid in the following countries:

<u>TD Area:</u> Argentina, Brazil (Sao Paulo state), Chile, Colombia, France, Germany, Italy, Mexico, Peru, Puerto Rico, Spain, United Kingdom, and USA (Miami and NY).

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or public communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

# TData

**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131
Contact:   Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
sortiz@us.telefonica.com

| | |
|---|---|
| **Invoice No. :** | 01-0904-00-002173 |
| **Invoice Date:** | 09/30/04 |
| **Invoice Period:** | September-04 |
| **Payment Due:** | Immediately |

| Name | Lycos Inc. |
|---|---|
| **Address** | 850 North Shoreline Blvd. |
| | Mountainview, CA 94043 |
| | |
| | **Attention:  Accounts Payable** |

**Fax #** 650 428 5111
**Att:** Bert Knorr
**eMail:** bert.knorr@corp.terralycos.com

| QTY | DESCRIPTION | UN PRC | TAX | TAX AMT | AMOUNT |
|---|---|---|---|---|---|
| **Hosting** | | | | | |
| | **September '04** | | | | |
| 3297 | Square Feet Collocation | $ 27.00 | 7.00% | $ 6,231.33 | $ 89,019.00 |
| 64 | Power Whips L6 configuration | $ 300.00 | 7.00% | $ 1,344.00 | $ 19,200.00 |
| 1 | Circuit - Madrid to Boston | $ 11,000.00 | 7.00% | $ 770.00 | $ 11,000.00 |
| 324.17 | Mbps bandwidth ACTUAL - August | $ 100.00 | 7.00% | $ 2,269.19 | $ 32,417.00 |
| 300 | Professional Service Hours | $ 56.00 | 0.00% | $ - | $ 16,800.00 |
| 1 | Akamai Services/Freeflow/Edgesuite | $ 67,500.00 | 7.00% | $ 4,725.00 | $ 67,500.00 |
| 1 | Domestic WAN | $ 31,500.00 | 7.00% | $ 2,205.00 | $ 31,500.00 |
| | **Subtotal** | | | $ 17,544.52 | $ 267,436.00 |
| | **State Communication Services Tax** | | | | $ - |
| | **Local Communication Services Tax** | | | | $ - |
| | **Gross Revenue Tax** | | | | $ - |
| | **Florida Sales & Use Tax** | | | | $ 17,544.52 |
| | **Subtotal** | | | | $ 284,980.52 |
| **Invoice Summary** | | | | | |
| | **Total Charges** | | | | $ 267,436.00 |
| | **State Communication Services Tax** | | | | $ - |
| | **Local Communication Services Tax** | | | | $ - |
| | **Gross Revenue Tax** | | | | $ - |
| | **Total Invoice** | | | | $ 284,980.52 |

PLEASE DETACH AND RETURN WITH YOUR PAYMENT

**INVOICE #**
01-0904-00-002173

**INVOICE DATE**
August 1, 2004

**REMIT PAYMENT TO:**
1221 BRICKELL AVE. SUITE 600
MIAMI, FL  33131

**REMMITANCE STUB**

| INVOICE AMOUNT DUE |
|---|
| $      284,980.52 |

Mountainview, CA 94043

Exhibit C

-------- Original Message --------
Subject:        Lycos Invoices
Date:    Tue, 14 Dec 2004 10:51:39 -0500
From:    Samuel Ortiz <sortiz@us.telefonica.com>
To:      <dean.batten@lycos-inc.com>
CC:      David Salway <dsalway@us.telefonica.com>


Dean,


Please find attached the invoices from Sept-Dec 2004, they have also
been mailed out and faxed.


Sam Ortiz

Exhibit D

# Telefonica

**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, FL 33131

Contact: Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
Email: sortiz@us.telefonica.com

| Invoice No. : | 01-1004-00-002227 |
|---|---|
| Invoice Date: | 10/27/04 |
| Invoice Period: | October-04 |
| Payment Due: | 11/26/04 |

| Name | Lycos Inc. |
|---|---|
| Address | 850 North Shoreline Blvd.<br>Mountainview, CA 94043 |

| Att: | Bert Knorr |
|---|---|
| Tel # | |
| Fax # | 650 428 5111 |
| eMail: | bert.knorr@corp.terralycos.com |

## Hosting

| | | | | | | |
|---|---|---|---|---|---|---|
| 4000 | Square Feet Collocation | $ | 27.00 | 7.00% | $ 7,560.00 | $ 108,000.00 |
| 64 | Power Whips L6 configuration | $ | 300.00 | 7.00% | $ 1,344.00 | $ 19,200.00 |
| 2 | Telephone Lines MRC | $ | 25.00 | 7.00% | $ 3.50 | $ 50.00 |
| 1 | Circuit - Madrid to Boston | $ | 11,000.00 | 7.00% | $ 770.00 | $ 11,000.00 |
| 400 | Mbps bandwidth Prebill - October | $ | 100.00 | 7.00% | $ 2,800.00 | $ 40,000.00 |
| 300 | Professional Service Hours | $ | 56.00 | 0.00% | $ - | $ 16,800.00 |
| 1 | Akamai Services/Freeflow/Edgesuite (Prorated from 10/17 Cancellation) | $ | 58,833.33 | 7.00% | $ 4,118.33 | $ 58,833.33 |
| 1 | Domestic WAN | $ | 31,500.00 | 7.00% | $ 2,205.00 | $ 31,500.00 |
| | Subtotal | | | | $ 18,800.83 | $ 285,383.33 |
| | State Communication Services Tax | | | | | $ - |
| | Local Communication Services Tax | | | | | $ - |
| | Gross Revenue Tax | | | | | $ - |
| | Florida Sales & Use Tax | | | | | $ 18,800.83 |
| | Subtotal | | | | | $ 304,184.16 |

## Invoice Summary

| Total Charges | $ 285,383.33 |
|---|---|
| State Communication Services Tax | $ - |
| Local Communication Services Tax | $ - |
| Gross Revenue Tax | $ - |
| Florida Sales & Use Tax | $ 18,800.83 |
| Total Taxes | $ 18,800.83 |
| Total Invoice | $ 304,184.16 |

----------------------------------------

PLEASE DETACH AND RETURN WITH YOUR PAYMENT
**REMITTANCE STUB**

**INVOICE #**
01-1004-00-002227
**INVOICE DATE**
October 27, 2004

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1221 BRICKELL AVE. SUITE 600
MIAMI, FL 33131

| INVOICE AMOUNT DUE |
|---|
| **$    304,184.16** |

Lycos Inc.
850 North Shoreline Blvd.
Mountainview, CA 94043

Exhibit E

**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131

| | | Invoice No. : | 01-1104-00-002326 |
|---|---|---|---|
| Contact: | Samuel Ortiz | Invoice Date: | 11/27/04 |
| Telephone: | 305-925-5782 | Invoice Period: | November-04 |
| Fax: | 305-373-1685 | Payment Due: | 12/27/04 |
| Email: | sortiz@us.telefonica.com | | |

| Name | Lycos Inc. | | Att: | Bert Knorr |
|---|---|---|---|---|
| | | | Tel # | |
| Address | 850 North Shoreline Blvd. | | Fax # | 650 428 5111 |
| | Mountainview, CA 94043 | | eMail: | bert.knorr@corp.terralycos.com |

| | DESCRIPTION | UNIT PRICE | TAX | TAX AMOUNT | AMOUNT |
|---|---|---|---|---|---|
| **Hosting** | | | | | |
| 4000 | Square Feet Collocation | $ 27.00 | 7.00% | $ 7,560.00 | $ 108,000.00 |
| 64 | Power Whips L6 configuration | $ 300.00 | 7.00% | $ 1,344.00 | $ 19,200.00 |
| 2 | Telephone Lines MRC | $ 25.00 | 7.00% | $ 3.50 | $ 50.00 |
| 1 | Circuit - Madrid to Boston - Local loop Madrid | $ 2,000.00 | 0.00% | $ - | $ 2,000.00 |
| 1 | Circuit - Madrid to Boston - International | $ 3,500.00 | 23.79% | $ 832.65 | $ 3,500.00 |
| 1 | Circuit - Madrid to Boston - Local Loop in USA | $ 5,500.00 | 23.79% | $ 1,308.45 | $ 5,500.00 |
| 400 | Mbps bandwidth Prebill - October | $ 100.00 | 7.00% | $ 2,800.00 | $ 40,000.00 |
| 300 | Professional Service Hours | $ 56.00 | 0.00% | $ - | $ 16,800.00 |
| 1 | Akamai Services | $ 46,916.67 | 7.00% | $ 3,284.17 | $ 46,916.67 |
| 1 | Domestic WAN (Florida -Ma - CA) | $ 31,500.00 | 23.79% | $ 7,493.85 | $ 31,500.00 |
| | **Subtotal** | | | $ 24,626.62 | $ 273,466.67 |
| | **State Communication Services Tax** | | | | $ 2,754.00 |
| | **Local Communication Services Tax** | | | | $ 2,316.60 |
| | **Gross Revenue Tax** | | | | $ 959.85 |
| | **Florida Sales & Use Tax** | | | | $ 14,991.67 |
| | **Universal Services Found** | | | | $ 3,604.50 |
| | **Subtotal** | | | | $ 298,093.29 |
| **Invoice Summary** | | | | | |
| | Total Charges | | | | $ 273,466.67 |
| | State Communication Services Tax | | | | $ 2,754.00 |
| | Local Communication Services Tax | | | | $ 2,316.60 |
| | Gross Revenue Tax | | | | $ 959.85 |
| | Florida Sales & Use Tax | | | | $ 14,991.67 |
| | Universal Services Found | | | | $ 3,604.50 |
| | Total Taxes | | | | $ 24,626.62 |
| | Total Invoice | | | | $ 298,093.29 |

-------------------------------------------------------------------------

PLEASE DETACH AND RETURN WITH YOUR PAYMENT
**REMITTANCE STUB**

**INVOICE #**
01-1104-00-002326
**INVOICE DATE**
November 27, 2004

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1221 BRICKELL AVE. SUITE 600
MIAMI, FL 33131

| INVOICE AMOUNT DUE |
|---|
| **$    298,093.29** |

Lycos Inc.
850 North Shoreline Blvd.
Mountainview, CA 94043

Exhibit F

**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131

Contact: Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
Email: sortiz@us.telefonica.com

| | | |
|---|---|---|
| Invoice No. : | 01-1204-00-002426 |
| Invoice Date: | 12/01/04 |
| Invoice Period: | December-04 |
| Payment Due: | 12/31/04 |

| Name | Lycos Inc. |
|---|---|
| Address | 850 North Shoreline Blvd.<br>Mountainview, CA 94043 |

| Att: | Dean Batten |
|---|---|
| Tel # | (781) 466-7634 |
| Fax # | 650 428 5111 |
| eMail: | dean.batten@lycos-inc.com |

**Hosting**

| QTY | DESCRIPTION | UNIT PRICE | TAX | TAX AMOUNT | TOTAL |
|---|---|---|---|---|---|
| 4000 | Square Feet Collocation | $ 27.00 | 7.00% | $ 7,560.00 | $ 108,000.00 |
| 64 | Power Whips L6 configuration | $ 300.00 | 7.00% | $ 1,344.00 | $ 19,200.00 |
| 2 | Telephone Lines MRC | $ 25.00 | 7.00% | $ 3.50 | $ 50.00 |
| 1 | Circuit - Madrid to Boston - Local loop Madrid | $ 2,000.00 | 0.00% | $ - | $ 2,000.00 |
| 1 | Circuit - Madrid to Boston - International | $ 3,500.00 | 23.79% | $ 832.65 | $ 3,500.00 |
| 1 | Circuit - Madrid to Boston - Local Loop in USA | $ 5,500.00 | 23.79% | $ 1,308.45 | $ 5,500.00 |
| 400 | Mbps bandwidth Prebill - November | $ 100.00 | 7.00% | $ 2,800.00 | $ 40,000.00 |
| 300 | Professional Service Hours | $ 56.00 | 0.00% | $ - | $ 16,800.00 |
| 1 | Akamai Services | $ 46,916.67 | 7.00% | $ 3,284.17 | $ 46,916.67 |
| 1 | Domestic WAN (Florida -Ma - CA) | $ 31,500.00 | 23.79% | $ 7,493.85 | $ 31,500.00 |
| | Subtotal | | | $ 24,626.62 | $ 273,466.67 |
| | State Communication Services Tax | | | | $ 2,754.00 |
| | Local Communication Services Tax | | | | $ 2,316.60 |
| | Gross Revenue Tax | | | | $ 959.85 |
| | Florida Sales & Use Tax | | | | $ 14,991.67 |
| | Universal Services Found | | | | $ 3,604.50 |
| | Subtotal | | | | $ 298,093.29 |

**Invoice Summary**

| | | |
|---|---|---|
| Total Charges | | $ 273,466.67 |
| | | |
| State Communication Services Tax | | $ 2,754.00 |
| Local Communication Services Tax | | $ 2,316.60 |
| Gross Revenue Tax | | $ 959.85 |
| Florida Sales & Use Tax | | $ 14,991.67 |
| Universal Services Found | | $ 3,604.50 |
| Total Taxes | | $ 24,626.62 |
| | | |
| Total Invoice | | $ 298,093.29 |

----------------------------------------------------------------------------------------------------

PLEASE DETACH AND RETURN WITH YOUR PAYMENT
REMITTANCE STUB

**INVOICE #**
01-1204-00-002426
**INVOICE DATE**
December 1, 2004

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1221 BRICKELL AVE. SUITE 600
MIAMI, FL  33131

| INVOICE AMOUNT DUE |
|---|
| $     298,093.29 |

Lycos Inc.
850 North Shoreline Blvd.
Mountainview, CA 94043

Exhibit G

**\*Bert Knorr\***

11/11/2004 07:36 PM

To:     Victor Turner/Lycos
cc:
Subject:     TData credit status

Victor,

The only outstanding TData credit is the 130k for September. (from resolution of billing dispute)
156K was the outstanding balance for September after the last payment about 6 weeks ago.
To my knowledge we have not received an October invoice.

best regards, Bert

Exhibit H

> 
> 
> -----Original Message-----
> From: Dean Batten [mailto:dean.batten@lycos-inc.com]
> Sent: Thursday, December 16, 2004 2:13 PM
> To: Samuel Ortiz
> Cc: David Salway
> Subject: Re: Lycos Invoices
> 
> 
> 
> Thanks Samuel.
> 
> 
> 
> I've now had time to go through these and there are a number of
> questions I have.
> 
>

> 
> 1. How are you calculating the Akamai charges? It looks like the
> proration for Oct was done based upon a 30-day month,
> 
> though Oct has 31 days. Doing it correctly would change the Oct charge
> from $58833.33 to $58467.74. Perhaps related to
> 
> this is the Akamai charge for Nov and Dec - how did you calculate this?
> The service we turned off was for $20k/month, so
> 
> shouldn't the charge going forward just be $47500/month (comparing to
> the old $67500)?
> 
> 
> 
> 2. The Madrid circuit was cancelled on 10/6, so for Oct this charge
> should be $2129.03 and zero for Nov and Dec. I can
> 
> dig up the emails related to this if necessary, though David Salway
> should have these already.
> 
> 
> 
> 3. Fred Schimscheimer finished up with us on 12/10 (8 working days in
> Dec), so the Prof Services hours for Dec should be
> 
> around the 200 hour mark, not 300 (he was not replaced). David and I
> need to talk about what this should be going
> 
> forward, but given the number of hours we are getting out of Isaac I
> would think it would be down to 100-120 hours/month
> 
> in future.
> 
> 
> 
> I'm ignoring the new tax charges and the imposition of the minimums on
> floorspace and bandwidth from Oct onwards as they
> 
> are bigger issues that need to be discussed separately.
> 
> 
> 
> Let me know what your take is on the three items I listed.
> 
> 
> 
> Regards,
> 
> 
> 
> Dean Batten.
> 
> Director of Operations.
> 
> Lycos, Inc.

>
>
>
>
>
>
>
>
>
>
>
>
>
>
> Samuel Ortiz wrote:
>
>> Dean,
>
>>
>
>>
>
>>
>
>> Please find attached the invoices from Sept-Dec 2004, they have also
>
>> been mailed out and faxed.
>
>>
>
>>
>
>>
>
>> Sam Ortiz
>
>>
>
>
>
>

Exhibit I

*Telefonica*

**SENT VIA FAX, CERTIFIED US MAIL, RETURN RECEIPT REQUESTED**

**~ NOTICE OF TERMINATION OF SERVICES ~**
**17:00 EST, 12/20/04**

RE:  PAST DUE BALANCE

December 20, 2004

Dear Mr. Batten:

This letter is in reference to the attached invoice which represents charges incurred from 09/01/04 – 12/31/04.  We make reference to the above mentioned invoices which appears to remain outstanding despite persistent communications regarding the past due status of the account.

As you are already aware of, we have been in continuous communications with Bert Knorr prior to your involvement, and directly with you, over the course of the last several months regarding this issue.  Unfortunately, the discussions that we have had centered on renegotiating the current contract, rather than bringing your account current.  We are also aware that you are disputing various items contained on your invoices.  Since you are now in possession of all the invoices in question, the undisputed portion of these invoices should be paid immediately.

Please note that there should be no dispute regarding the billing of the minimums regarding colo space and bandwidth charges.  These items are clearly defined in the Master Service Agreement and accompanying addendums.

We cannot extend your credit any further and wish to inform you that funds in the amount of $459,523.72 plus interest charges of $6,575.86, calculated at 1% per month per Section 4.1 of the Master Services Agreement signed by both parties on 11/20/03 and accounting for all payments made during the aforesaid time period.  This amount includes the unpaid balance of the 09/04/04 invoice; $155,339.56 (now 80 days past due), the October Invoice; $304,184.16, plus the aforementioned interest charges.

Therefore the sum of $466,099.58 is required to be sent via wire transfer and deposited to Telefonica Data's account no later than 15:00EST, 12/30/04.  If payment in this amount is not received prior to this date and time, Telefonica will immediately terminate all services currently being provided to Lycos.

In addition interest continues to accrue on the above amount at $153.17 daily from the date of this letter, the November Invoice totaling $296,093.29 will be due 12/27/04, and will begin accruing interest charges after that date, and the December invoice totaling $296,093.29 will become due on 01/01/05, incurring the same interest penalties after that date.  In addition there is a $66,599.50 tax assessment bill which is still pending, however this invoice will not be assessed any penalties or interest charges.

It is regrettable that we need to pursue this option; however after repeated attempts to resolve the outstanding balance on this account, as well as the lack of response to a formal demand for payment on several prior occasions, this is the last remaining option.

It is our hope that you save yourself the expense of court proceedings, legal expenses, and further interest charges, and pay the outstanding balance due at this time.

Sincerely,

Victoria Medina
CFO

Exhibit J

Dean Batten
<dean.batten@lyc      **To:**     David Salway <dsalway@us.telefonica.com>
os-inc.com>            **cc:**     Samuel Ortiz <sortiz@us.telefonica.com>, Zeke Rodriguez
                       <zrodriguez@us.telefonica.com>, Tom Quarles
<tquarles@us.telefonica.com>, Carlos David
12/21/2004 06:31      <cdavid@us.telefonica.com>, peter.karol@lycos-inc.com
PM                    **Subject:** Re: Comments on Lycos Invoices

**Seem my comments below.**

**David Salway wrote:**
**> Dean:**
**>**
**>**
**>**
**> I wanted to give you some feedback with regard to your specific comments**
**> regarding the invoices you have recently reviewed.  My responses are in**
**> red ? thanks.**
**>**
**>**
**>**
**> \*FROM A PREVIOUS EMAIL\***
**>**
**> September Invoice Total: $284,980.52, less the payment made left a**
**> balance of  \*$155,339.56\*.  The negotiations with Bert were exclusive of**
**> this invoice.  I am waiting for confirmation of your wire transfer**
**> payment from our Finance Department regarding this amount.**
**>**

**Let me repeat the message I sent to you on 12/17/04;**

**"I just want to check a couple of numbers with you before we send in**
**payment for the September invoice, which I believe**
**has not been paid yet. I understand from looking over past communications**

between yourself and Bert in relation to the
invoice for Dec '03 to Aug '04 time period that there was an amount of
$176,416.25 in dispute (relating to power and
network credits), but that we paid the full amount at the time. Since then
it appears that Bert and yourself had agreed
to settle on us paying an amount of $46,186.79 (taken from an email from
yourself to Bert on 9/28/04), which then leaves
us with a credit of $130,229.46.

I want to make sure that you are in agreement with this. If so, then we
will pay the September invoice less the credit
amount ($284,980.52 - $130,229.46 = $154,751.06).

If you can confirm with me that this is correct I will authorize the
payment."

Again, can you confirm my math? We still have a difference here that you
haven't explained. Please tell me which of my
numbers is incorrect, or show me how you arrived at $155,339.56. As I said,
we have already today paid $154,751.06,
which in the absence of a reply from you is the amount I thought to be
correct.


> 
> 
> 
> *YOUR COMMENT:*>
> 1. How are you calculating the Akamai charges? It looks like the
> proration for Oct was done based upon a 30-day month,
> 
> though Oct has 31 days. Doing it correctly would change the Oct charge
> from $58833.33 to $58467.74. Perhaps related to this is the Akamai
> charge for Nov and Dec - how did you calculate this? The service we
> turned off was for $20k/month, so shouldn't the charge going forward
> just be $47500/month (comparing to the old $67500)?
> 
> 
> 
> The Akamai Edgescape service was cancelled effective 10/17, and the MRC
> for this service was $20,000 per the attached document . You should
> have been charged the following:
> 
> 
> 
> October (prorated):  _$47,500_ + _($20,000/31) * 17 Days =  $10,967.72_
> = *_$58,467.72 _* (you are correct)
> 
> November:      *$47,500*,
> 
> December:      *$47,500*
> 
> 
> 
> You were actually charged $58,833.33 for October, and $46,916.67 for

> Edgescape Services – So, after correcting the October ? December
> invoices there is an additional *$801.05 *due for the three months,
> which we can adjust for in January.
>

So I take it we are in agreement on this one ($58467.74 for Oct,
$47500/month thereafter)?

>
>
> *YOUR COMMENT:*>
> 2. The Madrid circuit was cancelled on 10/6, so for Oct this charge
> should be $2129.03 and zero for Nov and Dec. I can
>
> dig up the emails related to this if necessary, though David Salway
> should have these already.
>
>
>
> I don't have the contract regarding this circuit, but I can confirm that
> the notice to cancel the circuit was received on 10/6/04 as you said.
> I need to make sure there are no early cancellation fees, so until I can
> determine that - you should consider the November and December invoices
> for this circuit "disputed amounts".   We received the notice to cancel
> on 10/6, so the October charges for the circuit are still due.  We can't
> prorate the amount due based on the day the notice was received. ? 30
> days is the minimum notice; I need to check the contract to make sure a
> longer notice is not necessary.
>

Patrick Hetherton sent you an email on 9/10/04 and another on 9/14/04
requesting that the circuit be cancelled as soon
as the Daum deal concluded, which we anticipated would happen in October.
We did not just send you the one notice on
10/6/04.

>
>
> *YOUR COMMENT:*>
> 3. Fred Schimscheimer finished up with us on 12/10 (8 working days in
> Dec), so the Prof Services hours for Dec should be around the 200 hour
> mark, not 300 (he was not replaced). David and I need to talk about what
> this should be going forward, but given the number of hours we are
> getting out of Isaac I would think it would be down to 100-120
hours/month
>
>
>
> Since we do not have a contract regarding the professional service hours
> we can reduce the hours to actuals, however they will have to be at the
> hands and eyes rate in the contract ? $125/hour ? since there will be no
> more minimums.  You will receive time reports on any hands & hours work
> requested so you can verify these hours.
>
>

> _So for December we can bill the following: _>
> 300 hours @ $56.00/hour ? prorated after Fred left = 300 hours X $56 =
> $16,800.  Then dividing $16,800 by 23 "Working Days" in December =
> $730.43/day.  *$730.43 X 8 Days = $5843.44*; we can't simply multiply 64
> hours by $56 for the time Fred was working, because the rates were
> negotiated based on billing for a 300 hour minimum, and if we bill you
> at the "hands & eyes" rate of $125/hr this totals $8000 ? so this
> actually works out better for you.
>
>
>
> _Then from Dec 8 ? per the contract:_>
>
>
> Actual hours from Dec 8 ? Dec 31 @$125.00 "Hands & Eyes" rate**
>

So $5843.48 for the time period up until Fred left ( (8/23)*$16800 )?
Then an hourly rate of $125 for Isaac for the remaining 15 working days
this year?
Is that right?
If so, then I'd like to start getting timesheets for Isaac on a weekly
basis so I can ensure that they are correct. You
will need to send me ones for the time already worked since 12/8. Let's not
leave it until the end of each month to sort
this out.

>
>
> *YOUR COMMENT:*>
> I'm ignoring the new tax charges and the imposition of the minimums on
> floorspace and bandwidth from Oct onwards as they
>
> are bigger issues that need to be discussed separately.
>
>
>
> You can speak to Victor Navarro in Finance directly -  regarding the
> taxation charges.
>
>
>
> The Colo and BW minimums will have to be billed and paid per the
> contract.  We need to bill from the contract, and these are the
> contractual minimums.  We can certainly continue our dialogue that Zeke
> has recently sent you feedback on, but our position remains the same on
> the billing for this.  I have no authority to change the terms of the
> contract we have in place, but am hopeful that the dialogue we began
> between you, Zeke, and Carlos David will continue.  I do want to caution
> you, however that in the absence of a new contract ? and a business
> incentive on our part to renegotiate a new contract, we have to be held
> to the terms contained in the current contract.
>
>
>



Exhibit K



Lycos, Inc.
100 Fifth Avenue.
Waltham, MA 02451
Tel: 781-370-2700
Fax: 781-370-3433
Internet: http://www.lycos.com

December 22, 2004

**BY FACSIMILE  786-845-0759**

David Salway
Director of Service Management - Enterprise Accounts
Telefonica Data
1221 Brickell Avenue Suite 600
Miami, Florida 33131

     Re:   Letter from Telefonica Data to Dean Batten at Lycos dated December 20, 2004

Dear David:

     This letter is in response to a letter I received from Telefonica Data dated December 20, 2004.  In that letter, T-Data advised Lycos that if it (T-Data) did not receive the sum of $466,099.58 on or before 15:00 EST on December 30, 2004, T-Data would immediately terminate all services it was currently providing Lycos.  According to your letter, the sum of $466,099.58 represented the total amount due for an invoice dated September 4, 2004, and an invoice for October in the amount of $304,184.16, plus interest charges.

