UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**RECEIVED**
Clerk's Office
USDC, Mass.
Date ___1/26/05___
By ___M.P.___
Deputy Clerk

| | | |
|---|---|---|
| LYCOS, INC., | ) | C.A. No. 04-12716-WGY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| TELEFONICA DATA USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NATURE OF THE ACTION

1.      In November, 2003, plaintiff, Lycos, Inc. ("Lycos") and defendant Telefonica

Data USA, Inc. ("T-Data") executed a master services agreement ("MSA") and several

exhibits and schedules with respect thereto (collectively, the "Transaction Documents")

pursuant to which T-Data became Lycos' new provider of hosting and bandwidth services.

These services are the core operational infrastructure for Lycos' provision of internet services

– which is Lycos' primary business.

2.      Disputes have arisen between Lycos and T-Data concerning the interpretation

and enforceability of specific terms of the Transaction Documents.  Specifically, the parties

disagree as to:

A.      Whether the principles contained in the January 29, 2003 version of a certain

Strategic Alliance Framework Agreement ("SAFA"), which version is explicitly

referenced in Paragraph 2 of the MSA, are the principles on which the parties

are to set annually charges for services rendered under the Transaction

Documents (as Lycos maintains), or whether the parties intended a version of

the SAFA dated February 12, 2003 to apply even though that version is not

referenced in the MSA and the January 29, 2003 SAFA is (as T-Data contends); and

B.    Whether, under Exhibit I to the MSA, T-Data is entitled to a termination charge for any period beyond January 8, 2005 for a specific service called the "Madrid circuit," when (i) Lycos terminated the Madrid circuit in October, 2004 and the contract, by its express terms, entitles T-Data to payment of a termination charge only through the end of Lycos' one-year term commitment on January 8, 2005, and (ii) even if the contract did not so provide, the liquidated damages clause under which T-Data seeks an additional twelve months of termination charges is unenforceable because it would allow T-Data to recover from Lycos immediately in one lump-sum payment an amount equal to 100% of monthly charges Lycos would have paid over the next twelve months had Lycos not terminated the Madrid circuit.

3.    Accordingly, Lycos seeks declarations:

A.    That the January 29, 2003 version of the SAFA, which requires T-Data to charge Lycos the best market price for services, and not any other version of the SAFA, is the version that is to be applied in adjusting annually the charges for services under Paragraph 3 of the MSA; and

B.    Either (i) that T-Data is not entitled to a termination charge or any other charge for the Madrid circuit for any period after January 8, 2005 or, if the Court declines to enter that declaration, (ii) that the liquidated damages provision contained in Paragraph 4.2 of Exhibit I to the MSA is unenforceable because it is unconscionable and contrary to public policy.

4.      Lycos also seeks, as provided under the Transaction Documents, payment of its reasonable attorneys' fees and costs as the prevailing party in this action.

## PARTIES

5.      Plaintiff Lycos, Inc. is a Virginia corporation with a principal place of business at 100 Fifth Avenue, Waltham, Massachusetts 02451.

6.      Defendant Telefonica Data USA, Inc. is a Florida corporation with a principal place of business at 1221 Brickell Avenue, Suite 600, Miami, Florida 33131.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states, and under 28 U.S.C. § 2201 because this case involves an actual controversy between the parties.

8.      This Court has personal jurisdiction over T-Data under Massachusetts General Laws c. 223A, § 3, because T-Data transacts business in the Commonwealth, has contracted to supply, and has supplied, services in the Commonwealth, and has sufficient minimum contacts with Massachusetts relating to this dispute as evidenced by, among other things, the following:

A.      During the negotiation of the Transaction Documents, T-Data's employees, representatives, and/or attorneys initiated more than ten telephone calls to Lycos in Waltham Massachusetts, and sent Lycos' General Counsel, resident in Waltham, Massachusetts, more than fifteen e-mails.  Affidavit of Andrew Feinberg, ¶ 3;

B.      In or around mid-October of 2003, senior executives of T-Data met face-to-face with senior executives of Lycos at Lycos' offices in Waltham, Massachusetts, to

negotiate outstanding issues in what were to become the Transaction Documents. Present on behalf of T-Data were Peter Pizarro, Chief Executive Officer, Ronald Jones, Vice President of Operations, and Zeke Rodriguez, Vice President of Sales. This meeting lasted an entire business day, and involved intensive discussion of numerous provisions of the Transaction Documents. This was the only face-to-face meeting between the senior executives of Lycos and T-Data during the negotiation of the Transaction Documents. *Id.*, ¶ 4;

C.   T-Data sent Lycos three letters, made more than five phone calls, and sent more than a dozen e-mails to Lycos in Waltham, Massachusetts after execution of the Transaction Documents, with respect to performance of the Transaction Documents. *Id.*, ¶ 6; Affidavit of Dean Batten, ¶ 4;

D.   T-Data delivered services to Lycos in Massachusetts by (i) installing, or causing to be installed, at Lycos' offices in Waltham, Massachusetts, a wire to establish a circuit that directly connected Lycos' Massachusetts location with the office of a company then-related to Lycos located in Madrid, Spain; and (ii) maintaining that wire and circuit. Batten Aff., ¶ 3;

E.   T-Data sent invoices for services rendered under the Transaction Documents to Lycos' offices in Waltham, Massachusetts headquarters. *Id.*, ¶ 4; and

F.   T-Data accepted more than a million dollars from Lycos in payment for services rendered pursuant to the Transaction Documents, amounts that were delivered to T-Data from Lycos' account with Bank of America (f/k/a Fleet Bank) located in Boston, Massachusetts.   Affidavit of Julie Callagee, ¶ 2.

## FACTS

*Lycos' Business*

9.      Lycos consists of a network of globally branded media properties and aggregated content distributed primarily through the World Wide Web.  Lycos provides web search and directory services, community and personalization features, and personal web publishing.   Lycos seeks to draw viewers to its web sites by providing a one-stop destination for information and communication.  Lycos generates revenue primarily through selling advertising and sponsorships on its web sites, electronic commerce including subscriptions, and by licensing its products and technology.

10.      Companies such as Lycos that depend on fast, reliable and uninterrupted access to its web sites by a large volume of users typically hire the services of a company offering high-capacity data and communication services, including web-server housing and internet connectivity.  In layman's terms, a web host "broadcasts" its customer's web sites on the internet by electronically "warehousing" that customer's web site files and related web-based services (i.e., email, electronic commerce) on a web server.  A web server is simply a computer built specifically for web hosting that runs a software program that systematically controls network access by distributing internet resources from a central point to other computers.  A web server waits for and then fulfils requests from users' computers on the internet to access a particular web site.

11.      Hosting companies hired by Lycos house Lycos' web servers.  They employ a physical building or room with security systems, redundant power supply and climate and temperature controls, along with network connectivity, to ensure that Lycos' servers never "go down."

*Lycos and T-Data Enter Into the Transaction Documents*

12.    In or around mid-October of 2003, senior executives of Lycos met face-to-face

with senior executives of T-Data at Lycos' offices in Waltham, Massachusetts, for an entire

business day to discuss certain terms of the proposed Transaction Documents.  Present on

behalf of T-Data were Peter Pizarro, Chief Executive Officer, Ronald Jones, Vice President of

Operations, and Zeke Rodriguez, Vice President of Sales.

13.    In November, 2003, Lycos and T-Data executed the Transaction Documents

pursuant to which T-Data agreed to provide to Lycos certain data storage, web server housing,

and networking and communication services, described in detail in the Transaction Documents

(the services provided pursuant to the Transaction Documents, together, the "Services").  The

Transaction Documents were signed by Lycos in Massachusetts.  A true and accurate copy of

the Transaction Documents is attached hereto as Exhibit A.

*Appropriate Agreement Governing Benchmarking Meeting With Lycos*

14.    At the time Lycos and T-Data negotiated and executed the Transaction

Documents:

A.    Lycos was a wholly-owned subsidiary of Terra Networks, S.A. ("Terra

Networks");

B.    The controlling shareholder of Terra Networks was Telefonica, S.A.

("Telefonica"); and

C.    Telefonica was, in turn, the sole owner of T-Data.

Lycos and Terra Networks were part of a group of companies known as the "Terra Group,"

and T-Data and Telefonica were part of the group of companies known as the "Telefonica

Group."

15.    Perhaps because of the above corporate relationships, the Transaction Documents require Lycos and T-Data to have annual "benchmarking" meetings at which they are to meet to determine whether the quality of and charges for Services are in accordance with the principles of the SAFA between Terra Networks and Telefonica dated January 29, 2003 and, if they are not, to adjust the quality and/or charges so that they are in accordance with the principles of that agreement.

16.    The foregoing is set forth in the MSA as follows:

> 2. **Pricing.** All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated <u>January 29, 2003</u> ("SAFA") . . . .

> 3. **Benchmarking.** On or about each anniversary of the Effective Date (as defined below) during the Term of the Agreement, the Parties shall meet to review the pricing, quality and charges of the Services. If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA. . . .

<u>Exhibit A</u>, at 1, ¶¶ 2-3 (emphasis added). Thus, the SAFA explicitly referenced in the MSA is the one dated January 29, 2003.

17.    The January 29, 2003 version of SAFA is not, however, the only iteration of that document. There is a February 12, 2003 version as well. Thus, both versions of the SAFA were in existence and available to both Lycos and T-Data at the time the Transaction Documents were negotiated and ultimately executed in November, 2003. As noted above, the MSA expressly refers to the January 29, 2003 version of the SAFA. True and accurate copies of the January 29, 2003 and February 12, 2003 versions of the SAFA, as translated from Spanish into English, are attached hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, respectively. A true and

accurate copy of the January 29, 2003 SAFA in Spanish, which is the official text that is binding on the parties, is attached hereto as Exhibit D.

18.    While the general concepts set forth in the January 29, 2003 and February 12, 2003 versions of the SAFA are similar in that they are both based on the proposition that Terra Group companies such as Lycos will purchase certain services exclusively from Telefonica Group companies such as T-Data, the precise principles themselves are different.  Specifically, the January 29, 2003 SAFA allows Lycos to purchase the services covered by the Transaction Documents from T-Data at the best market price, whereas the February 12, 2003 SAFA permits Lycos to purchase those services at the price offered to T-Data's most favored client. *Compare* Exhibits B and C, §§ 2.3.2. and 2.3.3.

19.    Notwithstanding the unambiguous language of Paragraph 2 of the MSA, which refers to the January 29, 2003 version of the SAFA, T-Data maintains that the operative version of the SAFA is the February 12, 2003 version.  Lycos maintains that the January 29, 2003 version is the operative one.

*Termination Charges for the Madrid Circuit*

20.    One of the services provided to Lycos by T-Data under the Transaction Documents is known as an "ATM Service."  The acronym "ATM" stands for "asynchronous transfer mode," which is a technology that organizes digital data (in the form of voice, data and video information) into small units and simultaneously transmits them on a single "circuit," providing "guaranteed bandwidth" for such transmissions at high speeds.  An ATM "circuit" is simply a dedicated path between the source and destination of the digital data.

21.    Attached as Exhibit I to the MSA is an agreement pursuant to which T-Data agreed to provide ATM services to Lycos.  Exhibit I, which has a two-year term, provides for

the delivery of one or more ATM services. *See* Exhibit A, at Exhibit I, §§ 3.2, 4.1 and 4.2.

For each ATM Service Lycos wanted, Lycos was required to make a minimum term

commitment of one year. *See id.*, § 3.2. Specifically, Exhibit I states that "[c]harges for

ATM Service for which Customer has made a minimum term commitment of twelve months

shall remain fixed for the term commitment period; . . ." *See id.*

22.    Effective January 9, 2004, Lycos committed to purchase ATM Services for a

circuit from Madrid, Spain to Waltham, Massachusetts, for a one-year term. *See* Exhibit A, at

Exhibit I, Schedules I-1 and I-2. This circuit was commonly known as the "Madrid circuit."

T-Data installed, or caused to be installed, a wire at Lycos' Massachusetts location to establish

this circuit and rendered services to Lycos in Massachusetts by maintaining this wire and

circuit as it was required to do. *See* Exhibit A, at Exhibit I, § 2.6. T-Data invoiced Lycos

$11,000 per month for this circuit.

23.    On or about October 5, 2004, Lycos' U.S.-based assets were sold to Daum

Communications Corp. As a result of the sale, Lycos no longer required a direct connection to

Madrid, the headquarters of its former corporate parent, Terra Networks. So, Lycos decided

to terminate the Madrid circuit. It gave notice of such termination prior to the closing of the

sale to Daum Communications.

24.    Section 4.2 of Exhibit I to the MSA states, in relevant part, as follows:

> **4.2. Termination.**    This Exhibit may be terminated in
> accordance with the termination provisions of the Agreement. In
> addition, Customer may terminate a particular ATM Service upon
> sixty (60) Days advance written notice to Telefonica Data
> provided that . . . Customer pays a termination charge (as an
> early discontinuance of ATM Service fee and not as a penalty) to
> Telefonica Data equal to the sum of the monthly charges for the
> ATM Service multiplied by the number of months remaining in
> the term commitment.

- 9 -

*See* Exhibit A, at Exhibit I, § 4.2 (emphases added).

25.    As Lycos gave notice of termination on October 5, 2004, the sixty-day notice period set forth in section 4.2 of Exhibit I to the MSA expired on or about December 5, 2004. Because the Madrid circuit had a service "start date" of January 9, 2004, Lycos was obligated to pay, at most, a termination charge equal to the monthly charge for the period through expiration of the one-year term commitment on January 8, 2005. *See* Exhibit A, at Exhibit I, §§ 1.3 and 2.4 and Schedules I-1 and I-2.

26.    Notwithstanding the foregoing, on January 12, 2005, T-Data sent an invoice to Lycos at its Waltham, Massachusetts offices seeking, among other things, payment of $154,000 representing the full $11,000 monthly charge for the canceled Madrid circuit as if Lycos had made a two-year commitment. A true and accurate copy of this invoice, which T-Data sent to Lycos' offices in Waltham, Massachusetts, is attached hereto as Exhibit E.

27.    While section 4.1 of Exhibit I to the Transaction Documents provides for a two-year term for that Exhibit, as noted above, the section requires only a twelve month "term commitment" for each individual ATM service ordered pursuant to that Exhibit. Lycos' commitment for the Madrid circuit was for a "one year term." *See* Exhibit A, at Exhibit I, Schedules I-1 and I-2. As section 4.2 provides for a termination charge equal to "the sum of the monthly charges multiplied by the number of months remaining in the term commitment," Lycos is not required to pay a termination charge or any other charge for any period after expiration of the one-year commitment on January 8, 2005.

28.    In the alternative, to the extent section 4.2 of Exhibit I to the MSA requires Lycos to pay a termination charge for the Madrid circuit for the two-year period through

January 8, 2006, as T-Data maintains, the termination provision is an unenforceable liquidated damages clause. Lycos has advised T-Data that the provision is unenforceable because it would put Lycos in a worse position, and T-Data in a better position, than both would have been in had Lycos not canceled the Madrid circuit. Specifically,

A.   As to the former, Lycos would have been better off not canceling the Madrid switch and paying $11,000 per month rather than canceling it and being invoiced on an accelerated basis for 100% of the amounts that T-Data claims would ultimately be due; and

B.   As to the latter, as a result of Lycos' cancellation of the Madrid circuit, T-Data maintains it is entitled to receive the full $11,000 per month on an accelerated basis, without having to incur any future costs. In other words, T-Data would receive profit of $11,000 per month – more than it would have if Lycos had not canceled the circuit.

29.   The liquidated damages provision is therefore unenforceable because it provides for an amount plainly disproportionate to T-Data's real damages and is not intended to provide fair compensation but to penalize Lycos' termination of the ATM Service. T-Data's actual losses resulting from Lycos' early termination were not difficult or impossible to ascertain at the time the parties executed the MSA, nor are they difficult or impossible to ascertain now. As a result, the liquidated damages provision is unconscionable and contrary to public policy.

30.   Notwithstanding the foregoing, T-Data maintains the liquidated damages provision in section 4.2 is enforceable.

## COUNT I
## (Declaratory Judgment)

31.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 30.

32.    A controversy or dispute exists between the parties concerning which version of the SAFA governs the annual benchmarking meetings between T-Data and Lycos at which the parties are to discuss (and potentially adjust) the charges under the Transaction Documents.

33.    Lycos seeks a judicial declaration that the January 29, 2003 version of the SAFA referenced in Paragraph 3 of the MSA, which requires T-Data to offer Lycos services at the best market price, sets forth the relevant principles governing the parties' discussions at the annual benchmarking meetings.  As the parties are in disagreement about which version of SAFA applies, Lycos is not at this time seeking a declaration about whether T-Data is actually charging for services in accordance with the principles of the applicable SAFA.

WHEREFORE, Lycos requests the relief set forth below.

## COUNT II
## (Declaratory Judgment)

34.    Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 33 above.

35.    A controversy or dispute exists between the parties concerning whether Lycos is required to pay a termination charge or any other charge for the Madrid circuit for any period after January 8, 2005.

36.    Under Exhibit I to the Transaction Documents, Lycos made a one-year commitment for the Madrid circuit.  Lycos provided notice of termination of the Madrid circuit before October 5, 2004.  Thus, the 60-day notice period expired before December 5,

2004. Therefore, Lycos' one-year commitment for the Madrid circuit expired on January 8, 2005.

37.     Accordingly, Lycos seeks a judicial declaration that it is not required to pay T-Data a termination charge or any other charge the Madrid circuit for any period after January 8, 2005.

WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT III**
**(Declaratory Judgment)**

</div>

38.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 37 above.

39.     In the event the Court declines to enter the declaration under Count II, a controversy or dispute exists between the parties concerning the enforceability of the liquidated damages provision contained in Paragraph 4.2 of Exhibit I to the MSA to the extent it would require Lycos to pay a termination charge for the Madrid circuit through January 8, 2006.

40.     Lycos seeks a judicial declaration that the liquidated damages provision contained in Paragraph 4.2 of Exhibit I to the MSA is unenforceable.

WHEREFORE, Lycos requests the relief set forth below.

<div align="center">

**COUNT IV**
**(Attorneys' Fees)**

</div>

41.     Lycos repeats and incorporates by reference the allegations contained in paragraphs 1 through 40 above.

42.     Under section 11.12 of the MSA, in any litigation between Lycos and T-Data, the non-prevailing party is required to pay the reasonable attorneys' fees and expenses of the prevailing party. *See* Exhibit A, § 11.12, at 7.

43.     Provided the Court enters all or a portion of the relief requested by Lycos,

Lycos is a prevailing party, entitled to payment of its reasonable attorneys' fees and costs.

WHEREFORE, Lycos requests the relief set forth below.

## REQUESTS FOR RELIEF

Lycos respectfully requests that this Court:

A.     On Count I, enter judgment declaring that the January 29, 2003 version of the
       SAFA referenced in Paragraph 3 of the MSA, which requires T-Data to charge
       Lycos the best market price, and not any other version of the SAFA, sets forth
       the principles governing the parties' discussions at the annual benchmarking
       meetings required under that paragraph;

B.     On Count II, enter judgment declaring that Lycos is not obligated to pay a
       termination charge or any other charge for the Madrid circuit for any period
       after January 8, 2005;

C.     On Count III, in the event the Court declines to enter the declaration under
       Count II, enter judgment declaring that the liquidated damages provision
       contained in Paragraph 4.2 of Exhibit I to the MSA is unenforceable;

D.     On Count IV, provided the Court enters the relief requested by Lycos, award
       Lycos its reasonable attorneys' fees and expenses incurred in prosecuting this
       action; and

E.    Grant Lycos such further relief as this Court may deem just and proper.

Respectfully submitted,
LYCOS, INC.
By its attorneys,

*Erik Bartenhagen*

Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  January 26, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for defendant, Barry S. Pollack, Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, by hand on January 26, 2005.

*Erik Bartenhagen*

Erik P. Bartenhagen



*Telefónica*

## MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is entered into by and between Lycos, Inc. ("Customer"), a Massachusetts corporation, and Telefonica Data USA, Inc., a Florida corporation

1.    **Telefonica Data Services; Terms & Conditions.**  Customer requests the Telefonica Data services ("Services"), which are checked in the table below.  Telefonica Data will render the Services pursuant to the terms and conditions contained in this Agreement and each applicable Exhibit. Telefonica Data may provide Customer with additional Services by executing additional Exhibits, which will be attached hereto and incorporated into this Agreement.  All Services provided under this Agreement or any amendment thereto or to an Exhibit are subject to the attached Master Services Agreement Terms & Conditions, which are hereby incorporated by reference and made a part hereof.

| Exhibit A | ☐ Equipment Purchase | Exhibit G | ☐ Web Hosting |
|---|---|---|---|
| Exhibit B | ☐ Equipment Lease | Exhibit H | ☐ Dial Access |
| Exhibit C | ☒ Collocation | Exhibit I | ☐ Frame Relay |
| Exhibit D | ☒ Data Storage | Exhibit J | ☐ IP Transit |
| Exhibit E | ☐ Operations & Maintenance | Exhibit K | ☒ Back-Up |
| Exhibit F | ☐ Virtual LAN | | |

2.    **Pricing.**  All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 ("SAFA") and set forth in each Exhibit and Customer shall pay Telefonica Data all recurring and non-recurring fees and other charges for Services rendered in the amounts and in the manner specified therein and in the Master Services Agreement General Terms & Conditions.  The Parties agree that the monthly recurring charges set forth in the Exhibits are subject to an annual price reduction of ten percent (10%) and Telefonica Data shall revise such charges accordingly on the anniversary date of each Service.

3.    **Benchmarking.**  On or about each anniversary of the Effective Date (as defined below) during the Term of this Agreement, the Parties shall meet to review the pricing, quality and charges of the Services.  If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA. If the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles, the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.

4.    **Term.**  This Agreement shall commence on November 1, 2003 ("Effective Date") and shall continue until the third anniversary of the Effective Date, unless terminated earlier in accordance with the Transaction Documents.

5.    **Preferred Provider.**  The Parties agree that Telefonica Data will be the preferred provider of data center and communications services to Customer during the term of the Agreement.  In the event Customer requires the provision of services similar to the Services and Telefonica Data is willing to provide such services at prices and on terms and conditions similar to the Services, Customer agrees that it will engage Telefonica Data to provide such services.

6.    **Entire Agreement; Amendments.** The Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter in this Agreement, and supersede all prior agreements, whether written or oral, with respect to the subject matter contained therein.  The Transaction Documents may be modified only by a written instrument executed by both parties.

### [REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the Parties have executed this Agreement through their respective duly authorized officers as of the Effective Date.

| CUSTOMER: LYCOS, INC. | | TELEFONICA DATA USA, INC. | |
|---|---|---|---|
| By: | _(Signature)_ | By: | _(Signature)_ |
| Printed Name: | | Printed Name: | PER PIZARNO |
| Title: | CFO | Title: | CEO |
| Date: | 11/18/03 | Date: | 11-20-03 |
| Address: | 100 Fifth Avenue | Address: | 1221 Brickell Avenue, Suite 600 |
| | Waltham, MA 02451 | | Miami, Florida 33131 |
| Fax: | | Fax: | |
| E-Mail: | | E-Mail: | |

## [SIGNATURE PAGE TO MASTER SERVICES AGREEMENT]

## MASTER SERVICES AGREEMENT TERMS & CONDITIONS

**1.  DEFINITIONS.**

**1.1.  Certain Definitions.**  The following terms shall have the following definitions:

(a)  "**Affiliate**" shall mean, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity, whether directly or indirectly through one or more intermediaries.

(b)  "**Agreement**" shall mean the Master Services Agreement, together with these Master Services Agreement General Terms and Conditions.

(c)  "**Business Day**" or "**business day**" shall mean any day on which banks are open for the transaction of banking business in the State of New York, United States of America.

(d)  "**Confidential Information**" shall mean all information, in any form, disclosed by the disclosing Party to the other Party which:

(i)  concerns the operations, plans, know-how, trade secrets, business affairs, personnel, customers or suppliers of the disclosing Party; or

(ii)  the receiving Party knows or might reasonably expect is regarded by the disclosing Party as the confidential information of the disclosing Party;

(iii)  is designated as confidential, restricted, proprietary, or with similar designation; or

(iv)  concerns any of the terms or conditions or other facts with respect to the Transaction Documents.

(e)  "**Control**" and its derivatives shall mean legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding voting capital stock (or other ownership interest, if not a corporation) of an entity, or actual managerial or operational control over such entity.

(f)  "**Days**" or "**days**" shall mean calendar days unless otherwise specified.

(g)  "**Effective Date**" shall have the meaning set forth in Section 3 of the first page of the Master Service Agreement.

(h)  "**End User**" shall mean the person or entity to which Customer resells or provides equipment, services or space pursuant to the terms of the Transaction Documents.

(i)  "**Equipment**" shall mean the equipment, if any, provided by Telefonica to Customer pursuant to an Exhibit.

(j)  "**Events of Default**" shall mean any of the following:

(i)  any representation or warranty made by a Party in the Transaction Documents which was incorrect in any respect when made and that could reasonably be expected to have a material adverse effect upon the other Party's ability to realize the benefits of the Transaction Documents;

(ii)  a material breach of the Transaction Documents that is capable of being cured on commercially reasonable terms within thirty (30) Days, which breach is not cured within thirty (30) Days after notice of breach to the breaching Party;

(iii)  a material breach of the Transaction Documents that is not capable of being cured within thirty (30) Days and the breaching Party fails to (A) proceed promptly and diligently after written notice to correct the breach, (B) develop within fifteen (15) Days following written notice of breach a complete plan for curing the breach, and (C) cure the breach within sixty (60) Days after notice thereof;

(iv)  Customer's failure to make any payment or any other amount when such payment or amount is due in accordance with any Transaction Document, which breach is not cured within five (5) business days after notice thereof; or

(v)  a material breach of the Transaction Documents that is not capable of being cured.

(k)  "**Intellectual Property Rights**" shall mean all intellectual property rights, including by way of explanation, but not by limitation,

those statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights.

(l)  "**Losses**" shall mean liabilities, damages and related costs and expenses, including fines, levies, assessments, reasonable legal fees, and disbursements and costs of investigations, litigation, settlement, judgment, interest and penalties.

(m)  "**Parties**" shall mean Customer and Telefonica Data, together.

(n)  "**Party**" shall mean Customer or Telefonica Data, individually, as appropriate.

(o)  "**Service**" shall mean any of the services Telefonica Data provides Customer pursuant to an Exhibit.

(p)  "**Telefonica Data Network**" shall mean Telefonica Data's and/or its Affiliates IP backbone network.

(q)  "**Term**" shall have the meaning set forth in Article 3 of the Master Service Agreement.

(r)  "**Transaction Documents**" shall mean the Agreement, and all Exhibits and Schedules thereto.

**1.2.  Other Definitions.**  Other terms used in this Agreement are defined in the context in which they are used and have the meanings there stated or are defined in the applicable Transaction Document.

**2.  END USER CHARGES.**  If, pursuant to the terms and conditions of the Transaction Documents, Customer resells the Service(s) ordered by Customer from Telefonica Data, Customer shall have the right to establish, in its sole discretion, the prices it charges End Users for the Service(s) resold pursuant to the Transaction Documents.

**3.  NETWORK INTEGRITY.**

**3.1.  Non-Interference.**  Neither Customer nor its End Users, suppliers, contractors, licensors or licensees shall restrict or interfere with the Telefonica Data Network or the maintenance or use thereof.  Upon notice, Customer shall promptly remove any hazard, interference or service obstruction that may be caused by equipment (including Equipment), hardware, software, content or connectivity, owned by or under the control of Customer or its End Users or transmitted through the Telefonica Data Network

**3.2.  Remedy.**  In the event that Customer or its End Users, suppliers, licensors or licensees restrict or interfere with the Telefonica Data Network or the use thereof, Telefonica Data may, after giving Customer reasonable notice, immediately modify, suspend, delay, condition, or cease until such restriction or interference is cured, performance of its obligations under the Transaction Documents, in whole or in part, to the extent reasonably necessary to remedy such restriction or interference.

**3.3.  Liens.**  Customer shall not, directly or indirectly, cause any Telefonica Data property (including the Telefonica Data Network) to become subject to any mechanic's lien, materialman's lien, vendor's lien or any similar lien, whether by operation of law or otherwise.  If Customer becomes aware that it has breached its obligations under this Section, it shall promptly notify Telefonica Data in writing, cause such lien to be discharged and released of record without cost to the other, as soon as reasonably possible, and indemnify Telefonica Data against all related Losses.

**4.  PAYMENT TERMS.**

**4.1.  Payment.**  Telefonica Data shall provide the Equipment and perform the Services set forth in the Exhibits in accordance with the provisions of the Transaction Documents and Customer shall pay all recurring, non-recurring and other charges for Equipment and/or Services as may be set forth in the Transaction Documents.  Unless otherwise provided for in the attached Exhibits, the fees due pursuant to the Transaction Documents shall be payable in accordance with the payment terms in this Article 4. Telefonica Data shall render invoices for Services rendered to Customer on a monthly basis.  Payment shall be due and payable no later than thirty (30) days after the date of the invoice.  Customer shall make payments under the Transaction Documents by wire transfer of immediately available funds to the United States account or accounts designated by Telefonica Data.  At

Telefonica Data's discretion, payments to be made pursuant to the Transaction Documents may be made by check or draft of immediately available funds delivered to the address designated in writing by Telefonica Data. Any amounts not paid when due shall be assessed interest at a monthly rate equal to one percent (1.0%) or the maximum rate allowed by law, whichever is less, from the date the payment was due. If Telefonica Data commences legal proceedings to collect any payment due to it under any of the Transaction Documents, Customer shall be responsible for and pay all reasonable attorneys' fees, court costs and other collection expenses incurred by Telefonica Data.

**4.2. Customer Responsibilities.** Except as specifically provided for in a Transaction Document, Customer shall have sole responsibility for the costs, expenses and deployment of any interconnection, installation and testing necessary to use the Equipment and Services provided herein. In no event will the untimely installation or faulty non-operation of Customer's equipment relieve Customer of its obligation to pay charges for the Services. In addition, delays or failures in obtaining payments from End Users shall not affect Customer's obligation to make payments hereunder to Telefonica Data. Customer is responsible for amounts it cannot collect from End Users.

**4.3. Taxes.** All charges to Customer are calculated exclusive of any applicable federal, state or local use, excise, value-added, gross receipts, sales and privilege taxes, duties, universal service assessments or similar liabilities (other than general income or property taxes imposed on Telefonica Data) associated with the Services or Equipment, whether charged to Telefonica Data, its suppliers or Affiliates, Customer or End User ("Additional Charges"). Such Additional Charges shall be paid by Customer in addition to all other charges provided for in the Transaction Documents, except to the extent Customer provides to Telefonica Data, prior to the shipping of Equipment or commencement of Services, as applicable, a valid tax exemption certificate for all federal, state and local jurisdictions relevant to the Equipment and/or Service.

**5.    INTELLECTUAL PROPERTY.** Each Party retains all right, title and interest in and to its respective Intellectual Property Rights. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property Rights, except as otherwise expressly authorized in the Transaction Documents

**6.    CONFIDENTIALITY.**

**6.1. Confidential Information.** Each Party acknowledges that after execution of the Transaction Documents, they may be furnished with, receive, or otherwise have access to Confidential Information of the other Party.

**6.2. Exclusion.** Confidential Information excludes any particular information that the receiving Party can demonstrate:

(a)    at the time of disclosure, was in the public domain or in the possession of the receiving Party;

(b)    after disclosure, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

(c)    was received after disclosure from a third party who had a lawful right to disclose such information to the receiving Party without any obligation to restrict its further use or disclosure;

(d)    was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; or

(e)    was required to be disclosed to satisfy a legal requirement of a competent government body.

**6.3. Obligations.** The following obligations with respect to Confidential Information shall survive the expiration or termination of this Agreement for a period of three (3) years or such longer period as required by regulation, law or court order.

(a)    Ongoing Obligation. Each Party's Confidential Information shall remain the property of that Party. Except as may otherwise be required by law or expressly authorized herein, neither Party shall disclose the confidential information of the other Party to any third party without the prior written consent of such other Party. Each Party shall use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent unauthorized disclosure of Confidential Information as it employs to avoid unauthorized disclosure of its own Confidential Information of a similar nature. Except as otherwise permitted hereunder, the Parties may disclose such information to entities performing services

required hereunder where: (i) use of such entity is authorized under the Transaction Documents, (ii) such disclosure is necessary or otherwise naturally occurs in that entity's scope of responsibility, and (iii) the entity agrees in writing to assume the obligations described in this Article. Any disclosure to such entity shall be under the terms and conditions of this Article.

(b)    Remedial Measures for Disclosure. Each Party shall take reasonable steps to ensure that its employees comply with this Article. In the event of any disclosure or loss of, or inability to account for, any Confidential Information of the disclosing Party, the receiving Party shall promptly, and at its own expense notify the disclosing Party in writing, and take such actions as may be necessary and cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

(c)    Permitted Disclosures. Except as otherwise provided herein, either Party may disclose the terms and conditions of these Transaction Documents to third parties that (i) have expressed a bona fide interest in consummating a significant financing, merger or acquisition transaction between such third parties and such Party, (ii) have a reasonable ability (financial and otherwise) to consummate such transaction, and (iii) have executed a nondisclosure agreement that includes within its scope the terms and conditions of this Article or substantially similar terms and conditions and also includes a procedure to limit the extent of copying and distribution of these Transaction Documents. Each Party shall endeavor to delay the disclosure of the terms and conditions of this Agreement until the status of discussions concerning such transaction warrants such disclosure.

(d)    Required Disclosures. A Party receiving a request under Section 6.2(c) to disclose Confidential Information shall immediately upon receiving such request, and to the extent that it may legally do so, advise the disclosing Party promptly and prior to making such disclosure in order that the disclosing Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information

**6.4. No Implied Rights.** Nothing contained in this Article shall be construed as obligating a Party to disclose its Confidential Information to the other, or as granting to or conferring on a Party any express or implied right or license to the Confidential Information of the other Party.

**7.    TERMINATION.**

**7.1. Default.**

(a)    In the event that either Party commits an Event of Default under Sections 1.1(j)(i), (iv) or (v), then the other Party may, by giving written notice to the defaulting Party, immediately terminate the applicable Transaction Document.

(b)    In the event that either Party commits an Event of Default under Sections 1.1(j)(ii) or (iii), then the other Party may, by giving written notice to the defaulting Party, terminate the applicable Transaction Document upon the expiration of the applicable cure period.

(c)    In addition to the right to terminate pursuant to subsections (a) and (b) above, the non-defaulting party may pursue any legal remedies it may have under applicable law or principles of equity relating to such breach and subject to the terms of this Section.

**7.2. Insolvency.** Either Party may immediately terminate the Transaction Documents if the other Party (a) ceases to do business in the normal course for a continuous period of at least thirty (30) Days; (b) becomes or is declared insolvent or bankrupt; (c) is the subject of any proceeding related to its liquidation or insolvency (whether voluntarily or involuntarily) which is not dismissed within ninety (90) Days; (d) makes an assignment for the benefit of creditors; (e) experiences a material adverse change in financial condition which may reasonably be expected to affect its ability to perform; or (f) fails to comply with a written request for reasonable assurances within ten (10) Days or otherwise repudiates the Transaction Documents.

**7.3. Effect of Termination.** Termination of the Transaction Documents refers to the termination of the Parties' respective commitments and obligations from and after the date of termination, but does not relieve the Parties of their payment and other obligations incurred prior to the date of termination.

