UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LYCOS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| ) | NO. 04-12716-WGY |
| v. ) | |
| ) | |
| TELEFONICA DATA USA, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## TELEFONICA DATA USA, INC.'S MOTION TO DISMISS
## LYCOS'S AMENDED COMPLAINT

Telefonica Data USA, Inc. ("T-Data") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint of Lycos, Inc. ("Lycos"), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### BACKGROUND

The Amended Complaint entirely abandons the prior claim by Lycos of a "threat" that supposedly warranted prompt declaratory relief on its original Complaint. As explained more fully below, in response to a clear demonstration that the alleged threat did not exist, Lycos hunted for other potential disputes in a strained effort to maintain this forum with requests for declaratory relief. The resulting Amended Complaint rests primarily on a variety of truly non-existent disputes, including (1) a belated effort to supplant a final agreement with a draft contrary not just to common sense but also to substantial and recent correspondence by Lycos's own counsel, (2) reliance on a billing error that had been corrected before Lycos filed the Amended Complaint, and (3) a lone remaining dispute that involves less than 15% of the requisite amount-in-dispute to support diversity

jursidiction in this Court. Declaratory relief is far less of a game by which to federalize and shop state claims than Lycos is attempting to play with its Amended Complaint.

The SAFA

On February 12, 2003, after days of negotiation and several draft agreements were exchanged, commented upon and revised, Telefonica, S.A. ("Telefonica"), T-Data's corporate parent, and Terra Networks, S.A. ("Terra"), Lycos's corporate parent, finalized and executed a Strategic Alliance Framework Agreement ("SAFA") that expressly referred to its execution on behalf of Lycos. A true and accurate copy of the SAFA, translated from Spanish to English, is attached as Exhibit A to the Declaration of Jill Brenner Meixel (the "Meixel Decl."). The SAFA supplanted a prior strategic alliance agreement dating back to 2000 and was intended to memorialize and regulate the terms and conditions under which Telefonica and Terra, and their subsidiaries, would engage each other's services in the future. *See* Meixel Decl. Exh. A, p. 3, sec. I. The very next day, Lycos's corporate parent filed a Form 6-K Report with the Securities and Exchange Commission summarizing the alliance:

> On February 12, 2003 Terra and Telefonica have signed a Strategic Alliance Master Agreement. . . .
>
> \*       \*       \*
>
> The main characteristics of the Master Agreement can be summarized as follows:
>
> \*       \*       \*
>
> 5.    Outsourcing *by the companies of the Terra Lycos Group* to the Telefonica Group companies of the management of all or part of the service and/or operation of the network access elements . . . under *most favored customer treatment, allow[able] by regulations.*"

A true and accurate copy of the February 13, 2003 6-K is attached as Exhibit B to the Meixel Decl. Paragraph 15 of the SAFA contains an alternative dispute resolution clause between the parties that requires submission to a monitoring committee and then, if necessary, arbitration.

**The MSA**

In connection with this alliance, in November 2003, Lycos and T-Data executed a Master Services Agreement ("MSA"), which memorialized the terms under which T-Data would provide to Lycos the services contemplated by the SAFA. A true and accurate copy of the MSA is attached as Exhibit C to the Meixel Decl.

Among other things, the MSA required Lycos and T-Data to conduct annual "benchmarking" meetings during which the parties were to review the pricing of T-Data's services in order to ensure that they were consistent with the SAFA's "most favored customer" policy. *See* Meixel Decl. Exh. C, ¶ 3. Paragraph 3 of the MSA incorporates by reference the SAFA's alternative dispute resolution clause. Lycos and T-Data operated under this agreement for approximately one year without incident.

**Lycos's Initial Complaint**

In the fourth quarter of 2004, Lycos failed to pay T-Data's invoices, allowing its account balance to grow to an unacceptably large sum of approximately $1,000,000.00. *See* Affidavit of David Salway ("Salway Aff."), ¶ 3.[1] On December 20, 2004, T-Data demanded that Lycos promptly bring current its substantial, and now substantially overdue open account. *See id.*, ¶ 4. Lycos quickly filed an action for declaratory and injunctive relief in the Superior Court for the Commonwealth of Massachusetts, seeking to enjoin T-Data from discontinuing its services under

---

[1] *Biogen, Inc. v. Schering AG*, 954 F. Supp. 391, 395 (D. Mass. 1996)(affidavits may be considered on 12(b)(1) motions).

the MSA, and sending Lycos "dark" as a consequence.[2] The case was removed to this Court where T-Data challenged the justicability of the dispute. The MSA explicitly prohibited T-Data from sending Lycos "dark" in the event of a default, and T-Data had assured Lycos that disrupting Lycos's business was not its intention,

notwithstanding Lycos's substantial outstanding balance. Accordingly, T-Data argued there existed no disputed question for the Court. Lycos abandoned its Complaint in response to T-Data's Motion to Dismiss, properly conceding that it failed to present a jurisdictionally meaningful case or controversy. *See Lycos's Opposition to Defendant's Motion to Dismiss*, pp. 4-5 ("Lycos does not dispute that certain of the matters contained in Lycos's original complaint have been resolved.").

