UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LYCOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| | ) | NO. 04-12716-WGY |
| v. | ) | |
| | ) | |
| TELEFONICA DATA USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DECLARATION OF JILL BRENNER MEIXEL</u>

I, Jill Brenner Meixel, hereby state that:

1.    I am an associate with the law firm of Donnelly, Conroy & Gelhaar, LLP and counsel for Defendant Telefonica Data USA, Inc. ("T-Data") in this action brought by Plaintiff Lycos, Inc. I make this Declaration in support of Defendant T-Data's Motion to Dismiss Lycos's Amended Complaint on personal knowledge, information or belief.

2.    Attached to this Declaration as Exhibit A is a true and accurate copy of the Strategic Alliance Framework Agreement dated February 12, 2003.

3.    Attached to this Declaration as Exhibit B is a true and accurate copy of the Form 6-K Report dated February 13, 2003 filed with the Securities and Exchange Commission.

4.    Attached to this Declaration as Exhibit C is a true and accurate copy of the November 2003 Master Services Agreement between Lycos and T-Data.

5.    Attached to this Declaration as Exhibit D is a true and accurate copy of a partially redacted letter dated January 10, 2005 from Thomas O. Bean, Esq., on behalf of Lycos, Inc. to Thomas J. Quarles, Esq., on behalf of T-Data.

6.    Attached to this Declaration as Exhibit E is a true and accurate copy of the draft Strategic Alliance Framework Agreement dated January 29, 2003.

7.    Attached to this Declaration as Exhibit F is a true and accurate copy of a January 4, 2005 email from Thomas Bean, Esq., on behalf of Lycos, Inc., to Thomas Quarles, Esq., on behalf of T-Data.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 8, 2005.


_____
Jill Brenner Meixel

-2-

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

EX-4.13 4 dex413.htm STRATEGIC ALLIANCE FRAMEWORK AGREEMENT DATED AS OF FEB. 12, 2003

Exhibit 4.13

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

STRATEGIC ALLIANCE FRAMEWORK AGREEMENT

signed by

**TERRA NETWORKS, S.A.**

and

**TELEFÓNICA, S.A.**

Madrid, February 12, 2003

1

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

In Madrid, on February 12, 2003

BETWEEN

For one part, TELEFÓNICA, S.A. (hereinafter, "TELEFÓNICA"), a stock company incorporated by virtue of the deed of incorporation executed by the Notary Public of Madrid, Mr Alejandro Rosselló Pastor, on 19th April 1924, under number 141 of his records, domiciled in Madrid, calle Gran Vía, 28. It is registered at the Business Registry of Madrid, at volume 12534, folio 21, sheet number M-6164. It is assigned Tax Identification Number A-28015865.

It is represented at this act by (*), of legal age, with domicile for these purposes in Madrid, Gran Vía, 28, holder of national identity document number (*), acting on behalf of TELEFÓNICA in his capacity as (*) of the company and making use of the faculties (*).

And for the other, TERRA NETWORKS, S.A. (hereinafter, "TERRA"), a stock company incorporated under the company name of TELEFÓNICA COMUNICACIONES INTERACTIVAS, S.A., by means of the deed authorised by the Notary Public of Madrid, Mr José Antonio Escartín Ipiens, on 4th December 1998, under number 5,276 of his records, registered at the Business Registry of Madrid, at Volume 13,753, Folio 185, Sheet number M-224,449, Entry 1. it changed its company name to that of TELEFÓNICA INTERACTIVA, S.A. in the deed executed on 16th March 1999, before the Notary Public of Madrid Mr Francisco Arriola Garrote, under number 1269 of his records, leading to entry 9 at the Business Registry of Madrid. It is domiciled in Barcelona, calle Nicaragua 54. It has been assigned Tax Identification Code A-82/196080. TERRA appears in its own name and in name and on behalf of Lycos, Inc., (hereinafter "LYCOS"), acting as the sole partner of the latter.

It is represented at this act by Mr Joaquim Agut Bonsfills, of legal age, with domicile for these purposes in Barcelona, calle Nicaragua 54, holder of national identity document number 39.134,364-W. He is acting on behalf of TERRA in his capacity as Executive Chairman of the firm, as set forth in the deed executed by the Notary Public of Madrid Mr Carlos Rives Gracia on 9th October 2001, under number 3,402 of his records.

Hereinafter, the expression "Parties" shall be used jointly for TELEFÓNICA and TERRA. The expression "Party" shall refer individually to either of them.

FREE TRANSLATION FROM SPANISH ORIGINAL

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

The Parties reciprocally recognise their capacity and legitimisation to grant this document.

## WITNESSETH

I.   Whereas, on May 16th, 2000, the Parties, along with BERTELSMANN AG, a corporation of German nationality, and LYCOS Inc. a corporation of United States nationality, the sole shareholder of which is TERRA, entered into an agreement called Strategic Alliance Framework Agreement (hereinafter the "Agreement"), which regulated the conditions under which BERTELSMANN and, if appropriate, TELEFÓNICA, would hire TERRA to provide certain products and services. The conditions established in that Agreement were on preferential terms.

II.  Whereas, a change has taken place in the business models created at the end of the 90s and beginning of 2000 to capture the growth value of the Internet, mainly based (although not exclusively) on income obtained by monetisation of the audience through access and advertising,                          , and one must also point out the worldwide crisis on the advertising market. On the other hand, the wave of offers in narrow band as well as broad band through the media provided by the telephone access or cable television operators has led to such operators developing their own business lines on the Internet, or having sought alliances with specific Internet access suppliers and/or Internet portals, in which sense one must point out the clearly complementary nature of TELEFÓNICA and TERRA due to their coinciding presence in Spain and Latin America. There is also a clear difference between the catalogue of services and products demanded by BERTELSMANN AG. and TELEFÓNICA, and BERTELSMANN AG. also focuses on the United States market which is more linked to LYCOS, Inc. These circumstances that have arisen have a great effect on articulation of the new phase of the relation, just as has been publicised on the markets since the last month of October. In this new context, the Parties, along with LYCOS, Inc. and BERTELSMANN AG., have considered it more convenient to continue their relations, leaving said Agreement without effect, it being fully replaced by this Strategic Alliance Framework Agreement and a new Memorandum of Understanding entered into with this same date (hereinafter "Agreement II"), which regulate the general terms of the new framework of relations between BERTELSMANN AG., TERRA and TELEFÓNICA, considering as the essential aspect for the purposes of its development the execution of this strategic alliance between TELEFÓNICA and TERRA.

III. Whereas, indeed, the trend shown by telephone access operators to seek alliances with specific Internet access providers has shown the convenience of taking advantage of the complementary factors there are between TELEFÓNICA and TERRA on all the markets in which both are present. In this sense, while TELEFÓNICA, as a telecommunications operator, has a clearly competitive position in matters of connectivity and provision of access to the international Internet nodes promoted by the development of broad band, TERRA is now the leader on the Spanish and Portuguese speaking market as a specific supplier of Internet access, being the reference portal in Latin America and Spain (as a leading aggregator and contents manager and provider of value added products and services related to the Internet), having developed a brand image which is unquestionably recognised in the New Technologies and Internet sector that contributes the experience and knowledge required for sustained joint construction of a sophisticated offer of narrow and broad band contents and services.

IV.  Whereas, by virtue of this complementary nature in its objectives, needs and business plans and identification of an improvement in the opportunities of growth, the Parties intend to establish a long term strategic alliance whose main objective will be to improve the joint development of both companies on the narrow and broad band Internet markets in all the countries in which both Groups are present, preferably in the residential segment, SOHO and, if appropriate, SMEs.

V.   [***]

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

VI.    Whereas, due to all the foregoing, the Parties hereby enter into this Framework Agreement, according to the following:

## CLAUSES

### ONE.    OBJECT OF THIS FRAMEWORK AGREEMENT.

The object of this Framework Agreement is the creation of a strategic alliance between TELEFÓNICA and TERRA (establishing the relevant model of relations between them in each one of the phases, just as mentioned hereunder, that take the maximum advantage of the capacity of TELEFÓNICA as a provider of narrow and broad band connectivity and access, and of TERRA as a portal, aggregator, provider and manager of Internet contents and services, in fixed telephony (including the wireless system used in this sector) and in mobile telephony (only if thus agreed in the Contracts and Subsequent Contracts, just as both terms are defined in Section Second and Fourth paragraph four ), all aimed at the residential and SOHO markets, and if agreed in the Contracts and Subsequent Contracts, SMEs, taking advantage of synergies and creating value for both Parties:

(i)    aggregation of the offer of products and services in the Internet business;

(ii)    provision of the offer of products and services in the Internet business,

(iii)    development and construction of new advanced services in the Internet business;

(iv)    connectivity and access to Internet business.

Moreover, the Parties shall use best effort to identify additional elements to those described in Section Two below that allow value to be generated for both Groups, with special emphasis on electronic commerce, and the relationships with the different mobile operators of the TELEFÓNICA Group (as such term is defined in Section Two below).

### TWO.    DEVELOPMENT OF THE MODEL OF RELATIONS IN EACH ONE OF THE PHASES OF BUSINESS FORMING THE OFFER FOR THE END CLIENT IN THE INTERNET BUSINESS.

The model of relations referred to in the above Section will be subject to development through the relevant contracts entered into between certain companies in the TELEFÓNICA Group and the TERRA Group, on the terms and conditions established in this Framework Agreement, adapted, if appropriate, to the legal and statutory requisites that may be applicable.

For that purpose, each Party hereby undertakes, as controlling shareholder of its respective Group, that each one of the contracts foreseen in this Section Two (hereinafter the "Contracts") shall be formalised and executed by the companies determined by it among those in its respective Group, this being understood in the sense of article 4 of Act 24/1988 of 24th July, of the Stock Market, and, for the purpose of this Framework Agreement, the TELEFÓNICA Group and Telefónica Publicidad e Información, S.A. shall not be considered an integral part of Telefónica Group (hereinafter "TELEFÓNICA Group" and "TERRA Group", as appropriate, and the companies thus determined by each Party among those of its respective Group, the "Companies in the TELEFÓNICA Group" or the "Companies in the TERRA Group", as appropriate), in order to generate:

(x) in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z) for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above, and as defined in the Note of the Exhibit I.

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

The Parties hereby agree that, to the extent require by virtue of the object of the relevant Contracts, they must be entered into by companies in the TELEFÓNICA Group and Companies in the TERRA Group with presence in the same geographic territories.

2.1.    Exclusivity of the Companies in the TERRA Group as a portal, service aggregator and supplier of added value services.

2.1.1.   TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group grant exclusively to the Companies in the TERRA Group as supplier of the essential elements of the portal and aggregator of the narrow and broad band Internet services targeting the residential segment, SOHO and, if appropriate SMEs, all to the satisfaction of TELEFÓNICA according to the contractual parameters established in the terms set forth in Section 2.1.5 below.

TELEFÓNICA hereby undertakes, on the terms and conditions of this Framework Agreement, for the Companies in the TELEFÓNICA Group to provide the Companies in the TERRA Group the exclusive commission to develop all the portals for aggregation of the Internet contents and services on narrow and broad band, targeting the residential segment, SOHO and, if appropriate, SMEs, developed by the Companies in the TERRA Group, whether Internet access portals in connectivity offers and Internet access by Companies in the TELEFÓNICA Group, and include the trademark and other distinctive signs of the Companies in the Terra Group (the use of said trademark and other distinctive signs will comply with the provisions of the agreements to be entered under Section 2.1.5 below).

2.1.2.   TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall acquire the necessary narrow and broad band Internet value added services exclusively from the Companies in the TERRA Group as required to construct the offer for end users, preferably residential, SOHO and, if appropriate, SMEs, listing, for purely illustrative although not limiting purposes, the following: e-mail, instant message platforms, unified message platforms, chats, etc.

2.1.3.   Commercialisation or provision to third parties of packaged services that are identical or substantially similar to those supplied to the Companies in the Telefónica Group as set forth in Sections 2.1.1 and 2.1.2 above shall require prior written consent from TELEFÓNICA, which will not be unjustifiably denied.

2.1.4.   TELEFÓNICA undertakes, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group assign to the Companies in the TERRA Group the exclusive management and operation of the advertising spaces that include third party advertising on the portals developed according to Section 2.1.1. above by the Companies in the TERRA Group. In order to avoid doubt, it is expressly recorded that the decision on existence of such advertising space shall be taken entirely by the Companies in the Telefónica Group.

2.1.5.   For the purposes of formalising what is set forth in Sections 2.1.1, 2.1.2, 2.1.3 and 2.1.4 above, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant licence contracts for brands and other distinctive signs and intellectual property, management of the portal, aggregation and access to value added services and use of software and maintenance, within the terms specified in Section 4.1 below, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II.

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[****]" herein.

2.2.    Acquisition, development and/or commercialisation of contents, service provision agreements and exchanges of shares and/or assets with vertical portals, advertising spaces, provision of on-line integral marketing spaces and provision of auditing, consultancy, management and maintenance services for country portals.

2.2.1.    Acquisition, development and commercialisation of contents and agreements to provide services and share and/or asset exchanges with vertical portals.

2.2.1.1.    TERRA and TELEFÓNICA hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group preferentially focus their demand for acquisition, development and/or commercialisation of content arising from the construction of the offer of products and services foreseen in Section Two through Companies in the TELEFÓNICA Group. For this purposes, "preferential focussing" shall be understood as the option for Companies in the TELEFÓNICA Group to offer the Companies in the TERRA Group the aforementioned contents and the obligation of the Companies in the TERRA Group to commission those contents from the Companies in the TELEFÓNICA Group, as long as the offer presented by the latter to the Companies in the TERRA Group is not objectively worse than the offer provided by any third party.

Moreover, TERRA and TELEFÓNICA undertake to make their best effort to ensure that the Companies in the TELEFÓNICA Group distribute their on-line contents preferentially through the Companies in the TERRA Group.

For that purpose, on the terms established in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for acquisition, development and/or commercialisation of content and rendering on-line training services, on the terms and conditions set forth in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 above.

2.2.1.2.    The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group enter into exclusive contracts to provide on-line training services to their respective employees through the company Educaterra, S.L..

The Parties undertake to use best efforts, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group will engage Mápel, S.A. for their needs of products, solutions and services based on on-line localisation.

In order to facilitate fulfilment of the commitments undertaken in Section 2.2.1.1 above and to optimise their respective portfolios, the Parties hereby undertake, on the terms and conditions foreseen in general terms under this Framework Agreement that, within the deadlines set in Section 4.1 below, Telefónica de España, S.A. shall transmit to Educaterra, S.A., and the latter shall acquire at market value, which according to the Parties valuations is equivalent to its book value, the platform A+ owned by it, on the terms and conditions established specifically in Exhibit III.

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

2.2.2.    Acquisition of advertising spaces.

TELEFÓNICA and TERRA hereby undertake, on the terms and conditions of this Framework Agreement, that the annual amount assigned by the TELEFÓNICA Group to acquisition of advertising spaces in the Companies in the TERRA Group shall not be less than [***]% of the total annual budget assigned by that Group to advertising.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts to acquire advertising spaces, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV.

2.2.3.    Provision of integral on-line marketing services.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, for the Companies in the TERRA Group to provide preferentially integral on-line marketing services to the Companies in the TELEFÓNICA Group. To these purposes, "preferential contracting" shall be understood as the option granted to the Companies in the TELEFÓNICA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing services of the Companies in the TERRA Group and the obligation of the Companies in the TELEFÓNICA Group to hire those integral on-line marketing services with the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the TELEFÓNICA Group is not objectively worse than the offer presented by any third party.

For that purposes, within the terms foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant service provision contracts for integral on-line marketing services, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV, mentioned under Section 2.2.2 above.

2.2.4.    Preferential contracting of the auditing, consultancy, management and maintenance services of the country portals of the Companies in the TELEFÓNICA Group by the Companies in the TERRA Group. To these purposes, "preferential contracting" shall be understood to be the option of the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group auditing, consultancy, management and maintenance services for its country portals and the obligation of the Companies in the TELEFÓNICA Group to hire those auditing, consultancy, management and maintenance services for country portals from the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the Telefónica Group is not objectively worse than the offer presented by any third party.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall provide the Companies in the TELEFÓNICA Group the auditing, consultancy, management and maintenance services of their respective country portals.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit VI.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

2.3.    Wholesale Internet connectivity and access.

2.3.1.    The Companies in the TELEFÓNICA Group, as exclusive suppliers of wholesale connectivity and access services.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire the wholesale Internet connectivity and access services exclusively from the Companies in the Telefónica Group, as long as that acquisition is made in the conditions of the most favoured client allowed by market regulations.

For that purposes, within the deadlines provided in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 and 2.2.1.1 above.

2.3.2.    Outsourcing regime or equivalent in operation of the network access elements.

The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall provide the outsourcing or equivalent service to operate all or part of the services and/or operation of the elements for excess to the network required by the Companies in the TERRA Group to provide the Internet access service to their preferentially residential customers, SOHO and, if appropriate, SMEs, as long as such services may be provided in the conditions of the most favoured client allowed by the regulations.

For that purposes, within the deadlines set in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for operation, hosting and management, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1 and 2.3.1 above.

2.3.3.    The Companies in the TELEFÓNICA Group, as exclusive providers of the network services required to build up the offer for end users.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire exclusively from the Companies in the TELEFÓNICA Group the advanced network services and platforms required to build up the offer for preferentially residential customers, SOHO and, if appropriate, SMEs on narrow and broad band, as long as such acquisition is performed in the conditions of the most favoured client that the regulation allows.

For that purposes, on the terms and conditions foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant exclusive supply contracts, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1, 2.3.1, and 2.3.2 above.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[**\*]" herein.

**THREE.   GENERAL TERMS APPLICABLE TO THE CONTRACTS.**

3.1.   Scope of application.

The general terms agreed in this Section Three shall be applicable to all the Contracts, as well as to the Subsequent Contracts (as to the latter, on the terms foreseen in Section 4.4 and in Section Six below). However, the content of Section 3.3 below shall only be applicable to the successive term contracts.

The Parties hereby undertake to include in the Contracts and, if appropriate, in the Subsequent Contracts, the service level agreements that shall determine and guarantee a quality for the services, in keeping with the standards in the sector. Moreover, the Contracts, and as appropriate, the Subsequent Contracts, shall establish the appropriate protection mechanisms for the Parties in the event of early termination, to allow an adequate, respectful transition as to the daily activities of the Parties under the relevant Contract (or Subsequent Contract).

3.2.   Modifications imposed by administrative bodies.

In the event of any of the entities or bodies regulating the telecommunications market, the right to competition and/or any other competent bodies, require substantial amendment of any of the Contracts or Subsequent Contracts, the Monitoring Committee will have to decide on the convenience of performing such an amendment or of making the relevant Contract or Subsequent Contract void. The Monitoring Committee must decide within the term of one month from the date on which the matter is submitted to it. However, if the requirement by the relevant entity or body were to establish a lower term for fulfilment thereof, the term of one month shall be reduced appropriately.

If the Monitoring Committee were to resolve to make the relevant Contract or Subsequent Contract void, it will comply with the terms set forth in Section 4.3 below and, if appropriate, the terms foreseen in Section Six below.

3.3.   Termination.

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1 and 4.4 below and in the antepenultimate paragraph of Section Six below, the Contracts and Subsequent Contracts shall end and be left without any effect whatsoever in any of the following cases:

(i)   on 31st December 2008 or, if appropriate, on expiration of any renewal of a Contract or Subsequent Contract in the event that one of the parties had notified the other party in writing with, at least, two months in advance prior written notice, its intention to terminate the relevant Contract or Subsequent Contract. In absence of the relevant prior written notice, the Contract or Subsequent Contract shall be deemed automatically and successively renewed for additional periods of one year, or

(ii)   on the sixtieth calendar day following the date on which the Change in Control takes place at TERRA, in the event of TELEFÓNICA having notified it within the term of its decision to terminate the Framework Agreement, on the terms set forth in Section Seven below; or

Termination of any of the Contracts in the cases foreseen in this Section 3.3 shall not give rise to any kind of liability being required among the relevant Parties, notwithstanding those strictly arising from execution thereof and fulfilment prior to the date of termination.

**Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.**

3.4. Confidentiality and public announcements.

The Contracts and Subsequent Contracts shall be confidential and none of the respective Parties shall reveal their existence and content without the consent of the other. An exception is made in cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the part under obligation shall previously inform the other.

The Parties shall agree on the content of any notification or public release related to the relevant Contracts and Subsequent Contracts.

3.5. Expenses and taxes.

Each part shall pay the expenses arising for it from formalisation and execution of the Contracts and Subsequent Contracts.

The obligations of a tax nature shall be paid by each part pursuant to the applicable laws and provisions.

3.6. Resolution of conflicts. Binding nature of the resolutions by the Monitoring Committee.

3.6.1. Resolutions of conflicts.
Any discrepancy in the interpretation as well as the execution of the Contracts and the Subsequent Contracts must be submitted by any of the Parties to the Monitoring Committee and, should a resolution not be provided, by it to the Chairmen of TELEFÓNICA and TERRA, resorting for the relevant judicial or arbitration proceedings only in the event of failure to reach an agreement by the Chairmen. To those ends, the terms of Section 15.1 below shall be applicable, with the particular specification that reference to the Parties must be understood to refer to the relevant Parties.

3.6.2. Binding nature of the resolutions by the Monitoring Committee

In any case, all agreements or resolutions by the Monitoring Committee, on the terms of Section Four below, shall be binding upon the relevant Parties, who undertake to fully comply with them, it thus being considered that the final decisions by those Parties may not be impugned.

**FOUR. PROCEDURES AND SCHEDULE FOR DEVELOPMENT.**

4.1. Terms to formalise the Contracts.

The Parties undertake that the Contracts, on the terms and conditions of this Framework Agreement and its Exhibits, are formalised between the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group within the maximum term of one month from the date of this Framework Agreement, adapted as appropriate to the applicable legal and statutory requisites, on the terms that are determined for that purpose by the Monitoring Committee foreseen in Section 4.2 below. That Committee shall also set, according to the legal and business circumstances, the exact dates on which each Contract or group of Contracts must be formalised.

As an exception, the Monitoring Committee may postpone formalisation of some of the Contracts for proper reasons, so these are granted once the aforementioned term of one month has expired, in which case the terms of Section 4.3 below shall be applicable.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

4.2.    Monitoring Committee.

4.2.1.    Composition.

The Parties hereby agree to create a Monitoring Committee for execution, development and monitoring of this Framework Agreement, which must be formed by six members, three of which, who shall include the person acting as Chairman, shall be appointed by TELEFÓNICA, and the remaining three shall be appointed by TERRA.

Each Party may replace any member or members appointed by it at any time, by serving the relevant written notice to the Monitoring Committee.

The Parties hereby resolve that the appointment of the members of the Monitoring Committee and their formal constitution shall take place within the term of fifteen days from signing this Framework Agreement.

4.2.2.    Meetings: calling, frequency and minutes.

The Chairman shall call the meetings. The Monitoring Committee shall meet at least once every quarter. However, the Chairman must call the Monitoring Committee whenever required to do so in writing by any of its members and, likewise, may call it on any occasion he may deem fit.

The Parties agree that the first Monitoring Committee shall meet no later than 28th February 2003.

The meetings of the Monitoring Committee may be attended by executives from either of the Parties with the right to speak but not vote, in order to provide information on the progress of the alliance and to facilitate decision making by the Monitoring Committee.

The Secretary to the Monitoring Committee, who shall be appointed by TERRA from among the members of the Monitoring Committee appointed by TERRA, shall take the minutes of the content of each meeting, which shall be signed by the Secretary with the approval of the Chairman once it is approved by those attending.

4.2.3.    Quorum, passing resolutions and binding nature of these.

The Monitoring Committee shall be understood to be validly met as long as it is attended by four of its members and the resolutions are passed unanimously.

The agreements and resolutions by the Monitoring Committee shall be binding upon the Parties, who undertake to fully comply with them directly or through the companies in their relevant Group, as appropriate. In this sense, the agreements and resolutions by the Monitoring Committee shall be considered final decisions by the Parties in relation to the matters concerned and, thus, not liable to be impugned.

Failing an agreement on any matter of its competence, the Monitoring Committee shall submit the matter to the Chairman of TELEFÓNICA and TERRA, who shall have a term of fifteen days to issue their finding. If that term expires without an agreement being reached, any of the Parties may initiate arbitration proceedings on the terms foreseen in Section Fifteen below.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

4.2.4.    Duties.

The Monitoring Committee is to perform the following duties.

(i)    to co-ordinate, direct and supervise performance and development of this Framework Agreement, through the process of formalisation of the Contracts, determining the dates of granting and integrating their content, as provided in Section 4.1 above.

(ii)    resolve on the convenience of extending, modifying or terminating any of the Contracts or Subsequent Contracts, or of formalising Subsequent Contracts, especially in the cases foreseen in Section 3.2 above and 4.4 below.

(iii)    resolve on possible amendments to be made in the Contracts or Subsequent Contracts, if their performance were to affect the profitability or strategic interests of the Telefónica Group or Terra Group, and this will only be when the circumstance may not compensated in terms of value through the mechanisms foreseen in this Framework Agreement.

(iv)    resolve on extension of this Framework Agreement or granting preemptive rights, as well as concerning the degree of fulfilment of the alliance and to take the relevant corrective measures, [***] and determining the cases in which the factual cases foreseen in Section Six below arise to apply the TELEFÓNICA Guarantee.

(v)    resolve on the convenience of modifying the Contracts and Subsequent Contracts according to the evolution of the applicable legislation, on the terms of Section 4.5 below.

(vi)    resolve on any discrepancy in interpretation as well as performance of this Framework Agreement, of the Contracts and of the Subsequent Contracts; and

(vii)    any others specifically entrusted to it under this Framework Agreement.

(viii)    resolve on creation of working subcommittees on any of the areas of specific activity in Spain, Brazil, Rest of Latin America and Relations with Telefónica Data, as well as suppression, modification, substitution or creation of additional subcommittees.

(ix)    analyze and review the amounts and criteria for allocation referred to in the Note of Annex I of the present Framework Agreement.

When performing its duties, the Monitoring Committee shall ensure that its resolutions comply with the principle of tax efficiency for the Parties, as well as for the relevant Parties of the Contracts and Subsequent Contracts.

4.3.    Review of the degree of fulfilment of the alliance and extension of the Framework Agreement.

4.3.1.    The Monitoring Committee must validate fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA in November every year. For that purposes, it must review the degree of fulfilment of the Contracts and, if appropriate, of the Subsequent Contracts, in order to determine whether the services have been rendered to the satisfaction of the relevant part and check that they have been fulfilled.

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

    (x)    in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

    (z)    for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above.

In order to facilitate that annual validation, on a quarterly basis, on the second month of the following quarter, the Monitoring Committee shall review the degree of fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA, the degree of fulfilment of the Contracts and, if appropriate, Subsequent Contracts, adopting the measures it may deem fit in each case.

On the other hand, in November 2008, the Monitoring Committee shall resolve on the extension or not, for the term deemed convenient, of this Framework Agreement and, where applicable, of the Contracts and Subsequent Contracts. If it were to decide not to extend them, the Monitoring Committee would determine the services, whether foreseen or not in Section Two above, in relation to which the Companies in the TELEFÓNICA Group would grant the Companies in the TERRA Group with presence in the same geographic territory, or vice-versa, a pre-emptive right to equal offers by third parties.

4.3.2.    However, the Monitoring Committee may perform the reviews foreseen in Section 4.3.1 above as an extraordinary measure in any other month of the year.

4.3.3.    The Monitoring Committee shall impose the measures it deems fit, [***] to correct the breaches detected during its annual validation duties and, if appropriate, shall determine whether it is appropriate to apply the TELEFÓNICA Guarantee foreseen in Section Six below.