     As you know, Lycos wired $154,751.06 to T-Data yesterday to pay the September invoice.  However, because Lycos did not receive the October invoice until Sam Ortiz of T-Data e-mailed it to me on December 14, 2004, Lycos is not obligated to pay that invoice until January 14, 2005.  (If you believe Lycos received the invoice covering October prior to December 14, 2004, please provide me documentation reflecting this.)  In addition, as you know from our e-mail exchange over the past few days, Lycos disputes some of the charges on the October invoice and T-Data appears to acknowledge that some of the charges were in error.  Lycos is ready, willing and able to pay proper charges on the October invoice on or before January 14, 2005, but it is not obligated to pay the $304,184.16 plus interest on or before December 30, 2004 and hence is not willing to do so.

     If, notwithstanding the fact that Lycos is not obligated to pay the $304,184.16

on or before December 30, 2004, T-Data still intends to terminate all services currently being provided to Lycos on or after 15:00 EST on December 30, 2004, please advise me immediately. If T-Data does intend to terminate such services, Lycos demands that T-Data comply with section 7.4 of the Master Services Agreement and provide Lycos with Termination Assistance Services for the period Lycos requests, up to eighteen months. Under that section, the parties are to agree upon the services to be provided and the charges for those services. The charges are to be based on the pricing principles of the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 (" SAFA"). I do not have a copy of SAFA, so, if you would fax it to me today, I would appreciate it. Then, we would work over the next few days to agree upon the Termination Assistance Services Lycos would like T-Data to provide and the charges for those services. While Lycos does not believe it is obligated to pay for those services monthly in advance of the services being rendered, Lycos would be willing to do so.

Thank you for your prompt attention to this matter. As you know, if T-Data terminates the contract on December 30, 2004, and does not provide Termination Assistance Services as Lycos requests and is contractually required, T-Data will have wrongfully and effectively put Lycos out of business. I trust T-Data will not take action that would lead to this disastrous result. Please advise me at your earliest convenience (today, if possible) of T-Data' s intentions.

Very truly yours,

Dean Batten

cc: Peter Karol

13K9592

13B9592



## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPT.
C.A. No.

04-5046

LYCOS, INC.,                )
                            )
    Plaintiff,              )
                            )
v.                          )
                            )
TELEFONICA DATA USA, INC.,  )
                            )
    Defendant.              )

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

DEC 23 2004

Edward J. Sullivan
CLERK

### MOTION TO APPOINT SPECIAL PROCESS SERVER

Pursuant to Mass. R. Civ. P. 4(c), plaintiff, Lycos, Inc., hereby moves for appointment of Esquire Express, Inc., 600 Brickell Ave., Miami, FL 33129, as special process server and thereby authorizes it to serve all process in this action, including but not limited to, service of summons, verified complaint, short order of notice, and court orders.

In support of this motion, plaintiff states that Esquire Express, Inc. is experienced in service of process and disinterested in this action. Upon information and belief, all process servers employed by Esquire Express, Inc. are over the age of eighteen.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  December 23, 2004

1389921.1

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

LYCOS, INC.,

Plaintiff,

v.

TELEFONICA DATA USA, INC.,

Defendant.

SUPERIOR COURT DEPT.
C.A. No.

04-5046



FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR TH'

DEC 23 2004

CLERK

## MOTION FOR SHORT ORDER OF NOTICE FOR
## HEARING ON REQUEST FOR PRELIMINARY INJUNCTION

Pursuant to Mass. R. Civ. P. 65(b) and Superior Court Rule 9A(e)(1), plaintiff Lycos,

Inc. ("Lycos") requests that this Court issue short order of notice of hearing on Lycos' request

for preliminary injunction set forth in Prayer (B)(2) of its Verified Complaint.

Because the Defendant has threatened in writing to terminate on December 30, 2004 the

contract pursuant to which the Defendant delivers Internet-related, the hearing on Lycos'

Motion for Preliminary Injunction must be held no later than Wednesday, December 29, 2004.

An expedited hearing is needed to prevent the defendant from suspending, terminating,

or otherwise ceasing to provide services pending further order of the Court and from refusing,

if the Defendant terminates its contractual relationship with the Plaintiff, to negotiate, as

provided under Paragraph 7.4 of their Master Services Agreement, delivery of Termination

Assistance Services requested by Lycos.

In further support for this Motion, Lycos refers the Court to its Verified Complaint and

Memorandum of Law.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  December 23, 2004

1389915.1

- 2 -

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPT.
C.A. No. 04-5046

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

DEC 23 2004

*Edward J. Sullivan*

CLERK

LYCOS, INC.,                            )
                                         )
        Plaintiff,                       )
                                         )    MEMORANDUM IN SUPPORT OF
v.                                       )    MOTION FOR PRELIMINARY INJUNCTION
                                         )
TELEFONICA DATA USA, INC.,               )
                                         )
        Defendant.                       )

### INTRODUCTION

This is an action brought by Lycos, Inc. ("Lycos") relating to a master services

agreement entered into between Lycos and defendant Telefonica Data USA, Inc. ("T-Data")

("Master Services Agreement") and several exhibits and schedules with respect thereto

(collectively, the "Transaction Documents"). Pursuant to the Transaction Documents, T-Data

is to provide certain critical data storage, networking and communication services to Lycos.

By this action, Lycos seeks both a declaration that, if T-Data terminates the Transaction

Documents, it may not suspend services provided for thereunder but must provide the

Termination Assistance Services under section 7.4 of the Master Services Agreement for which

Lycos is willing to pay as provided therein, and preliminary and permanent injunctions barring

T-Data, if T-Data terminates the Transaction Documents, from suspending, terminating, or

otherwise ceasing to provide services under the Transaction Documents and from refusing to

provide Termination Assistance Services under Paragraph 7.4 of the Master Services

Agreement.

The preliminary injunctive relief sought by Lycos is simply intended to ensure that, in the event T-Data follows through on its threats to terminate the Transaction Documents, T-Data complies with the express terms of the Transaction Documents by providing appropriate Termination Assistance Services, without which Lycos's Internet business would "go dark," effectively shuttering its operations and putting it out of business.

## FACTUAL BACKGROUND

Lycos consists of a network of globally branded media properties and aggregated content distributed primarily through the World Wide Web. (Verified Compl. ¶ 9). On or about November 18, 2003, Lycos and T-Data entered into the Transaction Documents whereby T-Data agreed to provide to Lycos certain data storage, networking and communication services. (*Id.* at ¶ 12). Companies such as Lycos that depend on fast, reliable and uninterrupted access to its web sites by a large volume of users typically hire the services of a company offering high-capacity data and communication services, including web server housing and internet connectivity. (*Id.* at ¶ 10). T-Data houses Lycos' web servers, and employs a physical building or room with security systems, redundant power supply and climate and temperature controls, along network connectivity, to ensure that Lycos' servers never "go down." (*Id.* at ¶ 11).

As Lycos began receiving invoices from T-Data for services rendered under the Transaction Documents, Lycos began to notice recurrent errors and miscalculations in those invoices. (*Id.* at ¶ 13). T-Data often threatened to terminate services if Lycos did not pay the incorrect invoices in full, even while the parties were trying to resolve these errors. (*Id.*). The invoice covering September, 2004, was erroneous in that it failed to give Lycos a credit of approximately $130,000 for amounts Lycos had overpaid in prior months. (*Id.* at ¶ 14). T-

- 2 -

Data's invoices for October, November and December of 2004 on December 14, 2004 also contained numerous errors, miscalculations and discrepancies. (*Id.* at ¶ 16).

Because Lycos did not receive the invoices covering the period from October through December until December 14, 2004, Lycos is not obligated to pay them until January 13, 2005. (*Id.* at ¶ 17). Despite this, and the numerous errors contained in all of these invoices, T-Data has threatened to terminate the Transaction Documents and immediately suspend services if Lycos had not paid the full amount of the September and October invoices on or before 3:00 p.m. EST on December 30, 2004. (*Id.* at ¶ 19). In response, Lycos has demanded that if T-Data insists on terminating the Transaction Documents, that T-Data provide Termination Assistance Services to Lycos under the terms of the Master Services Agreement. (*Id.* at ¶ 22). Lycos offered, even though it was not required to do so, to pay for Termination Assistance Services monthly in advance. (*Id.*). If T-Data terminates the Transaction Documents without providing Lycos with appropriate Termination Assistance Services, a majority of Lycos' internet content will "go dark" and Lycos would be unable to operate as an ongoing business. (*Id.* at ¶ 25).

## ARGUMENT

Massachusetts law entitles a party to a preliminary injunction where (1) it is reasonably likely to succeed on the merits of its claim; (2) it will suffer irreparable harm in the absence of injunctive relief; and (3) such harm outweighs any injury which the other party will suffer if the injunction is granted. *See* Mass. R. Civ. P. 65(b); *T&D Video, Inc. v. City of Revere*, 423 Mass. 577, 580 (1996); *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 617 (1980). In this case, an injunction is warranted.

A.    <u>Lycos Is Likely To Succeed On The Merits Of Its Claims</u>

In its Verified Complaint, Lycos has clearly established that it is entitled to a declaration under G.L. c. 231A, § 1 that even if T-Data may terminate the Transaction Documents, it may not suspend Services upon termination and must provide Termination Assistance Services provided Lycos is willing to pay for them. As a preliminary matter, it is evident that Lycos has fulfilled its obligations under the Transaction Documents by both paying almost the entire amount outstanding under the September, 2004 invoice, and by standing ready, willing and able to make payment of all undisputed amounts under the October, November and December 2004 invoices when they become due and payable on January 13, 2005. As a result, Lycos is not in material breach of the Transaction Documents, and T-Data has no justification for termination.

However, even if Lycos has not fulfilled its obligations such that T-Data may terminate the Transaction Documents, T-Data is obliged to provide and may not unilaterally suspend Termination Assistance Services because Lycos has offered to pay monthly in advance for such services. Under the clear terms of section 7.4 of the Master Services Agreement, T-Data is required to provide Termination Assistance Services to Lycos for up to 18 months following the termination of the Master Services Agreement, upon such terms as are mutually agreed to by the parties. (Verified Compl., ¶ 22 and Exh. A, § 7.4). Because Lycos has already offered to pay for the Termination Assistance Services in the event that T-Data wrongfully terminates the Transaction Documents, *see* Verified Compl. ¶ 22, Exh. J, T-Data must provide such services.

Under G.L. c. 231A, § 2, declaratory relief is an appropriate means to secure determinations of rights under a contract, such as the Transaction Documents. *See Sears,*

*Roebuck & Co. v. School Committee of Burlington*, 3 Mass. App. Ct. 399 (1975). A controversy or dispute exists between the parties concerning T-Data's right to immediately terminate the Transaction Documents and suspend all Services it provides to Lycos without offering Termination Assistance Services. Since September of 2004, T-Data often threatened to terminate services if Lycos did not pay its invoices in full, despite the fact that such invoices contained numerous errors and miscalculations. (Verified Compl. ¶ 13). T-Data recently escalated this dispute by sending a letter to Lycos on December 20, 2004 threatening to terminate the Transaction Documents if Lycos had not paid the full amount of the September and October invoices on or before 3:00 p.m. EST on December 30, 2004, even though both invoices contained errors and the October invoice was not even due and payable until January 13, 2005. (*Id.* at ¶¶ 15-19). Having not received any assurances from T-Data, Lycos is uncertain as to whether T-Data intends to provide Termination Assistance Services after T-Data wrongfully terminates the Transaction Documents on December 30, 2004. (*Id.* at ¶ 23). Lycos need not wait for catastrophe to strike before seeking injunctive relief. *See Dubois v. Selectmen of Dartmouth*, 2 Mass. App. Ct. 674, 679 (1974) ("One is not, of course, required to wait until he is injured before he can apply for injunctive relief.").

B.   Lycos Will Suffer Immediate And Irreparable Harm If T-Data Is Not Enjoined

Lycos will be immediately and irreparably harmed if T-Data is not enjoined from suspending, terminating, or otherwise ceasing to provide services under the Transaction Documents. Specifically, if T-Data terminates the Transaction Documents without providing Lycos with appropriate Termination Assistance Services, a majority of Lycos' internet content will "go dark." (Verified Compl. ¶ 25). Without an operating web server housing location, there would be no access to the majority of Lycos' web pages and Lycos would be unable to

- 5 -

operate as an ongoing business. (*Id.*). Upon termination of the Transaction Documents, Lycos will require several months to coordinate and put in place an alternate location for housing its web servers, which is presumably the reason the parties negotiated the Termination Assistance Services provision – to provide a "bridge" between T-Data and a successor company, thus ensuring that Lycos' web content remains online and accessible at all times. (*Id.* at ¶ 26). Lycos has advised T-Data and, upon information and belief, T-Data knows, that termination of the Transaction Documents without providing Termination Assistance Services would cause Lycos significant and irreparable harm. (*Id.* at ¶ 27). In circumstances such as this – where the action sought to be enjoined by the plaintiff would effectively put the plaintiff out of business – there can be no doubt that the plaintiff has met its burden of showing irreparable harm. *See Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Co.*, 399 Mass. 640, 643 (1987) (irreparable harm exists "where the loss threatens the very existence of the movant's business").

### C.    The Balance Of Equities Favors Issuance Of The Requested Relief

The balancing of the potential harm to both sides further supports granting Lycos injunctive relief. The potential harm to Lycos if T-Data is allowed to suspend services upon termination of the Transaction Documents without providing Termination Assistance Services would be immediate and irreparable, as discussed above. On the other hand, T-Data would suffer no harm in providing Lycos with Termination Assistance Services required under the Master Services Agreement that Lycos has agreed to pay for in advance on a monthly basis. Particularly where the potential harm to Lycos is so catastrophic, the balance of equities tilts strongly in Lycos' favor. *See Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 622 (1980) (holding that any harm a party may suffer is "far outweighed" when the harm to

the other party has the potential to "seriously disrupt and probably wipe out [the party's] business").

Courts have broad discretion to fashion such relief as will address the harm being suffered in a given case, and are encouraged to utilize their creative equitable powers in fashioning an appropriate injunctive remedy. *See Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 649 (1976). Here, the Court is being asked to issue a narrowly-tailored injunction protecting Lycos' very existence without imposing any harm at all on T-Data by simply requiring T-Data to live up to the terms of the Transaction Documents. The public interest encourages enforcement of contracts such as the Transaction Documents, and will not be adversely affected by an injunction barring T-Data from suspending the services described in the Transaction Documents, and from refusing to negotiate terms under which T-Data will provide Termination Assistance Services requested by Lycos.

## CONCLUSION

Because Lycos has clearly shown that it will likely prevail on the merits, that "immediate and irreparable injury" will result if Billings is not prevented from suspending services upon termination of the Transaction Documents without providing Termination Assistance Services, and that the balance of the equities rests in Lycos' favor, Lycos respectfully requests that the Court allow the Motion for Preliminary Injunction and grant Prayer B(2) of the Verified Complaint.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  December 23, 2004

1389877.1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPT.
C.A. No.

04-5046

LYCOS, INC.,

    Plaintiff,

v.

TELEFONICA DATA USA, INC.,

    Defendant.



FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

DEC 23 2004

VERIFIED COMPLAINT
FOR INJUNCTIVE AND OTHER RELIEF

| | |
|---|---|
| 3149A000012/23/04CIVIL | 240.00 |
| 3149A000012/23/04SUR CHARGE | 15.00 |
| 3149A000012/23/04SECC | 20.00 |

## NATURE OF THE ACTION

1.     In November, 2003, plaintiff, Lycos, Inc. ("Lycos") and defendant Telefonica Data USA, Inc. ("T-Data") entered into a master services agreement ("Master Services Agreement") and several exhibits and schedules with respect thereto (collectively, the "Transaction Documents") pursuant to which T-Data agreed to provide certain specialized services for housing and operation of web servers owned by Lycos, as well as connections to the World Wide Web.

2.     On  December 20, 2004, T-Data sent Lycos a letter threatening threat to terminate the Transaction Documents at 3:00 p.m. EST on December 30, 2004.  Termination of the Transaction Documents and suspension of services without delivery of appropriate Termination Assistance Services would cause the majority of Lycos's Internet business to "go dark," effectively shuttering more than 50% its Internet operations and putting Lycos out of business.

3.    Accordingly, Lycos seeks:

A.    a declaration under G.L. c. 231A, § 1 that if T-Data terminates the Transaction Documents, it may not suspend services upon termination but must provide the Termination Assistance Services under section 7.4 of the Master Services Agreement for which Lycos is willing to pay as provided therein; and

B.    preliminary and permanent injunctions barring T-Data from suspending, terminating, or otherwise ceasing to provide Services (as that term is defined in the Transaction Documents) pending further order of the Court and from refusing, if T-Data terminates the Transaction Documents, to negotiate, as provided under Paragraph 7.4 of the Master Services Agreement, delivery of Termination Assistance Services requested by Lycos.

## PARTIES

4.    Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

5.    Defendant Telefonica Data USA, Inc. is a Florida corporation with a principal place of business at 1221 Brickell Avenue, Suite 600, Miami, Florida 33131.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this matter pursuant to G.L. c. 231A, § 1 and G.L. c. 214, § 1.

7.    This Court has personal jurisdiction over T-Data under G.L. c. 223A, § 3, because (a) T-Data transacts business in the Commonwealth as evidenced by, among other things, having entered into the Transaction Documents with Lycos, a Massachusetts

- 2 -

corporation, and having communicated with Lycos in Massachusetts concerning those

documents; and (b) T-Data contracted to provide services in Massachusetts.

8.    Venue is proper in this county pursuant to G.L. c. 223, §§ 1, 8(2).

## FACTS

9.    Lycos consists of a network of globally branded media properties and

aggregated content distributed primarily through the World Wide Web.  Lycos provides web

search and directory services, community and personalization features, and personal web

publishing.  Lycos seeks to draw viewers to its web sites by providing a one-stop destination

for information and communication.  Lycos generates revenue primarily through selling

advertising and sponsorships on its web sites, electronic commerce, and by licensing its

products and technology.

10.    Companies such as Lycos that depend on fast, reliable and uninterrupted access

to its web sites by a large volume of users typically hire the services of a company offering

high-capacity data and communication services, including web-server housing and internet

connectivity.  In layman's terms, a web host "broadcasts" its customer's web sites on the

internet by electronically "warehousing" that customer's web site files and related web-based

services (i.e., email, electronic commerce) on a web server.  A web server is simply a

computer built specifically for web hosting that runs a software program that systematically

controls network access by distributing internet resources from a central point to other

computers.  A web server waits for and then fulfils requests from users' computers on the

internet to access a particular web site.

11.    T-Data houses Lycos' web-servers. It employs a physical building or room with security systems, redundant power supply and climate and temperature controls, along with network connectivity, to ensure that Lycos' servers never "go down."

12.    On or about November 18, 2003, Lycos and T-Data entered into the Transaction Documents whereby T-Data agreed to provide to Lycos certain data storage, web server housing, and networking and communication services, described in detail in the Transaction Documents (the services provided pursuant to the Transaction Documents, together, the "Services"). Under section 4.1 of the Master Services Agreement, T-Data is required to render invoices to Lycos on a monthly basis for Services, and Lycos is to make payment for those Services within 30 days. A copy of the Transaction Documents attached hereto as Exhibit A.

13.    As Lycos began receiving invoices from T-Data for Services rendered under the Transaction Documents, Lycos began to notice recurrent errors and miscalculations in those invoices. These invoicing errors and miscalculations caused significant discord between the parties. T-Data often threatened to terminate Services if Lycos did not pay the incorrect invoices in full, even while the parties were trying to resolve the errors. Notwithstanding these threats, the practice of the parties was to resolve the invoices before Lycos would make any payment. As a result, Lycos often paid invoices more than thirty days after receiving them.

14.    Invoicing errors continued in Fall, 2004. The invoice covering September, 2004, was erroneous in that it failed to give Lycos a credit of approximately $130,000 for amounts Lycos had overpaid in prior months. A true and accurate copy of the September, 2004 invoice is attached hereto as Exhibit B.

- 4 -

15. And, for reasons that are unclear, Lycos did not receive T-Data's invoices for October, November and December of 2004 until they were emailed and faxed to Lycos by T-Data on December 14, 2004. A true and accurate copy of the December 14, 2004 email from Sam Ortiz at T-Data to Dean Batten at Lycos is attached hereto as <u>Exhibit C</u>, and true and accurate copies of the October, November and December, 2004 invoices are attached hereto as <u>Exhibits D</u>, <u>E</u> and <u>F</u>, respectively. In fact, Bert Knorr, formerly Lycos' contact with T-Data, advised Lycos personnel before he left Lycos' employment on November 11, 2004, that he had not yet received the invoice for October. <u>See</u> e-mail attached as <u>Exhibit G</u>. (While T-Data maintains it sent the October-December invoices to Lycos prior to December 14, 2004, it has failed, despite several requests, to provide evidence of such delivery to Lycos.)

16. When Lycos finally received the invoices covering the period from October through December, Lycos discovered numerous errors, miscalculations and discrepancies in each of them.

17. Because Lycos did not receive the invoices covering the period from October through December until December 14, 2004, Lycos is not obligated to pay them until January 13, 2005.

18. On December 16, 2004, two days after receiving the invoices covering October through December, Lycos advised T-Data of numerous errors in those invoices. A true and accurate copy of the December 16, 2004 email from Dean Batten at Lycos to Sam Ortiz at T-Data is attached hereto as <u>Exhibit H</u>.

19. T-Data then sent Lycos a letter dated December 20, 2004, threatening to terminate the Transaction Documents if Lycos did not pay the full amount of the September and October invoices on or before 3:00 p.m. EST on December 30, 2004, even though both

invoices contained errors and the October invoice was not due and payable until January 13, 2005. A true and accurate copy of the December 20, 2004 letter from T-Data to Dean Batten, who works for Lycos in Massachusetts, is attached hereto as Exhibit I.

20.    In response to T-Data's letter, Lycos paid T-Data $154,751.06 on December 21, 2004, almost the entire amount T-Data had demanded with respect to the September invoice after deducting the approximately $130,000 credit to which Lycos was entitled. Approximately $600 remains in dispute with respect to the September invoice.

21.    Also on December 21, 2004, T-Data sent Lycos an e-mail in which it admitted that the October, November, and December invoices contained errors. A true and accurate copy of this e-mail is attached hereto as Exhibit J.

22.    On December 22, 2004, Lycos sent T-Data a letter advising T-Data that it (T-Data) had no right to terminate the Transaction Documents on December 30, 2004 because Lycos had paid the amount outstanding under the September invoice, and the October invoice, which T-Data had admitted contained errors and miscalculations, was not due until January, 2005. The letter also demanded that if T-Data terminated the Transaction Documents, that T-Data provide Termination Assistance Services to Lycos under section 7.4 of the Master Services Agreement. That section provides, in pertinent part, as follows:

> Upon the termination . . . of th[is] Agreement, Telefonica Data agrees to provide Termination Assistance Services consisting of continuation of any part or all of the Services to [Lycos] for up to eighteen (18) months following termination . . . of this Agreement. Termination Assistance Services shall be provided subject to, and in accordance with, the terms and conditions of this Agreement, except for the charges for such Termination Assistance Services, which such charge the Parties will mutually agree upon prior to the commencement of the Termination Assistance Services. The Parties agree that the charges for such Termination Assistance Services will be in accordance with the pricing principles of [the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003]. In the

- 6 -

event of termination resulting from an unremedied breach by [Lycos],
Telefonica Data shall be obligated to provide Termination Assistance Services
only so long as [Lycos] pays for Services that are part of such Termination
Assistance Services monthly in advance of the date the Services are to be
provided.

Lycos offered in its December 22, 2004 letter, even though it was not required to do so, to pay

for Termination Assistance Services monthly in advance. A true and accurate copy of the

letter from Lycos to T-Data dated December 22, 2004 is attached hereto as Exhibit K.

23.    Lycos is uncertain as to whether T-Data intends to provide Termination

Assistance Services, as Lycos has requested, after T-Data terminates the Transaction

Documents on December 30, 2004.

24.    Lycos at all times has been and remains ready, willing and able to pay all

undisputed invoice amounts when they become due and payable, to negotiate in good faith with

T-Data concerning all disputed amounts and, assuming T-Data terminates the Transaction

Documents, to negotiate the delivery of the Termination Assistance Services.

25.    If T-Data were to terminate the Transaction Documents and immediately

suspend Services without providing the Termination Assistance Services Lycos requires and

for which section 7.4 of the Master Services Agreement provides, the majority of Lycos'

Internet business would "go dark." Without an operating web server housing location, there

would be no access to the majority of Lycos' web pages and Lycos would be unable to operate

as an ongoing business.

26.    Upon termination of the Transaction Documents, Lycos will require several

months to coordinate and put in place an alternate location for housing its web servers, which

is presumably the reason the parties negotiated the Termination Assistance Services provision –

to provide a "bridge" between T-Data and a successor company, thus ensuring that Lycos' web content remains online and accessible at all times.

27.    Lycos has advised T-Data and, upon information and belief, T-Data knows, that termination of the Transaction Documents without providing Termination Assistance Services would cause Lycos significant and irreparable harm.