**7.4 Termination Assistance Services.** Upon the termination or expiration of the Agreement, Telefonica Data agrees to provide Termination Assistance Services consisting of continuation of any part or all of the

Services to Customer for up to eighteen (18) months following the termination or expiration of this Agreement. Termination Assistance Services shall be provided subject to, and in accordance with, the terms and conditions of this Agreement, except for the charges for such Termination Assistance Services, which such charges the Parties will mutually agree upon prior to the commencement of the Termination Assistance Services. The Parties agree that the charges for such Termination Assistance Services will be in accordance with the pricing principles of SAFA. In the event of termination resulting from an unremedied breach by Customer, Telefonica Data shall be obligated to provide Termination Assistance Services only so long as Customer pays for Services that are part of such Termination Assistance Services monthly in advance of the date the Services are to be provided.

**7.5. Shutdown/Transfer of Data Center.** In the event that during the Term of the Agreement the Telefonica Data data center located at 11300 N.W. 25th Street, Miami, Florida 33172 (the "Data Center") is to be shutdown or transferred to a non-Affiliate of Telefonica Data requiring Customer to move its technology infrastructure located at the Data Center to another location. Telefonica Data agrees (a) to provide Customer with notice of such event as soon as practicable and in any event at least sixty (60) days prior to the shut down or transfer, and (b) pay Customer the lesser of (i) Customer's Migration Costs, as defined below, and (ii) One Million Dollars ($1,000,000). Telefonica Data agrees to pay such amount within thirty (30) days of its receipt of an itemized invoice from Customer, together with supporting documentation, of its Migration Costs. For purposes of this Section, "Migration Costs" means the reasonable migration costs actually incurred by Customer to move its infrastructure to the new location, including, but not limited to, the costs of the physical move of Customer's infrastructure (breakdown, package, transport, delivery and reassembly), the costs of communication links between the Data Center and the new location during the migration period, the costs of professional services to supervise and oversee the migration and the costs of any necessary "swing gear" purchased or leased by Customer in connection with the migration.

**7.6 Wrongful Termination of Transaction Documents by Customer.** In the event Customer wrongfully terminates the Transaction Documents at any time prior to the expiration of the Term, then, in addition to any other damages for which Customer may be liable under the terms of the Transaction Documents, Customer agrees to pay Telefonica Data the product of Five Hundred Thousand Dollars ($500,000) times a fraction, the denominator of which is thirty-four (34) and the numerator of which is thirty-four (34) minus the number of months since the inception of the Term that Customer has paid the undisputed monthly recurring charges under the Transaction Documents, as reimbursement for the capital expenditures made by Telefonica Data to provide Customer the Services. Customer agrees to pay such amount within thirty days of the date of Customer's wrongful termination of the Transaction Documents.

## 8. REPRESENTATIONS; WARRANTIES; DISCLAIMERS.

**8.1 Representations.** Each Party represents and warrants to the other Party that:

(a) it has the requisite corporate power and authority to enter into the Transaction Documents and to carry out the transactions contemplated by the Transaction Documents;

(b) the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by the requisite corporate action on its part; and

(c) the Transaction Documents have been duly executed and delivered, and create lawful, valid and legally binding obligations, in accordance with their respective terms.

Additionally, Telefonica Data represents and warrants to Customer that as of the Effective Date Telefonica Data possesses sufficient ownership rights, title, and interests, and/or licenses, and the ability to offer and provide the Services, including without limitation, all intellectual property rights and third party consents, during the Term.

**8.2 Third Party Warranties.** Telefonica Data shall pass through to Customer all warranties covering Equipment and/or Services provided under the Transaction Documents to the extent that Telefonica Data is able pursuant to the agreements under which it obtained the warranties.

**8.3 Restrictions.** CUSTOMER SHALL NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, WHETHER WRITTEN OR ORAL, TO THIRD PARTIES, INCLUDING WITHOUT LIMITATION, END USERS ON TELEFONICA DATA'S BEHALF THAT ARE NOT EXPRESSLY AUTHORIZED HEREIN OR THAT MATERIALLY DEPART FROM ANY APPLICABLE SERVICE LEVEL COMMITMENT IN ANY TRANSACTION DOCUMENT.

**8.4 Disclaimers.**

(a) EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN A TRANSACTION DOCUMENT, ANY EQUIPMENT OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS ARE PROVIDED "AS IS" AND "AS AVAILABLE", AND NEITHER TELEFONICA DATA NOR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS MAKE ANY WARRANTIES TO CUSTOMER OR TO ANY OTHER THIRD PARTY INCUDING, WITHOUT LIMITATION, END USER, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT RELATING TO ANYTHING PROVIDED OR USED UNDER THE TRANSACTION DOCUMENTS OR DESCRIBED THEREIN, AND ANY SERVICES, EQUIPMENT, MATERIAL, GOODS, REAL ESTATE OR OTHER TANGIBLE OR INTANGIBLE ASSET THAT IS CONVEYED, HYPOTHECATED, LEASED, SOLD, OR OTHERWISE PROVIDED TO CUSTOMER IN ANY MANNER, OR AS TO ANY OTHER MATTER, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED.

(b) WITHOUT LIMITING THE FOREOING DISCLAIMER, TELEFONICA DATA FURTHER MAKES NO WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, REGARDING ANY MERCHANDISE, INFORMATION, PRODUCTS OR SERVICES PROVIDED THROUGH THE INTERNET OR ANY OTHER NETWORK. FURTHERMORE, TELEFONICA DATA HEREBY DISCLAIMS THAT ANY EQUIPMENT, PRODUCTS OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT CERTAIN RESULTS MAY BE OBTAINED BY ANYONE IN CONNECTION WITH THEIR USE.

**8.5 Use.** Telefonica Data shall provide, and Customer shall use, all Equipment and Services in accordance with all applicable laws and regulations.

**8.6 Provisioning Services.** Telefonica Data may, with the prior consent of Customer, which shall not be unreasonably, withheld, conditioned or delayed, provide or perform such Services through Affiliates, subcontractors or authorized agents. Notwithstanding the foregoing, Telefonica Data shall remain liable for the performance of its and its Affiliates', subcontractors' and authorized agents' obligations under the Transaction Documents.

## 9. LIABILITY.

**9.1 General Intent.** Subject to the specific provisions of this Article, it is the intent of the Parties that each shall be liable to the other only for any direct damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by the Transaction Documents.

**9.2 Liability Restrictions.**

(a) NOTWITHSTANDING ANYTHING IN THE TRANSACTION DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, LOSS OF REVENUE, INCOME, PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE, WHETHER SUCH CLAIM IS CHOATE OR INCHOATE, WHETHER BY STATUTE, IN TORT, OR IN CONTRACT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR CONTENT THAT IS TRANSMITTED BY CUSTOMER OR THIRD PARTIES INCLUDING, WITHOUT

(c) IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR ANY DEFECT, ERROR, INTERRUPTION, DELAY, OR ATTENUATION OF SERVICES CAUSED BY OR RESULTING FROM ANY EQUIPMENT NOT OWNED BY TELEFONICA DATA AND USED BY CUSTOMER OR AN END USER.

(d) FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED UNDER ANY TRANSACTION DOCUMENT, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER. CUSTOMER'S REMEDIES SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID UNDER ANY TRANSACTION DOCUMENT ARE LIQUIDATED, CUSTOMER ACKNOWLEDGES THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OBTAINING AN ADEQUATE REMEDY IS OTHERWISE INCONVENIENT, AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONBALE APPROXIMATION OF THE HARM OR LOSS. CUSTOMER CONFIRMS THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THE TRANSACTION DOCUMENTS SATISFY THE ESSENTIAL PURPOSES THEREOF.

(e) EACH PARTY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF (I) ACTUAL DIRECT DAMAGES OR (II) TWO MILLION DOLLARS ($2,000,000).

(f) THE LIMITATION SET FORTH IN SECTION 9.2(e) SHALL NOT APPLY WITH RESPECT TO (I) THIRD PARTY CLAIMS SUBJECT TO INDEMNIFICATION PURSUANT TO THE TRANSACTION DOCUMENTS; (II) FEES DUE AND OWING UNDER THE TRANSACTION DOCUMENTS FOR SERVICES ALREADY RENDERED OR (III) CLAIMS ARISING OUT OF A BREACH OF ANY CONFIDENTIALITY PROVISIONS.

(g) FOR PURPOSES OF THIS SECTION AND SUBJECT TO SECTION 9.2(f), ALL AMOUNTS PAYABLE OR PAID TO THIRD PARTIES IN CONNECTION WITH CLAIMS THAT ARE ELIGIBLE FOR INDEMNIFICATION PURSUANT TO THIS AGREEMENT SHALL BE DEEMED DIRECT DAMAGES.

### 9.3 Force Majeure.

(a) Neither Party shall be liable for any default or delay in the performance of its obligations under the Transaction Documents if and to the extent such default or delay is caused, directly or indirectly, by fire, explosion, cable cuts, vandalism, sabotage, power outage, flood, lightning, earthquake, elements of nature or "acts of God", war, riots, any civil or military authority (by national emergency or acts of third parties), civil disorders, rebellions, revolutions, insurrections, or acts of terrorism, naturally occurring or man-made obstructions to transmissions, provided the existence of such obstructions is beyond the responsible Party's control, lack of or delay in transportation, government obstructions to transmissions, government codes, ordinances, laws, rules, regulations or restrictions, provided that such default or delay could not have been prevented by reasonable precautions by the Party with the obligation to perform and cannot be reasonably circumvented by the Party with the obligation to perform through the use of alternate sources, workaround plans or other means (a "Force Majeure Event").

(b) In such event, the Party with the obligation to perform shall as soon as practicable give written notice to the other Party specifying the nature and anticipated duration of the Force Majeure Event and outline its recovery plan, if any. The Party with the obligation to perform shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent reasonably practicable without delay.

(c) The other Party may terminate all or any portion of the applicable Transaction Document if a Force Majeure Event continues for forty-five (45) days. In the event of such a termination, the terminating Party shall be obligated to pay for services properly performed up through the date of termination.

### 10. INDEMNIFICATION.

**10.1 Parties' Obligations.**

(a) **Mutual Obligations.** Each Party shall, at its expense, indemnify, defend and hold harmless the other Party and its Affiliates, as well as its officers, directors, employees, managers, contractors, agents, successors, and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of the following:

(i) the death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of the indemnifying Party;

(ii) the damage, loss or destruction of any real or tangible personal property resulting from the negligence or willful misconduct of the indemnifying Party or from the malfunction or failure of the indemnifying Party's equipment;

(iii) taxes, together with interest and penalties, that are the responsibility of the other Party;

(iv) claims by government regulators or agencies for fines, penalties, sanctions or other remedies arising from or in connection with a Party's failure to perform its responsibilities under this Agreement; and

(v) breach of any representation or warranty set forth in the Transaction Documents.

(b) **Customer's Obligations.** Customer shall, at its expense, indemnify, defend and hold harmless Telefonica Data and its Affiliates, as well as their officers, directors, employees, managers, contractors, agents, successors and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of Customer's use of the Services, Equipment and Products provided under the Transaction Documents including without limitation, such Losses or threatened Losses arising from, related to, incurred in connection with, or based on allegations of any of the following:

(i) any misuse of the Equipment or Services by Customer or an End User;

(ii) any use by Customer or an End User of non-Telefonica Data furnished products or services, facilities, equipment and/or software with any Equipment or Service not recommended or otherwise approved in writing by Telefonica Data; or

(iii) any transmission of content not supplied by Telefonica Data over or through the Telefonica Data Network or system.

**10.2 Intellectual Property Rights.**

(a) **Obligations.** Each Party shall, at its expense, indemnify, defend and hold harmless the other Party, and the other Party's Affiliates, officers, directors, employees, managers, contractors, agents, successors, and assigns, from and against any Losses and threatened Losses arising from, in connection with or based on any allegations arising under the Transaction Documents of infringement or misappropriation of any Intellectual Property Rights of the owning or controlling Party or any third party, except to the extent that any such allegations arise from (i) modification of such products or services, or any component thereof, by the indemnified Party that is not recommended or otherwise approved by the indemnifying Party, or (ii) use of the products or services by indemnified Party in combination with deliverables furnished by third parties that is not recommended or otherwise approved by indemnifying Party, to the extent that any such claim or allegation is directed to such combination.

(b) **Exclusive Liability and Remedy.** If any Service provided under any Transaction Document has become (or in Telefonica Data's reasonable judgment is likely to become) the subject of a third party infringement claim, Telefonica Data may, at its sole discretion and without further liability, do any of the following, which, together with the obligations set forth under Section 10.2(a) above, shall constitute Telefonica Data's sole obligation to Customer hereunder and Customer's exclusive remedy against Telefonica Data:

(i) at Telefonica Data's cost, obtain for Customer the right to continue use of the Service; or

(ii) at Telefonica Data's cost, replace or modify the Service so that it no longer is subject to the third party infringement claim.

**10.3 Procedure.** The Party to be indemnified under Section 10.1 or 10.2 ("Indemnitee") shall promptly notify the indemnifying Party under Section 10.1 or 10.2 ("Indemnitor") in writing of any claim for indemnification.

The Indemnitor shall have sole control of the defense and all related settlement negotiations with respect to the claim. The Indemnitee shall have the right, but not the obligation, to participate in the defense of any such claim or action through counsel of its own choosing at its own expense; provided, however, that if the Indemnitor fails to promptly assume the defense of a claim, the Indemnitee may assume the defense at the Indemnitor's cost and expense. The Indemnitee shall cooperate fully and execute all documents necessary for the defense of such claim. The Indemnitee shall have the right to approve settlement of any claim, such approval not to be unreasonably withheld or delayed, provided that the Indemnitee shall not be required to approve any settlement that involves an admission of liability or wrongful conduct on the part of the Indemnitee or restricts its ability to conduct its business in any material respect. In the event the Parties agree to settle a claim, neither Party shall publicize the settlement without first obtaining the written permission of the other Party, which permission will not be unreasonably withheld or delayed.

## 11   GENERAL.

### 11.1  Binding Nature and Assignment.

•  (a)   The Transaction Documents shall accrue to the benefit of and be binding upon the Parties and any permitted purchaser or any successor entity into which either Party has been merged or consolidated or to which either Party has sold or transferred all or substantially all of its assets.

(b)   Except as otherwise expressly provided in a Transaction Document, neither Party may, or shall have the power to, assign the Transaction Documents or delegate such Party's obligations hereunder, in whole or in part, without the prior written consent of the other, except that either Party may assign its rights and obligations under the Transaction Documents without the approval of the other Party to

(i)   an entity that acquires all or substantially all of the assets of such Party,

(ii)   to any Affiliate, in which event the assignor shall remain liable as a guarantor of the assignee/Affiliate's performance of such Party's obligations hereunder, or

(iii)   to a successor in a merger or acquisition, provided that such an assignee has the financial, technical and management capacity to perform all of the assignor's obligations hereunder.

### 11.2  Notices.
Any notices, requests, demands, and determinations under this Agreement (other than routine operational communications), shall be in writing and shall be deemed duly given (a) when delivered by hand, (b) one (1) Business Day after being transmitted via an express, overnight courier with a reliable system for tracking delivery, delivery costs paid (c) when sent by confirmed facsimile or email with a copy delivered by another means specified in this Section, or (d) on the day an authorized employee of the receiving party accepts receipt in writing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, to the address listed on the first page of the Master Services Agreement. A Party may from time to time change its address or designee for notice purposes by giving the other prior written notice of the new address or designee and the date upon which it will become effective.

### 11.3  Counterparts.
The Transaction Documents may be executed in counterparts, all of which taken together shall constitute one single agreement between the Parties.

### 11.4  Relationship of Parties.
The Parties are independent contractors, bound to each other only as provided for herein. Neither Party has the authority to bind, act on behalf of or represent the other. Nothing in the Transaction Documents creates a relationship of partnership, employer and employee, principal and agent, master and servant, or franchisor and franchisee. Neither Party shall act or fail to act in a way that could reasonably cause others to believe that it has authority to act on behalf of the other beyond the authority expressly granted herein.

### 11.5  Severability and Modification.

(a)   In the event that any provision of the Transaction Documents conflicts with the law under which the Transaction Documents are to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision shall be deemed to be modified to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law. The remainder of the Transaction Documents shall remain in full force and effect.

(b)   If any state or federal body of competent jurisdiction determines that any provision of the Transaction Documents violates any applicable rules, policies, or regulations, both Parties shall make reasonable efforts to promptly bring the Transaction Documents into compliance and shall endeavor in those efforts to preserve for both Parties the economic benefits as reflected in the Transaction Documents to the maximum extent possible.

### 11.6  Consents and Approval.
Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under the Transaction Documents, such action shall not be unreasonably delayed, conditioned or withheld. An approval or consent given by a Party under the Transaction Documents shall not relieve the other Party from responsibility for complying with the requirements of the Transaction Documents, nor shall it be construed as a waiver of any rights under the Transaction Documents, except as and to the extent otherwise expressly provided in such approval or consent.

### 11.7  Waiver of Default.
No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced. A delay or omission by either Party hereto to exercise any right or power under the Transaction Documents shall not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant.

### 11.8  Cumulative Remedies.
Except as otherwise expressly provided, all remedies provided for in the Transaction Documents shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

### 11.9  Survival.
Any provision of the Transaction Documents that contemplates performance or observance subsequent to any termination or expiration of the Transaction Documents (in whole or in part) shall survive any termination or expiration of the Transaction Documents (in whole or in part, as applicable) and continue in full force and effect.

### 11.10  Public Disclosures.
Any public use of a Party's name, trademark, service mark or trade dress, as well as all media releases, public announcements, and public disclosures relating to this Agreement or the subject matter of this Agreement, including promotional or marketing material, but not including announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, shall be coordinated with and shall be subject to the prior written approval by each Party prior to release.

### 11.11  Third Party Beneficiaries.
Except as otherwise provided in the Transaction Documents, the Transaction Documents shall not be deemed to create any rights in third parties, including End Users, suppliers and customers of a Party, or to create any obligations of a Party to any such third parties, or to give any right to either Party to enforce this Agreement on behalf of a third party.

### 11.12  Governing Law and Prevailing Party.
The Transaction Documents and performance under them shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law principles or the Convention on Contracts for the International Sale of Goods. In the event of any dispute between the Parties concerning the Transaction Documents, the parties agree that the prevailing Party in any such dispute shall be reimbursed for, and the non-prevailing Party shall pay, the reasonable attorneys' fees and expenses of the prevailing Party.

### 11.13  Amendment.
The Transaction Documents shall not be modified, amended or in any way altered except by an instrument in writing signed by both Parties.

### 11.14  Incorporation by Reference and Order of Precedence.

(a)   All Exhibits and Schedules are incorporated by reference into this Agreement. Any amendments to this Agreement (including with respect to exhibits and schedules) that are agreed upon by the Parties subsequent to the Effective Date, shall likewise be incorporated by reference into this Agreement.

(b)   Any conflict among or between the documents making up the Transaction Documents will be resolved in accordance with the following order of precedence (in descending order of precedence):

(i)   the Schedules,

    (ii)  the Exhibits, and

    (iii)  this Agreement.

**11.15 Export Control.** The export and/or import of certain products, including items to be resold under any attached exhibits and/or Confidential Information may be subject to domestic and/or foreign government export and/or import laws, rules, policies, procedures, restrictions and regulations. The Parties represent and warrant that they will comply with all applicable governmental laws, statutes, ordinances, administrative orders, procedures, policies, rules, regulations and restrictions including, without limitation, those related to the export and/or import of encryption items and technical materials. Each Party shall provide the other Party with prompt written notice of any export or import restrictions relating to the products and/or Confidential Information.

*Telefónica*

ORIGINAL
COPY

## EXHIBIT C

## TO

## MASTER SERVICES AGREEMENT

## COLLOCATION

This COLLOCATION EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 18, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1. **DEFINITIONS.**

    **1.1.** **"Bandwidth"** shall mean the bandwidth provided to Customer to connect Customer Equipment to the public Internet. The baseline bandwidth shall be burstable as specified in Schedule C-1. Telefonica Data shall provide Bandwidth in accordance with the service level objectives set forth in Schedule C-2.

    **1.2.** **"Customer Equipment"** shall mean telecommunications equipment and cabling provided by Customer that is housed in a Space.

    **1.3.** **"Premises"** shall mean a specific commercial building in the United States in which Telefonica Data, owns, controls or has leasehold interests in certain office and storage space suitable for the placement and operation of telecommunications equipment.

    **1.4.** **"Space"** shall mean an individual location within a Premises authorized by Telefonica Data for the housing of Customer Equipment.

2. **RIGHT TO OCCUPY, COLLOCATION ADDENDUMS; PERMISSIBLE USE AND RELOCATION.**

    **2.1.** **Obligation.** Telefonica Data shall provide Customer with Bandwidth, non-exclusive access to a Premises and exclusive access to Space for the purpose of installing, operating and supporting Customer Equipment. Customer shall collocate Customer Equipment only in the Space and at no other location within a Premises without Telefonica Data's prior written consent.

    **2.2.** **Collocation Addenda.** This Exhibit shall become a binding agreement between Customer and Telefonica Data only upon execution by the Parties of a Collocation Addendum, in the form attached hereto as Schedule C-1. Each Collocation Addendum, and any amendments thereto, shall incorporate the terms and conditions of this Exhibit as well as the Agreement, and be made part of both by reference. Each Collocation Addendum may have attached thereto the following Appendices:

        (a)  Facility Drawings, identified as Appendix 1

        (b)  General Description of Work Tasks and Special Terms and Conditions, identified as Appendix 2; and

        (c)  Managed Services (if applicable), identified as Appendix 3.

    **2.3.** **Demarcation Point Connection.** Telefonica Data shall provide and connect a cable from the core switch on its network to the demarcation point, which for each Space shall be the jack on the rack or cabinet provided for such connection.

    **2.4.** **Support Services.** In connection with the Space made available hereunder, Telefonica Data or its designee shall perform services which support the overall operation of the Premises (e.g., janitorial services, environmental systems maintenance, and power plant maintenance) at no additional charge to Customer. However, Customer shall be required to maintain the Space in an orderly manner and shall be responsible for the removal of trash, packing, cartons, and related items from the Space. Further, Customer shall maintain the Space in a safe condition including, but not limited to, the preclusion of storing hazardous materials in the Space. Telefonica Data will have no operations or maintenance responsibilities with respect to Customer Equipment.

**2.5.** **Limited License.** Customer acknowledges and agrees that it has been granted only a limited, non-exclusive license to occupy the Space for the period of time and under the terms and conditions set forth in the Agreement and herein, and that it has not been granted any real property interests of any kind in the Space or Premises.

**2.6.** **Reservation of Rights.** Customer Equipment shall remain Customer's exclusive personal property throughout the Term.

**2.7.** **Customer Obligations.**

(a) Customer shall keep the Space, Premises and any equipment therein free from any liens arising from any work performed, materials furnished or obligations incurred by or at the request of Customer. All persons either contracting with Customer or furnishing or rendering labor and materials to Customer shall be notified in writing by Customer that they must look only to Customer for payment for any labor or materials. If any lien is filed against the Space, Premises, or any equipment therein as a result of the acts or omissions of Customer, its employees, agents or contractors or subcontractors, Customer shall discharge it or bond it off within thirty (30) Days after Customer learns that the lien has been filed.

(b) Customer shall ensure (i) that Telefonica Data has access to the Customer Equipment so that Telefonica Data may perform its duties under this Exhibit; and (ii) that all existing Customer Equipment conforms to the manufacturer's specifications, which documentation shall be made available to Telefonica Data prior to Telefonica Data performing any maintenance services. If damage or destruction to any Telefonica Data equipment (e.g., test equipment/monitors) results from a breach of the foregoing, Customer shall promptly, at its option, either repair or replace the damaged or destroyed equipment to the extent any such damage is attributable to such breach.

**3.** **TERM; TERMINATION.**

**3.1.** **License Term.** This Exhibit shall commence on the date accepted by Telefonica Data and shall continue for the term set forth in the Addendum, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement (the "Term"). Customer's license to occupy each Space shall begin on the "Requested Service Date," as set forth in each fully executed individual Collocation Addendum or on the date Telefonica Data completes preparation of the Space, whichever is later, and shall continue for the lesser of the duration of the Term or Telefonica Data's underlying leasehold interest. In the event that Telefonica Data's underlying leasehold interest in the Premises expires prior to the expiration of the Term, Telefonica Data shall, at least one hundred twenty (120) Days before the expiration of such leasehold interest, make a good faith effort to renew the underlying leasehold interest to allow Customer to continue to occupy the Space for the duration of the Term.

**3.2.** **Effect of Termination.** Promptly after termination or expiration of the license for each Space, Customer shall remove the Customer Equipment and other property that has been installed by Customer or Customer's suppliers or contractors (or by Telefonica Data on behalf of Customer, if Telefonica Data desires such Customer Equipment to be removed).

**4.** **PRICES AND PAYMENT TERMS.**

**4.1.** **Fees.** In consideration of the license and services provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule C-1 in accordance with the payment terms and conditions set forth in the Agreement.

**4.2.** **Reimbursement.** Customer agrees to reimburse Telefonica Data promptly for all repair or restoration costs associated with damage or destruction caused by Customer's personnel, Customer's agents, Customer's suppliers/contractors or Customer's visitors during the Term or as a consequence of Customer's removal of the Customer Equipment or property installed in the Space.

**4.3.** **Bandwidth Charges.** If the 95th Percentile Number (defined below) is equal to or less than the baseline bandwidth amount, Customer shall pay only the recurring monthly fee. If the 95th Percentile Number is more than the baseline bandwidth amount, Customer shall pay the recurring monthly fee plus an amount for the additional usage billed on a per-megabit basis as set forth on the applicable Collocation Addendum. Telefonica Data will use the 95th percentile level procedure described below each month to determine the applicable bandwidth charges for each month. Telefonica Data will:

(a) measure actual inbound and outbound traffic levels into the applicable access port(s) during a standard measurement interval throughout the day (e.g., every 5 minutes);

(b) at the end of the month, sort all measurements for that month from highest to lowest;

(c) discard the top five percent (5%) of each month's measurements; and

(d) use the highest remaining measurement as the "95th Percentile Number" which will represent the Bandwidth usage for that month.

## 5.    ADDITIONAL TERMS.

**5.1.    Contractor Approval.** Before beginning any delivery, installation, replacement or removal work, Customer must obtain Telefonica Data's written approval with respect to Customer's choice of suppliers and contractors, which approval shall not be unreasonably withheld. Telefonica Data may request additional information before granting approval and may require substitution of suppliers and contractors, which are not Affiliates of Telefonica Data, as conditions of its approval. Approval by Telefonica Data is not an endorsement of Customer's supplier or contractor, and Customer will remain solely responsible for the selection of the supplier or contractor and all payments for construction work or any other work relating thereto.

**5.2.    Alterations.** Customer shall not make any construction changes or material alterations to the interior or exterior portions of the Space, including any cabling or power supplies for the Customer Equipment, without obtaining Telefonica Data's prior written approval for Customer to have the work performed or having Telefonica Data perform the work. Telefonica Data shall have the right to perform and manage any construction or material alterations within the Premises and Space areas at rates to be negotiated between the Parties.

**5.3.    Access.** Access to the Premises, use of the Space, installation of the Customer Equipment, and type of Customer Equipment installed, shall at all times be governed by generally accepted industry standards, applicable law and regulations, and such reasonable rules imposed by Telefonica Data. Customer shall promptly reimburse Telefonica Data for all costs associated with Customer's failure to follow such rules, including, without limitation, damage caused by End Users, suppliers, contractors or visitors, during the Term or, after termination or expiration, as a consequence of removal of the Customer Equipment or other property installed in the Space. Prior to first accessing the Premises, Customer shall provide and keep updated a list of its representatives authorized to access the Space and Telefonica Data shall provide photo-ID security badges for such individuals. Unless otherwise provided in a Collocation Addendum, each visit to the Space shall require the presentation of photo-ID security badges. Customer shall have access to the Space twenty-four hours a day, seven days a week.

**5.4.    Non-Interference.** Notwithstanding any other provisions of this Exhibit, Customer Equipment placed in the Space shall (a) not interfere with or impair service provided by Telefonica Data or by any other lessee of the Premises; (b) not unreasonably disturb any other lessee of the Premises; (c) not endanger or damage the facilities of Telefonica Data or of any authorized user of the Space, or the Premises; (d) not compromise the privacy of any communications carried in, from, or through the Premises; and (e) not create an unreasonable risk of injury or death to any individual or to the public. Customer shall not improperly restrict or interfere with the Telefonica Data Network or the use thereof. Upon notice by Telefonica Data, Customer shall promptly remove any hazard, interference, or service obstruction that may be caused by hardware, software or connectivity owned by or under the control of Customer. Nothing stated herein shall be construed to interfere with Customer's ability to comply with the rules, regulations or directives of any governmental or judicial authority. In the event that Customer improperly restricts or interferes with the Telefonica Data Network, or the use thereof, Telefonica Data may, after giving Customer notice, immediately modify, suspend, delay, condition, or cease until cured its obligations, in whole or in part, under this Exhibit.

**5.5.    Eminent Domain; Relocation.** Except as provided in subsection (a) and (b) below, Telefonica Data shall not arbitrarily require Customer to relocate the Customer Equipment.

(a) In the event the Premises becomes the subject of a taking by eminent domain by any authority having such power, Telefonica Data shall have the right to terminate the affected Collocation Addendum. Telefonica Data shall give Customer prompt advance notice, to the extent practicable of the eminent domain proceedings. Customer shall have no claim against Telefonica Data for any relocation expenses, any part of any award that may be made for such taking or the value of any unexpired term or renewed periods that result from a termination by Telefonica Data under this provision, or any loss of business from full or partial interruption or interference due to any termination. However, nothing contained in this Exhibit shall prohibit Customer from seeking any relief or remedy against the condemning authority in the event of an eminent domain proceeding or condemnation that affects the Space.

(b) Upon sixty (60) Days prior written notice or, in the event of an emergency (which shall not include

eminent domain), such time as may be reasonable, Telefonica Data reserves the right to change the location of the Space or the Premises to a site which shall afford comparable environmental conditions for the Customer Equipment and comparable accessibility to the Customer Equipment. Telefonica Data and Customer shall work together in good faith to minimize any disruption to Customer's services as a result of such relocation. Telefonica Data shall be responsible for the cost of improving the Space to which the Customer Equipment may be relocated, and for relocation of Customer Equipment interconnected to Telefonica Data services, except that Telefonica Data shall not be responsible for relocating facilities installed in violation of this Article 5.

6.    **INSURANCE.**  Customer agrees to maintain during the Term, at Customer's expense, for each Space (a) Comprehensive General Liability Insurance in an amount not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury or property damage, (b) Employers Liability in an amount not less than Five Hundred Thousand Dollars ($500,000.00) per occurrence, and (c) Workers' Compensation in an amount not less than that prescribed by statutory limits. Prior to taking occupancy of the Space, Customer shall furnish Telefonica Data with certificates of insurance which evidence the minimum levels of insurance set forth herein, name Telefonica Data as an additional insured, and provide that the policy may not be canceled unless thirty days notice is provided to Telefonica Data. Telefonica Data will not obtain any insurance with respect to and will not assume the risk of loss for any Customer Equipment.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER: | Accepted by Telefonica Data: |
|---|---|
| LYCOS, INC. | TELEFONICA DATA USA, INC. |
| By: | By: |
| Name: | Name: PETE R. PIZARRO |
| Title: CFO | Title: CFO |
| Date: 11/18/03 | Date: 11-20-03 |
| Address: | Address: 1221 Brickell Avenue, Suite 600 |
| | Miami, Florida 33131 |
| | Attn: |
| Fax: | Fax: |
| Email: | Email: |

C-4

# SCHEDULE C-1
## TO
## COLLOCATION EXHIBIT
### Collocation Addendum No. 1

This Collocation Addendum is made October __, 2003 and subject to all definitions, terms and conditions of the Agreement and Exhibit.

---

**LOCATION AND SERVICE DATE**

Premises Address:    11300 N.W. 25th Street
                     Miami, FL 33172

Term:    34 months from the Requested Start Date.  Minimum commitments go into effect November 1, 2003.

Requested
Service Date:    September 1, 2003

---

**DESCRIPTION OF
SITE AND SPACE**

Site Type:    ___ Optical Amplifier ___ Point of Presence ___ Regenerator ___ Termination Site
              ___ Junction Site ___ Other _____

Collocation Space:    4000 sq. ft. minimum

Space Required:

Power Required:    ___ amps per rack ___ amps total ___ DC convenience outlets #

Escort Services:    Escort Service is _____ REQUIRED ___X___ NOT REQUIRED

---

**BANDWIDTH**

Minimum 400 Mbps, burstable
Redundant port connections. 2

---

**FEES**

| | Non-Recurring | Monthly Recurring |
|---|---|---|
| Set Up Fee | See Appendix 2 | |
| Collocation | See Appendix 2 | $27 per square foot |
| Bandwidth | See Appendix 2 | $100 per Mbps |
| Power | See Appendix 2 | $200 per 110, Volt 20 amp; and $300 per 208 Volt, 30 amp breaker position in excess of the first (2) 110 Volt, 20 amp provided in each rack/cabinet |

---

**CUSTOMER:**

By: _____

Name: _____

Title: CFO

Date: 11/18/03

Address: _____

_____

_____

Fax: _____

Email: _____

**Telefonica Data:**
TELEFONICA DATA USA, INC.

By: _____

Name: PETE D'ARADIO

Title: CEO.

Date: 11-20-03

Address: 1221 Brickell Avenue, Suite 600
Miami, Florida 33131

Attn:

Fax: _____

Email: _____

C-5

**APPENDIX 1**

**TO**

**COLLOCATION ADDENDUM NO. 1**

<u>**Facility Drawings**</u>

# APPENDIX 2

## TO

## COLLOCATION ADDENDUM NO. 1

### General Description of Work Tasks and Special Terms and Conditions

**Pricing:** The charge for the Collocation is $27/sq ft/month for the Space. If Customer decreases its square footage below 4000 sq. ft., Telefonica Data will bill, and Customer shall pay for, 4000 sq. ft. In the event Customer desires to increase or reduce the square footage provided to it by Telefonica Data, Customer shall provide Telefonica Data at least 90 days written notice. The MRC for the Space includes 2 x 20 A breaker positions per rack/cabinet. Bandwidth monthly recurring charges are $100/Mbps/month with a 400Mbps minimum commitment. The minimums for bandwidth and space applies to the aggregate usage of Terra Lycos US and the Terra Lycos US MOC. This agreement supersedes and replaces previous agreements between Telefonica Data and the Terra Lycos MOC for bandwidth and space.

**Power:** Customer's average power consumption per sq. ft of floor space may not exceed 145 Watts per square foot for Server Room 3. Customer's actual monthly usage will be measured using Telefonica Data's building automation system, Johnson Controls' reporting and the Siemens WinPM power monitoring on the RPPs in Server Room 3 to determine the total power usage for the month. Such figure will be divided by the square footage Customer occupied in Server Room 3 during the month being measured. The credits and termination rights set forth herein shall not be applicable during the period that Customer's power consumption exceeds 145 Watts per square foot for Server Room 3.

**Installation of Racks and Cabinets:** Telefónica Data will provide and install the racks and Customer's cabinets at no additional charge to Customer. Customer must provide the cabinets to Telefonica Data and the wiring inside all cabinets and racks.