**Lycos's Amended Complaint**

In its Amended Complaint, Lycos quite candidly admits that it "developed and identified certain other disputes" to inflict upon T-Data and this Court. *See Lycos's Opposition to Defendant's Motion to Dismiss*, p.1 ("Because the parties resolved certain of the matters raised in the initial complaint and *Lycos has subsequently developed and identified certain other disputes*, Lycos has herewith filed a First Amended Complaint.") (emphasis supplied). As described below, Lycos's hunt for a declaratory judgment issue led it to different documents and terms than it had placed at issue in its initial Complaint.

Notwithstanding Lycos's corporate parent's statement to the SEC and the markets generally that the SAFA ensured Lycos "most favored customer" status for the purpose of price

---

[2] "Going dark" is a phrase Lycos used in its initial Complaint to describe the consequence of a speculative cessation of the telecommunications services that T-Data undisputedly continues to provide to Lycos.

-4-

benchmarking, and Lycos's well-documented belief that it was only entitled to "most favored customer status," Lycos now contends an actual dispute exists as to whether the SAFA instead guarantees Lycos "the best market price."

This fresh question reflects strained forum shopping efforts, based on Lycos's recent attempts to renegotiate T-Data's data-housing charges in response to T-Data's efforts to collect the overdue open account. T-Data submits that Lycos is struggling to preserve this forum for the resolution of the now-pending collection action in Florida.[3] On January 10, 2004, Lycos's counsel claimed for the first time that a draft of the SAFA, rather than the final executed agreement, somehow controlled and that "Lycos has received an offer of $22 per square foot for space, and $33/Mbps, along with free power," and that in order "[t]o comply with the most favored customer status of the [SAFA], T-Data should offer Lycos prices at least equivalent to those, if not better."[4] A partially redacted copy of T. Bean's January 10, 2005 letter is attached as Exhibit D to the Meixel Decl.[5] *See also* Affidavit of Tom Quarles ("Quarles Aff."), ¶3. T-Data rejected the demand, citing the argument's manifest flaw: the SAFA's "most favored customer" clause only requires T-Data to offer Lycos the best prices *T-Data* offers similarly situated customers, not the best price a T-Data

---

[3] On January 28, 2005, after a series of demand and default letters, T-Data filed an action in Miami-Dade County Circuit Court to collect on Lycos's open account.

[4] It should not go unnoticed that in correspondence dated January 10, 2004, Lycos's attorney stated that the SAFA conferred "most favored customer status" upon Lycos, a position Lycos's Amended Complaint now contradicts to "develop and identify" new disputes to present to the Court.

[5] While evidence of settlement negotiations is generally inadmissible under Fed. R. Evid. 408, the same negotiations may be used to show a litigant's "practical, pre-litigation understanding of a [contractual term]." *See Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78, 83 n. 4 (S.D.N.Y. 1992). Nevertheless, in order to honor both the exception and the rule, T-Data has attached a redacted version of the January 10, 2005 demand letter.

competitor offers customers. Amid this discussion, the Amended Complaint's centerpiece argument was born: the unsigned SAFA draft of January 29, 2003 – not the signed and publically reported SAFA of February 12, 2003 – controls price benchmarking and therefore, "best market price" is the operative pricing concept for T-Data's services.

The Amended Complaint also asserted two additional disputes relating to the term and termination charges for what the parties have come to refer to as the "Madrid Circuit."[6] As Lycos's Amended Complaint concedes, Lycos committed to a one-year term for the use of the Madrid Circuit under the MSA. *See* Amended Complaint, ¶ 21. Lycos, however, cancelled the service prior to the term's expiration, thereby incurring "a termination charge equal to the monthly charge for the period through [the] expiration of the one-year term commitment." *Id.*, ¶ 23. On this, the parties all agree. On January, 12, 2004, however, T-Data mistakenly invoiced Lycos for a two-year term commitment. Prior to the filing of the Amended Complaint, T-Data promptly reversed the charge.[7] *See* Salway Aff., ¶ 7. Therefore, the only dispute remaining with regard to the term commitment is a trifling question as to when the term began.[8] Lycos claims the one-year term began January 9,

---

[6] The Madrid Circuit is a dedicated high-bandwidth line between the United States and Madrid for the transmission of digital data.