4.4.    Adaptation and updating of the services and products.

According to the technological advances, the evolution of the specific needs of both Groups, the general market conditions, the evolution of the reference costs, and any other considerations related to achieving the objectives of this alliance, the Monitoring Committee may agree the modifications it may deem appropriate as to the services and products that, by virtue of this Framework Agreement and the Contracts or Subsequent Contracts, must be rendered to the relevant companies in the TELEFÓNICA Group and in the TERRA Group (even inclusion of new catalogues of services and products), making, when appropriate, the appropriate decisions for that purposes in relation to (i) amendment of this Framework Agreement, (ii) extension, amendment or suppression of certain Contracts or Subsequent Contracts, and (iii) formalisation of new contracts (hereinafter, along with the contracts mentioned in the paragraph preceding the penultimate one of Section Six below, the "Subsequent Contracts") which shall be subject to the terms and conditions foreseen in general within this Framework Agreement, except in the aspects which the Monitoring Committee may consider appropriate to modify.

In cases in which the Monitoring Committee may resolve to extend only certain Contracts or Subsequent Contracts, it shall also resolve on the Sections of this Framework Agreement that, by virtue of their applicability, must continue in force, taking full effects as to the Contracts or Subsequent Contracts extended.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003                    Page 14 of 20

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

4.5.    Adaptation of the Contracts and Later Contracts to the evolution of the applicable legislation.

According to the evolution of the applicable laws and, in particular, liberalisation of the regulation framework for the telecommunications market and competition rights, the Monitoring Committee may agree the modifications it may deem fit in relation to the Contracts and Subsequent Contracts, in order to overcome the restrictions contained in their clauses due to the limitations imposed by the by-laws in force at the time of granting.

FIVE.    GOOD FAITH.

The Parties undertake to act in good faith, abstaining from performing any action that may prevent or hinder performance of this Framework Agreement, and giving complete fulfilment directly, or through the companies in its respective Group to the obligations arising from this Framework Agreement, especially those related to (i) fulfilment of the resolutions by the Monitoring Committee, and (ii) formalisation of the Contracts and Subsequent Contracts, as well as their execution, by providing the services in accordance with the set quality parameters and payment of the relevant agreed prices.

SIX.    GUARANTEE BY TELEFÓNICA.

TELEFÓNICA hereby guarantees fulfilment by the Companies in the TELEFÓNICA Group of the obligation to formalise and fulfil the Contracts on the terms of this Framework Agreement.

In all cases in which, due to reasons other than breach by TERRA and/or the Companies in the TERRA Group, especially for legal or statutory reasons, it were not possible to formalise any of the Contracts, or they should become fully or partially void, or if there were to be any breach by TELEFÓNICA and/or the Companies in the TELEFÓNICA Group of these making it impossible to achieve:

(x)    in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)    for each one of the following financial years, a value equivalent at least to that established for 2003, as indicated in subparagraph (x) above (it being duly understood that in the event of the minimum value mentioned not being reached in any financial year, the deficit arising will be considered to be fully compensated by the necessary proportion by the surplus to that minimum figure that may have been obtained in any of the previous financial years).

TELEFÓNICA shall propose alternative mechanisms to the satisfaction of TERRA to provide services and acquire products that, within the setting of the complementary nature of both Groups, will allow the relevant compensation to take place.

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

In the presentation of alternative mechanisms by TELEFÓNICA, it shall take the following aspects, among others, into account: (i) contracts to render services or acquire products not foreseen in Section Two above that may have been entered into by the Parties, or between the companies in their respective Groups after the date on which this Framework Agreement came into force, or after that date, as long as these are services to be provided thereafter, (ii) newly available services and products that may arise by virtue of the technological advances in the evolution of the specific needs of both Groups and the market conditions; and (iii) possibilities arising from inclusion of any companies in the TELEFÓNICA Group or the TERRA Group.

New contracts which are formalised by virtue of the terms set forth in the preceding paragraph (hereinafter along with the contracts foreseen in Section 4.4 above, the "Subsequent Contracts") shall be subject to the terms and conditions foreseen in general terms in this Framework Agreement, except in the aspects the Parties find fit to modify.

In cases in which the Parties agree to extend only certain Contracts or Subsequent Contracts, they shall also resolve on the Stipulations of this Framework Agreement which, by virtue of its application to these, must continue in force, taking full effect in relation to the Contract or Subsequent Contracts extended.

The obligations of TELEFÓNICA within the framework of this Section shall be decreased by the relevant proportional part to show possible partial breaches by TERRA and/or by the Companies in the TERRA Group that may have taken place.

[***]

**SEVEN.   TERMINATION.**

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1. and 4.4 above, and in the antepenultimate paragraph of Section Six above, this Framework Agreement shall become void in any of the following cases:

(i)    on 31st December 2008 or, if appropriate, on expiration of any relevant renewal pursuant to Section 4.3.1 in the event that one of the Parties had notified the other Party in writing with, at least, two months in advance prior written notice, its intention to terminate the Framework Agreement. In absence of the relevant prior written notice, the Framework Agreement shall be deemed automatically and successively renewed for additional periods of one year, or

(ii)   at the option of TELEFÓNICA in the event of a Change in Control taking place in TERRA (on the terms foreseen in the last two paragraphs of this Section).

Termination of the Framework Agreement in the cases foreseen in this Section Seven shall not give rise to any kind of liability between the Parties being demanded, notwithstanding those arising strictly from the actual performance of the Framework Agreement prior to the date of termination.

A Change in Control of TERRA shall be understood to be any event or situation except for (i) the transfer by TELEFÓNICA of all or part of its participation in TERRA or (ii) an act or agreement of TELEFÓNICA with a third party which leads to a Change of Control that entitles a shareholder other than TELEFÓNICA to direct the management and administration of that company directly or indirectly, as the holder of the majority voting rights or by virtue of agreements entered into with other shareholders.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

If there is a Change in Control of TERRA, if TELEFÓNICA were to opt to terminate this Framework Agreement, it will have the term of one month from the date on which this took place to notify TERRA that the Framework Agreement shall terminate, and it shall cease to be effective on the sixtieth calendar day from the date on which that Change of Control of TERRA took place. All the Contracts and Subsequent Contracts shall also terminate on that date. Likewise, should the Change of Control take place before 27 October 2005 and TELEFÓNICA chooses to terminate the present Framework Agreement, TELEFÓNICA must acquire products and services from TERRA during each quarter included between the termination date foreseen in Section 3.3 ii and 26 October 2005, in the following terms: (i) US$ 50 MM for each quarter the first year, (ii) US$ 56.25 MM for each quarter the second year and (iii) US$ 62.5 MM for each quarter the third year. Said amounts will be reduced by the equivalent revenues to the possible non-compensated excess values referred to in Clause Section (z) and shall be paid as an advanced payment in the ten first days of each quarter [***].

**EIGHT.   CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.**

8.1.    This Framework Agreement and all the documentation or negotiations linked thereto are confidential and neither of the Parties shall reveal their existence and content without the consent of the other, with the exception of cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the Party obliged shall previously inform the other.

8.2.    The Parties shall agree the content of any public notice or release related to this Framework Agreement or its performance.

**NINE.   NOTICES.**

9.1.    All notices between the Parties concerning this Contract may be made either in writing delivered at the domicile of the addressee, or by facsimile, in which case the original must be sent by registered mail with acknowledgement of receipt to the domicile of the party addressed.

9.2.    For all the purposes of notice, delivery shall be considered to take place on the same working day on which the letter was delivered, or the facsimile was transmitted to the party addressed.

9.3.    For all the purposes related to this document, the Parties hereby provide the following fax numbers and domiciles:

TELEFÓNICA, S.A.
Attention of the Secretary General
Address: Gran Vía, 28, Madrid
Fax: 91 521 45 81

TERRA
Attention of the Secretary General
Address: Paseo de la Castellana, 92—Madrid
Fax: 91 452 38 81

**TEN.   ASSIGNMENT.**

This Framework Agreement and the obligations assumed by each one of the Parties by virtue thereof may not be transferred, nor may it be subject to assignment to any third party without the prior, express, written consent of the other Part.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

**ELEVEN.    VOIDNESS AND INEFFECTIVENESS OF THE CLAUSES.**

In the event that any Section or part thereof were to be declared void or ineffective, that nullity or ineffectiveness would affect only that provision or the relevant part thereof, while the Framework Agreement shall subsist in all other aspects, it being understood that such a Section or part thereof that may be affected shall be omitted. This shall all be considered notwithstanding the obligations of the Parties foreseen in Section Six above, as to it being applicable.

**TWELVE.    EXPENSES AND TAXES.**

12.1.    Each part shall pay the expenses directly borne by it from formalisation of this Framework Agreement.

12.2.    The obligations of a tax nature shall be paid by each Party according to the applicable laws and provisions.

**THIRTEEN.    ENACTMENT AND PREVALENCE OF THE AGREEMENT.**

13.1.    This Framework Agreement shall be effective 1st January 2003.

13.2.    This Framework Agreement substitutes any other agreement, document or previous contract entered into between the Parties, that may contradict it and, specifically, in the event of discrepancy between the content of this Framework Agreement and Agreement [], in all cases the terms of this Framework Agreement shall prevail between the Parties. [***].

**FOURTEEN.    APPLICABLE LAW.**

This Framework Agreement shall be governed and interpreted pursuant to the laws of the Kingdom of Spain.

**FIFTEEN.    DISPUTES RESOLUTION.**

15.1.    Any discrepancy in the interpretation as well as the performance of this Framework Agreement must be submitted by the Parties, prior to initiating eventual arbitration proceedings, as foreseen in Section 15.2 below, to the Monitoring Committee and, if appropriate, by it to the Chairmen of TELEFÓNICA and TERRA.

If the Monitoring Committee has not solved the controversy within the maximum term of one month from the date on which its intervention is requested by either of the Parties, the Monitoring Committee itself shall submit the matter to the Chairmen of TELEFÓNICA and TERRA within the 10 calendar days following expiry of the term mentioned.

Only if no agreement is reached by the Chairmen, within the fifteen working days following the date on which the controversy is submitted to them, shall the arbitration proceedings foreseen in Section 15.2 be foreseen.

15.2.    The Parties hereby grant this Section the status of an arbitration clause, pursuant to all the terms established and recognised in article 6.1 in relation to 5.1, of the current Act 36/1988 of 5th December, and submit all matters that may arise as to the validity, effectiveness, interpretation and/or performance of this Framework Agreement to the finding issued by an Arbitration Tribunal formed by three arbitrators, who shall decide on the matters of litigation subject to Law, and the (Parties) undertake to attend and abide by the finding issued.

*FREE TRANSLATION FROM SPANISH ORIGINAL*

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

The Arbitration Tribunal shall be formed by appointing an arbitrator for the plaintiff and another arbitrator for the defendant, both of whom shall then appoint a third arbitrator by reaching an agreement within the term stated in the following paragraph. Should an agreement not be reached within the said term, His Honour the Dean of the Honourable Legal Association of Madrid, or the Lawyer of that Association chosen by the Dean, shall be automatically appointed.

In order to constitute the arbitration tribunal and carry out the arbitration, the Parties shall proceed as follows:

(i)     The Party calling the arbitration shall serve authentic notice to the others stating the matter of litigation and appointing an arbitrator, of whose acceptance it has record.

(ii)    Within the unextendable term of eight calendar days from the date on which notice is received, the Parties summoned must state whether they accept the matter of litigation raised or extend it, and in all cases must appoint another arbitrator, of whose acceptance it has record.

(iii)   The Party calling the arbitration shall have a further eight calendar days to accept or reject, fully or partially, the extension of the matter of litigation. If it accepts, the other Party shall be served authentic notice. If it does not accept the extension, the matter of litigation shall be considered just as it was raised, notwithstanding the right to the other party has to bring further arbitration.

(iv)    When the said term for extension of the arbitration has elapsed, with or without agreement between the Parties, both arbitrators shall proceed to appoint a third one, or if they do not agree, shall appoint the Dean of the Honourable Law Association of Madrid, who may, at his discretion, accept the appointment or appoint a third arbitrator.

(v)     If more than ninety calendar days elapse from the notice calling the arbitration as provided hereabove (i) and if the Arbitration Tribunal has not been formed for any reason, the Parties may resort to judicial formalisation of the arbitration through the jurisdictional intervention foreseen in articles 38 and following of Act 36/1988 of 5th December.

(vi)    The Party that may proven to blame for it being impossible to constitute the Arbitration Tribunal shall pay the other part, in settlement of an accumulative conventional penalty, that is to say, notwithstanding other liabilities in which it may have incurred, the sum of 6,000 euros per day until the date on which the cause leading to such an impossibility is removed.

(vii)   Madrid, the capital, is named the venue for the arbitration for all the effects of announcement thereof.

The procedure shall be determined by the Arbitration Tribunal according to the applicable imperative regulations and the organisational principles set forth in articles 21 and following of Act 36/1988 of 5th December.

In any case, the Parties shall declare Spanish Law by common agreement to be the applicable legislation for resolution of any of the controversies that may arise in all the cases in which this arbitration clause may be applicable.

As to the content, from and term of the finding, the terms of articles 30 to 37 of the current Act 36/1988 of 5th December shall be applicable, and in all matters not foreseen by this Arbitration Section, the terms of the said Act shall also be applicable.

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

In all matters that may not be resolved by arbitration, as well as in judicial formalisation of this, if necessary, the Parties expressly submit, renouncing any other Jurisdiction, to the Tribunals of Madrid, the capital.

**SIXTEEN.   EXHIBITS.**

The five Exhibits to this Framework Agreement, a list of which is provided hereunder, form an integral part hereof to all effects, and it is understood by the Parties that all concepts included therein are equivalent to those included within this main body of the Framework Agreement, and, therefore, do not alter them in any way.

List of Exhibits:

Exhibit I

Exhibit II: Value Added Services, Portal and Related Infrastructure

Exhibit III: Corporate Services and Assets

Exhibit IV: Advertising

Exhibit V: Consulting

In witness whereof, the Parties sign double copies of this Framework Agreement, to a sole end, in the place and on the date first written above.

TELEFÓNICA, S.A.                                    TERRA NETWORKS, S.A.

Strategic Alliance Framework Agreement dated as of Feb. 12, 2003

Any text removed pursuant to Terra Networks' confidential treatment request has been separately filed with the U.S. Securities and Exchange Commission and is marked "[***]" herein.

EXHIBIT I

[***]

EXHIBIT II

[***]

EXHIBIT III

[***]

EXHIBIT IV

[***]

EXHIBIT V

[***]

*FREE TRANSLATION FROM SPANISH ORIGINAL*

6-K 1 d6k.htm FORM 6-K

# FORM 6-K
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

**Report of Foreign Private Issuer**

**Pursuant to Rule 13a-16 or 15d-16
of the Securities Exchange Act of 1934**

February 13, 2003
Commission File Number: 000-28011

# Terra Networks, S.A.
(Translation of registrant's name into English)

**Paseo de la Castellana, 92
28.046 Madrid
Spain
(34) 91-452-3900**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:

**Form 20-F  _X_      Form 40-F ___**

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):

**Yes ___      No  _X_**

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):

**Yes ___      No _X_**

Indicate by check mark whether by furnishing the information contained in this Form, the registrant is also thereby furnishing the information to the Commission pursuant to Rule 12g3-2(b) under the Securities Exchange Act of 1934:

**Yes ___      No _X_**

If "Yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3-2(b): <u>N/A</u>

# Terra Networks, S.A.

TABLE OF CONTENTS

| Item | | Sequential Page Number |
|------|---|---|
| 1 | Relevant fact, dated on February 13th 2003 | 3 |

[LOOSE TRANSLATION FOR INFORMATION PURPOSES ONLY]

## TO THE SECURITIES MARKETS NATIONAL COMMISSION

### NOTIFICATION OF RELEVANT FACT

TERRA NETWORKS, S.A., in compliance with Article 82 of Law 24/1988, of July 28, of the Securities Market, hereby communicates the following:

### HECHO RELEVANTE—RELEVANT FACT

On February 12th 2003 , Terra and Telefónica have signed a Strategic Alliance Master Agreement that substitutes the Strategic Agreement of May 16th, 2000 to which the company Bertelsmann was also party.

In addition, Terra, Lycos, Telefónica, and Bertelsmann have signed an agreement based on preferred relationships, which will allow the parties to continue exploring opportunities for the mutual provision of communication, development and content services in the online market.

The signing of the new Strategic Agreement between Terra and Telefónica responds, on the one hand, to the changes experienced in the Internet business, particularly the development of broadband services; and, on the other hand, the need to adapt the range of products and services offered by Terra Lycos Group under the May 2000 Agreement to the abovementioned new conditions and the specific needs of the Telefónica Group in those markets in which operates.

The Strategic Agreement takes full advantage of Telefónica Group's capacity as broad- and narrowband and access provider, along with the Terra Lycos Group's capacity as portal, aggregator, supplier and manager of fixed telephony internet content and services in the household, small office/home office (SOHO) and—when agreed—small and medium enterprise (SME) markets. The aim of the Strategic Agreement is to take advantage of synergies and the creation of value for both Groups.

This Strategic Agreement has been concluded for a period of six years ending December 31st, 2008 and shall automatically be renewed on an annual basis thereafter, unless expressly terminated by the parties.

The main characteristics of the Master Agreement can be summarised as follows:

1.    Strengthening   of the Terra Lycos Group as:

- Exclusive provider of the essential portal elements, use of the brand, aggregator of broad- and narrowband Internet content and services aimed at household, SOHO and—when agreed—SME segments in the Internet access and connectivity services offered by companies belonging to Telefónica Group.

- Preferred supplier of audit, consultancy, management and maintenance services for the Telefónica Group's country portals.

- Exclusive provider of online training services for Telefónica Group's employees.

- Preferred supplier of comprehensive online marketing services for the companies of Telefónica Group.

2.   The companies of Telefónica Group guarantee to acquire a minimum amount of online advertising space from the companies of Terra Lycos Group.

3.   Terra Lycos Group shall be Telefónica Group's exclusive provider of wholesale Internet access and connectivity services under most favoured customer treatment, allow by regulations.

4.   Outsourcing by the companies of Terra Lycos Group to the Telefónica Group companies of the management of all or part of the service and/or operation of the network access elements for providing Internet access to its household, SOHO and—when agreed— SME clients, under most favoured customer treatment, allow by regulations.

5.   The companies of Terra Lycos Group shall be Telefónica Group's exclusive provider of advanced network services and platforms necessary for developing services offered to household, SOHO and—when agreed—SME clients in both broad and narrowband, under most favoured customer treatment, allow by regulations.

Throughout its term, the Strategic Agreement guarantees Terra Lycos Group a generation of at least 78.5 million euro per year in value, which represents the difference between the revenues from the services provided under the Strategic Agreement and the costs and capital expenditure directly associated to those revenues. This Strategic Agreement defines a new relationship model between the two companies that makes better use of their respective capacities to boost the Internet-based growth of both companies.

SIGNATURES

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Terra Networks, S.A.

Date:                             By:    /s/   José F. Mateu Isturiz

                                      Name: José F. Mateu Isturiz
                                      Title:  General Counsel and Secretary of
                                                the Board of Directors





## MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is entered into by and between Lycos, Inc. ("Customer"), a Massachusetts corporation, and Telefonica Data USA, Inc., a Florida corporation

1.      **Telefonica Data Services; Terms & Conditions.**  Customer requests the Telefonica Data services ("Services"), which are checked in the table below.   Telefonica Data will render the Services pursuant to the terms and conditions contained in this Agreement and each applicable Exhibit. Telefonica Data may provide Customer with additional Services by executing additional Exhibits, which will be attached hereto and incorporated into this Agreement. All Services provided under this Agreement or any amendment thereto or to an Exhibit are subject to the attached Master Services Agreement Terms & Conditions, which are hereby incorporated by reference and made a part hereof.

| Exhibit A | ☐ Equipment Purchase | Exhibit G | ☐ Web Hosting |
|-----------|----------------------|-----------|---------------|
| Exhibit B | ☐ Equipment Lease | Exhibit H | ☐ Dial Access |
| Exhibit C | ☒ Collocation | Exhibit I | ☐ Frame Relay |
| Exhibit D | ☒ Data Storage | Exhibit J | ☐ IP Transit |
| Exhibit E | ☐ Operations & Maintenance | Exhibit K | ☒ Back-Up |
| Exhibit F | ☐ Virtual LAN | | |

2.      **Pricing.**  All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 ("SAFA") and set forth in each Exhibit and Customer shall pay Telefonica Data all recurring and non-recurring fees and other charges for Services rendered in the amounts and in the manner specified therein and in the Master Services Agreement General Terms & Conditions.  The Parties agree that the monthly recurring charges set forth in the Exhibits are subject to an annual price reduction of ten percent (10%) and Telefonica Data shall revise such charges accordingly on the anniversary date of each Service.

3.      **Benchmarking.**  On or about each anniversary of the Effective Date (as defined below) during the Term of this Agreement, the Parties shall meet to review the pricing, quality and charges of the Services.  If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA. If the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles, the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.

4.      **Term.**  This Agreement shall commence on November 1, 2003 ("Effective Date") and shall continue until the third anniversary of the Effective Date, unless terminated earlier in accordance with the Transaction Documents.

5.      **Preferred Provider.**  The Parties agree that Telefonica Data will be the preferred provider of data center and communications services to Customer during the term of the Agreement.  In the event Customer requires the provision of services similar to the Services and Telefonica Data is willing to provide such services at prices and on terms and conditions similar to the Services, Customer agrees that it will engage Telefonica Data to provide such services.

6.      **Entire Agreement; Amendments.** The Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter in this Agreement, and supersede all prior agreements, whether written or oral, with respect to the subject matter contained therein.  The Transaction Documents may be modified only by a written instrument executed by both parties.

### [REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the Parties have executed this Agreement through their respective duly authorized officers as of the Effective Date.

| CUSTOMER: LYCOS, INC. | TELEFONICA DATA USA, INC. |
|---|---|
| By: _(Signature)_ | By: _(Signature)_ |
| Printed Name: | Printed Name: PER PICARNO |
| Title: CFO | Title: CEO |
| Date: 11/18/03 | Date: 11-20-03 |
| Address: 100 Fifth Avenue | Address: 1221 Brickell Avenue, Suite 600 |
| Waltham, MA 02451 | Miami, Florida 33131 |
| Fax: | Fax: |
| E-Mail: | E-Mail: |

## [SIGNATURE PAGE TO MASTER SERVICES AGREEMENT]

## MASTER SERVICES AGREEMENT TERMS & CONDITIONS

1.  **DEFINITIONS.**

1.1. **Certain Definitions.**  The following terms shall have the following definitions:

(a) "Affiliate" shall mean, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity, whether directly or indirectly through one or more intermediaries.

(b) "Agreement" shall mean the Master Services Agreement, together with these Master Services Agreement General Terms and Conditions.

(c) "Business Day" or "business day" shall mean any day on which banks are open for the transaction of banking business in the State of New York, United States of America.

(d) "Confidential Information" shall mean all information, in any form, disclosed by the disclosing Party to the other Party which:

(i) concerns the operations, plans, know-how, trade secrets, business affairs, personnel, customers or suppliers of the disclosing Party; or

(ii) the receiving Party knows or might reasonably expect is regarded by the disclosing Party as the confidential information of the disclosing Party;

(iii) is designated as confidential, restricted, proprietary, or with similar designation; or

(iv) concerns any of the terms or conditions or other facts with respect to the Transaction Documents.

(e) "Control" and its derivatives shall mean legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding voting capital stock (or other ownership interest, if not a corporation) of an entity, or actual managerial or operational control over such entity.

(f) "Days" or "days" shall mean calendar days unless otherwise specified.

(g) "Effective Date" shall have the meaning set forth in Section 3 of the first page of the Master Service Agreement.

(h) "End User" shall mean the person or entity to which Customer resells or provides equipment, services or space pursuant to the terms of the Transaction Documents.

(i) "Equipment" shall mean the equipment, if any, provided by Telefonica to Customer pursuant to an Exhibit.

(j) "Events of Default" shall mean any of the following:

(i) any representation or warranty made by a Party in the Transaction Documents which was incorrect in any respect when made and that could reasonably be expected to have a material adverse effect upon the other Party's ability to realize the benefits of the Transaction Documents;

(ii) a material breach of the Transaction Documents that is capable of being cured on commercially reasonable terms within thirty (30) Days, which breach is not cured within thirty (30) Days after notice of breach to the breaching Party;

(iii) a material breach of the Transaction Documents that is not capable of being cured within thirty (30) Days and the breaching Party fails to (A) proceed promptly and diligently after written notice to correct the breach, (B) develop within fifteen (15) Days following written notice of breach a complete plan for curing the breach, and (C) cure the breach within sixty (60) Days after notice thereof;

(iv) Customer's failure to make any payment or any other amount when such payment or amount is due in accordance with any Transaction Document, which breach is not cured within five (5) business days after notice thereof, or

(v) a material breach of the Transaction Documents that is not capable of being cured.

(k) "Intellectual Property Rights" shall mean all intellectual property rights, including by way of explanation, but not by limitation,

those statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights.

(l) "Losses" shall mean liabilities, damages and related costs and expenses, including fines, levies, assessments, reasonable legal fees, and disbursements and costs of investigations, litigation, settlement, judgment, interest and penalties.

(m) "Parties" shall mean Customer and Telefonica Data, together.

(n) "Party" shall mean Customer or Telefonica Data, individually, as appropriate.

(o) "Service" shall mean any of the services Telefonica Data provides Customer pursuant to an Exhibit.

(p) "Telefonica Data Network" shall mean Telefonica Data's and/or its Affiliates IP backbone network.

(q) "Term" shall have the meaning set forth in Article 3 of the Master Service Agreement.

(r) "Transaction Documents" shall mean the Agreement, and all Exhibits and Schedules thereto.

1.2. **Other Definitions.**  Other terms used in this Agreement are defined in the context in which they are used and have the meanings there stated or are defined in the applicable Transaction Document.

2.  **END USER CHARGES.**  If, pursuant to the terms and conditions of the Transaction Documents, Customer resells the Service(s) ordered by Customer from Telefonica Data, Customer shall have the right to establish, in its sole discretion, the prices it charges End Users for the Service(s) resold pursuant to the Transaction Documents.

3.  **NETWORK INTEGRITY.**

3.1. **Non-Interference.**  Neither Customer nor its End Users, suppliers, contractors, licensors or licensees shall restrict or interfere with the Telefonica Data Network or the maintenance or use thereof.  Upon notice, Customer shall promptly remove any hazard, interference or service obstruction that may be caused by equipment (including Equipment), hardware, software, content or connectivity, owned by or under the control of Customer or its End Users or transmitted through the Telefonica Data Network

3.2. **Remedy.**  In the event that Customer or its End Users, suppliers, licensors or licensees restrict or interfere with the Telefonica Data Network or the use thereof, Telefonica Data may, after giving Customer reasonable notice, immediately modify, suspend, delay, condition, or cease until such restriction or interference is cured, performance of its obligations under the Transaction Documents, in whole or in part, to the extent reasonably necessary to remedy such restriction or interference.

3.3. **Liens.**  Customer shall not, directly or indirectly, cause any Telefonica Data property (including the Telefonica Data Network) to become subject to any mechanic's lien, materialman's lien, vendor's lien or any similar lien, whether by operation of law or otherwise.  If Customer becomes aware that it has breached its obligations under this Section, it shall promptly notify Telefonica Data in writing, cause such lien to be discharged and released of record without cost to the other, as soon as reasonably possible, and indemnify Telefonica Data against all related Losses.