## COUNT I
### (Declaratory Relief)

28.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 27 above.

29.    A controversy or dispute exists between the parties concerning T-Data's right, after termination, to suspend the Services it provides to Lycos without providing Termination Assistance Services.

30.    Under G.L. c. 231A, § 2, declaratory relief is an appropriate means to secure determinations of rights under a contract, such as the Transaction Documents.

31.    Lycos seeks a declaration under G.L. c. 231A, § 1 that even if T-Data may terminate the Transaction Documents, it may not suspend Services upon termination and must provide the Termination Assistance Services under section 7.4 of the Master Services Agreement for which Lycos is willing to pay as provided therein.

WHEREFORE, Lycos requests the relief set forth below.

## Count II
### (Injunctive Relief)

32.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 31 above.

33.    Lycos has a reasonable likelihood of success on its claim for declaratory relief because Lycos has fulfilled its obligations under the Transaction Documents by both paying the amount outstanding under the September, 2004 invoice, and by standing ready, willing and able to make payment of all undisputed amounts under the October, November and December 2004 invoices when they become due and payable on January 13, 2005.

34.    Even if Lycos has not fulfilled its obligations such that T-Data may terminate the Transaction Documents, because Lycos has offered to pay monthly in advance for Termination Assistance Services, T-Data is obliged to provide such services and may not simply suspend Services. See Exhibit A, § 7.4.

35.    Lycos will suffer irreparable harm if Services are suspended.  Specifically, if T-Data terminates the Transaction Documents without providing Lycos with appropriate Termination Assistance Services, a majority of Lycos' internet content will "go dark" and Lycos' customers will be unable to access a majority of its web site, effectively putting Lycos out of business, whereas T-Data would suffer no harm in providing Lycos with Termination Assistance Services required under the Master Services Agreement that Lycos has agreed to pay for in advance on a monthly basis.

36.    The harm to Lycos of suspension of Services far outweighs any harm to T-Data of having to provide and be paid for Termination Assistance Services.

37.    The public interest encourages enforcement of contracts such as the Transaction Documents, and will not be adversely affected by an injunction barring T-Data from suspending the Services described in the Transaction Documents, and from refusing to negotiate terms under which T-Data will provide Termination Assistance Services requested by Lycos.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT III
### (Attorneys' Fees)

38.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 37 above.

39.    Under section 11.12 of the Master Services Agreement, in any litigation between Lycos and T-Data, the non-prevailing party is required to pay the reasonable attorneys' fees and expenses of the prevailing party.  See Exhibit A, Master Services Agreement, § 11.12.

40.    Provided the Court enters the relief requested by Lycos in Counts I or II hereof, Lycos is a prevailing party, entitled to payment of its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## PRAYERS FOR RELIEF

WHEREFORE, Lycos respectfully requests that this Court:

A.    On Count I, enter judgment declaring that even if T-Data may terminate the Transaction Documents, it may not suspend Services upon termination and must provide the Termination Assistance Services under section 7.4 of the Master Services Agreement for which Lycos is willing to pay as provided therein.

B.    On Count II,

      1.    schedule a hearing on or before December 29, 2004 on Lycos' request for a preliminary injunction;

    2.      after notice and hearing, enter an order preliminarily enjoining T-Data from suspending, terminating, or otherwise ceasing to provide Services (as that term is defined in the Transaction Documents) pending further order of the Court and from refusing, if T-Data terminates the Transaction Documents, to negotiate, as provided under Paragraph 7.4 of the Master Services Agreement, delivery of Termination Assistance Services requested by Lycos; and

    3.      after notice and hearing, enter judgment permanently enjoining T-Data from suspending, terminating, or otherwise ceasing to provide Services (as that term is defined in the Transaction Documents) pending further order of the Court and from refusing, if T-Data terminates the Transaction Documents, to negotiate, as provided under Paragraph 7.4 of the Master Services Agreement, delivery of Termination Assistance Services requested by Lycos;

C.    On Count III, award Lycos its reasonable attorneys' fees and expenses incurred in prosecuting this action; and

D.    Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,

LYCOS, INC.

By its attorneys,

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000

Dated:  December 23, 2004

- 12 -

## **VERIFICATION**

I, Dean Batten, hereby verify under oath that I have read the foregoing Verified Complaint. The facts contained therein are true and correct to the best of my knowledge, information, and belief based upon my personal knowledge and information collected and made available to me by agents, representative and employees of Lycos, Inc. and its predecessor-in-interest.

Subscribed and sworn to me under the penalties of perjury this 22nd day of December, 2004.

_____
Dean Batten

1389480.2

- 13 -







# MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is entered into by and between Lycos, Inc. ("Customer"), a Massachusetts corporation, and Telefonica Data USA, Inc., a Florida corporation

1.    **Telefonica Data Services; Terms & Conditions.** Customer requests the Telefonica Data services ("Services"), which are checked in the table below.  Telefonica Data will render the Services pursuant to the terms and conditions contained in this Agreement and each applicable Exhibit. Telefonica Data may provide Customer with additional Services by executing additional Exhibits, which will be attached hereto and incorporated into this Agreement. All Services provided under this Agreement or any amendment thereto or to an Exhibit are subject to the attached Master Services Agreement Terms & Conditions, which are hereby incorporated by reference and made a part hereof.

| Exhibit A | ☐ Equipment Purchase | Exhibit G | ☐ Web Hosting |
|-----------|----------------------|-----------|---------------|
| Exhibit B | ☐ Equipment Lease | Exhibit H | ☐ Dial Access |
| Exhibit C | ☒ Collocation | Exhibit I | ☐ Frame Relay |
| Exhibit D | ☒ Data Storage | Exhibit J | ☐ IP Transit |
| Exhibit E | ☐ Operations & Maintenance | Exhibit K | ☒ Back-Up |
| Exhibit F | ☐ Virtual LAN | | |

2.    **Pricing.** All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 ("SAFA") and set forth in each Exhibit and Customer shall pay Telefonica Data all recurring and non-recurring fees and other charges for Services rendered in the amounts and in the manner specified therein and in the Master Services Agreement General Terms & Conditions. The Parties agree that the monthly recurring charges set forth in the Exhibits are subject to an annual price reduction of ten percent (10%) and Telefonica Data shall revise such charges accordingly on the anniversary date of each Service.

3.    **Benchmarking.** On or about each anniversary of the Effective Date (as defined below) during the Term of this Agreement, the Parties shall meet to review the pricing, quality and charges of the Services.  If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA. If the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles, the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.

4.    **Term.** This Agreement shall commence on November 1, 2003 ("Effective Date") and shall continue until the third anniversary of the Effective Date, unless terminated earlier in accordance with the Transaction Documents.

5.    **Preferred Provider.** The Parties agree that Telefonica Data will be the preferred provider of data center and communications services to Customer during the term of the Agreement.  In the event Customer requires the provision of services similar to the Services and Telefonica Data is willing to provide such services at prices and on terms and conditions similar to the Services, Customer agrees that it will engage Telefonica Data to provide such services.

6.    **Entire Agreement; Amendments.** The Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter in this Agreement, and supersede all prior agreements, whether written or oral, with respect to the subject matter contained therein.  The Transaction Documents may be modified only by a written instrument executed by both parties.

**[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the Parties have executed this Agreement through their respective duly authorized officers as of the Effective Date.

| CUSTOMER: LYCOS, INC. | | TELEFONICA DATA USA, INC. | |
|---|---|---|---|
| By: | _(Signature)_ | By: | _(Signature)_ |
| Printed Name: | | Printed Name: | PER PLARNO |
| Title: | CFO | Title: | CEO |
| Date: | 11/18/03 | Date: | 11-20-03 |
| Address: | 100 Fifth Avenue | Address: | 1221 Brickell Avenue, Suite 600 |
| | Waltham, MA 02451 | | Miami, Florida 33131 |
| Fax: | | Fax: | |
| E-Mail: | | E-Mail: | |

## [SIGNATURE PAGE TO MASTER SERVICES AGREEMENT]

## MASTER SERVICES AGREEMENT TERMS & CONDITIONS

### 1. DEFINITIONS.

**1.1. Certain Definitions.** The following terms shall have the following definitions:

(a) "**Affiliate**" shall mean, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity, whether directly or indirectly through one or more intermediaries.

(b) "**Agreement**" shall mean the Master Services Agreement, together with these Master Services Agreement General Terms and Conditions.

(c) "**Business Day**" or "**business day**" shall mean any day on which banks are open for the transaction of banking business in the State of New York, United States of America.

(d) "**Confidential Information**" shall mean all information, in any form, disclosed by the disclosing Party to the other Party which:

(i)   concerns the operations, plans, know-how, trade secrets, business affairs, personnel, customers or suppliers of the disclosing Party; or

(ii)   the receiving Party knows or might reasonably expect is regarded by the disclosing Party as the confidential information of the disclosing Party;

(iii)   is designated as confidential, restricted, proprietary, or with similar designation; or

(iv)   concerns any of the terms or conditions or other facts with respect to the Transaction Documents.

(e) "**Control**" and its derivatives shall mean legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding voting capital stock (or other ownership interest, if not a corporation) of an entity, or actual managerial or operational control over such entity.

(f) "**Days**" or "**days**" shall mean calendar days unless otherwise specified.

(g) "**Effective Date**" shall have the meaning set forth in Section 3 of the first page of the Master Service Agreement.

(h) "**End User**" shall mean the person or entity to which Customer resells or provides equipment, services or space pursuant to the terms of the Transaction Documents.

(i) "**Equipment**" shall mean the equipment, if any, provided by Telefonica to Customer pursuant to an Exhibit.

(j) "**Events of Default**" shall mean any of the following:

(i)   any representation or warranty made by a Party in the Transaction Documents which was incorrect in any respect when made and that could reasonably be expected to have a material adverse effect upon the other Party's ability to realize the benefits of the Transaction Documents;

(ii)   a material breach of the Transaction Documents that is capable of being cured on commercially reasonable terms within thirty (30) Days, which breach is not cured within thirty (30) Days after notice of breach to the breaching Party;

(iii)   a material breach of the Transaction Documents that is not capable of being cured within thirty (30) Days and the breaching Party fails to (A) proceed promptly and diligently after written notice to correct the breach, (B) develop within fifteen (15) Days following written notice of breach a complete plan for curing the breach, and (C) cure the breach within sixty (60) Days after notice thereof;

(iv)   Customer's failure to make any payment or any other amount when such payment or amount is due in accordance with any Transaction Document, which breach is not cured within five (5) business days after notice thereof, or

(v)   a material breach of the Transaction Documents that is not capable of being cured.

(k) "**Intellectual Property Rights**" shall mean all intellectual property rights, including by way of explanation, but not by limitation,

those statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights.

(l) "**Losses**" shall mean liabilities, damages and related costs and expenses, including fines, levies, assessments, reasonable legal fees, and disbursements and costs of investigations, litigation, settlement, judgment, interest and penalties.

(m) "**Parties**" shall mean Customer and Telefonica Data, together.

(n) "**Party**" shall mean Customer or Telefonica Data, individually, as appropriate.

(o) "**Service**" shall mean any of the services Telefonica Data provides Customer pursuant to an Exhibit.

(p) "**Telefonica Data Network**" shall mean Telefonica Data's and/or its Affiliates IP backbone network.

(q) "**Term**" shall have the meaning set forth in Article 3 of the Master Service Agreement.

(r) "**Transaction Documents**" shall mean the Agreement, and all Exhibits and Schedules thereto.

**1.2. Other Definitions.** Other terms used in this Agreement are defined in the context in which they are used and have the meanings there stated or are defined in the applicable Transaction Document.

### 2. END USER CHARGES.

If, pursuant to the terms and conditions of the Transaction Documents, Customer resells the Service(s) ordered by Customer from Telefonica Data, Customer shall have the right to establish, in its sole discretion, the prices it charges End Users for the Service(s) resold pursuant to the Transaction Documents.

### 3. NETWORK INTEGRITY.

**3.1. Non-Interference.** Neither Customer nor its End Users, suppliers, contractors, licensors or licensees shall restrict or interfere with the Telefonica Data Network or the maintenance or use thereof. Upon notice, Customer shall promptly remove any hazard, interference or service obstruction that may be caused by equipment (including Equipment), hardware, software, content or connectivity, owned by or under the control of Customer or its End Users or transmitted through the Telefonica Data Network

**3.2. Remedy.** In the event that Customer or its End Users, suppliers, licensors or licensees restrict or interfere with the Telefonica Data Network or the use thereof, Telefonica Data may, after giving Customer reasonable notice, immediately modify, suspend, delay, condition, or cease until such restriction or interference is cured, performance of its obligations under the Transaction Documents, in whole or in part, to the extent reasonably necessary to remedy such restriction or interference.

**3.3. Liens.** Customer shall not, directly or indirectly, cause any Telefonica Data property (including the Telefonica Data Network) to become subject to any mechanic's lien, materialman's lien, vendor's lien or any similar lien, whether by operation of law or otherwise. If Customer becomes aware that it has breached its obligations under this Section, it shall promptly notify Telefonica Data in writing, cause such lien to be discharged and released of record without cost to the other, as soon as reasonably possible, and indemnify Telefonica Data against all related Losses.

### 4. PAYMENT TERMS.

**4.1. Payment.** Telefonica Data shall provide the Equipment and perform the Services set forth in the Exhibits in accordance with the provisions of the Transaction Documents and Customer shall pay all recurring, non-recurring and other charges for Equipment and/or Services as may be set forth in the Transaction Documents. Unless otherwise provided for in the attached Exhibits, the fees due pursuant to the Transaction Documents shall be payable in accordance with the payment terms in this Article 4. Telefonica Data shall render invoices for Services rendered to Customer on a monthly basis. Payment shall be due and payable no later than thirty (30) days after the date of the invoice. Customer shall make payments under the Transaction Documents by wire transfer of immediately available funds to the United States account or accounts designated by Telefonica Data. At

Telefonica Data's discretion, payments to be made pursuant to the Transaction Documents may be made by check or draft of immediately available funds delivered to the address designated in writing by Telefonica Data. Any amounts not paid when due shall be assessed interest at a monthly rate equal to one percent (1.0%) or the maximum rate allowed by law, whichever is less, from the date the payment was due. If Telefonica Data commences legal proceedings to collect any payment due to it under any of the Transaction Documents, Customer shall be responsible for and pay all reasonable attorneys' fees, court costs and other collection expenses incurred by Telefonica Data.

**4.2. Customer Responsibilities.** Except as specifically provided for in a Transaction Document, Customer shall have sole responsibility for the costs, expenses and deployment of any interconnection, installation and testing necessary to use the Equipment and Services provided herein. In no event will the untimely installation or faulty non-operation of Customer's equipment relieve Customer of its obligation to pay charges for the Services. In addition, delays or failures in obtaining payments from End Users shall not affect Customer's obligation to make payments hereunder to Telefonica Data. Customer is responsible for amounts it cannot collect from End Users.

**4.3. Taxes.** All charges to Customer are calculated exclusive of any applicable federal, state or local use, excise, value-added, gross receipts, sales and privilege taxes, duties, universal service assessments or similar liabilities (other than general income or property taxes imposed on Telefonica Data) associated with the Services or Equipment, whether charged to Telefonica Data, its suppliers or Affiliates, Customer or End User ("Additional Charges"). Such Additional Charges shall be paid by Customer in addition to all other charges provided for in the Transaction Documents, except to the extent Customer provides to Telefonica Data, prior to the shipping of Equipment or commencement of Services, as applicable, a valid tax exemption certificate for all federal, state and local jurisdictions relevant to the Equipment and/or Service.

**5. INTELLECTUAL PROPERTY.** Each Party retains all right, title and interest in and to its respective Intellectual Property Rights. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property Rights, except as otherwise expressly authorized in the Transaction Documents

**6. CONFIDENTIALITY.**

**6.1. Confidential Information.** Each Party acknowledges that after execution of the Transaction Documents, they may be furnished with, receive, or otherwise have access to Confidential Information of the other Party.

**6.2. Exclusion.** Confidential Information excludes any particular information that the receiving Party can demonstrate:

(a) at the time of disclosure, was in the public domain or in the possession of the receiving Party;

(b) after disclosure, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

(c) was received after disclosure from a third party who had a lawful right to disclose such information to the receiving Party without any obligation to restrict its further use or disclosure;

(d) was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; or

(e) was required to be disclosed to satisfy a legal requirement of a competent government body.

**6.3. Obligations.** The following obligations with respect to Confidential Information shall survive the expiration or termination of this Agreement for a period of three (3) years or such longer period as required by regulation, law or court order.

(a) Ongoing Obligation. Each Party's Confidential Information shall remain the property of that Party. Except as may otherwise be required by law or expressly authorized herein, neither Party shall disclose the confidential information of the other Party to any third party without the prior written consent of such other Party. Each Party shall use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent unauthorized disclosure of Confidential Information as it employs to avoid unauthorized disclosure of its own Confidential Information of a similar nature. Except as otherwise permitted hereunder, the Parties may disclose such information to entities performing services

required hereunder where: (i) use of such entity is authorized under the Transaction Documents, (ii) such disclosure is necessary or otherwise naturally occurs in that entity's scope of responsibility, and (iii) the entity agrees in writing to assume the obligations described in this Article. Any disclosure to such entity shall be under the terms and conditions of this Article.

(b) Remedial Measures for Disclosure. Each Party shall take reasonable steps to ensure that its employees comply with this Article. In the event of any disclosure or loss of, or inability to account for, any Confidential Information of the disclosing Party, the receiving Party shall promptly, and at its own expense notify the disclosing Party in writing, and take such actions as may be necessary and cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

(c) Permitted Disclosures. Except as otherwise provided herein, either Party may disclose the terms and conditions of these Transaction Documents to third parties that (i) have expressed a bona fide interest in consummating a significant financing, merger or acquisition transaction between such third parties and such Party, (ii) have a reasonable ability (financial and otherwise) to consummate such transaction, and (iii) have executed a nondisclosure agreement that includes within its scope the terms and conditions of this Article or substantially similar terms and conditions and also includes a procedure to limit the extent of copying and distribution of these Transaction Documents. Each Party shall endeavor to delay the disclosure of the terms and conditions of this Agreement until the status of discussions concerning such transaction warrants such disclosure.

(d) Required Disclosures. A Party receiving a request under Section 6.2(e) to disclose Confidential Information shall immediately upon receiving such request, and to the extent that it may legally do so, advise the disclosing Party promptly and prior to making such disclosure in order that the disclosing Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information

**6.4. No Implied Rights.** Nothing contained in this Article shall be construed as obligating a Party to disclose its Confidential Information to the other, or as granting to or conferring on a Party any express or implied right or license to the Confidential Information of the other Party.

**7. TERMINATION.**

**7.1. Default.**

(a) In the event that either Party commits an Event of Default under Sections 1.1(j)(i), (iv) or (v), then the other Party may, by giving written notice to the defaulting Party, immediately terminate the applicable Transaction Document.

(b) In the event that either Party commits an Event of Default under Sections 1.1(j)(ii) or (iii), then the other Party may, by giving written notice to the defaulting Party, terminate the applicable Transaction Document upon the expiration of the applicable cure period.

(c) In addition to the right to terminate pursuant to subsections (a) and (b) above, the non-defaulting party may pursue any legal remedies it may have under applicable law or principles of equity relating to such breach and subject to the terms of this Section.

**7.2. Insolvency.** Either Party may immediately terminate the Transaction Documents if the other Party (a) ceases to do business in the normal course for a continuous period of at least thirty (30) Days; (b) becomes or is declared insolvent or bankrupt; (c) is the subject of any proceeding related to its liquidation or insolvency (whether voluntarily or involuntarily) which is not dismissed within ninety (90) Days; (d) makes an assignment for the benefit of creditors; (e) experiences a material adverse change in financial condition which may reasonably be expected to affect its ability to perform; or (f) fails to comply with a written request for reasonable assurances within ten (10) Days or otherwise repudiates the Transaction Documents.

**7.3. Effect of Termination.** Termination of the Transaction Documents refers to the termination of the Parties' respective commitments and obligations from and after the date of termination, but does not relieve the Parties of their payment and other obligations incurred prior to the date of termination.

**7.4 Termination Assistance Services.** Upon the termination or expiration of the Agreement, Telefonica Data agrees to provide Termination Assistance Services consisting of continuation of any part or all of the

Services to Customer for up to eighteen (18) months following the termination or expiration of this Agreement. Termination Assistance Services shall be provided subject to, and in accordance with, the terms and conditions of this Agreement, except for the charges for such Termination Assistance Services, which such charges the Parties will mutually agree upon prior to the commencement of the Termination Assistance Services. The Parties agree that the charges for such Termination Assistance Services will be in accordance with the pricing principles of SAFA. In the event of termination resulting from an unremedied breach by Customer, Telefonica Data shall be obligated to provide Termination Assistance Services only so long as Customer pays for Services that are part of such Termination Assistance Services monthly in advance of the date the Services are to be provided.

**7.5. Shutdown/Transfer of Data Center.** In the event that during the Term of the Agreement the Telefonica Data data center located at 11300 N.W. 25th Street, Miami, Florida 33172 (the "Data Center") is to be shutdown or transferred to a non-Affiliate of Telefonica Data requiring Customer to move its technology infrastructure located at the Data Center to another location, Telefonica Data agrees (a) to provide Customer with notice of such event as soon as practicable and in any event at least sixty (60) days prior to the shut down or transfer, and (b) pay Customer the lesser of (i) Customer's Migration Costs, as defined below, and (ii) One Million Dollars ($1,000,000). Telefonica Data agrees to pay such amount within thirty (30) days of its receipt of an itemized invoice from Customer, together with supporting documentation, of its Migration Costs. For purposes of this Section, "Migration Costs" means the reasonable migration costs actually incurred by Customer to move its infrastructure to the new location, including, but not limited to, the costs of the physical move of Customer's infrastructure (breakdown, package, transport, delivery and reassembly), the costs of communication links between the Data Center and the new location during the migration period, the costs of professional services to supervise and oversee the migration and the costs of any necessary "swing gear" purchased or leased by Customer in connection with the migration.

**7.6 Wrongful Termination of Transaction Documents by Customer.** In the event Customer wrongfully terminates the Transaction Documents at any time prior to the expiration of the Term, then, in addition to any other damages for which Customer may be liable under the terms of the Transaction Documents, Customer agrees to pay Telefonica Data the product of Five Hundred Thousand Dollars ($500,000) times a fraction, the denominator of which is thirty-four (34) and the numerator of which is thirty-four (34) minus the number of months since the inception of the Term that Customer has paid the undisputed monthly recurring charges under the Transaction Documents, as reimbursement for the capital expenditures made by Telefonica Data to provide Customer the Services. Customer agrees to pay such amount within thirty days of the date of Customer's wrongful termination of the Transaction Documents.

## 8. REPRESENTATIONS; WARRANTIES; DISCLAIMERS.

**8.1 Representations.** Each Party represents and warrants to the other Party that:

(a) it has the requisite corporate power and authority to enter into the Transaction Documents and to carry out the transactions contemplated by the Transaction Documents;

(b) the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by the requisite corporate action on its part; and

(c) the Transaction Documents have been duly executed and delivered, and create lawful, valid and legally binding obligations, in accordance with their respective terms.

Additionally, Telefonica Data represents and warrants to Customer that as of the Effective Date Telefonica Data possesses sufficient ownership rights, title, and interests, and/or licenses, and the ability to offer and provide the Services, including without limitation, all intellectual property rights and third party consents, during the Term.

**8.2 Third Party Warranties.** Telefonica Data shall pass through to Customer all warranties covering Equipment and/or Services provided under the Transaction Documents to the extent that Telefonica Data is able pursuant to the agreements under which it obtained the warranties.

**8.3 Restrictions.** CUSTOMER SHALL NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, WHETHER WRITTEN OR ORAL, TO THIRD PARTIES, INCLUDING WITHOUT LIMITATION, END USERS ON TELEFONICA DATA'S BEHALF THAT ARE NOT EXPRESSLY AUTHORIZED HEREIN OR THAT MATERIALLY DEPART FROM ANY APPLICABLE SERVICE LEVEL COMMITMENT IN ANY TRANSACTION DOCUMENT.

**8.4 Disclaimers.**

(a) EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN A TRANSACTION DOCUMENT, ANY EQUIPMENT OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS ARE PROVIDED "AS IS" AND "AS AVAILABLE", AND NEITHER TELEFONICA DATA NOR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS MAKE ANY WARRANTIES TO CUSTOMER OR TO ANY OTHER THIRD PARTY INCUDING, WITHOUT LIMITATION, END USER, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT RELATING TO ANYTHING PROVIDED OR USED UNDER THE TRANSACTION DOCUMENTS OR DESCRIBED THEREIN, AND ANY SERVICES, EQUIPMENT, MATERIAL, GOODS, REAL ESTATE OR OTHER TANGIBLE OR INTANGIBLE ASSET THAT IS CONVEYED, HYPOTHECATED, LEASED, SOLD, OR OTHERWISE PROVIDED TO CUSTOMER IN ANY MANNER, OR AS TO ANY OTHER MATTER, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED.

(b) WITHOUT LIMITING THE FOREGING DISCLAIMER, TELEFONICA DATA FURTHER MAKES NO WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, REGARDING ANY MERCHANDISE, INFORMATION, PRODUCTS OR SERVICES PROVIDED THROUGH THE INTERNET OR ANY OTHER NETWORK. FURTHERMORE, TELEFONICA DATA HEREBY DISCLAIMS THAT ANY EQUIPMENT, PRODUCTS OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT CERTAIN RESULTS MAY BE OBTAINED BY ANYONE IN CONNECTION WITH THEIR USE.

**8.5 Use.** Telefonica Data shall provide, and Customer shall use, all Equipment and Services in accordance with all applicable laws and regulations.