**Migration:** Subject to Customer's review of the proposed project plan and required Space layout, Telefónica Data will be the prime contractor for the migration of Customer's platform to the Premises Address. The Parties shall jointly produce a migration plan. Telefonica Data may subcontract some migration services from Cable and Wireless Internet Services, Inc. and its affiliates (collectively "C&W").

**Location of Servers:** Telefónica Data reserves the right to locate Customer's servers in Telefonica Data's data center where it reasonably deems appropriate, with the understanding and acknowledgement that Customer requests contiguous space.

**Benchmarking:** Telefonica Data will reduce the monthly recurring charges for bandwidth and collocation on each anniversary of the Service Start Date subject to further revisions in accordance with the Benchmarking provision contained in the Agreement.

**Invoices:** Telefonica Data shall begin invoicing the Customer as soon as the Space is ready for operation and the bandwidth connected. Notwithstanding anything to the contrary contained herein, minimum commitment billing will begin November 1, 2003.

**SCHEDULE C-2**
**TO**

**COLLOCATION EXHIBIT**
<u>Service Level Agreement</u>

Notification

<u>*Event Notification to Customer*</u>

- Telefonica Data shall provide initial notice to a designated Customer's representative by telephone, e-mail, pager or comparable notification service within 15 minutes of Telefonica Data becoming aware of a Severity One or Severity Two event (as defined below). If Customer first becomes aware of a Severity One or Severity Two event, Customer agrees to promptly notify Telefonica Data via the Customer Support Number [1-866-466-2872]. Status reports regarding the event will continue on the ½ hour until either the event has been resolved or the Parties have determined a course of action that does not require continued notification. Upon the resolution of a Severity One event, Telefonica Data will send Customer a written incident report within 48 hours. Telefonica Data will provide Customer monthly incident reports on all Severity Two events.

- <u>Severity One event</u>: The customer's suite has lost power or HVAC or all or a portion of Customer's network is not accessible.
  - <u>Severity Two event</u>: Customer's suite or network has experienced equipment failure resulting in degraded performance.

<u>*Escalation (Internal)*</u>

The following procedures define the escalation procedures that Telefonica Data will implement during an Unscheduled Outage (as defined below):

- Telefonica Data EMSC Level 1 Support shall use reasonable efforts to identify the cause of the event or outage and escalate to the Telefonica Data Maintenance Engineer during the first quarter hour of an outage.

- Telefonica Data will notify Customer as follows:

  - Telefonica Data will notify Customer's First Escalation Contact at the beginning of the second quarter hour;

  - If Telefonica Data is unable to contact Customer's First Escalation Contact, Telefonica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

  - If Telefonica Data is unable to contact Customer's Second Escalation Contact, Telefonica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

*"Unscheduled Outage"* means an interruption in the Services arising from failures to achieve the service level objectives provided under this Schedule. An Unscheduled Outage excludes outages (and service level failures) due to (i) Scheduled Outages (as defined below); (ii) network or Service upgrades requiring a predefined outage; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer, (iv) Customer's equipment, hardware, facilities or software or (v) Force Majeure events.

**Change Management**

- Unless otherwise provided in the Agreement, Exhibits, and Schedules, Telefonica Data will provide Customer at least five (5) business days prior written notice of any changes to be made by Telefonica Data that affect the Services provided under this Exhibit. However, if a shorter notification period is required as reasonably determined by Telefonica Data, changes may be made upon shorter notification to Customer. Telefonica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefonica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon the Customer's and Telefonica Data's requirements. If an outage is required, such outage will be considered a "Scheduled Outage." At the time Telefonica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Scheduled outage time may not exceed 8 hours total per month after which it will be considered to be unscheduled outage time. Telefonica Data agrees to work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefonica Data reserves the right, however, to proceed with any change if it is reasonably determined, by Telefonica Data, that the change will not cause harm to the Customer's specific environment and/or is otherwise necessary. Customer agrees to provide prior notification to Telefonica Data of any changes to Customer's configurations that interface with the Services provided under this Exhibit.

- Telefonica Data's Engagement Manager is responsible for the project management of all changes to Services provided to the Customer under this Exhibit.

**Power Service Level Objective**

- Telefonica Data will provide 100% power availability to Customer on a 24*7*365 basis.

- If Telefonica Data fails to meet this Power objective, Customer may request a credit equal to the following:

| Power | SERVICE CREDIT |
|---|---|
| 1st loss of power within month | 50% of the monthly recurring charge (MRC) for the affected Service |
| 2nd loss of power within month (chronic failure) | an additional 75% of the MRC charge for the affected Service |
| 3rd loss of power within month (catastrophic failure) | an additional 100% of the MRC charge for the affected Service |

- If an Outage lasts more than eight (8) consecutive hours in any 30 day rolling period or the Customer suffers 3 or more complete power failures to the Customer suite(s) in any 30 day rolling period then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the power infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

**HVAC Service Level Objective**

- Telefonica Data will provide a cooled environment for Customer's system. The ambient temperature of the room must not exceed 85 degrees Fahrenheit for more than an hour on a 7*24*365 basis.

- If Telefonica Data fails to meet this HVAC objective, Customer may request a credit equal to the following:

| HVAC | SERVICE CREDIT |
|---|---|
| 1st failure of temperature service level objective within month above 85° for 1 hour | 25 % of the MRC for the affected Service |
| 2nd failure of temperature service level objective within month above 85° for 1 hour | an additional 25% of the MRC for the affected Service |
| 3rd loss of temperature service level objective within month above 85° for 1 hour | an additional 50% of the MRC for the affected Service |
| 4th loss of temperature service level objective within month above 85° for 1 hour and substantial outage to Customer equipment occurs. | Option to terminate contract |

- If an Outage lasts more than eight (8) consecutive hours in any one 30 day rolling period or the Customer suffers 4 or more HVAC failures of above 85° for more than 1 hour per failure and in either case a substantial outage occurs to the Customer equipment, then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provides Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the HVAC infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

### Fire Suppression Service Level Objective

- Telefonica Data will provide the Customer with an industry standard fire suppression system that will protect the Customers equipment.
- If there is damage to the production equipment, as a result of the failure of Telefonica Data's fire detection or fire suppression systems, Telefonica Data will replace at its expense all damaged equipment with equipment of similar performance functionality. Notwithstanding the foregoing, if a fire is caused by Customer, Customer's End-User or Customer or its End-User's equipment and Telefonica Data's fire suppression system effectively suppresses the fire, Telefonica Data shall not be obligated to replace the damaged equipment.

- If Telefonica Data suffers any damage to the Premises Address or equipment located therein as a result of a fire caused by Customer or its End-Users or by Customer's or its End-User's equipment, Customer agrees to pay Telefonica Data for all costs reasonably incurred by Telefonica Data related to the repair, replacement and restoration of the Premises Address and its equipment located therein.

### Capacity Management Service Level Objective

- Telefonica Data agrees to provide written notice to Customer whenever a network circuit reaches 50% of such circuit's capacity over a period of fourteen days.

### Redundant Network Feed's Service Level Objective

- Telefonica Data will provide the Customer with redundant network feeds via different ISP's to alleviate the potential of a single point of failure within the Customer's access to the internet via Telefonica Data's infrastructure.

### Network Availability—Public Access Services Service Level Objective

- Telefonica Data will provide Public Access Services in accordance with the following network availability service level objective: Customer's ability to access the Telefonica Data network in the United States (i.e., "up-time"), will be no less than 99.95% during any calendar month. Network unavailability shall be determined by calculating network outages. For purposes of calculating network availability, a "Network Outage" shall mean a complete failure of Public Access Services. A Network Outage will be measured from the minute Customer notifies Telefonica Data of the Network Outage, or Telefonica Data otherwise becomes aware of the Network Outage, until the minute Telefonica

Data notifies Customer that the Network Outage has been resolved. Telefonica Data will provide Customer with monthly reports indicating up-time for all applicable Services.

- If a specific factor causes an Outage and the outage(s) caused by such factor lasts more than eight (8) consecutive hours in any 30 day rolling period (for purposes of this Network Availability -- Public Access Services Service Level Objective, an Outage is defined as a packet loss of greater than 40%), then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises. For purposes of clarification the following are examples that illustrate the intent of the Parties with respect to this provision:

    1. On the fifteenth (15th) day of a calendar month, Customer experiences a Network Outage that lasts for more than eight (8) hours. It is determined that a single factor caused the Network Outage. Under this scenario Customer would have the right to terminate the affected Service.

    2. On the twentieth (20th) day of a calendar month, Customer experiences a Network Outage that lasts for three (3) hours. On the twenty-fifth (25th) day of a calendar month, Customer experiences a Network Outage that lasts for six (6) hours. It is determined that precisely the same factor caused the Network Outages. Under this scenario Customer would have the right to terminate the affected Service.

    3. Same scenario as example 2 above except that it is determined that two different factors caused the Network Outages. Under this scenario Customer would not have the right to terminate the affected Service.

- Network Outages do not include failures due to: (i) regular maintenance during a scheduled window; (ii) network or service upgrades; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer; (v) Customer's equipment, hardware, facilities, or software; or (vi) Force Majeure events.

### Latency Service Level Objectives.

- Telefonica Data shall provide the Services in accordance with the following latency service level objectives 65 milliseconds or less round trip time between any two points in North America, (ii) 120 milliseconds or less round trip time between the United States and Europe, (iii) 120 milliseconds or less round trip time between the United States and South America, (iv) 500 milliseconds or less round trip time between the United States and any other point. Telefonica will continually measure latency between points on its network and will report the average latency in 15 minute periods. In the event that during a 30 day rolling period Telefonica Data fails to provide the Services in accordance with these Latency service level objectives (each such event a "Latency Miss"), Customer may request a credit in accordance with the following table:

| Latency Misses | SERVICE CREDIT |
|---|---|
| More than 3 but less than 10 Latency Misses in a month | 25 % of the MRC for the affected Service |
| 10 or more Latency Misses in a month | an additional 25% of the MRC for the affected Service |
| 2 independent Latency Misses individually greater than 20 times the latency service level objective | an additional 50% of the MRC for the affected Service |

- In addition to the credits above, in the event Customer experiences two independent Latency Misses where the transmission time is greater than 20 times the Latency service level objectives thresholds for which a Latency Miss occurs, Customer, in addition to its right to receive a credit, may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer must provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

### Packet Service Level Objective

- The packet loss service level objective for the Service is less than or equal to one percent (1%). Telefonica will measure the packet loss from anywhere on it's backbone into the Customer equipment and take the average loss in a

fifteen minute period. If for a 30 day rolling period, Telefonica Data fails to meet Packet Loss service level objective, Customer may request a credit as set forth below:

| Excess Packet Loss | SERVICE CREDIT |
|---|---|
| If the failure is >1% but < or = to 5% as measured above more than 3 times in a 30 day rolling period | 25 % of the MRC for the affected Service |
| If the failure is > 5% -but < or = to 30% as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service |
| If the failure is > 30% -but < or = to 40% as measured above more than twice in a 30 day rolling period. | 37.5% of the MRC for the affected Service for the first occurrence, then a further 37.5% for the second occurrence. |
| If the failure is > 40% + as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service for the first occurrence, then a further 50% for the second occurrence. |

- In the event the packet loss failure exceeds criteria four in the above table for two successive 30 day rolling periods, Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice to Telefonica Data; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

## Miscellaneous

- In order to receive any credits under this Schedule C-2, Customer must submit a written request to Telefonica Data no later than the last day of the month immediately following the month in which the service level objective was not met. Upon verification, Telefonica Data shall issue the credit on Customer's next monthly invoice.

- The availability, latency and packet loss service level objectives shall be measured over and between points on the Telefonica Data Network.

- An outage or failure to meet a Service Level Objective a second or multiple times must be for unrelated incidents and cannot be caused by continuation of an ongoing issue in any 72 hour period.

- **THE CREDITS AND TERMINATION RIGHTS SET FORTH HEREIN AND IN THE MSA CONSTITUTE TELEFONICA DATA'S SOLE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY FOR ANY FAILURE OF TELEFONICA DATA TO COMPLY WITH THE SERVICE LEVEL OBJECTIVES.**

- **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN THE CREDITS AND TERMINATION RIGHT SET FORTH HEREIN SHALL NOT BE APPLICABLE DURING ANY PERIOD THAT CUSTOMER HAS FAILED TO PAY UNDISPUTED CHARGES WITH RESPECT TO A TELEFONICA DATA INVOICE WHEN DUE AND SUCH UNDISPUTED CHARGES REMAIN OUTSTANDING.**

*Telefónica*

# EXHIBIT D

## TO

## MASTER SERVICES AGREEMENT

## DATA STORAGE

This DATA STORAGE EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated as of the _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

    **1.1.**    "Customer Data" shall mean all of the data Customer provides to Telefonica Data for Storage.

    **1.2.**    "Hardware, Software and Services" shall mean the hardware, software and services set forth in Schedule D-1.

    **1.3.**    "HBA" shall mean a host bus adapter.

    **1.4.**    "SAN" shall mean a storage area network.

    **1.5.**    "NAS" shall mean network attached storage.

    **1.6.**    "Storage" shall mean the storing of Customer Data on a SAN in accordance with this Exhibit.

    **1.7.**    "Allocated Storage" shall mean total amount of storage supported of which currently used storage is a subset.

2.    **STORAGE.**

    **2.1.**    **Orders.**    Customer shall order Storage pursuant to the ordering provisions in Schedule D-2. Telefonica Data shall use reasonable efforts to provide Storage by the Customer-requested Service Date identified in Schedule D-3.

    **2.2.**    **Obligation.**    Telefonica Data will provide Customer with non-exclusive Storage in accordance with Schedule D-3. Storage shall take place in Telefonica Data's Premises (as that term is defined in the applicable Collocation Exhibit).

    **2.3.**    **Inclusive Services.**    The customer shall provide the equipment, software and services necessary to provide Storage, including, Storage tuning, Connectrix fiber switch installation and customization, SAN design and implementation, SAN software, and HBA cards installation. The foregoing notwithstanding, Customer shall be responsible for providing all HBA hardware directly to Telefonica Data or acquiring all HBA hardware from Telefonica Data. Customer shall pay Telefonica Data for all HBA hardware Telefonica Data obtains in connection with providing the Storage hereunder to Customer.

    **2.4.**    **Backups.**    Customer is solely responsible for backup and archiving the Customer Data.

**2.5.    Scalability.**  Customer shall provide the necessary technical upgrades, such as additional cache memory, fiber channel directors or cables, switches, and similar items, to account for increased Customer demand for Storage, up to the maximum upgrade set forth in Schedule D-1; provided, however, that such upgrades incorporate the Hardware and Software.

**2.6.    Support Services.**  Telefonica Data will provide Customer support services for installation, reconfiguration and modification of the Storage capabilities.

**3.    TERM.**  This Exhibit shall commence on the Effective Date and continue in force during the Term set forth in Schedule D-2, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement.

**4.    PRICES AND PAYMENT TERMS.** In consideration of the Storage provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule D-2, pursuant to the terms and conditions set forth in the Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

CUSTOMER:                                **TELEFONICA DATA USA, INC.**


By: _____          By: _____

Name: _____          Name: _____

Title: _____         Title: _____

Date: _____          Date: _____

Address:_____          Address:    1221 Brickell Avenue, Suite 600
        _____                      Miami, Florida 33131
        _____                      Attn:

Fax: _____          Fax:

Email: _____          Email: _____

D-2

## SCHEDULE D-1

## TO

## DATA STORAGE EXHIBIT

### Hardware, Software and Services Covered By This Agreement

**Lycos Storage West Coast**

- Direct Attached Storage

    o  Hardware Type: Hitachi 9960 - fully redundant storage device.

  Supported Products

    o  MailCity – Data Bases          - 1 Tb
    o  HotStat – Data Warehouse     - 3 Tb

- Network Attached Storage ( NAS )

    o  Hardware Type: NetApp 840 Filers.

  Supported Products

    o  AngelFire                  - 6TB

**Lycos Storage East Coast**

- Direct Attached Storage

    o  Hardware Type: Hitachi 9960 – fully redundant storage device.

  Supported Products

    o  MyLycos                  - 700Gb
    o  Raging Bull              -170 Gb
    o  Data warehouse           - 420 Gb
    o  Portal                   - 1.2 Tb
    o  Small Catalog Query      - 1.1 Tb
    o  TuCows                   - 270 Gb remove

- Network Attached Storage (NAS)

    o  Hardware Type: NetApp 840 Filers.

  Supported Products

    o  Tripod                   - 7Tb
    o  HTML Gear                - 350Gb
    o  MyLycos Staging      - 320Gb
    o  Photo Shop               - 375 Gb

D-3

Total Supported Storage in Terra Bytes (TB)        - 21.905 TB

Maximum supported Storage in Terra Bytes supported  is 25TB of allocated storage.

**SCHEDULE D-2**

**TO**

**DATA STORAGE EXHIBIT**

**Data Storage**

| | |
|---|---|
| **LOCATION AND SERVICE DATE** | |
| Premise Address 1: | Premise Address 2: |
| 11300 NW 25th Street<br>Miami<br>Florida<br>33172 | Insert SC8 address |

Requested Service Date:  **June 1st 2003**

Term:  **36 Months**

**DESCRIPTION OF STORAGE**

See details in section above

Maximum Capacity:  **25 Terrabytes of allocated storage**

**FEES**

Non-Recurring Set-Up Fee:     **N/A**

Recurring Monthly Storage Fee:  **$30,000 per month**

Minimum Commitment:  **$30,000 per month**

# Service Level Objective

### I.    EVENT NOTIFICATION (TO CUSTOMER)

Telefónica Data shall provide initial notice to a designated Customer representative by telephone, e-mail, pager or comparable notification within fifteen (15) minutes of Telefónica Data becoming aware of a Severity One or Severity Two event as defined below.  Should Customer first become aware of such an event, Customer shall promptly provide initial notice to Telefónica Data via the Customer Support Number 1-866-466-2872.  Status reports regarding the event will be forthcoming on the ½ hour until either the event has been resolved or both Telefónica data  and Customer have determined a course of action that does not require continued notification.  At the resolution of a Severity One event, the customer will be sent a written incident report within forty-eight (48) hours.  Monthly incident reports will be provided on all other events.

"Severity One event" shall mean a portion of Customer's Data is not accessible.
"Severity Two event" shall mean that Customer's environment has experienced equipment failure resulting in degraded performance.

*Escalation (Internal)* - The following procedures define the escalation procedures that Telefónica Data will implement during an Unscheduled Outage as defined below:

*Telefónica Data EMSC* Level 1 Support shall use reasonable efforts to identify the cause of the outage and escalate to the Telefónica Data Maintenance Engineer during the first quarter hour of an outage.

*Telefónica Data* will notify Customer Level 2 Support as follows:

- Customer First Escalation Contact at the beginning of the second quarter hour;

-  If Telefónica Data is unable to contact Customer's First Escalation Contact, Telefónica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

- If Telefónica Data is unable to contact Customer's Second Escalation Contact, Telefónica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

-  Customer's First, Second and Third Escalation Contacts are identified in Annex (TBA), attached hereto. Customer shall provide immediate written notice of any changes to Annex (TBA) to Telefónica Data.

"Unscheduled Outages" shall mean interruptions in services arising from failures associated with services provided by Telefónica Data or a Force Majeure Event.

## II.    CHANGE MANAGEMENT

Unless otherwise provided in the Agreement, Exhibits, or Schedules, Customer will be provided at least five (5) business days prior written notice of any changes to be made by Telefónica Data that affect the Services.  However, if shorter notification period is required, changes will be made with the agreement of Customer.  Telefónica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefónica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon Customer's and Telefónica Data's requirements.  If an outage is required, such outage will be considered a Scheduled Outage.  At the time Telefónica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage.  In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Telefónica Datawill work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA.  Telefónica Data reserves the right, however, to proceed with any change if it is determined, by Telefónica Data, that the change will not cause harm to Customer's specific environment and/or is otherwise necessary. Customer is required to provide prior notification to Telefónica Data of any changes to its configurations

that interface with the provided Services.

Telefónica Data VP of Operations is responsible for the project management of all changes to services provided to the Customer.

*Telefónica*

# EXHIBIT G

## TO

## MASTER SERVICES AGREEMENT

### HOSTING SERVICES (Backup)

This HOSTING SERVICES EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

1.1 **"End User Content"** shall mean all text, words, names, likenesses, trademarks, logos, artwork, graphics, video, audio, HTML coding, domain names, image maps, links, software applications, or other content that appear on, or are uploaded to, an End User Web site.

1.2 **"Hosting Services"** shall mean those hosting services Telefonica Data provides to Customer as described herein. All hardware, software, materials, and other items associated with the delivery of Hosting Services to Customer by Telefonica Data will be operated and maintained, for the fees listed in Schedule G-1, by Telefonica Data, regardless of whether such hardware, software, materials, and other items are owned or leased by the Customer or Telefonica Data.

1.3 **"Service Misuse"** shall mean use of the Hosting Service in a manner that (a) may or does expose Telefonica Data to legal liability, (b) that violates any applicable law or regulation or Telefonica Data's Internet Acceptable Use Policy attached hereto in Schedule G-3, (c) is illegal, unlawful or harassing, (d) infringes upon Telefonica Data's or another's Intellectual Property Rights, or (e) otherwise abuses the integrity of any applicable network.

2.    **GENERAL OBLIGATIONS.** Subject to the terms and conditions of this Exhibit and the Agreement, Telefonica Data and Customer shall have the following general obligations.

2.1 **Telefonica Data.**

1.1. Hosting Services. Telefonica Data will provide Hosting Services to Customer in accordance with this Exhibit. Customer may elect, at its sole discretion, to resell Hosting Services to End Users. Telefonica Data shall provide all necessary hardware, software, materials and other items (except End User Content) for implementing the Hosting Services.

(a) End User Compliance. Telefonica Data reserves the right to review, using reasonable commercial means, and in its sole discretion, End User Content, including Web pages, to determine whether use thereof complies with the terms of this Exhibit.

(b) Related Services.

(i)    Maintenance. Telefonica Data shall provide maintenance services with respect to the Hosting Services in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

(ii)    Support. Telefonica Data shall provide support services with respect to the Hosting Services solely in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

### 2.2.    Customer

(a) <u>Content Development</u>.    Telefonica Data shall not be liable for any project management, development, operation, and End User content for the End User Web site(s), or any costs associated therewith. Customer or its End User shall be solely responsible for creating, coding, integrating, testing, and uploading End User Content.    Customer and its End User shall be solely responsible for maintaining authorizations and secure means to access and transfer End User Content to End User's Web site(s) using a remote access option provided by Telefonica Data. Telefonica Data reserves the right to alter the access options at its discretion in order to maintain the integrity of Telefonica Data's Internet operations and the Web sites of other hosting customers. Telefonica Data will promptly inform Customer of such changes.

(b) <u>Marketing</u>.    If Customer elects to resell the Hosting Services to End Users, then Customer will use its commercially reasonable efforts to promote the sale of Hosting Services to its End Users consistent with good business ethics and in a manner that will reflect favorably upon the Hosting Services. Customer shall identify Telefonica Data as the provider of Hosting Services by using, pursuant to Section 7.2 of this Exhibit, the Telefonica Data logo and the statement "Customer Web site hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify Customer from time to time. Customer shall refrain from engaging in any illegal, unfair, or deceptive trade practices, unethical business practices or making any representations or warrants inconsistent with the specifications provided by Telefonica Data with respect to the promotion or resale of the Hosting Services.

(c) <u>End User Terms and Conditions</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to agree in writing to comply with and Customer shall cause each End User to so comply with an enforceable written agreement that is at least as protective as Telefonica Data and its rights and as least as limiting with respect to Telefonica Data's liability as the terms set forth herein and the Agreement.

(d) <u>End User Content</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to grant to Customer a sub-licensable, worldwide, limited, royalty-free, non-exclusive license to upload, display, distribute, copy and store End User Content in connection with the Hosting Services.    Customer shall automatically grant Telefonica Data a sublicense with respect to End User Content in connection with the Hosting Services. Customer shall incorporate into its agreements with End Users language stating the following:

> "Except for software provided by Customer or any of Customer's third-party partners that is bundled with the Hosting Services or purchased separately from Customer or any of Customer's third-party partners, End User hereby represents and warrants that: (i) End User is the owner, valid licensee, or authorized user of End User's Web site and each element thereof; (ii) the use of the End User's Web site will not infringe any Intellectual Property right of any third party, or constitute a defamation, invasion of privacy, or violation of any right of publicity or other third party right; (iii) End User's Web site complies with all legislation, rules, and regulations of all applicable jurisdictions; (iv) End User's Web site is and will remain accurate and correct in all respects; and (v) End User's Web site shall be free from viruses, worms, Trojan horses, and other malicious code."

(e) <u>Service Misuses</u>. If Customer elects to resell the Hosting Services to End Users, then Customer is responsible for providing an operations support function that operates on a 24 hour a day, seven day a week basis and is able to fully respond if any End User engages in Service Misuse including (i) giving Telefonica Data a telephone number and e-mail address to use to notify Customer if Telefonica Data becomes aware that an End User is engaging in Service Misuse, and (ii) having the ability to suspend or block access to Hosting Service for an End User within sixty (60) minutes of Customer's receipt of a call or e-mail from Telefonica Data stating that the End User is engaging in Service Misuse.

(f) <u>Security and Privacy</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require an acknowledgment from each End User that there is no guarantee of security or privacy on the Internet, and Customer shall make no guarantee on behalf of Telefonica Data or for which Telefonica Data has any responsibility that an End User's Web site(s) or End User Content will be secure or private.

(g) <u>Non-Telefonica Data Supported Software.</u> If Customer elects to resell the Hosting Services to End Users, then Customer shall incorporate into its agreements with End Users language stating that all risks associated with the use of software on End User's Web site that is not supported by Telefonica Data is borne solely by the End User. Customer shall be solely liable for all damages resulting or arising from the use or loading of any software not supported by Telefonica Data onto End User's Web site which results in damages to End User's Web site or to any other Telefonica Data customer's Web site, or causes a failure or outage in the Hosting Services provided to End User or other End Users. CUSTOMER AGREES TO PAY TELEFONICA DATA ALL AMOUNTS INCURRED BY TELEFONICA DATA FOR WORK ARISING FROM CUSTOMER'S OR ANY END USER'S USE OF NON-SUPPORTED SOFTWARE.

(h) <u>Customer Provided Support</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall provide, at no cost to Telefonica Data, first level support via a Customer-provided toll-free number to End Users. First level support shall include, but is not limited to, issues related to account numbers, names, addresses, phone numbers, billing inquiries, cancellations, disconnections, reconnections of service, and access to Hosting Services, including interruption in Hosting Services caused by or under the control of Telefonica Data.

(i) <u>Approvals, Licenses</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall be responsible for having and keeping in place all licenses and other governmental approvals Customer needs, if any, for reselling Hosting Service. Customer shall comply with all applicable laws and regulations regarding reselling Hosting Service.

(j) <u>Configuration.</u> Telefonica Data's obligation to provide Hosting Services is contingent upon Customer providing its hardware and software configuration requirements to Telefonica Data in a manner reasonably acceptable to Telefonica Data. IN NO EVENT SHALL TELEFONICA DATA BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING AS A RESULT OF TELEFONICA DATA'S COMPLIANCE WITH CUSTOMER'S CONFIGURATION REQUIREMENTS.

**2.3. Mutual.**

(a) <u>General Obligations</u>. Each Party shall: (i) notify the other promptly of any perceived degradation in the Hosting Services and cooperate with the other Party to the fullest extent possible in order to determine the cause of and resolve any such degradation; (ii) comply fully with all applicable federal, state and local laws including regulations and ordinances relating to the Hosting Services to be provided hereunder and the resale of the Hosting Services to the End Users, and (iii) otherwise comply with the terms and conditions as set forth herein.

(b) <u>Customer Representative</u>. The Parties each will provide a single point of contact for administration of this Exhibit. The Parties shall cooperate with each other in the performance and delivery of the Hosting Services hereunder.

**3. ORDERING.** Customer shall order Hosting Services pursuant to the ordering provisions in Schedule G-1. Telefonica Data shall use commercially reasonable efforts to provide Hosting Services to Customer by the Customer-requested Service Start Date.

**4. BACKUPS.** In exchange for the "Backup Services" fees set forth in Schedule G-1, Telefonica Data will regularly, and on at least a weekly basis, and upon termination of this Exhibit, backup all Customer software, content, and data. If Customer elects to resell the Hosting Services to End Users, then the aforementioned backup shall include End Users' Web sites. Upon termination of this Exhibit, Telefonica Data will place all servers containing Customer and End User data in suspended mode for a period of seven (7) Days, during which time Customer or End Users may, at their sole expense, backup their respective data. Customer shall advise End User to perform independent backups of Web site information; or alternatively, Telefonica Data will provide Customer with copies of Telefonica Data's backups, the cost of copying the backups to be paid by Customer in addition to the Hosting Services fees. Customer shall ensure that each End User understands that Telefonica Data has no duty of care to any End User to perform backups of End User's Web site. Customer shall ensure that End User further understands that no bailment is intended by archiving, and Telefonica Data has no duty of care to End User to safekeep the archival backup. THE COPY TO BE MADE AT CUSTOMER'S COST SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR ANY DAMAGE TO OR LOSS OF SOFTWARE, DATA, CONTENT, OR OTHER INFORMATION ON END USER'S WEB SITE.

**5.    OWNERSHIP OF INTELLECTUAL PROPERTY.**

**5.1.    Generally.**  Except for End User Content, Telefonica Data shall own all right, title and interest, including Intellectual Property Rights, in and to the hardware, software, materials and other items (collectively, "Telefonica Data Equipment") necessary for implementing the Hosting Services.

**5.2.    Logo Use.**

(a)  Grant.  Telefonica Data grants to Customer a limited, nonexclusive, worldwide, royalty-free right to use the Telefonica Data logo provided by Telefonica Data to Customer on Customer's Web site and in promotional materials for Hosting Services during the term of this Exhibit solely for the purposes of (a) identifying Telefonica Data as the provider of Hosting Service, and (b) identifying Customer as a partner of Telefonica Data. Telefonica Data will provide Customer with a copy of Telefonica Data's logo (which may be in electronic form) and guidelines for its proper use. The Telefonica Data logo will be accompanied by the statement "Customer Web site Hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify to Customer from time to time. All references herein to the Telefonica Data logo shall include both the logo and the preceding statement.

(b)  Restrictions.  Use of Telefonica Data's logo by Customer shall be submitted to Telefonica Data for its prior review and approval. Customer will ensure that sufficient space, as agreed by the Parties, surrounds Telefonica Data's logo and that no graphic elements or text encroach upon Telefonica Data's logo, and that no text or graphics are hidden behind Telefonica Data's logo. Customer agrees to use Telefonica Data's logo only in the form and manner prescribed in Telefonica Data's guidelines for proper use of its logo. The Telefonica Data logo may be used by Customer as a link to a Telefonica Data Web site if so approved in advance by Telefonica Data. Under no circumstances will Customer use the Telefonica Data logo to link to any Web site other than a Telefonica Data Web site. Customer acknowledges that it shall not obtain any rights, title or interest in or to Telefonica Data's name or logo and any use of such name and logo shall inure solely to the benefit of Telefonica Data. Telefonica Data may withdraw Customer's right to use Telefonica Data's logo granted herein upon written notice to Customer. In the event of either Customer's receipt of notice from Telefonica Data withdrawing the right to use Telefonica Data's logo or termination of this Exhibit or the Agreement, Customer shall immediately cease all use of Telefonica Data's logo and remove Telefonica Data's logo from Customer's Web site.

**6.    PRICES AND PAYMENT TERMS**

**6.1.    Fee Schedule.**  Customer shall pay Telefonica Data the fees specified in Schedule G-1 of this Exhibit for the Hosting Services pursuant to the payment provisions in the Agreement.

**6.2.    Adjustments.**  Telefonica Data reserves the right to modify the fee schedule at any time by issuance of a revised fee schedule. Orders placed pursuant to Article 3 and received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all orders placed pursuant to Article 3 and accepted by Telefonica Data after the date of issuance of a revised fee schedule.

**7.    TERM AND TERMINATION**

**7.1.    Term.**  This Exhibit shall become effective on the date that it is signed by both parties and shall continue until the third anniversary of the Full Service Start Date, unless earlier terminated in accordance with this Exhibit and the Agreement.

**7.2.    Suspension of End User Service.**  If Customer elects to resell the Hosting Services to End Users, then in addition to its rights of termination, Telefonica Data may suspend the provision of Hosting Services to a specific End User immediately and indefinitely if Telefonica Data, in its sole discretion, determines any of the following:  (a) End User's Web site or use of the End User's Web site could cause liability to Telefonica Data; (b) End User posts material on the Web site that is threatening, abusive, harassing, indecent, pornographic or otherwise obscene, or that is libelous, defamatory or that violates any privacy rights; (c) End User conducts business practices on and through the Web site that Telefonica Data in its sole discretion determines to be illegal, deceptive, or otherwise constitute a misuse of the Web site, including, but not limited to, the practices known as "spamming"; (d)

End User uses the Web site, or develops or operates the Web site so that third parties use the Web site, in violation of the Internet AUP; (e) End User operates the Web site in such a manner so as to interfere with the use of products or services by other Telefonica Data customers or with third party systems, networks or services, or to engage in use of another party's account without authorization, or to engage in any activity intended to defeat security measures, or to distribute or post software or other material in violation of any export law or other governmental regulation, or to intentionally distribute software containing malicious code such as viruses and hacker tools; (f) Customer fails to make payments due to Telefonica Data according to the payment provisions of the Agreement; (g) End User becomes insolvent or ceases its normal business operations, or fails to comply with any of the provisions in this Exhibit relating to financial responsibility; or (h) Telefonica Data reasonably suspects that End User is engaged in misuse of the Hosting Service. Telefonica Data's rights to suspend service above shall be in addition to, and shall not be superseded by, Telefonica Data's rights of suspension under the Digital Millennium Copyright Act provisions detailed below.

    **7.3.    Resumption of Hosting Services.** Upon cure by Customer or, if Customer elects to resell the Hosting Services to End Users, an End User of the cause for suspension of Hosting Services to the satisfaction of Telefonica Data, including the provision of reasonable assurances that the cause of suspension shall not reoccur, and upon Customer's request, Telefonica Data may reinstate the provision of Hosting Services, subject to the payment by Customer of additional charges incurred by Telefonica Data in reinstating the Hosting Services. Telefonica Data may terminate the Hosting Service if Customer or End User does not cure the cause of a Service suspension or Customer does not pay the associated additional charges for Telefonica Data resuming the Service. In such an event, Customer (in addition to any other remedy available to Telefonica Data) will pay any termination fee described herein.

    **7.4.    Termination Procedures**. Upon termination of this Exhibit, Telefonica Data may immediately remove Customer's Web Site and, if Customer elects to resell the Hosting Services to End Users, End User's Web site from its servers and re-deploy its servers to other purposes subject to the provision giving End User the opportunity to backup the Web site during the seven (7) Day suspended mode period described in Section 4.