[7] As it happens, the charge was reversed thirteen days before the filing of Lycos's Amended Complaint. Therefore, Lycos unmistakably knew Count III was moot for nearly two weeks before asserting it in its Amended Complaint.

[8] Even Lycos must concede that the dispute regarding whether the term commitment was for two years or one (Count III) is now moot and fails to present an Article III case or controversy. *See Stokes v. Wurtsboro*, 818 F.2d 4, 6 (2d Cir.1987); *Carroll v. Butterfield Health Care, Inc.*, 2003 WL 22462604, at *4 (N.D. Ill. Oct. 29, 2003); *United Artists Theatre Circuit, Inc. v. Sun Plaza Enter. Corp.*, 1998 WL 938732, at *3 (E.D.N.Y. Nov. 05, 1998).

2004. T-Data believes the term began on February 4, 2004. This dispute poses at most a $9,402.64 question.[9]

With this backdrop, Lycos seeks a declaration that the unsigned, draft SAFA governs price benchmarking and that the Madrid Circuit's term began on January 9, 2004, and not February 4, 2004. Neither of these items poses any question within the jurisdiction of the Court.

## ARGUMENT

The jurisdictional authority of the federal courts extends no further than Article III of the Constitution and, within that limit, only to the extent authorized by statute. *See Bell v. New Jersey and Pennsylvania*, 461 U.S. 773, 778 (1983) ("Since federal courts are courts of limited jurisdiction, the court below could hear the case only if authorized by statute.") The Declaratory Judgment Act has been characterized as merely procedural in its operation, permitting courts to grant declaratory relief *only* in cases otherwise within the constitutional and statutory constraints of their jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Thus, for Lycos's new claims for declaratory relief to come within the judicial power of this Court, there must be some independent statutory basis for federal jurisdiction.

As illustrated below, neither of Lycos's lately "developed and identified" claims are within the subject matter jurisdiction of the Court.

---

[9]   Lycos committed to monthly payments of $11,000.00 for use of the Madrid Circuit, or a per diem charge of $361.64. *See* Amended Complaint, ¶ 22. Therefore, resolution of the question of whether the Madrid Circuit term ends on January 9, 2005 or February 4, 2005 represents a difference of twenty-six days, or $9,402.64.

1.      **The Court Lacks Subject Matter Jurisdiction over the SAFA Dispute**

If there were a real dispute pertaining to the SAFA, then the particular declaratory request regarding it would fall within the SAFA's alternative dispute resolution clause. The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, governs the enforcement of most written arbitration agreements. With the FAA, Congress declared a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. *Perry v. Thomas*, 482 U.S. 483, 489 (1987); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Bereovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 147 (1st Cir. 1998) ("The issue of arbitrability must be analyzed in light of the strong public policy favoring arbitration ...."). This means that any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration. *See Mercury Constr.*, 460 U.S. 1, 24-25; *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995) ("All doubts are to be resolved in favor of arbitrability"). Indeed, in enacting the FAA, Congress intended "to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." *Perry*, 489 U.S. at 490. Thus, under the FAA, "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... *shall be valid, irrevocable, and enforceable.*" 9 U.S.C. § 2 (emphasis added). Thus, the FAA not only empowers, but requires that federal courts enforce arbitration clauses and ensure that plaintiffs do not evade their contractual commitments to alternative forms of dispute resolution by invoking the jurisdiction of the federal courts. Lycos's Amended Complaint attempts just such an evasion.

Although it is conspicuously omitted from Lycos's block quote in Paragraph 16 on Page 7 of its Amended Complaint, the final sentence of the operative quote actually provides:

> If the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles, the Parties *shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.*

*Compare* Meixel Decl., Exh. C, ¶ 3 *with* Amended Complaint ¶ 16. Both the January 29, 2003 SAFA draft upon which Lycos relies, and the fully executed February 12, 2003 SAFA require that:

> Any discrepancy in the interpretation as well as the performance of this Framework Agreement *must be submitted by the Parties,* prior to initiating eventual arbitration proceedings . . . *to the Monitoring Committee and, if appropriate, by it to the Chairmen of Telefonica and Terra.*