4.  **PAYMENT TERMS.**

4.1. **Payment.**  Telefonica Data shall provide the Equipment and perform the Services set forth in the Exhibits in accordance with the provisions of the Transaction Documents and Customer shall pay all recurring, non-recurring and other charges for Equipment and/or Services as may be set forth in the Transaction Documents.  Unless otherwise provided for in the attached Exhibits, the fees due pursuant to the Transaction Documents shall be payable in accordance with the payment terms in this Article 4.  Telefonica Data shall render invoices for Services rendered to Customer on a monthly basis.  Payment shall be due and payable no later than thirty (30) days after the date of the invoice.  Customer shall make payments under the Transaction Documents by wire transfer of immediately available funds to the United States account or accounts designated by Telefonica Data.  At

Telefonica Data's discretion, payments to be made pursuant to the Transaction Documents may be made by check or draft of immediately available funds delivered to the address designated in writing by Telefonica Data. Any amounts not paid when due shall be assessed interest at a monthly rate equal to one percent (1.0%) or the maximum rate allowed by law, whichever is less, from the date the payment was due. If Telefonica Data commences legal proceedings to collect any payment due to it under any of the Transaction Documents, Customer shall be responsible for and pay all reasonable attorneys' fees, court costs and other collection expenses incurred by Telefonica Data.

**4.2. Customer Responsibilities.** Except as specifically provided for in a Transaction Document, Customer shall have sole responsibility for the costs, expenses and deployment of any interconnection, installation and testing necessary to use the Equipment and Services provided herein. In no event will the untimely installation or faulty non-operation of Customer's equipment relieve Customer of its obligation to pay charges for the Services. In addition, delays or failures in obtaining payments from End Users shall not affect Customer's obligation to make payments hereunder to Telefonica Data. Customer is responsible for amounts it cannot collect from End Users.

**4.3. Taxes.** All charges to Customer are calculated exclusive of any applicable federal, state or local use, excise, value-added, gross receipts, sales and privilege taxes, duties, universal service assessments or similar liabilities (other than general income or property taxes imposed on Telefonica Data) associated with the Services or Equipment, whether charged to Telefonica Data, its suppliers or Affiliates, Customer or End User ("Additional Charges"). Such Additional Charges shall be paid by Customer in addition to all other charges provided for in the Transaction Documents, except to the extent Customer provides to Telefonica Data, prior to the shipping of Equipment or commencement of Services, as applicable, a valid tax exemption certificate for all federal, state and local jurisdictions relevant to the Equipment and/or Service.

**5. INTELLECTUAL PROPERTY.** Each Party retains all right, title and interest in and to its respective Intellectual Property Rights. No licenses will be deemed to have been granted by either Party to any of its Intellectual Property Rights, except as otherwise expressly authorized in the Transaction Documents

**6. CONFIDENTIALITY.**

**6.1. Confidential Information.** Each Party acknowledges that after execution of the Transaction Documents, they may be furnished with, receive, or otherwise have access to Confidential Information of the other Party.

**6.2. Exclusion.** Confidential Information excludes any particular information that the receiving Party can demonstrate:

(a) at the time of disclosure, was in the public domain or in the possession of the receiving Party;

(b) after disclosure, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

(c) was received after disclosure from a third party who had a lawful right to disclose such information to the receiving Party without any obligation to restrict its further use or disclosure;

(d) was independently developed by the receiving Party without reference to Confidential Information of the disclosing Party; or

(e) was required to be disclosed to satisfy a legal requirement of a competent government body.

**6.3. Obligations.** The following obligations with respect to Confidential Information shall survive the expiration or termination of this Agreement for a period of three (3) years or such longer period as required by regulation, law or court order.

(a) Ongoing Obligation. Each Party's Confidential Information shall remain the property of that Party. Except as may otherwise be required by law or expressly authorized herein, neither Party shall disclose the confidential information of the other Party to any third party without the prior written consent of such other Party. Each Party shall use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent unauthorized disclosure of Confidential Information as it employs to avoid unauthorized disclosure of its own Confidential Information of a similar nature. Except as otherwise permitted hereunder, the Parties may disclose such information to entities performing services

required hereunder where: (i) use of such entity is authorized under the Transaction Documents, (ii) such disclosure is necessary or otherwise naturally occurs in that entity's scope of responsibility, and (iii) the entity agrees in writing to assume the obligations described in this Article. Any disclosure to such entity shall be under the terms and conditions of this Article.

(b) Remedial Measures for Disclosure. Each Party shall take reasonable steps to ensure that its employees comply with this Article. In the event of any disclosure or loss of, or inability to account for, any Confidential Information of the disclosing Party, the receiving Party shall promptly, and at its own expense notify the disclosing Party in writing, and take such actions as may be necessary and cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

(c) Permitted Disclosures. Except as otherwise provided herein, either Party may disclose the terms and conditions of these Transaction Documents to third parties that (i) have expressed a bona fide interest in consummating a significant financing, merger or acquisition transaction between such third parties and such Party, (ii) have a reasonable ability (financial and otherwise) to consummate such transaction, and (iii) have executed a nondisclosure agreement that includes within its scope the terms and conditions of this Article or substantially similar terms and conditions and also includes a procedure to limit the extent of copying and distribution of these Transaction Documents. Each Party shall endeavor to delay the disclosure of the terms and conditions of this Agreement until the status of discussions concerning such transaction warrants such disclosure.

(d) Required Disclosures. A Party receiving a request under Section 6.2(e) to disclose Confidential Information shall immediately upon receiving such request, and to the extent that it may legally do so, advise the disclosing Party promptly and prior to making such disclosure in order that the disclosing Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information

**6.4. No Implied Rights.** Nothing contained in this Article shall be construed as obligating a Party to disclose its Confidential Information to the other, or as granting to or conferring on a Party any express or implied right or license to the Confidential Information of the other Party.

**7. TERMINATION.**

**7.1. Default.**

(a) In the event that either Party commits an Event of Default under Sections 1.1(j)(i), (iv) or (v), then the other Party may, by giving written notice to the defaulting Party, immediately terminate the applicable Transaction Document.

(b) In the event that either Party commits an Event of Default under Sections 1.1(j)(ii) or (iii), then the other Party may, by giving written notice to the defaulting Party, terminate the applicable Transaction Document upon the expiration of the applicable cure period.

(c) In addition to the right to terminate pursuant to subsections (a) and (b) above, the non-defaulting party may pursue any legal remedies it may have under applicable law or principles of equity relating to such breach and subject to the terms of this Section.

**7.2. Insolvency.** Either Party may immediately terminate the Transaction Documents if the other Party (a) ceases to do business in the normal course for a continuous period of at least thirty (30) Days; (b) becomes or is declared insolvent or bankrupt; (c) is the subject of any proceeding related to its liquidation or insolvency (whether voluntarily or involuntarily) which is not dismissed within ninety (90) Days; (d) makes an assignment for the benefit of creditors; (e) experiences a material adverse change in financial condition which may reasonably be expected to affect its ability to perform; or (f) fails to comply with a written request for reasonable assurances within ten (10) Days or otherwise repudiates the Transaction Documents.

**7.3. Effect of Termination.** Termination of the Transaction Documents refers to the termination of the Parties' respective commitments and obligations from and after the date of termination, but does not relieve the Parties of their payment and other obligations incurred prior to the date of termination.

**7.4 Termination Assistance Services.** Upon the termination or expiration of the Agreement, Telefonica Data agrees to provide Termination Assistance Services consisting of continuation of any part or all of the

Services to Customer for up to eighteen (18) months following the termination or expiration of this Agreement. Termination Assistance Services shall be provided subject to, and in accordance with, the terms and conditions of this Agreement, except for the charges for such Termination Assistance Services, which such charges the Parties will mutually agree upon prior to the commencement of the Termination Assistance Services. The Parties agree that the charges for such Termination Assistance Services will be in accordance with the pricing principles of SAFA. In the event of termination resulting from an unremedied breach by Customer, Telefonica Data shall be obligated to provide Termination Assistance Services only so long as Customer pays for Services that are part of such Termination Assistance Services monthly in advance of the date the Services are to be provided.

**7.5. Shutdown/Transfer of Data Center.** In the event that during the Term of t he A greement t he T elefonica D ata data c enter l ocated at 1 1300 N.W. 25th Street, Miami, Florida 33172 (the "Data Center") is to be shutdown or transferred to a non-Affiliate of Telefonica Data requiring Customer to move its technology infrastructure located at the Data Center to another location, Telefonica Data agrees (a) to provide Customer with notice of such event as soon as practicable and in any event at least sixty (60) days prior to the shut down or transfer, and (b) pay Customer the lesser of (i) Customer's Migration Costs, as defined below, and (ii) One Million Dollars ($1,000,000). Telefonica Data agrees to pay such amount within thirty (30) days of its receipt of an itemized invoice from Customer, together with supporting documentation, of its Migration Costs. For purposes of this Section, "Migration Costs" means the reasonable migration costs actually incurred by Customer to move its infrastructure to the new location, including, but not limited to, the costs of the physical move of Customer's infrastructure (breakdown, package, transport, delivery and reassembly), the costs of communication links between the Data Center and the new location during the migration period, the costs of professional services to supervise and oversee the migration and the costs of any necessary "swing gear" purchased or leased by Customer in connection with the migration..

**7.6 Wrongful Termination of Transaction Documents by Customer.** In the event Customer wrongfully terminates the Transaction Documents at any time prior to the expiration of the Term, then, in addition to any other damages for which Customer may be liable under the terms of the Transaction Documents, Customer agrees to pay Telefonica Data the product of Five Hundred Thousand Dollars ($500,000) times a fraction, the denominator of which is thirty-four (34) and the numerator of which is thirty-four (34) minus the number of months since the inception of the Term that Customer has paid the undisputed monthly recurring charges under the Transaction Documents, as reimbursement for the capital expenditures made by Telefonica Data to provide Customer the Services. Customer agrees to pay such amount within thirty days of the date of Customer's wrongful termination of the Transaction Documents.

## 8.    REPRESENTATIONS; WARRANTIES; DISCLAIMERS.

**8.1  Representations.** Each Party represents and warrants to the other Party that:

(a)  it has the requisite corporate power a nd authority to enter into the Transaction Documents and to carry out the transactions contemplated by the Transaction Documents;

(b)  the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by the requisite corporate action on its part; and

(c)  the Transaction Documents have been duly executed and delivered, and create lawful, valid and legally binding obligations, in accordance with their respective terms.

Additionally, Telefonica Data represents and warrants to Customer that as of the Effective Date Telefonica Data possesses sufficient ownership rights, title, and interests, and/or licenses, and the ability to offer and provide the Services, including without limitation, all intellectual property rights and third party consents, during the Term.

**8.2  Third Party Warranties.** Telefonica Data shall pass through to Customer all warranties covering Equipment and/or Services provided under the Transaction Documents to the extent that Telefonica Data is able pursuant to the agreements under which it obtained the warranties.

**8.3  Restrictions.**    CUSTOMER SHALL NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, WHETHER WRITTEN OR ORAL, TO THIRD PARTIES, INCLUDING WITHOUT LIMITATION, END USERS ON TELEFONICA DATA'S BEHALF THAT ARE NOT EXPRESSLY AUTHORIZED HEREIN OR THAT MATERIALLY DEPART FROM ANY APPLICABLE SERVICE LEVEL COMMITMENT IN ANY TRANSACTION DOCUMENT.

**8.4  Disclaimers.**

(a)  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN A TRANSACTION DOCUMENT, ANY EQUIPMENT OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS ARE PROVIDED "AS IS" AND "AS AVAILABLE", AND NEITHER TELEFONICA DATA NOR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS MAKE ANY WARRANTIES TO CUSTOMER OR TO ANY OTHER THIRD PARTY INCUDING, WITHOUT LIMITATION, END USER, WHETHER EXPRESS, IMPLIED OR S TATUTORY, INCLUDING, B Y W AY O F E XAMPLE A ND N OT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT RELATING TO ANYTHING PROVIDED OR USED U NDER T HE T RANSACTION D OCUMENTS O R D ESCRIBED THEREIN, AND ANY SERVICES, EQUIPMENT, MATERIAL, GOODS, REAL ESTATE OR OTHER TANGIBLE OR INTANGIBLE ASSET THAT IS CONVEYED, HYPOTHECATED, LEASED, SOLD, OR OTHERWISE PROVIDED TO CUSTOMER IN ANY MANNER, OR AS TO ANY OTHER MATTER, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED.

(b)  WITHOUT LIMITING THE FOREOING DISCLAIMER, TELEFONICA DATA FURTHER MAKES NO WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, REGARDING ANY MERCHANDISE, INFORMATION, PRODUCTS OR SERVICES PROVIDED THROUGH THE INTERNET OR ANY OTHER NETWORK. FURTHERMORE, TELEFONICA DATA HEREBY DISCLAIMS THAT ANY EQUIPMENT, PRODUCTS OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS WILL BE UNINTERRUPTED OR ERROR F REE, O R T HAT C ERTAIN R ESULTS M AY B E O BTAINED BY ANYONE IN CONNECTION WITH THEIR USE.

**8.5  Use.** Telefonica Data shall provide, and Customer shall use, all Equipment and Services in accordance with all applicable laws and regulations.

**8.6  Provisioning Services.** Telefonica Data may, with the prior consent of Customer, which shall not be unreasonably withheld, conditioned or delayed, provide or perform such Services through Affiliates, subcontractors or authorized agents. Notwithstanding the foregoing, Telefonica Data shall remain liable for the performance of its and its Affiliates', subcontractors' and authorized agents' obligations under the Transaction Documents.

## 9.    LIABILITY.

**9.1  General Intent.** Subject to the specific provisions of this Article, it is the intent of the Parties that each shall be liable to the other only for any direct damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by the Transaction Documents.

**9.2  Liability Restrictions.**

(a)  NOTWITHSTANDING ANYTHING IN THE TRANSACTION DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, LOSS OF REVENUE, INCOME, PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE, WHETHER SUCH CLAIM IS CHOATE OR INCHOATE, WHETHER BY STATUTE, IN TORT, OR IN CONTRACT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)  IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR CONTENT THAT IS TRANSMITTED BY CUSTOMER OR THIRD PARTIES INCLUDING, WITHOUT

(c)  IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR ANY DEFECT, ERROR, INTERRUPTION, DELAY, OR ATTENUATION OF SERVICES CAUSED BY OR RESULTING FROM ANY EQUIPMENT NOT OWNED BY TELEFONICA DATA AND USED BY CUSTOMER OR AN END USER.

(d)  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED UNDER ANY TRANSACTION DOCUMENT, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER. CUSTOMER'S REMEDIES SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID UNDER ANY TRANSACTION DOCUMENT ARE LIQUIDATED, CUSTOMER ACKNOWLEDGES THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OBTAINING AN ADEQUATE REMEDY IS OTHERWISE INCONVENIENT, AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONBALE APPROXIMATION OF THE HARM OR LOSS. CUSTOMER CONFIRMS THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THE TRANSACTION DOCUMENTS SATISFY THE ESSENTIAL PURPOSES THEREOF.

(e)  EACH PARTY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF (I) ACTUAL DIRECT DAMAGES OR (II) TWO MILLION DOLLARS ($2,000,000).

(f)  THE LIMITATION SET FORTH IN SECTION 9.2(e) SHALL NOT APPLY WITH RESPECT TO (I) THIRD PARTY CLAIMS SUBJECT TO INDEMNIFICATION PURSUANT TO THE TRANSACTION DOCUMENTS; (II) FEES DUE AND OWING UNDER THE TRANSACTION DOCUMENTS FOR SERVICES ALREADY RENDERED OR (III) CLAIMS ARISING OUT OF A BREACH OF ANY CONFIDENTIALITY PROVISIONS.

(g)  FOR PURPOSES OF THIS SECTION AND SUBJECT TO SECTION 9.2(f), ALL AMOUNTS PAYABLE OR PAID TO THIRD PARTIES IN CONNECTION WITH CLAIMS THAT ARE ELIGIBLE FOR INDEMNIFICATION PURSUANT TO THIS AGREEMENT SHALL BE DEEMED DIRECT DAMAGES.

**9.3  Force Majeure.**

(a)  Neither Party shall be liable for any default or delay in the performance of its obligations under the Transaction Documents if and to the extent such default or delay is caused, directly or indirectly, by fire, explosion, cable cuts, vandalism, sabotage, power outage, flood, lightning, earthquake, elements of nature or "acts of God", war, riots, any civil or military authority (by national emergency or acts of third parties), civil disorders, rebellions, revolutions, insurrections, or acts of terrorism, naturally occurring or man-made obstructions to transmissions, provided the existence of such obstructions is beyond the responsible Party's control, lack of or delay in transportation, government obstructions to transmissions, government codes, ordinances, laws, rules, regulations or restrictions, provided that such default or delay could not have been prevented by reasonable precautions by the Party with the obligation to perform and cannot be reasonably circumvented by the Party with the obligation to perform through the use of alternate sources, workaround plans or other means (a "Force Majeure Event").

(b)  In such event, the Party with the obligation to perform shall as soon as practicable give written notice to the other Party specifying the nature and anticipated duration of the Force Majeure Event and outline its recovery plan, if any. The Party with the obligation to perform shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent reasonably practicable without delay.

(c)  The other Party may terminate all or any portion of the applicable Transaction Document if a Force Majeure Event continues for forty-five (45) days. In the event of such a termination, the terminating Party shall be obligated to pay for services properly performed up through the date of termination.

**10.  INDEMNIFICATION.**

**10.1  Parties' Obligations.**

(a)  **Mutual Obligations.**  Each Party shall, at its expense, indemnify, defend and hold harmless the other Party and its Affiliates, as well as its officers, directors, employees, managers, contractors, agents, successors, and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of the following:

(i)  the death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of the indemnifying Party;

(ii)  the damage, loss or destruction of any real or tangible personal property resulting from the negligence or willful misconduct of the indemnifying Party or from the malfunction or failure of the indemnifying Party's equipment;

(iii)  taxes, together with interest and penalties, that are the responsibility of the other Party;

(iv)  claims by government regulators or agencies for fines, penalties, sanctions or other remedies arising from or in connection with a Party's failure to perform its responsibilities under this Agreement; and

(v)  breach of any representation or warranty set forth in the Transaction Documents.

(b)  **Customer's Obligations.**  Customer shall, at its expense, indemnify, defend and hold harmless Telefonica Data and its Affiliates, as well as their officers, directors, employees, managers, contractors, agents, successors and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of Customer's use of the Services, Equipment and Products provided under the Transaction Documents including without limitation, such Losses or threatened Losses arising from, related to, incurred in connection with, or based on allegations of any of the following:

(i)  any misuse of the Equipment or Services by Customer or an End User;

(ii)  any use by Customer or an End User of non-Telefonica Data furnished products or services, facilities, equipment and/or software with any Equipment or Service not recommended or otherwise approved in writing by Telefonica Data;  or

(iii)  any transmission of content not supplied by Telefonica Data over or through the Telefonica Data Network or system.

**10.2  Intellectual Property Rights.**

(a)  **Obligations.** Each Party shall, at its expense, indemnify, defend and hold harmless the other Party, and the other Party's Affiliates, officers, directors, employees, managers, contractors, agents, successors, and assigns, from and against any Losses and threatened Losses arising from, in connection with or based on any allegations arising under the Transaction Documents of infringement or misappropriation of any Intellectual Property Rights of the owning or controlling Party or any third party, except to the extent that any such allegations arise from (i) modification of such products or services, or any component thereof, by the indemnified Party that is not recommended or otherwise approved by the indemnifying Party, or (ii) use of the products or services by indemnified Party in combination with deliverables furnished by third parties that is not recommended or otherwise approved by indemnifying Party, to the extent that any such claim or allegation is directed to such combination.

(b)  **Exclusive Liability and Remedy.**  If any Service provided under any Transaction Document has become (or in Telefonica Data's reasonable judgment is likely to become) the subject of a third party infringement claim, Telefonica Data may, at its sole discretion and without further liability, do any of the following, which, together with the obligations set forth under Section 10.2(a) above, shall constitute Telefonica Data's sole obligation to Customer hereunder and Customer's exclusive remedy against Telefonica Data:

(i)  at Telefonica Data's cost, obtain for Customer the right to continue use of the Service; or

(ii)  at Telefonica Data's cost, replace or modify the Service so that it no longer is subject to the third party infringement claim.

**10.3  Procedure.**  The Party to be indemnified under Section 10.1 or 10.2 ("Indemnitee") shall promptly notify the indemnifying Party under Section 10.1 or 10.2 ("Indemnitor") in writing of any claim for indemnification.

The Indemnitor shall have sole control of the defense and all related settlement negotiations with respect to the claim. The Indemnitee shall have the right, but not the obligation, to participate in the defense of any such claim or action through counsel of its own choosing at its own expense; provided, however, that if the Indemnitor fails to promptly assume the defense of a claim, the Indemnitee may assume the defense at the Indemnitor's cost and expense. The Indemnitee shall cooperate fully and execute all documents necessary for the defense of such claim. The Indemnitee shall have the right to approve settlement of any claim, such approval not to be unreasonably withheld or delayed, provided that the Indemnitee shall not be required to approve any settlement that involves an admission of liability or wrongful conduct on the part of the Indemnitee or restricts its ability to conduct its business in any material respect. In the event the Parties agree to settle a claim, neither Party shall publicize the settlement without first obtaining the written permission of the other Party, which permission will not be unreasonably withheld or delayed.

11    GENERAL.

11.1 Binding Nature and Assignment.

- (a)    The Transaction Documents shall accrue to the benefit of and be binding upon the Parties and any permitted purchaser or any successor entity into which either Party has been merged or consolidated or to which either Party has sold or transferred all or substantially all of its assets.

(b)    Except as otherwise expressly provided in a Transaction Document, neither Party may, or shall have the power to, assign the Transaction Documents or delegate such Party's obligations hereunder, in whole or in part, without the prior written consent of the other, except that either Party may assign its rights and obligations under the Transaction Documents without the approval of the other Party to

(i)    an entity that acquires all or substantially all of the assets of such Party,

(ii)    to any Affiliate, in which event the assignor shall remain liable as a guarantor of the assignee/Affiliate's performance of such Party's obligations hereunder, or

(iii)    to a successor in a merger or acquisition, provided that such an assignee has the financial, technical and management capacity to perform all of the assignor's obligations hereunder.

11.2 Notices.    Any notices, requests, demands, and determinations under this Agreement (other than routine operational communications), shall be in writing and shall be deemed duly given (a) when delivered by hand, (b) one (1) Business Day after being transmitted via an express, overnight courier with a reliable system for tracking delivery, delivery costs paid (c) when sent by confirmed facsimile or email with a copy delivered by another means specified in this Section, or (d) on the day an authorized employee of the receiving party accepts receipt in writing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, to the address listed on the first page of the Master Services Agreement. A Party may from time to time change its address or designee for notice purposes by giving the other prior written notice of the new address or designee and the date upon which it will become effective.

11.3 Counterparts.    The Transaction Documents may be executed in counterparts, all of which taken together shall constitute one single agreement between the Parties.

11.4 Relationship of Parties.    The Parties are independent contractors, bound to each other only as provided for herein. Neither Party has the authority to bind, act on behalf of or represent the other. Nothing in the Transaction Documents creates a relationship of partnership, employer and employee, principal and agent, master and servant, or franchisor and franchisee. Neither Party shall act or fail to act in a way that could reasonably cause others to believe that it has authority to act on behalf of the other beyond the authority expressly granted herein.

11.5 Severability and Modification.

(a)    In the event that any provision of the Transaction Documents conflicts with the law under which the Transaction Documents are to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision shall be deemed to be modified to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law. The remainder of the Transaction Documents shall remain in full force and effect.

(b)    If any state or federal body of competent jurisdiction determines that any provision of the Transaction Documents violates any applicable rules, policies, or regulations, both Parties shall make reasonable efforts to promptly bring the Transaction Documents into compliance and shall endeavor in those efforts to preserve for both Parties the economic benefits as reflected in the Transaction Documents to the maximum extent possible.

11.6 Consents and Approval.    Except where expressly provided as being in the sole discretion of a Party, where agreement, approval, acceptance, consent, or similar action by either Party is required under the Transaction Documents, such action shall not be unreasonably delayed, conditioned or withheld. An approval or consent given by a Party under the Transaction Documents shall not relieve the other Party from responsibility for complying with the requirements of the Transaction Documents, nor shall it be construed as a waiver of any rights under the Transaction Documents, except as and to the extent otherwise expressly provided in such approval or consent.

11.7 Waiver of Default.    No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, waiver, or discharge is sought to be enforced. A delay or omission by either Party hereto to exercise any right or power under the Transaction Documents shall not be construed to be a waiver thereof. A waiver by either of the Parties of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant.

11.8 Cumulative Remedies.    Except as otherwise expressly provided, all remedies provided for in the Transaction Documents shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

11.9 Survival.    Any provision of the Transaction Documents that contemplates performance or observance subsequent to any termination or expiration of the Transaction Documents (in whole or in part) shall survive any termination or expiration of the Transaction Documents (in whole or in part, as applicable) and continue in full force and effect.

11.10 Public Disclosures.    Any public use of a Party's name, trademark, service mark or trade dress, as well as all media releases, public announcements, and public disclosures relating to this Agreement or the subject matter of this Agreement, including promotional or marketing material, but not including announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements beyond the reasonable control of the disclosing Party, shall be coordinated with and shall be subject to the prior written approval by each Party prior to release.

11.11 Third Party Beneficiaries.    Except as otherwise provided in the Transaction Documents, the Transaction Documents shall not be deemed to create any rights in third parties, including End Users, suppliers and customers of a Party, or to create any obligations of a Party to any such third parties, or to give any right to either Party to enforce this Agreement on behalf of a third party.

11.12 Governing Law and Prevailing Party.    The Transaction Documents and performance under them shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice of law principles or the Convention on Contracts for the International Sale of Goods. In the event of any dispute between the Parties concerning the Transaction Documents, the parties agree that the prevailing Party in any such dispute shall be reimbursed for, and the non-prevailing Party shall pay, the reasonable attorneys' fees and expenses of the prevailing Party.

11.13 Amendment.    The Transaction Documents shall not be modified, amended or in any way altered except by an instrument in writing signed by both Parties.

11.14 Incorporation by Reference and Order of Precedence.

(a)    All Exhibits and Schedules are incorporated by reference into this Agreement. Any amendments to this Agreement (including with respect to exhibits and schedules) that are agreed upon by the Parties subsequent to the Effective Date, shall likewise be incorporated by reference into this Agreement.

(b)    Any conflict among or between the documents making up the Transaction Documents will be resolved in accordance with the following order of precedence (in descending order of precedence):

(i)    the Schedules,

(ii)  the Exhibits, and

(iii)  this Agreement.

**11.15 Export Control.**  The export and/or import of certain products, including items to be resold under any attached exhibits and/or Confidential Information may be subject to domestic and/or foreign government export and/or import laws, rules, policies, procedures, restrictions and regulations. The Parties represent and warrant that they will comply with all applicable governmental laws, statutes, ordinances, administrative orders, procedures, policies, rules, regulations and restrictions including, without limitation, those related to the export and/or import of encryption items and technical materials.  Each Party shall provide the other Party with prompt written notice of any export or import restrictions relating to the products and/or Confidential Information.

*Telefónica*

ORIGINAL
COPY

## EXHIBIT C .

## TO

## MASTER SERVICES AGREEMENT

## <u>COLLOCATION</u>

This COLLOCATION EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 18 , 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

    1.1.    **"Bandwidth"** shall mean the bandwidth provided to Customer to connect Customer Equipment to the public Internet. The baseline bandwidth shall be burstable as specified in Schedule C-1. Telefonica Data shall provide Bandwidth in accordance with the service level objectives set forth in Schedule C-2.

    1.2.    **"Customer Equipment"** shall mean telecommunications equipment and cabling provided by Customer that is housed in a Space.