**8.6 Provisioning Services.** Telefonica Data may, with the prior consent of Customer, which shall not be unreasonably, withheld, conditioned or delayed, provide or perform such Services through Affiliates, subcontractors or authorized agents. Notwithstanding the foregoing, Telefonica Data shall remain liable for the performance of its and its Affiliates', subcontractors' and authorized agents' obligations under the Transaction Documents.

## 9. LIABILITY.

**9.1 General Intent.** Subject to the specific provisions of this Article, it is the intent of the Parties that each shall be liable to the other only for any direct damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by the Transaction Documents.

**9.2 Liability Restrictions.**

(a) NOTWITHSTANDING ANYTHING IN THE TRANSACTION DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, LOSS OF REVENUE, INCOME, PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE, WHETHER SUCH CLAIM IS CHOATE OR INCHOATE, WHETHER BY STATUTE, IN TORT, OR IN CONTRACT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR CONTENT THAT IS TRANSMITTED BY CUSTOMER OR THIRD PARTIES INCLUDING, WITHOUT

(c)  IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR ANY DEFECT, ERROR, INTERRUPTION, DELAY, OR ATTENUATION OF SERVICES CAUSED BY OR RESULTING FROM ANY EQUIPMENT NOT OWNED BY TELEFONICA DATA AND USED BY CUSTOMER OR AN END USER.

(d)  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED UNDER ANY TRANSACTION DOCUMENT, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER. CUSTOMER'S REMEDIES SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID UNDER ANY TRANSACTION DOCUMENT ARE LIQUIDATED, CUSTOMER ACKNOWLEDGES THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OBTAINING AN ADEQUATE REMEDY IS OTHERWISE INCONVENIENT, AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONBALE APPROXIMATION OF THE HARM OR LOSS. CUSTOMER CONFIRMS THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THE TRANSACTION DOCUMENTS SATISFY THE ESSENTIAL PURPOSES THEREOF.

(e)  EACH PARTY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF (I) ACTUAL DIRECT DAMAGES OR (II) TWO MILLION DOLLARS ($2,000,000).

(f)  THE LIMITATION SET FORTH IN SECTION 9.2(e) SHALL NOT APPLY WITH RESPECT TO (I) THIRD PARTY CLAIMS SUBJECT TO INDEMNIFICATION PURSUANT TO THE TRANSACTION DOCUMENTS; (II) FEES DUE AND OWING UNDER THE TRANSACTION DOCUMENTS FOR SERVICES ALREADY RENDERED OR (III) CLAIMS ARISING OUT OF A BREACH OF ANY CONFIDENTIALITY PROVISIONS.

(g)  FOR PURPOSES OF THIS SECTION AND SUBJECT TO SECTION 9.2(f), ALL AMOUNTS PAYABLE OR PAID TO THIRD PARTIES IN CONNECTION WITH CLAIMS THAT ARE ELIGIBLE FOR INDEMNIFICATION PURSUANT TO THIS AGREEMENT SHALL BE DEEMED DIRECT DAMAGES.

**9.3  Force Majeure.**

(a)  Neither Party shall be liable for any default or delay in the performance of its obligations under the Transaction Documents if and to the extent such default or delay is caused, directly or indirectly, by fire, explosion, cable cuts, vandalism, sabotage, power outage, flood, lightning, earthquake, elements of nature or "acts of God", war, riots, any civil or military authority (by national emergency or acts of third parties), civil disorders, rebellions, revolutions, insurrections, or acts of terrorism, naturally occurring or man-made obstructions to transmissions, provided the existence of such obstructions is beyond the responsible Party's control, lack of or delay in transportation, government obstructions to transmissions, government codes, ordinances, laws, rules, regulations or restrictions, provided that such default or delay could not have been prevented by reasonable precautions by the Party with the obligation to perform and cannot be reasonably circumvented by the Party with the obligation to perform through the use of alternate sources, workaround plans or other means (a "Force Majeure Event").

(b)  In such event, the Party with the obligation to perform shall as soon as practicable give written notice to the other Party specifying the nature and anticipated duration of the Force Majeure Event and outline its recovery plan, if any. The Party with the obligation to perform shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent reasonably practicable without delay.

(c)  The other Party may terminate all or any portion of the applicable Transaction Document if a Force Majeure Event continues for forty-five (45) days. In the event of such a termination, the terminating Party shall be obligated to pay for services properly performed up through the date of termination.

**10.  INDEMNIFICATION.**

**10.1  Parties' Obligations.**

(a)  **Mutual Obligations.**  Each Party shall, at its expense, indemnify, defend and hold harmless the other Party and its Affiliates, as well as its officers, directors, employees, managers, contractors, agents, successors, and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of the following:

(i)  the death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of the indemnifying Party;

(ii)  the damage, loss or destruction of any real or tangible personal property resulting from the negligence or willful misconduct of the indemnifying Party or from the malfunction or failure of the indemnifying Party's equipment;

(iii)  taxes, together with interest and penalties, that are the responsibility of the other Party;

(iv)  claims by government regulators or agencies for fines, penalties, sanctions or other remedies arising from or in connection with a Party's failure to perform its responsibilities under this Agreement; and

(v)  breach of any representation or warranty set forth in the Transaction Documents.

(b)  **Customer's Obligations.**  Customer shall, at its expense, indemnify, defend and hold harmless Telefonica Data and its Affiliates, as well as their officers, directors, employees, managers, contractors, agents, successors and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of Customer's use of the Services, Equipment and Products provided under the Transaction Documents including without limitation, such Losses or threatened Losses arising from, related to, incurred in connection with, or based on allegations of any of the following:

(i)  any misuse of the Equipment or Services by Customer or an End User;

(ii)  any use by Customer or an End User of non-Telefonica Data furnished products or services, facilities, equipment and/or software with any Equipment or Service not recommended or otherwise approved in writing by Telefonica Data; or

(iii)  any transmission of content not supplied by Telefonica Data over or through the Telefonica Data Network or system.

**10.2  Intellectual Property Rights.**

(a)  **Obligations.**  Each Party shall, at its expense, indemnify, defend and hold harmless the other Party, and the other Party's Affiliates, officers, directors, employees, managers, contractors, agents, successors, and assigns, from and against any Losses and threatened Losses arising from, in connection with or based on any allegations arising under the Transaction Documents of infringement or misappropriation of any Intellectual Property Rights of the owning or controlling Party or any third party, except to the extent that any such allegations arise from (i) modification of such products or services, or any component thereof, by the indemnified Party that is not recommended or otherwise approved by the indemnifying Party, or (ii) use of the products or services by indemnified Party in combination with deliverables furnished by third parties that is not recommended or otherwise approved by indemnifying Party, to the extent that any such claim or allegation is directed to such combination.

(b)  **Exclusive Liability and Remedy.**  If any Service provided under any Transaction Document has become (or in Telefonica Data's reasonable judgment is likely to become) the subject of a third party infringement claim, Telefonica Data may, at its sole discretion and without further liability, do any of the following, which, together with the obligations set forth under Section 10.2(a) above, shall constitute Telefonica Data's sole obligation to Customer hereunder and Customer's exclusive remedy against Telefonica Data:

(i)  at Telefonica Data's cost, obtain for Customer the right to continue use of the Service; or

(ii)  at Telefonica Data's cost, replace or modify the Service so that it no longer is subject to the third party infringement claim.

**10.3  Procedure.**  The Party to be indemnified under Section 10.1 or 10.2 ("Indemnitee") shall promptly notify the indemnifying Party under Section 10.1 or 10.2 ("Indemnitor") in writing of any claim for indemnification.

The Indemnitor shall have sole control of the defense and all related settlement negotiations with respect to the claim. The Indemnitee shall have the right, but not the obligation, to participate in the defense of any such claim or action through counsel of its own choosing at its own expense; provided, however, that if the Indemnitor fails to promptly assume the defense of a claim, the Indemnitee may assume the defense at the Indemnitor's cost and expense. The Indemnitee shall cooperate fully and execute all documents necessary for the defense of such claim. The Indemnitee shall have the right to approve settlement of any claim, such approval not to be unreasonably withheld or delayed, provided that the Indemnitee shall not be required to approve any settlement that involves an admission of liability or wrongful conduct on the part of the Indemnitee or restricts its ability to conduct its business in any material respect. In the event the Parties agree to settle a claim, neither Party shall publicize the settlement without first obtaining the written permission of the other Party, which permission will not be unreasonably withheld or delayed.

## 11  GENERAL.

### 11.1 Binding Nature and Assignment.

(a)  The Transaction Documents shall accrue to the benefit of and be binding upon the Parties and any permitted purchaser or any successor entity into which either Party has been merged or consolidated or to which either Party has sold or transferred all or substantially all of its assets.

(b)  Except as otherwise expressly provided in a Transaction Document, neither Party may, or shall have the power to, assign the Transaction Documents or delegate such Party's obligations hereunder, in whole or in part, without the prior written consent of the other, except that either Party may assign its rights and obligations under the Transaction Documents without the approval of the other Party to

(i)  an entity that acquires all or substantially all of the assets of such Party,

(ii)  to any Affiliate, in which event the assignor shall remain liable as a guarantor of the assignee/Affiliate's performance of such Party's obligations hereunder, or

(iii)  to a successor in a merger or acquisition, provided that such an assignee has the financial, technical and management capacity to perform all of the assignor's obligations hereunder.

### 11.2 Notices.
Any notices, requests, demands, and determinations under this Agreement (other than routine operational communications), shall be in writing and shall be deemed duly given (a) when delivered by hand, (b) one (1) Business Day after being transmitted via an express, overnight courier with a reliable system for tracking delivery, delivery costs paid (c) when sent by confirmed facsimile or email with a copy delivered by another means specified in this Section, or (d) on the day an authorized employee of the receiving party accepts receipt in writing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, to the address listed on the first page of the Master Services Agreement. A Party may from time to time change its address or designee for notice purposes by giving the other prior written notice of the new address or designee and the date upon which it will become effective.

### 11.3 Counterparts.
The Transaction Documents may be executed in counterparts, all of which taken together shall constitute one single agreement between the Parties.

### 11.4 Relationship of Parties.
The Parties are independent contractors, bound to each other only as provided for herein. Neither Party has the authority to bind, act on behalf of or represent the other. Nothing in the Transaction Documents creates a relationship of partnership, employer and employee, principal and agent, master and servant, or franchisor and franchisee. Neither Party shall act or fail to act in a way that could reasonably cause others to believe that it has authority to act on behalf of the other beyond the authority expressly granted herein.

### 11.5 Severability and Modification.

(a)  In the event that any provision of the Transaction Documents conflicts with the law under which the Transaction Documents are to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision shall be deemed to be modified to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law. The remainder of the Transaction Documents shall remain in full force and effect.

(b)  If any state or federal body of competent jurisdiction determines that any provision of the Transaction Documents violates any applicable rules, policies, or regulations, both Parties shall make reasonable efforts to promptly bring the Transaction Documents into compliance and shall endeavor in those efforts to preserve for both Parties the economic benefits as reflected in the Transaction Documents to the maximum extent possible.

### 11.6 Consents and Approval.
Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under the Transaction Documents, such action shall not be unreasonably delayed, conditioned or withheld. An approval or consent given by a Party under the Transaction Documents shall not relieve the other Party from responsibility for complying with the requirements of the Transaction Documents, nor shall it be construed as a waiver of any rights under the Transaction Documents, except as and to the extent otherwise expressly provided in such approval or consent.

### 11.7 Waiver of Default.
No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced. A delay or omission by either Party hereto to exercise any right or power under the Transaction Documents shall not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant.

### 11.8 Cumulative Remedies.
Except as otherwise expressly provided, all remedies provided for in the Transaction Documents shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

### 11.9 Survival.
Any provision of the Transaction Documents that contemplates performance or observance subsequent to any termination or expiration of the Transaction Documents (in whole or in part) shall survive any termination or expiration of the Transaction Documents (in whole or in part, as applicable) and continue in full force and effect.

### 11.10 Public Disclosures.
Any public use of a Party's name, trademark, service mark or trade dress, as well as all media releases, public announcements, and public disclosures relating to this Agreement or the subject matter of this Agreement, including promotional or marketing material, but not including announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, shall be coordinated with and shall be subject to the prior written approval by each Party prior to release.

### 11.11 Third Party Beneficiaries.
Except as otherwise provided in the Transaction Documents, the Transaction Documents shall not be deemed to create any rights in third parties, including End Users, suppliers and customers of a Party, or to create any obligations of a Party to any such third parties, or to give any right to either Party to enforce this Agreement on behalf of a third party.

### 11.12 Governing Law and Prevailing Party.
The Transaction Documents and performance under them shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law principles or the Convention on Contracts for the International Sale of Goods. In the event of any dispute between the Parties concerning the Transaction Documents, the parties agree that the prevailing Party in any such dispute shall be reimbursed for, and the non-prevailing Party shall pay, the reasonable attorneys' fees and expenses of the prevailing Party.

### 11.13 Amendment.
The Transaction Documents shall not be modified, amended or in any way altered except by an instrument in writing signed by both Parties.

### 11.14 Incorporation by Reference and Order of Precedence.

(a)  All Exhibits and Schedules are incorporated by reference into this Agreement. Any amendments to this Agreement (including with respect to exhibits and schedules) that are agreed upon by the Parties subsequent to the Effective Date, shall likewise be incorporated by reference into this Agreement.

(b)  Any conflict among or between the documents making up the Transaction Documents will be resolved in accordance with the following order of precedence (in descending order of precedence):

(i)  the Schedules,

(ii)  the Exhibits, and

(iii)  this Agreement.

**11.15 Export Control.** The export and/or import of certain products, including items to be resold under any attached exhibits and/or Confidential Information may be subject to domestic and/or foreign government export and/or import laws, rules, policies, procedures, restrictions and regulations. The Parties represent and warrant that they will comply with all applicable governmental laws, statutes, ordinances, administrative orders, procedures, policies, rules, regulations and restrictions including, without limitation, those related to the export and/or import of encryption items and technical materials. Each Party shall provide the other Party with prompt written notice of any export or import restrictions relating to the products and/or Confidential Information.

*Telefonica*



**EXHIBIT C**

**TO**

**MASTER SERVICES AGREEMENT**

**COLLOCATION**

This COLLOCATION EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 1̲6̲, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

   1.1.    **"Bandwidth"** shall mean the bandwidth provided to Customer to connect Customer Equipment to the public Internet. The baseline bandwidth shall be burstable as specified in Schedule C-1. Telefonica Data shall provide Bandwidth in accordance with the service level objectives set forth in Schedule C-2.

   1.2.    **"Customer Equipment"** shall mean telecommunications equipment and cabling provided by Customer that is housed in a Space.

   1.3.    **"Premises"** shall mean a specific commercial building in the United States in which Telefonica Data, owns, controls or has leasehold interests in certain office and storage space suitable for the placement and operation of telecommunications equipment.

   1.4.    **"Space"** shall mean an individual location within a Premises authorized by Telefonica Data for the housing of Customer Equipment.

2.    **RIGHT TO OCCUPY, COLLOCATION ADDENDUMS; PERMISSIBLE USE AND RELOCATION.**

   2.1.    **Obligation.** Telefonica Data shall provide Customer with Bandwidth, non-exclusive access to a Premises and exclusive access to Space for the purpose of installing, operating and supporting Customer Equipment. Customer shall collocate Customer Equipment only in the Space and at no other location within a Premises without Telefonica Data's prior written consent.

   2.2.    **Collocation Addenda.** This Exhibit shall become a binding agreement between Customer and Telefonica Data only upon execution by the Parties of a Collocation Addendum, in the form attached hereto as Schedule C-1. Each Collocation Addendum, and any amendments thereto, shall incorporate the terms and conditions of this Exhibit as well as the Agreement, and be made part of both by reference. Each Collocation Addendum may have attached thereto the following Appendices:

   (a)  Facility Drawings, identified as Appendix 1

   (b)  General Description of Work Tasks and Special Terms and Conditions, identified as Appendix 2; and

   (c)  Managed Services (if applicable), identified as Appendix 3.

   2.3.    **Demarcation Point Connection.** Telefonica Data shall provide and connect a cable from the core switch on its network to the demarcation point, which for each Space shall be the jack on the rack or cabinet provided for such connection.

   2.4.    **Support Services.** In connection with the Space made available hereunder, Telefonica Data or its designee shall perform services which support the overall operation of the Premises (e.g., janitorial services, environmental systems maintenance, and power plant maintenance) at no additional charge to Customer. However, Customer shall be required to maintain the Space in an orderly manner and shall be responsible for the removal of trash, packing, cartons, and related items from the Space. Further, Customer shall maintain the Space in a safe condition including, but not limited to, the preclusion of storing hazardous materials in the Space. Telefonica Data will have no operations or maintenance responsibilities with respect to Customer Equipment.

C-1

**2.5.** **Limited License.** Customer acknowledges and agrees that it has been granted only a limited, non-exclusive license to occupy the Space for the period of time and under the terms and conditions set forth in the Agreement and herein, and that it has not been granted any real property interests of any kind in the Space or Premises.

**2.6.** **Reservation of Rights.** Customer Equipment shall remain Customer's exclusive personal property throughout the Term.

**2.7.** **Customer Obligations.**

(a) Customer shall keep the Space, Premises and any equipment therein free from any liens arising from any work performed, materials furnished or obligations incurred by or at the request of Customer. All persons either contracting with Customer or furnishing or rendering labor and materials to Customer shall be notified in writing by Customer that they must look only to Customer for payment for any labor or materials. If any lien is filed against the Space, Premises, or any equipment therein as a result of the acts or omissions of Customer, its employees, agents or contractors or subcontractors, Customer shall discharge it or bond it off within thirty (30) Days after Customer learns that the lien has been filed.

(b) Customer shall ensure (i) that Telefonica Data has access to the Customer Equipment so that Telefonica Data may perform its duties under this Exhibit; and (ii) that all existing Customer Equipment conforms to the manufacturer's specifications, which documentation shall be made available to Telefonica Data prior to Telefonica Data performing any maintenance services. If damage or destruction to any Telefonica Data equipment (e.g., test equipment/monitors) results from a breach of the foregoing, Customer shall promptly, at its option, either repair or replace the damaged or destroyed equipment to the extent any such damage is attributable to such breach.

## 3. TERM; TERMINATION.

**3.1.** **License Term.** This Exhibit shall commence on the date accepted by Telefonica Data and shall continue for the term set forth in the Addendum, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement (the "Term"). Customer's license to occupy each Space shall begin on the "Requested Service Date," as set forth in each fully executed individual Collocation Addendum or on the date Telefonica Data completes preparation of the Space, whichever is later, and shall continue for the lesser of the duration of the Term or Telefonica Data's underlying leasehold interest. In the event that Telefonica Data's underlying leasehold interest in the Premises expires prior to the expiration of the Term, Telefonica Data shall, at least one hundred twenty (120) Days before the expiration of such leasehold interest, make a good faith effort to renew the underlying leasehold interest to allow Customer to continue to occupy the Space for the duration of the Term.

**3.2.** **Effect of Termination.** Promptly after termination or expiration of the license for each Space, Customer shall remove the Customer Equipment and other property that has been installed by Customer or Customer's suppliers or contractors (or by Telefonica Data on behalf of Customer, if Telefonica Data desires such Customer Equipment to be removed).

## 4. PRICES AND PAYMENT TERMS.

**4.1.** **Fees.** In consideration of the license and services provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule C-1 in accordance with the payment terms and conditions set forth in the Agreement.

**4.2.** **Reimbursement.** Customer agrees to reimburse Telefonica Data promptly for all repair or restoration costs associated with damage or destruction caused by Customer's personnel, Customer's agents, Customer's suppliers/contractors or Customer's visitors during the Term or as a consequence of Customer's removal of the Customer Equipment or property installed in the Space.

**4.3.** **Bandwidth Charges.** If the 95th Percentile Number (defined below) is equal to or less than the baseline bandwidth amount, Customer shall pay only the recurring monthly fee. If the 95th Percentile Number is more than the baseline bandwidth amount, Customer shall pay the recurring monthly fee plus an amount for the additional usage billed on a per-megabit basis as set forth on the applicable Collocation Addendum. Telefonica Data will use the 95th percentile level procedure described below each month to determine the applicable bandwidth charges for each month. Telefonica Data will:

(a) measure actual inbound and outbound traffic levels into the applicable access port(s) during a standard measurement interval throughout the day (e.g., every 5 minutes);

(b) at the end of the month, sort all measurements for that month from highest to lowest;

(c) discard the top five percent (5%) of each month's measurements; and

(d) use the highest remaining measurement as the "95th Percentile Number" which will represent the Bandwidth usage for that month.

5.    **ADDITIONAL TERMS.**

5.1.    **Contractor Approval.** Before beginning any delivery, installation, replacement or removal work, Customer must obtain Telefonica Data's written approval with respect to Customer's choice of suppliers and contractors, which approval shall not be unreasonably withheld. Telefonica Data may request additional information before granting approval and may require substitution of suppliers and contractors, which are not Affiliates of Telefonica Data, as conditions of its approval. Approval by Telefonica Data is not an endorsement of Customer's supplier or contractor, and Customer will remain solely responsible for the selection of the supplier or contractor and all payments for construction work or any other work relating thereto.

5.2.    **Alterations.** Customer shall not make any construction changes or material alterations to the interior or exterior portions of the Space, including any cabling or power supplies for the Customer Equipment, without obtaining Telefonica Data's prior written approval for Customer to have the work performed or having Telefonica Data perform the work. Telefonica Data shall have the right to perform and manage any construction or material alterations within the Premises and Space areas at rates to be negotiated between the Parties.

5.3.    **Access.** Access to the Premises, use of the Space, installation of the Customer Equipment, and type of Customer Equipment installed, shall at all times be governed by generally accepted industry standards, applicable law and regulations, and such reasonable rules imposed by Telefonica Data. Customer shall promptly reimburse Telefonica Data for all costs associated with Customer's failure to follow such rules, including, without limitation, damage caused by End Users, suppliers, contractors or visitors, during the Term or, after termination or expiration, as a consequence of removal of the Customer Equipment or other property installed in the Space. Prior to first accessing the Premises, Customer shall provide and keep updated a list of its representatives authorized to access the Space and Telefonica Data shall provide photo-ID security badges for such individuals. Unless otherwise provided in a Collocation Addendum, each visit to the Space shall require the presentation of photo-ID security badges. Customer shall have access to the Space twenty-four hours a day, seven days a week.

5.4.    **Non-Interference.** Notwithstanding any other provisions of this Exhibit, Customer Equipment placed in the Space shall (a) not interfere with or impair service provided by Telefonica Data or by any other lessee of the Premises; (b) not unreasonably disturb any other lessee of the Premises; (c) not endanger or damage the facilities of Telefonica Data or of any authorized user of the Space, or the Premises; (d) not compromise the privacy of any communications carried in, from, or through the Premises; and (e) not create an unreasonable risk of injury or death to any individual or to the public. Customer shall not improperly restrict or interfere with the Telefonica Data Network or the use thereof. Upon notice by Telefonica Data, Customer shall promptly remove any hazard, interference, or service obstruction that may be caused by hardware, software or connectivity owned by or under the control of Customer. Nothing stated herein shall be construed to interfere with Customer's ability to comply with the rules, regulations or directives of any governmental or judicial authority. In the event that Customer improperly restricts or interferes with the Telefonica Data Network, or the use thereof, Telefonica Data may, after giving Customer notice, immediately modify, suspend, delay, condition, or cease until cured its obligations, in whole or in part, under this Exhibit.

5.5.    **Eminent Domain; Relocation.** Except as provided in subsection (a) and (b) below, Telefonica Data shall not arbitrarily require Customer to relocate the Customer Equipment.

(a) In the event the Premises becomes the subject of a taking by eminent domain by any authority having such power, Telefonica Data shall have the right to terminate the affected Collocation Addendum. Telefonica Data shall give Customer prompt advance notice, to the extent practicable of the eminent domain proceedings. Customer shall have no claim against Telefonica Data for any relocation expenses, any part of any award that may be made for such taking or the value of any unexpired term or renewed periods that result from a termination by Telefonica Data under this provision, or any loss of business from full or partial interruption or interference due to any termination. However, nothing contained in this Exhibit shall prohibit Customer from seeking any relief or remedy against the condemning authority in the event of an eminent domain proceeding or condemnation that affects the Space.

(b) Upon sixty (60) Days prior written notice or, in the event of an emergency (which shall not include

C-3

eminent domain), such time as may be reasonable, Telefonica Data reserves the right to change the location of the Space or the Premises to a site which shall afford comparable environmental conditions for the Customer Equipment and comparable accessibility to the Customer Equipment. Telefonica Data and Customer shall work together in good faith to minimize any disruption to Customer's services as a result of such relocation. Telefonica Data shall be responsible for the cost of improving the Space to which the Customer Equipment may be relocated, and for relocation of Customer Equipment interconnected to Telefonica Data services, except that Telefonica Data shall not be responsible for relocating facilities installed in violation of this Article 5.

6.     **INSURANCE.**  Customer agrees to maintain during the Term, at Customer's expense, for each Space (a) Comprehensive General Liability Insurance in an amount not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury or property damage, (b) Employers Liability in an amount not less than Five Hundred Thousand Dollars ($500,000.00) per occurrence, and (c) Workers' Compensation in an amount not less than that prescribed by statutory limits. Prior to taking occupancy of the Space, Customer shall furnish Telefonica Data with certificates of insurance which evidence the minimum levels of insurance set forth herein, name Telefonica Data as an additional insured, and provide that the policy may not be canceled unless thirty days notice is provided to Telefonica Data. Telefonica Data will not obtain any insurance with respect to and will not assume the risk of loss for any Customer Equipment.