**8.    INDEMNITY.** In addition to the indemnity provisions set forth in the Agreement, Customer agrees to indemnify and hold harmless Telefonica Data: (a) if Customer elects to resell the Hosting Services to End Users, against any claims by End User's Web site users or other third parties based on right of privacy, right of publicity, infringement of Intellectual Property Rights, misappropriation, or other claims, whether in contract or tort and whether statutory or at common law; (b) against all claims by End User's Web site users or other third parties arising from Telefonica Data's compliance with any subpoena or other judicial or governmental directive requesting information from Telefonica Data that is contained on End User's Web site; (c) against all claims by End Users whose Web site(s) reside on shared servers, for any claim by another customer sharing the same server with End User if such other customer's claim alleges damages arising out of or relating to use of End User's Web site(s) and/or End User Content; and (d) against claims arising from or related to Telefonica Data's compliance with Customer's configuration requirements.

    **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:<br>**LYCOS** | | Telefonica Data:<br>**TELEFONICA USA, INC.** | |
|---|---|---|---|
| **By:** | _____ | **By:** | _____ |
| | *(Signature)* | | *(Signature)* |
| **Printed Name:** | _____ | **Printed Name:** | Pete Pizarro |
| **Title:** | _____ | **Title:** | CEO |
| **Date:** | _____ | **Date:** | _____ |
| **Address:** | _____ | **Address:** | 1221 Brickell Avenue, Suite 600 |
| | _____ | | Miami, Florida 33131 |
| **Fax:** | _____ | **Fax:** | _____ |
| **E-Mail:** | _____ | **E-Mail:** | ppizarro@us.telefonica-data.com |

**SCHEDULE G-1**

**TO**

**HOSTING SERVICES EXHIBIT**

**Pricing**

The cost for Data back up is outlined below.  Customer commits to a minimum monthly back-up of at least 4 TB of Data., For any month where the volume of Customer Data backed up by Telefonica Data is equal to or less than 4 TB, Customer will be billed for, and agrees to pay, charges equal to the back-up of 4TB of Data.  This price is for all Customer Data backed up at Telefonica Data Miami data center.

Telefonica Data will make six standard daily incremental backups and these daily back-ups will be retained off site for one week.  Telefonica Data will make full weekly backups that will be retained off site for a month.  Telefonica Data will make 12 full monthly backups that will be retained off site.

This pricing for the Services to be provided under this Exhibit does not include any servers, cards or connections that may be needed to attach Customer's storage to the Telefonica Data solution.  The Parties shall mutually determine what servers, cards or connections are necessary and the Parties shall mutually agree upon the charges that Customer shall pay for such servers, cards or connections.

Customer must purchase all tapes required for the rotation of backups.

|  | Service | Backup/ GB |
|---|---|---|
|  | 4 TerraBytes | $2.20 |
|  | 5 TerraBytes | $2.00 |
|  | 6 TerraBytes | $1.80 |
|  | 7 TerraBytes | $1.65 |
|  | 8 TerraBytes | $1.50 |
|  | 9 TerraBytes | $1.35 |
|  | 10 TerraBytes | $1.25 |

SCHEDULE G-2

TO

HOSTING SERVICES EXHIBIT

**Service Level Agreement**

### 1. Managed Backup

Telefonica Data will attempt to restart failed backups three times before notifying the customer of the failure. In the event that the backups continue to fail, Telefonica Data will notify Customer prior to 8:00am ET the following day to determine how Customer wishes to proceed. These times and numbers serve as a baseline and may be modified by the Parties during the creation of the Runbook.

- o Credits for failure to meet the Managed Backup Service Level Objectives are as follows

  - Customer shall receive a credit equal to $20 per failure to retry the job the appropriate number of times or failure to notify Customer within the appropriate time frame.

  - The credits for any one instance in a month can never exceed $1,000 and the total credits for a month may not exceed the monthly recurring charges for the affected Service for such month.

**SCHEDULE G-3**

**TO**

**HOSTING EXHIBIT G**

**TELEFONICA DATA ACCEPTABLE USE POLICY**

This acceptable use policy ("AUP") covers (1) TDUSA' customer's (the "Customer") (and the Customer's customers, agents and users) use of and access to TDUSA' facilities (e.g. Internet Data Centers); (2) Customer's (and its customers, agents and users) use of the TDUSA online services; and (3) TDUSA' maintenance of the services it provides to its Customers.

#### ACCESS TO INTERNET DATA CENTERS

Only those individuals identified in writing by Customer on the Customer Registration Form ("Representatives") may access the Internet Data Centers. Customer shall deliver prior written notice to TDUSA of any changes to the Customer Registration Form and the list of Representatives. Customer and its Representatives shall not allow any unauthorized persons to have access to or enter any Internet Data Centers. Customer and its Representatives may only access the Customer Area, unless otherwise approved and accompanied by an authorized TDUSA representative.

#### USE OF INTERNET DATA CENTER FACILITY

*Conduct at Internet Data Centers.* Customer and its Representatives agree to adhere to and abide by all security and safety measures established by TDUSA. Customer and its Representatives shall also not do or participate in any of the following: (1) misuse or abuse any TDUSA property or equipment or third party equipment; (2) make any unauthorized use of or interfere with any property or equipment of any other TDUSA Customer; (3) harass any individual, including TDUSA personnel and representatives of other TDUSA Customers; or (4) engage in any activity that is in violation of the law or aids or assists any criminal activity while on TDUSA property or in connection with the Internet Data Center Services.

*Prohibited Items.* Customer and its Representatives shall keep each Customer Area clean at all times. It is each Customer's responsibility to keep its area clean and free and clear of debris and refuse. Customer shall not, except as otherwise agreed to in writing by TDUSA, (1) place any computer hardware or other equipment in the Customer Area that has not been identified in writing to TDUSA; (2) store any paper products or other combustible materials of any kind in the Customer Area (other than equipment manuals); and (3) bring any Prohibited Materials (as defined below) into any Internet Data Center. "Prohibited Materials" shall include, but not limited to, the following and any similar items:

- food and drink;
- tobacco products;
- explosives and weapons;
- hazardous materials;
- alcohol, illegal drugs and other intoxicants;
- electro-magnetic devices which could unreasonably interfere with computer and telecommunications equipment;
- radioactive materials; and
- photographic or recording equipment of any kind (other than tape back-up equipment).

#### EQUIPMENT AND CONNECTIONS

*Customer Equipment.* Each connection to and from a piece of Customer Equipment shall be clearly labeled with Customer's name (or code name provided in writing to TDUSA) and the starting and ending point of the connection. Customer Equipment must be configured and run at all times in compliance with the manufacturer's specifications, including power outlet, power consumption and clearance requirements. Customer must use its best efforts to provide TDUSA with at least 48 hours prior notice any time it intends to connect or disconnect any Customer Equipment or other equipment.

## MAINTENANCE

TDUSA will conduct routine scheduled maintenance of its Data Center only according to its regularly scheduled maintenance schedule. In the event a mission critical maintenance situation arises, TDUSA may be required to perform emergency maintenance at any time. During these scheduled and emergency maintenance periods, Customer's Equipment may be unable to transmit and receive data, and Customer may be unable to access the Customer Equipment. Customer agrees to cooperate with TDUSA during the scheduled and emergency maintenance periods.

### ONLINE CONDUCT

*Customer Content.* Customer acknowledges that TDUSA exercises no control whatsoever over the content of the information passing through Customer's site(s) and that it is the sole responsibility of Customer to ensure that the information it and its users transmit and receive complies with all applicable laws and regulations and this AUP.

*Prohibited Activities.* Customer will not, and will not permit any persons ("Users") using Customer's online facilities and/or services, including, but not limited to, Customer's Web site(s) and transmission capabilities, to do any of the following ("Prohibited Activities"):

- send unsolicited commercial messages or communications in any form ("SPAM");
- engage in any activities or actions that infringe or misappropriate the intellectual property rights of others, including, but not limited to, using third party copyrighted materials without appropriate permission, using third party trademarks without appropriate permission or attribution, and using or distributing third party information protected as a trade secret information in violation of a duty of confidentiality;
- engage in any activities or actions that would violate the personal privacy rights of others, including, but not limited to, collecting and distributing information about Internet users without their permission, except as permitted by applicable law;
- send, post or host harassing, abusive, libelous or obscene materials or assist in any similar activities related thereto;
- intentionally omit, delete, forge or misrepresent transmission information, including headers, return mailing and Internet protocol addresses;
- engage in any activities or actions intended to withhold or cloak Customer's or its Users' identity or contact information;
- use the TDUSA connectivity services for any illegal purposes, in violation of any applicable laws or regulations or in violation of the rules of any other service providers, web sites, chat rooms or the like; and
- assist or permit any persons in engaging in any of the activities described above.

If Customer becomes aware of any Prohibited Activities, Customer will use best efforts to remedy such Prohibited Activities immediately, including, if necessary, limiting or terminating User's access to Customer's online facilities.

***Third Party Complaint Process.*** TDUSA routinely receives written complaints ("Complaints") from third parties regarding Prohibited Activities allegedly being conducted by a Customer or its Users. Due to the nature of TDUSA' business, in TDUSA' experience, most legitimate complaints and actual Prohibited Activity is conducted by Customers and users of TDUSA' Customers, not by TDUSA' Customers themselves. TDUSA requires its Customers to use policies similar to this AUP and will work with its Customers to resolve violations. TDUSA will take the following actions to document and resolve each Complaint received by TDUSA related to a Customer or its Users.

<u>First Complaint</u>. Upon receipt of the initial complaint from a third party regarding Prohibited Activity by a Customer or its User, TDUSA will send a letter (the "First Letter") to the complaining third party that describes TDUSA' policies related to the Prohibited Activity and lists the contact information for the Customer and encloses a copy of the original Complaint received by TDUSA. TDUSA also will deliver notice of the Complaint to the Customer by sending a copy of the same letter to the Customer via e-mail to its abuse address so that Customer can identify and remedy the Prohibited Activity. TDUSA's goal is to put the complainant directly in touch with the party in the best position to remedy the problem, TDUSA' Customer who has the relationship with the alleged violator.

<u>Second Complaint</u>. Upon receipt of a second complaint after the date of the First Letter related to the same or similar Prohibited Activity of Customer described in the First Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a second letter (the "Second Letter") with a copy of the second complaint to the Customer and request that Customer respond in writing to TDUSA with an explanation and timeline of the actions to be taken by Customer to remedy Prohibited Activity. In the event that Customer does not respond to the TDUSA' Second Letter and remedy the

Prohibited Activity within ten (10) business days, TDUSA will bill Customer in the following month $500 to cover TDUSA' administrative costs associated with the Prohibited Activities of Customer.

<u>Third Complaint</u>. Upon receipt of a third complaint after the date of the Second Letter related to the same or similar Prohibited Activity of Customer described in the Second Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a third and final letter (the "Third Letter") with a copy of the third complaint to the Customer and request again that the Prohibited Activity cease immediately. In the event that the Prohibited Activity does not cease within five (5) business days, TDUSA will terminate or suspend its connectivity service to its Customer, and will only resume providing service when it receives adequate assurances that such activity will not continue. TDUSA will also bill its Customer $5,000 to cover TDUSA' administrative costs associated with the Prohibited Activities.

***Suspension and Termination of Service***. TDUSA reserves the right to suspend and/or terminate a Customer's Service at any time for any material failure of Customer, its Representatives or its Users to comply with these AUP.

#### SUPPLEMENTAL SERVICES

Subject to the terms and conditions set forth in the Agreement, TDUSA may, from time to time, provide Customer with certain limited services and equipment needed and requested by Customer on a "one-off" or emergency basis ("Supplemental Services") where such services are not included within the scope of the Services purchased by Customer. Customer will be charged for all Supplemental Services provided Customer. TDUSA has no obligation to determine the need for or provide Supplemental Services. All Supplemental Services are provided on an "as-is" basis and exclude warranties of any kind, whether express or implied.

*Telefónica*



# EXHIBIT I

## TO

## MASTER SERVICES AGREEMENT

## ATM

This ATM EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 20, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS**

    **1.1.**    **"Customer CPE"** shall mean all Customer premises equipment other than the Equipment and the Software.

    **1.2.**    **"ATM Service"** shall mean switched data asynchronous transfer mode service, including any Telefonica Data furnished equipment and software (respectively "Equipment and Software") used at the Customer's premises to provide the switched data ATM Service.

    **1.3.**    **"Service Start Date"** shall mean the date when the ATM Service is operational and ready for use between two of Customer's premises.

2.    **ORDERING, INSTALLATION, USE AND MAINTENANCE**

    **2.1.**    **Orders.** Customer shall order ATM Services pursuant to the ordering provisions in Schedule I-1.

    **2.2.**    **Service Start Date.** Telefonica Data shall use commercially reasonable efforts to provide the ATM Service by the applicable Customer-requested Service Start Date identified in Schedule I-1.

    **2.3.**    **Preparations.** To facilitate the installation and maintenance of the ATM Service, Customer shall: (i) prepare its premises as necessary; (ii) provide any inside wiring required to interconnect local access lines to the Equipment, and (iii) provide Telefonica Data with access to the Equipment and software and provide security as reasonably required by Telefonica Data.

    **2.4.**    **Acceptance.** Telefonica Data shall notify Customer of the Service Start Date. Unless Customer notifies Telefonica Data's network control personnel within five (5) Days after the Service Start Date that it has demonstrated that ATM Service is not operational and ready for Customer's use, ATM Service between such sites shall be deemed accepted by Customer as of the Service Start Date, and Customer shall pay for such ATM Service as of such date.

    **2.5.**    **Relocation.** Customer may request ATM Service to be moved (i.e., disconnected from one location and reconnected at another location) subject to reasonable ATM Service interruption and payment of Telefonica Data's then-standard applicable relocation charges.

    **2.6.**    **Maintenance.** Telefonica Data shall maintain the ATM Service, including establishing regularly scheduled maintenance periods. Maintenance of the Equipment and Software is provided as a part of the ATM Service at no additional charge to Customer unless such charges are (i) specifically set forth in this Exhibit, (ii) for maintenance which is necessitated by unauthorized maintenance or other acts or omissions of Customer or others, or (iii) for technical assistance or support with respect to any Customer CPE which is used in conjunction with the ATM Service, including, without limitation, assistance in connecting the Customer CPE to the Equipment and support in identifying and/or correcting problems within the Customer CPE. In the case of Subsections (ii) or (iii), Telefonica Data's then-standard dispatch ATM Service charge(s) shall apply.

**2.7.     Surrender of Equipment and Software.** Customer shall surrender the Equipment and Software to Telefonica Data promptly upon the discontinuance of the ATM Service for which it was being used, in the same condition as delivered, reasonable wear only excepted. If Equipment and Software is not so surrendered, Customer shall pay Telefonica Data any additional charges resulting therefrom.

**2.8.     Contingency.** Telefonica Data will operate and maintain the ATM Service, contingent upon Telefonica Data's (a) ability to maintain necessary licenses or permissions, and (b) availability of network capacity and connections.

**3.     PRICES AND PAYMENT TERMS**

**3.1.     Fees.** Customer shall pay Telefonica Data the recurring, non-recurring and other charges set forth in Schedule I-2 in accordance with the payment terms and conditions of the Agreement. Telefonica Data reserves the right to modify the fees at any time by issuance of a revised fee schedule, which such modifications will only apply to new Orders for Services as set forth in this Section 3.1. New Orders for Services received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance of the revised fee schedule, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all new Orders for Services accepted by Telefonica Data after the date of issuance of a revised fee schedule.

**3.2.     Commitment.** Charges for ATM Service for which Customer has made a minimum term commitment of twelve months shall remain fixed for the term commitment period; provided, however, that Telefonica Data may revise its charges upon thirty (30) Days advance written notice if the carrier(s) providing local access increase their charges to Telefonica Data. Unless otherwise provided for in the Order for Service, charges for ATM Service for which Customer has not made a term commitment of at least twelve (12) months are subject to modification by Telefonica Data upon at least sixty (60) Days prior written notice to Customer.

**4.     TERM; TERMINATION; AND DELAY**

**4.1. Term.** The term of this Exhibit shall commence on the date accepted by Telefonica Data (the "Effective Date") and shall continue until the second anniversary of the Effective Date, unless earlier terminated in accordance with this Exhibit or the Agreement.

**4.2.     Termination.** This Exhibit may be terminated in accordance with the termination provisions of the Agreement. In addition, Customer may terminate a particular ATM Service upon sixty (60) Days advance written notice to Telefonica Data provided that termination occurs prior to the expiration date of that ATM Service's term commitment and Customer pays a termination charge (as an early discontinuance of ATM Service fee and not as a penalty) to Telefonica Data equal to the sum of the monthly charges for the ATM Service multiplied by the number of months remaining in the term commitment.

**4.3.     Effect.** Upon termination, Customer shall immediately (i) cease utilizing the ATM Service, (ii) pay Telefonica Data for all charges incurred by Customer through the date such ATM Service is discontinued, and (iii) pay any applicable termination charges (as an early discontinuance fee and not as a penalty) as set forth above and/or elsewhere in this Exhibit.

**5.     LIABILITY, WARRANTY, SOFTWARE, TITLE AND RISK OF LOSS**

**5.1.     Liability.** If the ATM Service or any portion thereof is unavailable to Customer due to a total or partial interruption of the ATM Service, Telefonica Data's sole obligation, and Customer's sole and exclusive remedy with respect to such interruption of ATM Services shall be for Customer to request and Telefonica Data to provide a pro rata credit for the period and for the portion of the ATM Service affected during which the ATM Service or any part thereof was unavailable to Customer. Telefonica Data's maximum liability for any damages arising out of or related to this Exhibit shall not exceed the total charges for the ATM Services provided under this Exhibit during the month in which such liability arises.

**5.2.     Software.** Customer shall use Software (whether embedded in hardware as firmware or otherwise) and any related documentation only with Equipment, if any, and the ATM Service. Customer shall not (i) reproduce, reverse engineer, disassemble, decompile, modify, adapt, translate, create derivative works from, or transfer or transmit the Software in any form or by any means, or (ii) use the Software for any purpose other than as set forth in

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

5.3. **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| | |
|---|---|
| CUSTOMER:. | Accepted by Telefonica Data: |
| Lycos, Inc. | **TELEFONICA DATA USA, INC.** |
| By: | By: |
| Name: Vish Yelsangikar Bela P. Lucy | Name: ANTONIO BERNARDOS |
| Title: Network Operations & Security Manager CFO | Title: EVP |
| Date: 28 January, 2004 | Date: 02/04/04 |
| Address: | Address: 1221 Brickell Avenue, Suite 600 |
| | Miami, Florida 33131 |
| | Attn: |
| Fax: | Fax: |
| Email: vish.yelsangikar@corp.terralycos.com | Email: |

REVIEWED BY
TERRA LYCOS LEGAL___PDL

this paragraph.  Customer shall not have any ownership rights in, or obtain rights to, the Software.  If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

     **5.3.**    **Title and Risk of Loss.**  Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s).  Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software.  Risk of loss for Equipment and Software shall pass to Customer upon delivery of  Equipment and Software to Customer's premises.

     **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

CUSTOMER:.

_Lycos, Inc._

By: _Brian D. Lyc_
Name: ~~Vish Yelsangikar~~ Brian D. Lyc
Title: ~~Network Operations & Security Manager~~ CFO
Date: _28_ January, 2004
Address: _____
     _____
     _____
Fax: _____
Email: ~~vish.yelsangikar@corp.terralycos.com~~

Accepted by Telefonica Data:
**TELEFONICA DATA USA, INC.**

By: _____
Name: _____
Title: _____
Date: _____
Address: 1221 Brickell Avenue, Suite 600
     Miami, Florida 33131
     Attn:
Fax: _____
Email: _____

REVIEWED BY
TERRA LYCOS LEGAL _PDL_

**SCHEDULE I-1**

**TO**

**EXHIBIT I**

<u>**Order Form**</u>



C:\Documents and
Settings\JRiggs\Desk

**Service Start Date:** <u>**9 January, 2004**</u>

**Telefónica Data**

| | | |
|---|---|---|
| Number of order | Order Form  900 | |
| GAM | Zeke Rodriguez | |
| GAE | Jim Riggs | |
| Order Date | | |
| Term | 1 Year  ✓ | 2 Years | 3 Years |

| COMPANY | Terra Lycos, L.L.C. | Billing Contact | Terra Lycos | CPM | Pablo A. Gamham |
|---|---|---|---|---|---|
| Contact | Vish Yelsangikar | Phone | Vish Yelsangikar | Phone | 305-925-6224 |
| Fax | 650-428-5241 | Fax | | Cell | 305-915-3200 |
| E-mail | vish.yelsangikar@corp.terralycos.com | E-mail | vish.yelsangikar@corp.terralycos.com | E-mail | pgamham@us.telefonica-data.com |

| Address | | Billing | |
|---|---|---|---|
| NPA-Nxx | | Information | |
| Full Number | | & Contacts | |
| | | (All Countries) | |

| Customer Type: | | Change of service | Renewal | Upgrade | Add-on | Install Date: | |
|---|---|---|---|---|---|---|---|

**ATM**

| | | | | | | | COUNTRY |
|---|---|---|---|---|---|---|---|
| 5mbps ATM var.net | | 5mbps | 5mbps | DS3/E3 | $1,000.00 | $11,000.00 | USA |

(See Schedule E 1-1 to Exhibit I )

**Installation Address**

| Location: | | Location: | |
|---|---|---|---|
| Country | USA | Country | Spain |
| State | MA | State | Madrid |
| City | Waltham | City | Madrid |
| Address | 100 FIFTH AVENUE | Address | Avda de las dos Castillas, 7, Pozuelo de Alarcon |
| Suite / Floor | | Suite / Floor | |
| Tie Down (Rack/Shelf, Position) | | Tie Down (Rack/Shelf, Position) | |

Notes: Connecting to Customer POP/Local Loop? If so CFM/LOA need to be issued depending on who meets who.

| Name | | Name | |
|---|---|---|---|
| Phone | | Phone | |
| Number | | Number | |
| eMail | | eMail | |

| Port | ☐T1  ☐E1   ☑DS3  ☐STM1 | Port | ☐T1  ☐E1   ☐DS3  ☑DS3  ☐STM1 |
|---|---|---|---|
| Interface: | G703 coax | (BNC, G703, V35, SC-MM) | Interface: | G703 coax | (BNC, G703, V35, SC-MM) |
| Params: | | (B8ZS-AMI, ESF-SF, Framed) | Params: | | (B8ZS-AMI, ESF-SF, Framed) |
| Qos, Class | VBRnrt | CBR, VBR, Type1 QoS | DLCI | 77,904 | |
| Notes: | | | | | |

**Installation Fees**

| | One Time Fee | |
|---|---|---|
| Circuit installations costs | | $1,000.00 |

**Customer Premise Equipment**

| | | | | | | |
|---|---|---|---|---|---|---|
| No Equipment | | | | | | |

**Technical Information**

| IP Addresses | N/A | | Other | |
|---|---|---|---|---|
| IP Address | N/A | | Other | |

| Customer, Terra Lycos, L.L.C. | Telefonica USA, Inc. |
|---|---|
| Signature: | Signature: |

REVIEWED BY
TERRA LYCOS LEGAL **PDR**

| Name: Web Velasquez  BEN LULY | Name: ANTONIO BERNARDO |
|---|---|
| Title: Network Operations & Security Manager  CFO | Title: EVP |
| Date: | Date: 02/04/04 |

**SCHEDULE I-2**

**TO**

**EXHIBIT I**

<u>**Pricing**</u>



C:\Documents and
Settings\JRiggs\Desk



Service Type | ATM

Currency: US
No taxes
Term: 1 year



| Circuit ID | Host Site | Host Address | Host # | Access Line Host | Remote Site | Remote Address | Remote # | Access Line Remote | CIR | Observation | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | USA | | DS3 | | Spain | | | DS3 | 5mbps vc-nrt | No equipment | | $11,000.00 |
| | | | | | | | | | | | | $1,000.00 |

Conditions: Prices without local (Spain) and US taxes.
1 year term.
Prices are subject to local loop feasibility.
Prices valid for 60 days.
Prices do not consider any Customer Equipment.

**SCHEDULE I-2**

**TO**

**EXHIBIT I**

**SERVICE LEVEL AGREEMENT**

C:\Documents and
Settings\JRiggs\Desk

*Telefonica*     **Telefonica     International     Wholesale     Services**

Marketing Department

# International ATM VBRnrt Service

## Service Level Agreement

**_Telefonica
Data_**

Telefonica DataCorp

# Statement of confidentiality

This documentation is property of Telefonica and is confidential. It may not be reproduced in whole or in part, processed by a computer, or transmitted in any way or by any electronic or mechanical means, photocopying, recording, or by any other means. It may not be lent out or rented and its use may not be assigned without the prior written permission of Telefonica, the Copyright holder. Failure to comply with the aforementioned restrictions by any person with access to the documentation will be prosecuted in accordance with the law.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

 

*Telefónica* **Telefonica DataCorp**

*Data*

# CHART OF CONTENTS

1.  INTRODUCTION AND GENERAL CONDITIONS ........................................................... 4

2.  QUALITY OF SERVICE GUARANTEES ................................................................. 5

    2.1.  DEFINITIONS .................................................................................... 5

    2.2.  SERVICE LEVEL GUARANTEES ................................................................. 5

        *Availability* ................................................................................ 5

        *Mean Time to Deliver the Service* ...................................................... 6

        *Mean Time to Repair* ...................................................................... 7

        *Network Target Delays* .................................................................... 7

    EXCLUSIONS AND EXCEPTIONS ........................................................................ 8

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefonica*

*Data*

# 1.    INTRODUCTION AND GENERAL CONDITIONS

The following document describes the standard SLA ("Service Level Agreement") of the International ATM VBRnrt Service, in which Telefonica Data offers a set of guarantees for different key aspects in order to ensure the quality expected and demanded by Customer. The Guarantees that Telefonica Data assumes in relation to Customer are: Availability, Time to Deliver, Mean Time to Repair, and Network Target Delay.

If the International ATM Service does not comply with the parameters defined in this document, Customer will be entitled to demand from Telefonica Data a compensation in accordance with Section 2 of this document.

Any compensation from Telefonica Data to Customer shall take effect only if (i) Customer identifies an incident that may be deemed to be a failure or non performance of the International ATM Service provided by Telefonica Data, (ii) Customer notifies Telefonica Data the existence of such incident through the one stop procedure defined for that purpose in a period of 30 Days after such incident occurred, (iii) such incident is confirmed to be a failure or non performance of the International ATM Service by Telefonica Data. The incidents described in the Exclusions and Exceptions section are specifically excluded from the calculation of quality of service guarantees.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

## 2.    QUALITY OF SERVICE GUARANTEES

### 2.1.    Definitions

- **Permanent Virtual Circuit (PVC):** defines a permanent logical connection established between two customer accesses over the Network to guarantee that sequence will be maintained in the order of the frames received by the Network.
- **Customer Network:** Set of connections contracted by the customer for the Service.
- **NNI:** Network to network Interconnection.

### 2.2.    Service Level Guarantees

*Availability*

Availability is defined per each two locations and on a monthly basis, and means the total amount of time that the International ATM Service is not under any single outage between such two locations. Availability for each two locations shall be calculated according to the following formula:

$$Availability = \frac{Ttotal - Tunavail}{Ttotal} * 100 \, (\%)$$

Where:

- $Ttotal$ = total time in minutes of the period considered, i.e. one calendar month.
- $Tunav$ = total time in minutes in which the service it is not available on a continuous basis within the Ttotal interval considered (total lack of communication through Telefonica Data's network). If an outage does not exceed the amount guaranteed by Telefonica Data in accordance to the chart below, the amount that shall account for Tunav shall be zero.

The SLA defined in the International ATM VBRnrt Service is defined in accordance to the following chart:

| Service Area | Scope of Service with details | Availability Guaranteed (AG) |
|---|---|---|
| TD Area | From Main Customer's Office in Location A to Main Customer's Office in Location B | 99.5 %* |

*This Availability value could be improved until a maximum of 99.7% depending on possible redundancy scenarios hired by Customer. Also, due to the constants improvements of the service, this objective will be revised and will periodically communicate to Customer.

Compensations for non-compliance with the SLA defined for Availability

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

If Telefonica Data fails to deliver the service in accordance with the chart above, then, as Customer's sole and exclusive remedy, Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following measures:

| Actual availability of Customer's network | Service Voucher in % of the monthly bill (on the Price of Sale to Customer of the PVC Segment affected) |
|---|---|
| 99.4 < A < A.G. | 5% |
| 99.3 < A < 99.4 | 10% |
| 99.2 < A < 99.3 | 15% |
| 99.1 < A < 99.2 | 20% |
| A < 99.1 | 25% |

Where A is the availability measured between each two Customer's locations and AG is the availability guaranteed.

## Mean Time to Deliver the Service

The Mean Time to Deliver the International ATM Service is defined by location according to the following chart:

| Origin/Destination | Mean Time to Deliver |
|---|---|
| TD Area | 65 Days |
| All others (target measure) | 85 Days |

## Compensations for non-compliance with the Mean Time to Deliver the Service

Should the installation date be delayed by TD beyond the Guaranteed Installation Date (possibly modified as defined above), then Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following chart:

| Percentage of delay with respect to the committed Mean Time to Deliver | Service Voucher in % of the Installation Charge for the location affected |
|---|---|
| For each complete business day of delay past the Guaranteed Installation Date | 5% |

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefonica*
**Data**



## Mean Time to Repair

Mean Time to Repair is defined on a monthly basis and means the average time in which the International ATM Service has been under a failure in accordance with the terms defined. Telefonica Data's Mean Time to Repair objective is 6 hours for TD Area locations.

Mean Time to Repair shall be calculated according to the following formula:

$$\text{Mean Repair Time} = \frac{\sum_{1}^{NI}[Tunav_i]}{NI} \, hours$$

Where:

- $Tunav_i =$ Each of the times in hours that the service is not available during each of the events in which a failure has occurred in one calendar month
- $NI =$ Number of events in which a failure has occurred in one calendar month.

## Network Target Delays

The transit delay is the mean time that takes for a 100-byte packet to go through Telefonica Data's Network form POP to POP. Telefonica Data shall measure transit delay under ordinary operation conditions.

The specific origin and destination points to measure the transit delay shall be the POPs of Telefonica Data's International Network. For the avoidance of doubt the transit delay is not measured on an end-to-end basis.

The target transit delay values, Round Trip Delay, are specified in the chart below:

| Round trip Delay* (ms) | Europe | North America | South America** |
|---|---|---|---|
| Europe (London) | 95 | 130 | 250 |
| North America | 130 | 70 | 140 |
| South America** | 250 | 140 | 95 |

*The delays in the chart above vary depending on the country. For instance, in Europe (London) the delay is 25 ms for Madrid, Milan and Paris, and 50 ms when the destination is Rome and Vienna.
** Except for Colombia.

Due to the continuous improvements and upgrades in Telefonica Data's Network, the target transit delays are subject to continuous revision, change, and improvement

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefonica*

*Data*

Telefonica DataCorp

## Exclusions and Exceptions

The exclusions and exceptions that shall not be consider under this Section 2 are the following ones:

1. Programmed Service Interruptions due to ordinary maintenance tasks within the schedule assigned to that end, and Service Interruptions for non-programmed maintenance tasks, as long as Customer has received prior notification from Telefonica Data.
2. Specific laws, regulations or customs dispositions in a specific country.
3. Service Interruptions that may occur due to Customer's act or omissions.
4. Service Interruptions due to Force Majeure or beyond Telefonica Data's control.
5. The delays caused by Customer if the personnel appointed by Telefonica to resolve an incident is not allowed to have access to Customer's premises.
6. Any interruption caused specifically by Customer's equipment or applications.
7. The access connection line equipment shall be turned on permanently for all Customer's Network interfaces.

The values of guaranteed Availability and to measure and calculate Time to Deliver the Service shall only be valid in the following countries:

TD Area: Argentina, Brazil (Sao Paulo state), Chile, Colombia, France, Germany, Italy, Mexico, Peru, Puerto Rico, Spain, United Kingdom, and USA (Miami and NY).

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

# STRATEGIC ALLIANCE FRAMEWORK AGREEMENT

**signed by**

## TERRA NETWORKS, S.A.

**and**

## TELEFÓNICA, S.A.

**Madrid, 29th January, 2003**

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

In Madrid, on 29th January, 2003

BETWEEN

For one part, TELEFÓNICA, S.A. (hereinafter, "TELEFÓNICA"), a stock company incorporated by virtue of the deed of incorporation executed by the Notary Public of Madrid, Mr Alejandro Rosselló Pastor, on 19th April 1924, under number 141 of his records, domiciled in Madrid, calle Gran Vía, 28. It is registered at the Business Registry of Madrid, at volume 12534, folio 21, sheet number M-6164. It is assigned Tax Identification Number A-28015865.

It is represented at this act by (*), of legal age, with domicile for these purposes in Madrid, Gran Vía, 28, holder of national identity document number (*), acting on behalf of TELEFÓNICA in his capacity as (*) of the company and making use of the faculties (*).

And for the other, TERRA NETWORKS, S.A. (hereinafter, "TERRA"), a stock company incorporated under the company name of TELEFÓNICA COMUNICACIONES INTERACTIVAS, S.A., by means of the deed authorised by the Notary Public of Madrid, Mr José Antonio Escartín Ipiens, on 4th December 1998, under number 5,276 of his records, registered at the Business Registry of Madrid, at Volume 13,753, Folio 185, Sheet number M-224,449, Entry 1. it changed its company name to that of TELEFÓNICA INTERACTIVA, S.A. in the deed executed on 16th March 1999, before the Notary Public of Madrid Mr Francisco Arriola Garrote, under number 1269 of his records, leading to entry 9 at the Business Registry of Madrid. It is domiciled in Barcelona, calle Nicaragua 54. It has been assigned Tax Identification Code A-82/196080. TERRA appears in its own name and in name and on behalf of Lycos, Inc., (hereinafter "LYCOS"), acting as the sole partner of the latter.

It is represented at this act by Mr Joaquim Agut Bonsfills, of legal age, with domicile for these purposes in Barcelona, calle Nicaragua 54, holder of national identity document number 39.134.364-W. He is acting on behalf of TERRA in his capacity as Executive Chairman of the firm, as set forth in the deed executed by the Notary Public of Madrid Mr Carlos Rives Gracia on 9th October 2001, under number 3,402 of his records.

Hereinafter, the expression "Parties" shall be used jointly for TELEFÓNICA and TERRA. The expression "Party" shall refer individually to either of them.

The Parties reciprocally recognise their capacity and legitimisation to grant this document.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

WITNESSETH

I.    Whereas, on May 16[th,] 2000, the Parties, along with BERTELSMANN AG, a corporation of German nationality, and LYCOS Inc., a corporation of United States nationality, the sole shareholder of which is TERRA, entered into an agreement called Strategic Alliance Framework Agreement (hereinafter the "Agreement"), which regulated the conditions under which BERTELSMANN and, if appropriate, TELEFÓNICA, would hire TERRA to provide certain products and services. The conditions established in that Agreement were on preferential terms.