*Compare* Meixel Decl. Exh. A, p. 17 § 15 and the January 29, 2003 Draft SAFA, § 15, a true and accurate copy of which is attached as Exhibit E to the Meixel Decl. If the Monitoring Committee and the Chairmen cannot resolve the dispute, then the dispute must be sent to "an Arbitration Tribunal . . . who shall decide on the matters of litigation." *Id.* It is no accident, then, that Lycos's reproduction of Paragraph 16 in its Amended Complaint substitutes an ellipses for Paragraph 16's critical and, T-Data submits, dispositive final sentence. Paragraph 16 of the MSA, read in its entirety, reflects Lycos's commitment to the alternative dispute resolution procedures specified in the SAFA and its express disavowal of the jurisdiction of this or any other court over any benchmarking dispute. Accordingly, the Court lacks jurisdiction over the SAFA dispute and dismissal is proper. See *American Postal Workers Union v. U.S. Postal Service*, 2002 WL 356754 (N.D. Tex 2002) (claim dismissed under R. 12(b)(1) where subject to mandatory arbitration provision); *DeGroff v. Mascotech Forming Technologies-Fort Wayne, Inc.*, 179 F. Supp. 2d 896 (N.D. Ind. 2001) (same); *West Shore Pipe Line Co. v. Associated Elec. and Gas Ins. Servs. Ltd.*, 791 F.Supp. 200 (N.D. Ill. 1992)(same).

### 2.  The Court Lacks Jurisdiction over the Madrid Circuit Dispute

With the benchmarking dispute expressly and unambiguously outside the jurisdiction of this Court, and only the $9,402.64 question of the Madrid Circuit remaining, the Court lacks subject matter jurisdiction over Lycos's freshly "developed and identified . . . . other disputes." Nevertheless, in the event Lycos presses in its mission to federalize this modest $9,402.64 question of contractual interpretation, T-Data submits that the Amended Complaint suffers from the remaining fatal jurisdictional defects as described below.

#### A.  The Amended Complaint Fails to Satisfy the Jurisdictional Minimum Amount in Controversy

As Lycos concedes, Section 4 of Exhibit I to the MSA governs the procedures for terminating the so-called "Madrid Circuit" ATM service. Section 4.2 of Exhibit I provides that Lycos "may terminate a particular ATM Service upon sixty (60) days advance written notice to Telefonica Data provided that termination occurs prior to the expiration date of that ATM Service's *term commitment* and [Lycos] pays a termination charge . . . to Telefonica Data equal to the sum of the monthly charges for the ATM Service multiplied by the number of months remaining in the *term commitment*." *See* Meixel Decl. Exh. C at I-2, §4.2 (emphasis supplied).

Lycos also concedes that it was "required to make a minimum term commitment of one year." *See* Amended Complaint ¶ 22. Under Section 4's heading "**TERM; TERMINATION; AND DELAY**," the beginning of the Madrid Circuit's term is defined as the date T-Data accepted the Madrid Circuit proposal, February 4, 2004. Thus, the Madrid Circuit term commitment runs from February 4, 2004 through February 3, 2005. Lycos, however, inexplicably pins the beginning of its one-year term commitment to January 9, 2004, thereby placing the conclusion of the term at January 8, 2005, a difference of twenty-six days or approximately $9,402.64.

In 1938, the Supreme Court established the basic standard by which to evaluate a challenge that a plaintiff has not met the jurisdictional amount-in-controversy requirement:

> The rule governing dismissal for want of jurisdiction in cases brought in federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938) (internal citations omitted). "Under *St. Paul*, a plaintiff's allegations of damages that meet the amount-in-controversy requirement suffices unless questioned by the opposing party or the court." *Spielman v. Genzyme Corp.*, 251 F.3d 1, 5 (1st Cir. 2001). Once a defendant questions jurisdiction by challenging the amount of damages alleged in the complaint, the burden shifts to the plaintiff to show that it is not a legal certainty that the claims do not involve the requisite amount. *Id.* at 4; *Barrett v. Lombardi*, 239 F.3d 23, 30-31 (1st Cir. 2001). Jurisdiction over this $9,402.64 claim has been so challenged in the present record. This molehill cannot be elevated into the jurisdictionally necessary mountain.

### 3. The Court Should Decline to Exercise Jurisdiction

Finally, even if jurisdictional requirements over Lycos's Amended Complaint somehow are met, this Court is not compelled to exercise that jurisdiction and is free to leave the dispute to more appropriate tribunals, *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1941), "for 'a declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion.'" *See Lizza & Sons, Inc. v. Hartford Accident & Indem. Co.*, 247 F.2d 262, 264 (1st Cir. 1957) (citing *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948). ""Whether declaratory relief is appropriate' in any particular case is an inquiry 'which every grant of this remedy must survive.'" *Id.* (citing *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)).