    1.3.    **"Premises"** shall mean a specific commercial building in the United States in which Telefonica Data, owns, controls or has leasehold interests in certain office and storage space suitable for the placement and operation of telecommunications equipment.

    1.4.    **"Space"** shall mean an individual location within a Premises authorized by Telefonica Data for the housing of Customer Equipment.

2.    **RIGHT TO OCCUPY, COLLOCATION ADDENDUMS; PERMISSIBLE USE AND RELOCATION.**

    2.1.    **Obligation.** Telefonica Data shall provide Customer with Bandwidth, non-exclusive access to a Premises and exclusive access to Space for the purpose of installing, operating and supporting Customer Equipment. Customer shall collocate Customer Equipment only in the Space and at no other location within a Premises without Telefonica Data's prior written consent.

    2.2.    **Collocation Addenda.** This Exhibit shall become a binding agreement between Customer and Telefonica Data only upon execution by the Parties of a Collocation Addendum, in the form attached hereto as Schedule C-1. Each Collocation Addendum, and any amendments thereto, shall incorporate the terms and conditions of this Exhibit as well as the Agreement, and be made part of both by reference. Each Collocation Addendum may have attached thereto the following Appendices:

        (a)  Facility Drawings, identified as Appendix 1

        (b)  General Description of Work Tasks and Special Terms and Conditions, identified as Appendix 2; and

        (c)  Managed Services (if applicable), identified as Appendix 3.

    2.3.    **Demarcation Point Connection.** Telefonica Data shall provide and connect a cable from the core switch on its network to the demarcation point, which for each Space shall be the jack on the rack or cabinet provided for such connection.

    2.4.    **Support Services.** In connection with the Space made available hereunder, Telefonica Data or its designee shall perform services which support the overall operation of the Premises (e.g., janitorial services, environmental systems maintenance, and power plant maintenance) at no additional charge to Customer. However, Customer shall be required to maintain the Space in an orderly manner and shall be responsible for the removal of trash, packing, cartons, and related items from the Space. Further, Customer shall maintain the Space in a safe condition including, but not limited to, the preclusion of storing hazardous materials in the Space. Telefonica Data will have no operations or maintenance responsibilities with respect to Customer Equipment.

2.5.    **Limited License.** Customer acknowledges and agrees that it has been granted only a limited, non-exclusive license to occupy the Space for the period of time and under the terms and conditions set forth in the Agreement and herein, and that it has not been granted any real property interests of any kind in the Space or Premises.

2.6.    **Reservation of Rights.** Customer Equipment shall remain Customer's exclusive personal property throughout the Term.

2.7.    **Customer Obligations.**

(a)  Customer shall keep the Space, Premises and any equipment therein free from any liens arising from any work performed, materials furnished or obligations incurred by or at the request of Customer.  All persons either contracting with Customer or furnishing or rendering labor and materials to Customer shall be notified in writing by Customer that they must look only to Customer for payment for any labor or materials.  If any lien is filed against the Space, Premises, or any equipment therein as a result of the acts or omissions of Customer, its employees, agents or contractors or subcontractors, Customer shall discharge it or bond it off within thirty (30) Days after Customer learns that the lien has been filed.

(b)  Customer shall ensure (i) that Telefonica Data has access to the Customer Equipment so that Telefonica Data may perform its duties under this Exhibit; and (ii) that all existing Customer Equipment conforms to the manufacturer's specifications, which documentation shall be made available to Telefonica Data prior to Telefonica Data performing any maintenance services. If damage or destruction to any Telefonica Data equipment (e.g., test equipment/monitors) results from a breach of the foregoing, Customer shall promptly, at its option, either repair or replace the damaged or destroyed equipment to the extent any such damage is attributable to such breach.

3.      **TERM; TERMINATION.**

3.1.    **License Term.** This Exhibit shall commence on the date accepted by Telefonica Data and shall continue for the term set forth in the Addendum, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement (the "Term").  Customer's license to occupy each Space shall begin on the "Requested Service Date," as set forth in each fully executed individual Collocation Addendum or on the date Telefonica Data completes preparation of the Space, whichever is later, and shall continue for the lesser of the duration of the Term or Telefonica Data's underlying leasehold interest.  In the event that Telefonica Data's underlying leasehold interest in the Premises expires prior to the expiration of the Term, Telefonica Data shall, at least one hundred twenty (120) Days before the expiration of such leasehold interest, make a good faith effort to renew the underlying leasehold interest to allow Customer to continue to occupy the Space for the duration of the Term.

3.2.    **Effect of Termination.** Promptly after termination or expiration of the license for each Space, Customer shall remove the Customer Equipment and other property that has been installed by Customer or Customer's suppliers or contractors (or by Telefonica Data on behalf of Customer, if Telefonica Data desires such Customer Equipment to be removed).

4.      **PRICES AND PAYMENT TERMS.**

4.1.    **Fees.** In consideration of the license and services provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule C-1 in accordance with the payment terms and conditions set forth in the Agreement.

4.2.    **Reimbursement.** Customer agrees to reimburse Telefonica Data promptly for all repair or restoration costs associated with damage or destruction caused by Customer's personnel, Customer's agents, Customer's suppliers/contractors or Customer's visitors during the Term or as a consequence of Customer's removal of the Customer Equipment or property installed in the Space.

4.3.    **Bandwidth Charges.** If the 95th Percentile Number (defined below) is equal to or less than the baseline bandwidth amount, Customer shall pay only the recurring monthly fee.  If the 95th Percentile Number is more than the baseline bandwidth amount, Customer shall pay the recurring monthly fee plus an amount for the additional usage billed on a per-megabit basis as set forth on the applicable Collocation Addendum. Telefonica Data will use the 95th percentile level procedure described below each month to determine the applicable bandwidth charges for each month. Telefonica Data will:

(a)  measure actual inbound and outbound traffic levels into the applicable access port(s) during a standard measurement interval throughout the day (e.g., every 5 minutes);

(b) at the end of the month, sort all measurements for that month from highest to lowest;

(c) discard the top five percent (5%) of each month's measurements; and

(d) use the highest remaining measurement as the "95th Percentile Number" which will represent the Bandwidth usage for that month.

5.    **ADDITIONAL TERMS.**

5.1.    **Contractor Approval.** Before beginning any delivery, installation, replacement or removal work, Customer must obtain Telefonica Data's written approval with respect to Customer's choice of suppliers and contractors, which approval shall not be unreasonably withheld. Telefonica Data may request additional information before granting approval and may require substitution of suppliers and contractors, which are not Affiliates of Telefonica Data, as conditions of its approval. Approval by Telefonica Data is not an endorsement of Customer's supplier or contractor, and Customer will remain solely responsible for the selection of the supplier or contractor and all payments for construction work or any other work relating thereto.

5.2.    **Alterations.** Customer shall not make any construction changes or material alterations to the interior or exterior portions of the Space, including any cabling or power supplies for the Customer Equipment, without obtaining Telefonica Data's prior written approval for Customer to have the work performed or having Telefonica Data perform the work. Telefonica Data shall have the right to perform and manage any construction or material alterations within the Premises and Space areas at rates to be negotiated between the Parties.

5.3.    **Access.** Access to the Premises, use of the Space, installation of the Customer Equipment, and type of Customer Equipment installed, shall at all times be governed by generally accepted industry standards, applicable law and regulations, and such reasonable rules imposed by Telefonica Data. Customer shall promptly reimburse Telefonica Data for all costs associated with Customer's failure to follow such rules, including, without limitation, damage caused by End Users, suppliers, contractors or visitors, during the Term or, after termination or expiration, as a consequence of removal of the Customer Equipment or other property installed in the Space. Prior to first accessing the Premises, Customer shall provide and keep updated a list of its representatives authorized to access the Space and Telefonica Data shall provide photo-ID security badges for such individuals. Unless otherwise provided in a Collocation Addendum, each visit to the Space shall require the presentation of photo-ID security badges. Customer shall have access to the Space twenty-four hours a day, seven days a week.

5.4.    **Non-Interference.** Notwithstanding any other provisions of this Exhibit, Customer Equipment placed in the Space shall (a) not interfere with or impair service provided by Telefonica Data or by any other lessee of the Premises; (b) not unreasonably disturb any other lessee of the Premises; (c) not endanger or damage the facilities of Telefonica Data or of any authorized user of the Space, or the Premises; (d) not compromise the privacy of any communications carried in, from, or through the Premises; and (e) not create an unreasonable risk of injury or death to any individual or to the public. Customer shall not improperly restrict or interfere with the Telefonica Data Network or the use thereof. Upon notice by Telefonica Data, Customer shall promptly remove any hazard, interference, or service obstruction that may be caused by hardware, software or connectivity owned by or under the control of Customer. Nothing stated herein shall be construed to interfere with Customer's ability to comply with the rules, regulations or directives of any governmental or judicial authority. In the event that Customer improperly restricts or interferes with the Telefonica Data Network, or the use thereof, Telefonica Data may, after giving Customer notice, immediately modify, suspend, delay, condition, or cease until cured its obligations, in whole or in part, under this Exhibit.

5.5.    **Eminent Domain; Relocation.** Except as provided in subsection (a) and (b) below, Telefonica Data shall not arbitrarily require Customer to relocate the Customer Equipment.

(a) In the event the Premises becomes the subject of a taking by eminent domain by any authority having such power, Telefonica Data shall have the right to terminate the affected Collocation Addendum. Telefonica Data shall give Customer prompt advance notice, to the extent practicable of the eminent domain proceedings. Customer shall have no claim against Telefonica Data for any relocation expenses, any part of any award that may be made for such taking or the value of any unexpired term or renewed periods that result from a termination by Telefonica Data under this provision, or any loss of business from full or partial interruption or interference due to any termination. However, nothing contained in this Exhibit shall prohibit Customer from seeking any relief or remedy against the condemning authority in the event of an eminent domain proceeding or condemnation that affects the Space.

(b) Upon sixty (60) Days prior written notice or, in the event of an emergency (which shall not include

C-3

eminent domain), such time as may be reasonable, Telefonica Data reserves the right to change the location of the Space or the Premises to a site which shall afford comparable environmental conditions for the Customer Equipment and comparable accessibility to the Customer Equipment. Telefonica Data and Customer shall work together in good faith to minimize any disruption to Customer's services as a result of such relocation. Telefonica Data shall be responsible for the cost of improving the Space to which the Customer Equipment may be relocated, and for relocation of Customer Equipment interconnected to Telefonica Data services, except that Telefonica Data shall not be responsible for relocating facilities installed in violation of this Article 5.

6.      **INSURANCE.**  Customer agrees to maintain during the Term, at Customer's expense, for each Space (a) Comprehensive General Liability Insurance in an amount not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury or property damage, (b) Employers Liability in an amount not less than Five Hundred Thousand Dollars ($500,000.00) per occurrence, and (c) Workers' Compensation in an amount not less than that prescribed by statutory limits. Prior to taking occupancy of the Space, Customer shall furnish Telefonica Data with certificates of insurance which evidence the minimum levels of insurance set forth herein, name Telefonica Data as an additional insured, and provide that the policy may not be canceled unless thirty days notice is provided to Telefonica Data. Telefonica Data will not obtain any insurance with respect to and will not assume the risk of loss for any Customer Equipment.

    **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

**CUSTOMER:**
LYCOS, INC.

By: _____
Name: _____
Title: CFO
Date: 11/18/03
Address: _____
_____
_____
Fax: _____
Email: _____

**Accepted by Telefonica Data:**
TELEFONICA DATA USA, INC.

By: _____
Name: PETE R. PIZARRO
Title: CEO
Date: 11-20-03
Address: 1221 Brickell Avenue, Suite 600
Miami, Florida 33131
Attn:
Fax: _____
Email: _____

C-4

# SCHEDULE C-1
## TO
## COLLOCATION EXHIBIT
### Collocation Addendum No. 1

This Collocation Addendum is made October __, 2003 and subject to all definitions, terms and conditions of the Agreement and Exhibit.

**LOCATION AND SERVICE DATE**

| | |
|---|---|
| Premises Address: | 11300 N.W. 25th Street<br>Miami, FL 33172 |
| Term: | 34 months from the Requested Start Date.  Minimum commitments go into effect November 1, 2003. |
| Requested<br>Service Date: | September 1, 2003 |

**DESCRIPTION OF SITE AND SPACE**

Site Type:  ____ Optical Amplifier  ____ Point of Presence  ____ Regenerator  ____ Termination Site  ____ Junction Site  ____ Other _____

Collocation Space: 4000 sq. ft. minimum
Space Required:

Power Required:  ____ amps per rack  ____ amps total  ____ DC convenience outlets #
Escort Services:  Escort Service is _____ REQUIRED  __X__ NOT REQUIRED

**BANDWIDTH**

Minimum 400 Mbps, burstable
Redundant port connections. 2

**FEES**

| | Non-Recurring | Monthly Recurring |
|---|---|---|
| Set Up Fee | See Appendix 2 | |
| Collocation | See Appendix 2 | $27 per square foot |
| Bandwidth | See Appendix 2 | $100 per Mbps |
| Power | See Appendix 2 | $200 per 110, Volt 20 amp;<br>and $300 per 208 Volt, 30 amp<br>breaker position in excess of<br>the first (2) 110 Volt, 20 amp<br>provided in each rack/cabinet |

**CUSTOMER:**

By: _____
Name: _____
Title: CFO
Date: 11/18/03
Address: _____
         _____
         _____
Fax: _____
Email: _____

**Telefonica Data:**
TELEFONICA DATA USA, INC

By: _____
Name: PETE V. 24RNO
Title: CEO.
Date: 11-20-03
Address: 1221 Brickell Avenue, Suite 600
         Miami, Florida 33131
         Attn:
Fax: _____
Email: _____

APPENDIX 1

TO

COLLOCATION ADDENDUM NO. 1

<u>Facility Drawings</u>

## APPENDIX 2

## TO

## COLLOCATION ADDENDUM NO. 1

### General Description of Work Tasks and Special Terms and Conditions

**Pricing:** The charge for the Collocation is $27/sq ft/month for the Space. If Customer decreases its square footage below 4000 sq. ft., Telefonica Data will bill, and Customer shall pay for, 4000 sq. ft. In the event Customer desires to increase or reduce the square footage provided to it by Telefonica Data, Customer shall provide Telefonica Data at least 90 days written notice. The MRC for the Space includes 2 x 20 A breaker positions per rack/cabinet. Bandwidth monthly recurring charges are $100/Mbps/month with a 400Mbps minimum commitment. The minimums for bandwidth and space applies to the aggregate usage of Terra Lycos US and the Terra Lycos US MOC. This agreement supersedes and replaces previous agreements between Telefonica Data and the Terra Lycos MOC for bandwidth and space.

**Power:** Customer's average power consumption per sq. ft of floor space may not exceed 145 Watts per square foot for Server Room 3. Customer's actual monthly usage will be measured using Telefonica Data's building automation system, Johnson Controls' reporting and the Siemens WinPM power monitoring on the RPPs in Server Room 3 to determine the total power usage for the month. Such figure will be divided by the square footage Customer occupied in Server Room 3 during the month being measured. The credits and termination rights set forth herein shall not be applicable during the period that Customer's power consumption exceeds 145 Watts per square foot for Server Room 3.

**Installation of Racks and Cabinets:** Telefónica Data will provide and install the racks and Customer's cabinets at no additional charge to Customer. Customer must provide the cabinets to Telefonica Data and the wiring inside all cabinets and racks.

**Migration:** Subject to Customer's review of the proposed project plan and required Space layout, Telefónica Data will be the prime contractor for the migration of Customer's platform to the Premises Address. The Parties shall jointly produce a migration plan. Telefonica Data may subcontract some migration services from Cable and Wireless Internet Services, Inc. and its affiliates (collectively "C&W").

**Location of Servers:** Telefónica Data reserves the right to locate Customer's servers in Telefonica Data's data center where it reasonably deems appropriate, with the understanding and acknowledgement that Customer requests contiguous space.

**Benchmarking:** Telefonica Data will reduce the monthly recurring charges for bandwidth and collocation on each anniversary of the Service Start Date subject to further revisions in accordance with the Benchmarking provision contained in the Agreement.

**Invoices:** Telefonica Data shall begin invoicing the Customer as soon as the Space is ready for operation and the bandwidth connected. Notwithstanding anything to the contrary contained herein, minimum commitment billing will begin November 1, 2003.

## SCHEDULE C-2
## TO

## COLLOCATION EXHIBIT

### Service Level Agreement

#### Notification

*Event Notification to Customer*

- Telefonica Data shall provide initial notice to a designated Customer's representative by telephone, e-mail, pager or comparable notification service within 15 minutes of Telefonica Data becoming aware of a Severity One or Severity Two event (as defined below). If Customer first becomes aware of a Severity One or Severity Two event, Customer agrees to promptly notify Telefonica Data via the Customer Support Number [1-866-466-2872]. Status reports regarding the event will continue on the ½ hour until either the event has been resolved or the Parties have determined a course of action that does not require continued notification. Upon the resolution of a Severity One event, Telefonica Data will send Customer a written incident report within 48 hours. Telefonica Data will provide Customer monthly incident reports on all Severity Two events.

- Severity One event: The customer's suite has lost power or HVAC or all or a portion of Customer's network is not accessible.

  - Severity Two event: Customer's suite or network has experienced equipment failure resulting in degraded performance.

*Escalation (Internal)*

The following procedures define the escalation procedures that Telefonica Data will implement during an Unscheduled Outage (as defined below):

- Telefonica Data EMSC Level 1 Support shall use reasonable efforts to identify the cause of the event or outage and escalate to the Telefonica Data Maintenance Engineer during the first quarter hour of an outage.

- Telefonica Data will notify Customer as follows:

  - Telefonica Data will notify Customer's First Escalation Contact at the beginning of the second quarter hour;

  - If Telefonica Data is unable to contact Customer's First Escalation Contact, Telefonica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

  - If Telefonica Data is unable to contact Customer's Second Escalation Contact, Telefonica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

*"Unscheduled Outage"* means an interruption in the Services arising from failures to achieve the service level objectives provided under this Schedule. An Unscheduled Outage excludes outages (and service level failures) due to (i) Scheduled Outages (as defined below); (ii) network or Service upgrades requiring a predefined outage; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer, (iv) Customer's equipment, hardware, facilities or software or (v) Force Majeure events.

## Change Management

- Unless otherwise provided in the Agreement, Exhibits, and Schedules, Telefonica Data will provide Customer at least five (5) business days prior written notice of any changes to be made by Telefonica Data that affect the Services provided under this Exhibit. However, if a shorter notification period is required as reasonably determined by Telefonica Data, changes may be made upon shorter notification to Customer. Telefonica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefonica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon the Customer's and Telefonica Data's requirements. If an outage is required, such outage will be considered a "Scheduled Outage." At the time Telefonica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Scheduled outage time may not exceed 8 hours total per month after which it will be considered to be unscheduled outage time. Telefonica Data agrees to work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefonica Data reserves the right, however, to proceed with any change if it is reasonably determined, by Telefonica Data, that the change will not cause harm to the Customer's specific environment and/or is otherwise necessary. Customer agrees to provide prior notification to Telefonica Data of any changes to Customer's configurations that interface with the Services provided under this Exhibit.

- Telefonica Data's Engagement Manager is responsible for the project management of all changes to Services provided to the Customer under this Exhibit.

### Power Service Level Objective

- Telefonica Data will provide 100% power availability to Customer on a 24*7*365 basis.

- If Telefonica Data fails to meet this Power objective, Customer may request a credit equal to the following:

| Power | SERVICE CREDIT |
|---|---|
| 1st loss of power within month | 50% of the monthly recurring charge (MRC) for the affected Service |
| 2nd loss of power within month (chronic failure) | an additional 75% of the MRC charge for the affected Service |
| 3rd loss of power within month (catastrophic failure) | an additional 100% of the MRC charge for the affected Service |

- If an Outage lasts more than eight (8) consecutive hours in any 30 day rolling period or the Customer suffers 3 or more complete power failures to the Customer suite(s) in any 30 day rolling period then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the power infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

### HVAC Service Level Objective

- Telefonica Data will provide a cooled environment for Customer's system. The ambient temperature of the room must not exceed 85 degrees Fahrenheit for more than an hour on a 7*24*365 basis.

- If Telefonica Data fails to meet this HVAC objective, Customer may request a credit equal to the following:

C-9

| HVAC | SERVICE CREDIT |
|---|---|
| 1st failure of temperature service level objective within month above 85° for 1 hour | 25 % of the MRC for the affected Service |
| 2nd failure of temperature service level objective within month above 85° for 1 hour | an additional 25% of the MRC for the affected Service |
| 3rd loss of temperature service level objective within month above 85° for 1 hour | an additional 50% of the MRC for the affected Service |
| 4th loss of temperature service level objective within month above 85° for 1 hour and substantial outage to Customer equipment occurs. | Option to terminate contract |

- If an Outage lasts more than eight (8) consecutive hours in any one 30 day rolling period or the Customer suffers 4 or more HVAC failures of above 85° for more than 1 hour per failure and in either case a substantial outage occurs to the Customer equipment, then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provides Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

- During the period that Telefonica Data is carrying out infrastructure upgrades (starting date to be provided to Customer in writing) to the HVAC infrastructure to accommodate Customer requirements, Telefonica Data shall only be held liable after two failures in any calendar month and the Customer will not have a right to terminate the affected Service.

### Fire Suppression Service Level Objective

- Telefonica Data will provide the Customer with an industry standard fire suppression system that will protect the Customers equipment.
- If there is damage to the production equipment, as a result of the failure of Telefonica Data's fire detection or fire suppression systems, Telefonica Data will replace at its expense all damaged equipment with equipment of similar performance functionality. Notwithstanding the foregoing, if a fire is caused by Customer, Customer's End-User or Customer or its End-User's equipment and Telefonica Data's fire suppression system effectively suppresses the fire, Telefonica Data shall not be obligated to replace the damaged equipment.

- If Telefonica Data suffers any damage to the Premises Address or equipment located therein as a result of a fire caused by Customer or its End-Users or by Customer's or its End-User's equipment, Customer agrees to pay Telefonica Data for all costs reasonably incurred by Telefonica Data related to the repair, replacement and restoration of the Premises Address and its equipment located therein.

### Capacity Management Service Level Objective

- Telefonica Data agrees to provide written notice to Customer whenever a network circuit reaches 50% of such circuit's capacity over a period of fourteen days.

### Redundant Network Feed's Service Level Objective

- Telefonica Data will provide the Customer with redundant network feeds via different ISP's to alleviate the potential of a single point of failure within the Customer's access to the internet via Telefonica Data's infrastructure.

### Network Availability—Public Access Services Service Level Objective

- Telefonica Data will provide Public Access Services in accordance with the following network availability service level objective: Customer's ability to access the Telefonica Data network in the United States (i.e., "up-time"), will be no less than 99.95% during any calendar month. Network unavailability shall be determined by calculating network outages. For purposes of calculating network availability, a "Network Outage" shall mean a complete failure of Public Access Services. A Network Outage will be measured from the minute Customer notifies Telefonica Data of the Network Outage, or Telefonica Data otherwise becomes aware of the Network Outage, until the minute Telefonica

Data notifies Customer that the Network Outage has been resolved. Telefonica Data will provide Customer with monthly reports indicating up-time for all applicable Services.

- If a specific factor causes an Outage and the outage(s) caused by such factor lasts more than eight (8) consecutive hours in any 30 day rolling period (for purposes of this Network Availability -- Public Access Services Service Level Objective, an Outage is defined as a packet loss of greater than 40%), then Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises. For purposes of clarification the following are examples that illustrate the intent of the Parties with respect to this provision:

  1. On the fifteenth (15th) day of a calendar month, Customer experiences a Network Outage that lasts for more than eight (8) hours. It is determined that a single factor caused the Network Outage. Under this scenario Customer would have the right to terminate the affected Service.

  2. On the twentieth (20th) day of a calendar month, Customer experiences a Network Outage that lasts for three (3) hours. On the twenty-fifth (25th) day of a calendar month, Customer experiences a Network Outage that lasts for six (6) hours. It is determined that precisely the same factor caused the Network Outages. Under this scenario Customer would have the right to terminate the affected Service.

  3. Same scenario as example 2 above except that it is determined that two different factors caused the Network Outages. Under this scenario Customer would not have the right to terminate the affected Service.

- Network Outages do not include failures due to: (i) regular maintenance during a scheduled window; (ii) network or service upgrades; (iii) circuits or network elements provided by third parties; (iv) acts or omissions of Customer; (v) Customer's equipment, hardware, facilities, or software; or (vi) Force Majeure events.

**Latency Service Level Objectives.**

- Telefonica Data shall provide the Services in accordance with the following latency service level objectives 65 milliseconds or less round trip time between any two points in North America, (ii) 120 milliseconds or less round trip time between the United States and Europe, (iii) 120 milliseconds or less round trip time between the United States and South America, (iv) 500 milliseconds or less round trip time between the United States and any other point. Telefonica will continually measure latency between points on its network and will report the average latency in 15 minute periods. In the event that during a 30 day rolling period Telefonica Data fails to provide the Services in accordance with these Latency service level objectives (each such event a "Latency Miss"), Customer may request a credit in accordance with the following table:

| Latency Misses | SERVICE CREDIT |
|---|---|
| More than 3 but less than 10 Latency Misses in a month | 25 % of the MRC for the affected Service |
| 10 or more Latency Misses in a month | an additional 25% of the MRC for the affected Service |
| 2 independent Latency Misses individually greater than 20 times the latency service level objective | an additional 50% of the MRC for the affected Service |

- In addition to the credits above, in the event Customer experiences two independent Latency Misses where the transmission time is greater than 20 times the Latency service level objectives thresholds for which a Latency Miss occurs, Customer, in addition to its right to receive a credit, may elect to terminate the affected Service upon fifteen (15) days prior written notice; provided, however, Customer must provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

**Packet Service Level Objective**

- The packet loss service level objective for the Service is less than or equal to one percent (1%). Telefonica will measure the packet loss from anywhere on it's backbone into the Customer equipment and take the average loss in a

fifteen minute period. If for a 30 day rolling period, Telefonica Data fails to meet Packet Loss service level objective, Customer may request a credit as set forth below:

| Excess Packet Loss | SERVICE CREDIT |
|---|---|
| If the failure is >1% but < or = to 5% as measured above more than 3 times in a 30 day rolling period | 25 % of the MRC for the affected Service |
| If the failure is > 5% -but < or = to 30% as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service |
| If the failure is > 30% -but < or = to 40% as measured above more than twice in a 30 day rolling period. | 37.5% of the MRC for the affected Service for the first occurrence, then a further 37.5% for the second occurrence. |
| If the failure is > 40% + as measured above more than twice in a 30 day rolling period. | 50% of the MRC for the affected Service for the first occurrence, then a further 50% for the second occurrence. |

- In the event the packet loss failure exceeds criteria four in the above table for two successive 30 day rolling periods, Customer may elect to terminate the affected Service upon fifteen (15) days prior written notice to Telefonica Data; provided, however, Customer provide Telefonica Data notice of such election within seven (7) days of the date on which Customer's right to terminate arises.

### Miscellaneous

- In order to receive any credits under this Schedule C-2, Customer must submit a written request to Telefonica Data no later than the last day of the month immediately following the month in which the service level objective was not met. Upon verification, Telefonica Data shall issue the credit on Customer's next monthly invoice.

- The availability, latency and packet loss service level objectives shall be measured over and between points on the Telefonica Data Network.

- An outage or failure to meet a Service Level Objective a second or multiple times must be for unrelated incidents and cannot be caused by continuation of an ongoing issue in any 72 hour period.