**IN WITNESS WHEREOF**, the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER: | Accepted by Telefonica Data: |
|---|---|
| LYCOS, INC. | TELEFONICA DATA USA, INC. |
| By: | By: |
| Name: | Name: PETE R. PIZARRO |
| Title: CFO | Title: CFO |
| Date: 11/18/03 | Date: 11-20-03 |
| Address: | Address: 1221 Brickell Avenue, Suite 600 |
|  | Miami, Florida 33131 |
|  | Attn: |
| Fax: | Fax: |
| Email: | Email: |

C-4

# SCHEDULE C-1
## TO
## COLLOCATION EXHIBIT
### Collocation Addendum No. 1

This Collocation Addendum is made October __, 2003 and subject to all definitions, terms and conditions of the Agreement and Exhibit.

**LOCATION AND SERVICE DATE**

Premises Address:    11300 N.W. 25th Street
                     Miami, FL 33172

Term:                34 months from the Requested Start Date.  Minimum commitments go into effect November 1, 2003.
Requested
Service Date:        September 1, 2003

**DESCRIPTION OF
SITE AND SPACE**

Site Type:           ___  Optical Amplifier  ___  Point of Presence  ___  Regenerator  ___  Termination Site
                     ___  Junction Site  ___  Other  _____
Collocation Space:   4000 sq. ft. minimum
Space Required:

Power Required:      ___ amps per rack  ___ amps total  ___ DC convenience outlets #
Escort Services:     Escort Service is  _____ REQUIRED  ___X___ NOT REQUIRED

**BANDWIDTH**

Minimum 400 Mbps, burstable
Redundant port connections. 2

**FEES**

| | Non-Recurring | Monthly Recurring |
|---|---|---|
| Set Up Fee | | |
| Collocation | See Appendix 2 | $27 per square foot |
| Bandwidth | See Appendix 2 | $100 per Mbps |
| Power | See Appendix 2 | $200 per 110, Volt 20 amp; and $300 per 208 Volt, 30 amp breaker position in excess of the first (2) 110 Volt, 20 amp provided in each rack/cabinet |

| CUSTOMER: | Telefonica Data: |
|---|---|
| | TELEFONICA DATA USA, INC |
| By: _____ | By: _____ |
| Name: _____ | Name: PETE O. 24/1/1 |
| Title: CFO | Title: C&O. |
| Date: 11/18/03 | Date: 11-20-03 |
| Address: _____ | Address: 1221 Brickell Avenue, Suite 600 |
| _____ | Miami, Florida 33131 |
| _____ | Attn: |
| Fax: _____ | Fax: _____ |
| Email: _____ | Email: _____ |

# APPENDIX 1

## TO

## COLLOCATION ADDENDUM NO. 1

### Facility Drawings

# APPENDIX 2

## TO

## COLLOCATION ADDENDUM NO. 1

### General Description of Work Tasks and Special Terms and Conditions

**Pricing:** The charge for the Collocation is $27/sq ft/month for the Space. If Customer decreases its square footage below 4000 sq. ft., Telefonica Data will bill, and Customer shall pay for, 4000 sq. ft. In the event Customer desires to increase or reduce the square footage provided to it by Telefonica Data, Customer shall provide Telefonica Data at least 90 days written notice. The MRC for the Space includes 2 x 20 A breaker positions per rack/cabinet. Bandwidth monthly recurring charges are $100/Mbps/month with a 400Mbps minimum commitment. The minimums for bandwidth and space applies to the aggregate usage of Terra Lycos US and the Terra Lycos US MOC. This agreement supersedes and replaces previous agreements between Telefonica Data and the Terra Lycos MOC for bandwidth and space.

**Power:** Customer's average power consumption per sq. ft of floor space may not exceed 145 Watts per square foot for Server Room 3. Customer's actual monthly usage will be measured using Telefonica Data's building automation system, Johnson Controls' reporting and the Siemens WinPM power monitoring on the RPPs in Server Room 3 to determine the total power usage for the month. Such figure will be divided by the square footage Customer occupied in Server Room 3 during the month being measured. The credits and termination rights set forth herein shall not be applicable during the period that Customer's power consumption exceeds 145 Watts per square foot for Server Room 3.

**Installation of Racks and Cabinets:** Telefónica Data will provide and install the racks and Customer's cabinets at no additional charge to Customer. Customer must provide the cabinets to Telefonica Data and the wiring inside all cabinets and racks.

**Migration:** Subject to Customer's review of the proposed project plan and required Space layout, Telefónica Data will be the prime contractor for the migration of Customer's platform to the Premises Address. The Parties shall jointly produce a migration plan. Telefonica Data may subcontract some migration services from Cable and Wireless Internet Services, Inc. and its affiliates (collectively "C&W").

**Location of Servers:** Telefónica Data reserves the right to locate Customer's servers in Telefonica Data's data center where it reasonably deems appropriate, with the understanding and acknowledgement that Customer requests contiguous space.

**Benchmarking:** Telefonica Data will reduce the monthly recurring charges for bandwidth and collocation on each anniversary of the Service Start Date subject to further revisions in accordance with the Benchmarking provision contained in the Agreement.

**Invoices:** Telefonica Data shall begin invoicing the Customer as soon as the Space is ready for operation and the bandwidth connected. Notwithstanding anything to the contrary contained herein, minimum commitment billing will begin November 1, 2003.

**SCHEDULE C-2**
**TO**

**COLLOCATION EXHIBIT**

<u>**Service Level Agreement**</u>

Notification

<u>*Event Notification to Customer*</u>

- Telefonica Data shall provide initial notice to a designated Customer's representative by telephone, e-mail, pager or comparable notification service within 15 minutes of Telefonica Data becoming aware of a Severity One or Severity Two event (as defined below).  If Customer first becomes aware of a Severity One or Severity Two event, Customer agrees to promptly notify Telefonica Data via the Customer Support Number [1-866-466-2872].  Status reports regarding the event will continue on the ½ hour until either the event has been resolved or the Parties have determined a course of action that does not require continued notification.  Upon the resolution of a Severity One event, Telefonica Data will send Customer a written incident report within 48 hours.  Telefonica Data will provide Customer monthly incident reports on all Severity Two events.

- <u>Severity One event</u>: The customer's suite has lost power or HVAC or all or a portion of Customer's network is not accessible.

  - <u>Severity Two event</u>: Customer's suite or network has experienced equipment failure resulting in degraded performance.

<u>*Escalation (Internal)*</u>

The following procedures define the escalation procedures that Telefonica Data will implement during an Unscheduled Outage (as defined below):

- Telefonica Data EMSC Level 1 Support shall use reasonable efforts to identify the cause of the event or outage and escalate to the Telefonica Data Maintenance Engineer during the first quarter hour of an outage.

- Telefonica Data will notify Customer as follows:

  - Telefonica Data will notify Customer's First Escalation Contact at the beginning of the second quarter hour;

  - If Telefonica Data is unable to contact Customer's First Escalation Contact, Telefonica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

  - If Telefonica Data is unable to contact Customer's Second Escalation Contact, Telefonica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

*"Unscheduled Outage"* means an interruption in the Services arising from failures to achieve the service level objectives provided under this Schedule.  An Unscheduled Outage excludes outages (and service level failures) due to (i) Scheduled Outages  (as defined below); (ii) network or Service upgrades requiring a predefined outage; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer, (iv) Customer's equipment, hardware, facilities or software or (v) Force Majeure events.

## Change Management

- Unless otherwise provided in the Agreement, Exhibits, and Schedules, Telefonica Data will provide Customer at least five (5) business days prior written notice of any changes to be made by Telefonica Data that affect the Services provided under this Exhibit. However, if a shorter notification period is required as reasonably determined by Telefonica Data, changes may be made upon shorter notification to Customer. Telefonica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefonica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon the Customer's and Telefonica Data's requirements. If an outage is required, such outage will be considered a "Scheduled Outage." At the time Telefonica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Scheduled outage time may not exceed 8 hours total per month after which it will be considered to be unscheduled outage time. Telefonica Data agrees to work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefonica Data reserves the right, however, to proceed with any change if it is reasonably determined, by Telefonica Data, that the change will not cause harm to the Customer's specific environment and/or is otherwise necessary. Customer agrees to provide prior notification to Telefonica Data of any changes to Customer's configurations that interface with the Services provided under this Exhibit.

- Telefonica Data's Engagement Manager is responsible for the project management of all changes to Services provided to the Customer under this Exhibit.

## Power Service Level Objective

- Telefonica Data will provide 100% power availability to Customer on a 24*7*365 basis.

- If Telefonica Data fails to meet this Power objective, Customer may request a credit equal to the following:

| Power | SERVICE CREDIT |
|---|---|
| 1st loss of power within month | 50% of the monthly recurring charge (MRC) for the affected Service |
| 2nd loss of power within month (chronic failure) | an additional 75% of the MRC charge for the affected Service |
| 3rd loss of power within month (catastrophic failure) | an additional 100% of the MRC charge for the affected Service |

- If an Outage lasts more than eight (8) consecutive hours in any 30 day rolling period or the Customer suffers 3 or more complete power failures to the Customer suite(s) in any 30 day rolling period then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the power infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

## HVAC Service Level Objective

- Telefonica Data will provide a cooled environment for Customer's system. The ambient temperature of the room must not exceed 85 degrees Fahrenheit for more than an hour on a 7*24*365 basis.

- If Telefonica Data fails to meet this HVAC objective, Customer may request a credit equal to the following:

| HVAC | SERVICE CREDIT |
|---|---|
| 1st failure of temperature service level objective within month above 85° for 1 hour | 25 % of the MRC for the affected Service |
| 2nd failure of temperature service level objective within month above 85° for 1 hour | an additional 25% of the MRC for the affected Service |
| 3rd loss of temperature service level objective within month above 85° for 1 hour | an additional 50% of the MRC for the affected Service |
| 4th loss of temperature service level objective within month above 85° for 1 hour and substantial outage to Customer equipment occurs. | Option to terminate contract |

- If an Outage lasts more than eight (8) consecutive hours in any one 30 day rolling period or the Customer suffers 4 or more HVAC failures of above 85° for more than 1 hour per failure and in either case a substantial outage occurs to the Customer equipment, then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provides Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the HVAC infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

### Fire Suppression Service Level Objective

- Telefonica Data will provide the Customer with an industry standard fire suppression system that will protect the Customers equipment.
- If there is damage to the production equipment, as a result of the failure of Telefonica Data's fire detection or fire suppression systems, Telefonica Data will replace at its expense all damaged equipment with equipment of similar performance functionality. Notwithstanding the foregoing, if a fire is caused by Customer, Customer's End-User or Customer or its End-User's equipment and Telefonica Data's fire suppression system effectively suppresses the fire, Telefonica Data shall not be obligated to replace the damaged equipment.

- If Telefonica Data suffers any damage to the Premises Address or equipment located therein as a result of a fire caused by Customer or its End-Users or by Customer's or its End-User's equipment, Customer agrees to pay Telefonica Data for all costs reasonably incurred by Telefonica Data related to the repair, replacement and restoration of the Premises Address and its equipment located therein.

### Capacity Management Service Level Objective

- Telefonica Data agrees to provide written notice to Customer whenever a network circuit reaches 50% of such circuit's capacity over a period of fourteen days.

### Redundant Network Feed's Service Level Objective

- Telefonica Data will provide the Customer with redundant network feeds via different ISP's to alleviate the potential of a single point of failure within the Customer's access to the internet via Telefonica Data's infrastructure.

### Network Availability—Public Access Services Service Level Objective

- Telefonica Data will provide Public Access Services in accordance with the following network availability service level objective: Customer's ability to access the Telefonica Data network in the United States (i.e., "up-time"), will be no less than 99.95% during any calendar month. Network unavailability shall be determined by calculating network outages. For purposes of calculating network availability, a "Network Outage" shall mean a complete failure of Public Access Services. A Network Outage will be measured from the minute Customer notifies Telefonica Data of the Network Outage, or Telefonica Data otherwise becomes aware of the Network Outage, until the minute Telefonica

Data notifies Customer that the Network Outage has been resolved. Telefonica Data will provide Customer with monthly reports indicating up-time for all applicable Services.

- If a specific factor causes an Outage and the outage(s) caused by such factor lasts more than eight (8) consecutive hours in any 30 day rolling period (for purposes of this Network Availability -- Public Access Services Service Level Objective, an Outage is defined as a packet loss of greater than 40%), then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises. For purposes of clarification the following are examples that illustrate the intent of the Parties with respect to this provision:

    1. On the fifteenth (15th) day of a calendar month, Customer experiences a Network Outage that lasts for more than eight (8) hours. It is determined that a single factor caused the Network Outage. Under this scenario Customer would have the right to terminate the affected Service.

    2. On the twentieth (20th) day of a calendar month, Customer experiences a Network Outage that lasts for three (3) hours. On the twenty-fifth (25th) day of a calendar month, Customer experiences a Network Outage that lasts for six (6) hours. It is determined that precisely the same factor caused the Network Outages. Under this scenario Customer would have the right to terminate the affected Service.

    3. Same scenario as example 2 above except that it is determined that two different factors caused the Network Outages. Under this scenario Customer would not have the right to terminate the affected Service.

- Network Outages do not include failures due to: (i) regular maintenance during a scheduled window; (ii) network or service upgrades; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer; (v) Customer's equipment, hardware, facilities, or software; or (vi) Force Majeure events.

### Latency Service Level Objectives.

- Telefonica Data shall provide the Services in accordance with the following latency service level objectives 65 milliseconds or less round trip time between any two points in North America, (ii) 120 milliseconds or less round trip time between the United States and Europe, (iii) 120 milliseconds or less round trip time between the United States and South America, (iv) 500 milliseconds or less round trip time between the United States and any other point. Telefonica will continually measure latency between points on its network and will report the average latency in 15 minute periods. In the event that during a 30 day rolling period Telefonica Data fails to provide the Services in accordance with these Latency service level objectives (each such event a "Latency Miss"), Customer may request a credit in accordance with the following table:

| Latency Misses | SERVICE CREDIT |
|---|---|
| More than 3 but less than 10 Latency Misses in a month | 25 % of the MRC for the affected Service |
| 10 or more Latency Misses in a month | an additional 25% of the MRC for the affected Service |
| 2 independent Latency Misses individually greater than 20 times the latency service level objective | an additional 50% of the MRC for the affected Service |

- In addition to the credits above, in the event Customer experiences two independent Latency Misses where the transmission time is greater than 20 times the Latency service level objectives thresholds for which a Latency Miss occurs, Customer, in addition to its right to receive a credit, may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer must provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

### Packet Service Level Objective

- The packet loss service level objective for the Service is less than or equal to one percent (1%). Telefonica will measure the packet loss from anywhere on it's backbone into the Customer equipment and take the average loss in a

fifteen minute period. If for a 30 day rolling period, Telefonica Data fails to meet Packet Loss service level objective, Customer may request a credit as set forth below:

| Excess Packet Loss | SERVICE CREDIT |
|---|---|
| If the failure is >1% but < or = to 5% as measured above more than 3 times in a 30 day rolling period | 25 % of the MRC for the affected Service |
| If the failure is > 5% -but < or = to 30% as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service |
| If the failure is > 30% -but < or = to 40% as measured above more than twice in a 30 day rolling period. | 37.5% of the MRC for the affected Service for the first occurrence, then a further 37.5% for the second occurrence. |
| If the failure is > 40% + as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service for the first occurrence, then a further 50% for the second occurrence. |

- In the event the packet loss failure exceeds criteria four in the above table for two successive 30 day rolling periods, Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice to Telefonica Data; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

## Miscellaneous

- In order to receive any credits under this Schedule C-2, Customer must submit a written request to Telefonica Data no later than the last day of the month immediately following the month in which the service level objective was not met. Upon verification, Telefonica Data shall issue the credit on Customer's next monthly invoice.

- The availability, latency and packet loss service level objectives shall be measured over and between points on the Telefonica Data Network.

- An outage or failure to meet a Service Level Objective a second or multiple times must be for unrelated incidents and cannot be caused by continuation of an ongoing issue in any 72 hour period.

- **THE CREDITS AND TERMINATION RIGHTS SET FORTH HEREIN AND IN THE MSA CONSTITUTE TELEFONICA DATA'S SOLE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY FOR ANY FAILURE OF TELEFONICA DATA TO COMPLY WITH THE SERVICE LEVEL OBJECTIVES.**

- **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN THE CREDITS AND TERMINATION RIGHT SET FORTH HEREIN SHALL NOT BE APPLICABLE DURING ANY PERIOD THAT CUSTOMER HAS FAILED TO PAY UNDISPUTED CHARGES WITH RESPECT TO A TELEFONICA DATA INVOICE WHEN DUE AND SUCH UNDISPUTED CHARGES REMAIN OUTSTANDING.**

*Telefónica*

## EXHIBIT D

## TO

## MASTER SERVICES AGREEMENT

## DATA STORAGE

This DATA STORAGE EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated as of the _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

    **1.1.**    "Customer Data" shall mean all of the data Customer provides to Telefonica Data for Storage.

    **1.2.**    "Hardware, Software and Services" shall mean the hardware, software and services set forth in Schedule D-1.

    **1.3.**    "HBA" shall mean a host bus adapter.

    **1.4.**    "SAN" shall mean a storage area network.

    **1.5.**    "NAS" shall mean network attached storage.

    **1.6.**    "Storage" shall mean the storing of Customer Data on a SAN in accordance with this Exhibit.

    **1.7.**    "Allocated Storage" shall mean total amount of storage supported of which currently used storage is a subset.

2.    **STORAGE.**

    **2.1.**    **Orders.**  Customer shall order Storage pursuant to the ordering provisions in Schedule D-2. Telefonica Data shall use reasonable efforts to provide Storage by the Customer-requested Service Date identified in Schedule D-3.

    **2.2.**    **Obligation.** Telefonica Data will provide Customer with non-exclusive Storage in accordance with Schedule D-3.  Storage shall take place in Telefonica Data's Premises (as that term is defined in the applicable Collocation Exhibit).

    **2.3.**    **Inclusive Services.** The customer shall provide the equipment, software and services necessary to provide Storage, including, Storage tuning, Connectrix fiber switch installation and customization, SAN design and implementation, SAN software, and HBA cards installation.  The foregoing notwithstanding, Customer shall be responsible for providing all HBA hardware directly to Telefonica Data or acquiring all HBA hardware from Telefonica Data.  Customer shall pay Telefonica Data for all HBA hardware Telefonica Data obtains in connection with providing the Storage hereunder to Customer.

    **2.4.**    **Backups.** Customer is solely responsible for backup and archiving the Customer Data.

**2.5.    Scalability.** Customer shall provide the necessary technical upgrades, such as additional cache memory, fiber channel directors or cables, switches, and similar items, to account for increased Customer demand for Storage, up to the maximum upgrade set forth in Schedule D-1; provided, however, that such upgrades incorporate the Hardware and Software.

**2.6.    Support Services.** Telefonica Data will provide Customer support services for installation, reconfiguration and modification of the Storage capabilities.

**3.    TERM.** This Exhibit shall commence on the Effective Date and continue in force during the Term set forth in Schedule D-2, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement.

**4.    PRICES AND PAYMENT TERMS.** In consideration of the Storage provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule D-2, pursuant to the terms and conditions set forth in the Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

CUSTOMER:                                    **TELEFONICA DATA USA, INC.**

By: _____              By: _____

Name: _____              Name: _____

Title: _____             Title: _____

Date: _____              Date: _____

Address:_____              Address:    1221 Brickell Avenue, Suite 600

_____                          Miami, Florida 33131

_____                          Attn:

Fax: _____              Fax:

Email: _____              Email: _____

D-2

**SCHEDULE D-1**

**TO**

**DATA STORAGE EXHIBIT**

<u>**Hardware, Software and Services Covered By This Agreement**</u>

**Lycos Storage West Coast**

- <u>Direct Attached Storage</u>

    o Hardware Type: Hitachi 9960 - fully redundant storage device.

  Supported Products

    o MailCity – Data Bases          - 1 Tb
    o HotStat – Data Warehouse     - 3 Tb

- <u>Network Attached Storage ( NAS )</u>

    o Hardware Type: NetApp 840 Filers.

  Supported Products

    o AngelFire                          - 6TB

**Lycos Storage East Coast**

- <u>Direct Attached Storage</u>

    o Hardware Type: Hitachi 9960 – fully redundant storage device.

  Supported Products

    o MyLycos                    - 700Gb
    o Raging Bull                -170 Gb
    o Data warehouse           - 420 Gb
    o Portal                       - 1.2 Tb
    o Small Catalog Query      - 1.1 Tb
    o TuCows                     - 270 Gb remove

- <u>Network Attached Storage (NAS)</u>

    o Hardware Type: NetApp 840 Filers.

  Supported Products

    o Tripod                 - 7Tb
    o HTML Gear            - 350Gb
    o MyLycos Staging    - 320Gb
    o Photo Shop           - 375 Gb

Total Supported Storage in Terra Bytes (TB)        - 21.905 TB

Maximum supported Storage in Terra Bytes supported  is 25TB of allocated storage.

## SCHEDULE D-2

## TO

## DATA STORAGE EXHIBIT

### Data Storage

| LOCATION AND SERVICE DATE | |
|---|---|
| Premise Address 1: | Premise Address 2: |
| 11300 NW 25th Street Miami Florida 33172 | Insert SC8 address |

**LOCATION AND SERVICE DATE**

Premise Address 1:

11300 NW 25th Street
Miami
Florida
33172

Premise Address 2:

Insert SC8 address

Requested Service Date:  **June 1st 2003**

Term:  **36 Months**

**DESCRIPTION OF STORAGE**

See details in section above

Maximum Capacity:  **25 Terrabytes of allocated storage**

**FEES**

Non-Recurring Set-Up Fee:    **N/A**

Recurring Monthly Storage Fee:  **$30,000 per month**

Minimum Commitment: **$30,000 per month**

# Service Level Objective

## I.    EVENT NOTIFICATION (TO CUSTOMER)

Telefónica Data shall provide initial notice to a designated Customer representative by telephone, e-mail, pager or comparable notification within fifteen (15) minutes of Telefónica Data becoming aware of a Severity One or Severity Two event as defined below. Should Customer first become aware of such an event, Customer shall promptly provide initial notice to Telefónica Data via the Customer Support Number 1-866-466-2872. Status reports regarding the event will be forthcoming on the ½ hour until either the event has been resolved or both Telefónica data and Customer have determined a course of action that does not require continued notification. At the resolution of a Severity One event, the customer will be sent a written incident report within forty-eight (48) hours. Monthly incident reports will be provided on all other events.

"Severity One event" shall mean a portion of Customer's Data is not accessible.
"Severity Two event" shall mean that Customer's environment has experienced equipment failure resulting in degraded performance.

*Escalation (Internal)* - The following procedures define the escalation procedures that Telefónica Data will implement during an Unscheduled Outage as defined below:

*Telefónica Data EMSC* Level 1 Support shall use reasonable efforts to identify the cause of the outage and escalate to the Telefónica Data Maintenance Engineer during the first quarter hour of an outage.

*Telefónica Data* will notify Customer Level 2 Support as follows:

- Customer First Escalation Contact at the beginning of the second quarter hour;

- If Telefónica Data is unable to contact Customer's First Escalation Contact, Telefónica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

- If Telefónica Data is unable to contact Customer's Second Escalation Contact, Telefónica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

- Customer's First, Second and Third Escalation Contacts are identified in Annex (TBA), attached hereto. Customer shall provide immediate written notice of any changes to Annex (TBA) to Telefónica Data.

"Unscheduled Outages" shall mean interruptions in services arising from failures associated with services provided by Telefónica Data or a Force Majeure Event.

## II.    CHANGE MANAGEMENT

Unless otherwise provided in the Agreement, Exhibits, or Schedules, Customer will be provided at least five (5) business days prior written notice of any changes to be made by Telefónica Data that affect the Services. However, if shorter notification period is required, changes will be made with the agreement of Customer. Telefónica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefónica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon Customer's and Telefónica Data's requirements. If an outage is required, such outage will be considered a Scheduled Outage. At the time Telefónica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Telefónica Data will work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefónica Data reserves the right, however, to proceed with any change if it is determined, by Telefónica Data, that the change will not cause harm to Customer's specific environment and/or is otherwise necessary. Customer is required to provide prior notification to Telefónica Data of any changes to its configurations

that interface with the provided Services.

Telefónica Data VP of Operations is responsible for the project management of all changes to services provided to the Customer.

*Telefonica*

## EXHIBIT G

## TO

## MASTER SERVICES AGREEMENT

## HOSTING SERVICES (Backup)

    This HOSTING SERVICES EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

    **1.1 "End User Content"** shall mean all text, words, names, likenesses, trademarks, logos, artwork, graphics, video, audio, HTML coding, domain names, image maps, links, software applications, or other content that appear on, or are uploaded to, an End User Web site.

    **1.2 "Hosting Services"** shall mean those hosting services Telefonica Data provides to Customer as described herein. All hardware, software, materials, and other items associated with the delivery of Hosting Services to Customer by Telefonica Data will be operated and maintained, for the fees listed in Schedule G-1, by Telefonica Data, regardless of whether such hardware, software, materials, and other items are owned or leased by the Customer or Telefonica Data.

    **1.3 "Service Misuse"** shall mean use of the Hosting Service in a manner that (a) may or does expose Telefonica Data to legal liability, (b) that violates any applicable law or regulation or Telefonica Data's Internet Acceptable Use Policy attached hereto in Schedule G-3, (c) is illegal, unlawful or harassing, (d) infringes upon Telefonica Data's or another's Intellectual Property Rights, or (e) otherwise abuses the integrity of any applicable network.

2.    **GENERAL OBLIGATIONS.** Subject to the terms and conditions of this Exhibit and the Agreement, Telefonica Data and Customer shall have the following general obligations.

    **2.1 Telefonica Data.**

    **1.1.** Hosting Services. Telefonica Data will provide Hosting Services to Customer in accordance with this Exhibit. Customer may elect, at its sole discretion, to resell Hosting Services to End Users. Telefonica Data shall provide all necessary hardware, software, materials and other items (except End User Content) for implementing the Hosting Services.