II.    Whereas, the evolution of the business models created at the end of the 90s and beginning of 2000 to capture the short term growth value of the Internet, mainly based (although not exclusively) on income obtained by monetisation of the audience through access and advertising, gave shown that these have not attained the feasibility expectations created, and one must also point out the worldwide crisis on the advertising market. On the other hand, the wave of offers in narrow band as well as broad band through the media provided by the telephone access or cable television operators has led to such operators developing their own business lines on the Internet, or having sought alliances with specific Internet access suppliers and/or Internet portals, in which sense one must point out the clearly complementary nature of TELEFÓNICA and TERRA due to their coinciding presence in Spain and Latin America. There is also a clear difference between the catalogue of services and products demanded by BERTELSMANN AG. and TELEFÓNICA, and BERTELSMANN AG. also focuses on the United States market which is more linked to LYCOS, Inc. These circumstances that have arisen have a great effect on articulation of the new phase of the relation, just as has been publicised on the markets since the last month of October. In this new context, the Parties, along with LYCOS, Inc. and BERTELSMANN AG., have considered it more convenient to continue their relations, leaving said Agreement without effect, it being fully replaced by this Strategic Alliance Framework Agreement and a new Memorandum of Understanding entered into with this same date (hereinafter "Agreement II"), which regulate the general terms of the new framework of relations between BERTELSMANN AG., TERRA and TELEFÓNICA, considering as the essential aspect for the purposes of its development the execution of this strategic alliance between TELEFÓNICA and TERRA.

III.    Whereas, indeed, the trend shown by telephone access operators to seek alliances with specific Internet access providers has shown the convenience of taking advantage of the complementary factors there are between TELEFÓNICA and TERRA on all the markets in which both are present. In this sense, while TELEFÓNICA, as a telecommunications operator, has a clearly competitive position in matters of connectivity and provision of access to the international Internet nodes promoted by the development of broad band, TERRA is now the leader on the Spanish and Portuguese speaking market as a specific supplier of Internet access, being the reference portal in Latin America and Spain (as a leading aggregator and contents

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

manager and provider of value added products and services related to the Internet), having developed a brand image which is unquestionably recognised in the New Technologies and Internet sector that contributes the experience and knowledge required for sustained joint construction of a sophisticated offer of narrow and broad band contents and services.

IV.  Whereas, by virtue of this complementary nature in its objectives, needs and business plans and identification of an improvement in the opportunities of growth, the Parties intend to establish a long term strategic alliance whose main objective will be to improve the joint development of both companies on the narrow and broad band Internet markets in all the countries in which both Groups are present, preferably in the residential segment, SOHO and, if appropriate, SMEs.

V.  Whereas, due to all the foregoing, the Parties hereby enter into this Strategic Alliance Framework Agreement (hereinafter "Framework Agreement"), according to the following:

## CLAUSES

## ONE.  OBJECT OF THIS FRAMEWORK AGREEMENT.

The object of this Framework Agreement is the creation of a strategic alliance between TELEFÓNICA and TERRA (establishing the relevant model of relations between them in each one of the phases, just as mentioned hereunder, that take the maximum advantage of the capacity of TELEFÓNICA as a provider of narrow and broad band connectivity and access, and of TERRA as a portal, aggregator, provider and manager of Internet contents and services, in fixed telephony (including the wireless system used in this sector) and in mobile telephony (only if thus agreed in the Contracts and Subsequent Contracts, just as both terms are defined in Section Three), all aimed at the residential and SOHO markets, and if agreed in the Contracts and Subsequent Contracts, SMEs, taking advantage of synergies and creating value for both Parties:

> (i) aggregation of the offer of products and services in the Internet business;
>
> (ii) provision of the offer of products and services in the Internet business,
>
> (iii) development and construction of new advanced services in the Internet business;
>
> (iv) connectivity and access to Internet business.

Moreover, the Parties shall use best effort to identify additional elements to those described in Section Two below that allow value to be generated for both Groups, with special emphasis on

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

electronic commerce, and the relationships with the different mobile operators of the TELEFÓNICA Group (as such term is defined in Section Two below).

**TWO.    DEVELOPMENT OF THE MODEL OF RELATIONS IN EACH ONE OF THE PHASES OF BUSINESS FORMING THE OFFER FOR THE END CLIENT IN THE INTERNET BUSINESS.**

The model of relations referred to in the above Section will be subject to development through the relevant contracts entered into between certain companies in the TELEFÓNICA Group and the TERRA Group, on the terms and conditions established in this Framework Agreement, adapted, if appropriate, to the legal and statutory requisites that may be applicable.

For that purpose, each Party hereby undertakes, as controlling shareholder of its respective Group, that each one of the contracts foreseen in this Section Two (hereinafter the "Contracts") shall be formalised and executed by the companies determined by it among those in its respective Group, this being understood in the sense of article 4 of Act 24/1988 of 24th July, of the Stock Market, and, for the purpose of this Framework Agreement, the TERRA Group and Telefónica Publicidad e Información, S.A. shall not be considered an integral part of Telefónica Group (hereinafter "TELEFÓNICA Group" and "TERRA Group", as appropriate, and the companies thus determined by each Party among those of its respective Group, the "Companies in the TELEFÓNICA Group" or the "Companies in the TERRA Group", as appropriate), in order to generate:

(x)    in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)    for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above.

The Parties hereby agree that, to the extent require by virtue of the object of the relevant Contracts, they must be entered into by companies in the TELEFÓNICA Group and Companies in the TERRA Group with presence in the same geographic territories.

2.1.    Exclusivity of the Companies in the TERRA Group as a portal, service aggregator and supplier of added value services.

2.1.1.    TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group grant exclusivity to the Companies in the TERRA Group as

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

supplier of the essential elements of the portal and aggregator of the narrow and broad band Internet services targeting the residential segment, SOHO and, if appropriate SMEs, all to the satisfaction of TELEFÓNICA according to the contractual parameters established in the terms set forth in Section 2.1.5 below.

TELEFÓNICA hereby undertakes, on the terms and conditions of this Framework Agreement, for the Companies in the TELEFÓNICA Group to provide the Companies in the TERRA Group the exclusive commission to develop all the portals for aggregation of the Internet contents and services on narrow and broad band, targeting the residential segment, SOHO and, if appropriate, SMEs, developed by the Companies in the TERRA Group, whether Internet access portals in connectivity offers and Internet access by Companies in the TELEFÓNICA Group, and include the trademark and other distinctive signs of the Companies in the Terra Group (the use of said trademark and other distinctive signs will comply with the provisions of the agreements to be entered under Section 2.1.5 below).

2.1.2.    TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall acquire the necessary narrow and broad band Internet value added services exclusively from the Companies in the TERRA Group as required to construct the offer for end users, preferably residential, SOHO and, if appropriate, SMEs, listing, for purely illustrative although not limiting purposes, the following: e-mail, instant message platforms, unified message platforms, chats, etc.

2.1.3.    Commercialisation or provision to third parties of service packages that are identical or substantially similar to those supplied to the Companies in the Telefónica Group as set forth in Sections 2.1.1 and 2.1.2 above shall require prior written consent from TELEFÓNICA.

2.1.4.    TELEFÓNICA undertakes, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group assign to the Companies in the TERRA Group the exclusive management and operation of the advertising spaces that include third party advertising on the portals developed according to Section 2.1.1. above by the Companies in the TERRA Group. In order to avoid doubt, it is expressly recorded that the decision on operation of such advertising space shall be taken entirely by the Companies in the Telefónica Group.

CONFIDENTIAL AND PRIVILEDGE INFORMATION

2.1.5.        For the purposes of formalising what is set forth in Sections 2.1.1, 2.1.2, 2.1.3 and 2.1.4 above, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant licence contracts for brands and other distinctive signs and intellectual property, management of the portal, aggregation and access to value added services and use of software and maintenance, within the terms specified in Section 4.1 below, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II.

2.2.    Acquisition, development and/or commercialisation of contents, service provision agreements and exchanges of shares and/or assets with vertical portals, advertising spaces, provision of on-line integral marketing spaces and provision of auditing, consultancy, management and maintenance services for country portals.

2.2.1.        Acquisition, development and commercialisation of contents and agreements to provide services and share and/or asset exchanges with vertical portals.

2.2.1.1.            TERRA and TELEFÓNICA hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group preferentially focus their demand for acquisition, development and/or commercialisation of content arising from the construction of the offer of products and services foreseen in Section Two through Companies in the TELEFÓNICA Group. For this purposes, "preferential focussing" shall be understood as the option for Companies in the TELEFÓNICA Group to offer the Companies in the TERRA Group the aforementioned contents and the obligation of the Companies in the TERRA Group to commission those contents from the Companies in the TELEFÓNICA Group, as long as the offer presented by the latter to the Companies in the TERRA Group is not objectively worse than the offer provided by any third party.

Moreover, TERRA and TELEFÓNICA undertake to make their best effort to ensure that the Companies in the TELEFÓNICA Group distribute their on-line contents preferentially through the Companies in the TERRA Group.

For that purposes, on the terms established in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for acquisition, development and/or commercialisation

CONFIDENTIAL AND PRIVILEDGE INFORMATION

of content and rendering on-line training services, on the terms and conditions set forth in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 above.

2.2.1.2.    The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group enter into exclusive contracts to provide on-line training services to their respective employees through the company Educaterra, S.L.

The Parties undertake to use best efforts, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group will engage Maptel, S.A. for their needs of products, solutions and services based on on-line localisation.

In order to facilitate fulfilment of the commitments undertaken in Section 2.2.1.1 above and to optimise their respective portfolios, the Parties hereby undertake, on the terms and conditions foreseen in general terms under this Framework Agreement that, within the deadlines set in Section 4.1 below, Telefónica de España, S.A. shall transmit to Educaterra, S.A., and the latter shall acquire at market value, which according to the Parties valuations is equivalent to its book value, the platform A+ owned by it, on the terms and conditions established specifically in Exhibit III.

2.2.1.3.    Likewise, the Parties shall analyze the convenience and shall negotiate, if appropriate, the conditions under which TERRA may fully or partially convey to:

(i)  Telefónica Móviles, S.A., its share in Terra Mobile, S.A.;

(ii)  The TELEFÓNICA Group, its share in Ifigenia, S.A.; and

(iii) The TELEFÓNICA Group, its share in Maptel, S.A.

2.2.2.  Acquisition of advertising spaces.

TELEFÓNICA and TERRA hereby undertake, on the terms and conditions of this Framework Agreement, that the annual amount

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

assigned by the TELEFÓNICA Group to acquisition of advertising spaces in the Companies in the TERRA Group shall not be less than 2% of the total annual budget assigned by that Group to advertising.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts to acquire advertising spaces, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV.

2.2.3. Provision of integral on-line marketing services.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, for the Companies in the TERRA Group to provide preferentially integral on-line marketing services to the Companies in the TELEFÓNICA Group. To these purposes, "preferential contracting" shall be understood as the option granted to the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing services of the Companies in the TERRA Group and the obligation of the Companies in the TELEFÓNICA Group to hire those integral on-line marketing services with the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the TELEFÓNICA Group is not objectively worse than the offer presented by any third party.

For that purposes, within the terms foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant service provision contracts for integral on-line marketing services, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV, mentioned under Section 2.2.2 above.

2.2.4.    Preferential contracting of the auditing, consultancy, management and maintenance services of the country portals of the Companies in the TELEFÓNICA Group by the Companies in the TERRA Group. To these purposes, "preferential contracting" shall be understood to be the option of the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group auditing, consultancy, management and maintenance services for its country portals and the obligation of the Companies in the TELEFÓNICA Group to hire those auditing, consultancy, management and maintenance services for country portals from the Companies in the TERRA Group, as long as the offer

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

presented by the latter to the Companies in the Telefónica Group is not objectively worse than the offer presented by any third party.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall provide the Companies in the TELEFÓNICA Group the auditing, consultancy, management and maintenance services of their respective country portals.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit VI.

2.3.    Wholesale Internet connectivity and access.

2.3.1.    The Companies in the TELEFÓNICA Group, as exclusive suppliers of wholesale connectivity and access services.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire the wholesale Internet connectivity and access services exclusively from the Companies in the Telefónica Group, as long as that acquisition is made on better conditions than those allowed by market regulations.

For that purposes, within the deadlines provided in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 and 2.2.1.1 above.

2.3.2. Outsourcing regime or equivalent in operation of the network access elements.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall provide the outsourcing or equivalent service to operate all or part of the services and/or operation of the elements for excess to the network required by the Companies in the TERRA Group to provide the Internet access service to their preferentially residential customers, SOHO and, if appropriate, SMEs, as long as such services may be provided under the best market conditions allowed by the regulations.

For that purposes, within the deadlines set in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for operation, hosting and management, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1 and 2.3.1 above.

2.3.3.    The Companies in the TELEFÓNICA Group, as exclusive providers of the network services required to build up the offer for end users.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire exclusively from the Companies in the TELEFÓNICA Group the advanced network services and platforms required to build up the offer for preferentially residential customers, SOHO and, if appropriate, SMEs on narrow and broad band, as long as such acquisition is performed on the best market conditions the regulation allows.

For that purposes, on the terms and conditions foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant exclusive supply contracts, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1, 2.3.1, and 2.3.2 above.

## THREE. GENERAL TERMS APPLICABLE TO THE CONTRACTS.

3.1.    Scope of application.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

The general terms agreed in this Section Three shall be applicable to all the Contracts, as well as to the Subsequent Contracts (as to the latter, on the terms foreseen in Section 4.4 and in Section Six below). However, the content of Section 3.3 below shall only be applicable to the successive term contracts.

The Parties hereby undertake to include in the Contracts and, if appropriate, in the Subsequent Contracts, the service level agreements that shall determine and guarantee a quality for the services, in keeping with the standards in the sector. Moreover, the Contracts, and as appropriate, the Subsequent Contracts, shall establish the appropriate protection mechanisms for the Parties in the event of early termination, to allow an adequate, respectful transition as to the daily activities of the Parties under the relevant Contract (or Subsequent Contract).

3.2.  Modifications imposed by administrative bodies.

In the event of any of the entities or bodies regulating the telecommunications market, the right to competition and/or any other competent bodies, require substantial amendment of any of the Contracts or Subsequent Contracts, the Monitoring Committee will have to decide on the convenience of performing such an amendment or of making the relevant Contract or Subsequent Contract void. The Monitoring Committee must decide within the term of one month from the date on which the matter is submitted to it. However, if the requirement by the relevant entity or body were to establish a lower term for fulfilment thereof, the term of one month shall be reduced appropriately.

If the Monitoring Committee were to resolve to make the relevant Contract or Subsequent Contract void, it will comply with the terms set forth in Section 4.3 below and, if appropriate, the terms foreseen in Section Six below.

3.3.  Termination.

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1 and 4.4 below and in the last paragraph of Section Six below, the Contracts and Subsequent Contracts shall end and be left without any effect whatsoever in any of the following cases:

(i)  on 31st December 2008 or, if appropriate, on expiration of any renewal of a Contract or Subsequent Contract in the event that one of the parties had notified the other party in writing with, at least, two months in advance prior written notice, its intention to terminate the relevant Contract or Subsequent Contract. In absence of the relevant prior written notice, the Contract or

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Subsequent Contract shall be deemed automatically and successively renewed for additional periods of one year, or

(ii)    on the sixtieth calendar day following the date on which the Change in Control takes place at TERRA in the event of TELEFÓNICA having notified it within the term of its decision to terminate the Framework Agreement, on the terms set forth in Section Seven below; or

Termination of any of the Contracts in the cases foreseen in this Section 3.3 shall not give rise to any kind of liability being required among the relevant Parties, notwithstanding those strictly arising from execution thereof and fulfilment prior to the date of termination.

3.4. Confidentiality and public announcements.

The Contracts and Subsequent Contracts shall be confidential and none of the respective Parties shall reveal their existence and content without the consent of the other. An exception is made in cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the part under obligation shall previously inform the other.

The Parties shall agree on the content of any notification or public release related to the relevant Contracts and Subsequent Contracts.

3.5.    Expenses and taxes.

Each part shall pay the expenses arising for it from formalisation and execution of the Contracts and Subsequent Contracts.

The obligations of a tax nature shall be paid by each part pursuant to the applicable laws and provisions.

3.6.    Resolution of conflicts. Binding nature of the resolutions by the Monitoring Committee.

3.6.1.    Resolutions of conflicts.

Any discrepancy in the interpretation as well as the execution of the Contracts and the Subsequent Contracts must be submitted by any of the Parties to the Monitoring Committee and, should a resolution not be provided, by it to the

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Chairmen of TELEFÓNICA and TERRA, resorting for the relevant judicial or arbitration proceedings only in the event of failure to reach an agreement by the Chairmen. To those ends, the terms of Section 15.1 below shall be applicable, with the particular specification that reference to the Parties must be understood to refer to the relevant Parties.

### 3.6.2.  Binding nature of the resolutions by the Monitoring Committee

In any case, all agreements or resolutions by the Monitoring Committee, on the terms of Section Four below, shall be binding upon the relevant Parties, who undertake to fully comply with them, it thus being considered that the final decisions by those Parties may not be impugned.

## FOUR. PROCEDURES AND SCHEDULE FOR DEVELOPMENT.

### 4.1.   Terms to formalise the Contracts.

The Parties undertake that the Contracts, on the terms and conditions of this Framework Agreement and its Exhibits, are formalised between the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group within the maximum term of one month from the date of this Framework Agreement, adapted as appropriate to the applicable legal and statutory requisites, on the terms that are determined for that purpose by the Monitoring Committee foreseen in Section 4.2 below. That Committee shall also set, according to the legal and business circumstances, the exact dates on which each Contract or group of Contracts must be formalised.

As an exception, the Monitoring Committee may postpone formalisation of some of the Contracts for proper reasons, so these are granted once the aforementioned term of one month has expired, in which case the terms of Section 4.3 below shall be applicable.

### 4.2. Monitoring Committee.

#### 4.2.1.   Composition.

The Parties hereby agree to create a Monitoring Committee for execution, development and monitoring of this Framework Agreement,

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

which must be formed by six members, three of which, who shall include the person acting as Chairman, shall be appointed by TELEFÓNICA, and the remaining three shall be appointed by TERRA.

Each Party may replace any member or members appointed by it at any time, by serving the relevant written notice to the Monitoring Committee.

The Parties hereby resolve that the appointment of the members of the Monitoring Committee and their formal constitution shall take place within the term of fifteen days from signing this Framework Agreement.

4.2.2.   Meetings: calling, frequency and minutes.

The Chairman shall call the meetings. The Monitoring Committee shall meet at least once every quarter. However, the Chairman must call the Monitoring Committee whenever required to do so in writing by any of its members and, likewise, may call it on any occasion he may deem fit.

The Parties agree that the first Monitoring Committee shall meet no later than 28th February 2003.

The meetings of the Monitoring Committee may be attended by executives from either of the Parties with the right to speak but not vote, in order to provide information on the progress of the alliance and to facilitate decision making by the Monitoring Committee.

The Secretary to the Monitoring Committee, who shall be appointed by TERRA from among the members of the Monitoring Committee appointed by TERRA, shall take the minutes of the content of each meeting, which shall be signed by the Secretary with the approval of the Chairman once it is approved by those attending.

4.2.3.   Quorum, passing resolutions and binding nature of these.

The Monitoring Committee shall be understood to be validly met as long as it is attended by four of its members and the resolutions are passed unanimously.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

The agreements and resolutions by the Monitoring Committee shall be binding upon the Parties, who undertake to fully comply with them directly or through the companies in their relevant Group, as appropriate. In this sense, the agreements and resolutions by the Monitoring Committee shall be considered final decisions by the Parties in relation to the matters concerned and, thus, not liable to be impugned.

Failing an agreement on any matter of its competence, the Monitoring Committee shall submit the matter to the Chairmen of TELEFÓNICA and TERRA, who shall have a term of fifteen days to issue their finding. If that term expires without an agreement being reached, any of the Parties may initiate arbitration proceedings on the terms foreseen in Section Fifteen below.

4.2.4.  Duties.

The Monitoring Committee is to perform the following duties.

(i)    to co-ordinate, direct and supervise performance and development of this Framework Agreement, through the process of formalisation of the Contracts, determining the dates of granting and integrating their content, as provided in Section 4.1 above.

(ii)    resolve on the convenience of extending, modifying or terminating any of the Contracts or Subsequent Contracts, or of formalising Subsequent Contracts, especially in the cases foreseen in Section 3.2 above and 4.4 below.

(iii)    resolve on possible amendments to be made in the Contracts or Subsequent Contracts, if their performance were to affect the profitability or strategic interests of the Telefónica Group or Terra Group, and this will only be when the circumstance may not compensated in terms of value through the mechanisms foreseen in this Framework Agreement.

(iv)    resolve on extension of this Framework Agreement or granting preemptive rights, as well as concerning the degree of fulfilment of the alliance and to take the relevant corrective measures, on the terms of Section 4.3 below, and determining the cases in which the factual cases foreseen in Section Six below arise to apply the TELEFÓNICA Guarantee.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

(v)      resolve on the convenience of modifying the Contracts and Subsequent Contracts according to the evolution of the applicable legislation, on the terms of Section 4.5 below.

(vi)      resolve on any discrepancy in interpretation as well as performance of this Framework Agreement, of the Contracts and of the Subsequent Contracts; and

(vii)      any others specifically entrusted to it under this Framework Agreement.

(viii)      resolve on creation of working subcommittees on any of the areas of specific activity in Spain, Brazil, Rest of Latin America and Relations with Telefónica Data, as well as suppression, modification, substitution or creation of additional subcommittees.

When performing its duties, the Monitoring Committee shall ensure that its resolutions comply with the principle of tax efficiency for the Parties, as well as for the relevant Parties of the Contracts and Subsequent Contracts.

4.3.      Revision of the degree of fulfilment of the alliance and extension of the Framework Agreement.

     4.3.1.      The Monitoring Committee must validate fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA in November every year. For that purposes, it must review the degree of fulfilment of the Contracts and, if appropriate, of the Subsequent Contracts, in order to determine whether the services have been rendered to the satisfaction of the relevant part and check that they have been fulfilled.

     (x)      in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

     (z)      for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above.

In order to facilitate that annual validation, on a quarterly basis, on the second have of the second month of the following quarter, the

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Monitoring Committee shall review the degree of fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA, the degree of fulfilment of the Contracts and, if appropriate, Subsequent Contracts, adopting the measures it may deem fit in each case.

On the other hand, in November 2008, the Monitoring Committee shall resolve on the extension or not, for the term deemed convenient, of this Framework Agreement and, where applicable, of the Contracts and Subsequent Contracts. If it were to decide not to extend them, the Monitoring Committee would determine the services, whether foreseen or not in Section Two above, in relation to which the Companies in the TELEFÓNICA Group would grant the Companies in the TERRA Group with presence in the same geographic territory, or vice-versa, a pre-emptive right to equal offers by third parties.

4.3.2.    However, the Monitoring Committee may perform the revisions foreseen in Section 4.3.1 above as an extraordinary measure in any other month of the year.

4.3.3.    The Monitoring Committee shall impose the measures it deems fit to correct the breaches detected during its annual validation duties and, if appropriate, shall determine whether it is appropriate to apply the TELEFÓNICA Guarantee foreseen in Section Six below.

4.4.    Adaptation and updating of the services and products.

According to the technological advances, the evolution of the specific needs of both Groups, the general market conditions, the evolution of the reference costs, and any other considerations related to achieving the objectives of this alliance, the Monitoring Committee may agree the modifications it may deem appropriate as to the services and products that, by virtue of this Framework Agreement and the Contracts or Subsequent Contracts, must be rendered to the relevant companies in the TELEFÓNICA Group and in the TERRA Group (even inclusion of new catalogues of services and products), making, when appropriate, the appropriate decisions for that purposes in relation to (i) amendment of this Framework Agreement, (ii) extension, amendment or suppression of certain Contracts or Subsequent Contracts, and (iii) formalisation of new contracts (hereinafter, along with the contracts mentioned in the paragraph preceding the penultimate one of Section Six below, the "Subsequent Contracts") which shall be subject to the terms and conditions foreseen in general within this Framework Agreement, except in the aspects which the Monitoring Committee may consider appropriate to modify.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

In cases in which the Monitoring Committee may resolve to extend only certain Contracts or Subsequent Contracts, it shall also resolve on the Sections of this Framework Agreement that, by virtue of their applicability, must continue in force, taking full effects as to the Contracts or Subsequent Contracts extended.

4.5.    Adaptation of the Contracts and Later Contracts to the evolution of the applicable legislation.

According to the evolution of the applicable laws and, in particular, liberalisation of the regulation framework for the telecommunications market and competition rights, the Monitoring Committee may agree the modifications it may deem fit in relation to the Contracts and Subsequent Contracts, in order to overcome the restrictions contained in their clauses due to the limitations imposed by the by-laws in force at the time of granting.

## FIVE. GOOD FAITH.

The Parties undertake to act in good faith, abstaining from performing any action that may prevent or hinder performance of this Framework Agreement, and giving complete fulfilment directly, or through the companies in its respective Group to the obligations arising from this Framework Agreement, especially those related to (i) fulfilment of the resolutions by the Monitoring Committee, and (ii) formalisation of the Contracts and Subsequent Contracts, as well as their execution, by providing the services in accordance with the set quality parameters and payment of the relevant agreed prices.

## SIX. GUARANTEE BY TELEFÓNICA.

TELEFÓNICA hereby guarantees fulfilment by the Companies in the TELEFÓNICA Group of the obligation to formalise and fulfil the Contracts on the terms of this Framework Agreement.

In all cases in which, due to reasons other than breach by TERRA and/or the Companies in the TERRA Group, especially for legal or statutory reasons, it were not possible to formalise any of the Contracts, or they should become fully or partially void, or if there were to be any breach by TELEFÓNICA and/or the Companies in the TELEFÓNICA Group of these making it impossible to achieve:

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

CONFIDENTIAL AND PRIVILEDGE INFORMATION

(x)  in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)  for each one of the following financial years, a value equivalent at least to that established for 2003, as indicated in subparagraph (x) above (it being duly understood that in the event of the minimum value mentioned not being reached in any financial year, the deficit arising will be considered to be fully compensated by the necessary proportion by the surplus to that minimum figure that may have been obtained in any of the previous financial years).

TELEFÓNICA shall propose alternative mechanisms to the satisfaction of TERRA to provide services and acquire products that, within the setting of the complementary nature of both Groups, will allow the relevant compensation to take place.

In the presentation of alternative mechanisms by TELEFÓNICA, it shall take the following aspects, among others, into account: (i) contracts to render services or acquire products not foreseen in Section Two above that may have been entered into by the Parties, or between the companies in their respective Groups after the date on which this Framework Agreement came into force, or after that date, as long as these are services to be provided thereafter; (ii) newly available services and products that may arise by virtue of the technological advances in the evolution of the specific needs of both Groups and the market conditions; and (iii) possibilities arising from inclusion of any companies in the TELEFÓNICA Group or the TERRA Group.

New contracts which are formalised by virtue of the terms set forth in the preceding paragraph (hereinafter along with the contracts foreseen in Section 4.4 above, the "Subsequent Contracts") shall be subject to the terms and conditions foreseen in general terms in this Framework Agreement, except in the aspects the Parties find fit to modify.

In cases in which the Parties agree to extend only certain Contracts or Subsequent Contracts, they shall also resolve on the Stipulations of this Framework Agreement which, by virtue of its application to these, must continue in force, taking full effect in relation to the Contract or Subsequent Contracts extended.

The obligations of TELEFÓNICA within the framework of this Section shall be decreased by the relevant proportional part to show possible partial breaches by TERRA and/or by the Companies in the TERRA Group that may have taken place.

**SEVEN. TERMINATION.**

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1. and 4.4 above, and in the penultimate paragraph of Section Six above, this Framework Agreement shall become void in any of the following cases:

(i)     on 31st December 2008 or, if appropriate, on expiration of any relevant renewal pursuant to Section 4.3.1 in the event that one of the Parties had notified the other Party in writing with, at least, two months in advance prior written notice, its intention to terminate the Framework Agreement. In absence of the relevant prior written notice, the Framework Agreement shall be deemed automatically and successively renewed for additional periods of one year, or

(ii)    at the option of TELEFÓNICA in the event of a Change in Control taking place in TERRA (on the terms foreseen in the last two paragraphs of this Section).

Termination of the Framework Agreement in the cases foreseen in this Section Seven shall not give rise to any kind of liability between the Parties being demanded, notwithstanding those arising strictly from the actual performance of the Framework Agreement prior to the date of termination.

A Change in Control of TERRA shall be understood to be any event or situation that entitles a shareholder other than TELEFÓNICA to direct the management and administration of that company directly or indirectly, as the holder of the majority voting rights or by virtue of agreements entered into with other shareholders.

If there is a Change in Control of TERRA, if TELEFÓNICA were to opt to terminate this Framework Agreement, it will have the term of one month from the date on which this took place to notify TERRA that the Framework Agreement shall terminate, and it shall cease to be effective on the sixtieth calendar day from the date on which that Change of Control of TERRA took place. All the Contracts and Subsequent Contracts shall also terminate on that date.

## EIGHT. CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.

8.1.    This Framework Agreement and all the documentation or negotiations linked thereto are confidential and neither of the Parties shall reveal their existence and content without the consent of the other, with the exception of cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the Party obliged shall previously inform the other.

8.2.    The Parties shall agree the content of any public notice or release related to this Framework Agreement or its performance.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

**NINE. NOTICES.**

9.1.  All notices between the Parties concerning this Contract may be made either in writing delivered at the domicile of the addressee, or by facsimile, in which case the original must be sent by registered mail with acknowledgement of receipt to the domicile of the party addressed.

9.2.  For all the purposes of notice, delivery shall be considered to take place on the same working day on which the letter was delivered, or the facsimile was transmitted to the party addressed.

9.3.  For all the purposes related to this document, the Parties hereby provide the following fax numbers and domiciles:

TELEFÓNICA, S.A.

Attention of the Secretary General

Address: Gran Vía, 28, Madrid

Fax: 91 521 45 81

TERRA

Attention of the Secretary General

Address: Paseo de la Castellana, 92 - Madrid

Fax: 91 452 38 81

**TEN. ASSIGNMENT.**

This Framework Agreement and the obligations assumed by each one of the Parties by virtue thereof may not be transferred, nor may be subject to assignment to any third party without the prior, express, written consent of the other Part.

**ELEVEN. VOIDNESS AND INEFFECTIVENESS OF THE CLAUSES.**

In the event that any Section or part thereof were to be declared void or ineffective, that nullity or ineffectiveness would affect only that provision or the relevant part thereof, while the Framework Agreement shall subsist in all other aspects, it being understood that such a Section or part thereof that may be affected shall be omitted. This shall all be considered

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

notwithstanding the obligations of the Parties foreseen in Section Six above, as to it being applicable.

## TWELVE. EXPENSES AND TAXES.

12.1.     Each part shall pay the expenses directly borne by it from formalisation of this Framework Agreement.

12.2.     The obligations of a tax nature shall be paid by each Party according to the applicable laws and provisions.

## THIRTEEN. ENACTMENT AND PREVALENCE OF THE AGREEMENT.

13.1.     This Framework Agreement shall be effective 1st January 2003.

13.2.     This Framework Agreement substitutes any other agreement, document or previous contract entered into between the Parties, that may contradict it and, specifically, in the event of discrepancy between the content of this Framework Agreement and Agreement II, in all cases the terms of this Framework Agreement shall prevail between the Parties. Notwithstanding the terms set forth in this Section 13.2, both Parties recognise that the exclusive and other rights granted to TERRA in relation to rendering the services of Internet access prior to the date of enforcement of this Framework Agreement (contracts related to rendering services in Argentina and Peru) remain unaltered.

## FOURTEEN. APPLICABLE LAW.

This Framework Agreement shall be governed and interpreted pursuant to the laws of the Kingdom of Spain.

## FIFTEEN. DISPUTES RESOLUTION.

15.1.     Any discrepancy in the interpretation as well as the performance of this Framework Agreement must be submitted by the Parties, prior to initiating eventual arbitration proceedings, as foreseen in Section 15.2 below, to the Monitoring Committee and, if appropriate, by it to the Chairmen of TELEFÓNICA and TERRA.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

If the Monitoring Committee has not solved the controversy within the maximum term of one month from the date on which its intervention is requested by either of the Parties, the Monitoring Committee itself shall submit the matter to the Chairmen of TELEFÓNICA and TERRA within the 10 calendar days following expiry of the term mentioned.

Only if no agreement is reached by the Chairmen, within the fifteen working days following the date on which the controversy is submitted to them, shall the arbitration proceedings foreseen in Section 15.2 be foreseen.

15.2     The Parties hereby grant this Section the status of an arbitration clause, pursuant to all the terms established and recognised in article 6.1 in relation to 5.1, of the current Act 36/1988 of 5th December, and submit all matters that may arise as to the validity, effectiveness, interpretation and/or performance of this Framework Agreement to the finding issued by an Arbitration Tribunal formed by three arbitrators, who shall decide on the matters of litigation subject to Law, and the (Parties) undertake to attend and abide by the finding issued.

The Arbitration Tribunal shall be formed by appointing an arbitrator for the plaintiff and another arbitrator for the defendant, both of whom shall then appoint a third arbitrator by reaching an agreement within the term stated in the following paragraph. Should an agreement not be reached within the said term, His Honour the Dean of the Honourable Legal Association of Madrid, or the Lawyer of that Association chosen by the Dean, shall be automatically appointed.

In order to constitute the arbitration tribunal and carry out the arbitration, the Parties shall proceed as follows:

(i)       The Party calling the arbitration shall serve authentic notice to the others stating the matter of litigation and appointing an arbitrator, of whose acceptance it has record.

(ii)      Within the unextendable term of eight calendar days from the date on which notice is received, the Parties summoned must state whether they accept the matter of litigation raised or extend it, and in all cases must appoint another arbitrator, of whose acceptance it has record.

(iii)     The Party calling the arbitration shall have a further eight calendar days to accept or reject, fully or partially, the extension

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

of the matter of litigation. If it accepts, the other Party shall be served authentic notice. If it does not accept the extension, the matter of litigation shall be considered just as it was raised, notwithstanding the right the other party has to bring further arbitration.

(iv)   When the said term for extension of the arbitration has elapsed, with or without agreement between the Parties, both arbitrators shall proceed to appoint a third one, or if they do not agree, shall appoint the Dean of the Honourable Law Association of Madrid, who may, at his discretion, accept the appointment or appoint a third arbitrator.

(v)   If more than ninety calendar days elapse from the notice calling the arbitration as provided hereabove (i) and if the Arbitration Tribunal has not been formed for any reason, the Parties may resort to judicial formalisation of the arbitration through the jurisdictional intervention foreseen in articles 38 and following of Act 36/1988 of 5th December.

(vi)   The Party that may proven to blame for it being impossible to constitute the Arbitration Tribunal shall pay the other part, in settlement of an accumulative conventional penalty, that is to say, notwithstanding other liabilities in which it may have incurred, the sum of 6,000 euros per day until the date on which the cause leading to such an impossibility is removed.

(vii)   Madrid, the capital, is named the venue for the arbitration for all the effects of announcement thereof.

The procedure shall be determined by the Arbitration Tribunal according to the applicable imperative regulations and the organisational principles set forth in articles 21 and following of Act 36/1988 of 5th December.

In any case, the Parties shall declare Spanish Law by common agreement to be the applicable legislation for resolution of any of the controversies that may arise in all the cases in which this arbitration clause may be applicable.

As to the content, from and term of the finding, the terms of articles 30 to 37 of the current Act 36/1988 of 5th December shall be applicable, and in all matters not foreseen by this Arbitration Section, the terms of the said Act shall also be applicable.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

In all matters that may not be resolved by arbitration, as well as in judicial formalisation of this, if necessary, the Parties expressly submit, renouncing any other Jurisdiction, to the Tribunals of Madrid, the capital.

## SIXTEEN. EXHIBITS.

The five Exhibits to this Framework Agreement, a list of which is provided hereunder, form an integral part hereof to all effects, and it is understood by the Parties that all concepts included therein are equivalent to those included within this main body of the Framework Agreement, and, therefore, do not alter them in any way.