The belated and inconsistent "development and identification" of the claims asserted in Lycos's Amended Complaint gives rise to special circumstances that favor a discretionary declination by this Court to exercise jurisdiction. While Lycos's initial Complaint was the product of a seemingly real, though ill-founded concern, that its business would be shut down as a consequence of its delinquencies in paying T-Data's invoices, the Amended Complaint is an only thinly-disguised contrivance intended to secure a foothold in a Massachusetts court for the litigation involving Lycos's overdue account. Under the MSA, T-Data was required to give Lycos notice and an opportunity to cure before instituting any collection action against Lycos. When Lycos received T-Data's default notice on January 20, 2005, Lycos recognized a collection action was imminent and sought to wrest the choice of forum from T-Data by "developing and identifying" these new disputes to preserve its place in this Court.

The January 10, 2005 letter from Lycos's counsel demonstrates the insubstantiality of the new issues raised in the Amended Complaint. In the letter, Lycos's counsel unmistakably refers to the SAFA's "most favored customer status." Indeed, six days earlier, on January 4, 2005, Lycos's attorney unhesitatingly characterized the SAFA's benchmarking standard as follows:

> Based upon our conversation today, I understand you may have a copy in Spanish of the Strategic Framework Agreement referred to in the Master Services Agreement. Attached is a copy in English that was filed with the SEC. *Provisions herein reflect a "most favored customer" status for the parties.* . . .

A true and accurate copy of Thomas Bean's January 4, 2005 e-mail to Tom Quarles is attached to Meixel Decl. as Exhibit F. *See also* Quarles Aff., ¶2. A dispute with regard to the SAFA standard was never envisioned until Lycos hunted for grounds on which to preserve its case in this Court, so as to better challenge the venue of the collection action in Florida. Lycos has instead attempted to federalize and to shop a truly non-existent SAFA dispute and the $9,402.64 Madrid Circuit dispute,

tactics that should not be countenanced. *See Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942); *see also Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306 (1st Cir. 1986).

Rather, *Brillhart* should guide the Court in its consideration of whether to exercise its discretion and take jurisdiction over the Amended Complaint. In *Brillhart*, the Supreme Court discouraged the unnecessary fragmentation of litigation between state and federal courts through declaratory judgment actions. There, Excess brought a declaratory judgment action in federal district court in Kansas seeking a declaration of the parties' rights under a contract of reinsurance shortly before it was named a defendant in a garnishment proceeding brought by Brillhart in Missouri state court. In upholding the district court's discretionary refusal to exercise jurisdiction over Excess' suit, the Supreme Court wrote:

> Although the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act, it was under no compulsion to exercise that jurisdiction. [Brillhart]'s motion to dismiss the bill was addressed to the discretion of the court.... The motion rested upon the claim that, since another proceeding was pending in a state court in which all the matters in controversy between the parties could be fully adjudicated, a declaratory judgment in the federal court was unwarranted. The correctness of this claim was certainly relevant in determining whether the District Court should assume jurisdiction and proceed to determine the rights of the parties. Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

*Brillhart*, 316 U.S. at 494-95; *see also Atlas Bolt and Screw Co. v. Walker Fabrication Co.*, 1988 WL 42379, at *3 n. 1 (D. Mass. 1988) ("In suing here, Atlas has essentially tried to federalize a breach of contract action, preempting the defendants from choosing their forum, since suit would be proper in both the state and federal courts.")

Since none of Lycos's newly-developed and identified claims raise federal questions – or, for that matter, questions of any more substance or complexity than the garden-variety state court contract action – they can and should be adequately resolved in the collection action that T-Data filed in Miami-Dade County Circuit Court and the dispute resolution procedures specified by the MSA. *See id.* To the extent the Amended Complaint somehow can invoke the Court's jurisdiction, despite the jurisdictional defects identified above, it is well within the Court's discretion to dismiss the Amended Complaint in favor of the Florida proceeding and the MSA dispute resolution proceedings. The Amended Complaint fails to present a federal question in either the jurisdictional or prudential senses and should be dismissed accordingly.

## CONCLUSION

For the foregoing reasons, T-Data respectfully requests that this Court dismiss the Amended Complaint.

TELEFONICA DATA USA, INC.

By its attorneys,

*/s/ Jill B. Meixel*
Barry S. Pollack (BBO# 642064)
Jill Brenner Meixel (BBO# 652501)
Donnelly, Conroy & Gelhaar, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

Dated: February 8, 2005