- **THE CREDITS AND TERMINATION RIGHTS SET FORTH HEREIN AND IN THE MSA CONSTITUTE TELEFONICA DATA'S SOLE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY FOR ANY FAILURE OF TELEFONICA DATA TO COMPLY WITH THE SERVICE LEVEL OBJECTIVES.**

- **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN THE CREDITS AND TERMINATION RIGHT SET FORTH HEREIN SHALL NOT BE APPLICABLE DURING ANY PERIOD THAT CUSTOMER HAS FAILED TO PAY UNDISPUTED CHARGES WITH RESPECT TO A TELEFONICA DATA INVOICE WHEN DUE AND SUCH UNDISPUTED CHARGES REMAIN OUTSTANDING.**

*Telefónica*

## EXHIBIT D

## TO

## MASTER SERVICES AGREEMENT

## DATA STORAGE

This DATA STORAGE EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated as of the _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFINITIONS.**

    1.1.    "Customer Data" shall mean all of the data Customer provides to Telefonica Data for Storage.

    1.2.    "Hardware, Software and Services" shall mean the hardware, software and services set forth in Schedule D-1.

    1.3.    "HBA" shall mean a host bus adapter.

    1.4.    "SAN" shall mean a storage area network.

    1.5.    "NAS" shall mean network attached storage.

    1.6.    "Storage" shall mean the storing of Customer Data on a SAN in accordance with this Exhibit.

    1.7.    "Allocated Storage" shall mean total amount of storage supported of which currently used storage is a subset.

2.    **STORAGE.**

    2.1.    **Orders.** Customer shall order Storage pursuant to the ordering provisions in Schedule D-2. Telefonica Data shall use reasonable efforts to provide Storage by the Customer-requested Service Date identified in Schedule D-3.

    2.2.    **Obligation.** Telefonica Data will provide Customer with non-exclusive Storage in accordance with Schedule D-3. Storage shall take place in Telefonica Data's Premises (as that term is defined in the applicable Collocation Exhibit).

    2.3.    **Inclusive Services.** The customer shall provide the equipment, software and services necessary to provide Storage, including, Storage tuning, Connectrix fiber switch installation and customization, SAN design and implementation, SAN software, and HBA cards installation. The foregoing notwithstanding, Customer shall be responsible for providing all HBA hardware directly to Telefonica Data or acquiring all HBA hardware from Telefonica Data. Customer shall pay Telefonica Data for all HBA hardware Telefonica Data obtains in connection with providing the Storage hereunder to Customer.

    2.4.    **Backups.** Customer is solely responsible for backup and archiving the Customer Data.

D-1

**2.5.    Scalability.** Customer shall provide the necessary technical upgrades, such as additional cache memory, fiber channel directors or cables, switches, and similar items, to account for increased Customer demand for Storage, up to the maximum upgrade set forth in Schedule D-1; provided, however, that such upgrades incorporate the Hardware and Software.

**2.6.    Support Services.** Telefonica Data will provide Customer support services for installation, reconfiguration and modification of the Storage capabilities.

**3.    TERM.** This Exhibit shall commence on the Effective Date and continue in force during the Term set forth in Schedule D-2, unless otherwise earlier terminated in accordance with this Exhibit and the Agreement.

**4.    PRICES AND PAYMENT TERMS.** In consideration of the Storage provided hereunder, Customer shall pay to Telefonica Data the recurring, non-recurring and other charges set forth in Schedule D-2, pursuant to the terms and conditions set forth in the Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

CUSTOMER:                                          **TELEFONICA DATA USA, INC.**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

Address:_____          Address:    1221 Brickell Avenue, Suite 600
_____                         Miami, Florida 33131
_____                         Attn:

Fax: _____          Fax:

Email: _____          Email: _____

D-2

**SCHEDULE D-1**

**TO**

**DATA STORAGE EXHIBIT**

<u>Hardware, Software and Services Covered By This Agreement</u>

**Lycos Storage West Coast**

- <u>Direct Attached Storage</u>

    o   Hardware Type: Hitachi 9960 - fully redundant storage device.

    Supported Products

    | | | |
    |---|---|---|
    | o | MailCity – Data Bases | - 1 Tb |
    | o | HotStat – Data Warehouse | - 3 Tb |

- <u>Network Attached Storage ( NAS )</u>

    o   Hardware Type: NetApp 840 Filers.

    Supported Products

    | | | |
    |---|---|---|
    | o | AngelFire | - 6TB |

**Lycos Storage East Coast**

- <u>Direct Attached Storage</u>

    o   Hardware Type: Hitachi 9960 – fully redundant storage device.

    Supported Products

    | | | |
    |---|---|---|
    | o | MyLycos | - 700Gb |
    | o | Raging Bull | -170 Gb |
    | o | Data warehouse | - 420 Gb |
    | o | Portal | - 1.2 Tb |
    | o | Small Catalog Query | - 1.1 Tb |
    | o | TuCows | - 270 Gb remove |

- <u>Network Attached Storage (NAS)</u>

    o   Hardware Type: NetApp 840 Filers.

    Supported Products

    | | | |
    |---|---|---|
    | o | Tripod | - 7Tb |
    | o | HTML Gear | - 350Gb |
    | o | MyLycos Staging | - 320Gb |
    | o | Photo Shop | - 375 Gb |

D-3

Total Supported Storage in Terra Bytes (TB)        - 21.905 TB

Maximum supported Storage in Terra Bytes supported  is 25TB of allocated storage.

**SCHEDULE D-2**

**TO**

**DATA STORAGE EXHIBIT**

**Data Storage**

| | |
|---|---|
| **LOCATION AND SERVICE DATE** | |
| Premise Address 1: | Premise Address 2: |
| 11300 NW 25th Street<br>Miami<br>Florida<br>33172 | Insert SC8 address |

Requested Service Date:  **June 1st 2003**

Term:  **36 Months**

**DESCRIPTION OF STORAGE**

See details in section above

Maximum Capacity:  **25 Terrabytes of allocated storage**

**FEES**

Non-Recurring Set-Up Fee:     **N/A**

Recurring Monthly Storage Fee:  **$30,000 per month**

Minimum Commitment: **$30,000 per month**

D-5

# Service Level Objective

I.    **EVENT NOTIFICATION (TO CUSTOMER)**

Telefónica Data shall provide initial notice to a designated Customer representative by telephone, e-mail, pager or comparable notification within fifteen (15) minutes of Telefónica Data becoming aware of a Severity One or Severity Two event as defined below. Should Customer first become aware of such an event, Customer shall promptly provide initial notice to Telefónica Data via the Customer Support Number 1-866-466-2872. Status reports regarding the event will be forthcoming on the ½ hour until either the event has been resolved or both Telefónica data and Customer have determined a course of action that does not require continued notification. At the resolution of a Severity One event, the customer will be sent a written incident report within forty-eight (48) hours. Monthly incident reports will be provided on all other events.

"Severity One event" shall mean a portion of Customer's Data is not accessible.
"Severity Two event" shall mean that Customer's environment has experienced equipment failure resulting in degraded performance.

*Escalation (Internal)* - The following procedures define the escalation procedures that Telefónica Data will implement during an Unscheduled Outage as defined below:

*Telefónica Data EMSC* Level 1 Support shall use reasonable efforts to identify the cause of the outage and escalate to the Telefónica Data Maintenance Engineer during the first quarter hour of an outage.

*Telefónica Data* will notify Customer Level 2 Support as follows:

- Customer First Escalation Contact at the beginning of the second quarter hour;

- If Telefónica Data is unable to contact Customer's First Escalation Contact, Telefónica Data will notify Customer's Second Escalation Contact at the beginning of the third quarter hour; or

- If Telefónica Data is unable to contact Customer's Second Escalation Contact, Telefónica Data will notify Customer's Third Escalation Contact at the beginning of the fourth quarter hour.

- Customer's First, Second and Third Escalation Contacts are identified in Annex (TBA), attached hereto. Customer shall provide immediate written notice of any changes to Annex (TBA) to Telefónica Data.

"Unscheduled Outages" shall mean interruptions in services arising from failures associated with services provided by Telefónica Data or a Force Majeure Event.

## II.    CHANGE MANAGEMENT

Unless otherwise provided in the Agreement, Exhibits, or Schedules, Customer will be provided at least five (5) business days prior written notice of any changes to be made by Telefónica Data that affect the Services. However, if shorter notification period is required, changes will be made with the agreement of Customer. Telefónica Data will strive to minimize outages that may be caused by a change; however, in the event that an outage is required, Telefónica Data will use commercially reasonable efforts to minimize the impact of the change and schedule the outage based upon Customer's and Telefónica Data's requirements. If an outage is required, such outage will be considered a Scheduled Outage. At the time Telefónica Data provides Customer with notice of such Scheduled Outage, it shall also provide an estimated duration of such Scheduled Outage. In the event that the duration of such outage exceeds such estimate, such excess shall be deemed an Unscheduled Outage. Telefónica Datawill work with Customer on all change management issues in order to ensure that the Services are not affected beyond the levels set forth in this SLA. Telefónica Data reserves the right, however, to proceed with any change if it is determined, by Telefónica Data, that the change will not cause harm to Customer's specific environment and/or is otherwise necessary. Customer is required to provide prior notification to Telefónica Data of any changes to its configurations

that interface with the provided Services.

Telefónica Data VP of Operations is responsible for the project management of all changes to services provided to the Customer.

*Telefónica*

# EXHIBIT G

## TO

## MASTER SERVICES AGREEMENT

## HOSTING SERVICES (Backup)

This HOSTING SERVICES EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated _____, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.     **DEFINITIONS.**

1.1 **"End User Content"** shall mean all text, words, names, likenesses, trademarks, logos, artwork, graphics, video, audio, HTML coding, domain names, image maps, links, software applications, or other content that appear on, or are uploaded to, an End User Web site.

1.2 **"Hosting Services"** shall mean those hosting services Telefonica Data provides to Customer as described herein. All hardware, software, materials, and other items associated with the delivery of Hosting Services to Customer by Telefonica Data will be operated and maintained, for the fees listed in Schedule G-1, by Telefonica Data, regardless of whether such hardware, software, materials, and other items are owned or leased by the Customer or Telefonica Data.

1.3 **"Service Misuse"** shall mean use of the Hosting Service in a manner that (a) may or does expose Telefonica Data to legal liability, (b) that violates any applicable law or regulation or Telefonica Data's Internet Acceptable Use Policy attached hereto in Schedule G-3, (c) is illegal, unlawful or harassing, (d) infringes upon Telefonica Data's or another's Intellectual Property Rights, or (e) otherwise abuses the integrity of any applicable network.

2.     **GENERAL OBLIGATIONS.** Subject to the terms and conditions of this Exhibit and the Agreement, Telefonica Data and Customer shall have the following general obligations.

**2.1 Telefonica Data.**

1.1. Hosting Services. Telefonica Data will provide Hosting Services to Customer in accordance with this Exhibit. Customer may elect, at its sole discretion, to resell Hosting Services to End Users. Telefonica Data shall provide all necessary hardware, software, materials and other items (except End User Content) for implementing the Hosting Services.

(a) End User Compliance.  Telefonica Data reserves the right to review, using reasonable commercial means, and in its sole discretion, End User Content, including Web pages, to determine whether use thereof complies with the terms of this Exhibit.

(b) Related Services.

(i)     Maintenance. Telefonica Data shall provide maintenance services with respect to the Hosting Services in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

(ii)    Support. Telefonica Data shall provide support services  with respect to the Hosting Services solely in accordance with Schedule G-2 in exchange for the fees set forth in Schedule G-1.

## 2.2.    Customer

(a) <u>Content Development</u>.  Telefonica Data shall not be liable for any project management, development, operation, and End User content for the End User Web site(s), or any costs associated therewith. Customer or its End User shall be solely responsible for creating, coding, integrating, testing, and uploading End User Content.  Customer and its End User shall be solely responsible for maintaining authorizations and secure means to access and transfer End User Content to End User's Web site(s) using a remote access option provided by Telefonica Data.  Telefonica Data reserves the right to alter the access options at its discretion in order to maintain the integrity of Telefonica Data's Internet operations and the Web sites of other hosting customers.  Telefonica Data will promptly inform Customer of such changes.

(b) <u>Marketing</u>.  If Customer elects to resell the Hosting Services to End Users, then Customer will use its commercially reasonable efforts to promote the sale of Hosting Services to its End Users consistent with good business ethics and in a manner that will reflect favorably upon the Hosting Services.  Customer shall identify Telefonica Data as the provider of Hosting Services by using, pursuant to Section 7.2 of this Exhibit, the Telefonica Data logo and the statement "Customer Web site hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify Customer from time to time.  Customer shall refrain from engaging in any illegal, unfair, or deceptive trade practices, unethical business practices or making any representations or warrants inconsistent with the specifications provided by Telefonica Data with respect to the promotion or resale of the Hosting Services.

(c) <u>End User Terms and Conditions</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to agree in writing to comply with and Customer shall cause each End User to so comply with an enforceable written agreement that is at least as protective as Telefonica Data and its rights and as least as limiting with respect to Telefonica Data's liability as the terms set forth herein and the Agreement.

(d) <u>End User Content</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require each End User to grant to Customer a sub-licensable, worldwide, limited, royalty-free, non-exclusive license to upload, display, distribute, copy and store End User Content in connection with the Hosting Services.  Customer shall automatically grant Telefonica Data a sublicense with respect to End User Content in connection with the Hosting Services. Customer shall incorporate into its agreements with End Users language stating the following:

"Except for software provided by Customer or any of Customer's third-party partners that is bundled with the Hosting Services or purchased separately from Customer or any of Customer's third-party partners, End User hereby represents and warrants that: (i) End User is the owner, valid licensee, or authorized user of End User's Web site and each element thereof; (ii) the use of the End User's Web site will not infringe any Intellectual Property right of any third party, or constitute a defamation, invasion of privacy, or violation of any right of publicity or other third party right; (iii) End User's Web site complies with all legislation, rules, and regulations of all applicable jurisdictions; (iv) End User's Web site is and will remain accurate and correct in all respects; and (v) End User's Web site shall be free from viruses, worms, Trojan horses, and other malicious code."

(e) <u>Service Misuses</u>. If Customer elects to resell the Hosting Services to End Users, then Customer is responsible for providing an operations support function that operates on a 24 hour a day, seven day a week basis and is able to fully respond if any End User engages in Service Misuse including (i) giving Telefonica Data a telephone number and e-mail address to use to notify Customer if Telefonica Data becomes aware that an End User is engaging in Service Misuse, and (ii) having the ability to suspend or block access to Hosting Service for an End User within sixty (60) minutes of Customer's receipt of a call or e-mail from Telefonica Data stating that the End User is engaging in Service Misuse.

(f) <u>Security and Privacy</u>. If Customer elects to resell the Hosting Services to End Users, then Customer shall require an acknowledgment from each End User that there is no guarantee of security or privacy on the Internet, and Customer shall make no guarantee on behalf of Telefonica Data or for which Telefonica Data has any responsibility that an End User's Web site(s) or End User Content will be secure or private.

(g) Non-Telefonica Data Supported Software. If Customer elects to resell the Hosting Services to End Users, then Customer shall incorporate into its agreements with End Users language stating that all risks associated with the use of software on End User's Web site that is not supported by Telefonica Data is borne solely by the End User. Customer shall be solely liable for all damages resulting or arising from the use or loading of any software not supported by Telefonica Data onto End User's Web site which results in damages to End User's Web site or to any other Telefonica Data customer's Web site, or causes a failure or outage in the Hosting Services provided to End User or other End Users. CUSTOMER AGREES TO PAY TELEFONICA DATA ALL AMOUNTS INCURRED BY TELEFONICA DATA FOR WORK ARISING FROM CUSTOMER'S OR ANY END USER'S USE OF NON-SUPPORTED SOFTWARE.

(h) Customer Provided Support. If Customer elects to resell the Hosting Services to End Users, then Customer shall provide, at no cost to Telefonica Data, first level support via a Customer-provided toll-free number to End Users. First level support shall include, but is not limited to, issues related to account numbers, names, addresses, phone numbers, billing inquiries, cancellations, disconnections, reconnections of service, and access to Hosting Services, including interruption in Hosting Services caused by or under the control of Telefonica Data.

(i) Approvals, Licenses. If Customer elects to resell the Hosting Services to End Users, then Customer shall be responsible for having and keeping in place all licenses and other governmental approvals Customer needs, if any, for reselling Hosting Service. Customer shall comply with all applicable laws and regulations regarding reselling Hosting Service.

(j) Configuration. Telefonica Data's obligation to provide Hosting Services is contingent upon Customer providing its hardware and software configuration requirements to Telefonica Data in a manner reasonably acceptable to Telefonica Data. IN NO EVENT SHALL TELEFONICA DATA BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING AS A RESULT OF TELEFONICA DATA'S COMPLIANCE WITH CUSTOMER'S CONFIGURATION REQUIREMENTS.

### 2.3.   Mutual.

(a) General Obligations. Each Party shall: (i) notify the other promptly of any perceived degradation in the Hosting Services and cooperate with the other Party to the fullest extent possible in order to determine the cause of and resolve any such degradation; (ii) comply fully with all applicable federal, state and local laws including regulations and ordinances relating to the Hosting Services to be provided hereunder and the resale of the Hosting Services to the End Users, and (iii) otherwise comply with the terms and conditions as set forth herein.

(b) Customer Representative. The Parties each will provide a single point of contact for administration of this Exhibit. The Parties shall cooperate with each other in the performance and delivery of the Hosting Services hereunder.

**3.    ORDERING.** Customer shall order Hosting Services pursuant to the ordering provisions in Schedule G-1. Telefonica Data shall use commercially reasonable efforts to provide Hosting Services to Customer by the Customer-requested Service Start Date.

**4.    BACKUPS.** In exchange for the "Backup Services" fees set forth in Schedule G-1, Telefonica Data will regularly, and on at least a weekly basis, and upon termination of this Exhibit, backup all Customer software, content, and data. If Customer elects to resell the Hosting Services to End Users, then the aforementioned backup shall include End Users' Web sites. Upon termination of this Exhibit, Telefonica Data will place all servers containing Customer and End User data in suspended mode for a period of seven (7) Days, during which time Customer or End Users may, at their sole expense, backup their respective data. Customer shall advise End User to perform independent backups of Web site information; or alternatively, Telefonica Data will provide Customer with copies of Telefonica Data's backups, the cost of copying the backups to be paid by Customer in addition to the Hosting Services fees. Customer shall ensure that each End User understands that Telefonica Data has no duty of care to any End User to perform backups of End User's Web site. Customer shall ensure that End User further understands that no bailment is intended by archiving, and Telefonica Data has no duty of care to End User to safekeep the archival backup. THE COPY TO BE MADE AT CUSTOMER'S COST SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR ANY DAMAGE TO OR LOSS OF SOFTWARE, DATA, CONTENT, OR OTHER INFORMATION ON END USER'S WEB SITE.

**5.    OWNERSHIP OF INTELLECTUAL PROPERTY.**

**5.1.    Generally.** Except for End User Content, Telefonica Data shall own all right, title and interest, including Intellectual Property Rights, in and to the hardware, software, materials and other items (collectively, "Telefonica Data Equipment") necessary for implementing the Hosting Services.

**5.2.    Logo Use.**

(a)    <u>Grant</u>. Telefonica Data grants to Customer a limited, nonexclusive, worldwide, royalty-free right to use the Telefonica Data logo provided by Telefonica Data to Customer on Customer's Web site and in promotional materials for Hosting Services during the term of this Exhibit solely for the purposes of (a) identifying Telefonica Data as the provider of Hosting Service, and (b) identifying Customer as a partner of Telefonica Data. Telefonica Data will provide Customer with a copy of Telefonica Data's logo (which may be in electronic form) and guidelines for its proper use. The Telefonica Data logo will be accompanied by the statement "Customer Web site Hosting powered by Telefonica Data" or such other statement as Telefonica Data may notify to Customer from time to time. All references herein to the Telefonica Data logo shall include both the logo and the preceding statement.

(b)    <u>Restrictions</u>. Use of Telefonica Data's logo by Customer shall be submitted to Telefonica Data for its prior review and approval. Customer will ensure that sufficient space, as agreed by the Parties, surrounds Telefonica Data's logo and that no graphic elements or text encroach upon Telefonica Data's logo, and that no text or graphics are hidden behind Telefonica Data's logo. Customer agrees to use Telefonica Data's logo only in the form and manner prescribed in Telefonica Data's guidelines for proper use of its logo. The Telefonica Data logo may be used by Customer as a link to a Telefonica Data Web site if so approved in advance by Telefonica Data. Under no circumstances will Customer use the Telefonica Data logo to link to any Web site other than a Telefonica Data Web site. Customer acknowledges that it shall not obtain any rights, title or interest in or to Telefonica Data's name or logo and any use of such name and logo shall inure solely to the benefit of Telefonica Data. Telefonica Data may withdraw Customer's right to use Telefonica Data's logo granted herein upon written notice to Customer. In the event of either Customer's receipt of notice from Telefonica Data withdrawing the right to use Telefonica Data's logo or termination of this Exhibit or the Agreement, Customer shall immediately cease all use of Telefonica Data's logo and remove Telefonica Data's logo from Customer's Web site.

**6.    PRICES AND PAYMENT TERMS**

**6.1.    Fee Schedule.** Customer shall pay Telefonica Data the fees specified in Schedule G-1 of this Exhibit for the Hosting Services pursuant to the payment provisions in the Agreement.

**6.2.    Adjustments.** Telefonica Data reserves the right to modify the fee schedule at any time by issuance of a revised fee schedule. Orders placed pursuant to Article 3 and received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all orders placed pursuant to Article 3 and accepted by Telefonica Data after the date of issuance of a revised fee schedule.

**7.    TERM AND TERMINATION**

**7.1.    Term.** This Exhibit shall become effective on the date that it is signed by both parties and shall continue until the third anniversary of the Full Service Start Date, unless earlier terminated in accordance with this Exhibit and the Agreement.

**7.2.    Suspension of End User Service.** If Customer elects to resell the Hosting Services to End Users, then in addition to its rights of termination, Telefonica Data may suspend the provision of Hosting Services to a specific End User immediately and indefinitely if Telefonica Data, in its sole discretion, determines any of the following: (a) End User's Web site or use of the End User's Web site could cause liability to Telefonica Data; (b) End User posts material on the Web site that is threatening, abusive, harassing, indecent, pornographic or otherwise obscene, or that is libelous, defamatory or that violates any privacy rights; (c) End User conducts business practices on and through the Web site that Telefonica Data in its sole discretion determines to be illegal, deceptive, or otherwise constitute a misuse of the Web site, including, but not limited to, the practices known as "spamming"; (d)

End User uses the Web site, or develops or operates the Web site so that third parties use the Web site, in violation of the Internet AUP; (e) End User operates the Web site in such a manner so as to interfere with the use of products or services by other Telefonica Data customers or with third party systems, networks or services, or to engage in use of another party's account without authorization, or to engage in any activity intended to defeat security measures, or to distribute or post software or other material in violation of any export law or other governmental regulation, or to intentionally distribute software containing malicious code such as viruses and hacker tools; (f) Customer fails to make payments due to Telefonica Data according to the payment provisions of the Agreement; (g) End User becomes insolvent or ceases its normal business operations, or fails to comply with any of the provisions in this Exhibit relating to financial responsibility; or (h) Telefonica Data reasonably suspects that End User is engaged in misuse of the Hosting Service. Telefonica Data's rights to suspend service above shall be in addition to, and shall not be superseded by, Telefonica Data's rights of suspension under the Digital Millennium Copyright Act provisions detailed below.

      7.3.    **Resumption of Hosting Services.** Upon cure by Customer or, if Customer elects to resell the Hosting Services to End Users, an End User of the cause for suspension of Hosting Services to the satisfaction of Telefonica Data, including the provision of reasonable assurances that the cause of suspension shall not reoccur, and upon Customer's request, Telefonica Data may reinstate the provision of Hosting Services, subject to the payment by Customer of additional charges incurred by Telefonica Data in reinstating the Hosting Services. Telefonica Data may terminate the Hosting Service if Customer or End User does not cure the cause of a Service suspension or Customer does not pay the associated additional charges for Telefonica Data resuming the Service. In such an event, Customer (in addition to any other remedy available to Telefonica Data) will pay any termination fee described herein.

      7.4.    **Termination Procedures.** Upon termination of this Exhibit, Telefonica Data may immediately remove Customer's Web Site and, if Customer elects to resell the Hosting Services to End Users, End User's Web site from its servers and re-deploy its servers to other purposes subject to the provision giving End User the opportunity to backup the Web site during the seven (7) Day suspended mode period described in Section 4.

8.    **INDEMNITY.** In addition to the indemnity provisions set forth in the Agreement, Customer agrees to indemnify and hold harmless Telefonica Data: (a) if Customer elects to resell the Hosting Services to End Users, against any claims by End User's Web site users or other third parties based on right of privacy, right of publicity, infringement of Intellectual Property Rights, misappropriation, or other claims, whether in contract or tort and whether statutory or at common law; (b) against all claims by End User's Web site users or other third parties arising from Telefonica Data's compliance with any subpoena or other judicial or governmental directive requesting information from Telefonica Data that is contained on End User's Web site; (c) against all claims by End Users whose Web site(s) reside on shared servers, for any claim by another customer sharing the same server with End User if such other customer's claim alleges damages arising out of or relating to use of End User's Web site(s) and/or End User Content; and (d) against claims arising from or related to Telefonica Data's compliance with Customer's configuration requirements.

      **IN WITNESS WHEREOF**, the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:<br>LYCOS | | Telefonica Data:<br>TELEFONICA USA, INC. | |
|---|---|---|---|
| By: | _____<br>*(Signature)* | By: | _____<br>*(Signature)* |
| Printed Name: | _____ | Printed Name: | **Pete Pizarro** |
| Title: | _____ | Title: | **CEO** |
| Date: | _____ | Date: | _____ |
| Address: | _____<br>_____ | Address: | **1221 Brickell Avenue, Suite 600**<br>**Miami, Florida 33131** |
| Fax: | _____ | Fax: | _____ |
| E-Mail: | _____ | E-Mail: | **ppizarro@us.telefonica-data.com** |

**SCHEDULE G-1**

**TO**

**HOSTING SERVICES EXHIBIT**

**<u>Pricing</u>**

The cost for Data back up is outlined below.  Customer commits to a minimum monthly back-up of at least 4 TB of Data., For any month where the volume of Customer Data backed up by Telefonica Data is equal to or less than 4 TB, Customer will be billed for, and agrees to pay, charges equal to the back-up of 4TB of Data.  This price is for all Customer Data backed up at Telefonica Data Miami data center.

Telefonica Data will make six standard daily incremental backups and these daily back-ups will be retained off site for one week.  Telefonica Data will make full weekly backups that will be retained off site for a month.  Telefonica Data will make 12 full monthly backups that will be retained off site.

This pricing for the Services to be provided under this Exhibit does not include any servers, cards or connections that may be needed to attach Customer's storage to the Telefonica Data solution.  The Parties shall mutually determine what servers, cards or connections are necessary and the Parties shall mutually agree upon the charges that Customer shall pay for such servers, cards or connections.

Customer must purchase all tapes required for the rotation of backups.

|  | Service | Backup/ GB |
|---|---|---|
|  | **4 TerraBytes** | $2.20 |
|  | **5 TerraBytes** | $2.00 |
|  | **6 TerraBytes** | $1.80 |
|  | **7 TerraBytes** | $1.65 |
|  | **8 TerraBytes** | $1.50 |
|  | **9 TerraBytes** | $1.35 |
|  | **10 TerraBytes** | $1.25 |

SCHEDULE G-2

TO

HOSTING SERVICES EXHIBIT

Service Level Agreement

## 1. Managed Backup

Telefonica Data will attempt to restart failed backups three times before notifying the customer of the failure. In the event that the backups continue to fail, Telefonica Data will notify Customer prior to 8:00am ET the following day to determine how Customer wishes to proceed. These times and numbers serve as a baseline and may be modified by the Parties during the creation of the Runbook.