    (a) End User Compliance. Telefonica Data reserves the right to review, using reasonable commercial means, and in its sole discretion, End User Content, including Web pages, to determine whether use thereof complies with the terms of this Exhibit.

    (b) Related Services.

        (i)    Maintenance. Telefonica Data shall provide maintenance services with respect to the Hosting Services in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

        (ii)    Support. Telefonica Data shall provide support services with respect to the Hosting Services solely in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

### 2.2. Customer

(a) <u>Content Development</u>. Telefonica Data shall not be liable for any project management, development, operation, and End User content for the End User Web site(s), or any costs associated therewith. Customer or its End User shall be solely responsible for creating, coding, integrating, testing, and uploading End User Content. Customer and its End User shall be solely responsible for maintaining authorizations and secure means to access and transfer End User Content to End User's Web site(s) using a remote access option provided by Telefonica Data. Telefonica Data reserves the right to alter the access options at its discretion in order to maintain the integrity of Telefonica Data's Internet operations and the Web sites of other hosting customers. Telefonica Data will promptly inform Customer of such changes.

(b) <u>Marketing</u>. If Customer elects to resell the Hosting Services to End Users, then Customer will use its commercially reasonable efforts to promote the sale of Hosting Services to its End Users consistent with good business ethics and in a manner that will reflect favorably upon the Hosting Services. Customer shall identify Telefonica Data as the provider of Hosting Services by using, pursuant to Section 7.2 of this Exhibit, the Telefonica Data logo and the statement "Customer Web site hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify Customer from time to time. Customer shall refrain from engaging in any illegal, unfair, or deceptive trade practices, unethical business practices or making any representations or warrants inconsistent with the specifications provided by Telefonica Data with respect to the promotion or resale of the Hosting Services.

(c) <u>End User Terms and Conditions</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to agree in writing to comply with and Customer shall cause each End User to so comply with an enforceable written agreement that is at least as protective as Telefonica Data and its rights and as least as limiting with respect to Telefonica Data's liability as the terms set forth herein and the Agreement.

(d) <u>End User Content</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to grant to Customer a sub-licensable, worldwide, limited, royalty-free, non-exclusive license to upload, display, distribute, copy and store End User Content in connection with the Hosting Services. Customer shall automatically grant Telefonica Data a sublicense with respect to End User Content in connection with the Hosting Services. Customer shall incorporate into its agreements with End Users language stating the following:

> "Except for software provided by Customer or any of Customer's third-party partners that is bundled with the Hosting Services or purchased separately from Customer or any of Customer's third-party partners, End User hereby represents and warrants that: (i) End User is the owner, valid licensee, or authorized user of End User's Web site and each element thereof; (ii) the use of the End User's Web site will not infringe any Intellectual Property right of any third party, or constitute a defamation, invasion of privacy, or violation of any right of publicity or other third party right; (iii) End User's Web site complies with all legislation, rules, and regulations of all applicable jurisdictions; (iv) End User's Web site is and will remain accurate and correct in all respects; and (v) End User's Web site shall be free from viruses, worms, Trojan horses, and other malicious code."

(e) <u>Service Misuses</u>. If Customer elects to resell the Hosting Services to End Users, then Customer is responsible for providing an operations support function that operates on a 24 hour a day, seven day a week basis and is able to fully respond if any End User engages in Service Misuse including (i) giving Telefonica Data a telephone number and e-mail address to use to notify Customer if Telefonica Data becomes aware that an End User is engaging in Service Misuse, and (ii) having the ability to suspend or block access to Hosting Service for an End User within sixty (60) minutes of Customer's receipt of a call or e-mail from Telefonica Data stating that the End User is engaging in Service Misuse.

(f) <u>Security and Privacy</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require an acknowledgment from each End User that there is no guarantee of security or privacy on the Internet, and Customer shall make no guarantee on behalf of Telefonica Data or for which Telefonica Data has any responsibility that an End User's Web site(s) or End User Content will be secure or private.

(g) <u>Non-Telefonica Data Supported Software.</u> If Customer elects to resell the Hosting Services to End Users, then Customer shall incorporate into its agreements with End Users language stating that all risks associated with the use of software on End User's Web site that is not supported by Telefonica Data is borne solely by the End User. Customer shall be solely liable for all damages resulting or arising from the use or loading of any software not supported by Telefonica Data onto End User's Web site which results in damages to End User's Web site or to any other Telefonica Data customer's Web site, or causes a failure or outage in the Hosting Services provided to End User or other End Users. CUSTOMER AGREES TO PAY TELEFONICA DATA ALL AMOUNTS INCURRED BY TELEFONICA DATA FOR WORK ARISING FROM CUSTOMER'S OR ANY END USER'S USE OF NON-SUPPORTED SOFTWARE.

(h) <u>Customer Provided Support</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall provide, at no cost to Telefonica Data, first level support via a Customer-provided toll-free number to End Users. First level support shall include, but is not limited to, issues related to account numbers, names, addresses, phone numbers, billing inquiries, cancellations, disconnections, reconnections of service, and access to Hosting Services, including interruption in Hosting Services caused by or under the control of Telefonica Data.

(i) <u>Approvals, Licenses</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall be responsible for having and keeping in place all licenses and other governmental approvals Customer needs, if any, for reselling Hosting Service. Customer shall comply with all applicable laws and regulations regarding reselling Hosting Service.

(j) <u>Configuration.</u> Telefonica Data's obligation to provide Hosting Services is contingent upon Customer providing its hardware and software configuration requirements to Telefonica Data in a manner reasonably acceptable to Telefonica Data. IN NO EVENT SHALL TELEFONICA DATA BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING AS A RESULT OF TELEFONICA DATA'S COMPLIANCE WITH CUSTOMER'S CONFIGURATION REQUIREMENTS.

**2.3.    Mutual.**

(a) <u>General Obligations</u>. Each Party shall: (i) notify the other promptly of any perceived degradation in the Hosting Services and cooperate with the other Party to the fullest extent possible in order to determine the cause of and resolve any such degradation; (ii) comply fully with all applicable federal, state and local laws including regulations and ordinances relating to the Hosting Services to be provided hereunder and the resale of the Hosting Services to the End Users, and (iii) otherwise comply with the terms and conditions as set forth herein.

(b) <u>Customer Representative</u>. The Parties each will provide a single point of contact for administration of this Exhibit. The Parties shall cooperate with each other in the performance and delivery of the Hosting Services hereunder.

**3.     ORDERING.** Customer shall order Hosting Services pursuant to the ordering provisions in Schedule G-1. Telefonica Data shall use commercially reasonable efforts to provide Hosting Services to Customer by the Customer-requested Service Start Date.

**4.     BACKUPS.** In exchange for the "Backup Services" fees set forth in Schedule G-1, Telefonica Data will regularly, and on at least a weekly basis, and upon termination of this Exhibit, backup all Customer software, content, and data. If Customer elects to resell the Hosting Services to End Users, then the aforementioned backup shall include End Users' Web sites. Upon termination of this Exhibit, Telefonica Data will place all servers containing Customer and End User data in suspended mode for a period of seven (7) Days, during which time Customer or End Users may, at their sole expense, backup their respective data. Customer shall advise End User to perform independent backups of Web site information; or alternatively, Telefonica Data will provide Customer with copies of Telefonica Data's backups, the cost of copying the backups to be paid by Customer in addition to the Hosting Services fees. Customer shall ensure that each End User understands that Telefonica Data has no duty of care to any End User to perform backups of End User's Web site. Customer shall ensure that End User further understands that no bailment is intended by archiving, and Telefonica Data has no duty of care to End User to safekeep the archival backup. THE COPY TO BE MADE AT CUSTOMER'S COST SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR ANY DAMAGE TO OR LOSS OF SOFTWARE, DATA, CONTENT, OR OTHER INFORMATION ON END USER'S WEB SITE.

5.    **OWNERSHIP OF INTELLECTUAL PROPERTY.**

    **5.1.    Generally.** Except for End User Content, Telefonica Data shall own all right, title and interest, including Intellectual Property Rights, in and to the hardware, software, materials and other items (collectively, "Telefonica Data Equipment") necessary for implementing the Hosting Services.

    **5.2.    Logo Use.**

        (a)  Grant.  Telefonica Data grants to Customer a limited, nonexclusive, worldwide, royalty-free right to use the Telefonica Data logo provided by Telefonica Data to Customer on Customer's Web site and in promotional materials for Hosting Services during the term of this Exhibit solely for the purposes of (a) identifying Telefonica Data as the provider of Hosting Service, and (b) identifying Customer as a partner of Telefonica Data. Telefonica Data will provide Customer with a copy of Telefonica Data's logo (which may be in electronic form) and guidelines for its proper use. The Telefonica Data logo will be accompanied by the statement "Customer Web site Hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify to Customer from time to time. All references herein to the Telefonica Data logo shall include both the logo and the preceding statement.

        (b)  Restrictions.  Use of Telefonica Data's logo by Customer shall be submitted to Telefonica Data for its prior review and approval. Customer will ensure that sufficient space, as agreed by the Parties, surrounds Telefonica Data's logo and that no graphic elements or text encroach upon Telefonica Data's logo, and that no text or graphics are hidden behind Telefonica Data's logo. Customer agrees to use Telefonica Data's logo only in the form and manner prescribed in Telefonica Data's guidelines for proper use of its logo. The Telefonica Data logo may be used by Customer as a link to a Telefonica Data Web site if so approved in advance by Telefonica Data. Under no circumstances will Customer use the Telefonica Data logo to link to any Web site other than a Telefonica Data Web site. Customer acknowledges that it shall not obtain any rights, title or interest in or to Telefonica Data's name or logo and any use of such name and logo shall inure solely to the benefit of Telefonica Data. Telefonica Data may withdraw Customer's right to use Telefonica Data's logo granted herein upon written notice to Customer. In the event of either Customer's receipt of notice from Telefonica Data withdrawing the right to use Telefonica Data's logo or termination of this Exhibit or the Agreement, Customer shall immediately cease all use of Telefonica Data's logo and remove Telefonica Data's logo from Customer's Web site.

6.    **PRICES AND PAYMENT TERMS**

    **6.1.    Fee Schedule.** Customer shall pay Telefonica Data the fees specified in Schedule G-1 of this Exhibit for the Hosting Services pursuant to the payment provisions in the Agreement.

    **6.2.    Adjustments.** Telefonica Data reserves the right to modify the fee schedule at any time by issuance of a revised fee schedule. Orders placed pursuant to Article 3 and received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all orders placed pursuant to Article 3 and accepted by Telefonica Data after the date of issuance of a revised fee schedule.

7.    **TERM AND TERMINATION**

    **7.1.    Term.** This Exhibit shall become effective on the date that it is signed by both parties and shall continue until the third anniversary of the Full Service Start Date, unless earlier terminated in accordance with this Exhibit and the Agreement.

    **7.2.    Suspension of End User Service.** If Customer elects to resell the Hosting Services to End Users, then in addition to its rights of termination, Telefonica Data may suspend the provision of Hosting Services to a specific End User immediately and indefinitely if Telefonica Data, in its sole discretion, determines any of the following: (a) End User's Web site or use of the End User's Web site could cause liability to Telefonica Data; (b) End User posts material on the Web site that is threatening, abusive, harassing, indecent, pornographic or otherwise obscene, or that is libelous, defamatory or that violates any privacy rights; (c) End User conducts business practices on and through the Web site that Telefonica Data in its sole discretion determines to be illegal, deceptive, or otherwise constitute a misuse of the Web site, including, but not limited to, the practices known as "spamming"; (d)

End User uses the Web site, or develops or operates the Web site so that third parties use the Web site, in violation of the Internet AUP; (e) End User operates the Web site in such a manner so as to interfere with the use of products or services by other Telefonica Data customers or with third party systems, networks or services, or to engage in use of another party's account without authorization, or to engage in any activity intended to defeat security measures, or to distribute or post software or other material in violation of any export law or other governmental regulation, or to intentionally distribute software containing malicious code such as viruses and hacker tools; (f) Customer fails to make payments due to Telefonica Data according to the payment provisions of the Agreement; (g) End User becomes insolvent or ceases its normal business operations, or fails to comply with any of the provisions in this Exhibit relating to financial responsibility; or (h) Telefonica Data reasonably suspects that End User is engaged in misuse of the Hosting Service. Telefonica Data's rights to suspend service above shall be in addition to, and shall not be superseded by, Telefonica Data's rights of suspension under the Digital Millennium Copyright Act provisions detailed below.

**7.3.    Resumption of Hosting Services.** Upon cure by Customer or, if Customer elects to resell the Hosting Services to End Users, an End User of the cause for suspension of Hosting Services to the satisfaction of Telefonica Data, including the provision of reasonable assurances that the cause of suspension shall not reoccur, and upon Customer's request, Telefonica Data may reinstate the provision of Hosting Services, subject to the payment by Customer of additional charges incurred by Telefonica Data in reinstating the Hosting Services. Telefonica Data may terminate the Hosting Service if Customer or End User does not cure the cause of a Service suspension or Customer does not pay the associated additional charges for Telefonica Data resuming the Service. In such an event, Customer (in addition to any other remedy available to Telefonica Data) will pay any termination fee described herein.

**7.4.    Termination Procedures.** Upon termination of this Exhibit, Telefonica Data may immediately remove Customer's Web Site and, if Customer elects to resell the Hosting Services to End Users, End User's Web site from its servers and re-deploy its servers to other purposes subject to the provision giving End User the opportunity to backup the Web site during the seven (7) Day suspended mode period described in Section 4.

**8.    INDEMNITY.** In addition to the indemnity provisions set forth in the Agreement, Customer agrees to indemnify and hold harmless Telefonica Data: (a) if Customer elects to resell the Hosting Services to End Users, against any claims by End User's Web site users or other third parties based on right of privacy, right of publicity, infringement of Intellectual Property Rights, misappropriation, or other claims, whether in contract or tort and whether statutory or at common law; (b) against all claims by End User's Web site users or other third parties arising from Telefonica Data's compliance with any subpoena or other judicial or governmental directive requesting information from Telefonica Data that is contained on End User's Web site; (c) against all claims by End Users whose Web site(s) reside on shared servers, for any claim by another customer sharing the same server with End User if such other customer's claim alleges damages arising out of or relating to use of End User's Web site(s) and/or End User Content; and (d) against claims arising from or related to Telefonica Data's compliance with Customer's configuration requirements.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER: LYCOS | | Telefonica Data: TELEFONICA USA, INC. | |
|---|---|---|---|
| By: | _____ *(Signature)* | By: | _____ *(Signature)* |
| Printed Name: | _____ | Printed Name: | **Pete Pizarro** |
| Title: | _____ | Title: | **CEO** |
| Date: | _____ | Date: | _____ |
| Address: | _____ | Address: | **1221 Brickell Avenue, Suite 600** |
| | _____ | | **Miami, Florida 33131** |
| Fax: | _____ | Fax: | _____ |
| E-Mail: | _____ | E-Mail: | **ppizarro@us.telefonica-data.com** |

**SCHEDULE G-1**

**TO**

**HOSTING SERVICES EXHIBIT**

**Pricing**

The cost for Data back up is outlined below.  Customer commits to a minimum monthly back-up of at least 4 TB of Data., For any month where the volume of Customer Data backed up by Telefonica Data is equal to or less than 4 TB, Customer will be billed for, and agrees to pay, charges equal to the back-up of 4TB of Data.  This price is for all Customer Data backed up at Telefonica Data Miami data center.

Telefonica Data will make six standard daily incremental backups and these daily back-ups will be retained off site for one week.  Telefonica Data will make full weekly backups that will be retained off site for a month.  Telefonica Data will make 12 full monthly backups that will be retained off site.

This pricing for the Services to be provided under this Exhibit does not include any servers, cards or connections that may be needed to attach Customer's storage to the Telefonica Data solution.  The Parties shall mutually determine what servers, cards or connections are necessary and the Parties shall mutually agree upon the charges that Customer shall pay for such servers, cards or connections.

Customer must purchase all tapes required for the rotation of backups.

|  | Service | Backup/ GB |
|---|---|---|
|  | **4 TerraBytes** | $2.20 |
|  | **5 TerraBytes** | $2.00 |
|  | **6 TerraBytes** | $1.80 |
|  | **7 TerraBytes** | $1.65 |
|  | **8 TerraBytes** | $1.50 |
|  | **9 TerraBytes** | $1.35 |
|  | **10 TerraBytes** | $1.25 |

**SCHEDULE G-2**

**TO**

**HOSTING SERVICES EXHIBIT**

**Service Level Agreement**

**1. Managed Backup**

Telefonica Data will attempt to restart failed backups three times before notifying the customer of the failure. In the event that the backups continue to fail, Telefonica Data will notify Customer prior to 8:00am ET the following day to determine how Customer wishes to proceed. These times and numbers serve as a baseline and may be modified by the Parties during the creation of the Runbook.

      o   Credits for failure to meet the Managed Backup Service Level Objectives are as follows

            ■  Customer shall receive a credit equal to $20 per failure to retry the job the appropriate number of times or failure to notify Customer within the appropriate time frame.

            ■  The credits for any one instance in a month can never exceed $1,000 and the total credits for a month may not exceed the monthly recurring charges for the affected Service for such month.

**SCHEDULE G-3**

**TO**

**HOSTING EXHIBIT G**

**TELEFONICA DATA ACCEPTABLE USE POLICY**

This acceptable use policy ("AUP") covers (1) TDUSA' customer's (the "Customer") (and the Customer's customers, agents and users) use of and access to TDUSA' facilities (e.g. Internet Data Centers); (2) Customer's (and its customers, agents and users) use of the TDUSA online services; and (3) TDUSA' maintenance of the services it provides to its Customers.

ACCESS TO INTERNET DATA CENTERS
Only those individuals identified in writing by Customer on the Customer Registration Form  ("Representatives") may access the Internet Data Centers. Customer shall deliver prior written notice to TDUSA of any changes to the Customer Registration Form and the list of Representatives.  Customer and its Representatives shall not allow any unauthorized persons to have access to or enter any Internet Data Centers.  Customer and its Representatives may only access the Customer Area, unless otherwise approved and accompanied by an authorized TDUSA representative.

USE OF INTERNET DATA CENTER FACILITY

*Conduct at Internet Data Centers.*  Customer and its Representatives agree to adhere to and abide by all security and safety measures established by TDUSA. Customer and its Representatives shall also not do or participate in any of the following: (1) misuse or abuse any TDUSA property or equipment or third party equipment; (2) make any unauthorized use of or interfere with any property or equipment of any other TDUSA Customer; (3) harass any individual, including TDUSA personnel and representatives of other TDUSA Customers; or (4) engage in any activity that is in violation of the law or aids or assists any criminal activity while on TDUSA property or in connection with the Internet Data Center Services.

*Prohibited Items.*  Customer and its Representatives shall keep each Customer Area clean at all times.  It is each Customer's responsibility to keep its area clean and free and clear of debris and refuse.  Customer shall not, except as otherwise agreed to in writing by TDUSA, (1) place any computer hardware or other equipment in the Customer Area that has not been identified in writing to TDUSA; (2) store any paper products or other combustible materials of any kind in the Customer Area (other than equipment manuals); and (3) bring any Prohibited Materials (as defined below) into any Internet Data Center. "Prohibited Materials" shall include, but not limited to, the following and any similar items:
- food and drink;
- tobacco products;
- explosives and weapons;
- hazardous materials;
- alcohol, illegal drugs and other intoxicants;
- electro-magnetic devices which could unreasonably interfere with computer and telecommunications equipment;
- radioactive materials; and
- photographic or recording equipment of any kind (other than tape back-up equipment).

EQUIPMENT AND CONNECTIONS

*Customer Equipment.*  Each connection to and from a piece of Customer Equipment shall be clearly labeled with Customer's name (or code name provided in writing to TDUSA) and the starting and ending point of the connection. Customer Equipment must be configured and run at all times in compliance with the manufacturer's specifications, including power outlet, power consumption and clearance requirements.  Customer must use its best efforts to provide TDUSA with at least 48 hours prior notice any time it intends to connect or disconnect any Customer Equipment or other equipment.

**MAINTENANCE**
TDUSA will conduct routine scheduled maintenance of its Data Center only according to its regularly scheduled maintenance schedule. In the event a mission critical maintenance situation arises, TDUSA may be required to perform emergency maintenance at any time. During these scheduled and emergency maintenance periods, Customer's Equipment may be unable to transmit and receive data, and Customer may be unable to access the Customer Equipment. Customer agrees to cooperate with TDUSA during the scheduled and emergency maintenance periods.

**ONLINE CONDUCT**
*Customer Content.* Customer acknowledges that TDUSA exercises no control whatsoever over the content of the information passing through Customer's site(s) and that it is the sole responsibility of Customer to ensure that the information it and its users transmit and receive complies with all applicable laws and regulations and this AUP.

*Prohibited Activities.* Customer will not, and will not permit any persons ("Users") using Customer's online facilities and/or services, including, but not limited to, Customer's Web site(s) and transmission capabilities, to do any of the following ("Prohibited Activities"):

- send unsolicited commercial messages or communications in any form ("SPAM");
- engage in any activities or actions that infringe or misappropriate the intellectual property rights of others, including, but not limited to, using third party copyrighted materials without appropriate permission, using third party trademarks without appropriate permission or attribution, and using or distributing third party information protected as a trade secret information in violation of a duty of confidentiality;
- engage in any activities or actions that would violate the personal privacy rights of others, including, but not limited to, collecting and distributing information about Internet users without their permission, except as permitted by applicable law;
- send, post or host harassing, abusive, libelous or obscene materials or assist in any similar activities related thereto;
- intentionally omit, delete, forge or misrepresent transmission information, including headers, return mailing and Internet protocol addresses;
- engage in any activities or actions intended to withhold or cloak Customer's or its Users' identity or contact information;
- use the TDUSA connectivity services for any illegal purposes, in violation of any applicable laws or regulations or in violation of the rules of any other service providers, web sites, chat rooms or the like; and
- assist or permit any persons in engaging in any of the activities described above.

If Customer becomes aware of any Prohibited Activities, Customer will use best efforts to remedy such Prohibited Activities immediately, including, if necessary, limiting or terminating User's access to Customer's online facilities.

***Third Party Complaint Process.*** TDUSA routinely receives written complaints ("Complaints") from third parties regarding Prohibited Activities allegedly being conducted by a Customer or its Users. Due to the nature of TDUSA' business, in TDUSA' experience, most legitimate complaints and actual Prohibited Activity is conducted by Customers and users of TDUSA' Customers, not by TDUSA' Customers themselves. TDUSA requires its Customers to use policies similar to this AUP and will work with its Customers to resolve violations. TDUSA will take the following actions to document and resolve each Complaint received by TDUSA related to a Customer or its Users.

First Complaint. Upon receipt of the initial complaint from a third party regarding Prohibited Activity by a Customer or its User, TDUSA will send a letter (the "First Letter") to the complaining third party that describes TDUSA' policies related to the Prohibited Activity and lists the contact information for the Customer and encloses a copy of the original Complaint received by TDUSA. TDUSA also will deliver notice of the Complaint to the Customer by sending a copy of the same letter to the Customer via e-mail to its abuse address so that Customer can identify and remedy the Prohibited Activity. TDUSA's goal is to put the complainant directly in touch with the party in the best position to remedy the problem, TDUSA' Customer who has the relationship with the alleged violator.

Second Complaint. Upon receipt of a second complaint after the date of the First Letter related to the same or similar Prohibited Activity of Customer described in the First Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a second letter (the "Second Letter") with a copy of the second complaint to the Customer and request that Customer respond in writing to TDUSA with an explanation and timeline of the actions to be taken by Customer to remedy Prohibited Activity. In the event that Customer does not respond to the TDUSA' Second Letter and remedy the

Prohibited Activity within ten (10) business days, TDUSA will bill Customer in the following month $500 to cover TDUSA' administrative costs associated with the Prohibited Activities of Customer.

Third Complaint. Upon receipt of a third complaint after the date of the Second Letter related to the same or similar Prohibited Activity of Customer described in the Second Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a third and final letter (the "Third Letter") with a copy of the third complaint to the Customer and request again that the Prohibited Activity cease immediately. In the event that the Prohibited Activity does not cease within five (5) business days, TDUSA will terminate or suspend its connectivity service to its Customer, and will only resume providing service when it receives adequate assurances that such activity will not continue. TDUSA will also bill its Customer $5,000 to cover TDUSA' administrative costs associated with the Prohibited Activities.

***Suspension and Termination of Service.*** TDUSA reserves the right to suspend and/or terminate a Customer's Service at any time for any material failure of Customer, its Representatives or its Users to comply with these AUP.

SUPPLEMENTAL SERVICES

Subject to the terms and conditions set forth in the Agreement, TDUSA may, from time to time, provide Customer with certain limited services and equipment needed and requested by Customer on a "one-off" or emergency basis ("Supplemental Services") where such services are not included within the scope of the Services purchased by Customer. Customer will be charged for all Supplemental Services provided Customer. TDUSA has no obligation to determine the need for or provide Supplemental Services. All Supplemental Services are provided on an "as-is" basis and exclude warranties of any kind, whether express or implied.

*Telefonica*



# EXHIBIT I

## TO

## MASTER SERVICES AGREEMENT

### ATM

.This ATM EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 20, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1. **DEFENITIONS**

   **1.1.** "Customer CPE" shall mean all Customer premises equipment other than the Equipment and the Software.

   **1.2.** "ATM Service" shall mean switched data asynchronous transfer mode service, including any Telefonica Data furnished equipment and software (respectively "Equipment and Software") used at the Customer's premises to provide the switched data ATM Service.

   **1.3.** "Service Start Date" shall mean the date when the ATM Service is operational and ready for use between two of Customer's premises.