List of Exhibits:

Exhibit I

Exhibit II Value Added Services, Portal and Related Infrastructure

Exhibit III: Corporate Services and Assets

Exhibit IV: Advertising

Exhibit V: Consulting

In witness whereof, the Parties sign double copies of this Framework Agreement, to a sole end, in the place and on the date first written above.

TELEFÓNICA, S.A.                    TERRA NETWORKS, S.A.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

# EXHIBIT I

*(Millones de Euros)*

|  |  | 2003 |
|---|---|---|
| **I. VALUE ADDED SERVICES, PORTAL AND RELATED INFRASTRUCTURE** | | |
| | Revenues | 96.3 |
| | Costs | (30.6) |
| | EBITDA | 65.7 |
| | Capex | 0.0 |
| **II. CORPORATE ASSETS AND SERVICES** | | |
| | Revenues | 5.1 |
| | Costs | (3.4) |
| | EBITDA | 1.7 |
| | Capex | 0.0 |
| **III. ADVERTISING** | | |
| | Revenues | 8.0 |
| | Costs | (1.6) |
| | EBITDA | 6.4 |
| | Capex | 0.0 |
| **IV. CONSULTING** | | |
| | Revenues | 9.4 |
| | Costs | (4.7) |
| | EBITDA | 4.7 |
| | Capex | 0.0 |

**Total EBITDA**                                      **78.5 Mill. Euros**

                                                      **66%**

**Total Revenues**                                    **118.8 Mill. Euros**

**Total Costs**                                       **(40.3) Mill. Euros**

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

**EXHIBIT II**

**VALUE ADDED SERVICES, PORTAL AND RELATED INFRASTRUCTURE**

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)     The Companies in the TELEFÓNICA Group will engage the Companies in the TERRA Group on an exclusive basis to develop all portals for the aggregation of content and Internet services on narrow and broad band of the Companies in the TELEFÓNICA Group, which target the residential segment, SOHO and, if appropriate, SMEs;

(ii)    The Companies in the TERRA Group shall be suppliers of the essential elements of the portal and aggregator of the narrow and broad band Internet services targeting the residential segment, SOHO and, if appropriate SMEs;

(iii)   The portals developed by the Companies in the TERRA Group for the Companies in the TELEFÓNICA Group, the essential elements of the portal, content and Internet services described above will be commercialized with the trademark and other distinctive signs of the Companies in the TERRA Group, for which purposes the relevant licenses shall be granted.

(iv)    The Companies in the TELEFÓNICA Group shall acquire the necessary narrow and broad band Internet value added services exclusively from the Companies in the TERRA Group as required to construct the offer for end users, preferably residential, SOHO and, if appropriate, SMEs, listing, for purely illustrative although not limiting purposes, the following: e-mail, instant message platforms, unified message platforms, chats, etc.

(v)     The Companies in the TELEFÓNICA Group shall assign to the Companies in the TERRA Group the exclusive management and operation of the advertising spaces that include third party advertising on the portals developed according to Section 2.1.1. above by the Companies in the TERRA Group (the decision of exploiting advertising spaces on such portal relying solely in Companies in the TELEFÓNICA Group).

(vi)    On other terms, the Companies in the TERRA Group shall preferentially focus their demand for acquisition, development and/or commercialisation of content arising from the construction of the offer of products and services foreseen in Section Two of this Framework Agreement through the Companies in the TELEFÓNICA Group.

(vii)   TERRA and TELEFÓNICA undertake to make their best effort to ensure that the Companies in the TELEFÓNICA Group distribute their on-line contents preferentially through the Companies in the TERRA Group.

(viii)  The Companies in the TERRA Group shall acquire the wholesale Internet connectivity and access services exclusively from the Companies in the TELEFÓNICA Group, as long as that acquisition is made on better conditions than those allowed by market regulations.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

(ix)    The Companies in the TELEFÓNICA Group shall provide the outsourcing or equivalent service to operate all or part of the services and/or operation of the elements for excess to the network required by the Companies in the TERRA Group to provide the Internet access service to their preferentially residential customers, SOHO and, if appropriate, SMEs, as long as such services may be provided under the best market conditions allowed by the regulations.

(x)    The Companies in the TERRA Group shall acquire exclusively from the Companies in the TELEFÓNICA Group the advanced network services and platforms required to build up the offer for preferentially residential customers, SOHO and, if appropriate, SMEs on narrow and broad band, as long as such acquisition is performed on the best market conditions the regulation allows.

TERRA y TELEFÓNICA estimate that the operation of the foregoing relationships shall result in a creation of global value equivalent to 65´7 million Euros in year 2003, which may be breakdown as follows:

|  | MM Euros |
|---|---|
| Revenues | 96'3 |
| Costs | 30'6 |
| EBITDA | 65´7 |
| Capex | 0 |

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

## EXHIBIT III

## CORPORATE ASSETS AND SERVICES

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)     The Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall enter into exclusive contracts to provide on-line training services to their respective employees through the company Educaterra, S.L.

(ii)    The Companies in the TELEFÓNICA Group and the Companies in the TERRA Group will engage Maptel, S.A. for their needs of products, solutions and services based on on-line localization

(iii)   Telefónica de España, S.A. shall transfer to Educaterra, S.A. platform A+ own by it, following the terms set forth in Section 2.2.1.2 of this Framework Agreement.

TERRA y TELEFÓNICA estimate that the item (i) above shall result in a creation of global value equivalent to 1´7 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |     |
|----------|----------|-----|
| Revenues | 5'1      |     |
| Costs    |          | 3'4 |
| EBITDA   | 1'7      |     |
| Capex    | 0        |     |

With respect to item (ii) above, as the date hereof the Parties have not yet estimated its economic impact.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

**EXHIBIT IV**

**ADVERTISING**

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)     Group TELEFÓNICA shall assign not be less than 2% of the total annual budget assigned by that Group to the acquisition of advertising spaces in the Companies in the TERRA Group,

(ii)    The Companies in the TERRA Group to provide preferentially integral on-line marketing services to the Companies in the TELEFÓNICA Group. For these purposes, "preferential contracting" shall be understood as the option granted to the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing services of the Companies in the TERRA Group and the obligation of the Companies in the TELEFÓNICA Group to hire those integral on-line marketing services with the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the TELEFÓNICA Group is not objectively worse than the offer presented by any third party

TERRA y TELEFÓNICA estimate that item (i) above shall result in a creation of global value equivalent to 6´4 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |     |
|----------|----------|-----|
| Revenues | 8        |     |
| Costs    |          | 1'6 |
| EBITDA   | 6'4      |     |
| Capex    | 0        |     |

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

## EXHIBIT V

## CONSULTING

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)     Preferential contracting of the auditing, consultancy, management and maintenance services of the country portals of the Companies in the TELEFÓNICA Group by the Companies in the TERRA Group. To these purposes, "preferential contracting" shall be understood to be the option of the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group auditing, consultancy, management and maintenance services for its country portals and the obligation of the Companies in the TELEFÓNICA Group to hire those auditing, consultancy, management and maintenance services for country portals from the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the Telefónica Group is not objectively worse than the offer presented by any third party.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall provide the Companies in the TELEFÓNICA Group the auditing, consultancy, management and maintenance services of their respective country portals.

TERRA y TELEFÓNICA estiman que el epígrafe (i) anterior arrojará una generación de valor global equivalente a 4´7 millones de Euros en el año 2003, que se desglosa de la siguiente forma:
TERRA y TELEFÓNICA estimate that the item (i) above shall result in a creation of global value equivalent to 4´7 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |
|----------|----------|
| Revenues | 9'4      |
| Costs    | 4,7      |
| EBITDA   | 4,7      |
| Capex    | 0        |

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

EX-4.13 4 dex413.htm STRATEGIC ALLIANCE FRAMEWORK AGREEMENT DATED AS OF FEB. 12, 2003

Exhibit 4.13

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

STRATEGIC ALLIANCE FRAMEWORK AGREEMENT

signed by

**TERRA NETWORKS, S.A.**

and

**TELEFÓNICA, S.A.**

Madrid, February 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

In Madrid, on February 12, 2003

BETWEEN

For one part, TELEFÓNICA, S.A. (hereinafter, "TELEFÓNICA"), a stock company incorporated by virtue of the deed of incorporation executed by the Notary Public of Madrid, Mr Alejandro Rosselló Pastor, on 19th April 1924, under number 141 of his records, domiciled in Madrid, calle Gran Vía, 28. It is registered at the Business Registry of Madrid, at volume 12534, folio 21, sheet number M-6164. It is assigned Tax Identification Number A-28015865.

It is represented at this act by (*), of legal age, with domicile for these purposes in Madrid, Gran Vía, 28, holder of national identity document number (*), acting on behalf of TELEFÓNICA in his capacity as (*) of the company and making use of the faculties (*).

And for the other, TERRA NETWORKS, S.A. (hereinafter, "TERRA"), a stock company incorporated under the company name of TELEFÓNICA COMUNICACIONES INTERACTIVAS, S.A., by means of the deed authorised by the Notary Public of Madrid, Mr José Antonio Escartín Ipiens, on 4th December 1998, under number 5,276 of his records, registered at the Business Registry of Madrid, at Volume 13,753, Folio 185, Sheet number M-224,449, Entry 1. it changed its company name to that of TELEFÓNICA INTERACTIVA, S.A. in the deed executed on 16th March 1999, before the Notary Public of Madrid Mr Francisco Arriola Garrote, under number 1269 of his records, leading to entry 9 at the Business Registry of Madrid. It is domiciled in Barcelona, calle Nicaragua 54. It has been assigned Tax Identification Code A-82196080. TERRA appears in its own name and in name and on behalf of Lycos, Inc., (hereinafter "LYCOS"), acting as the sole partner of the latter.

It is represented at this act by Mr Joaquim Agut Bonsfills, of legal age, with domicile for these purposes in Barcelona, calle Nicaragua 54, holder of national identity document number 39.134.364-W. He is acting on behalf of TERRA in his capacity as Executive Chairman of the firm, as set forth in the deed executed by the Notary Public of Madrid Mr Carlos Rives Gracia on 9th October 2001, under number 3,402 of his records.

Hereinafter, the expression "Parties" shall be used jointly for TELEFÓNICA and TERRA. The expression "Party" shall refer individually to either of them.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 3 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

The Parties reciprocally recognise their capacity and legitimisation to grant this document.

## WITNESSETH

I.    Whereas, on May 16th, 2000, the Parties, along with BERTELSMANN A.G, a corporation of German nationality, and LYCOS Inc., a corporation of United States nationality, the sole shareholder of which is TERRA, entered into an agreement called Strategic Alliance Framework Agreement (hereinafter the "Agreement"), which regulated the conditions under which BERTELSMANN and, if appropriate, TELEFÓNICA, would hire TERRA to provide certain products and services. The conditions established in that Agreement were on preferential terms.

II.    Whereas, a change has taken place in the business models created at the end of the 90s and beginning of 2000 to capture the growth value of the Internet, mainly based (although not exclusively) on income obtained by monetisation of the audience through access and advertising,    , and one must also point out the worldwide crisis on the advertising market. On the other hand, the wave of offers in narrow band as well as broad band through the media provided by the telephone access or cable television operators has led to such operators developing their own business lines on the Internet, or having sought alliances with specific Internet access suppliers and/or Internet portals, in which sense one must point out the clearly complementary nature of TELEFÓNICA and TERRA due to their conceding presence in Spain and Latin America. There is also a clear difference between the catalogue of services and products demanded by BERTELSMANN A.G. and TELEFÓNICA, and BERTELSMANN A.G. also focuses on the United States market which is more linked to LYCOS, Inc. These circumstances that have arisen have a great effect on articulation of the new phase of the relation, just as has been publicised on the markets since the last month of October. In this new context, the Parties, along with LYCOS, Inc. and BERTELSMANN A.G., have considered it more convenient to continue their relations, leaving said Agreement without effect, it being fully replaced by this Strategic Alliance Framework Agreement and a new Memorandum of Understanding entered into with this same date (hereinafter "Agreement II"), which regulate the general terms of the new framework of relations between BERTELSMANN A.G., TERRA and TELEFÓNICA, considering as the essential aspect for the purposes of its development the execution of this strategic alliance between TELEFÓNICA and TERRA.

III.    Whereas, indeed, the trend shown by telephone access operators to seek alliances with specific Internet access providers has shown the convenience of taking advantage of the complementary factors there are between TELEFÓNICA, and TERRA on all the markets in which both are present. In this sense, while TELEFÓNICA, as a telecommunications operator, has a clearly competitive position in matters of connectivity and provision of access to the international Internet nodes promoted by the development of broad band, TERRA is now the leader on the Spanish and Portuguese speaking market as a specific supplier of Internet access, being the reference portal in Latin America and Spain (as a leading aggregator and contents manager and provider of value added products and services related to the Internet, having developed a brand image which is unquestionably recognised in the New Technologies and Internet sector that contributes the experience and knowledge required for sustained joint construction of a sophisticated offer of narrow and broad band contents and services.

IV.    Whereas, by virtue of this complementary nature in its objectives, needs and business plans and identification of an improvement in the opportunities of growth, the Parties intend to establish a long term strategic alliance whose main objective will be to improve the joint development of both companies on the narrow and broad band Internet markets in all the countries in which both Groups are present, preferably in the residential segment, SOHO and, if appropriate, SMEs.

V.    [***]

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

VI.    Whereas, due to all the foregoing, the Parties hereby enter into this Framework Agreement, according to the following:

<div style="text-align:center">CLAUSES</div>

### ONE.    OBJECT OF THIS FRAMEWORK AGREEMENT.

The object of this Framework Agreement is the creation of a strategic alliance between TELEFÓNICA and TERRA (establishing the relevant model of relations between them in each one of the phases, just as mentioned hereunder, that take the maximum advantage of the capacity of TELEFÓNICA, as a provider of narrow and broad band connectivity and access, and of TERRA as a portal, aggregator, provider and manager of Internet contents and services, in fixed telephony (including the wireless system used in this sector) and in mobile telephony (only if thus agreed in the Contracts and Subsequent Contracts, just as both terms are defined in Section Second and Fourth paragraph four ), all aimed at the residential and SOHO markets, and if agreed in the Contracts and Subsequent Contracts, SMEs, taking advantage of synergies and creating value for both Parties:

(i)     aggregation of the offer of products and services in the Internet business;

(ii)    provision of the offer of products and services in the Internet business,

(iii)   development and construction of new advanced services in the Internet business;

(iv)    connectivity and access to Internet business.

Moreover, the Parties shall use best effort to identify additional elements to those described in Section Two below that allow value to be generated for both Groups, with special emphasis on electronic commerce, and the relationships with the different mobile operators of the TELEFÓNICA Group (as such term is defined in Section Two below).

### TWO.    DEVELOPMENT OF THE MODEL OF RELATIONS IN EACH ONE OF THE PHASES OF BUSINESS FORMING THE OFFER FOR THE END CLIENT IN THE INTERNET BUSINESS.

The model of relations referred to in the above Section will be subject to development through the relevant contracts entered into between certain companies in the TELEFÓNICA Group and the TERRA Group, on the terms and conditions established in this Framework Agreement, adapted, if appropriate, to the legal and statutory requisites that may be applicable.

For that purpose, each Party hereby undertakes, as controlling shareholder of its respective Group, that each one of the contracts foreseen in this Section Two (hereinafter the "Contracts") shall be formalised and executed by the companies determined by it among those in its respective Group, this being understood in the sense of article 4 of Act 24/1988 of 24th July, of the Stock Market, and, for the purpose of this Framework Agreement, the TERRA Group and Telefónica Publicidad e Información, S.A. shall not be considered an integral part of Telefónica Group (hereinafter "TELEFÓNICA Group" and "TERRA Group", as appropriate, and the companies thus determined by each Party among those of its respective Group, the "Companies in the TELEFÓNICA Group" or the "Companies in the TERRA Group", as appropriate), in order to generate:

(x) in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z) for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above, and as defined in the Note of the Exhibit I.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 5 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

The Parties hereby agree that, to the extent require by virtue of the object of the relevant Contracts, they must be entered into by companies in the TELEFÓNICA Group and Companies in the TERRA Group with presence in the same geographic territories.

2.1.    Exclusivity of the Companies in the TERRA Group as a portal, service aggregator and supplier of added value services.

2.1.1.    TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group grant exclusivity to the Companies in the TERRA Group as supplier of the essential elements of the portal and aggregator of the narrow and broad band Internet services targeting the residential segment, SOHO and, if appropriate SMEs, all to the satisfaction of TELEFÓNICA according to the contractual parameters established in the terms set forth in Section 2.1.5 below.

2.1.2.    TELEFÓNICA hereby undertakes, on the terms and conditions of this Framework Agreement, for the Companies in the TELEFÓNICA Group to provide the Companies in the TERRA Group the exclusive commission to develop all the portals for aggregation of the Internet contents and services on narrow and broad band, targeting the residential segment, SOHO and, if appropriate, SMEs, developed by the Companies in the TERRA Group, whether Internet access portals in connectivity offers and Internet access by Companies in the TELEFÓNICA Group, and include the trademark and other distinctive signs of the Companies in the Terra Group (the use of said trademark and other distinctive signs will comply with the provisions of the agreements to be entered under Section 2.1.5 below).

2.1.3.    Commercialisation or provision to third parties of packaged services that are identical or substantially similar to those supplied to the Companies in the Telefónica Group as set forth in Sections 2.1.1 and 2.1.2 above shall require prior written consent from TELEFÓNICA, which will not be unjustifiably denied.

2.1.2.    TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall acquire the necessary narrow and broad band Internet value added services exclusively from the Companies in the TERRA Group as required to construct the offer: for end users, preferably residential, SOHO and, if appropriate, SMEs, listing, for purely illustrative although not limiting purposes, the following: e-mail, instant message platforms, unified message platforms, chats, etc.

2.1.4.    TELEFÓNICA undertakes, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group assign to the Companies in the TERRA Group the exclusive management and operation of the advertising spaces that include third party advertising on the portals developed according to Section 2.1.1. above by the Companies in the TERRA Group. In order to avoid doubt, it is expressly recorded that the decision on existence of such advertising space shall be taken entirely by the Companies in the Telefónica Group.

2.1.5.    For the purposes of formalising what is set forth in Sections 2.1.1, 2.1.2, 2.1.3 and 2.1.4 above, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant licence contracts for brands and other distinctive signs and intellectual property, management of the portal, aggregation and access to value added services and use of software and maintenance, within the terms specified in Section 4.1 below, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II.

*PAGE TRANSLATION FROM SPANISH ORIGINAL.*

**Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.**

2.2. Acquisition, development and/or commercialisation of contents, service provision agreements and exchanges of shares and/or assets with vertical portals, advertising spaces, provision of on-line integral marketing spaces and provision of auditing, consultancy, management and maintenance services for country portals.

2.2.1. Acquisition, development and commercialisation of contents and agreements to provide services and share and/or asset exchanges with vertical portals.

2.2.1.1. TERRA and TELEFÓNICA hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group preferentially focus their demand for acquisition, development and/or commercialisation of content arising from the construction of the offer of products and services foreseen in Section Two through Companies in the TELEFÓNICA Group. For this purposees, "preferential focussing" shall be understood as the option for Companies in the TELEFÓNICA Group to offer the Companies in the TERRA Group the aforementioned contents and the obligation of the Companies in the TERRA Group to commission those contents from the Companies in the TELEFÓNICA Group, as long as the offer presented by the latter to the Companies in the TERRA Group is not objectively worse than the offer provided by any third party.

Moreover, TERRA and TELEFÓNICA undertake to make their best effort to ensure that the Companies in the TELEFÓNICA Group distribute their on-line contents preferentially through the Companies in the TERRA Group.
For that purposes, on the terms established in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for acquisition, development and/or commercialisation of content and rendering on-line training services, on the terms and conditions set forth in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 above.

2.2.1.2. The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group enter into exclusive contracts to provide on-line training services to their respective employees through the company Educaterra, S.L.
The Parties undertake to use best efforts, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group will engage Maptel, S.A. for their needs of products, solutions and services based on on-line localisation.
In order to facilitate fulfilment of the commitments undertaken in Section 2.2.1.1 above and to optimise their respective portfolios, the Parties hereby undertake, on the terms and conditions foreseen in general terms under this Framework Agreement that, within the deadlines set in Section 4.1 below, Telefónica de España, S.A. shall transmit to Educaterra, S.A., and the latter shall acquire at market value, which according to the Parties valuations is equivalent to its book value, the platform A+ owned by it, on the terms and conditions established specifically in Exhibit III.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

2.2.2.    Acquisition of advertising spaces.

TELEFÓNICA and TERRA hereby undertake, on the terms and conditions of this Framework Agreement, that the annual amount assigned by the TELEFÓNICA Group to acquisition of advertising spaces in the Companies in the TERRA Group shall not be less than [***]% of the total annual budget assigned by that Group to advertising.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts to acquire advertising spaces, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV.

2.2.3.    Provision of integral on-line marketing services.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, for the Companies in the TERRA Group to provide preferentially integral on-line marketing services to the Companies in the TELEFÓNICA Group. To these purposes, "preferential contracting" shall be understood as the option granted to the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing services of the Companies in the TELEFÓNICA Group and the obligation of the Companies in the TELEFÓNICA Group to hire those integral on-line marketing services with the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the TELEFÓNICA Group is not objectively worse than the offer presented by any third party.

For that purposes, within the terms foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant service provision contracts for integral on-line marketing services, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV, mentioned under Section 2.2.2 above.

2.2.4.    Preferential contracting of the auditing, consultancy, management and maintenance services of the country portals of the Companies in the TELEFÓNICA Group by the Companies in the TERRA Group. To these purposes, "preferential contracting" shall be understood to be the option of the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing Companies and the obligation of the Companies in the TELEFÓNICA Group auditing, consultancy, management and maintenance services for its country portals and the obligation of the Companies in the TELEFÓNICA Group to hire those auditing, consultancy, management and maintenance services for country portals from the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the Telefónica Group is not objectively worse than the offer presented by any third party.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall provide the Companies in the TELEFÓNICA Group the auditing, consultancy, management and maintenance services of their respective country portals.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit VI.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 8 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

2.3.    Wholesale Internet connectivity and access.

2.3.1.    The Companies in the TELEFÓNICA Group, as exclusive suppliers of wholesale connectivity and access services.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire the wholesale Internet connectivity and access services exclusively from the Companies in the Telefónica Group, as long as that acquisition is made in the conditions of the most favoured client allowed by market regulations.

For that purposes, within the deadlines provided in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 and 2.2.1.1 above.

2.3.2.    Outsourcing regime or equivalent in operation of the network access elements.

The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall provide the outsourcing or equivalent service to operate all or part of the services and/or operation of the elements for excess to the network required by the Companies in the TERRA Group to provide the Internet access service to their preferentially residential customers, SOHO and, if appropriate, SMEs, as long as such services may be provided in the conditions of the most favoured client allowed by the regulations.

For that purposes, within the deadlines set in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant contracts for operation, hosting and management, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1 and 2.3.1 above.

2.3.3.    The Companies in the TELEFÓNICA Group, as exclusive providers of the network services required to build up the offer for end users.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire exclusively from the Companies in the TELEFÓNICA Group the advanced network services and platforms required to build up the offer for preferentially residential customers, SOHO and, if appropriate, SMEs on narrow and broad band, as long as such acquisition is performed in the conditions of the most favoured client that the regulation allows.

For that purposes, on the terms and conditions foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant exclusive supply contracts, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1, 2.3.1, and 2.3.2 above.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 9 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

**THREE.    GENERAL TERMS APPLICABLE TO THE CONTRACTS.**

3.1.    Scope of application.

The general terms agreed in this Section Three shall be applicable to all the Contracts, as well as to the Subsequent Contracts (as to the latter, on the terms foreseen in Section 4.4 and in Section Six below). However, the content of Section 3.3 below shall only be applicable to the successive term contracts.

The Parties hereby undertake to include in the Contracts and, if appropriate, in the Subsequent Contracts, the service level agreements that shall determine and guarantee a quality for the services, in keeping with the standards in the sector. Moreover, the Contracts, and as appropriate, the Subsequent Contracts, shall establish the appropriate protection mechanisms for the Parties in the event of early termination, to allow an adequate, respectful transition as to the daily activities of the Parties under the relevant Contract (or Subsequent Contract).

3.2.    Modifications imposed by administrative bodies.

In the event of any of the entities or bodies regulating the telecommunications market, the right to competition and/or any other competent bodies, require substantial amendment of any of the Contracts or Subsequent Contracts, the Monitoring Committee will have to decide on the convenience of performing such an amendment or of making the relevant Contract or Subsequent Contract void. The Monitoring Committee must decide within the term of one month from the date on which the matter is submitted to it. However, if the requirement by the relevant entity or body were to establish a lower term for fulfilment thereof, the term of one month shall be reduced appropriately.

If the Monitoring Committee were to resolve to make the relevant Contract or Subsequent Contract void, it will comply with the terms set forth in Section 4.3 below and, if appropriate, the terms foreseen in Section Six below.

3.3.    Termination.

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1 and 4.4 below and in the antepenultimate paragraph of Section Six below, the Contracts and Subsequent Contracts shall end and be left without any effect whatsoever in any of the following cases:

(i)    on 31st December 2008 or, if appropriate, on expiration of any renewal of a Contract or Subsequent Contract in the event that one of the parties had notified the other party in writing with, at least, two months in advance prior written notice, its intention to terminate the relevant Contract or Subsequent Contract. In absence of the relevant prior written notice, the Contract or Subsequent Contract shall be deemed automatically and successively renewed for additional periods of one year, or

(ii)   on the sixtieth calendar day following the date on which the Change in Control takes place at TERRA in the event of TELEFÓNICA having notified it within the term of its decision to terminate the Framework Agreement, on the terms set forth in Section Seven below; or

Termination of any of the Contracts in the cases foreseen in this Section 3.3 shall not give rise to any kind of liability being required among the relevant Parties, notwithstanding those strictly arising from execution thereof and fulfilment prior to the date of termination.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 10 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

3.4.    Confidentiality and public announcements.

The Contracts and Subsequent Contracts shall be confidential and none of the respective Parties shall reveal their existence and content without the consent of the other. An exception is made in cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the part under obligation shall previously inform the other.

The Parties shall agree on the content of any notification or public release related to the relevant Contracts and Subsequent Contracts.

3.5.    Expenses and taxes.

Each part shall pay the expenses arising for it from formalisation and execution of the Contracts and Subsequent Contracts.

The obligations of a tax nature shall be paid by each part pursuant to the applicable laws and provisions.

3.6.    Resolution of conflicts. Binding nature of the resolutions by the Monitoring Committee.

3.6.1.    Resolutions of conflicts.
          Any discrepancy in the interpretation as well as the execution of the Contracts and the Subsequent Contracts must be submitted by any of the Parties to the Monitoring Committee and, should a resolution not be provided, by it to the Chairmen of TELEFONICA and TERRA, resorting for the relevant judicial or arbitration proceedings only in the event of failure to reach an agreement by the Chairmen. To those ends, the terms of Section 15.1 below shall be applicable, with the particular specification that reference to the Parties must be understood to refer to the relevant Parties.

3.6.2.    Binding nature of the resolutions by the Monitoring Committee
          In any case, all agreements or resolutions by the Monitoring Committee, on the terms of Section Four below, shall be binding upon the relevant Parties, who undertake to fully comply with them, it thus being considered that the final decisions by those Parties may not be impugned.

**FOUR.    PROCEDURES AND SCHEDULE FOR DEVELOPMENT.**

4.1.    Terms to formalise the Contracts.

The Parties undertake that the Contracts, on the terms and conditions of this Framework Agreement and its Exhibits, are formalised between the Companies in the TELEFONICA Group and the Companies in the TERRA Group within the maximum term of one month from the date of this Framework Agreement, adapted as appropriate to the applicable legal and statutory requisites, on the terms that are determined for that purpose by the Monitoring Committee foreseen in Section 4.2 below. That Committee shall also set, according to the legal and business circumstances, the exact dates on which each Contract or group of Contracts must be formalised.

As an exception, the Monitoring Committee may postpone formalisation of some of the Contracts for proper reasons, so these are granted once the aforementioned term of one month has expired, in which case the terms of Section 4.3 below shall be applicable.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

4.2.    Monitoring Committee.

4.2.1.    Composition.

The Parties hereby agree to create a Monitoring Committee for execution, development and monitoring of this Framework Agreement, which must be formed by six members, three of which, who shall include the person acting as Chairman, shall be appointed by TELEFÓNICA, and the remaining three shall be appointed by TERRA.

Each Party may replace any member or members appointed by it at any time, by serving the relevant written notice to the Monitoring Committee.

The Parties hereby resolve that the appointment of the members of the Monitoring Committee and their formal constitution shall take place within the term of fifteen days from signing this Framework Agreement.

4.2.2.    Meetings: calling, frequency and minutes.

The Chairman shall call the meetings. The Monitoring Committee shall meet at least once every quarter. However, the Chairman must call the Monitoring Committee whenever required to do so in writing by any of its members and, likewise, may call it on any occasion he may deem fit.

The Parties agree that the first Monitoring Committee shall meet no later than 28th February 2003.

The meetings of the Monitoring Committee may be attended by executives from either of the Parties with the right to speak but not vote, in order to provide information on the progress of the alliance and to facilitate decision making by the Monitoring Committee.

The Secretary to the Monitoring Committee, who shall be appointed by TERRA from among the members of the Monitoring Committee appointed by TERRA, shall take the minutes of the content of each meeting, which shall be signed by the Secretary with the approval of the Chairman once it is approved by those attending.

4.2.3.    Quorum, passing resolutions and binding nature of these.

The Monitoring Committee shall be understood to be validly met as long as it is attended by four of its members and the resolutions are passed unanimously.

The agreements and resolutions by the Monitoring Committee shall be binding upon the Parties, who undertake to fully comply with them directly or through the companies in their relevant Group, as appropriate. In this sense, the agreements and resolutions by the Monitoring Committee shall be considered final decisions by the Parties in relation to the matters concerned and, thus, not liable to be impugned.

Failing an agreement on any matter of its competence, the Monitoring Committee shall submit the matter to the Chairmen of TELEFÓNICA and TERRA, who shall have a term of fifteen days to issue their finding. If that term expires without an agreement being reached, any of the Parties may initiate arbitration proceedings on the terms foreseen in Section Fifteen below.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

4.2.4.    Duties.

The Monitoring Committee is to perform the following duties.

(i)    to co-ordinate, direct and supervise performance and development of this Framework Agreement, through the process of formalisation of the Contracts, determining the dates of granting and integrating their content, as provided in Section 4.1 above.

(ii)    resolve on the convenience of extending, modifying or terminating any of the Contracts or Subsequent Contracts, or of formalising Subsequent Contracts, especially in the cases foreseen in Section 3.2 above and 4.4 below.

(iii)    resolve on possible amendments to be made in the Contracts or Subsequent Contracts, if their performance were to affect the profitability or strategic interests of the Telefónica Group or Terra Group, and this will only be when the circumstance may not compensated in terms of value through the mechanisms foreseen in this Framework Agreement.

(iv)    resolve on extension of this Framework Agreement or granting preemptive rights, as well as concerning the degree of fulfilment of the alliance and to take the relevant corrective measures, [***] and determining the cases in which the factual cases foreseen in Section Six below arise to apply the TELEFÓNICA Guarantee.

(v)    resolve on the convenience of modifying the Contracts and Subsequent Contracts according to the evolution of the applicable legislation, on the terms of Section 4.5 below.

(vi)    resolve on any discrepancy in interpretation as well as performance of this Framework Agreement, of the Contracts and of the Subsequent Contracts; and

(vii)    any others specifically entrusted to it under this Framework Agreement.

(viii)    resolve on creation of working subcommittees on any of the areas of specific activity in Spain, Brazil, Rest of Latin America and Relations with Telefónica Data, as well as suppression, modification, substitution or creation of additional subcommittees.

(ix)    analyze and review the amounts and criteria for allocation referred to in the Note of Annex 1 of the present Framework Agreement.

When performing its duties, the Monitoring Committee shall ensure that its resolutions comply with the principle of tax efficiency for the Parties, as well as for the relevant Parties of the Contracts and Subsequent Contracts.

4.3.    Review of the degree of fulfilment of the alliance and extension of the Framework Agreement.

4.3.1.    The Monitoring Committee must validate fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA in November every year. For that purposes, it must review the degree of fulfilment of the Contracts and, if appropriate, of the Subsequent Contracts, in order to determine whether the services have been rendered to the satisfaction of the relevant part and check that they have been fulfilled.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 13 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

(x)     in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)     for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above.

In order to facilitate that annual validation, on a quarterly basis, on the second half of the second month of the following quarter, the Monitoring Committee shall review the degree of fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA, the degree of fulfilment of the Contracts and, if appropriate, Subsequent Contracts, adopting the measures it may deem fit in each case.

On the other hand, in November 2008, the Monitoring Committee shall resolve on the extension or not, for the term deemed convenient, of this Framework Agreement and, where applicable, of the Contracts and Subsequent Contracts. If it were to decide not to extend them, the Monitoring Committee would determine the services, whether foreseen or not in Section Two above, in relation to which the Companies in the TELEFÓNICA Group would grant the Companies in the TERRA Group with presence in the same geographic territory, or vice-versa, a pre-emptive right to equal offers by third parties.

4.3.2.    However, the Monitoring Committee may perform the reviews foreseen in Section 4.3.1 above as an extraordinary measure in any other month of the year.

4.3.3.    The Monitoring Committee shall impose the measures it deems fit, ["***] to correct the breaches detected during its annual validation duties and, if appropriate, shall determine whether it is appropriate to apply the TELEFÓNICA Guarantee foreseen in Section Six below.

4.4.    Adaptation and updating of the services and products.

According to the technological advances, the evolution of the specific needs of both Groups, the general market conditions, the evolution of the reference costs, and any other considerations related to achieving the objectives of this alliance, the Monitoring Committee may agree the modifications it may deem appropriate as to the services and products that, by virtue of this Framework Agreement and the Contracts or Subsequent Contracts, must be rendered to the relevant companies in the TELEFÓNICA Group and in the TERRA Group (even inclusion of new catalogues of services and products), making, when appropriate, the appropriate decisions for that purposes in relation to (i) amendment of this Framework Agreement, (ii) extension, amendment or suppression of certain Contracts or Subsequent Contracts, and (iii) formalisation of new contracts (hereinafter, along with the contracts mentioned in the paragraph preceding the penultimate one of Section Six below, the "Subsequent Contracts") which shall be subject to the terms and conditions foreseen in general within this Framework Agreement, except in the aspects which the Monitoring Committee may consider appropriate to modify.

In cases in which the Monitoring Committee may resolve to extend only certain Contracts or Subsequent Contracts, it shall also resolve on the Sections of this Framework Agreement that, by virtue of their applicability, must continue in force, taking full effects as to the Contracts or Subsequent Contracts extended.

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed **pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.**

4.5.    Adaptation of the Contracts and Later Contracts to the evolution of the applicable legislation.

According to the evolution of the applicable laws and, in particular, liberalisation of the regulation framework for the telecommunications market and competition rights, the Monitoring Committee may agree the modifications it may deem fit in relation to the Contracts and Subsequent Contracts, in order to overcome the restrictions contained in their clauses due to the limitations imposed by the by-laws in force at the time of granting.