- o Credits for failure to meet the Managed Backup Service Level Objectives are as follows

    - Customer shall receive a credit equal to $20 per failure to retry the job the appropriate number of times or failure to notify Customer within the appropriate time frame.

    - The credits for any one instance in a month can never exceed $1,000 and the total credits for a month may not exceed the monthly recurring charges for the affected Service for such month.

G-7

**SCHEDULE G-3**

**TO**

**HOSTING EXHIBIT G**

**TELEFONICA DATA ACCEPTABLE USE POLICY**

This acceptable use policy ("AUP") covers (1) TDUSA' customer's (the "Customer") (and the Customer's customers, agents and users) use of and access to TDUSA' facilities (e.g. Internet Data Centers); (2) Customer's (and its customers, agents and users) use of the TDUSA online services; and (3) TDUSA' maintenance of the services it provides to its Customers.

ACCESS TO INTERNET DATA CENTERS

Only those individuals identified in writing by Customer on the Customer Registration Form ("Representatives") may access the Internet Data Centers. Customer shall deliver prior written notice to TDUSA of any changes to the Customer Registration Form and the list of Representatives. Customer and its Representatives shall not allow any unauthorized persons to have access to or enter any Internet Data Centers. Customer and its Representatives may only access the Customer Area, unless otherwise approved and accompanied by an authorized TDUSA representative.

USE OF INTERNET DATA CENTER FACILITY

*Conduct at Internet Data Centers.* Customer and its Representatives agree to adhere to and abide by all security and safety measures established by TDUSA. Customer and its Representatives shall also not do or participate in any of the following: (1) misuse or abuse any TDUSA property or equipment or third party equipment; (2) make any unauthorized use of or interfere with any property or equipment of any other TDUSA Customer; (3) harass any individual, including TDUSA personnel and representatives of other TDUSA Customers; or (4) engage in any activity that is in violation of the law or aids or assists any criminal activity while on TDUSA property or in connection with the Internet Data Center Services.

*Prohibited Items.* Customer and its Representatives shall keep each Customer Area clean at all times. It is each Customer's responsibility to keep its area clean and free and clear of debris and refuse. Customer shall not, except as otherwise agreed to in writing by TDUSA, (1) place any computer hardware or other equipment in the Customer Area that has not been identified in writing to TDUSA; (2) store any paper products or other combustible materials of any kind in the Customer Area (other than equipment manuals); and (3) bring any Prohibited Materials (as defined below) into any Internet Data Center. "Prohibited Materials" shall include, but not limited to, the following and any similar items:

- food and drink;
- tobacco products;
- explosives and weapons;
- hazardous materials;
- alcohol, illegal drugs and other intoxicants;
- electro-magnetic devices which could unreasonably interfere with computer and telecommunications equipment;
- radioactive materials; and
- photographic or recording equipment of any kind (other than tape back-up equipment).

EQUIPMENT AND CONNECTIONS

*Customer Equipment.* Each connection to and from a piece of Customer Equipment shall be clearly labeled with Customer's name (or code name provided in writing to TDUSA) and the starting and ending point of the connection. Customer Equipment must be configured and run at all times in compliance with the manufacturer's specifications, including power outlet, power consumption and clearance requirements. Customer must use its best efforts to provide TDUSA with at least 48 hours prior notice any time it intends to connect or disconnect any Customer Equipment or other equipment.

G-8

**MAINTENANCE**
TDUSA will conduct routine scheduled maintenance of its Data Center only according to its regularly scheduled maintenance schedule. In the event a mission critical maintenance situation arises, TDUSA may be required to perform emergency maintenance at any time. During these scheduled and emergency maintenance periods, Customer's Equipment may be unable to transmit and receive data, and Customer may be unable to access the Customer Equipment. Customer agrees to cooperate with TDUSA during the scheduled and emergency maintenance periods.

**ONLINE CONDUCT**
*Customer Content.* Customer acknowledges that TDUSA exercises no control whatsoever over the content of the information passing through Customer's site(s) and that it is the sole responsibility of Customer to ensure that the information it and its users transmit and receive complies with all applicable laws and regulations and this AUP.

*Prohibited Activities.* Customer will not, and will not permit any persons ("Users") using Customer's online facilities and/or services, including, but not limited to, Customer's Web site(s) and transmission capabilities, to do any of the following ("Prohibited Activities"):

- send unsolicited commercial messages or communications in any form ("SPAM");
- engage in any activities or actions that infringe or misappropriate the intellectual property rights of others, including, but not limited to, using third party copyrighted materials without appropriate permission, using third party trademarks without appropriate permission or attribution, and using or distributing third party information protected as a trade secret information in violation of a duty of confidentiality;
- engage in any activities or actions that would violate the personal privacy rights of others, including, but not limited to, collecting and distributing information about Internet users without their permission, except as permitted by applicable law;
- send, post or host harassing, abusive, libelous or obscene materials or assist in any similar activities related thereto;
- intentionally omit, delete, forge or misrepresent transmission information, including headers, return mailing and Internet protocol addresses;
- engage in any activities or actions intended to withhold or cloak Customer's or its Users' identity or contact information;
- use the TDUSA connectivity services for any illegal purposes, in violation of any applicable laws or regulations or in violation of the rules of any other service providers, web sites, chat rooms or the like; and
- assist or permit any persons in engaging in any of the activities described above.

If Customer becomes aware of any Prohibited Activities, Customer will use best efforts to remedy such Prohibited Activities immediately, including, if necessary, limiting or terminating User's access to Customer's online facilities.

*Third Party Complaint Process.* TDUSA routinely receives written complaints ("Complaints") from third parties regarding Prohibited Activities allegedly being conducted by a Customer or its Users. Due to the nature of TDUSA' business, in TDUSA' experience, most legitimate complaints and actual Prohibited Activity is conducted by Customers and users of TDUSA' Customers, not by TDUSA' Customers themselves. TDUSA requires its Customers to use policies similar to this AUP and will work with its Customers to resolve violations. TDUSA will take the following actions to document and resolve each Complaint received by TDUSA related to a Customer or its Users.

First Complaint. Upon receipt of the initial complaint from a third party regarding Prohibited Activity by a Customer or its User, TDUSA will send a letter (the "First Letter") to the complaining third party that describes TDUSA' policies related to the Prohibited Activity and lists the contact information for the Customer and encloses a copy of the original Complaint received by TDUSA. TDUSA also will deliver notice of the Complaint to the Customer by sending a copy of the same letter to the Customer via e-mail to its abuse address so that Customer can identify and remedy the Prohibited Activity. TDUSA's goal is to put the complainant directly in touch with the party in the best position to remedy the problem, TDUSA' Customer who has the relationship with the alleged violator.

Second Complaint. Upon receipt of a second complaint after the date of the First Letter related to the same or similar Prohibited Activity of Customer described in the First Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a second letter (the "Second Letter") with a copy of the second complaint to the Customer and request that Customer respond in writing to TDUSA with an explanation and timeline of the actions to be taken by Customer to remedy Prohibited Activity. In the event that Customer does not respond to the TDUSA' Second Letter and remedy the

Prohibited Activity within ten (10) business days, TDUSA will bill Customer in the following month $500 to cover TDUSA' administrative costs associated with the Prohibited Activities of Customer.

Third Complaint. Upon receipt of a third complaint after the date of the Second Letter related to the same or similar Prohibited Activity of Customer described in the Second Letter that clearly indicates that the Prohibited Activity continued after the date of the First Letter, TDUSA will send a third and final letter (the "Third Letter") with a copy of the third complaint to the Customer and request again that the Prohibited Activity cease immediately. In the event that the Prohibited Activity does not cease within five (5) business days, TDUSA will terminate or suspend its connectivity service to its Customer, and will only resume providing service when it receives adequate assurances that such activity will not continue. TDUSA will also bill its Customer $5,000 to cover TDUSA' administrative costs associated with the Prohibited Activities.

*Suspension and Termination of Service.* TDUSA reserves the right to suspend and/or terminate a Customer's Service at any time for any material failure of Customer, its Representatives or its Users to comply with these AUP.

SUPPLEMENTAL SERVICES

Subject to the terms and conditions set forth in the Agreement, TDUSA may, from time to time, provide Customer with certain limited services and equipment needed and requested by Customer on a "one-off" or emergency basis ("Supplemental Services") where such services are not included within the scope of the Services purchased by Customer. Customer will be charged for all Supplemental Services provided Customer. TDUSA has no obligation to determine the need for or provide Supplemental Services. All Supplemental Services are provided on an "as-is" basis and exclude warranties of any kind, whether express or implied.

*Telefónica*



**EXHIBIT I**

**TO**

**MASTER SERVICES AGREEMENT**

**ATM**

.This ATM EXHIBIT ("Exhibit") is entered into between Customer and Telefonica Data, and shall be governed by the terms and conditions of the Master Services Agreement ("Agreement") dated November 20, 2003, between the Parties. Terms used in this Exhibit that are not defined below or in the Agreement are defined in the context in which they are used and have the meanings there stated, or are defined in the applicable Schedule to this Exhibit.

1.    **DEFENITIONS**

   **1.1.**    **"Customer CPE"** shall mean all Customer premises equipment other than the Equipment and the Software.

   **1.2.**    **"ATM Service"** shall mean switched data asynchronous transfer mode service, including any Telefonica Data furnished equipment and software (respectively "Equipment and Software") used at the Customer's premises to provide the switched data ATM Service.

   **1.3.**    **"Service Start Date"** shall mean the date when the ATM Service is operational and ready for use between two of Customer's premises.

2.    **ORDERING, INSTALLATION, USE AND MAINTENANCE**

   **2.1.**    **Orders.** Customer shall order ATM Services pursuant to the ordering provisions in Schedule I-1.

   **2.2.**    **Service Start Date.** Telefonica Data shall use commercially reasonable efforts to provide the ATM Service by the applicable Customer-requested Service Start Date identified in Schedule I-1.    ,

   **2.3.**    **Preparations.** To facilitate the installation and maintenance of the ATM Service, Customer shall: (i) prepare its premises as necessary; (ii) provide any inside wiring required to interconnect local access lines to the Equipment, and (iii) provide Telefonica Data with access to the Equipment and software and provide security as reasonably required by Telefonica Data.

   **2.4.**    **Acceptance.** Telefonica Data shall notify Customer of the Service Start Date. Unless Customer notifies Telefonica Data's network control personnel within five (5) Days after the Service Start Date that it has demonstrated that ATM Service is not operational and ready for Customer's use, ATM Service between such sites shall be deemed accepted by Customer as of the Service Start Date, and Customer shall pay for such ATM Service as of such date.

   **2.5.**    **Relocation.** Customer may request ATM Service to be moved (i.e., disconnected from one location and reconnected at another location) subject to reasonable ATM Service interruption and payment of Telefonica Data's then-standard applicable relocation charges.

   **2.6.**    **Maintenance.** Telefonica Data shall maintain the ATM Service, including establishing regularly scheduled maintenance periods. Maintenance of the Equipment and Software is provided as a part of the ATM Service at no additional charge to Customer unless such charges are (i) specifically set forth in this Exhibit, (ii) for maintenance which is necessitated by unauthorized maintenance or other acts or omissions of Customer or others, or (iii) for technical assistance or support with respect to any Customer CPE which is used in conjunction with the ATM Service, including, without limitation, assistance in connecting the Customer CPE to the Equipment and support in identifying and/or correcting problems within the Customer CPE. In the case of Subsections (ii) or (iii), Telefonica Data's then-standard dispatch ATM Service charge(s) shall apply.

**2.7.    Surrender of Equipment and Software.** Customer shall surrender the Equipment and Software to Telefonica Data promptly upon the discontinuance of the ATM Service for which it was being used, in the same condition as delivered, reasonable wear only excepted. If Equipment and Software is not so surrendered, Customer shall pay Telefonica Data any additional charges resulting therefrom.

**2.8.    Contingency.** Telefonica Data will operate and maintain the ATM Service, contingent upon Telefonica Data's (a) ability to maintain necessary licenses or permissions, and (b) availability of network capacity and connections.

## 3.    PRICES AND PAYMENT TERMS

**3.1.    Fees.** Customer shall pay Telefonica Data the recurring, non-recurring and other charges set forth in Schedule I-2 in accordance with the payment terms and conditions of the Agreement. Telefonica Data reserves the right to modify the fees at any time by issuance of a revised fee schedule, which such modifications will only apply to new Orders for Services as set forth in this Section 3.1. New Orders for Services received before the date of issuance of a revised fee schedule, and those received within thirty (30) Days thereafter which specify a delivery date within ninety (90) Days of the date of issuance of the revised fee schedule, will be invoiced to Customer without regard to the price change, provided, however, that price decreases will be effective for all new Orders for Services accepted by Telefonica Data after the date of issuance of a revised fee schedule.

**3.2.    Commitment.** Charges for ATM Service for which Customer has made a minimum term commitment of twelve months shall remain fixed for the term commitment period; provided, however, that Telefonica Data may revise its charges upon thirty (30) advance written notice if the carrier(s) providing local access increase their charges to Telefonica Data. Unless otherwise provided for in the Order for Service, charges for ATM Service for which Customer has not made a term commitment of at least twelve (12) months are subject to modification by Telefonica Data upon at least sixty (60) Days prior written notice to Customer.

## 4.    TERM; TERMINATION; AND DELAY

**4.1. Term.** The term of this Exhibit shall commence on the date accepted by Telefonica Data (the "Effective Date") and shall continue until the second anniversary of the Effective Date, unless earlier terminated in accordance with this Exhibit or the Agreement.

**4.2.    Termination.** This Exhibit may be terminated in accordance with the termination provisions of the Agreement. In addition, Customer may terminate a particular ATM Service upon sixty (60) Days advance written notice to Telefonica Data provided that termination occurs prior to the expiration date of that ATM Service's term commitment and Customer pays a termination charge (as an early discontinuance of ATM Service fee and not as a penalty) to Telefonica Data equal to the sum of the monthly charges for the ATM Service multiplied by the number of months remaining in the term commitment.

**4.3.    Effect.** Upon termination, Customer shall immediately (i) cease utilizing the ATM Service, (ii) pay Telefonica Data for all charges incurred by Customer through the date such ATM Service is discontinued, and (iii) pay any applicable termination charges (as an early discontinuance fee and not as a penalty) as set forth above and/or elsewhere in this Exhibit.

## 5.    LIABILITY, WARRANTY, SOFTWARE, TITLE AND RISK OF LOSS

**5.1.    Liability.** If the ATM Service or any portion thereof is unavailable to Customer due to a total or partial interruption of the ATM Service, Telefonica Data's sole obligation, and Customer's sole and exclusive remedy with respect to such interruption of ATM Services shall be for Customer to request and Telefonica Data to provide a pro rata credit for the period and for the portion of the ATM Service affected during which the ATM Service or any part thereof was unavailable to Customer. Telefonica Data's maximum liability for any damages arising out of or related to this Exhibit shall not exceed the total charges for the ATM Services provided under this Exhibit during the month in which such liability arises.

**5.2.    Software.** Customer shall use Software (whether embedded in hardware as firmware or otherwise) and any related documentation only with Equipment, if any, and the ATM Service. Customer shall not (i) reproduce, reverse engineer, disassemble, decompile, modify, adapt, translate, create derivative works from, or transfer or transmit the Software in any form or by any means, or (ii) use the Software for any purpose other than as set forth in

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

   5.3.    **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

   **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:. | Accepted by Telefonica Data: |
|---|---|
| Lycos, Inc. | **TELEFONICA DATA USA, INC.** |
| By: | By: |
| Name: Vish Yelsangikar Brian P. Lucy | Name: ANTONIO BERNARDO |
| Title: Network Operations & Security Manager CFO | Title: EVP |
| Date: 28 January, 2004 | Date: 02/04/04 |
| Address: | Address: 1221 Brickell Avenue, Suite 600 |
|  | Miami, Florida 33131 |
|  | Attn: |
| Fax: | Fax: |
| Email: vish.yelsangikar@corp.terralycos.com | Email: |

REVIEWED BY
TERRA LYCOS LEGAL PDL

I-3

this paragraph. Customer shall not have any ownership rights in, or obtain rights to, the Software. If a license agreement accompanies the Software, Customer agrees to abide by the terms of such agreement.

     **5.3.**    **Title and Risk of Loss.** Unless purchased by Customer from Telefonica Data, Title to Equipment and Software shall at all times remain with Telefonica Data or its designee(s). Customer shall not permit any liens or encumbrances to be placed upon Equipment and Software, and Telefonica Data shall have the right to take all actions necessary (including taking possession from Customer's premises) to protect ownership interest in Equipment and Software. Risk of loss for Equipment and Software shall pass to Customer upon delivery of Equipment and Software to Customer's premises.

     **IN WITNESS WHEREOF,** the Parties have executed this Exhibit through their respective duly authorized officers as of the date accepted set forth below.

| CUSTOMER:. | | Accepted by Telefonica Data: |
|---|---|---|
| Lycos, Inc. | | **TELEFONICA DATA USA, INC.** |
| By: | ~~Bly~~ | By: |
| Name: | ~~Vish Yelsangikar~~ Brian P. Luy | Name: |
| Title: | ~~Network Operations & Security Manager~~ CFO | Title: |
| Date: | 28 January, 2004 | Date: |
| Address: | | Address:  1221 Brickell Avenue, Suite 600 |
| | | Miami, Florida 33131 |
| | | Attn: |
| Fax: | | Fax: |
| Email: | ~~vish.yelsangikar@corp.terralycos.com~~ | Email: |

REVIEWED BY
TERRA LYCOS LEGAL___PDL___

I-3

SCHEDULE I-1

TO

EXHIBIT I

Order Form



C:\Documents and
Settings\JRiggs\Desk

Service Start Date: <u>9 January, 2004</u>

**Telefonica Data**

| | | |
|---|---|---|
| Number of ord | Order Form  000 | |
| GAM | Zeke Rodriguez | |
| GAE | Jim Riggs | |

| | | | | Order Date | | |
|---|---|---|---|---|---|---|
| | | | | Term | 1 Year | 2 Years | 3 Years |

| COMPANY | Terra Lycos, Inc. | Billing Contact | Terra Lycos | GPH | Pablo A. Garnham |
|---|---|---|---|---|---|
| Contact | Vish Yelsangikar | Phone | Vish Yelsangikar | Phone | 305-925-5224 |
| Phone | 650-434-5241 | Fax | | Cell | 305-915-3206 |
| Fax | | E-mail | vish.yelsangikar@corp.terralycos.com | Fax | |
| E-mail | vish.yelsangikar@corp.terralycos.com | | | E-mail | pgarnham@us.telefonica-data.com |

| Address | | Billing |
|---|---|---|
| NPA-Nxx | | Information |
| Full Number | | & Contacts |
| | | (All Countries) |

| Customer Type: | | Change of service | Renewal | Upgrade | Add-on | Install Date: | |
|---|---|---|---|---|---|---|---|

**ATM**

| | | | | | | | Monthly | Country |
|---|---|---|---|---|---|---|---|---|
| 5mbps ATM var-nn | | 5mbps | | 5mbps | DS3/E3 | $1,000.00 | $11,000.00 | USA |

See Schedule E-1 to Exhibit I

**Installation Address**

| Location: | | Location: | |
|---|---|---|---|
| Country | USA | Country | Spain |
| State | MA | State | |
| City | Waltham | City | Madrid |
| Address | 400 ? Totten  100 FIFTH AVENUE | Address | Avda de los dos Castillas, 7, Pozuelo de Alarcon |
| Suite / Floor | | Suite / Floor | |
| Tie Down (Rack/Shelf, Position) | | Tie Down (Rack/Shelf, Position) | |

Notes: Connecting to Customer POP/Local Loop? If so CFA/LOA need to be issued (depending on who moves who.

| | | | | |
|---|---|---|---|---|
| Name | | Name | | |
| Phone | | Phone | | |
| Number | | Number | | |
| eMail | | eMail | | |

| Port: | □ T1 □ E1 | □ DS3 | □ STM | Port: | □ T1 □ E1 | □ DS3 | □ STM |
|---|---|---|---|---|---|---|---|
| Interface: | G703 coax | | (BNC, G703, V35, SC-MM) | Interface: | G703 coax | | (BNC, G703, V35, SC-MM) |
| Param: | | | (B8ZS-AMI, ESF-SF, Framed) | Param: | | | (B8ZS-AMI, ESF-SF, Framed) |
| Qos, Class | VBRnrt | CBR, VBR, Type QoS | | DLCI | 17,704 | | |

Notes:

**Installation Fees**

| | | |
|---|---|---|
| Circuit installation costs | | $1,000.00 |

**Customer Premise Equipment**

| | | | | | Monthly Charges | | Extend Price |
|---|---|---|---|---|---|---|---|
| No Equipments | | | | | | | |

**Technical Information**

| IP Addresses | N/A | | | Other | |
|---|---|---|---|---|---|
| IP Address | N/A | | | Other | |

| Customer: Terra Lycos, Inc. | Telefonica USA, Inc. |
|---|---|
| Signature: | Signature: |

REVIEWED BY
TERRA LYCOS LEGAL POC

| Name: ~~Josh Yukneagewar~~  Brian Luby | Name: ANTONIO BERNARDO |
| Title: ~~Network Operations & Security Manager~~ CFO | Title: EVP |
| Date: | Date: 02/04/04 |

SCHEDULE I-2

TO

EXHIBIT I

**Pricing**



C:\Documents and
Settings\JRiggs\Desk

Service Type | ATM

Currency: U$
No taxes
Term: 1 year

| Circuit ID | Host Site | Host Address | Host# | Access Line Host | Remote Site | Remote Address | Remote# | Access Line Remote | CIR | Observation | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | USA | | | DS3 | Spain | | | DS3 | 5mbps vbr-nrt | No equipment | $11,000.00 | $11,000.00 |

Conditions: Prices without local (Spain) and US taxes.
1 year term.
Prices are subject to local loop feasibility.
Prices valid for 60 days.
Prices do not consider any Customer Equipment.



SCHEDULE I-2

TO

EXHIBIT I

SERVICE LEVEL AGREEMENT

C:\Documents and
Settings\JRiggs\Desk

Telefonica International Wholesale
Services

Marketing Department

# International ATM VBRnrt Service

# Service Level Agreement



# Statement of confidentiality

This documentation is property of Telefonica and is confidential. It may not be reproduced in whole or in part, processed by a computer, or transmitted in any way or by any electronic or mechanical means, photocopying, recording, or by any other means. It may not be lent out or rented and its use may not be assigned without the prior written permission of Telefonica, the Copyright holder. Failure to comply with the aforementioned restrictions by any person with access to the documentation will be prosecuted in accordance with the law.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.




**Telefónica** *Data*

# CHART OF CONTENTS

1.    INTRODUCTION AND GENERAL CONDITIONS .................................................................. 4

2.    QUALITY OF SERVICE GUARANTEES.................................................................................. 5

     2.1.    DEFINITIONS ............................................................................................................... 5
     2.2.    SERVICE LEVEL GUARANTEES .................................................................................. 5
         *Availability* ............................................................................................................... 5
         *Mean Time to Deliver the Service* .......................................................................... 6
         *Mean Time to Repair* ............................................................................................. 7
         *Network Target Delays*.......................................................................................... 7
     EXCLUSIONS AND EXCEPTIONS ........................................................................................... 8

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

*Telefónica*

*Data*



## 1. INTRODUCTION AND GENERAL CONDITIONS

The following document describes the standard SLA ("Service Level Agreement") of the International ATM VBRnrt Service, in which Telefonica Data offers a set of guarantees for different key aspects in order to ensure the quality expected and demanded by Customer. The Guarantees that Telefonica Data assumes in relation to Customer are: Availability, Time to Deliver, Mean Time to Repair, and Network Target Delay.

If the International ATM Service does not comply with the parameters defined in this document, Customer will be entitled to demand from Telefonica Data a compensation in accordance with Section 2 of this document.

Any compensation from Telefonica Data to Customer shall take effect only if (i) Customer identifies an incident that may be deemed to be a failure or non performance of the International ATM Service provided by Telefonica Data, (ii) Customer notifies Telefonica Data the existence of such incident through the one stop procedure defined for that purpose in a period of 30 Days after such incident occurred, (iii) such incident is confirmed to be a failure or non performance of the International ATM Service by Telefonica Data. The incidents described in the Exclusions and Exceptions section are specifically excluded from the calculation of quality of service guarantees.

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.



## 2. QUALITY OF SERVICE GUARANTEES

### 2.1. Definitions

- **Permanent Virtual Circuit (PVC):** defines a permanent logical connection established between two customer accesses over the Network to guarantee that sequence will be maintained in the order of the frames received by the Network.
- **Customer Network:** Set of connections contracted by the customer for the Service.
- **NNI:** Network to network Interconnection.

### 2.2 Service Level Guarantees

*Availability*

Availability is defined per each two locations and on a monthly basis, and means the total amount of time that the International ATM Service is not under any single outage between such two locations. Availability for each two locations shall be calculated according to the following formula:

$$Availability = \frac{Ttotal - Tunavail}{Ttotal} * 100 \, (\%)$$

Where:

- $Ttotal$ = total time in minutes of the period considered, i.e. one calendar month.
- $Tunav$ = total time in minutes in which the service it is not available on a continuous basis within the Ttotal interval considered (total lack of communication through Telefonica Data's network). If an outage does not exceed the amount guaranteed by Telefonica Data in accordance to the chart below, the amount that shall account for Tunav shall be zero.

The SLA defined in the International ATM VBRnrt Service is defined in accordance to the following chart:

| Service Area | Scope of Service with details | Availability Guaranteed (AG) |
|:---:|:---:|:---:|
| TD Area | From Main Customer's Office in Location A to Main Customer's Office in Location B | 99.5 %* |

*This Availability value could be improved until a maximum of 99.7% depending on possible redundancy scenarios hired by Customer. Also, due to the constants improvements of the service, this objective will be revised and will periodically communicate to Customer.

Compensations for non-compliance with the SLA defined for Availability

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

If Telefonica Data fails to deliver the service in accordance with the chart above, then, as Customer's sole and exclusive remedy, Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following measures:

| Actual availability of Customer's network | Service Voucher in % of the monthly bill (on the Price of Sale to Customer of the PVC Segment affected) |
|---|---|
| 99.4 < A < A.G. | 5% |
| 99.3 < A < 99.4 | 10% |
| 99.2 < A < 99.3 | 15% |
| 99.1 < A < 99.2 | 20% |
| A < 99.1 | 25% |

Where A is the availability measured between each two Customer's locations and AG is the availability guaranteed.

*Mean Time to Deliver the Service*

The Mean Time to Deliver the International ATM Service is defined by location according to the following chart:

| Origin/Destination | Mean Time to Deliver |
|---|---|
| TD Area | 65 Days |
| All others (target measure) | 85 Days |

*Compensations for non-compliance with the Mean Time to Deliver the Service*

Should the installation date be delayed by TD beyond the Guaranteed Installation Date (possibly modified as defined above), then Telefonica Data will provide Customer with a one time credit in form of a voucher according to the following chart:

| Percentage of delay with respect to the committed Mean Time to Deliver | Service Voucher in % of the Installation Charge for the location affected |
|---|---|
| For each complete business day of delay past the Guaranteed Installation Date | 5% |

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.


## Mean Time to Repair

Mean Time to Repair is defined on a monthly basis and means the average time in which the International ATM Service has been under a failure in accordance with the terms defined. Telefonica Data's Mean Time to Repair objective is 6 hours for TD Area locations.

Mean Time to Repair shall be calculated according to the following formula:

$$\text{Mean Repair Time} = \frac{\sum_{1}^{NI} \left[Tunav_i\right]}{NI} hours$$

Where:

- $Tunav_i$ = Each of the times in hours that the service is not available during each of the events in which a failure has occurred in one calendar month
- $NI$ = Number of events in which a failure has occurred in one calendar month.