2. **ORDERING, INSTALLATION, USE AND MAINTENANCE**

   **2.1.** **Orders.** Customer shall order ATM Services pursuant to the ordering provisions in Schedule I-1.

   **2.2.** **Service Start Date.** Telefonica Data shall use commercially reasonable efforts to provide the ATM Service by the applicable Customer-requested Service Start Date identified in Schedule I-1.

   **2.3.** **Preparations.** To facilitate the installation and maintenance of the ATM Service, Customer shall: (i) prepare its premises as necessary; (ii) provide any inside wiring required to interconnect local access lines to the Equipment, and (iii) provide Telefonica Data with access to the Equipment and software and provide security as reasonably required by Telefonica Data.

   **2.4.** **Acceptance.** Telefonica Data shall notify Customer of the Service Start Date. Unless Customer notifies Telefonica Data's network control personnel within five (5) Days after the Service Start Date that it has demonstrated that ATM Service is not operational and ready for Customer's use, ATM Service between such sites shall be deemed accepted by Customer as of the Service Start Date, and Customer shall pay for such ATM Service as of such date.

   **2.5.** **Relocation.** Customer may request ATM Service to be moved (i.e., disconnected from one location and reconnected at another location) subject to reasonable ATM Service interruption and payment of Telefonica Data's then-standard applicable relocation charges.

   **2.6.** **Maintenance.** Telefonica Data shall maintain the ATM Service, including establishing regularly scheduled maintenance periods. Maintenance of the Equipment and Software is provided as a part of the ATM Service at no additional charge to Customer unless such charges are (i) specifically set forth in this Exhibit, (ii) for maintenance which is necessitated by unauthorized maintenance or other acts or omissions of Customer or others, or (iii) for technical assistance or support with respect to any Customer CPE which is used in conjunction with the ATM Service, including, without limitation, assistance in connecting the Customer CPE to the Equipment and support in identifying and/or correcting problems within the Customer CPE. In the case of Subsections (ii) or (iii), Telefonica Data's then-standard dispatch ATM Service charge(s) shall apply.

**2.7.    Surrender of Equipment and Software.** Customer shall surrender the Equipment and Software to Telefonica Data promptly upon the discontinuance of the ATM Service for which it was being used, in the same condition as delivered, reasonable wear only excepted. If Equipment and Software is not so surrendered, Customer shall pay Telefonica Data any additional charges resulting therefrom.

**2.8.    Contingency.** Telefonica Data will operate and maintain the ATM Service, contingent upon Telefonica Data's (a) ability to maintain necessary licenses or permissions, and (b) availability of network capacity and connections.

## 3.    PRICES AND PAYMENT TERMS

**3.1.    Fees.** Customer shall pay Telefonica Data the recurring, non-recurring and other charges set forth in Schedule I-2 in accordance with the payment terms and conditions of the Agreement. Telefonica Data reserves the right to modify the fees at any time by issuance of a revised fee schedule, which such modifications will only apply to new Orders for Services as set forth in this Section 3.1. New Orders for Services received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance of the revised fee schedule, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all new Orders for Services accepted by Telefonica Data after the date of issuance of a revised fee schedule.

**3.2.    Commitment.** Charges for ATM Service for which Customer has made a minimum term commitment of twelve months shall remain fixed for the term commitment period; provided, however, that Telefonica Data may revise its charges upon thirty (30) Days advance written notice if the carrier(s) providing local access increase their charges to Telefonica Data. Unless otherwise provided for in the Order for ATM Service for which Customer has not made a term commitment of at least twelve (12) months are subject to modification by Telefonica Data upon at least sixty (60) Days prior written notice to Customer.

## 4.    TERM; TERMINATION; AND DELAY

**4.1. Term.** The term of this Exhibit shall commence on the date accepted by Telefonica Data (the "Effective Date") and shall continue until the second anniversary of the Effective Date, unless earlier terminated in accordance with this Exhibit or the Agreement.

**4.2.    Termination.** This Exhibit may be terminated in accordance with the termination provisions of the Agreement. In addition, Customer may terminate a particular ATM Service upon sixty (60) Days advance written notice to Telefonica Data provided that termination occurs prior to the expiration date of that ATM Service's term commitment and Customer pays a termination charge (as an early discontinuance of ATM Service fee and not as a penalty) to Telefonica Data equal to the sum of the monthly charges for the ATM Service multiplied by the number of months remaining in the term commitment.

**4.3.    Effect.** Upon termination, Customer shall immediately (i) cease utilizing the ATM Service, (ii) pay Telefonica Data for all charges incurred by Customer through the date such ATM Service is discontinued, and (iii) pay any applicable termination charges (as an early discontinuance fee and not as a penalty) as set forth above and/or elsewhere in this Exhibit.

## 5.    LIABILITY, WARRANTY, SOFTWARE, TITLE AND RISK OF LOSS

**5.1.    Liability.** If the ATM Service or any portion thereof is unavailable to Customer due to a total or partial interruption of the ATM Service, Telefonica Data's sole obligation, and Customer's sole and exclusive remedy with respect to such interruption of ATM Services shall be for Customer to request and Telefonica Data to provide a pro rata credit for the period and for the portion of the ATM Service affected during which the ATM Service or any part thereof was unavailable to Customer. Telefonica Data's maximum liability for any damages arising out of or related to this Exhibit shall not exceed the total charges for the ATM Services provided under this Exhibit during the month in which such liability arises.

**5.2.    Software.** Customer shall use Software (whether embedded in hardware as firmware or otherwise) and any related documentation only with Equipment, if any, and the ATM Service. Customer shall not (i) reproduce, reverse engineer, disassemble, decompile, modify, adapt, translate, create derivative works from, or transfer or transmit the Software in any form or by any means, or (ii) use the Software for any purpose other than as set forth in

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

     5.3.    **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

     **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER: | Lycos, Inc. | Accepted by Telefonica Data: | |
|---|---|---|---|
| | | **TELEFONICA DATA USA, INC.** | |
| By: | ~~BDY~~ | By: | |
| Name: | ~~Vish Yelsangikar~~ Brian P. Lucy | Name: | ANTONIO BERNARDO |
| Title: | ~~Network Operations & Security Manager~~ CFO | Title: | EVP |
| Date: | 28 January, 2004 | Date: | 02/04/04 |
| Address: | | Address: | 1221 Brickell Avenue, Suite 600 |
| | | | Miami, Florida 33131 |
| | | | Attn: |
| Fax: | | Fax: | |
| Email: | ~~vish.yelsangikar@corp.terralycos.com~~ | Email: | |

REVIEWED BY
TERRA LYCOS LEGAL___PDC____

I-3

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

5.3.     **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:. | Accepted by Telefonica Data: |
|---|---|
| _Lycos, Inc._ | **TELEFONICA DATA USA, INC.** |
| By: | By: |
| Name: ~~Vish Yelsangikar~~ Brian P. Lucy | Name: |
| Title: ~~Network Operations & Security Manager~~ CFO | Title: |
| Date: 28 January, 2004 | Date: |
| Address: | Address: 1221 Brickell Avenue, Suite 600 |
|  | Miami, Florida 33131 |
|  | Attn: |
| Fax: | Fax: |
| Email: ~~vish.yelsangikar@corp.terralycos.com~~ | Email: |

REVIEWED BY
TERRA LYCOS LEGAL  PDL

I-3

## SCHEDULE I-1

## TO

## EXHIBIT I

## Order Form



C:\Documents and
Settings\JRiggs\Desk

**Service Start Date: <u>9 January, 2004</u>**

I-4

**Telefónica Data**

| Number of order | | Order Form  000 |
|---|---|---|
| GAM | | Zeke Rodriguez |
| GAE | | Jim Roges |
| Order Date | | |

| COMPANY | Terra Lycos, Inc. | Billing Contact | Terra Lycos | Term | 6 Months | 2 Years | 3 Years |
|---|---|---|---|---|---|---|---|
| Contact | Vish Velsangkar | Phone | Vish Velsangkar | GPH | Pablo A. Gamham | | |
| Phone | 650-438-5241 | Fax | | Phone | 305-925-5224 | | |
| Fax | | E-mail | vish.velsangkar@corp.terralycos.com | Cell | 305-915-3206 | | |
| E-mail | vish.velsangkar@corp.terralycos.com | | | Fax | | | |
| | | | | E-Mail | pgarnham@us.telefonica-data.com | | |

| Address | | Billing | |
| NPA-Nxx | | Information | |
| Full Number | | & Contacts | |
| | | (All Countries) | |

| Customer Type: | | Change of service | Renewal | Upgrade | Add-on | Install Date: |

**ATM**

| | | | | | | |
|---|---|---|---|---|---|---|
| 5mbps ATM var-nrt | 6mbps | | 6mbps | DS3/E3 | $1,000.00 | $11,000.00 | USA |

See Schedule E-1-1 to Exhibit 1

**Installation Address**

| Location: | | Location: | |
|---|---|---|---|
| Country | USA | Country | Spain |
| State | MA | State | |
| City | Waltham | City | Madrid |
| Address | 100 FIFTH AVENUE | Address | Avda de las dos Castillas, 7, Pozuelo de Alarcon |
| Suite / Floor | | Suite / Floor | |
| Tie Down (Rack/Shelf, Position) | | Tie Down (Rack/Shelf, Position) | |

Notes: Connecting to Customer POP/Local Loop? If so CFM.OA need to be issued (depending on who meets who.

| Name | | Name | |
| Phone | | Phone | |
| Number | | Number | |
| eMail | | eMail | |

| Port: | ☐ T1 ☐ E1 ☐ STM1 | Port: | ☐ T1 ☐ E1 ☐ STM1 |
| Interface: | GT03 crnxx | (BNC, G703, V35, SC-MM) | Interface: | GT03 crnxx | (BNC, G703, V35, SC-MM) |
| | | (B8ZS-AMI, ESF-SF, Framed) | | | (B8ZS-AMI, ESF-SF, Framed) |
| Qos. Class | VBRnrt | QBR, VBR, Type OoS | DLCI | 17,904 | |

**Installation Fees**

| | | |
|---|---|---|
| Circuit installations costs | | $1,000.00 |

**Customer Premise Equipment**

| | | | | |
| No Equipments | | | | |

**Technical Information**

| IP Addresses | N/A | | Other | |
| IP Address | N/A | | Other | |

| Customer: Terra Lycos, Inc. | | Telefonica USA, Inc. | |
|---|---|---|---|
| Signature: | | Signature: | |

REVIEWED BY
TERRA LYCOS LEGAL

| Name: ~~John Valenzuela~~ Beth Luby | Name: ANTONIO BERNARDO |
| Title: Network Operations & Security Manager  CFO | Title: EVP |
| Date: | Date: 02/04/04 |

**SCHEDULE I-2**

**TO**

**EXHIBIT I**

<u>Pricing</u>



C:\Documents and
Settings\JRiggs\Desk

I-5

Service Type | ATM

Currency: U$
No taxes
Term: 1 year



| Circuit ID | Host Site | Host Address | Host # | Access Line Host | Remote Site | Remote Address | Remote # | Access Line Remote | CIR | Observation | | $11,000.00 | $11,000.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | USA | | | DS3 | Spain | | | DS3 | 5mbps vc-vci | No equipment | | | |

Conditions: Prices without local (Spain) and US taxes.
1 year term.
Prices are subject to local loop feasibility.
Prices valid for 60 days.
Prices do not consider any Customer Equipment.

# SCHEDULE I-2

## TO

## EXHIBIT I

## SERVICE LEVEL AGREEMENT



C:\Documents and
Settings\JRiggs\Desk

*Telefónica*

Telefónica International Wholesale
Services

Marketing Department

# International ATM VBRnrt Service

## Service Level Agreement

*Telefónica*
*Data*

# Statement of confidentiality

This documentation is property of Telefonica and is confidential. It may not be reproduced in whole or in part, processed by a computer, or transmitted in any way or by any electronic or mechanical means, photocopying, recording, or by any other means. It may not be lent out or rented and its use may not be assigned without the prior written permission of Telefonica, the Copyright holder. Failure to comply with the aforementioned restrictions by any person with access to the documentation will be prosecuted in accordance with the law.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.



*Data*

Telefonica DataCorp

# CHART OF CONTENTS

1.  INTRODUCTION AND GENERAL CONDITIONS ........................................................................................ 4

2.  QUALITY OF SERVICE GUARANTEES.................................................................................................... 5

   2.1.  DEFINITIONS ......................................................................................................................... 5
   2.2.  SERVICE LEVEL GUARANTEES .............................................................................................. 5
      *Availability* ................................................................................................................. 5
      *Mean Time to Deliver the Service* ........................................................................ 6
      *Mean Time to Repair* ............................................................................................. 7
      *Network Target Delays* ........................................................................................... 7
   EXCLUSIONS AND EXCEPTIONS ................................................................................................... 8

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.



# 1. INTRODUCTION AND GENERAL CONDITIONS

The following document describes the standard SLA ("Service Level Agreement") of the International ATM VBRnrt Service, in which Telefonica Data offers a set of guarantees for different key aspects in order to ensure the quality expected and demanded by Customer. The Guarantees that Telefonica Data assumes in relation to Customer are: Availability, Time to Deliver, Mean Time to Repair, and Network Target Delay.

If the International ATM Service does not comply with the parameters defined in this document, Customer will be entitled to demand from Telefonica Data a compensation in accordance with Section 2 of this document.

Any compensation from Telefonica Data to Customer shall take effect only if (i) Customer identifies an incident that may be deemed to be a failure or non performance of the International ATM Service provided by Telefonica Data, (ii) Customer notifies Telefonica Data the existence of such incident through the one stop procedure defined for that purpose in a period of 30 Days after such incident occurred, (iii) such incident is confirmed to be a failure or non performance of the International ATM Service by Telefonica Data. The incidents described in the Exclusions and Exceptions section are specifically excluded from the calculation of quality of service guarantees.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefónica*
*Data*

# 2. QUALITY OF SERVICE GUARANTEES

## 2.1. Definitions

- **Permanent Virtual Circuit (PVC):** defines a permanent logical connection established between two customer accesses over the Network to guarantee that sequence will be maintained in the order of the frames received by the Network.
- **Customer Network:** Set of connections contracted by the customer for the Service.
- **NNI:** Network to network Interconnection.

## 2.2. Service Level Guarantees

### Availability

Availability is defined per each two locations and on a monthly basis, and means the total amount of time that the International ATM Service is not under any single outage between such two locations. Availability for each two locations shall be calculated according to the following formula:

$$Availability = \frac{Ttotal - Tunavail}{Ttotal} * 100\,(\%)$$

Where:

- $Ttotal$ = total time in minutes of the period considered, i.e. one calendar month.
- $Tunav$ = total time in minutes in which the service it is not available on a continuous basis within the $Ttotal$ interval considered (total lack of communication through Telefonica Data's network). If an outage does not exceed the amount guaranteed by Telefonica Data in accordance to the chart below, the amount that shall account for $Tunav$ shall be zero.

The SLA defined in the International ATM VBRnrt Service is defined in accordance to the following chart:

| Service Area | Scope of Service with details | Availability Guaranteed (AG) |
|---|---|---|
| TD Area | From Main Customer's Office in Location A to Main Customer's Office in Location B | 99.5 %* |

*This Availability value could be improved until a maximum of 99.7% depending on possible redundancy scenarios hired by Customer. Also, due to the constants improvements of the service, this objective will be revised and will periodically communicate to Customer.

### Compensations for non-compliance with the SLA defined for Availability

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

If Telefonica Data fails to deliver the service in accordance with the chart above, then, as Customer's sole and exclusive remedy, Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following measures:

| Actual availability of Customer's network | Service Voucher in % of the monthly bill (on the Price of Sale to Customer of the PVC Segment affected) |
|---|---|
| 99.4 < A < A.G. | 5% |
| 99.3 < A < 99.4 | 10% |
| 99.2 < A < 99.3 | 15% |
| 99.1 < A < 99.2 | 20% |
| A < 99.1 | 25% |

Where A is the availability measured between each two Customer's locations and AG is the availability guaranteed.

## Mean Time to Deliver the Service

The Mean Time to Deliver the International ATM Service is defined by location according to the following chart:

| Origin/Destination | Mean Time to Deliver |
|---|---|
| TD Area | 65 Days |
| All others (target measure) | 85 Days |

## Compensations for non-compliance with the Mean Time to Deliver the Service

Should the installation date be delayed by TD beyond the Guaranteed Installation Date (possibly modified as defined above), then Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following chart:

| Percentage of delay with respect to the committed Mean Time to Deliver | Service Voucher in % of the Installation Charge for the location affected |
|---|---|
| For each complete business day of delay past the Guaranteed Installation Date | 5% |

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.



**Telefonica** **Data**

Telefonica DataCorp

## Mean Time to Repair

Mean Time to Repair is defined on a monthly basis and means the average time in which the International ATM Service has been under a failure in accordance with the terms defined. Telefonica Data's Mean Time to Repair objective is 6 hours for TD Area locations.

Mean Time to Repair shall be calculated according to the following formula:

$$Mean\ Repair\ Time = \frac{\sum_{1}^{NI}[Tunav_i]}{NI}\text{---} hours$$

Where:

- $Tunav_i$ = Each of the times in hours that the service is not available during each of the events in which a failure has occurred in one calendar month
- $NI$ = Number of events in which a failure has occurred in one calendar month.

## Network Target Delays

The transit delay is the mean time that takes for a 100-byte packet to go through Telefonica Data's Network form POP to POP. Telefonica Data shall measure transit delay under ordinary operation conditions.

The specific origin and destination points to measure the transit delay shall be the POPs of Telefonica Data's International Network. For the avoidance of doubt the transit delay is not measured on an end-to-end basis.

The target transit delay values, Round Trip Delay, are specified in the chart below:

| Round trip Delay* (ms) | Europe | North America | South America** |
|---|---|---|---|
| Europe (London) | 95 | 130 | 250 |
| North America | 130 | 70 | 140 |
| South America** | 250 | 140 | 95 |

*The delays in the chart above vary depending on the country. For instance, in Europe (London) the delay is 25 ms for Madrid, Milan and Paris, and 50 ms when the destination is Rome and Vienna.
** Except for Colombia.

Due to the continuous improvements and upgrades in Telefonica Data's Network, the target transit delays are subject to continuous revision, change, and improvement

Property of Telefonica DataCorp. S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefónica Data*



Telefonica DataCorp

## Exclusions and Exceptions

The exclusions and exceptions that shall not be consider under this Section 2 are the following ones:

1. Programmed Service Interruptions due to ordinary maintenance tasks within the schedule assigned to that end, and Service Interruptions for non-programmed maintenance tasks, as long as Customer has received prior notification from Telefonica Data.
2. Specific laws, regulations or customs dispositions in a specific country.
3. Service Interruptions that may occur due to Customer's act or omissions.
4. Service Interruptions due to Force Majeure or beyond Telefonica Data's control.
5. The delays caused by Customer if the personnel appointed by Telefonica to resolve an incident is not allowed to have access to Customer's premises.
6. Any interruption caused specifically by Customer's equipment or applications.
7. The access connection line equipment shall be turned on permanently for all Customer's Network interfaces.

The values of guaranteed Availability and to measure and calculate Time to Deliver the Service shall only be valid in the following countries:

TD Area: Argentina, Brazil (Sao Paulo state), Chile, Colombia, France, Germany, Italy, Mexico, Peru, Puerto Rico, Spain, United Kingdom, and USA (Miami and NY).

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.



# TData

**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131
Contact:    Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
sortiz@us.telefonica.com

| Invoice No. : | 01-0904-00-002173 |
|---|---|
| Invoice Date: | 09/30/04 |
| Invoice Period: | September-04 |
| Payment Due: | Immediately |

| Name | Lycos Inc. |
|---|---|
| Address | 850 North Shoreline Blvd. |
| | Mountainview, CA 94043 |
| | **Attention:  Accounts Payable** |

Fax #  **650 428 5111**
Att: **Bert Knorr**
eMail: bert.knorr@corp.terralycos.com

| Qty. | DESCRIPTION | Unit Price | | Tax | | AMOUNT |
|---|---|---|---|---|---|---|
| **Hosting** | | | | | | |
| | **September '04** | | | | | |
| 3297 | Square Feet Collocation | $ | 27.00 | 7.00% | $ 6,231.33 | $ 89,019.00 |
| 64 | Power Whips L6 configuration | $ | 300.00 | 7.00% | $ 1,344.00 | $ 19,200.00 |
| 1 | Circuit - Madrid to Boston | $ | 11,000.00 | 7.00% | $ 770.00 | $ 11,000.00 |
| 324.17 | Mbps bandwidth ACTUAL - August | $ | 100.00 | 7.00% | $ 2,269.19 | $ 32,417.00 |
| 300 | Professional Service Hours | $ | 56.00 | 0.00% | $ - | $ 16,800.00 |
| 1 | Akamai Services/Freeflow/Edgesuite | $ | 67,500.00 | 7.00% | $ 4,725.00 | $ 67,500.00 |
| 1 | Domestic WAN | $ | 31,500.00 | 7.00% | $ 2,205.00 | $ 31,500.00 |
| | **Subtotal** | | | | $ 17,544.52 | $ 267,436.00 |
| | State Communication Services Tax | | | | | $ - |
| | Local Communication Services Tax | | | | | $ - |
| | Gross Revenue Tax | | | | | $ - |
| | Florida Sales & Use Tax | | | | | $ 17,544.52 |
| | **Subtotal** | | | | | $ 284,980.52 |

**Invoice Summary**

| | | | |
|---|---|---|---|
| | **Total Charges** | | $ 267,436.00 |
| | State Communication Services Tax | | $ - |
| | Local Communication Services Tax | | $ - |
| | Gross Revenue Tax | | $ - |
| | **Total Invoice** | | $ 284,980.52 |

PLEASE DETACH AND RETURN WITH YOUR PAYMENT

**REMMITANCE STUB**

**INVOICE #**
01-0904-00-002173

**INVOICE DATE**
August 1, 2004

**REMIT PAYMENT TO:**
1221 BRICKELL AVE. SUITE 600
MIAMI, FL  33131

| INVOICE AMOUNT DUE |
|---|
| $    284,980.52 |

Mountainview, CA 94043



RECYCLED

-------- Original Message --------
Subject:      Lycos Invoices
Date:     Tue, 14 Dec 2004 10:51:39 -0500
From:     Samuel Ortiz <sortiz@us.telefonica.com>
To:       <dean.batten@lycos-inc.com>
CC:       David Salway <dsalway@us.telefonica.com>

Dean,


Please find attached the invoices from Sept-Dec 2004, they have also
been mailed out and faxed.