### FIVE.    GOOD FAITH.

The Parties undertake to act in good faith, abstaining from performing any action that may prevent or hinder performance of this Framework Agreement, and giving complete fulfilment directly, or through the companies in its respective Group to the obligations arising from this Framework Agreement, especially those related to (i) fulfilment of the resolutions by the Monitoring Committee, and (ii) formalisation of the Contracts and Subsequent Contracts, as well as their execution, by providing the services in accordance with the set quality parameters and payment of the relevant agreed prices.

### SIX.    GUARANTEE BY TELEFÓNICA.

TELEFÓNICA, hereby guarantees fulfilment by the Companies in the TELEFÓNICA Group of the obligation to formalise and fulfil the Contracts on the terms of this Framework Agreement.

In all cases in which, due to reasons other than breach by TERRA and/or the Companies in the TERRA Group, especially for legal or statutory reasons, it were not possible to formalise any of the Contracts, or they should become fully or partially void, or if there were to be any breach by TELEFÓNICA and/or the Companies in the TELEFÓNICA Group of these making it impossible to achieve:

(x)    in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)    for each one of the following financial years, a value equivalent at least to that established for 2003, as indicated in subparagraph (x) above (it being duly understood that in the event of the minimum value mentioned not being reached in any financial year, the deficit arising will be considered to be fully compensated by the necessary proportion by the surplus to that minimum figure that may have been obtained in any of the previous financial years).

TELEFÓNICA, shall propose alternative mechanisms to the satisfaction of TERRA to provide services and acquire products that, within the setting of the complementary nature of both Groups, will allow the relevant compensation to take place.

*FREE TRANSLATION FROM SPANISH ORIGINAL*

14

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003                                    Page 15 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

In the presentation of alternative mechanisms by TELEFÓNICA, it shall take the following aspects, among others, into account: (i) contracts to render services or acquire products not foreseen in Section Two above that may have been entered into by the Parties, or between the companies in their respective Groups after the date on which this Framework Agreement came into force, or after that date, as long as these are services to be provided thereafter; (ii) newly available services and products that may arise by virtue of the technological advances in the evolution of the specific needs of both Groups and the market conditions; and (iii) possibilities arising from inclusion of any companies in the TELEFÓNICA Group or the TERRA Group.

New contracts which are formalised by virtue of the terms set forth in the preceding paragraph (hereinafter along with the contracts foreseen in Section 4.4 above, the "Subsequent Contracts") shall be subject to the terms and conditions foreseen in general terms in this Framework Agreement, except in the aspects the Parties find fit to modify.

In cases in which the Parties agree to extend only certain Contracts or Subsequent Contracts, they shall also resolve on the Stipulations of this Framework Agreement which, by virtue of its application to these, must continue in force, taking full effect in relation to the Contract or Subsequent Contracts extended.

The obligations of TELEFÓNICA, within the framework of this Section shall be decreased by the relevant proportional part to show possible partial breaches by TERRA and/or by the Companies in the TERRA Group that may have taken place.

[***]

SEVEN.    TERMINATION.

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1. and 4.4 above, and in the antepenultimate paragraph of Section Six above, this Framework Agreement shall become void in any of the following cases:

   (i)   on 31st December 2008 or, if appropriate, on expiration of any relevant renewal pursuant to Section 4.3.1 in the event that one of the Parties had notified the other Party in writing with, at least, two months in advance prior written notice, its intention to terminate the Framework Agreement. In absence of the relevant prior written notice, the Framework Agreement shall be deemed automatically and successively renewed for additional periods of one year, or

   (ii)   at the option of TELEFÓNICA in the event of a Change in Control taking place in TERRA (on the terms foreseen in the last two paragraphs of this Section).

Termination of the Framework Agreement in the cases foreseen in this Section Seven shall not give rise to any kind of liability between the Parties being demanded, notwithstanding those arising strictly from the actual performance of the Framework Agreement prior to the date of termination.

A Change in Control of TERRA shall be understood to be any event or situation except for (i) the transfer by TELEFÓNICA of all or part of its participation in TERRA or (ii) an act or agreement of TELEFÓNICA with a third party which leads to a Change of Control that entitles a shareholder other than TELEFÓNICA to direct the management and administration of that company directly or indirectly, as the holder of the majority voting rights or by virtue of agreements entered into with other shareholders.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 16 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

If there is a Change in Control of TERRA, if TELEFÓNICA were to opt to terminate this Framework Agreement, it will have the term of one month from the date on which this took place to notify TERRA that the Framework Agreement shall terminate, and it shall cease to be effective on the sixtieth calendar day from the date on which that Change of Control of TERRA took place. All the Contracts and Subsequent Contracts shall also terminate on that date. Likewise, should the Change of Control take place before 27 October 2005 and TELEFÓNICA chooses to terminate the present Framework Agreement, TELEFÓNICA must acquire products and services from TERRA during each quarter included between the termination date foreseen in Section 3.3 ii and 26 October 2005, in the following terms: (i) US$ 50 MM for each quarter the first year, (ii) US$ 56.25 MM for each quarter the second year and (iii) US$ 62.5 MM for each quarter the third year. Said amounts will be reduced by the equivalent revenues to the possible non-compensated excess values referred to in Clause Section (z) and shall be paid as an advanced payment in the ten first days of each quarter [***].

**EIGHT.    CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.**

8.1.    This Framework Agreement and all the documentation or negotiations linked thereto are confidential and neither of the Parties shall reveal their existence and content without the consent of the other, with the exception of cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the Party obliged shall previously inform the other.

8.2.    The Parties shall agree the content of any public notice or release related to this Framework Agreement or its performance.

**NINE.    NOTICES.**

9.1.    All notices between the Parties concerning this Contract may be made either in writing delivered at the domicile of the addressee, or by facsimile, in which case the original must be sent by registered mail with acknowledgement of receipt to the domicile of the party addressed.

9.2.    For all the purposes of notice, delivery shall be considered to take place on the same working day on which the letter was delivered, or the facsimile was transmitted to the party addressed.

9.3.    For all the purposes related to this document, the Parties hereby provide the following fax numbers and domiciles:

TELEFÓNICA, S. A.
Attention of the Secretary General
Address: Gran Via, 28, Madrid
Fax: 91 521 45 81

TERRA
Attention of the Secretary General
Address: Paseo de la Castellana, 92—Madrid
Fax: 91 452 38 81

**TEN.    ASSIGNMENT.**

This Framework Agreement and the obligations assumed by each one of the Parties by virtue thereof may not be transferred, nor may be subject to assignment to any third party without the prior, express, written consent of the other Part.

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

**ELEVEN.   VOIDNESS AND INEFFECTIVENESS OF THE CLAUSES.**

In the event that any Section or part thereof were to be declared void or ineffective, that nullity or ineffectiveness would affect only that provision or the relevant part thereof, while the Framework Agreement shall subsist in all other aspects, it being understood that such a Section or part thereof that may be affected shall be omitted. This shall all be considered notwithstanding the obligations of the Parties foreseen in Section Six above, as to it being applicable.

**TWELVE.   EXPENSES AND TAXES.**

12.1.    Each part shall pay the expenses directly borne by it from formalisation of this Framework Agreement.

12.2.    The obligations of a tax nature shall be paid by each Party according to the applicable laws and provisions.

**THIRTEEN.   ENACTMENT AND PREVALENCE OF THE AGREEMENT.**

13.1.    This Framework Agreement shall be effective 1st January 2003.

13.2.    This Framework Agreement substitutes any other agreement, document or previous contract entered into between the Parties, that may contradict it and, specifically, in the event of discrepancy between the content of this Framework Agreement and Agreement II, in all cases the terms of this Framework Agreement shall prevail between the Parties. [***].

**FOURTEEN.   APPLICABLE LAW.**

This Framework Agreement shall be governed and interpreted pursuant to the laws of the Kingdom of Spain.

**FIFTEEN.   DISPUTES RESOLUTION.**

15.1.    Any discrepancy in the interpretation as well as the performance of this Framework Agreement must be submitted by the Parties, prior to initiating eventual arbitration proceedings, as foreseen in Section 15.2 below, to the Monitoring Committee and, if appropriate, by it to the Chairmen of TELEFÓNICA and TERRA.

If the Monitoring Committee has not solved the controversy within the maximum term of one month from the date on which its intervention is requested by either of the Parties, the Monitoring Committee itself shall submit the matter to the Chairmen of TELEFÓNICA and TERRA within the 10 calendar days following expiry of the term mentioned.

Only if no agreement is reached by the Chairmen, within the fifteen working days following the date on which the controversy is submitted to them, shall the arbitration proceedings foreseen in Section 15.2 be foreseen.

15.2.    The Parties hereby grant this Section the status of an arbitration clause, pursuant to all the terms established and recognised in article 6.1 in relation to 5.1, of the current Act 36/1988 of 5th December, and submit all matters that may arise as to the validity, effectiveness, interpretation and/or performance of this Framework Agreement to the finding issued by an Arbitration Tribunal formed by three arbitrators, who shall decide on the matters of litigation subject to Law, and the (Parties) undertake to attend and abide by the finding issued.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Page 18 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

The Arbitration Tribunal shall be formed by appointing an arbitrator for the plaintiff and another arbitrator for the defendant, both of whom shall then appoint a third arbitrator by reaching an agreement within the term stated in the following paragraph. Should an agreement not be reached within the said term, His Honour the Dean of the Honourable Legal Association of Madrid, or the Lawyer of that Association chosen by the Dean, shall be automatically appointed.

In order to constitute the arbitration tribunal and carry out the arbitration, the Parties shall proceed as follows:

(i) The Party calling the arbitration shall serve authentic notice to the others stating the matter of litigation and appointing an arbitrator, of whose acceptance it has record.

(ii) Within the unextendable term of eight calendar days from the date on which notice is received, the Parties summoned must state whether they accept the matter of litigation raised or extend it, and in all cases must appoint another arbitrator, of whose acceptance it has record.

(iii) The Party calling the arbitration shall have a further eight calendar days to accept or reject, fully or partially, the extension of the matter of litigation. If it accepts, the other Party shall be served authentic notice. If it does not accept the extension, the matter of litigation shall be considered just as it was raised, notwithstanding the right the other party has to bring further arbitration.

(iv) When the said term for extension of the arbitration has elapsed, with or without agreement between the Parties, both arbitrators shall proceed to appoint a third one, or if they do not agree, shall appoint the Dean of the Honourable Law Association of Madrid, who may, at his discretion, accept the appointment or appoint a third arbitrator.

(v) If more than ninety calendar days elapse from the notice calling the arbitration as provided hereabove (i) and if the Arbitration Tribunal has not been formed for any reason, the Parties may resort to judicial formalisation of the arbitration through the jurisdictional intervention foreseen in articles 38 and following of Act 36/1988 of 5th December.

(vi) The Party that may proven to blame for it being impossible to constitute the Arbitration Tribunal shall pay the other part, in settlement of an accumulative conventional penalty, that is to say, notwithstanding other liabilities in which it may have incurred, the sum of 6,000 euros per day until the date on which the cause leading to such an impossibility is removed.

(vii) Madrid, the capital, is named the venue for the arbitration for all the effects of announcement thereof.

The procedure shall be determined by the Arbitration Tribunal according to the applicable imperative regulations and the organisational principles set forth in articles 21 and following of Act 36/1988 of 5th December.

In any case, the Parties shall declare Spanish Law by common agreement to be the applicable legislation for resolution of any of the controversies that may arise in all the cases in which this arbitration clause may be applicable.

As to the content, from and term of the finding, the terms of articles 30 to 37 of the current Act 36/1988 of 5th December shall be applicable, and in all matters not foreseen by this Arbitration Section, the terms of the said Act shall also be applicable.

*FREE TRANSLATION FROM SPANISH ORIGINAL.*

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

In all matters that may not be resolved by arbitration, as well as in judicial formalisation of this, if necessary, the Parties expressly submit, renouncing any other Jurisdiction, to the Tribunals of Madrid, the capital.

## SIXTEEN.  EXHIBITS.

The five Exhibits to this Framework Agreement, a list of which is provided hereunder, form an integral part hereof to all effects, and it is understood by the Parties that all concepts included therein are equivalent to those included within this main body of the Framework Agreement, and, therefore, do not alter them in any way.

List of Exhibits:

Exhibit 1

Exhibit II: Value Added Services, Portal and Related Infrastructure

Exhibit III: Corporate Services and Assets

Exhibit IV: Advertising

Exhibit V: Consulting

In witness whereof, the Parties sign double copies of this Framework Agreement, to a sole end, in the place and on the date first written above.

TELEFÓNICA, S.A.                                    TERRA NETWORKS, S.A.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

EXHIBIT I

[***]

EXHIBIT II

[***]

EXHIBIT III

[***]

EXHIBIT IV

[***]

EXHIBIT V

[***]

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Page 20 of 20

**CONTRATO MARCO**

**DE ALIANZA ESTRATÉGICA**

**suscrito por**

**TERRA NETWORKS, S.A.**

**y**

**TELEFONICA, S.A.**

**Madrid, 29 de Enero de 2003**

En Madrid, a 29 de Enero de 2003.

## REUNIDOS

De una parte, TELEFÓNICA, S.A. (en lo sucesivo, "TELEFÓNICA"), entidad mercantil constituida en virtud de escritura de constitución autorizada por el Notario de Madrid, Don Alejandro Roselló Pastor, el día 19 de abril de 1924, bajo el número 141 de su protocolo, domiciliada en Madrid, calle Gran Vía, 28. Está inscrita en el Registro Mercantil de Madrid, al tomo 12534, folio 21, hoja número M-6164. Tiene asignado el Número de Identificación Fiscal A-28015865.

Se halla representada en este acto por [●], mayor de edad, con domicilio a estos efectos en Madrid, Gran vía, 28, y con DNI número [●]. Interviene en representación de TELEFÓNICA, en su condición [●] de la entidad y haciendo uso de las facultades [●].

Y de otra, TERRA NETWORKS, S.A. (en lo sucesivo "TERRA"), entidad mercantil constituida con la denominación social TELEFÓNICA COMUNICACIONES INTERACTIVAS, S.A., mediante escritura autorizada por el Notario de Madrid, Don José Antonio Escartín Ipiens el día 4 de diciembre de 1998, bajo el número 5.276 de su protocolo, e inscrita en el Registro Mercantil de Madrid al Tomo 13.753, Folio 185, Hoja número M-224.449, Inscripción 1ª. Cambiada su denominación social por la de TELEFÓNICA INTERACTIVA, S.A., mediante escritura otorgada el día 16 de marzo de 1999, ante el Notario de Madrid, Don Antonio Crespo Monerri, con el número 1.116 de su protocolo. Posteriormente ha sido cambiada su denominación social por la actual, por escritura autorizada el día 1 de octubre de 1999, ante el Notario de Madrid, Don Francisco Arriola Garrote, bajo el número 1269 de su protocolo, causando la inscripción 9ª en el Registro Mercantil de Madrid. Domiciliada en Barcelona, calle Nicaragua 54. Tiene asignado el Código de Identificación Fiscal A-82/196080. TERRA comparece en nombre propio y en nombre y representación de Lycos, Inc. (en lo sucesivo, "LYCOS"), en calidad de socio único de ésta última.

Se halla representada en este acto por D. Joaquim Agut Bonsfills, mayor de edad, con domicilio a estos efectos en Barcelona, calle Nicaragua 54 y con DNI número 39.134.364 W. Interviene en representación de TERRA, en su condición de Presidente Ejecutivo de la entidad, según consta en escritura otorgada ante el Notario de Madrid, D. Carlos Rives Gracia el día 9 de octubre de 2001, con el número 3.402 de su protocolo.

En adelante, la expresión "Partes" designará conjuntamente a TELEFÓNICA y a TERRA. La expresión "Parte" designará individualmente a cualquiera de ellas.

Las Partes, reconociéndose recíprocamente capacidad y legitimación para otorgar el presente documento,

## EXPONEN

2

I-    Que con fecha 16 de Mayo de 2000, las Partes junto con BERTELSMANN AG., entidad mercantil de nacionalidad alemana y LYCOS, Inc., entidad mercantil de nacionalidad norteamericana, cuyo único accionista es TERRA, celebraron un acuerdo denominado Strategic Alliance Memorandum of Understanding (en lo sucesivo el "Acuerdo"), en el que se regulaban las condiciones en que BERTELSMANN y, en su caso, TELEFÓNICA contratarían con TERRA la prestación de determinados servicios y productos. Las condiciones que se establecían en dicho Acuerdo eran en términos preferenciales.

II-    Que la evolución de los modelos de negocio creados a finales de los 90 y principios de 2000 para capturar el valor de crecimiento de Internet a corto plazo, fundamentados principalmente (aunque no exclusivamente) en ingresos provenientes de la monetización de la audiencia a través del acceso y la publicidad, ha demostrado que los mismos no han alcanzado las expectativas de viabilidad creadas, debiendo destacarse además la crisis mundial del mercado publicitario. Por otra parte, la irrupción de la oferta de acceso tanto en banda estrecha como especialmente en banda ancha a través de los medios proporcionados por los operadores de acceso telefónico o de televisión por cable, ha propiciado que tales operadores hayan ido desarrollando sus propias líneas de negocio en Internet o hayan buscado alianzas con los proveedores específicos de acceso a Internet y(o) portales de Internet, destacando en este sentido la clara complementariedad existente entre TELEFÓNICA y TERRA por su presencia coincidente en España y Latinoamérica. Asimismo, existe una clara diferencia entre el catálogo de servicios y productos que demandan BERTELSMANN AG. y TELEFÓNICA, focalizándose, además, BERTELSMANN AG. en el mercado norteamericano, más vinculado a LYCOS, Inc. Estas circunstancias sobrevenidas tienen un gran peso en la articulación de una nueva fase de la relación, tal y como se ha venido haciendo público a los mercados desde el pasado mes de Octubre. En este nuevo contexto, las Partes, junto con LYCOS, Inc y BERTELSMANN AG., han considerado mas conveniente continuar sus relaciones dejando sin efecto el mencionado Acuerdo y quedando aquél plenamente sustituido por el presente Contrato Marco de Alianza Estratégica y por un nuevo Memorandum of Understanding (en adelante el "Acuerdo II"), que se ha procedido a formalizar con esta misma fecha, en el que se regulan los términos generales del nuevo marco de relaciones entre BERTELSMANN AG., TERRA y TELEFÓNICA, contemplándose como el aspecto esencial a efectos de su desarrollo la celebración de la presente alianza estratégica entre TELEFÓNICA y TERRA.

III-    Que, efectivamente, la tendencia expuesta de los operadores de acceso telefónico a buscar alianzas con los proveedores específicos de acceso a Internet, ha puesto de manifiesto la conveniencia de aprovechar la complementariedad existente entre TELEFÓNICA y TERRA en todos los mercados en que ambas están presentes. En este sentido, mientras que TELEFÓNICA, en cuanto operador de telecomunicaciones, presenta una clara posición competitiva en materia de conectividad y provisión de acceso a los nodos internacionales de Internet potenciada por el desarrollo de la banda ancha, TERRA es actualmente el líder en el mercado de habla hispano-portuguesa como proveedor específico de acceso a Internet, siendo el portal de referencia en Latinoamerica y España (como destacado agregador y gestor de contenidos, y proveedor de productos y servicios de valor añadido relacionados con Internet), habiendo desarrollado una imagen de marca con un reconocimiento incuestionable en el sector de las Nuevas Tecnologías e Internet que aportan la experiencia y conocimiento necesarios para la construcción conjunta sostenida de una oferta sofisticada de contenidos y servicios de banda ancha y banda estrecha.

IV-    Que, en virtud de esta complementariedad en sus objetivos, necesidades y planes de negocio y la identificación de una mejora de las oportunidades de crecimiento, es intención de las Partes

establecer una alianza estratégica a largo plazo cuyo objetivo prioritario será mejorar el desarrollo conjunto de ambas sociedades en los mercados de Internet de banda ancha y banda estrecha en todos los países en los que ambos Grupos estén presentes, preferentemente en el segmento residencial, SOHO y, en su caso, PYMES.

V-    Que, como consecuencia de todo lo anteriormente expuesto las partes otorgan el presente Contrato Marco de Alianza Estratégica (en lo sucesivo, el "Contrato Marco") de acuerdo con las siguientes,

## ESTIPULACIONES

**PRIMERA.-    OBJETO DEL PRESENTE CONTRATO MARCO.**

El objeto del presente Contrato Marco es la creación de una alianza estratégica entre TELEFÓNICA y TERRA estableciendo el correspondiente modelo de relaciones entre las mismas en cada una de las fases, tal y como a continuación se mencionan, que aprovechen al máximo la capacidad de TELEFÓNICA como proveedor de conectividad y acceso en banda ancha y banda estrecha, y de TERRA como portal, agregador, proveedor y gestor de contenidos y servicios de Internet, en telefonía fija (incluido el sistema wireless empleado en este sector) y en telefonía móvil (sólo si así se acordase en los Contratos y Contratos Posteriores, tal y como ambos términos se definen en la Estipulación Tercera), todo ello dirigido a los mercados residencial, SOHO y, si así se acordase en los Contratos y Contratos Posteriores, PYMES, aprovechando sinergias y creando valor para ambas partes:

(i)      agregación de la oferta de productos y servicios en el negocio de Internet;
(ii)     provisión de la oferta de productos y servicios en el negocio de Internet;
(iii)    desarrollo y construcción de nuevos servicios avanzados en el negocio Internet; y
(iv)    conectividad y acceso al negocio Internet.

Adicionalmente, las Partes realizarán sus mejores esfuerzos para identificar elementos adicionales a los señalados en la Estipulación Segunda siguiente que permitan generar valor para ambos Grupos, con especial énfasis en el comercio electrónico y en las relaciones con las distintas operadoras de telefonía móvil del Grupo TELEFÓNICA (tal y como este concepto se define en la Estipulación Segunda siguiente).

**SEGUNDA.-    DESARROLLO DEL MODELO DE RELACIONES EN CADA UNA DE LAS FASES DEL NEGOCIO QUE INTEGRAN LA OFERTA AL CLIENTE FINAL EN EL NEGOCIO DE INTERNET.**

El modelo de relaciones referido en la Estipulación anterior será objeto de desarrollo a través de los correspondientes contratos que se celebrarán entre determinadas sociedades del Grupo TELEFÓNICA y del Grupo TERRA, en los términos y condiciones establecidos en el presente Contrato Marco adaptados, en su caso, a los requisitos que legal y regulatoriamente fuesen aplicables.

A tal efecto, cada Parte se compromete, en su condición de accionista de control de su respectivo Grupo, a que cada uno de los contratos previstos en la presente Estipulación Segunda (en adelante, los "Contratos") sea formalizado y ejecutado por las sociedades por ella determinadas de entre las de su respectivo Grupo, entendido en el sentido del artículo 4 de la Ley 24/ 1988 de 24 de Julio, del Mercado de Valores y no considerándose, a estos efectos, al Grupo TERRA ni a la sociedad Telefónica Publicidad e Información, S.A.

como parte integrante del Grupo Telefónica (en adelante, el "Grupo TELEFÓNICA" y el "Grupo TERRA", según proceda, y las sociedades así determinadas por cada Parte de entre las de su respectivo Grupo, las "Sociedades del Grupo TELEFÓNICA" o las "Sociedades del Grupo TERRA", según proceda), de modo que resulten efectivamente generados,

(x), en el ejercicio 2003, al menos, el valor global en Euros (78,5 MM) previsto en el Anexo I, que se deriva del desglose que, a título meramente estimativo, se contiene en los Anexos II, III, IV, y V del presente Contrato Marco, y,

(z), para cada uno de los ejercicios siguientes, un valor equivalente como mínimo al establecido para 2003 según lo indicado en el subapartado (x) anterior.

Las Partes acuerdan que, en cuanto resulte necesario en virtud del objeto de los correspondientes Contratos, los mismos deberán ser celebrados entre Sociedades del Grupo TELEFÓNICA y Sociedades del Grupo TERRA con presencia en los mismos ámbitos geográficos.

2.1.  Exclusividad de las Sociedades del Grupo TERRA como portal, agregador de servicios y proveedor de servicios de valor añadido.

2.1.1  TELEFÓNICA y TERRA se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TELEFÓNICA otorguen exclusividad a las Sociedades del Grupo TERRA como proveedor de los elementos esenciales del portal y agregador de los contenidos y servicios de Internet en banda ancha y banda estrecha, dirigidos al segmento residencial, SOHO y, en su caso, PYMES, todo ello a satisfacción de TELEFÓNICA conforme a los parámetros contractuales que se establezcan según lo dispuesto en la Estipulación 2.1.5. posterior.

TELEFÓNICA se compromete, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TELEFÓNICA encomienden exclusivamente a las Sociedades del Grupo TERRA el desarrollo de todos los portales para la agregación de los contenidos y servicios de Internet en banda ancha y banda estrecha, dirigidos al segmento residencial, SOHO y, en su caso, PYMES. Así, TELEFÓNICA se compromete a que los portales de Internet de banda ancha y banda estrecha dirigidos al segmento residencial, SOHO y, en su caso, PYMES, desarrollados por las Sociedades del Grupo TERRA sean los portales de acceso a Internet en las ofertas de conectividad y acceso a Internet de las Sociedades del Grupo TELEFÓNICA e incorporen la marca y otros signos distintivos de las Sociedades del Grupo Terra (el uso de dicha marca y/u otros signos distintivos respetarán las previsiones de los contratos referidos en la Estipulación 2.1.5 posterior).

2.1.2.  TELEFÓNICA y TERRA se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TELEFÓNICA adquieran en exclusiva de las Sociedades del Grupo TERRA los servicios de valor añadido de Internet en banda ancha y banda estrecha necesarios para la construcción de la oferta a clientes finales preferentemente residenciales, SOHO y, en su caso, PYMES, enumerándose a título meramente enunciativo y no limitativo los siguientes: e-mail, plataformas de mensajería instantánea, plataformas de mensajería unificada, chats, etc.

2.1.3.  La comercialización o prestación a terceros de paquetes de servicios que resulten idénticos o sustancialmente similares a los suministrados a las Sociedades de Grupo Telefónica

según lo dispuesto en las Estipulaciones 2.1.1 y 2.1.2. anteriores requerirá el previo consentimiento escrito de TELEFONICA.

2.1.4.   TELEFÓNICA se compromete, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TELEFÓNICA cedan en exclusiva a las Sociedades del Grupo TERRA la gestión y explotación de los espacios publicitarios que incorporen publicidad de terceros en los portales desarrollados conforme al apartado 2.1.1. anterior por las Sociedades del Grupo TERRA. A fin de evitar dudas, se hace constar expresamente que la decisión sobre la explotación de tales espacios publicitarios corresponde enteramente a las sociedades de Grupo Telefónica.

2.1.5.   A efectos de formalizar lo dispuesto en las Estipulaciones 2.1.1, 2.1.2., 2.1.3, y 2.1.4 anteriores, las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán en los plazos establecidos en la Estipulación 4.1 siguiente los correspondientes contratos de licencia de marca y otros signos distintivos y de propiedad intelectual, de gestión de portal, agregación y acceso a servicios de valor añadido y de uso de software y de mantenimiento, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo II.

2.2.   Adquisición, desarrollo y/o comercialización de contenidos, acuerdos de provisión de servicios y de intercambios de participación y/o activos con portales verticales, espacios publicitarios, provisión de servicios de marketing integral on-line y prestación de servicios de auditoría, consultoría, gestión y mantenimiento de portales-país.

2.2.1.   Adquisición, desarrollo y comercialización de contenidos y acuerdos de provisión de servicios y de intercambios de participación y/o activos con portales verticales.

2.2.1.1.   TERRA y TELEFÓNICA se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TERRA canalicen preferentemente a través de las Sociedades del Grupo TELEFÓNICA su demanda de adquisición, desarrollo y/o comercialización de contenidos surgida de la construcción de la oferta de productos y servicios prevista en la presente Estipulación Segunda. A estos efectos, se entenderá por "canalización preferente" la opción de las Compañías del Grupo TELEFÓNICA de ofrecer a las Compañías del Grupo TERRA los precitados contenidos y la obligación de las Compañías del Grupo TERRA de contratar dichos contenidos con las Compañías del Grupo TELEFÓNICA, siempre que la oferta presentada por éstas últimas a las Compañías del Grupo TERRA no sea objetivamente peor a la oferta presentada por cualquier tercero.

Asimismo, TERRA y TELEFÓNICA se comprometen a hacer sus mejores esfuerzos para que las Sociedades del Grupo TELEFÓNICA distribuyan sus contenidos on-line preferentemente a través de las Sociedades del Grupo TERRA.

A tal efecto, en los plazos establecidos en la Estipulación 4.1 siguiente, las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán los correspondientes contratos de adquisición, desarrollo y/o

comercialización de contenidos y de prestación de servicios de formación on-line, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo II, mencionado en la Estipulación 2.1.5 anterior.

2.2.1.2.  Las Partes se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA contraten exclusivamente la prestación de servicios de formación on-line de sus respectivos empleados a través de la sociedad Educaterra, S.L.

Asimismo, las Partes harán sus mejores esfuerzos para que las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA canalicen sus necesidades de productos, soluciones y/o servicios basados en localización on-line a través de la sociedad Maptel, S.A.

A fin de facilitar el cumplimiento de los compromisos asumidos en la Estipulación 2.2.1.1. anterior y optimizar sus respectivas carteras, las Partes se comprometen, en los términos y condiciones previstos con carácter general en el presente Contrato Marco a que, en los plazos previstos en la Estipulación 4.1 siguiente, Telefónica de España, S.A. transmita a Educaterra, S.A. y ésta adquiera a valor de mercado, que de conformidad con las valoraciones de las Partes se corresponde con su valor en libros, la plataforma A+ de su propiedad, en los términos y condiciones establecidos con carácter específico en el Anexo III.

2.2.1.3.  Asimismo, las Partes analizarán la conveniencia y negociarán, en su caso, las condiciones en que TERRA podría transmitir, total o parcialmente, a:

(i)     Telefónica Móviles, S.A. su participación en Terra Mobile, S.A.;
(ii)    Al Grupo TELEFÓNICA su participación en Ifigenia, S.A.; y
(iii)   Al Grupo TELEFÓNICA su participación en Maptel, S.A.

2.2.2.  Adquisición de espacios publicitarios.

TELEFÓNICA y TERRA se comprometen, en los términos y condiciones del presente Contrato Marco, a que el importe anual destinado por el Grupo TELEFÓNICA a la adquisición de espacios publicitarios en las Sociedades del Grupo TERRA no resulte inferior al 2% de presupuesto total anual destinado por aquél Grupo a publicidad.

A tal efecto, en los plazos previstos en la Estipulación 4.1 siguiente, las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán los correspondientes contratos de adquisición de espacios publicitarios, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo IV.

2.2.3.  Provisión de servicios de marketing integral on-line.

Las Partes se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TERRA provean con carácter preferente servicios de marketing integral on-line a las Sociedades del Grupo TELEFÓNICA. A estos efectos se

C Marco TRR 29.01.03.doc

entenderá por "contratación preferente" la opción de las Compañías del Grupo TERRA de ofrecer a las Compañías del TELEFONICA los servicios de marketing integral on-line de las Compañías del Grupo TERRA y la obligación de las Compañías del Grupo TELEFONICA de contratar dichos servicios de marketing integral on-line con las Compañías del Grupo TERRA, siempre que la oferta presentada por éstas últimas a las Compañías del Grupo TELEFONICA no sea objetivamente peor a la oferta presentada por cualquier tercero.

A tal efecto, en los plazos previstos en la Estipulación 4.1 siguiente, las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán los correspondientes contratos de provisión de servicios de marketing integral on-line, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo IV, mencionado en la Estipulación 2.2.2 anterior.

2.2.4.   Contratación preferente de los servicios de auditoría, consultoría, gestión y mantenimiento de los portales-país de las Sociedades del Grupo TELEFÓNICA por parte de las Sociedades del Grupo TERRA. A estos efectos se entenderá por "contratación preferente" la opción de las Compañías del Grupo TERRA de ofrecer a las Compañías del Grupo TELEFÓNICA los servicios de auditoría, consultoría, gestión y mantenimiento de sus portales-país y la obligación de las Compañías del Grupo TELEFONICA de contratar dichos servicios de auditoría, consultoría, gestión y mantenimiento de los portales-país con las Compañías del Grupo TERRA, siempre que la oferta presentada por éstas últimas a las Compañías del Grupo TELEFONICA no sea objetivamente peor a la oferta presentada por cualquier tercero.

Las Partes se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TERRA presten a las Sociedades del Grupo TELEFÓNICA los servicios de auditoría, consultoría, gestión y mantenimiento de sus respectivos portales-país.

A tal efecto, en los plazos previstos en la Estipulación 4.1 siguiente, las Sociedades del Grupo TERRA y las Sociedades del Grupo TELEFÓNICA otorgarán los correspondientes contratos de auditoría, consultoría, gestión y mantenimiento de portales-país, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo V.

2.3.   Conectividad y acceso a Internet mayorista.

2.3.1.   Las Sociedades del Grupo TELEFÓNICA como proveedores exclusivos de servicios de conectividad y acceso mayorista.

Las Partes se comprometen respectivamente, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TERRA adquieran en exclusiva de las Sociedades del Grupo Telefónica los servicios de conectividad y acceso mayoristas, siempre que tal adquisición se realice en las mejores condiciones de mercado regulatoriamente admisibles.

A tal efecto, en los plazos previstos en la Estipulación 4.1 siguiente, las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán los correspondientes contratos, en los términos y condiciones previstos con carácter general en el presente

Contrato Marco y, de forma específica en el Anexo II, referido en las Estipulaciones 2.1.5 y 2.2.1.1 anteriores.

2.3.2.   Régimen de outsourcing o equivalente en la explotación de los elementos de acceso a la red.

Las Partes se comprometen, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TELEFÓNICA presten el servicio de outsourcing o equivalente para la operación de todos o parte de los servicios y/o explotación de los elementos de acceso a la red que necesiten las Sociedades del Grupo TERRA para la provisión del servicio de acceso a Internet a sus clientes preferentemente residenciales, SOHO y, en su caso, PYMES, y ello siempre que tales servicios se puedan prestar en las mejores condiciones de mercado regulatoriamente admisibles.

A tal efecto, en los plazos previstos en la Estipulación 4.1 siguiente, las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán los correspondientes contratos de explotación, hosting y gestión, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo II referido en las Estipulaciones 2.1.5, 2.2.1.1 y 2.3.1 anteriores.

2.3.3.   Las Sociedades del Grupo TELEFÓNICA como proveedores exclusivos de los servicios de red necesarios para la construcción de la oferta a clientes finales.

Las Partes se comprometen respectivamente, en los términos y condiciones del presente Contrato Marco, a que las Sociedades del Grupo TERRA adquieran en exclusiva de las Sociedades del Grupo Telefónica los servicios avanzados de red y plataformas necesarios para la construcción de la oferta a clientes preferentemente residenciales, SOHO y, en su caso, PYMES en banda ancha y banda estrecha, y ello siempre que tal adquisición se realice en las mejores condiciones de mercado regulatoriamente admisibles.

A tal efecto, en los plazos previstos en la Estipulación 4.1 siguiente las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA otorgarán los correspondientes contratos de suministro en exclusiva, en los términos y condiciones previstos con carácter general en el presente Contrato Marco y, de forma específica en el Anexo II referido en las Estipulaciones 2.1.5, 2.2.1.1, 2.3.1 y 2.3.2 anteriores.

**TERCERA.-    CONDICIONES GENERALES APLICABLES A LOS CONTRATOS.**

3.1.   Ámbito de aplicación.