## Network Target Delays

The transit delay is the mean time that takes for a 100-byte packet to go through Telefonica Data's Network form POP to POP. Telefonica Data shall measure transit delay under ordinary operation conditions.

The specific origin and destination points to measure the transit delay shall be the POPs of Telefonica Data's International Network. For the avoidance of doubt the transit delay is not measured on an end-to-end basis.

The target transit delay values, Round Trip Delay, are specified in the chart below:

| Round trip Delay* (ms) | Europe | North America | South America** |
|---|---|---|---|
| Europe (London) | 95 | 130 | 250 |
| North America | 130 | 70 | 140 |
| South America** | 250 | 140 | 95 |

*The delays in the chart above vary depending on the country. For instance, in Europe (London) the delay is 25 ms for Madrid, Milan and Paris, and 50 ms when the destination is Rome and Vienna.
** Except for Colombia.

Due to the continuous improvements and upgrades in Telefonica Data's Network, the target transit delays are subject to continuous revision, change, and improvement

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.



## Exclusions and Exceptions

The exclusions and exceptions that shall not be consider under this Section 2 are the following ones:

1. Programmed Service Interruptions due to ordinary maintenance tasks within the schedule assigned to that end, and Service Interruptions for non-programmed maintenance tasks, as long as Customer has received prior notification from Telefonica Data.
2. Specific laws, regulations or customs dispositions in a specific country.
3. Service Interruptions that may occur due to Customer's act or omissions.
4. Service Interruptions due to Force Majeure or beyond Telefonica Data's control.
5. The delays caused by Customer if the personnel appointed by Telefonica to resolve an incident is not allowed to have access to Customer's premises.
6. Any interruption caused specifically by Customer's equipment or applications.
7. The access connection line equipment shall be turned on permanently for all Customer's Network interfaces.

The values of guaranteed Availability and to measure and calculate Time to Deliver the Service shall only be valid in the following countries:

TD Area: Argentina, Brazil (Sao Paulo state), Chile, Colombia, France, Germany, Italy, Mexico, Peru, Puerto Rico, Spain, United Kingdom, and USA (Miami and NY).

Property of Telefonica DataCorp, S.A.
Any reproduction, distribution, or pubic communication, without the express authorization of Telefonica DataCorp, S.A. is prohibited.

 Nutter

Thomas O. Bean
Direct Line: 617-439-2348
Fax: 617-310-9348
E-mail: tbean@nutter.com

January 10, 2005
105401-2

## FOR SETTLEMENT PURPOSES ONLY

**BY FACSIMILE  305-789-3395 and**
**BY E-MAIL**

Thomas J. Quarles, Esq.
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
Suite 2500
150 West Flagler Street
Miami, Florida 33130

      Re:   *Lycos, Inc. v. Telefonica Data USA, Inc.*,
              D. Mass., C.A. No. 04-12716-WGY ("Civil Action")

Dear Tom:

REDACTED

Nutter McClennen & Fish LLP ▪ Attorneys at Law

World Trade Center West ▪ 155 Seaport Boulevard ▪ Boston, MA 02210-2604 ▪ 617-439-2000 ▪ Fax: 617-310-9000 ▪ www.nutter.com

Thomas J. Quarles, Esq.
January 10, 2005
Page 2



The relevant provisions of the MSA are as follows:

2. Pricing. All pricing for Services shall be in accordance with the Strategic
Alliance Framework Agreement between Terra Networks, S.A. and Telefonica,
S.A. dated January 29, 2003 ("SAFA") and as set forth in each Exhibit and
Customer shall pay Telefonica Data all recurring and non-recurring fees and
other charges for Services rendered in the amounts and in the manner specified
therein and in the Master Services Agreement General Terms & Conditions.
The Parties agree that the monthly recurring charges set forth in the Exhibits are
subject to an annual price reduction of ten percent (10%) and Telefonica Data
shall revise such charges accordingly on the anniversary date of each Service.

3. Benchmarking. On or about each anniversary of the Effective Date (as
defined below) during the Term of the Agreement, the Parties shall meet to
review the pricing, quality and charges of the Services. If the Parties determine
that the quality or charges are not in accordance with the principles outlined in
the SAFA, Telefonica Data shall adjust the quality and/or charges so that both
are in accordance with the principles outlined in the SAFA. If the Parties are
unable to agree upon whether the quality and charges are in accordance with the
principles of the SAFA or regarding the adjustments necessary to bring the
quality and charges in accordance with such principles, the Parties shall follow
the dispute resolution provisions set forth in the SAFA to resolve their
disagreement.

(emphases added).

As you know, the "principle" underlying the SAFA is a "most favored customer" status.
Thus, T-Data is obligated not only to provide T-Data with a ten percent reduction in cost as of
November 1, 2004 -- which it did not on the November-January invoices – but it is obligated
to renegotiate the charges for Services if those charges are not consistent with Lycos' status as
a most favored customer.

Dean has advised Zeke that Lycos has received an offer of $22 per square foot for
space, and $33/Mbps, along with free power (for which Lycos is now paying T-Data $19,200
per month). To comply with the most favored customer status of the contract, T-Data should
offer Lycos prices at least equivalent to those, if not better.

**REDACTED**

Thomas J. Quarles, Esq.
January 10, 2005
Page 3



Thank you for your attention to this matter.

Very truly yours,

Thomas O. Bean

1393842.1

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

# STRATEGIC ALLIANCE FRAMEWORK AGREEMENT

**signed by**

## TERRA NETWORKS, S.A.

**and**

## TELEFÓNICA, S.A.

**Madrid, 29th January, 2003**

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

In Madrid, on 29th January, 2003

BETWEEN

For one part, TELEFÓNICA, S.A. (hereinafter, "TELEFÓNICA"), a stock company incorporated by virtue of the deed of incorporation executed by the Notary Public of Madrid, Mr Alejandro Rosselló Pastor, on 19th April 1924, under number 141 of his records, domiciled in Madrid, calle Gran Vía, 28. It is registered at the Business Registry of Madrid, at volume 12534, folio 21, sheet number M-6164. It is assigned Tax Identification Number A-28015865.

It is represented at this act by (*), of legal age, with domicile for these purposes in Madrid, Gran Vía, 28, holder of national identity document number (*), acting on behalf of TELEFÓNICA in his capacity as (*) of the company and making use of the faculties (*).

And for the other, TERRA NETWORKS, S.A. (hereinafter, "TERRA"), a stock company incorporated under the company name of TELEFÓNICA COMUNICACIONES INTERACTIVAS, S.A., by means of the deed authorised by the Notary Public of Madrid, Mr José Antonio Escartín Ipiens, on 4th December 1998, under number 5,276 of his records, registered at the Business Registry of Madrid, at Volume 13,753, Folio 185, Sheet number M-224,449, Entry 1. it changed its company name to that of TELEFÓNICA INTERACTIVA, S.A. in the deed executed on 16th March 1999, before the Notary Public of Madrid Mr Francisco Arriola Garrote, under number 1269 of his records, leading to entry 9 at the Business Registry of Madrid. It is domiciled in Barcelona, calle Nicaragua 54. It has been assigned Tax Identification Code A-82/196080. TERRA appears in its own name and in name and on behalf of Lycos, Inc., (hereinafter "LYCOS"), acting as the sole partner of the latter.

It is represented at this act by Mr Joaquim Agut Bonsfills, of legal age, with domicile for these purposes in Barcelona, calle Nicaragua 54, holder of national identity document number 39.134.364-W. He is acting on behalf of TERRA in his capacity as Executive Chairman of the firm, as set forth in the deed executed by the Notary Public of Madrid Mr Carlos Rives Gracia on 9th October 2001, under number 3,402 of his records.

Hereinafter, the expression "Parties" shall be used jointly for TELEFÓNICA and TERRA. The expression "Party" shall refer individually to either of them.

The Parties reciprocally recognise their capacity and legitimisation to grant this document.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

WITNESSETH

I.     Whereas, on May 16th, 2000, the Parties, along with BERTELSMANN AG, a
       corporation of German nationality, and LYCOS Inc., a corporation of United States
       nationality, the sole shareholder of which is TERRA, entered into an agreement called
       Strategic Alliance Framework Agreement (hereinafter the "Agreement"), which
       regulated the conditions under which BERTELSMANN and, if appropriate,
       TELEFÓNICA, would hire TERRA to provide certain products and services. The
       conditions established in that Agreement were on preferential terms.

II.    Whereas, the evolution of the business models created at the end of the 90s and
       beginning of 2000 to capture the short term growth value of the Internet, mainly based
       (although not exclusively) on income obtained by monetisation of the audience through
       access and advertising, gave shown that these have not attained the feasibility
       expectations created, and one must also point out the worldwide crisis on the
       advertising market. On the other hand, the wave of offers in narrow band as well as
       broad band through the media provided by the telephone access or cable television
       operators has led to such operators developing their own business lines on the
       Internet, or having sought alliances with specific Internet access suppliers and/or
       Internet portals, in which sense one must point out the clearly complementary nature of
       TELEFÓNICA and TERRA due to their coinciding presence in Spain and Latin
       America. There is also a clear difference between the catalogue of services and
       products    demanded    by    BERTELSMANN    AG.    and    TELEFÓNICA,    and
       BERTELSMANN AG. also focuses on the United States market which is more linked to
       LYCOS, Inc. These circumstances that have arisen have a great effect on articulation
       of the new phase of the relation, just as has been publicised on the markets since the
       last month of October. In this new context, the Parties, along with LYCOS, Inc. and
       BERTELSMANN AG., have considered it more convenient to continue their relations,
       leaving said Agreement without effect, it being fully replaced by this Strategic Alliance
       Framework Agreement and a new Memorandum of Understanding entered into with
       this same date (hereinafter "Agreement II"), which regulate the general terms of the
       new   framework   of   relations   between   BERTELSMANN   AG.,   TERRA   and
       TELEFÓNICA, considering as the essential aspect for the purposes of its development
       the execution of this strategic alliance between TELEFÓNICA and TERRA.

III.   Whereas, indeed, the trend shown by telephone access operators to seek alliances
       with specific Internet access providers has shown the convenience of taking advantage
       of the complementary factors there are between TELEFÓNICA and TERRA on all the
       markets in which both are present. In this sense, while TELEFÓNICA, as a
       telecommunications operator, has a clearly competitive position in matters of
       connectivity and provision of access to the international Internet nodes promoted by
       the development of broad band, TERRA is now the leader on the Spanish and
       Portuguese speaking market as a specific supplier of Internet access, being the
       reference portal in Latin America and Spain (as a leading aggregator and contents

Case 1:04-cv-12716-WGY    Document 18-6    Filed 02/08/2005    Page 5 of 33

manager and provider of value added products and services related to the Internet), having developed a brand image which is unquestionably recognised in the New Technologies and Internet sector that contributes the experience and knowledge required for sustained joint construction of a sophisticated offer of narrow and broad band contents and services.

IV.    Whereas, by virtue of this complementary nature in its objectives, needs and business plans and identification of an improvement in the opportunities of growth, the Parties intend to establish a long term strategic alliance whose main objective will be to improve the joint development of both companies on the narrow and broad band Internet markets in all the countries in which both Groups are present, preferably in the residential segment, SOHO and, if appropriate, SMEs.

V.    Whereas, due to all the foregoing, the Parties hereby enter into this Strategic Alliance Framework Agreement (hereinafter "Framework Agreement"), according to the following:

## CLAUSES

## ONE.  OBJECT OF THIS FRAMEWORK AGREEMENT.

The object of this Framework Agreement is the creation of a strategic alliance between TELEFÓNICA and TERRA (establishing the relevant model of relations between them in each one of the phases, just as mentioned hereunder, that take the maximum advantage of the capacity of TELEFÓNICA as a provider of narrow and broad band connectivity and access, and of TERRA as a portal, aggregator, provider and manager of Internet contents and services, in fixed telephony (including the wireless system used in this sector) and in mobile telephony (only if thus agreed in the Contracts and Subsequent Contracts, just as both terms are defined in Section Three), all aimed at the residential and SOHO markets, and if agreed in the Contracts and Subsequent Contracts, SMEs, taking advantage of synergies and creating value for both Parties:

(i) aggregation of the offer of products and services in the Internet business;

(ii) provision of the offer of products and services in the Internet business,

(iii) development and construction of new advanced services in the Internet business;

(iv) connectivity and access to Internet business.

Moreover, the Parties shall use best effort to identify additional elements to those described in Section Two below that allow value to be generated for both Groups, with special emphasis on

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

electronic commerce, and the relationships with the different mobile operators of the TELEFÓNICA Group (as such term is defined in Section Two below).

**TWO.    DEVELOPMENT OF THE MODEL OF RELATIONS IN EACH ONE OF THE PHASES OF BUSINESS FORMING THE OFFER FOR THE END CLIENT IN THE INTERNET BUSINESS.**

The model of relations referred to in the above Section will be subject to development through the relevant contracts entered into between certain companies in the TELEFÓNICA Group and the TERRA Group, on the terms and conditions established in this Framework Agreement, adapted, if appropriate, to the legal and statutory requisites that may be applicable.

For that purpose, each Party hereby undertakes, as controlling shareholder of its respective Group, that each one of the contracts foreseen in this Section Two (hereinafter the "Contracts") shall be formalised and executed by the companies determined by it among those in its respective Group, this being understood in the sense of article 4 of Act 24/1988 of 24th July, of the Stock Market, and, for the purpose of this Framework Agreement, the TERRA Group and Telefónica Publicidad e Información, S.A. shall not be considered an integral part of Telefónica Group (hereinafter "TELEFÓNICA Group" and "TERRA Group", as appropriate, and the companies thus determined by each Party among those of its respective Group, the "Companies in the TELEFÓNICA Group" or the "Companies in the TERRA Group", as appropriate), in order to generate:

(x)    in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)    for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above.

The Parties hereby agree that, to the extent require by virtue of the object of the relevant Contracts, they must be entered into by companies in the TELEFÓNICA Group and Companies in the TERRA Group with presence in the same geographic territories.

2.1.    Exclusivity of the Companies in the TERRA Group as a portal, service aggregator and supplier of added value services.

2.1.1.    TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group grant exclusivity to the Companies in the TERRA Group as

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

supplier of the essential elements of the portal and aggregator of the narrow and broad band Internet services targeting the residential segment, SOHO and, if appropriate SMEs, all to the satisfaction of TELEFÓNICA according to the contractual parameters established in the terms set forth in Section 2.1.5 below.

TELEFÓNICA hereby undertakes, on the terms and conditions of this Framework Agreement, for the Companies in the TELEFÓNICA Group to provide the Companies in the TERRA Group the exclusive commission to develop all the portals for aggregation of the Internet contents and services on narrow and broad band, targeting the residential segment, SOHO and, if appropriate, SMEs, developed by the Companies in the TERRA Group, whether Internet access portals in connectivity offers and Internet access by Companies in the TELEFÓNICA Group, and include the trademark and other distinctive signs of the Companies in the Terra Group (the use of said trademark and other distinctive signs will comply with the provisions of the agreements to be entered under Section 2.1.5 below).

2.1.2.    TELEFÓNICA and TERRA undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall acquire the necessary narrow and broad band Internet value added services exclusively from the Companies in the TERRA Group as required to construct the offer for end users, preferably residential, SOHO and, if appropriate, SMEs, listing, for purely illustrative although not limiting purposes, the following: e-mail, instant message platforms, unified message platforms, chats, etc.

2.1.3.    Commercialisation or provision to third parties of service packages that are identical or substantially similar to those supplied to the Companies in the Telefónica Group as set forth in Sections 2.1.1 and 2.1.2 above shall require prior written consent from TELEFÓNICA.

2.1.4.    TELEFÓNICA undertakes, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group assign to the Companies in the TERRA Group the exclusive management and operation of the advertising spaces that include third party advertising on the portals developed according to Section 2.1.1. above by the Companies in the TERRA Group. In order to avoid doubt, it is expressly recorded that the decision on operation of such advertising space shall be taken entirely by the Companies in the Telefónica Group.

CONFIDENTIAL AND PRIVILEDGE INFORMATION

2.1.5.    For the purposes of formalising what is set forth in Sections 2.1.1, 2.1.2, 2.1.3 and 2.1.4 above, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant licence contracts for brands and other distinctive signs and intellectual property, management of the portal, aggregation and access to value added services and use of software and maintenance, within the terms specified in Section 4.1 below, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II.

2.2.    Acquisition, development and/or commercialisation of contents, service provision agreements and exchanges of shares and/or assets with vertical portals, advertising spaces, provision of on-line integral marketing spaces and provision of auditing, consultancy, management and maintenance services for country portals.

2.2.1.    Acquisition, development and commercialisation of contents and agreements to provide services and share and/or asset exchanges with vertical portals.

2.2.1.1.    TERRA and TELEFÓNICA hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group preferentially focus their demand for acquisition, development and/or commercialisation of content arising from the construction of the offer of products and services foreseen in Section Two through Companies in the TELEFÓNICA Group. For this purposees, "preferential focussing" shall be understood as the option for Companies in the TELEFÓNICA Group to offer the Companies in the TERRA Group the aforementioned contents and the obligation of the Companies in the TERRA Group to commission those contents from the Companies in the TELEFÓNICA Group, as long as the offer presented by the latter to the Companies in the TERRA Group is not objectively worse than the offer provided by any third party.

Moreover, TERRA and TELEFÓNICA undertake to make their best effort to ensure that the Companies in the TELEFÓNICA Group distribute their on-line contents preferentially through the Companies in the TERRA Group.

For that purposes, on the terms established in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for acquisition, development and/or commercialisation

CONFIDENTIAL AND PRIVILEDGE INFORMATION

of content and rendering on-line training services, on the terms and conditions set forth in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 above.

2.2.1.2.     The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group enter into exclusive contracts to provide on-line training services to their respective employees through the company Educaterra, S.L.

The Parties undertake to use best efforts, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group will engage Maptel, S.A. for their needs of products, solutions and services based on on-line localisation.

In order to facilitate fulfilment of the commitments undertaken in Section 2.2.1.1 above and to optimise their respective portfolios, the Parties hereby undertake, on the terms and conditions foreseen in general terms under this Framework Agreement that, within the deadlines set in Section 4.1 below, Telefónica de España, S.A. shall transmit to Educaterra, S.A., and the latter shall acquire at market value, which according to the Parties valuations is equivalent to its book value, the platform A+ owned by it, on the terms and conditions established specifically in Exhibit III.

2.2.1.3.     Likewise, the Parties shall analyze the convenience and shall negotiate, if appropriate, the conditions under which TERRA may fully or partially convey to:

(i)  Telefónica Móviles, S.A., its share in Terra Mobile, S.A.;

(ii) The TELEFÓNICA Group, its share in Ifigenia, S.A.; and

(iii) The TELEFÓNICA Group, its share in Maptel, S.A.

2.2.2.  Acquisition of advertising spaces.

TELEFÓNICA and TERRA hereby undertake, on the terms and conditions of this Framework Agreement, that the annual amount

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

assigned by the TELEFÓNICA Group to acquisition of advertising spaces in the Companies in the TERRA Group shall not be less than 2% of the total annual budget assigned by that Group to advertising.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts to acquire advertising spaces, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV.

2.2.3. Provision of integral on-line marketing services.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, for the Companies in the TERRA Group to provide preferentially integral on-line marketing services to the Companies in the TELEFÓNICA Group. To these purposes, "preferential contracting" shall be understood as the option granted to the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing services of the Companies in the TERRA Group and the obligation of the Companies in the TELEFÓNICA Group to hire those integral on-line marketing services with the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the TELEFÓNICA Group is not objectively worse than the offer presented by any third party.

For that purposes, within the terms foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant service provision contracts for integral on-line marketing services, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit IV, mentioned under Section 2.2.2 above.

2.2.4.    Preferential contracting of the auditing, consultancy, management and maintenance services of the country portals of the Companies in the TELEFÓNICA Group by the Companies in the TERRA Group. To these purposes, "preferential contracting" shall be understood to be the option of the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group auditing, consultancy, management and maintenance services for its country portals and the obligation of the Companies in the TELEFÓNICA Group to hire those auditing, consultancy, management and maintenance services for country portals from the Companies in the TERRA Group, as long as the offer

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

presented by the latter to the Companies in the Telefónica Group is not objectively worse than the offer presented by any third party.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall provide the Companies in the TELEFÓNICA Group the auditing, consultancy, management and maintenance services of their respective country portals.

For that purposes, within the deadlines foreseen in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit VI.

2.3.    Wholesale Internet connectivity and access.

2.3.1.        The Companies in the TELEFÓNICA Group, as exclusive suppliers of wholesale connectivity and access services.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire the wholesale Internet connectivity and access services exclusively from the Companies in the Telefónica Group, as long as that acquisition is made on better conditions than those allowed by market regulations.

For that purposes, within the deadlines provided in Section 4.1 below, the Companies in the TERRA Group and the Companies in the TELEFÓNICA Group shall grant the relevant auditing, consultancy, management and maintenance contracts for country portals, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5 and 2.2.1.1 above.

2.3.2. Outsourcing regime or equivalent in operation of the network access elements.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

The Parties undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TELEFÓNICA Group shall provide the outsourcing or equivalent service to operate all or part of the services and/or operation of the elements for excess to the network required by the Companies in the TERRA Group to provide the Internet access service to their preferentially residential customers, SOHO and, if appropriate, SMEs, as long as such services may be provided under the best market conditions allowed by the regulations.

For that purposes, within the deadlines set in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant contracts for operation, hosting and management, on the terms and conditions foreseen in general terms in this Framework Agreement and, specifically, in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1 and 2.3.1 above.

2.3.3.    The Companies in the TELEFÓNICA Group, as exclusive providers of the network services required to build up the offer for end users.

The Parties undertake, respectively, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall acquire exclusively from the Companies in the TELEFÓNICA Group the advanced network services and platforms required to build up the offer for preferentially residential customers, SOHO and, if appropriate, SMEs on narrow and broad band, as long as such acquisition is performed on the best market conditions the regulation allows.

For that purposes, on the terms and conditions foreseen in Section 4.1 below, the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall grant the relevant exclusive supply contracts, on the terms and conditions foreseen in general terms in this Framework Agreement and specifically in Exhibit II, mentioned in Section 2.1.5, 2.2.1.1, 2.3.1, and 2.3.2 above.

## THREE. GENERAL TERMS APPLICABLE TO THE CONTRACTS.

3.1.    Scope of application.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

The general terms agreed in this Section Three shall be applicable to all the Contracts, as well as to the Subsequent Contracts (as to the latter, on the terms foreseen in Section 4.4 and in Section Six below). However, the content of Section 3.3 below shall only be applicable to the successive term contracts.

The Parties hereby undertake to include in the Contracts and, if appropriate, in the Subsequent Contracts, the service level agreements that shall determine and guarantee a quality for the services, in keeping with the standards in the sector. Moreover, the Contracts, and as appropriate, the Subsequent Contracts, shall establish the appropriate protection mechanisms for the Parties in the event of early termination, to allow an adequate, respectful transition as to the daily activities of the Parties under the relevant Contract (or Subsequent Contract).

3.2.    Modifications imposed by administrative bodies.

In the event of any of the entities or bodies regulating the telecommunications market, the right to competition and/or any other competent bodies, require substantial amendment of any of the Contracts or Subsequent Contracts, the Monitoring Committee will have to decide on the convenience of performing such an amendment or of making the relevant Contract or Subsequent Contract void. The Monitoring Committee must decide within the term of one month from the date on which the matter is submitted to it. However, if the requirement by the relevant entity or body were to establish a lower term for fulfilment thereof, the term of one month shall be reduced appropriately.

If the Monitoring Committee were to resolve to make the relevant Contract or Subsequent Contract void, it will comply with the terms set forth in Section 4.3 below and, if appropriate, the terms foreseen in Section Six below.

3.3.    Termination.

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1 and 4.4 below and in the last paragraph of Section Six below, the Contracts and Subsequent Contracts shall end and be left without any effect whatsoever in any of the following cases:

(i)      on 31st December 2008 or, if appropriate, on expiration of any renewal of a Contract or Subsequent Contract in the event that one of the parties had notified the other party in writing with, at least, two months in advance prior written notice, its intention to terminate the relevant Contract or Subsequent Contract. In absence of the relevant prior written notice, the Contract or

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Subsequent Contract shall be deemed automatically and successively renewed for additional periods of one year, or

(ii)    on the sixtieth calendar day following the date on which the Change in Control takes place at TERRA in the event of TELEFÓNICA having notified it within the term of its decision to terminate the Framework Agreement, on the terms set forth in Section Seven below; or

Termination of any of the Contracts in the cases foreseen in this Section 3.3 shall not give rise to any kind of liability being required among the relevant Parties, notwithstanding those strictly arising from execution thereof and fulfilment prior to the date of termination.

3.4. Confidentiality and public announcements.

The Contracts and Subsequent Contracts shall be confidential and none of the respective Parties shall reveal their existence and content without the consent of the other. An exception is made in cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the part under obligation shall previously inform the other.

The Parties shall agree on the content of any notification or public release related to the relevant Contracts and Subsequent Contracts.

3.5.    Expenses and taxes.

Each part shall pay the expenses arising for it from formalisation and execution of the Contracts and Subsequent Contracts.

The obligations of a tax nature shall be paid by each part pursuant to the applicable laws and provisions.

3.6.    Resolution of conflicts. Binding nature of the resolutions by the Monitoring Committee.

3.6.1.  Resolutions of conflicts.

Any discrepancy in the interpretation as well as the execution of the Contracts and the Subsequent Contracts must be submitted by any of the Parties to the Monitoring Committee and, should a resolution not be provided, by it to the

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Chairmen of TELEFÓNICA and TERRA, resorting for the relevant judicial or arbitration proceedings only in the event of failure to reach an agreement by the Chairmen. To those ends, the terms of Section 15.1 below shall be applicable, with the particular specification that reference to the Parties must be understood to refer to the relevant Parties.

### 3.6.2. Binding nature of the resolutions by the Monitoring Committee

In any case, all agreements or resolutions by the Monitoring Committee, on the terms of Section Four below, shall be binding upon the relevant Parties, who undertake to fully comply with them, it thus being considered that the final decisions by those Parties may not be impugned.

## FOUR. PROCEDURES AND SCHEDULE FOR DEVELOPMENT.

### 4.1.    Terms to formalise the Contracts.

The Parties undertake that the Contracts, on the terms and conditions of this Framework Agreement and its Exhibits, are formalised between the Companies in the TELEFÓNICA Group and the Companies in the TERRA Group within the maximum term of one month from the date of this Framework Agreement, adapted as appropriate to the applicable legal and statutory requisites, on the terms that are determined for that purpose by the Monitoring Committee foreseen in Section 4.2 below. That Committee shall also set, according to the legal and business circumstances, the exact dates on which each Contract or group of Contracts must be formalised.

As an exception, the Monitoring Committee may postpone formalisation of some of the Contracts for proper reasons, so these are granted once the aforementioned term of one month has expired, in which case the terms of Section 4.3 below shall be applicable.

### 4.2. Monitoring Committee.

#### 4.2.1.  Composition.

The Parties hereby agree to create a Monitoring Committee for execution, development and monitoring of this Framework Agreement,

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

which must be formed by six members, three of which, who shall include the person acting as Chairman, shall be appointed by TELEFÓNICA, and the remaining three shall be appointed by TERRA.

Each Party may replace any member or members appointed by it at any time, by serving the relevant written notice to the Monitoring Committee.

The Parties hereby resolve that the appointment of the members of the Monitoring Committee and their formal constitution shall take place within the term of fifteen days from signing this Framework Agreement.