Sam Ortiz



# Telefonica

**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131

Contact: Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
Email: sortiz@us.telefonica.com

| Invoice No. : | 01-1004-00-002227 |
|---|---|
| Invoice Date: | 10/27/04 |
| Invoice Period: | October-04 |
| Payment Due: | 11/26/04 |

| Name | Lycos Inc. |
|---|---|
| Address | 850 North Shoreline Blvd. Mountainview, CA 94043 |

| Att: | Bert Knorr |
|---|---|
| Tel # | |
| Fax # | 650 428 5111 |
| eMail: | bert.knorr@corp.terralycos.com |

| QTY | DESCRIPTION | Unit Price | | Tax | | AMOUNT | |
|---|---|---|---|---|---|---|---|
| 4000 | Square Feet Collocation | $ | 27.00 | 7.00% | $ 7,560.00 | $ | 108,000.00 |
| 64 | Power Whips L6 configuration | $ | 300.00 | 7.00% | $ 1,344.00 | $ | 19,200.00 |
| 2 | Telephone Lines MRC | $ | 25.00 | 7.00% | $ 3.50 | $ | 50.00 |
| 1 | Circuit - Madrid to Boston | $ | 11,000.00 | 7.00% | $ 770.00 | $ | 11,000.00 |
| 400 | Mbps bandwidth Prebill - October | $ | 100.00 | 7.00% | $ 2,800.00 | $ | 40,000.00 |
| 300 | Professional Service Hours | $ | 56.00 | 0.00% | $ - | $ | 16,800.00 |
| 1 | Akamai Services/Freeflow/Edgesuite (Prorated from 10/17 Cancellation) | $ | 58,833.33 | 7.00% | $ 4,118.33 | $ | 58,833.33 |
| 1 | Domestic WAN | $ | 31,500.00 | 7.00% | $ 2,205.00 | $ | 31,500.00 |
| | Subtotal | | | | $ 18,800.83 | $ | 285,383.33 |
| | State Communication Services Tax | | | | | $ | - |
| | Local Communication Services Tax | | | | | $ | - |
| | Gross Revenue Tax | | | | | $ | - |
| | Florida Sales & Use Tax | | | | | $ | 18,800.83 |
| | Subtotal | | | | | $ | 304,184.16 |

**Invoice Summary**

| | | | |
|---|---|---|---|
| Total Charges | | $ | 285,383.33 |
| State Communication Services Tax | | $ | - |
| Local Communication Services Tax | | $ | - |
| Gross Revenue Tax | | $ | - |
| Florida Sales & Use Tax | | $ | 18,800.83 |
| Total Taxes | | $ | 18,800.83 |
| **Total Invoice** | | $ | 304,184.16 |

---

**INVOICE #**
01-1004-00-002227

**INVOICE DATE**
October 27, 2004

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1221 BRICKELL AVE. SUITE 600
MIAMI, FL 33131

PLEASE DETACH AND RETURN WITH YOUR PAYMENT
**REMITTANCE STUB**

| INVOICE AMOUNT DUE |
|---|
| **$ 304,184.16** |

Lycos Inc.
850 North Shoreline Blvd.
Mountainview, CA 94043



**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131

Contact: Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
Email: sortiz@us.telefonica.com

| Invoice No. : | 01-1104-00-002326 |
|---|---|
| Invoice Date: | 11/27/04 |
| Invoice Period: | November-04 |
| Payment Due: | 12/27/04 |

| Name | **LYCOS Inc.** |
|---|---|
| Address | **850 North Shoreline Blvd.** |
| | **Mountainview, CA 94043** |

| Att: | **Bert Knorr** |
|---|---|
| Tel # | |
| Fax # | 650 428 5111 |
| eMail: | bert.knorr@corp.terralycos.com |

| QTY | DESCRIPTION | Unit Price | | Tax | | Amount | |
|---|---|---|---|---|---|---|---|
| **Hosting** | | | | | | | |
| 4000 | Square Feet Collocation | $ | 27.00 | 7.00% | $ 7,560.00 | $ | 108,000.00 |
| 64 | Power Whips L6 configuration | $ | 300.00 | 7.00% | $ 1,344.00 | $ | 19,200.00 |
| 2 | Telephone Lines MRC | $ | 25.00 | 7.00% | $ 3.50 | $ | 50.00 |
| 1 | Circuit - Madrid to Boston - Local loop Madrid | $ | 2,000.00 | 0.00% | $ - | $ | 2,000.00 |
| 1 | Circuit - Madrid to Boston - International | $ | 3,500.00 | 23.79% | $ 832.65 | $ | 3,500.00 |
| 1 | Circuit - Madrid to Boston - Local Loop in USA | $ | 5,500.00 | 23.79% | $ 1,308.45 | $ | 5,500.00 |
| 400 | Mbps bandwidth Prebill - October | $ | 100.00 | 7.00% | $ 2,800.00 | $ | 40,000.00 |
| 300 | Professional Service Hours | $ | 56.00 | 0.00% | $ - | $ | 16,800.00 |
| 1 | Akamai Services | $ | 46,916.67 | 7.00% | $ 3,284.17 | $ | 46,916.67 |
| 1 | Domestic WAN (Florida -Ma - CA) | $ | 31,500.00 | 23.79% | $ 7,493.85 | $ | 31,500.00 |
| | Subtotal | | | | $ 24,626.62 | $ | 273,466.67 |
| | State Communication Services Tax | | | | | $ | 2,754.00 |
| | Local Communication Services Tax | | | | | $ | 2,316.60 |
| | Gross Revenue Tax | | | | | $ | 959.85 |
| | Florida Sales & Use Tax | | | | | $ | 14,991.67 |
| | Universal Services Found | | | | | $ | 3,604.50 |
| | Subtotal | | | | | $ | 298,093.29 |

**Invoice Summary**

| | | | |
|---|---|---|---|
| Total Charges | | $ | 273,466.67 |
| State Communication Services Tax | | $ | 2,754.00 |
| Local Communication Services Tax | | $ | 2,316.60 |
| Gross Revenue Tax | | $ | 959.85 |
| Florida Sales & Use Tax | | $ | 14,991.67 |
| Universal Services Found | | $ | 3,604.50 |
| Total Taxes | | $ | 24,626.62 |
| Total Invoice | | $ | 298,093.29 |

--------------------------------------------------------------------------------

PLEASE DETACH AND RETURN WITH YOUR PAYMENT
**REMITTANCE STUB**

**INVOICE #**
01-1104-00-002326
**INVOICE DATE**
November 27, 2004

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1221 BRICKELL AVE. SUITE 600
MIAMI, FL 33131

| INVOICE AMOUNT DUE |
|---|
| **$   298,093.29** |

Lycos Inc.
850 North Shoreline Blvd.
Mountainview, CA 94043



**Telefonica Data USA, Inc.**
1221 Brickell Ave., Suite 600
Miami, Fl. 33131

Contact: Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
Email: sortiz@us.telefonica.com

| Invoice No. : | 01-1204-00-002426 |
|---|---|
| Invoice Date: | 12/01/04 |
| Invoice Period: | December-04 |
| Payment Due: | 12/31/04 |

| Name | **Lycos Inc.** |
|---|---|
| Address | **850 North Shoreline Blvd.** **Mountainview, CA 94043** |

| Att: | Dean Batten |
|---|---|
| Tel # | (781) 466-7634 |
| Fax # | 650 428 5111 |
| eMail: | dean.batten@lycos-inc.com |

| Hosting | DESCRIPTION | Unit Rate | TAX | AMOUNT |
|---|---|---|---|---|
| 4000 | Square Feet Collocation | $ 27.00 | 7.00% $ 7,560.00 | $ 108,000.00 |
| 64 | Power Whips L6 configuration | $ 300.00 | 7.00% $ 1,344.00 | $ 19,200.00 |
| 2 | Telephone Lines MRC | $ 25.00 | 7.00% $ 3.50 | $ 50.00 |
| 1 | Circuit - Madrid to Boston - Local loop Madrid | $ 2,000.00 | 0.00% $ - | $ 2,000.00 |
| 1 | Circuit - Madrid to Boston - International | $ 3,500.00 | 23.79% $ 832.65 | $ 3,500.00 |
| 1 | Circuit - Madrid to Boston - Local Loop in USA | $ 5,500.00 | 23.79% $ 1,308.45 | $ 5,500.00 |
| 400 | Mbps bandwidth Prebill - November | $ 100.00 | 7.00% $ 2,800.00 | $ 40,000.00 |
| 300 | Professional Service Hours | $ 56.00 | 0.00% $ - | $ 16,800.00 |
| 1 | Akamai Services | $ 46,916.67 | 7.00% $ 3,284.17 | $ 46,916.67 |
| 1 | Domestic WAN (Florida -Ma - CA) | $ 31,500.00 | 23.79% $ 7,493.85 | $ 31,500.00 |
| | Subtotal | | $ 24,626.62 | $ 273,466.67 |
| | State Communication Services Tax | | | $ 2,754.00 |
| | Local Communication Services Tax | | | $ 2,316.60 |
| | Gross Revenue Tax | | | $ 959.85 |
| | Florida Sales & Use Tax | | | $ 14,991.67 |
| | Universal Services Found | | | $ 3,604.50 |
| | Subtotal | | | $ 298,093.29 |

**Invoice Summary**

| Total Charges | | $ 273,466.67 |
|---|---|---|
| State Communication Services Tax | | $ 2,754.00 |
| Local Communication Services Tax | | $ 2,316.60 |
| Gross Revenue Tax | | $ 959.85 |
| Florida Sales & Use Tax | | $ 14,991.67 |
| Universal Services Found | | $ 3,604.50 |
| Total Taxes | | $ 24,626.62 |
| Total Invoice | | $ 298,093.29 |

---

**INVOICE #**
01-1204-00-002426

**INVOICE DATE**
December 1, 2004

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1221 BRICKELL AVE. SUITE 600
MIAMI, FL 33131

PLEASE DETACH AND RETURN WITH YOUR PAYMENT
**REMITTANCE STUB**

| INVOICE AMOUNT DUE |
|---|
| **$ 298,093.29** |

**Lycos Inc.**
850 North Shoreline Blvd.
Mountainview, CA 94043



RECYCLED

*Bert Knorr*

11/11/2004 07:36 PM

To:     Victor Turner/Lycos
cc:
Subject:     TData credit status


Victor,

The only outstanding TData credit is the 130k for September. (from
resolution of billing dispute)
156K was the outstanding balance for September after the last payment
about 6 weeks ago.
To my knowledge we have not received an October invoice.

best regards, Bert



> 
> 1. How are you calculating the Akamai charges? It looks like the
> proration for Oct was done based upon a 30-day month,
> 
> though Oct has 31 days. Doing it correctly would change the Oct charge
> from $58833.33 to $58467.74. Perhaps related to
> 
> this is the Akamai charge for Nov and Dec - how did you calculate this?
> The service we turned off was for $20k/month, so
> 
> shouldn't the charge going forward just be $47500/month (comparing to
> the old $67500)?
> 
> 
> 
> 2. The Madrid circuit was cancelled on 10/6, so for Oct this charge
> should be $2129.03 and zero for Nov and Dec. I can
> 
> dig up the emails related to this if necessary, though David Salway
> should have these already.
> 
> 
> 
> 3. Fred Schimscheimer finished up with us on 12/10 (8 working days in
> Dec), so the Prof Services hours for Dec should be
> 
> around the 200 hour mark, not 300 (he was not replaced). David and I
> need to talk about what this should be going
> 
> forward, but given the number of hours we are getting out of Isaac I
> would think it would be down to 100-120 hours/month
> 
> in future.
> 
> 
> 
> I'm ignoring the new tax charges and the imposition of the minimums on
> floorspace and bandwidth from Oct onwards as they
> 
> are bigger issues that need to be discussed separately.
> 
> 
> 
> Let me know what your take is on the three items I listed.
> 
> 
> 
> Regards,
> 
> 
> 
> Dean Batten.
> 
> Director of Operations.
> 
> Lycos, Inc.

> 
> 
> -----Original Message-----
> From: Dean Batten [mailto:déan.batten@lycos-inc.com]
> Sent: Thursday, December 16, 2004 2:13 PM
> To: Samuel Ortiz
> Cc: David Salway
> Subject: Re: Lycos Invoices
> 
> 
> 
> Thanks Samuel.
> 
> 
> 
> I've now had time to go through these and there are a number of
> questions I have.
> 
>

```
>
>
>
>
>
>
>
>
>
>
>
>
>
>
> Samuel Ortiz wrote:
>
>>  Dean,
>
>>
>
>>
>
>>
>
>>  Please find attached the invoices from Sept-Dec 2004, they have also
>
>>  been mailed out and faxed.
>
>>
>
>>
>
>>
>
>>  Sam Ortiz
>
>>
>
>
>
```





**SENT VIA FAX, CERTIFIED US MAIL, RETURN RECEIPT REQUESTED**

** NOTICE OF TERMINATION OF SERVICES **
17:00 EST, 12/20/04

RE:  PAST DUE BALANCE

December 20, 2004

Dear Mr. Batten:

This letter is in reference to the attached invoice which represents charges incurred from 09/01/04 – 12/31/04.  We make reference to the above mentioned invoices which appears to remain outstanding despite persistent communications regarding the past due status of the account.

As you are already aware of, we have been in continuous communications with Bert Knorr prior to your involvement, and directly with you, over the course of the last several months regarding this issue.  Unfortunately, the discussions that we have had centered on renegotiating the current contract, rather than bringing your account current.  We are also aware that you are disputing various items contained on your invoices.  Since you are now in possession of all the invoices in question, the undisputed portion of these invoices should be paid immediately.

Please note that there should be no dispute regarding the billing of the minimums regarding colo space and bandwidth charges.  These items are clearly defined in the Master Service Agreement and accompanying addendums.

We cannot extend your credit any further and wish to inform you that funds in the amount of $459,523.72 plus interest charges of $6,575.86, calculated at 1% per month per Section 4.1 of the Master Services Agreement signed by both parties on 11/20/03 and accounting for all payments made during the aforesaid time period.  This amount includes the unpaid balance of the 09/04/04 invoice; $155,339.56 (now 80 days past due), the October Invoice; $304,184.16, plus the aforementioned interest charges.

Therefore the sum of $466,099.68 is required to be sent via wire transfer and deposited to Telefonica Data's account no later than 15:00EST, 12/30/04.  If payment in this amount is not received prior to this date and time, Telefonica will immediately terminate all services currently being provided to Lycos.

In addition interest continues to accrue on the above amount at $153.17 daily from the date of this letter, the November Invoice totaling $296,093.29 will be due 12/27/04, and will begin accruing interest charges after that date, and the December Invoice totaling $296,093.29 will become due on 01/01/05, incurring the same interest penalties after that date.  In addition there is a $66,599.50 tax assessment bill which is still pending, however this invoice will not be assessed any penalties or interest charges.

It is regrettable that we need to pursue this option; however after repeated attempts to resolve the outstanding balance on this account, as well as the lack of response to a formal demand for payment on several prior occasions, this is the last remaining option.

It is our hope that you save yourself the expense of court proceedings, legal expenses, and further interest charges, and pay the outstanding balance due at this time.

Sincerely,

Victoria Medina
CFO



Dean Batten
<dean.batten@lyc       To:    David Salway <dsalway@us.telefonica.com>
os-inc.com>            cc:    Samuel Ortiz <sortiz@us.telefonica.com>, Zeke Rodriguez
                       <zrodriguez@us.telefonica.com>, Tom Quarles
<tquarles@us.telefonica.com>, Carlos David
12/21/2004 06:31       <cdavid@us.telefonica.com>, peter.karol@lycos-inc.com
PM                     Subject: Re: Comments on Lycos Invoices

Seem my comments below.

David Salway wrote:
> Dean:
>
>
>
> I wanted to give you some feedback with regard to your specific comments
> regarding the invoices you have recently reviewed.  My responses are in
> red ? thanks.
>
>
>
> *FROM A PREVIOUS EMAIL*
>
> September Invoice Total: $284,980.52, less the payment made left a
> balance of  *$155,339.56*.  The negotiations with Bert were exclusive of
> this invoice.  I am waiting for confirmation of your wire transfer
> payment from our Finance Department regarding this amount.
>

Let me repeat the message I sent to you on 12/17/04;

"I just want to check a couple of numbers with you before we send in
payment for the September invoice, which I believe
has not been paid yet. I understand from looking over past communications

between yourself and Bert in relation to the
invoice for Dec '03 to Aug '04 time period that there was an amount of
$176,416.25 in dispute (relating to power and
network credits), but that we paid the full amount at the time. Since then
it appears that Bert and yourself had agreed
to settle on us paying an amount of $46,186.79 (taken from an email from
yourself to Bert on 9/28/04), which then leaves
us with a credit of $130,229.46.

I want to make sure that you are in agreement with this. If so, then we
will pay the September invoice less the credit
amount ($284,980.52 - $130,229.46 = $154,751.06).

If you can confirm with me that this is correct I will authorize the
payment."

Again, can you confirm my math? We still have a difference here that you
haven't explained. Please tell me which of my
numbers is incorrect, or show me how you arrived at $155,339.56. As I said,
we have already today paid $154,751.06,
which in the absence of a reply from you is the amount I thought to be
correct.


>

>
>
> *YOUR COMMENT:*>
> 1. How are you calculating the Akamai charges? It looks like the
> proration for Oct was done based upon a 30-day month,
>
> though Oct has 31 days. Doing it correctly would change the Oct charge
> from $58833.33 to $58467.74. Perhaps related to this is the Akamai
> charge for Nov and Dec - how did you calculate this? The service we
> turned off was for $20k/month, so shouldn't the charge going forward
> just be $47500/month (comparing to the old $67500)?
>
>
>
> The Akamai Edgescape service was cancelled effective 10/17, and the MRC
> for this service was $20,000 per the attached document . You should
> have been charged the following:
>
>
>
> October (prorated): _$47,500_ + _($20,000/31) * 17 Days =  $10,967.72_
> = *_$58,467.72 _* (you are correct)
>
> November:      *$47,500*,
>
> December:      *$47,500*
>
>
>
> You were actually charged $58,833.33 for October, and $46,916.67 for

> November and December.  For some reason I had a different number for the
> Edgescape Services -- So, after correcting the October ? December
> invoices there is an additional *$801.05  *due for the three months,
> which we can adjust for in January.
>

So I take it we are in agreement on this one ($58467.74 for Oct,
$47500/month thereafter)?

>
>
> *YOUR COMMENT:*>
> 2. The Madrid circuit was cancelled on 10/6, so for Oct this charge
> should be $2129.03 and zero for Nov and Dec. I can
>
> dig up the emails related to this if necessary, though David Salway
> should have these already.
>
>
>
> I don't have the contract regarding this circuit, but I can confirm that
> the notice to cancel the circuit was received on 10/6/04 as I can
> I need to make sure there are no early cancellation fees, so until I can
> determine that - you should consider the November and December invoices
> for this circuit  "disputed amounts".   We received the notice to cancel
> on 10/6, so the October charges for the circuit are still due.  We can't
> prorate the amount due based on the day the notice was received. ? 30
> days is the minimum notice; I need to check the contract to make sure a
> longer notice is not necessary.
>

Patrick Hetherton sent you an email on 9/10/04 and another on 9/14/04
requesting that the circuit be cancelled as soon
as the Daum deal concluded, which we anticipated would happen in October.
We did not just send you the one notice on
10/6/04.

>
>
> *YOUR COMMENT:*>
> 3. Fred Schimscheimer finished up with us on 12/10 (8 working days in
> Dec), so the Prof Services hours for Dec should be around the 200 hour
> mark, not 300 (he was not replaced). David and I need to talk about what
> this should be going forward, but given the number of hours we are
> getting out of Isaac I would think it would be down to 100-120
hours/month
>
>
>
> Since we do not have a contract regarding the professional service hours
> we can reduce the hours to actuals, however they will have to be at the
> hands and eyes rate in the contract ? $125/hour ? since there will be no
> more minimums.  You will receive time reports on any hands & hours work
> requested so you can verify these hours.
>
>

> _So for December we can bill the following:_>
> 300 hours @ $56.00/hour ? prorated after Fred left  = 300 hours X $56 =
> $16,800.  Then dividing $16,800 by 23 "Working Days" in December =
> $730.43/day.  *$730.43 X 8 Days = $5843.44*; we can't simply multiply 64
> hours by $56 for the time Fred was working, because the rates were
> negotiated based on billing for a 300 hour minimum, and if we bill you
> at the "hands & eyes" rate of $125/hr this totals $8000 ? so this
> actually works out better for you.
>
>
> _Then from Dec 8 ? per the contract:_>
>
>
> Actual hours from Dec 8 ? Dec 31 @$125.00 "Hands & Eyes" rate**
>

So $5843.48 for the time period up until Fred left ( (8/23)*$16800 )?
Then an hourly rate of $125 for Isaac for the remaining 15 working days
this year?
Is that right?
If so, then I'd like to start getting timesheets for Isaac on a weekly
basis so I can ensure that they are correct. You
will need to send me ones for the time already worked since 12/8. Let's not
leave it until the end of each month to sort
this out.

>
>
> *YOUR COMMENT:*>
> I'm ignoring the new tax charges and the imposition of the minimums on
> floorspace and bandwidth from Oct onwards as they
>
> are bigger issues that need to be discussed separately.
>
>
>
> You can speak to Victor Navarro in Finance directly -  regarding the
> taxation charges.
>
>
>
> The Colo and BW minimums will have to be billed and paid per the
> contract.  We need to bill from the contract, and these are the
> contractual minimums.  We can certainly continue our dialogue that Zeke
> has recently sent you feedback on, but our position remains the same on
> the billing for this.  I have no authority to change the terms of the
> contract we have in place, but am hopeful that the dialogue we began
> between you, Zeke, and Carlos David will continue.  I do want to caution
> you, however that in the absence of a new contract ? and a business
> incentive on our part to renegotiate a new contract, we have to be held
> to the terms contained in the current contract.
>
>
>





Lycos, Inc.
100 Fifth Avenue.
Waltham, MA 02451
Tel: 781-370-2700
Fax: 781-370-3433
Internet: http://www.lycos.com

December 22, 2004

**BY FACSIMILE 786-845-0759**

David Salway
Director of Service Management - Enterprise Accounts
Telefonica Data
1221 Brickell Avenue Suite 600
Miami, Florida 33131

     Re:    <u>Letter from Telefonica Data to Dean Batten at Lycos dated December 20, 2004</u>

Dear David:

     This letter is in response to a letter I received from Telefonica Data dated December 20, 2004. In that letter, T-Data advised Lycos that if it (T-Data) did not receive the sum of $466,099.58 on or before 15:00 EST on December 30, 2004, T-Data would immediately terminate all services it was currently providing Lycos. According to your letter, the sum of $466,099.58 represented the total amount due for an invoice dated September 4, 2004, and an invoice for October in the amount of $304,184.16, plus interest charges.

     As you know, Lycos wired $154,751.06 to T-Data yesterday to pay the September invoice. However, because Lycos did not receive the October invoice until Sam Ortiz of T-Data e-mailed it to me on December 14, 2004, Lycos is not obligated to pay that invoice until January 14, 2005. (If you believe Lycos received the invoice covering October prior to December 14, 2004, please provide me documentation reflecting this.) In addition, as you know from our e-mail exchange over the past few days, Lycos disputes some of the charges on the October invoice and T-Data appears to acknowledge that some of the charges were in error. Lycos is ready, willing and able to pay proper charges on the October invoice on or before January 14, 2005, but it is not obligated to pay the $304,184.16 plus interest on or before December 30, 2004 and hence is not willing to do so.

     If, notwithstanding the fact that Lycos is not obligated to pay the $304,184.16

on or before December 30, 2004, T-Data still intends to terminate all services currently being provided to Lycos on or after 15:00 EST on December 30, 2004, please advise me immediately. If T-Data does intend to terminate such services, Lycos demands that T-Data comply with section 7.4 of the Master Services Agreement and provide Lycos with Termination Assistance Services for the period Lycos requests, up to eighteen months. Under that section, the parties are to agree upon the services to be provided and the charges for those services. The charges are to be based on the pricing principles of the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 (" SAFA"). I do not have a copy of SAFA, so, if you would fax it to me today, I would appreciate it. Then, we would work over the next few days to agree upon the Termination Assistance Services Lycos would like T-Data to provide and the charges for those services. While Lycos does not believe it is obligated to pay for those services monthly in advance of the services being rendered, Lycos would be willing to do so.

Thank you for your prompt attention to this matter. As you know, if T-Data terminates the contract on December 30, 2004, and does not provide Termination Assistance Services as Lycos requests and is contractually required, T-Data will have wrongfully and effectively put Lycos out of business. I trust T-Data will not take action that would lead to this disastrous result. Please advise me at your earliest convenience (today, if possible) of T-Data' s intentions.

Very truly yours,

Dean Batten

cc: Peter Karol

13X9592

13B9592

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 04-5046 F | Trial Court of Massachusetts Superior Court Department County:_____ |
|---|---|---|

| PLAINTIFF(S)  Lycos, Inc. | DEFENDANT(S)  Telefonica Data USA, Inc. |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE  617/439-2000  Thomas O. Bean, Esq.  Nutter, McClennen & Fish, LLP  155 Seaport Blvd., Boston, MA 02210  Board of Bar Overseers number: 548072 | ATTORNEY (if known) |

## Origin code and track designation

Place an x in one box only:

[X] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO.        TYPE OF ACTION (specify)        TRACK        IS THIS A JURY CASE?

D13        Declaratory Judgment        ( A )        ( ) Yes        ( X ) No

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

### TORT CLAIMS
(Attach additional sheets as necessary)

A.  Documented medical expenses to date:
1.   Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
2.   Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
3.   Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
4.   Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
5.   Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
                                                                        Subtotal $. . . . . . . . . .

B.  Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
C.  Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
D.  Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . $. . . . . . . . . . .
E.  Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
F.  Other documented items of damages (describe)
                                                                                $. . . . . . . . . .

G.  Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                                                $. . . . . . . . . . .
                                                                        TOTAL $. . . . . . . . . . .

*Stamp: OFFICE OF THE / CLERK OF THE COURTS / FOR THE COUNTY OF MIDDLESEX / DEC 23 2004 / Edward J. Sullivan / CLERK*

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s): Lycos, Inc. seeks declaratory and injunctive relief barring Telefonica Data USA, Inc. from terminating the Nov. 18, 2003 Master Services Agreement until the parties agree on Termination Assistance Services thereunder.

                                                                        TOTAL $. . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record _Thomas Bean_                DATE: 12/23/04

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

MAS-20031124
gilmanr

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Civil Docket**

12/29/2004
01:55 PM

# MICV2004-05046
## Lycos, Inc v Telefonica Data USA, Inc.

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 12/23/2004 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 12/29/2004 | **Session** | F - Cv F (10A Cambridge) | | |
| **Origin** | 1 | **Case Type** | D13 - Declaratory judgement (231A) | | |
| **Lead Case** | | **Track** | A | | |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 03/23/2005 | **Answer** | 05/22/2005 | **Rule12/19/20** | 05/22/2005 |
| **Rule 15** | 03/18/2006 | **Discovery** | 02/11/2007 | **Rule 56** | 04/12/2007 |
| **Final PTC** | 08/10/2007 | **Disposition** | 12/23/2007 | **Jury Trial** | No |

### PARTIES

**Plaintiff**
Lycos, Inc
Active 12/23/2004

**Private Counsel 548072**
Thomas O Bean
Nutter McClennen & Fish
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Phone: 617-439-2000
Fax: 617-310-9000
Active 12/23/2004 Notify

**Defendant**
Telefonica Data USA, Inc.
Service pending 12/23/2004

**Private Counsel 652501**
Jill L Brenner
Donnelly Conroy & Gelhaar
1 Beacon Street
33rd Floor
Boston, MA 02108
Phone: 617-720-2880
Fax: 617-720-3554
Active 12/29/2004 Notify

**Private Counsel 642064**
Barry S Pollack
Donnelly Conroy & Gelhaar
1 Beacon Street
33rd Floor
Boston, MA 02108
Phone: 617-720-2880
Fax: 617-720-3554
Active 12/29/2004 Notify

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 12/23/2004 | 1.0 | Complaint & civil action cover sheet filed |
| 12/23/2004 | | Origin 1, Type D13, Track A. |
| 12/23/2004 | 2.0 | Plaintiff Lycos, Inc's MOTION for appointment of special process server Esquire Express, Inc. and after review Allowed. (Brassard, J.) |
| 12/23/2004 | 3.0 | Plaintiff Lycos, Inc's MOTION for Short Order of Notice for hearing on request for preliminary injunction. |
| 12/23/2004 | 4.0 | Memorandum in support of motion for preliminary injunction |
| 12/23/2004 | 5.0 | Summons and order of notice issued; returnable December 29, 2004 at 2:00 pm in courtroom 9A. |

MAS-20031124
gilmanr

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Civil Docket**

12/29/2004
01:55 PM

## MICV2004-05046
## Lycos, Inc v Telefonica Data USA, Inc.

| Date | Paper | Text |
|------|-------|------|
| 12/29/2004 | 6.0 | Case REMOVED this date to US District Court of Massachusetts  by deft Telefonica Data USA, Inc |
| 12/29/2004 | | ABOVE ACTION THIS DAY REMOVED TO US DISTRICT COURT |