Las condiciones generales acordadas en la presente Estipulación Tercera serán aplicables a todos los Contratos, así como a los Contratos Posteriores (respecto de estos últimos, en los términos previstos en la Estipulación 4.4 y en la Estipulación Sexta siguientes). No obstante, el contenido de la Estipulación 3.3 siguiente sólo será aplicable a los contratos de tracto sucesivo.

Las Partes se comprometen a incorporar en los Contratos y, en su caso, en los Contratos Posteriores, los acuerdos de nivel de servicio que determinen y garanticen una calidad de los servicios acorde a

los estándares del sector. Asimismo, los Contratos y, en su caso, los Contratos Posteriores establecerán las protecciones oportunas para las Partes en el supuesto de su terminación anticipada para permitir una transición adecuada y respetuosa con las actividades cotidianas de las partes objeto del Contrato (o Contrato Posterior) correspondiente.

3.2.    Modificaciones impuestas por órganos administrativos.

En el supuesto de que alguna de las entidades u órganos reguladores del mercado de las telecomunicaciones, del derecho de la competencia y/o cualesquiera otros competentes exigiera modificar sustancialmente cualquiera de los Contratos o de los Contratos Posteriores, corresponderá al Comité de Seguimiento resolver sobre la conveniencia de efectuar dicha modificación o dejar sin efecto el correspondiente Contrato o Contrato Posterior. El Comité de Seguimiento deberá resolver en el plazo de un mes a contar desde la fecha en que le sea sometido el asunto. No obstante, si el requerimiento de la entidad u órgano correspondiente fijase un plazo inferior para su cumplimiento, el plazo de un mes se reducirá convenientemente.

Si el Comité de Seguimiento resolviese dejar sin efecto el correspondiente Contrato o Contrato Posterior, se estará a lo dispuesto en la Estipulación 4.3 siguiente y, en su caso, a lo previsto en la Estipulación Sexta siguiente.

3.3.    Terminación.

Sin perjuicio de los supuestos de prórroga previstos en el último párrafo de las Estipulaciones 4.3.1 y 4.4 siguientes y en el penúltimo párrafo de la Estipulación Sexta siguiente, los Contratos y los Contratos Posteriores terminarán, quedando sin efecto alguno, en cualquiera de los supuestos siguientes:

(i)    el día 31 de diciembre de 2008 o, en su caso, a la fecha de finalización de cualquier prórroga de un Contrato o un Contrato Posterior, en caso de que cualquiera de las partes hubiese notificado a la otra por escrito, con una antelación de, al menos, dos meses a las fechas mencionadas, su intención de terminar el correspondiente Contrato o Contrato Posterior. En defecto de la correspondiente notificación en plazo, el Contrato o Contrato Posterior se entenderá automática y sucesivamente prorrogado por plazos de un año; o

(ii)    en el sexagésimo día natural siguiente a la fecha en que se haya producido un Cambio de Control en TERRA en el supuesto de que TELEFÓNICA hubiese comunicado a aquélla en plazo su decisión de dar por terminado el Contrato Marco, en los términos previstos en la Estipulación Séptima siguiente; o

La terminación de cualquiera de los Contratos en los supuestos previstos en la presente Estipulación 3.3 no dará derecho a la exigencia de ningún tipo de responsabilidad entre las correspondientes partes, sin perjuicio de aquéllas que estrictamente se deriven de su propia ejecución y cumplimiento con anterioridad a la fecha de terminación.

3.4.    Confidencialidad y anuncios públicos.

Los Contratos y los Contratos Posteriores tendrán carácter confidencial y ninguna de las respectivas partes revelará su existencia y contenido sin el consentimiento de la otra. Se exceptúan los supuestos en los que la obligación de revelar información venga impuesta por una autoridad judicial o administrativa competente o por Ley, en cuyo caso la parte obligada informará con carácter previo a la otra.

Las partes acordarán el contenido de cualquier notificación o comunicación pública relacionada con los correspondientes Contratos y Contratos Posteriores.

3.5.    Gastos y tributos.

Cada parte satisfará os gastos que para ella se deriven de la formalización y ejecución de los Contratos y de los Contratos Posteriores.

Las obligaciones de carácter tributario serán satisfechas por cada parte de conformidad con las leyes y disposiciones aplicables.

3.6.    Resolución de conflictos. Carácter vinculante de los acuerdos del Comité de Seguimiento.

3.6.1.    Resolución de conflictos.

Cualquier discrepancia tanto en la interpretación como en la ejecución de los Contratos y de los Contratos Posteriores deberá someterse por cualquiera de las partes al Comité de Seguimiento y, en defecto de resolución, por éste a los Presidentes de TELEFÓNICA y de TERRA, quedando expedita la correspondiente vía judicial o arbitral sólo en caso de falta de acuerdo entre los Presidente. A tales efectos será de aplicación lo dispuesto en la Estipulación 15.1 siguiente, con la particularidad de que la referencia a las Partes deberá entenderse realizada a las correspondientes partes.

3.6.2.    Carácter vinculante de los acuerdos del Comité de Seguimiento.

En todo caso, cualquier acuerdo o resolución del Comité de Seguimiento, en los términos de la Estipulación Cuarta siguiente, tendrá carácter vinculante para las correspondientes partes, quienes se comprometerán a darles pleno cumplimiento, considerándose, por tanto, decisiones finales de dichas partes no susceptibles de impugnación.

## CUARTA.-    PROCEDIMIENTOS Y CALENDARIO DE DESARROLLO.

4.1.    Plazos para la formalización de los Contratos.

Las Partes se comprometen a que los Contratos, en los términos y condiciones del presente Contrato Marco y sus Anexos, se formalicen entre las Sociedades del Grupo TELEFÓNICA y las Sociedades del Grupo TERRA en un plazo máximo de un mes a contar desde la fecha del presente Contrato Marco, adaptados, en su caso, a los requisitos que legal y regulatoriamente fuesen aplicables, en los términos que, a tal efecto, determine el Comité de Seguimiento previsto en la Estipulación 4.2 siguiente. Dicho Comité fijará igualmente, en función de los condicionantes jurídicos y de negocio, las fechas exactas en que deberán formalizarse cada Contrato o grupo de Contratos.

De forma excepcional, el Comité de Seguimiento por razones fundadas podrá aplazar la formalización de algunos de los Contratos, de forma que sean otorgados una vez concluido el mencionado plazo de un mes, en cuyo caso se estará a lo dispuesto en la Estipulación 4.3 siguiente.

4.2.    Comité de Seguimiento.

    4.2.1.    Composición.

Las Partes acuerdan crear un Comité de Seguimiento para la ejecución, desarrollo y seguimiento del presente Contrato Marco, que estará formado por seis miembros, de los cuales tres, entre los que se incluye el que hará las veces de Presidente, serán nombrados por TELEFÓNICA y los tres restantes serán nombrados por TERRA.

Cada Parte podrá reemplazar en cualquier momento a alguno o algunos de los miembros por ella nombrados, mediante la correspondiente comunicación escrita al Comité de Seguimiento.

Las Partes acuerdan que el nombramiento de los miembros del Comité de Seguimiento y su constitución formal tendrá lugar en el plazo de quince días a contar desde la firma del presente Contrato Marco.

    4.2.2.    Reuniones: convocatoria, periodicidad y actas.

Corresponde al Presidente la convocatoria de las reuniones. El Comité de Seguimiento se reunirá, como mínimo, una vez cada trimestre. No obstante, el Presidente deberá convocar el Comité de Seguimiento siempre que lo solicite por escrito alguno de sus miembros y, asimismo, podrá convocarlo en cualquier otra ocasión que estime conveniente.

Las Partes acuerdan que el primer Comité de Seguimiento tendrá lugar no más tarde del 28 de febrero de 2003.

A las reuniones del Comité de Seguimiento podrán asistir directivos de ambas Partes con derecho de voz, pero no de voto, a fin de aportar información sobre la marcha de la alianza y facilitar la toma de decisiones por parte del Comité de Seguimiento.

El Secretario del Comité de Seguimiento, que será designado por TERRA de entre los miembros del Comité de Seguimiento nombrados por TERRA, levantará acta del contenido de cada reunión, la cual una vez aprobada por los asistentes será firmada por el Secretario con el visto bueno del Presidente.

    4.2.3.    Quórum de asistencia, adopción de acuerdos y carácter vinculante de los mismos.

El Comité de Seguimiento se entenderá válidamente reunido siempre que asistan, al menos, cuatro de sus miembros y los acuerdos se adoptarán por unanimidad.

Los acuerdos y resoluciones del Comité de Seguimiento tendrán carácter vinculante para las Partes, quienes se comprometen a dar pleno cumplimiento a los mismos directamente o a través de las sociedades de su respectivo Grupo, según proceda. En este sentido, los acuerdos y resoluciones del Comité de Seguimiento se considerarán decisiones finales de

C Marco TRR 29.01.03.doc

las Partes en relación a las materias sobre las que versen y, por tanto, no susceptibles de impugnación.

En defecto de acuerdo sobre algún asunto de su competencia, el Comité de Seguimiento someterá la cuestión a los Presidentes de TELEFÓNICA y de TERRA, quienes dispondrán de un plazo de quince días para resolver. Agotado dicho plazo sin haberse alcanzado un acuerdo, cualquiera de las Partes podrá iniciar el procedimiento arbitral en los términos previstos en la Estipulación Decimoquinta siguiente.

4.2.4.    Funciones.

Corresponde a la Comité de Seguimiento el desarrollo de las siguientes funciones:

(i)     coordinar, dirigir y supervisar la ejecución y desarrollo del presente Contrato Marco y en especial el proceso de formalización de los Contratos, determinando las fechas de su otorgamiento e integrando su contenido, conforme a lo dispuesto en la Estipulación 4.1 anterior;

(ii)     resolver sobre la conveniencia de prorrogar, modificar o dejar sin efecto cualquiera de los Contratos o de los Contratos Posteriores o de formalizar Contratos Posteriores, en especial en los supuestos previstos en la Estipulación 3.2 anterior y 4.4. posterior.

(iii)     resolver sobre las posibles modificaciones a realizar en los Contratos o Contratos Posteriores en el caso de que su ejecución afecte a la rentabilidad o intereses estratégicos de Grupo Telefónica o Grupo Terra, y ello únicamente cuando tal circunstancia no resulte compensable en términos de valor mediante los mecanismos previstos en este Contrato Marco;

(iv)     resolver sobre la prórroga del presente Contrato Marco u otorgamiento de derechos de tanteo, así como sobre el grado de cumplimiento de la alianza y adoptar las medidas correctoras pertinentes, en los términos de la Estipulación 4.3 siguiente, y determinando los casos en que concurran los supuestos de hecho previstos en la Estipulación Sexta siguiente para la aplicación de la Garantía de TELEFÓNICA.

(v)     resolver sobre la conveniencia de modificar los Contratos y los Contratos Posteriores en función de la evolución de la legislación aplicable, en los términos de la Estipulación 4.5 siguiente.

(vi)     resolver sobre cualquier discrepancia tanto en la interpretación como en la ejecución del presente Contrato Marco, de los Contratos y de los Contratos Posteriores; y

(vii)     cualesquiera otras que expresamente se le encomienden en el presente Contrato Marco.

(viii)     resolver sobre la creación de subcomités de trabajo referidos a las áreas de actividad específica de España, Brasil, Resto de Latinoamérica y Relaciones con

Telefónica Data, así como sobre su supresión, modificación, sustitución o sobre la creación de subcomités adicionales.

En el ejercicio de sus funciones, el Comité de Seguimiento cuidará que sus resoluciones se ajusten al principio de eficiencia fiscal para las Partes, así como para las correspondientes partes de los Contratos y de los Contratos Posteriores.

4.3. Revisión del grado de cumplimiento de la alianza y prórroga del Contrato Marco.

4.3.1. El Comité de Seguimiento deberá validar en el mes de Noviembre de cada año el cumplimiento de los objetivos de la alianza entre TELEFÓNICA y TERRA. A tal efecto deberá revisar el grado de cumplimiento de los Contratos y, en su caso de los Contratos Posteriores, a fin de determinar si los servicios se han prestado a satisfacción de la parte correspondiente y comprobar que ha sido alcanzado,

(x), en el ejercicio 2003, al menos, el valor global en Euros (78,5 MM) previsto en el Anexo I, que se deriva del desglose que, a título meramente estimativo, se contiene en los Anexos II, III IV y Vdel presente Contrato Marco, y,

(z), para cada uno de los ejercicios siguientes, un valor equivalente como mínimo al establecido para 2003 según lo indicado en el subapartado (x) anterior.

A fin de facilitar dicha validación anual, el Comité de Seguimiento revisará trimestralmente, en la segunda mitad del segundo mes del trimestre siguiente, el grado de cumplimiento de los objetivos de la alianza entre TELEFÓNICA y TERRA, el grado de cumplimiento de los Contratos y, en su caso de los Contratos Posteriores, adoptando en su caso las medidas que estime pertinentes.

Por otra parte, en el mes de Noviembre de 2008 el Comité de Seguimiento resolverá sobre la prórroga o no, por el plazo que estime conveniente, del presente Contrato Marco y, en su caso, de los Contratos y los Contratos Posteriores. En el caso de que decidiese no prorrogarlos, el Comité de Seguimiento determinará los servicios, previstos o no en la Estipulación Segunda anterior, en relación con los cuales las sociedades del Grupo TELEFÓNICA otorgarán a las sociedades del Grupo TERRA, con presencia en el mismo ámbito geográfico, o viceversa, un derecho de tanteo para igualar las ofertas de terceros.

4.3.2. No obstante, el Comité de Seguimiento, podrá realizar con carácter extraordinario en cualquier otro mes del año las revisiones previstas en la Estipulación 4.3.1 anterior.

4.3.3. El Comité de Seguimiento impondrá las medidas que estime pertinentes para corregir los incumplimientos detectados en su función de validación anual y, en su caso, determinará la procedencia de la aplicación de la Garantía de TELEFÓNICA prevista en la Estipulación Sexta siguiente.

4.4. Adaptación y actualización de servicios y productos.

En función de los avances tecnológicos, de la evolución de las necesidades específicas de ambos Grupos, de las condiciones generales del mercado, la evolución de los costes de referencia, y de cualesquiera otras consideraciones relacionadas con la consecución de los objetivos de la

presente alianza, el Comité de Seguimiento podrá acordar las modificaciones que estime pertinentes respecto de los servicios y productos que, en virtud del presente Contrato Marco y de los Contratos o los Contratos Posteriores, deban ser prestados entre las correspondientes sociedades del Grupo TELEFÓNICA y del Grupo TERRA (incluso la incorporación de nuevos catálogos de servicios y productos), adoptando, en su caso, las decisiones que a tal efecto resulten pertinentes en materia de (i) modificación del presente Contrato Marco, (ii) prórroga, modificación o extinción de determinados Contratos o Contratos Posteriores, y (iii) formalización de nuevos contratos (en adelante, junto con los contratos mencionados en el antepenúltimo párrafo de la Estipulación Sexta siguiente, los "Contratos Posteriores") que quedarán sujetos a los términos y condiciones previstos con carácter general en el presente Contrato Marco, salvo en aquellos aspectos que el Comité de Seguimiento considere oportuno modificar.

En los supuestos en que el Comité de Seguimiento acordase prorrogar sólo determinados Contratos o Contratos Posteriores resolverá, igualmente, sobre las Estipulaciones del presente Contrato Marco que, en virtud de su aplicabilidad a los mismos, deban continuar en vigor, produciendo plenos efectos respecto de los Contratos o Contratos Posteriores prorrogados.

4.5.    Adaptación de los Contratos y de los Contratos Posteriores a la evolución de la legislación aplicable.

En función de la evolución de la legislación aplicable y, en particular, de la liberalización del marco regulador del mercado de las telecomunicaciones y del derecho de la competencia, el Comité de Seguimiento podrá acordar las modificaciones que estime pertinentes respecto de los Contratos y de los Contratos Posteriores, a fin de superar las restricciones contenidas en sus clausulados a consecuencia de las limitaciones impuestas por la normativa vigente en el momento de su otorgamiento.

**QUINTA.-        BUENA FE.**

Las Partes se comprometen actuar de buena fe, absteniéndose de realizar cualquier actuación que pudiera impedir o dificultar la ejecución del presente Contrato Marco y dando pleno cumplimiento directamente o a través de las sociedades de su respectivo Grupo a las obligaciones derivadas del presente Contrato Marco, en especial las relativas (i) al cumplimiento de las resoluciones del Comité de Seguimiento, y (ii) a la formalización de los Contratos y de los Contratos Posteriores, así como a su ejecución, mediante la prestación de los servicios con arreglo a los parámetros de calidad fijados y la satisfacción de los correspondientes precios pactados.

**SEXTA.-        GARANTÍA DE TELEFÓNICA.**

TELEFÓNICA garantiza el cumplimiento por parte de las Sociedades del Grupo TELEFÓNICA de las obligaciones de formalización y cumplimiento de los Contratos en los términos del presente Contrato Marco.

En todos aquellos supuestos en los que por cualquier causa distinta del incumplimiento de TERRA y/o de las Sociedades de Grupo TERRA, y en especial por razones legales o regulatorias, no fuese posible formalizar o quedase sin efecto total o parcialmente alguno o algunos de los Contratos o se produjese cualquier incumplimiento por parte de TELEFONICA y/o Sociedades de Grupo TELEFONICA de los mismos que resultase en la imposibilidad de alcanzar,

(x) en el ejercicio 2003, al menos, el valor global en Euros (78,5 MM) previsto en el Anexo I, que se deriva del desglose que, a título meramente enunciativo, se contiene en los Anexos II, III, IV y V del presente Contrato Marco; y

(z) para cada uno de los ejercicios siguientes, un valor equivalente como mínimo al establecido para 2003 según lo indicado en el subapartado (x) anterior (en el bien entendido de que en el supuesto de que en algún ejercicio no se alcanzase el mencionado valor mínimo, el déficit producido se entenderá automáticamente compensado en la parte necesaria con los excesos sobre tal valor mínimo que hubieran podido producirse en cualquiera de los ejercicios anteriores),

TELEFÓNICA propondrá a satisfacción de TERRA mecanismos alternativos para la prestación de servicios y adquisición de productos que, en el marco de la complementariedad entre ambos Grupos, permitan efectuar la correspondiente compensación.

Para la presentación de mecanismos alternativos por parte de TELEFÓNICA se tendrán en cuenta, entre otros, los siguientes aspectos: (i) contratos de prestación de servicios o adquisición de productos no previstos en la Estipulación Segunda anterior que hubiesen sido celebrados entre las Partes o entre las sociedades de sus respectivos Grupos con posterioridad a la fecha de entrada en vigor del presente Contrato Marco o con anterioridad a dicha fecha siempre que se trate de prestaciones a ejecutar con posterioridad a la misma; (ii) nuevas disponibilidades de servicios y productos que pudieran surgir en virtud de los avances tecnológicos, de la evolución de las necesidades específicas de ambos Grupos y de las condiciones del mercado; y (iii) posibilidades derivadas de la incorporación de cualesquiera sociedades al Grupo TELEFÓNICA o al Grupo TERRA.

Los nuevos contratos que lleguen a formalizarse en virtud de lo dispuesto en el párrafo anterior (en adelante, junto con los contratos previstos en la Estipulación 4.4. anterior, los "Contratos Posteriores") quedarán sujetos a los términos y condiciones previstos con carácter general en el presente Contrato Marco, salvo en aquellos aspectos que las Partes consideren oportuno modificar.

En los supuestos en que las Partes acordasen prorrogar sólo determinados Contratos o Contratos Posteriores resolverán, igualmente, sobre las Estipulaciones del presente Contrato Marco que, en virtud de su aplicabilidad a los mismos, deban continuar en vigor, produciendo plenos efectos respecto de los Contratos o Contratos Posteriores prorrogados.

Las obligaciones de TELEFONICA en el marco de la presente Estipulación se minorarán en la parte proporcional que corresponda para reflejar posibles incumplimientos de carácter parcial de TERRA y/o de las Sociedades de Grupo TERRA que hubiera podido tener lugar.


SÉPTIMA.-    TERMINACIÓN.

Sin perjuicio de los supuestos de prórroga previstos en el último párrafo de las Estipulaciones 4.3.1 y 4.4 anteriores y en el penúltimo párrafo de la Estipulación Sexta anterior, el presente Contrato Marco terminará, quedando sin efecto alguno, en cualquiera de los supuestos siguientes:

    (i)       el día 31 de diciembre de 2008 o, en su caso, a la fecha de finalización de la prórroga correspondiente de conformidad con la Estipulación 4.3.1, en caso de que cualquiera de las Partes hubiese notificado a la otra por escrito, con una antelación de, al menos, dos meses a las fechas mencionadas, su intención de terminar el Contrato Marco. En defecto de la correspondiente notificación en plazo, el Contrato Marco se entenderá automática y sucesivamente prorrogado por plazos de un año; y

    (ii)      a opción de TELEFÓNICA en caso de producirse un Cambio de Control en TERRA (en los términos previstos en los dos últimos párrafos de la presente Estipulación).

La terminación del Contrato Marco en los supuestos previstos en la presente Estipulación Séptima no dará derecho a la exigencia de ningún tipo de responsabilidad entre las Partes, sin perjuicio de aquéllas que estrictamente se deriven de la propia ejecución del Contrato Marco con anterioridad a la fecha de terminación.

Se entenderá por Cambio de Control en TERRA cualquier acontecimiento o situación que dé derecho a un accionista distinto de TELEFÓNICA a dirigir, directa o indirectamente, la gestión y administración de aquella sociedad, en cuanto titular de la mayoría de los derechos de voto o en virtud de acuerdos celebrados con otros accionistas.

En caso de producirse un Cambio de Control en TERRA, si TELEFÓNICA optase por terminar el presente Contrato Marco, dispondrá de un plazo de un mes desde la fecha en que aquél se produjo para comunicar a TERRA que el Contrato Marco terminará, dejando de producir efectos, el sexagésimo día natural siguiente a la fecha en que se produjo el mencionado Cambio de Control en Terra. Todos los Contratos y los Contratos Posteriores terminarán igualmente en dicha fecha.

## OCTAVA.-        CONFIDENCIALIDAD Y ANUNCIOS PÚBLICOS.

8.1    El presente Contrato Marco y toda la documentación o negociación vinculada al mismo tienen carácter confidencial y ninguna de las Partes revelará su existencia y contenidos sin el consentimiento de la otra. Se exceptúan los supuestos en los que la obligación de revelar información venga impuesta por una autoridad judicial o administrativa competente o por Ley, en cuyo caso la Parte obligada informará con carácter previo a la otra.

8.2    Las Partes acordarán el contenido de cualquier notificación o comunicación pública relacionada con el presente Contrato Marco o con su ejecución.

## NOVENA.-        COMUNICACIONES.

9.1.    Toda comunicación entre las Partes relativa a este Contrato podrá hacerse bien por escrito entregado en la dirección del destinatario, o bien por telefax, en cuyo caso el original deberá ser enviado por correo certificado con acuse de recibo a la dirección del destinatario.

9.2.    Para todos los efectos la comunicación se entenderá realizada el mismo día hábil en que se entregó el escrito o se transmitió el telefax al destinatario.

9.3.  Para todos los efectos relacionados con el presente documento, las Partes indican como números de fax y domicilio los siguientes:

TELEFÓNICA, S.A.
Atención del Secretario General
Dirección: Gran Vía 28 - Madrid
Fax: 91-521.45.81

TERRA
Atención del Secretario General
Dirección: Paseo de la Castellana 92 - Madrid
Fax: 91 452 38 81

## DÉCIMA- CESIÓN.

El presente Contrato Marco y las obligaciones asumidas por cada una de las Partes en virtud del mismo no serán transmisibles ni podrán ser objeto de cesión a ningún tercero sin el consentimiento previo, expreso y por escrito de la otra Parte.

## UNDÉCIMA.- NULIDAD E INEFICACIA DE LAS ESTIPULACIONES.

En el caso de que alguna Estipulación o parte de ella fuera declarada nula o ineficaz, tal nulidad o ineficacia afectará tan sólo a dicha disposición o a la parte correspondiente de la misma, subsistiendo el Contrato Marco en todo lo demás, teniéndose tal Estipulación o la parte de la misma que resultare afectada por no puesta. Todo ello se entenderá sin perjuicio de las obligaciones de las Partes previstas en la Estipulación Sexta anterior, en cuanto la misma resulte de aplicación.

## DUODÉCIMA.- GASTOS Y TRIBUTOS.

12.1.  Cada parte satisfará los gastos que para ella se deriven de la formalización del presente Contrato Marco.

12.2.  Las obligaciones de carácter tributario serán satisfechas por cada Parte de conformidad con las leyes y disposiciones aplicables.

## DECIMOTERCERA.- ENTRADA EN VIGOR Y PREVALENCIA DE PACTO.

13.1.  El presente Contrato Marco producirá efectos desde el 1 de enero de 2003.

13.2.  El presente Contrato Marco sustituye a cualquier otro acuerdo, documento o contrato anterior celebrado entre las Partes, que pudiera estar en contradicción con aquél y, en particular, en caso de discrepancia entre el contenido del presente Contrato Marco y el del Acuerdo II, prevalecerá en todo caso entre las Partes lo dispuesto en el presente Contrato Marco. Sin perjuicio de lo dispuesto en esta Estipulación 13.2, ambas Partes reconocen que las exclusividades y demás derechos otorgados a TERRA en relación con la prestación de servicios de acceso a Internet con anterioridad a la fecha de

entrada en vigor de este Contrato Marco (contratos relativos a la prestación de servicios en Argentina y Perú) permanecen inalteradas.

## DECIMOCUARTA.- LEY APLICABLE.

El presente Contrato Marco se regirá e interpretará de acuerdo con las leyes del Reino de España.

## DECIMOQUINTA.- RESOLUCION DE CONFLICTOS.

15.1.  Cualquier discrepancia tanto en la interpretación como en la ejecución del presente Contrato Marco deberá someterse por las Partes, previamente al inicio del eventual procedimiento arbitral, previsto en la Estipulación 15.2 siguiente, al Comité de Seguimiento y, en su caso, por éste a los Presidentes de TELEFÓNICA y de TERRA.

Si el Comité de Seguimiento no hubiese resuelto la controversia en el plazo máximo de un mes desde la fecha en que se hubiese solicitado su intervención por cualquiera de las Partes, el propio Comité de Seguimiento someterá la cuestión a los Presidentes de TELEFÓNICA y de TERRA dentro de los 10 días naturales siguientes a la expiración del plazo mencionado.

Sólo en defecto de acuerdo entre los Presidentes, dentro de los quince días hábiles siguientes a la fecha en que se les sometió la controversia, quedará expedita la vía arbitral prevista en la Estipulación 15.2 siguiente.

15.2.  Las Partes, dando a la presente el valor de cláusula arbitral, de acuerdo con cuanto se establece y reconoce en el artículo 6.1, en relación con el 5.1, de la vigente Ley 36/1988 de 5 de Diciembre, someten la solución de cuantas cuestiones puedan suscitarse sobre validez, eficacia, interpretación y/o ejecución del presente Contrato Marco a la decisión de un Colegio Arbitral formado por tres árbitros, que decidirán las cuestiones litigiosas con sujeción a Derecho, y se obliga a estar y pasar por la decisión que se adopte.

El Colegio Arbitral se formará a través de la designación de un árbitro por la parte demandante y otro árbitro por la parte demandada, nombrando luego ambos árbitros al tercero mediante acuerdo al que deberán llegar en el plazo que se señala en el párrafo siguiente. En el supuesto de no llegar a acuerdo dentro del referido plazo, quedará automáticamente designado el Ilustrísimo Sr. Decano del Ilustre Colegio de Abogados de Madrid o el Letrado de ese Colegio que sea elegido por el propio Decano.

Para constituir el colegio arbitral y realizar el arbitraje, las partes contratantes procederán del siguiente modo:

(i)      La Parte que suscite el arbitraje dirigirá por conducto fehaciente comunicación a las demás señalando la cuestión litigiosa y designando un árbitro, de cuya aceptación tenga constancia.

(ii)     En el improrrogable plazo de ocho días naturales desde la fecha en que reciban la comunicación, las partes requeridas deberán manifestar si aceptan la cuestión litigiosa suscitada o la amplían, y en todo caso señalarán otro árbitro, de cuya aceptación tengan constancia.

(iii)      La Parte que ha suscitado el arbitraje dispondrá de ocho días naturales más para aceptar o rechazar, total o parcialmente, la ampliación de la cuestión litigiosa. Si la acepta, lo comunicará fehacientemente a la otra Parte. Si no aceptara la ampliación, la cuestión litigiosa quedará planteada tal y como fue suscitada, sin perjuicio del derecho que pueda asistir a la contraparte para plantear un nuevo arbitraje.

(iv)      Transcurrido el referido término sobre la ampliación del arbitraje con o sin acuerdo de las partes, ambos árbitros procederán a nombrar al tercero, o, a falta de acuerdo, designarán al Ilustrísimo Sr. Decano del Ilustre Colegio de Abogados de Madrid, que podrá a su discreción aceptar la designación o  designar un tercer árbitro.

(v)      Si transcurriesen más de noventa días naturales desde que se produjo la notificación de haberse suscitado el arbitraje conforme a lo prevenido supra(i) y por cualquier causa no hubiere podido constituirse el Colegio Arbitral, las Partes podrán acudir a la formalización judicial del arbitraje mediante la intervención jurisdiccional prevista en los artículos 38 y siguientes de la Ley 36/1988, de 5 de Diciembre.

(vi)      La Parte a la que pueda ser imputada la imposibilidad de constituir el Colegio Arbitral satisfará a la otra parte, en concepto de pena convencional cumulativa, es decir, sin perjuicio de otras responsabilidades en que pueda haber incurrido, la cantidad de 6.000 euros diarios hasta la fecha en la que remueva la causa que causó tal imposibilidad.

(vii)      Se designa la plaza de Madrid capital como lugar del arbitraje a todos los efectos que esta declaración conlleva.

El procedimiento será determinado por el Colegio Arbitral de acuerdo con las normas imperativas aplicables y con los principios organizativos recogidos en los artículos 21 y siguientes de la Ley 36/1988, de 5 de Diciembre.

En todo caso, las Partes declaran de común acuerdo el Derecho Español como ordenamiento aplicable para la resolución de cualquiera de las controversias que pudieran surgir en todos los supuestos en los que sea de aplicación este convenio arbitral.

Respecto del contenido, forma y plazo del laudo, se estará a lo dispuesto en los artículos 30 a 37 de la vigente Ley 36/1988, de 5 de Diciembre, y en todo lo no previsto en el presente Convenio Arbitral, se estará también a lo dispuesto en la misma Ley.

Para todo aquello que no pueda resolverse por arbitraje, así como para la formalización judicial del mismo, si fuere necesario, las Partes se someten expresamente, con renuncia a cualquier otro Fuero, a la jurisdicción de los Tribunales de Madrid capital.

## DECIMOSEXTA.- ANEXOS.

Los cinco anexos del presente Contrato Marco, relación de los cuales se adjunta a continuación, forman a todos los efectos parte integrante del mismo, en el bien entendido de que todos los conceptos en ellos contenidos corresponden a los previstos en el cuerpo del Contrato Marco y, por tanto, en nada los modifican

Relación de Anexos:

Anexo I
Anexo II: Servicios de Valor Añadido, Portal e Infraestructuras Asociadas
Anexo III: Servicios y Activos Corporativos
Anexo IV: Publicidad
Anexo V: Consultoría

Y, en prueba de conformidad, las partes suscriben el presente Contrato Marco en duplicado ejemplar y a un solo efecto, en el lugar y fecha indicados en el encabezamiento.

TELEFONICA S.A.                                 TERRA NETWORKS, S.A

**Telefonica Data USA, Inc.**
1111 Brickell Ave., 10th Floor
Miami, Fl. 33131

Contact: Samuel Ortiz
Telephone: 305-925-5782
Fax: 305-373-1685
Email: sortiz@us.telefonica.com

| | | | Invoice No. : | |
| --- | --- | --- | --- | --- |
| | | | Invoice Date: | 01/12/05 |
| | | | Invoice Period: | January-05 |
| | | | Payment Due: | 02/11/05 |

| Name | **Lycos, Inc. Corporate Headquarters** |
| --- | --- |
| | **Attn: Dean Batten** |
| Address | 100 5th Ave |
| | Waltham, MA 02451 |

| Att: | Dean Batten |
| --- | --- |
| Tel # | (781) 466-7634 |
| Fax # | (781) 370-3433 |
| eMail: | dean.batten@lycos-inc.com |

| Qty. | DESCRIPTION | Unit Price | | Tax | | | AMOUNT |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Hosting** | | | | | | | |
| 210 | 70 Power Whips L5 Configuration - Nov, Dec, Jan | $ | 180.00 | 7.00% | $ | 2,646.00 | $ 37,800.00 |
| | **Circuit - Madrid to Waltham, Mass** | | | | | | |
| | **Service Date: 2/1/04** | | | | | | |
| | **Term: 2 Years** | | | | | | |
| | **Cancellation Date: 10/6/04, 60 Days Notice Req'd** | | | | | | |
| | **10/6 - 12/6** | | | | | $ - | $ - |
| -1 | Credit for previous billing on December Invoice | $ | 11,000.00 | 23.79% | $ | (770.00) | $ (11,000.00) |
| -1 | Credit for previous billing on January Invoice | $ | 11,000.00 | 23.79% | $ | (2,616.90) | $ (11,000.00) |
| 14 | Billing for Remainder of Exhibit 1 (ATM Agmt) 12/1/04 - 1/31/06 (14 Months) | $ | 11,000.00 | 23.79% | $ | 10,780.00 | $ 154,000.00 |
| | | | | 7.00% | $ | - | $ - |
| | **Subtotal** | | | | $ | 10,039.10 | $ 169,800.00 |
| | **State Communication Services Tax** | | | | | | $ (748.00) |
| | **Local Communication Services Tax** | | | | | | $ (629.20) |
| | **Gross Revenue Tax** | | | | | | $ (260.70) |
| | **Florida Sales & Use Tax** | | | | | | $ 12,656.00 |
| | **Universal Services Found** | | | | | | $ (979.00) |
| | **Subtotal** | | | | | | $ 179,839.10 |
| **Invoice Summary** | | | | | | | |
| | **Total Charges** | | | | | | $ 169,800.00 |
| | **State Communication Services Tax** | | | | | | $ (748.00) |
| | **Local Communication Services Tax** | | | | | | $ (629.20) |
| | **Gross Revenue Tax** | | | | | | $ (260.70) |
| | **Florida Sales & Use Tax** | | | | | | $ 12,656.00 |
| | **Universal Services Found** | | | | | | $ (979.00) |
| | **Total Taxes** | | | | | | $ 10,039.10 |
| | **Total Invoice** | | | | | | $ 179,839.10 |

--------------------------------------------------------------------------------
PLEASE DETACH AND RETURN WITH YOUR PAYMENT
**INVOICE #**                                    **REMITTANCE STUB**

**INVOICE DATE**
   January 12, 2005

| **INVOICE AMOUNT DUE** |
| --- |
| **$    179,839.10** |

**REMIT PAYMENT TO:**
TELEFONICA DATA USA INC
ATTN: Finance Director's Office
1111 Brickell Ave., 10th Floor
MIAMI, FL  33131

**Lycos, Inc. Corporate Headquarters**
100 5th Ave
Waltham, MA 02451