4.2.2.  Meetings: calling, frequency and minutes.

The Chairman shall call the meetings. The Monitoring Committee shall meet at least once every quarter. However, the Chairman must call the Monitoring Committee whenever required to do so in writing by any of its members and, likewise, may call it on any occasion he may deem fit.

The Parties agree that the first Monitoring Committee shall meet no later than 28th February 2003.

The meetings of the Monitoring Committee may be attended by executives from either of the Parties with the right to speak but not vote, in order to provide information on the progress of the alliance and to facilitate decision making by the Monitoring Committee.

The Secretary to the Monitoring Committee, who shall be appointed by TERRA from among the members of the Monitoring Committee appointed by TERRA, shall take the minutes of the content of each meeting, which shall be signed by the Secretary with the approval of the Chairman once it is approved by those attending.

4.2.3.  Quorum, passing resolutions and binding nature of these.

The Monitoring Committee shall be understood to be validly met as long as it is attended by four of its members and the resolutions are passed unanimously.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

The agreements and resolutions by the Monitoring Committee shall be binding upon the Parties, who undertake to fully comply with them directly or through the companies in their relevant Group, as appropriate. In this sense, the agreements and resolutions by the Monitoring Committee shall be considered final decisions by the Parties in relation to the matters concerned and, thus, not liable to be impugned.

Failing an agreement on any matter of its competence, the Monitoring Committee shall submit the matter to the Chairmen of TELEFÓNICA and TERRA, who shall have a term of fifteen days to issue their finding. If that term expires without an agreement being reached, any of the Parties may initiate arbitration proceedings on the terms foreseen in Section Fifteen below.

4.2.4. Duties.

The Monitoring Committee is to perform the following duties.

(i)     to co-ordinate, direct and supervise performance and development of this Framework Agreement, through the process of formalisation of the Contracts, determining the dates of granting and integrating their content, as provided in Section 4.1 above.

(ii)    resolve on the convenience of extending, modifying or terminating any of the Contracts or Subsequent Contracts, or of formalising Subsequent Contracts, especially in the cases foreseen in Section 3.2 above and 4.4 below.

(iii)   resolve on possible amendments to be made in the Contracts or Subsequent Contracts, if their performance were to affect the profitability or strategic interests of the Telefónica Group or Terra Group, and this will only be when the circumstance may not compensated in terms of value through the mechanisms foreseen in this Framework Agreement.

(iv)    resolve on extension of this Framework Agreement or granting preemptive rights, as well as concerning the degree of fulfilment of the alliance and to take the relevant corrective measures, on the terms of Section 4.3 below, and determining the cases in which the factual cases foreseen in Section Six below arise to apply the TELEFÓNICA Guarantee.

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

(v)     resolve on the convenience of modifying the Contracts and Subsequent Contracts according to the evolution of the applicable legislation, on the terms of Section 4.5 below.

(vi)    resolve on any discrepancy in interpretation as well as performance of this Framework Agreement, of the Contracts and of the Subsequent Contracts; and

(vii)   any others specifically entrusted to it under this Framework Agreement.

(viii)  resolve on creation of working subcommittees on any of the areas of specific activity in Spain, Brazil, Rest of Latin America and Relations with Telefónica Data, as well as suppression, modification, substitution or creation of additional subcommittees.

When performing its duties, the Monitoring Committee shall ensure that its resolutions comply with the principle of tax efficiency for the Parties, as well as for the relevant Parties of the Contracts and Subsequent Contracts.

4.3.    Revision of the degree of fulfilment of the alliance and extension of the Framework Agreement.

   4.3.1.   The Monitoring Committee must validate fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA in November every year. For that purposes, it must review the degree of fulfilment of the Contracts and, if appropriate, of the Subsequent Contracts, in order to determine whether the services have been rendered to the satisfaction of the relevant part and check that they have been fulfilled.

         (x)    in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

         (z)    for each one of the following financial years, an equivalent value at least to that established for 2003, as indicated in subparagraph (x) above.

      In order to facilitate that annual validation, on a quarterly basis, on the second have of the second month of the following quarter, the

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Monitoring Committee shall review the degree of fulfilment of the objectives of the alliance between TELEFÓNICA and TERRA, the degree of fulfilment of the Contracts and, if appropriate, Subsequent Contracts, adopting the measures it may deem fit in each case.

On the other hand, in November 2008, the Monitoring Committee shall resolve on the extension or not, for the term deemed convenient, of this Framework Agreement and, where applicable, of the Contracts and Subsequent Contracts. If it were to decide not to extend them, the Monitoring Committee would determine the services, whether foreseen or not in Section Two above, in relation to which the Companies in the TELEFÓNICA Group would grant the Companies in the TERRA Group with presence in the same geographic territory, or vice-versa, a pre-emptive right to equal offers by third parties.

4.3.2.    However, the Monitoring Committee may perform the revisions foreseen in Section 4.3.1 above as an extraordinary measure in any other month of the year.

4.3.3.    The Monitoring Committee shall impose the measures it deems fit to correct the breaches detected during its annual validation duties and, if appropriate, shall determine whether it is appropriate to apply the TELEFÓNICA Guarantee foreseen in Section Six below.

4.4.    Adaptation and updating of the services and products.

According to the technological advances, the evolution of the specific needs of both Groups, the general market conditions, the evolution of the reference costs, and any other considerations related to achieving the objectives of this alliance, the Monitoring Committee may agree the modifications it may deem appropriate as to the services and products that, by virtue of this Framework Agreement and the Contracts or Subsequent Contracts, must be rendered to the relevant companies in the TELEFÓNICA Group and in the TERRA Group (even inclusion of new catalogues of services and products), making, when appropriate, the appropriate decisions for that purposes in relation to (i) amendment of this Framework Agreement, (ii) extension, amendment or suppression of certain Contracts or Subsequent Contracts, and (iii) formalisation of new contracts (hereinafter, along with the contracts mentioned in the paragraph preceding the penultimate one of Section Six below, the "Subsequent Contracts") which shall be subject to the terms and conditions foreseen in general within this Framework Agreement, except in the aspects which the Monitoring Committee may consider appropriate to modify.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

CONFIDENTIAL AND PRIVILEDGE INFORMATION

In cases in which the Monitoring Committee may resolve to extend only certain Contracts or Subsequent Contracts, it shall also resolve on the Sections of this Framework Agreement that, by virtue of their applicability, must continue in force, taking full effects as to the Contracts or Subsequent Contracts extended.

4.5.    Adaptation of the Contracts and Later Contracts to the evolution of the applicable legislation.

According to the evolution of the applicable laws and, in particular, liberalisation of the regulation framework for the telecommunications market and competition rights, the Monitoring Committee may agree the modifications it may deem fit in relation to the Contracts and Subsequent Contracts, in order to overcome the restrictions contained in their clauses due to the limitations imposed by the by-laws in force at the time of granting.

## FIVE. GOOD FAITH.

The Parties undertake to act in good faith, abstaining from performing any action that may prevent or hinder performance of this Framework Agreement, and giving complete fulfilment directly, or through the companies in its respective Group to the obligations arising from this Framework Agreement, especially those related to (i) fulfilment of the resolutions by the Monitoring Committee, and (ii) formalisation of the Contracts and Subsequent Contracts, as well as their execution, by providing the services in accordance with the set quality parameters and payment of the relevant agreed prices.

## SIX. GUARANTEE BY TELEFÓNICA.

TELEFÓNICA hereby guarantees fulfilment by the Companies in the TELEFÓNICA Group of the obligation to formalise and fulfil the Contracts on the terms of this Framework Agreement.

In all cases in which, due to reasons other than breach by TERRA and/or the Companies in the TERRA Group, especially for legal or statutory reasons, it were not possible to formalise any of the Contracts, or they should become fully or partially void, or if there were to be any breach by TELEFÓNICA and/or the Companies in the TELEFÓNICA Group of these making it impossible to achieve:

FREE TRANSLATION OF SPANISH ORIGINAL TEXT
(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

(x)  in financial year 2003, at least, the global value in Euros (78,5MM) set forth in Exhibit I, arising from the breakdown described, simply as estimations, on Exhibits II, III, IV, and V of this Framework Agreement, and,

(z)  for each one of the following financial years, a value equivalent at least to that established for 2003, as indicated in subparagraph (x) above (it being duly understood that in the event of the minimum value mentioned not being reached in any financial year, the deficit arising will be considered to be fully compensated by the necessary proportion by the surplus to that minimum figure that may have been obtained in any of the previous financial years).

TELEFÓNICA shall propose alternative mechanisms to the satisfaction of TERRA to provide services and acquire products that, within the setting of the complementary nature of both Groups, will allow the relevant compensation to take place.

In the presentation of alternative mechanisms by TELEFÓNICA, it shall take the following aspects, among others, into account: (i) contracts to render services or acquire products not foreseen in Section Two above that may have been entered into by the Parties, or between the companies in their respective Groups after the date on which this Framework Agreement came into force, or after that date, as long as these are services to be provided thereafter; (ii) newly available services and products that may arise by virtue of the technological advances in the evolution of the specific needs of both Groups and the market conditions; and (iii) possibilities arising from inclusion of any companies in the TELEFÓNICA Group or the TERRA Group.

New contracts which are formalised by virtue of the terms set forth in the preceding paragraph (hereinafter along with the contracts foreseen in Section 4.4 above, the "Subsequent Contracts") shall be subject to the terms and conditions foreseen in general terms in this Framework Agreement, except in the aspects the Parties find fit to modify.

In cases in which the Parties agree to extend only certain Contracts or Subsequent Contracts, they shall also resolve on the Stipulations of this Framework Agreement which, by virtue of its application to these, must continue in force, taking full effect in relation to the Contract or Subsequent Contracts extended.

The obligations of TELEFÓNICA within the framework of this Section shall be decreased by the relevant proportional part to show possible partial breaches by TERRA and/or by the Companies in the TERRA Group that may have taken place.

**SEVEN. TERMINATION.**

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

Notwithstanding the cases of extension foreseen in the last paragraph of Sections 4.3.1. and 4.4 above, and in the penultimate paragraph of Section Six above, this Framework Agreement shall become void in any of the following cases:

    (i)    on 31st December 2008 or, if appropriate, on expiration of any relevant renewal pursuant to Section 4.3.1 in the event that one of the Parties had notified the other Party in writing with, at least, two months in advance prior written notice, its intention to terminate the Framework Agreement. In absence of the relevant prior written notice, the Framework Agreement shall be deemed automatically and successively renewed for additional periods of one year, or

    (ii)    at the option of TELEFÓNICA in the event of a Change in Control taking place in TERRA (on the terms foreseen in the last two paragraphs of this Section).

Termination of the Framework Agreement in the cases foreseen in this Section Seven shall not give rise to any kind of liability between the Parties being demanded, notwithstanding those arising strictly from the actual performance of the Framework Agreement prior to the date of termination.

A Change in Control of TERRA shall be understood to be any event or situation that entitles a shareholder other than TELEFÓNICA to direct the management and administration of that company directly or indirectly, as the holder of the majority voting rights or by virtue of agreements entered into with other shareholders.

If there is a Change in Control of TERRA, if TELEFÓNICA were to opt to terminate this Framework Agreement, it will have the term of one month from the date on which this took place to notify TERRA that the Framework Agreement shall terminate, and it shall cease to be effective on the sixtieth calendar day from the date on which that Change of Control of TERRA took place. All the Contracts and Subsequent Contracts shall also terminate on that date.

## EIGHT. CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.

8.1.    This Framework Agreement and all the documentation or negotiations linked thereto are confidential and neither of the Parties shall reveal their existence and content without the consent of the other, with the exception of cases in which the obligation to disclose information is imposed by a competent judicial or administrative authority or by Law, in which case the Party obliged shall previously inform the other.

8.2.    The Parties shall agree the content of any public notice or release related to this Framework Agreement or its performance.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

**NINE. NOTICES.**

9.1.    All notices between the Parties concerning this Contract may be made either in writing delivered at the domicile of the addressee, or by facsimile, in which case the original must be sent by registered mail with acknowledgement of receipt to the domicile of the party addressed.

9.2.    For all the purposes of notice, delivery shall be considered to take place on the same working day on which the letter was delivered, or the facsimile was transmitted to the party addressed.

9.3.    For all the purposes related to this document, the Parties hereby provide the following fax numbers and domiciles:

TELEFÓNICA, S.A.

Attention of the Secretary General

Address: Gran Vía, 28, Madrid

Fax: 91 521 45 81

TERRA

Attention of the Secretary General

Address: Paseo de la Castellana, 92 - Madrid

Fax: 91 452 38 81

**TEN. ASSIGNMENT.**

This Framework Agreement and the obligations assumed by each one of the Parties by virtue thereof may not be transferred, nor may be subject to assignment to any third party without the prior, express, written consent of the other Part.

**ELEVEN. VOIDNESS AND INEFFECTIVENESS OF THE CLAUSES.**

In the event that any Section or part thereof were to be declared void or ineffective, that nullity or ineffectiveness would affect only that provision or the relevant part thereof, while the Framework Agreement shall subsist in all other aspects, it being understood that such a Section or part thereof that may be affected shall be omitted. This shall all be considered

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

notwithstanding the obligations of the Parties foreseen in Section Six above, as to it being applicable.

## TWELVE.  EXPENSES AND TAXES.

12.1.        Each part shall pay the expenses directly borne by it from formalisation of this Framework Agreement.

12.2.        The obligations of a tax nature shall be paid by each Party according to the applicable laws and provisions.

## THIRTEEN.  ENACTMENT AND PREVALENCE OF THE AGREEMENT.

13.1.        This Framework Agreement shall be effective 1st January 2003.

13.2.        This Framework Agreement substitutes any other agreement, document or previous contract entered into between the Parties, that may contradict it and, specifically, in the event of discrepancy between the content of this Framework Agreement and Agreement II, in all cases the terms of this Framework Agreement shall prevail between the Parties. Notwithstanding the terms set forth in this Section 13.2, both Parties recognise that the exclusive and other rights granted to TERRA in relation to rendering the services of Internet access prior to the date of enforcement of this Framework Agreement (contracts related to rendering services in Argentina and Peru) remain unaltered.

## FOURTEEN.  APPLICABLE LAW.

This Framework Agreement shall be governed and interpreted pursuant to the laws of the Kingdom of Spain.

## FIFTEEN.  DISPUTES RESOLUTION.

15.1.        Any discrepancy in the interpretation as well as the performance of this Framework Agreement must be submitted by the Parties, prior to initiating eventual arbitration proceedings, as foreseen in Section 15.2 below, to the Monitoring Committee and, if appropriate, by it to the Chairmen of TELEFÓNICA and TERRA.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

CONFIDENTIAL AND PRIVILEDGE INFORMATION

If the Monitoring Committee has not solved the controversy within the maximum term of one month from the date on which its intervention is requested by either of the Parties, the Monitoring Committee itself shall submit the matter to the Chairmen of TELEFÓNICA and TERRA within the 10 calendar days following expiry of the term mentioned.

Only if no agreement is reached by the Chairmen, within the fifteen working days following the date on which the controversy is submitted to them, shall the arbitration proceedings foreseen in Section 15.2 be foreseen.

15.2   The Parties hereby grant this Section the status of an arbitration clause, pursuant to all the terms established and recognised in article 6.1 in relation to 5.1, of the current Act 36/1988 of 5th December, and submit all matters that may arise as to the validity, effectiveness, interpretation and/or performance of this Framework Agreement to the finding issued by an Arbitration Tribunal formed by three arbitrators, who shall decide on the matters of litigation subject to Law, and the (Parties) undertake to attend and abide by the finding issued.

The Arbitration Tribunal shall be formed by appointing an arbitrator for the plaintiff and another arbitrator for the defendant, both of whom shall then appoint a third arbitrator by reaching an agreement within the term stated in the following paragraph. Should an agreement not be reached within the said term, His Honour the Dean of the Honourable Legal Association of Madrid, or the Lawyer of that Association chosen by the Dean, shall be automatically appointed.

In order to constitute the arbitration tribunal and carry out the arbitration, the Parties shall proceed as follows:

(i)   The Party calling the arbitration shall serve authentic notice to the others stating the matter of litigation and appointing an arbitrator, of whose acceptance it has record.

(ii)   Within the unextendable term of eight calendar days from the date on which notice is received, the Parties summoned must state whether they accept the matter of litigation raised or extend it, and in all cases must appoint another arbitrator, of whose acceptance it has record.

(iii)   The Party calling the arbitration shall have a further eight calendar days to accept or reject, fully or partially, the extension

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

of the matter of litigation. If it accepts, the other Party shall be served authentic notice. If it does not accept the extension, the matter of litigation shall be considered just as it was raised, notwithstanding the right the other party has to bring further arbitration.

(iv)    When the said term for extension of the arbitration has elapsed, with or without agreement between the Parties, both arbitrators shall proceed to appoint a third one, or if they do not agree, shall appoint the Dean of the Honourable Law Association of Madrid, who may, at his discretion, accept the appointment or appoint a third arbitrator.

(v)    If more than ninety calendar days elapse from the notice calling the arbitration as provided hereabove (i) and if the Arbitration Tribunal has not been formed for any reason, the Parties may resort to judicial formalisation of the arbitration through the jurisdictional intervention foreseen in articles 38 and following of Act 36/1988 of 5th December.

(vi)    The Party that may proven to blame for it being impossible to constitute the Arbitration Tribunal shall pay the other part, in settlement of an accumulative conventional penalty, that is to say, notwithstanding other liabilities in which it may have incurred, the sum of 6,000 euros per day until the date on which the cause leading to such an impossibility is removed.

(vii)    Madrid, the capital, is named the venue for the arbitration for all the effects of announcement thereof.

The procedure shall be determined by the Arbitration Tribunal according to the applicable imperative regulations and the organisational principles set forth in articles 21 and following of Act 36/1988 of 5th December.

In any case, the Parties shall declare Spanish Law by common agreement to be the applicable legislation for resolution of any of the controversies that may arise in all the cases in which this arbitration clause may be applicable.

As to the content, from and term of the finding, the terms of articles 30 to 37 of the current Act 36/1988 of 5th December shall be applicable, and in all matters not foreseen by this Arbitration Section, the terms of the said Act shall also be applicable.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

CONFIDENTIAL AND PRIVILEDGE INFORMATION

In all matters that may not be resolved by arbitration, as well as in judicial formalisation of this, if necessary, the Parties expressly submit, renouncing any other Jurisdiction, to the Tribunals of Madrid, the capital.

**SIXTEEN. EXHIBITS.**

The five Exhibits to this Framework Agreement, a list of which is provided hereunder, form an integral part hereof to all effects, and it is understood by the Parties that all concepts included therein are equivalent to those included within this main body of the Framework Agreement, and, therefore, do not alter them in any way.

List of Exhibits:

Exhibit I

Exhibit II Value Added Services, Portal and Related Infrastructure

Exhibit III: Corporate Services and Assets

Exhibit IV: Advertising

Exhibit V: Consulting

In witness whereof, the Parties sign double copies of this Framework Agreement, to a sole end, in the place and on the date first written above.

TELEFÓNICA, S.A.                 TERRA NETWORKS, S.A.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

# EXHIBIT I

*(Millones de Euros)*

|  |  | 2003 |
|---|---|---:|
| **I. VALUE ADDED SERVICES, PORTAL AND RELATED INFRASTRUCTURE** |  |  |
|  | **Revenues** | 96.3 |
|  | **Costs** | (30.6) |
|  | **EBITDA** | 65.7 |
|  | **Capex** | 0.0 |
| **II. CORPORATE ASSETS AND SERVICES** |  |  |
|  | **Revenues** | 5.1 |
|  | **Costs** | (3.4) |
|  | **EBITDA** | 1.7 |
|  | **Capex** | 0.0 |
| **III. ADVERTISING** |  |  |
|  | **Revenues** | 8.0 |
|  | **Costs** | (1.6) |
|  | **EBITDA** | 6.4 |
|  | **Capex** | 0.0 |
| **IV. CONSULTING** |  |  |
|  | **Revenues** | 9.4 |
|  | **Costs** | (4.7) |
|  | **EBITDA** | 4.7 |
|  | **Capex** | 0.0 |

**Total EBITDA**                              **78.5 Mill. Euros**

                                                      **66%**

**Total Revenues**                            **118.8 Mill. Euros**

**Total Costs**                               **(40.3) Mill. Euros**

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

## EXHIBIT II

### VALUE ADDED SERVICES, PORTAL AND RELATED INFRASTRUCTURE

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)     The Companies in the TELEFÓNICA Group will engage the Companies in the TERRA Group on an exclusive basis to develop all portals for the aggregation of content and Internet services on narrow and broad band of the Companies in the TELEFÓNICA Group, which target the residential segment, SOHO and, if appropriate, SMEs;

(ii)    The Companies in the TERRA Group shall be suppliers of the essential elements of the portal and aggregator of the narrow and broad band Internet services targeting the residential segment, SOHO and, if appropriate SMEs;

(iii)   The portals developed by the Companies in the TERRA Group for the Companies in the TELEFÓNICA Group, the essential elements of the portal, content and Internet services described above will be commercialized with the trademark and other distinctive signs of the Companies in the TERRA Group, for which purposes the relevant licenses shall be granted.

(iv)    The Companies in the TELEFÓNICA Group shall acquire the necessary narrow and broad band Internet value added services exclusively from the Companies in the TERRA Group as required to construct the offer for end users, preferably residential, SOHO and, if appropriate, SMEs, listing, for purely illustrative although not limiting purposes, the following: e-mail, instant message platforms, unified message platforms, chats, etc.

(v)     The Companies in the TELEFÓNICA Group shall assign to the Companies in the TERRA Group the exclusive management and operation of the advertising spaces that include third party advertising on the portals developed according to Section 2.1.1. above by the Companies in the TERRA Group (the decision of exploiting advertising spaces on such portal relying solely in Companies in the TELEFÓNICA Group).

(vi)    On other terms, the Companies in the TERRA Group shall preferentially focus their demand for acquisition, development and/or commercialisation of content arising from the construction of the offer of products and services foreseen in Section Two of this Framework Agreement through the Companies in the TELEFÓNICA Group.

(vii)   TERRA and TELEFÓNICA undertake to make their best effort to ensure that the Companies in the TELEFÓNICA Group distribute their on-line contents preferentially through the Companies in the TERRA Group.

(viii)  The Companies in the TERRA Group shall acquire the wholesale Internet connectivity and access services exclusively from the Companies in the TELEFÓNICA Group, as long as that acquisition is made on better conditions than those allowed by market regulations.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

(ix)    The Companies in the TELEFÓNICA Group shall provide the outsourcing or equivalent service to operate all or part of the services and/or operation of the elements for excess to the network required by the Companies in the TERRA Group to provide the Internet access service to their preferentially residential customers, SOHO and, if appropriate, SMEs, as long as such services may be provided under the best market conditions allowed by the regulations.

(x)    The Companies in the TERRA Group shall acquire exclusively from the Companies in the TELEFÓNICA Group the advanced network services and platforms required to build up the offer for preferentially residential customers, SOHO and, if appropriate, SMEs on narrow and broad band, as long as such acquisition is performed on the best market conditions the regulation allows.

TERRA y TELEFÓNICA estimate that the operation of the foregoing relationships shall result in a creation of global value equivalent to 65'7 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |
|----------|----------|
| Revenues | 96'3     |
| Costs    | 30'6     |
| EBITDA   | 65'7     |
| Capex    | 0        |

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

## EXHIBIT III

### CORPORATE ASSETS AND SERVICES

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)   The Companies in the TELEFÓNICA Group and the Companies in the TERRA Group shall enter into exclusive contracts to provide on-line training services to their respective employees through the company Educaterra, S.L.

(ii)  The Companies in the TELEFÓNICA Group and the Companies in the TERRA Group will engage Maptel, S.A. for their needs of products, solutions and services based on on-line localization

(iii) Telefónica de España, S.A. shall transfer to Educaterra, S.A. platform A+ own by it, following the terms set forth in Section 2.2.1.2 of this Framework Agreement.

TERRA y TELEFÓNICA estimate that the item (i) above shall result in a creation of global value equivalent to 1´7 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |     |
|----------|----------|-----|
| Revenues | 5'1      |     |
| Costs    |          | 3'4 |
| EBITDA   | 1'7      |     |
| Capex    | 0        |     |

With respect to item (ii) above, as the date hereof the Parties have not yet estimated its economic impact.

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

## EXHIBIT IV

## ADVERTISING

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)    Group TELEFÓNICA shall assign not be less than 2% of the total annual budget assigned by that Group to the acquisition of advertising spaces in the Companies in the TERRA Group,

(ii)   The Companies in the TERRA Group to provide preferentially integral on-line marketing services to the Companies in the TELEFÓNICA Group. For these purposes, "preferential contracting" shall be understood as the option granted to the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group the integral on-line marketing services of the Companies in the TERRA Group and the obligation of the Companies in the TELEFÓNICA Group to hire those integral on-line marketing services with the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the TELEFÓNICA Group is not objectively worse than the offer presented by any third party

TERRA y TELEFÓNICA estimate that item (i) above shall result in a creation of global value equivalent to 6´4 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |     |
|----------|----------|-----|
| Revenues | 8        |     |
| Costs    |          | 1'6 |
| EBITDA   | 6'4      |     |
| Capex    | 0        |     |

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

*CONFIDENTIAL AND PRIVILEDGE INFORMATION*

## EXHIBIT V

## CONSULTING

The relationships between the TERRA Group and the TELEFÓNICA Group in this Exhibit are build on the following elements foreseen in Section Two of this Framework Agreement:

(i)     Preferential contracting of the auditing, consultancy, management and maintenance services of the country portals of the Companies in the TELEFÓNICA Group by the Companies in the TERRA Group. To these purposes, "preferential contracting" shall be understood to be the option of the Companies in the TERRA Group to offer the Companies in the TELEFÓNICA Group auditing, consultancy, management and maintenance services for its country portals and the obligation of the Companies in the TELEFÓNICA Group to hire those auditing, consultancy, management and maintenance services for country portals from the Companies in the TERRA Group, as long as the offer presented by the latter to the Companies in the Telefónica Group is not objectively worse than the offer presented by any third party.

The Parties hereby undertake, on the terms and conditions of this Framework Agreement, that the Companies in the TERRA Group shall provide the Companies in the TELEFÓNICA Group the auditing, consultancy, management and maintenance services of their respective country portals.

TERRA y TELEFÓNICA estiman que el epígrafe (i) anterior arrojará una generación de valor global equivalente a 4´7 millones de Euros en el año 2003, que se desglosa de la siguiente forma:
TERRA y TELEFÓNICA estimate that the item (i) above shall result in a creation of global value equivalent to 4´7 million Euros in year 2003, which may be breakdown as follows:

|          | MM Euros |
|----------|----------|
| Revenues | 9'4      |
| Costs    | 4,7      |
| EBITDA   | 4,7      |
| Capex    | 0        |

*FREE TRANSLATION OF SPANISH ORIGINAL TEXT*
*(N.B.- ONLY SPANISH ORIGINAL TEXT IS BINDING)*

**From:**        "Thomas Bean" <tbean@nutter.com>
**To:**          <tquarles@swmwas.com>
**Date:**        1/4/2005 5:11:40 PM
**Subject:**     Lycos v. T-Data

Based on our conversation today, I understand you may have a copy in
Spanish of the Strategic Alliance Framework Agreement referred to in the
Master Services Agreement. Attached is a copy in English that was filed
with the SEC. Provisions herein reflect a "most favored customer"
status for the parties. So, the price for Lycos' Termination Assistance
Services is to be based on the concept that Lycos is a "most favored
customer," and not simply at what I expect is the higher contract price.
Any questions, please let me know.


Thomas O. Bean
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2348 (phone)
(617) 310-9348 (fax)

e-mail tbean@nutter.com