UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LYCOS, INC., | ) | C.A. No. 04-12716-WGY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **LYCOS, INC.'S OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION TO DISMISS** |
| TELEFONICA DATA USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Defendant Telefonica Data USA, Inc.'s ("T-Data") second Motion to Dismiss has no more merit than its first – which T-Data withdrew.  Its contention that the claims in Lycos, Inc.'s ("Lycos") First Amended Complaint are subject to arbitration fails because: (1) the plain language of the narrow arbitration clause does not apply to the disputes raised by Lycos; and (2) the arbitration process – in which the decision-makers are the chairmen of T-Data's parent and cousin -- is inherently biased and should therefore not be enforced.  While T-Data's motion is centered around this meritless arbitration argument, for good measure T-Data also insincerely accuses Lycos of inequitable conduct when, in fact, it is T-Data that is misleading the Court in its repeated (and ultimately vain) attempts to avoid this Court's jurisdiction and have the parties' dispute resolved in a recently filed action in Florida.

For these reasons, Lycos respectfully requests that this Court deny the defendant's Motion to Dismiss.

## FACTS

### The Transaction Documents

In November, 2003, Lycos – a network of globally branded media properties distributed primarily through the World Wide Web – and T-Data entered into a Master Services Agreement ("MSA") and several related documents (together, the "Transaction Documents") pursuant to which T-Data agreed to provide certain specialized services for housing and operation of web servers owned by Lycos, as well as connections to the World Wide Web. *See* First Amended Complaint, docket entry no. 12 in this action ("Docket Entry # __"), at ¶ 13. At the time Lycos and T-Data negotiated and executed the Transaction Documents, Lycos was a wholly-owned subsidiary of Terra Networks, S.A. ("Terra"), whose controlling shareholder was Telefonica, S.A. ("Telefonica"), the sole owner of T-Data. *Id*. Thus, Lycos and T-Data were cousins, both having the same direct or indirect parent in Telefonica.

Perhaps because of these corporate relationships, the MSA requires Lycos and T-Data to have annual "benchmarking" meetings at which they are to meet to determine whether the quality of and charges for services are in accordance with the principles of a document called the Strategic Alliance Framework Agreement ("SAFA") between Terra and Telefonica dated January 29, 2003 and, if they are not, to adjust the quality and/or charges so that they are in accordance with the principles of that agreement. *Id.* at ¶ 15. The relevant portions of the MSA state as follows:

> **2. Pricing. All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated** *January 29, 2003* **("SAFA") . . . .**

**3.  Benchmarking.  On or about each anniversary of the Effective Date (as defined below) during the Term of the Agreement, the Parties shall meet to review the pricing, quality and charges of the Services.  If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA.  If the Parties are unable to agree upon** *whether the quality and charges are in accordance with the principles of SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles*, **the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.**

*Id*. at ¶ 16 (emphases added).

On October 5, 2004, Lycos' U.S.-based assets were sold to Daum Communications Corp.  *Id.* at ¶ 23.  As a result of this sale, Lycos is no longer the child of Terra, the indirect child of Telefonica, or the cousin of T-Data.  However, T-Data is still wholly-owned by Telefonica, which is still the controlling shareholder of Terra.[1]

 Lycos' Original Complaint

On December 20, 2004, T-Data sent Lycos a letter threatening to terminate the Transaction Documents at 3:00 p.m. EST on December 30, 2004 if Lycos did not pay certain monies that T-Data claimed were due and owing under the Transaction Documents.  *See* **Batten Aff. dated January 26, 2005, Docket Entry # 10, at ¶ 4, Exh. B.**  Termination of the Transaction Documents and suspension of services would have caused the majority of Lycos' internet operations to shut down and would have threatened the viability of Lycos' business. *See* **Verified Complaint, Docket Entry # 2, Attachment # 1, at ¶¶ 25-27.**

Faced with such a catastrophic result, Lycos filed this action on December 23, 2004, seeking, among other things, preliminary and permanent injunctions barring T-Data from

---

[1]  **Having been disowned by its parent (Terra) and indirect parent (Telefonica), it is not surprising that Lycos' dispute with its former cousin (T-Data) arose.**

suspending, terminating, or otherwise ceasing to provide services.  *Id.* at Count II.  After T-Data removed this action to this Court, T-Data advised Lycos in writing that it would provide Lycos continuing transitional services if it terminated the MSA, thus resolving the injunctive relief Lycos had sought.  On January 12, 2005, T-Data then moved to dismiss this action for lack of personal and subject matter jurisdiction.  *See* Docket Entry # 4.  T-Data withdrew that motion at this Court's scheduling conference on February 9, 2005.  *See* Electronic Clerk's Notes entered on February 9, 2005.

## Lycos' Amended Complaint

Between the time that Lycos filed its original complaint in state court on December 23, 2005 and the time it filed its Amended Complaint in this Court on January 26, 2005, several additional disputes between Lycos and T-Data arose.  Lycos' counsel initially believed, as T-Data suggests, that a SAFA dated February 12, 2003 (the "February 12 SAFA") applied to the parties' pricing arrangement, because T-Data's counsel had represented to him that there was no SAFA dated January 29, 2003 (the "January 29 SAFA"), despite the plain language of the MSA.  The February 12 SAFA entitled Lycos to a pricing arrangement based on "best customer price."  Lycos' counsel eventually discovered, however, that a January 29 SAFA did in fact exist, and that such SAFA, contrary to the February 12 SAFA and T-Data's position on the issue, entitled Lycos to the "best market price."  By letter dated January 18, 2005, Lycos' counsel immediately informed T-Data's counsel of this discovery and requested that he inform Lycos by 3:00 p.m. on January 20, 2005 whether T-Data still maintained that the February 12 SAFA rather than the January 29 SAFA was operative.  *See* Affidavit of Thomas O. Bean ("Bean Aff.") filed herewith, at Exh. A.  Absent a response from T-Data, Lycos stated that it would "assume that T-Data still believes that the February 12 SAFA was operative."  *Id.*

In addition, on January 12, 2005, T-Data had sent Lycos an invoice seeking, among other things, payment of $154,000 for cancellation of the so-called "Madrid Circuit," an amount that Lycos believed was a gross over-billing and something T-Data now concedes was in error.  In its January 18, 2005 letter to T-Data, Lycos also identified this new issue between the parties, and likewise requested a response from T-Data by 3:00 p.m. on January 20, 2003. *Id*.

By letter dated January 19, 2005, T-Data's counsel responded by asserting that the February 12 SAFA as opposed to the January 29 SAFA was in fact operative, and that T-Data disagreed with Lycos' position concerning the Madrid circuit.  *See* Bean Aff., Exh. B.[2]

In the Amended Complaint, Lycos seeks a declaration that the principles contained in the January 29 SAFA, which version is explicitly referenced in Paragraph 2 of the MSA, as opposed to a SAFA dated several weeks later on February 12, 2003, applies to the parties' pricing arrangement.  *See* First Amended Complaint, Docket Entry # 12, at Count I.  It also seeks relief from overcharges relating to the Madrid Circuit.  *Id.* at Counts II and III.  The Amended Complaint resolved the personal jurisdictional concerns raised in T-Data's first Motion to Dismiss, which T-Data has since withdrawn.  T-Data now moves the Court to dismiss this action for lack of subject matter jurisdiction, arguing that the arbitration provision contained in the MSA requires dismissal of this action in favor of arbitration in Spain.

<u>The Arbitration Provision</u>

As noted above, the MSA provides that if "the Parties are unable to agree upon *whether the quality and charges are in accordance with the principles of SAFA or regarding the*

---

[2]  Like T-Data, Lycos is attaching a settlement letter in heavily redacted form solely to show T-Data's understanding as of the date of the letter that a controversy or dispute had arisen between the parties concerning the issues that have been made part of Lycos' First Amended Complaint.  All other statements in Mr. Quarles' letter have been redacted.

*adjustments necessary to bring the quality and charges in accordance with such principles*, **the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.**"  **Both the January 29 and February 12 SAFAs require the parties to submit any disputes first to a "Monitoring Committee."**  *See* **First Amended Complaint, Docket Entry #12, at Exhs. B and C, § 15.1.  The Monitoring Committee consists of six members, three of whom (including the Chairman) are appointed by Telefonica (T-Data's parent) and three of whom are appointed by Terra (the controlling shareholder of which is Telefonica).**  *Id.*  **If the Monitoring Committee is unable to resolve the dispute within thirty days, the dispute is to be submitted to the Chairmen of Telefonica and Terra for resolution.**  *Id.*  **Thus, the decision-makers are the chairmen of T-Data's parent and cousin.  In the unlikely event the chairmen cannot resolve a dispute between their child (T-Data) and their former child (Lycos), the dispute is to be submitted to an arbitration tribunal.**  *Id.*  **The panel is to consist of three arbitrators, one selected by "the plaintiff," one by "the defendant," and a third by the other two arbitrators.**  *Id.*, **§ 15.2**.

<u>**The Florida Action**</u>

**The day after Lycos filed its Amended Complaint, T-Data commenced a collection action against Lycos in Florida state court, an action Lycos has since been removed to federal court.  A true and accurate copy of T-Data's complaint filed in Florida is attached hereto as <u>Exhibit A</u>.  On February 22, 2005, Lycos moved to dismiss the action in Florida or have venue transferred to this Court.  A true and accurate copy of this Motion (without exhibits) is attached hereto as <u>Exhibit B</u>.**

## ARGUMENT

I.     **Because the Arbitration Clause is Neither Enforceable Against Lycos nor Applicable to the Instant Dispute, this Action is Within the Court's Jurisdiction**

This Court has subject matter jurisdiction to hear this dispute.  The federal presumption of arbitrability, not surprisingly, "presumes proof of a preexisting agreement to arbitrate disputes" that covers the claims at issue.  *McCarthy v. Azure,* **22 F.3d 351, 355 (1ˢᵗ Cir. 1994).  Accordingly, to compel arbitration pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 1** *et seq.* **("FAA"), this Court must find, among other things, that (1) there exists a valid and enforceable written agreement to arbitrate and (2) the dispute in question falls within the scope of that agreement.** *See Williams v. HealthAlliance Hospitals, Inc.*, **158 F. Supp. 2d 156, 159-160 (D. Mass. 2001).  T-Data cannot satisfy either of those requirements.**

A.     *The Arbitration Procedure In The SAFA Is Inherently Biased And Impartial In T-Data's Favor, Rendering It Unenforceable*

**Pursuant to § 2 of the FAA, arbitration agreements "shall be valid, irrevocable and enforceable,** *save upon such grounds as exist at law or equity for the revocation of any contract*.**"  9 U.S.C. § 2 (emphasis added).  The Supreme Court has clearly stated that "contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."** *Doctor's Assocs., Inc. v. Casarotto*, **517 U.S. 681, 687 (1996).  In addressing the use of general contract defenses to invalidate arbitration clauses under the FAA, "state law may be applied 'if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'"** *Id.* **at 686-87, quoting** *Perry v. Thomas*, **482 U.S. 483, 492 n.9 (1987).  Thus, "[w]hile federal law may govern the interpretation and enforcement of a valid arbitration agreement, state law**

governs the question of whether such an agreement exists in the first instance." *Eassa Props. v. Shearson Lehman Bros., Inc.*, **851 F.2d 1301, 1304 n.7 (11th Cir. 1998).**

Moreover, under New York law – which the parties agreed governs the MSA[3] – an arbitration provision is substantively unconscionable when the provision is unreasonably favorable to one party. *See Gillman v. Chase Manhattan Bank, N.A.*, **534 N.E.2d 824, 829 (N.Y. 1988).**[4] The determination of unconscionability can be based on the substantive component alone when "a provision of the contract is so outrageous as to warrant holding it unenforceable. . . ." *Id.* at **829.**

The arbitration provision contained in the MSA is substantively unconscionable because it mandates the selection of non-neutral decision-makers who have financial and business interests aligned with T-Data's. As noted above, the MSA provides that if the parties "are unable to agree upon *whether the quality and charges are in accordance with the principles of SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles*, the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement." (emphasis added). Assuming *arguendo* that the parties' dispute concerns the "quality and charges" of the services – which as set forth in part I(B) *infra* it does not – both the January 29 and February 12 SAFAs require the parties to submit their dispute first to a "Monitoring Committee"[5] consisting of six members. Three of those members (including the Chairman) are appointed by Telefonica (T-Data's parent) and three are

---

[3]    *See* **First Amended Complaint, Docket Entry # 12, at Exh. A, p. 7, § 11.12.**

[4]    **This is distinguished from procedural unconscionability which "requires an examination of the contract formation process and the alleged lack of meaningful choice."** *Id.* at **828.**

[5]    *See* **First Amended Complaint, Docket Entry # 12, at Exhs. B and C, § 15.1.**

appointed by Terra Networks (the controlling shareholder of which is Telefonica).[6]  If the

Monitoring Committee is unable to resolve the dispute within thirty days, the dispute is then to

be submitted to the Chairmen of Telefonica and Terra Networks, T-Data's parent and cousin,

respectively.   Thus, at both the first and second stages of this process, the decision-makers are

necessarily selected by, related to, and/or employed by T-Data's parent and cousin companies.[7]

It would be the most naïve exercise in optimism to believe that either the members of the

Monitoring Committee or the Chairmen of Telefonica and Terra would allow a dispute

between T-Data and Lycos to proceed to the arbitration panel.

> Under New York law:
>
> [N]o party to a contract, or someone so identified with the party as to be in fact,
> even though not in name, the party, can be designated as an arbitrator to decide
> disputes under it.  Apart from outraging public policy, such an agreement is
> illusory; for while in form it provides for arbitration, in substance it yields the
> power to an adverse party to decide disputes under the contract.

*Cross & Brown Co. v. Nelson*, 167 N.Y.S.2d 573, 576 (N.Y. App. Div. 1957).  In *Cross*, the

arbitration provision made the board of directors of one of the parties the arbitrators under the

agreement.  The Court observed:

> We brush aside any metaphysical subtleties about corporate personality and view
> the agreement as one in which one of the parties is named as arbitrator.  Unless
> we close our eyes to realities, the agreement here becomes, not a contract to
> arbitrate, but an engagement to capitulate.

*Id.* at 575-76.  It concluded that "the invalidity of the instant agreement to arbitrate is

proclaimed on its face," and denied the motion to stay the litigation.  *Id.* at 576.

---

[6] *See id.*, § 4.2.

[7] Only in the unlikely event the chairmen cannot resolve a dispute between their child (T-Data) and
former child (Lycos) is the dispute submitted to an arbitration tribunal.  That panel is to consist of one arbitrator
selected by "the plaintiff," one by "the defendant," and a third by the other two arbitrators.

*Cross* has recently been followed by courts in other states (including Massachusetts) construing contracts in which the parties selected New York law. *See Buhrer v. BDO Seidman*, **16 Mass. L. Rptr. 551 (Mass. Super. July 7, 2003) (***Cross*** is "the only New York appellate court to have considered this issue," concluding that having arbitrators who owe fiduciary responsibilities to one of the parties "is offensive to basic notions of fairness" and holding that "the arbitration provision is invalid on its face and unenforceable");** *BDO Seidman v. Miller*, **949 S.W.2d 858 (Tex. App. 1997) (holding that where the financial interest of the arbitrators are identical to those of the defendant, such an arrangement is "repugnant to a proper sense of justice").**

**Not surprisingly, New York law is consistent with the law of other states where courts have found an arbitration clause invalid on its face and unenforceable where the arbitrators are closely aligned with one of the parties such that the other party is unable to obtain an impartial and unbiased ruling.** *See, e.g.*, *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, **170 F.3d 1, 16 (1st Cir. 1999) ("[p]laintiffs are not required to take their claims to biased panels or through biased procedures");** *Penn v. Ryan's Family Steakhouses, Inc.*, **95 F. Supp. 2d 940, 946 (N.D. Ind. 2000) (where arbitration panel appointed by an entity being paid by one of the parties, "the procedures under the Agreement for the selection of an arbitration panel are so biased and unfair as to call for revocation of the Agreement");** *Harold Allen's Mobile Home Factory Outlet, Inc. v. Butler*, **825 So.2d 779, 783-84 (Ala. 2002) ("[o]ur research has not disclosed a single case upholding a provision in an arbitration agreement in which appointment of the arbitrator is within the exclusive control of one of the parties," held that "the arbitration-selection provision allowing [defendant] to select the arbitrator with no input from [plaintiff] is unconscionable as a matter of law");** *Ditto v. Remax Preferred*

*Properties, Inc.*, **861 P.2d 1000, 1004 (Okl. App. 1993) (holding that "an arbitration clause as would exclude one of the parties from any voice in the selection of arbitrators cannot be enforced [since] [s]uch a clause conflicts with our fundamental notions of fairness, and tends to defeat arbitration's ostensible goals of expeditious and equitable dispute resolution").**

The Supreme Court of West Virginia borrowed from Aesop in describing the situation in particularly memorable terms.

> Let us assume for a minute that for some reason all the rabbits and all the foxes decided to enter into a contract for mutual security, one provision of which were [sic] that any disputes arising out of the contract would be arbitrated by a panel of foxes. Somehow that shocks our consciences, and it doesn't help the rabbits very much either. . . . [T]his Court would not countenance an arbitration provision by which the parties agree that all disputes will be arbitrated by a panel chosen exclusively by one of the parties. This is the classic rabbits and foxes situation, with the foxes stacking the arbitration panel in their favor. Such a contract provision is inherently inequitable and unconscionable because in a way it nullifies all the other provisions of the contract.

*Board of Education of the County of Berkeley v. W. Harley Miller, Inc.*, **236 S.E.2d 439, 443-44 (W.Va. 1977). This Court should not enforce an arbitration clause that gives exclusive power to the foxes – the chairmen of T-Data's parent and its cousin – to administer the arbitration process at all stages and select the very decision-makers and arbitrators prepared to swallow up their former child, Lycos.**

      **B.**     *Even if the Arbitration Clause were Enforceable, It is Inapplicable to the Current Dispute*

T-Data misleadingly proclaims in its Memorandum of Law that the arbitration clause covers "any benchmarking dispute," and then proceeds to fill up two pages with case law describing the not-so-novel proposition that there is a strong federal policy in favor of upholding arbitration provisions. In its zeal to recite the obvious, T-Data misses two critical points. First, T-Data fails to address the important distinction between "broad" and "narrow"

arbitration provisions and glosses over the analytical framework this Court must apply when, as here, faced with a "narrow" arbitration provision.  Second, T-Data completely ignores the plain language of the arbitration clause at issue in this case.

T-Data conveniently omits case law holding that courts must first review the language of the arbitration provision and find a "clear, explicit statement" of the parties' intent to submit the specific dispute in issue to binding arbitration.  *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, **858 F.2d 825, 829 (2d Cir. 1988).  In construing narrow arbitration clauses, courts "must be careful to carry out the specific and limited intent of the parties" and "[a]lthough [courts] must be mindful of the federal presumption in favor of arbitration, [courts] cannot allow that presumption to have the strong effect here that it would have if [courts] were construing a broad arbitration clause."**  *Id.*

The arbitration clause at issue here is not, as one court put it, a "standard broad arbitration clause applying to any dispute between [Lycos] and [T-Data] arising out of or related to the [MSA]," but instead "define[s] a limited scope of arbitration."  *Coady v. Ashcroft & Gerel*, **996 F. Supp. 95, 107 (D. Mass. 1998) (Young, J.).  Indeed, Section 3 of the MSA requires the parties to follow the arbitration procedure in the SAFA** *only* **if "the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles."  The plain language of this clause limits arbitration only to those disputes involving two discreet issues: (1) whether the quality of and charges for T-Data's services are consistent with the principles of the SAFA; and (2) if not, the extent of adjustments necessary to make T-Data's services so consistent.  T-Data itself has admitted, by**

filing its collection action in a Florida court, that the arbitration clause does not cover all disputes under the MSA between the parties.  *See* <u>Exhibit A</u>, attached hereto.

As applied to the instant case, Lycos' First Amended Complaint presents neither of the issues covered by the parties' arbitration clause, but rather asks this Court for a simple declaration as to whether the January 29 or February 12 SAFA applies to the parties' pricing arrangement.  To render its decision, the Court need not consider whether the quality or charges relating to T-Data's services is consistent with any particular SAFA nor the extent of any adjustments necessary to make such services consistent.  The court need only interpret the MSA as written.

There are a number of additional factors used by courts to construe narrow arbitration provisions such as the one present in this case, all of which indicate that the arbitration clause here applies only to the limited disputes referenced above and does not cover the issues presented by Lycos' First Amended Complaint.  First, courts frequently examine the "tone of the clause as a whole" to determine its scope.  *McDonnell Douglas*, 858 F.2d at 832.  For example, in *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1 (1st Cir. 2004), the arbitration provision assigned certain narrow disputes to a panel of accountants.  The First Circuit held that, in such a situation, "it makes no sense to assume that accountants would be entrusted with evaluating disputes about the operation of the business in question . . . [n]or would one expect accountants to have special competence in deciding whether business misconduct unrelated to accounting conventions was a breach of contract or any implied duty of fair dealing."  *Id.* at 19-20; *see also McDonnell Douglas*, 858 F.2d at 833 (holding that "[h]ad the parties intended to submit all issues regarding the utility's good faith to an arbitrator, we do not believe that they would have chosen a tax counsel").  Here, the

arbitration panel would consist of businessmen who may have experience and expertise in market pricing disputes, but there is no reason to believe they have particular competence in deciding contract interpretation issues.  There is simply no reason to believe that the parties would have referred contract-based claims to such an arbitration panel, and every reason to believe that the panel's purview extended only to financial number-crunching and market analyses.

Second, the location of the arbitration provision in the contract should be considered. *See Coady*, **996 F. Supp. at 107.**  In *Coady*, the Court found that the arbitration provision was part of the compensation section only, and that there was "no separate section regarding arbitration, dispute resolution or grievances." *Id.*  The Court then drew the reasonable conclusion that "[t]he location of the provision suggests that only issues relating to compensation are the subject of arbitration." *Id.*  As in *Coady*, the arbitration provision appears in only one section; there is no other ADR provision in the MSA.  Therefore, the provision's location indicates that arbitration would occur only when a pricing dispute arose at one of the benchmarking meetings.  Here, the parties cannot even agree as to which version of the SAFA should govern such a benchmarking meeting.  As a result, Lycos' First Amended Complaint seeking a determination as to which SAFA would apply in the event a benchmarking meeting is held is several steps removed from the type of dispute governed by this arbitration provision.

Finally, the application of common sense indicates that the parties' arbitration provision does not apply to this particular dispute.  The Court must keep in mind that an arbitration clause "is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, **514 U.S. 938, 943**

- 14 -

(1995).  It is plain that the parties intended only a small subset of financial and pricing disputes to be presented to an arbitration panel consisting of businessmen able to handle such narrow disputes, but no others.  Just as "if the Red Sox' sports announcer says that the batter hit the ball out of the park, everyone knows that a baseball is implied," *Fit Tech*, **374 F.3d at 9**, common sense dictates that the parties did not intend this arbitration clause to cover the disputes set forth in Lycos' First Amended Complaint.  Therefore, T-Data's Motion to Dismiss must be denied.

**II.**    **This Court Has Jurisdiction Over Claims Relating To The Madrid Circuit Dispute**

Because Lycos' claim seeking a declaration as to which SAFA applies to the benchmarking provisions of the MSA clearly meets the amount in controversy requirement and is properly before this court based on diversity, the Court has supplemental jurisdiction over the counts pertaining to the Madrid Circuit even if, as T-Data claims, the amount in dispute on these claims is only **$9,402.64**.  *See Carvalho v. Town of Westport*, **140 F. Supp. 2d 95, 99 (D. Mass. 2001) (Young, J.)**.  While Lycos certainly appreciates T-Data's admission in its papers that its invoices contained an error over-billing Lycos by over $140,000 – an error which, unfortunately, has plagued this relationship – and its representation that it is not seeking payment of this erroneous over-billing, Lycos will continue to maintain both counts related to the Madrid Circuit in their entirety until it receives an amended and corrected invoice crediting it for the undisputed amounts that were over-billed, which so far has not been forthcoming. *See* **Affidavit of Patrick Hetherton ("Hetherton Aff.") filed herewith, at ¶ 2**.  Indeed, contrary to the affidavit of Mr. Salway, Lycos did not learn that T-Data was not demanding payment of $154,000 for the Madrid Circuit until it received T-Data's motion to dismiss.  *See* **Hetherton Aff., ¶ 3**.

**III.     No Other Good Reason Exists For This Court To Decline Jurisdiction**

In a last-ditch effort to convince this Court to decline jurisdiction even if all statutory prerequisites have been met, T-Data asserts numerous unfounded allegations apparently aimed at accusing Lycos of some sort of malfeasance in bringing this action.  T-Data has somehow intuited that Lycos' motivations cannot be anything but underhanded, and that Lycos' claims in this litigation (although valid from any objective viewpoint) are nothing more than a "thinly-disguised contrivance" to secure jurisdiction.

Viewed objectively, it is T-Data and not Lycos that is intent on such machinations.  As explained above, the disputes that are part of Lycos' First Amended Complaint are not "invented," nor are they "insubstantial."  Lycos' counsel did not even become aware that the January 29 SAFA existed until after he sent the January 10, 2005 letter attached to T-Data's motion papers.  Thereafter, he wrote T-Data's counsel a letter dated January 18, 2005 advising T-Data of this discovery and informing him that the January 29 SAFA was in fact operative, a fact T-Data conveniently fails to disclose to the Court.  *See* Bean Aff., Exh. A.

Moreover, the invoice sent by T-Data and received by Lycos on January 12, 2005 containing egregious over-charges was not "invented" by Lycos.  As noted above, Lycos learned for the first time that T-Data was not seeking the entire amount billed when it read T-Data's motion papers.  *See* Hetherton Aff., ¶ 3.

Despite all this, T-Data cites *Brillhart v. Excess Ins. Co.*, **316 U.S. 491 (1942)** in urging the Court to exercise its discretion to dismiss Lycos' declaratory judgment action. However, now that T-Data's Florida collection action has been removed to Federal Court, *Brillhart* clearly does not apply.  *See id.* at 495 ("Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is

pending *in state court* **presenting the same issues. . . .") (emphasis added);** *Chedester v. Town of Whately*, **279 F. Supp. 2d 53, 56 (D. Mass. 2003) (same). Indeed, Lycos has already moved to stay or transfer the Florida case pending disposition of this first-filed action.** *See* **Exhibit B, attached hereto. Thus, no prudential issues exist to justify T-Data's feigned concern for judicial economy.**

**Finally, to the extent T-Data has accused Lycos of trying to "federalize" a "garden-variety state court contract action" and thereby urge the Court to refrain from exercising jurisdiction, the Court need only review its docket to ascertain that Lycos filed its original complaint in state court.** *See* **Docket Entry # 1. It is hypocritical for T-Data to complain about "federalizing" this dispute when T-Data was the party that removed it to this Court.**

<u>CONCLUSION</u>

The arbitration provision contained in the Transaction Documents does not warrant dismissal of this action, both because it is unenforceable as a result of substantive unconscionability for failure to provide a fair and unbiased arbitration process, and because the language of the arbitration provision plainly does not apply to the disputes currently being litigated. There being no other valid basis to dismiss under Rule 12(b)(1), the Court should retain jurisdiction over this matter and deny T-Data's Motion to Dismiss.

Respectfully submitted,

LYCOS, INC.

By its attorneys,


/s/ Erik P. Bartenhagen_____
Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Dated:  February 25, 2005

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for defendant, Barry S. Pollack, Donnelly, Conroy & Gelhaar, LLP, One Beacon Street, 33rd Floor, Boston, MA 02108, by hand on February 25, 2005.

/s/ Erik P. Bartenhagen

1405353.4

- 18 -

EXHIBIT A TO LYCOS, INC.'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

IN THE CIRCUIT COURT OF THE 11ᵀᴴ
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

TELEFONICA DATA USA, INC.,                    CASE NO.

                Plaintiff,                    05 -02111 CA22

vs.

LYCOS, INC.,

                Defendant.

_____/

## COMPLAINT

THE ORIGINAL FILED

ON   JAN 2 8 2005
IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL
CIVIL DIVISION

      Plaintiff Telefonica Data USA, Inc. ("T-Data") hereby sues Defendant Lycos, Inc. ("Lycos"),
and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

      1.    This is an action on an open account and for other relief involving an amount in
controversy in excess of Fifteen Thousand Dollars ($15,000.00) and thus within the jurisdiction of
this Court.

      2.    T-Data  is incorporated under the laws of the State of Florida and has its principal
place of business in Miami, Florida.

      3.    Lycos is incorporated under the laws of Virginia, and has its principal place of
business in Waltham, Massachusetts.

      4.    The Court has personal jurisdiction over Lycos under F.S. 48.193 because Lycos
conducts and solicits business in Florida; it entered into and breached the subject contract in Florida;
and it is engages in substantial and not isolated activity in Florida. Among other things, T-Data and
Lycos entered into agreements whereby T-Data would provide Lycos services out of T-Data's data

center located in Miami-Dade County, Florida. Additionally, pursuant to the T-Data/Lycos agreements, Lycos leased space and placed its equipment in T-Data's Miami-Dade County data center.

5.    Venue is proper pursuant to F.S. § 47.051 because this cause of action accrued in Miami-Dade County.

**FACTS**

6.    Lycos provides Internet products and services to consumers and businesses through its network of online properties. It offers basic search and directory services, as well as a variety of fee-based services that provide users access to value-added content or services. The Company also sells marketing and advertising services to businesses across its properties and services.

7.    T-Data is a data and telecommunications services firm, offering web-server housing, data storage, and other networking and communications services to large volume users.

8.    On or about November 20, 2003, Lycos and T-Data entered into a three year service contract, documented by a "Master Services Agreement." A true and accurate copy of the "Master Services Agreement," is attached hereto as Exhibit A.

9.    Pursuant to Article 4 of the Master Services Agreement, T-Data agreed to provide Lycos certain data storage, web-server housing, and other networking and communications services. In exchange, Lycos agreed to be invoiced on a monthly basis and to make payment on those invoices no later than thirty (30) days after the date of each invoice.

10.    In addition, pursuant to Article 4, Lycos agreed to "be responsible for a pay all reasonable attorneys' fees, court costs and other collection expenses incurred by Telefonica Data" in the event Lycos failed to timely pay its monthly invoices as they came due.

-2-

11.    Lycos has failed to pay certain outstanding sums invoiced under the Master Services Agreement as they came due.  A copy of the T-Data's January 20, 2005 invoice for the all outstanding sums is attached as Exhibit "B." A copy of T-Data's January 25, 2005 "breakdown" of the January 20, 2005 invoice is attached as Exhibit "C."

12.    T-Data has been damaged as result of Lycos's failure to pay on T-Data's invoices, and, as a consequence, T-Data was required to retain the undersigned attorneys to collect the aforementioned debts.

**COUNT I**
**OPEN ACCOUNT**

13.    T-Data repeats and realleges the allegations of paragraph 1 through paragraph 12 of this Complaint.

14.    The Master Services Agreement contemplates a connected series of transactions where T-Data would provide communications services and Lycos would be billed for those services on a monthly basis.

15.    Lycos has failed to pay certain sums, due with interest, as contemplated by the Master Services Agreement, thereby leaving an open account.

16.    Telefonica has demanded that these sums be paid, and all other conditions precedent to this action have been likewise satisfied or waived.

-3-

WHEREFORE, T-Data respectfully requests that this Court enter judgment in its favor for damages, together with costs and interest, attorneys' fees under Article 4 of the Master Services Agreement, and all such other relief as the Court deems just and proper.

Dated: January 28th, 2005.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.
Attorneys for Plaintiff
Suite 2200 - Museum Tower
150 West Flagler Street
Miami, FL 33130
(305) 789-3200 - Telephone
(305) 789-3395 - Facsimile

By: _____
    ALEXANDER ANGUEIRA
    Florida Bar No.
    aangueira@swmwas.com
    CHRISTOPHER L. BARNETT
    Florida Bar No. 0360510
    cbarnett@swmwas.com

G:\W-LIT\36523\043\complaint.wpd

-4-





# MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is entered into by and between Lycos, Inc. ("Customer"); a Massachusetts corporation, and Telefonica Data USA, Inc., a Florida corporation

1.     Telefonica Data Services; Terms & Conditions.  Customer requests the Telefonica Data services ("Services"), which are checked in the table below.  Telefonica Data will render the Services pursuant to the terms and conditions contained in this Agreement and each applicable Exhibit. Telefonica Data may provide Customer with additional Services by executing additional Exhibits, which will be attached hereto and incorporated into this Agreement.  All Services provided under this Agreement or any amendment thereto or to an Exhibit are subject to the attached Master Services Agreement Terms & Conditions, which are hereby incorporated by reference and made a part hereof.

| Exhibit A | ☐ Equipment Purchase | Exhibit G | ☐ Web Hosting |
| Exhibit B | ☐ Equipment Lease | Exhibit H | ☐ Dial Access |
| Exhibit C | ☒ Collocation | Exhibit I | ☐ Frame Relay |
| Exhibit D | ☒ Data Storage | Exhibit J | ☐ IP Transit |
| Exhibit E | ☐ Operations & Maintenance | Exhibit K | ☒ Back-Up |
| Exhibit F | ☐ Virtual LAN | | |

2.     Pricing.  All pricing for Services shall be in accordance with the Strategic Alliance Framework Agreement between Terra Networks, S.A. and Telefonica, S.A. dated January 29, 2003 ("SAFA") and set forth in each Exhibit and Customer shall pay Telefonica Data all recurring and non-recurring fees and other charges for Services rendered in the amounts and in the manner specified therein and in the Master Services Agreement General Terms & Conditions. The Parties agree that the monthly recurring charges set forth in the Exhibits are subject to an annual price reduction of ten percent (10%) and Telefonica Data shall revise such charges accordingly on the anniversary date of each Service.

3.     Benchmarking.  On or about each anniversary of the Effective Date (as defined below) during the Term of this Agreement, the Parties shall meet to review the pricing, quality and charges of the Services.  If the Parties determine that the quality or charges are not in accordance with the principles outlined in the SAFA, Telefonica Data shall adjust the quality and/or charges so that both are in accordance with the principles outlined in the SAFA. If the Parties are unable to agree upon whether the quality and charges are in accordance with the principles of the SAFA or regarding the adjustments necessary to bring the quality and charges in accordance with such principles, the Parties shall follow the dispute resolution provisions set forth in the SAFA to resolve their disagreement.

4.     Term.  This Agreement shall commence on November 1, 2003 ("Effective Date") and shall continue until the third anniversary of the Effective Date, unless terminated earlier in accordance with the Transaction Documents.

5.     Preferred Provider.  The Parties agree that Telefonica Data will be the preferred provider of data center and communications services to Customer during the term of the Agreement.  In the event Customer requires the provision of services similar to the Services and Telefonica Data is willing to provide such services at prices and on terms and conditions similar to the Services, Customer agrees that it will engage Telefonica Data to provide such services.

6.     Entire Agreement; Amendments.  The Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter in this Agreement, and supersede all prior agreements, whether written or oral, with respect to the subject matter contained therein.  The Transaction Documents may be modified only by a written instrument executed by both parties.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]



**EXHIBIT**

A

**IN WITNESS WHEREOF**, the Parties have executed this Agreement through their respective duly authorized officers as of the Effective Date.

| CUSTOMER: LYCOS, INC. | | TELEFONICA DATA USA, INC. | |
|---|---|---|---|
| By: | *(Signature)* | By: | *(Signature)* |
| Printed Name: | | Printed Name: PEP ALZANO | |
| Title: | CFO | Title: CEO | |
| Date: | 11/18/03 | Date: 11-20-03 | |
| Address: | 100 Fifth Avenue Waltham, MA 02451 | Address: | 1221 Brickell Avenue, Suite 600 Miami, Florida 33131 |
| Fax: | | Fax: | |
| E-Mail: | | E-Mail: | |

## [SIGNATURE PAGE TO MASTER SERVICES AGREEMENT]

## MASTER SERVICES AGREEMENT TERMS & CONDITIONS

**1.  DEFINITIONS.**

**1.1.  Certain Definitions.**  The following terms shall have the following definitions:

(a)  "Affiliate" shall mean, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity, whether directly or indirectly through one or more intermediaries.

(b)  "Agreement" shall mean the Master Services Agreement, together with these Master Services Agreement General Terms and Conditions.

(c)  "Business Day" or "business day" shall mean any day on which banks are open for the transaction of banking business in the State of New York, United States of America.

(d)  "Confidential Information" shall mean all information, in any form, disclosed by the disclosing Party to the other Party which:

(i)  concerns the operations, plans, know-how, trade secrets, business affairs, personnel, customers or suppliers of the disclosing Party; or

(ii)  the receiving Party knows or might reasonably expect is regarded by the disclosing Party as the confidential information of the disclosing Party;

(iii)  is designated as confidential, restricted, proprietary, or with similar designation; or

(iv)  concerns any of the terms or conditions or other facts with respect to the Transaction Documents.

(e)  "Control" and its derivatives shall mean legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding voting capital stock (or other ownership interest, if not a corporation) of an entity, or actual managerial or operational control over such entity.

(f)  "Days" or "days" shall mean calendar days unless otherwise specified.

(g)  "Effective Date" shall have the meaning set forth in Section 3 of the first page of the Master Service Agreement.

(h)  "End User" shall mean the person or entity to which Customer resells or provides equipment, services or space pursuant to the terms of the Transaction Documents.

(i)  "Equipment" shall mean the equipment, if any, provided by Telefonica to Customer pursuant to an Exhibit.

(j)  "Events of Default" shall mean any of the following:

(i)  any representation or warranty made by a Party to the Transaction Documents which was incorrect in any respect when made and that could reasonably be expected to have a material adverse effect upon the other Party's ability to realize the benefits of the Transaction Documents;

(ii)  a material breach of the Transaction Documents that is capable of being cured on commercially reasonable terms within thirty (30) Days, which breach is not cured within thirty (30) Days after notice of breach to the breaching Party;

(iii)  a material breach of the Transaction Documents that is not capable of being cured within thirty (30) Days and the breaching Party fails to (A) proceed promptly and diligently after written notice to correct the breach, (B) develop within fifteen (15) Days following written notice of breach a complete plan for curing the breach, and (C) cure the breach within sixty (60) Days after notice thereof;

(iv)  Customer's failure to make any payment or any other amount when such payment or amount is due in accordance with any Transaction Document, which breach is not cured within five (5) business days after notice thereof; or

(v)  a material breach of the Transaction Documents that is not capable of being cured.

(k)  "Intellectual Property Rights" shall mean all intellectual property rights, including by way of explanation, but not by limitation,

those statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights.

(l)  "Losses" shall mean liabilities, damages and related costs and expenses, including fines, levies, assessments, reasonable legal fees, and disbursements and costs of investigations, litigation, settlement, judgment, interest and penalties.

(m)  "Parties" shall mean Customer and Telefonica Data, together.

(n)  "Party" shall mean Customer or Telefonica Data, individually, as appropriate.

(o)  "Service" shall mean any of the services Telefonica Data provides Customer pursuant to an Exhibit.

(p)  "Telefonica Data Network" shall mean Telefonica Data's and/or its Affiliates IP backbone network.

(q)  "Term" shall have the meaning set forth in Article 3 of the Master Service Agreement.

(r)  "Transaction Documents" shall mean the Agreement, and all Exhibits and Schedules thereto.

**1.2.  Other Definitions.**  Other terms used in this Agreement are defined in the context in which they are used and have the meanings there stated or are defined in the applicable Transaction Document.

**2.  END USER CHARGES.**  If, pursuant to the terms and conditions of the Transaction Documents, Customer resells the Service(s) ordered by Customer from Telefonica Data, Customer shall have the right to establish, in its sole discretion, the prices it charges End Users for the Service(s) resold pursuant to the Transaction Documents.

**3.  NETWORK INTEGRITY.**

**3.1.  Non-Interference.**  Neither Customer nor its End Users, suppliers, contractors, licensors or licensees shall restrict or interfere with the Telefonica Data Network or the maintenance or use thereof. Upon notice, Customer shall promptly remove any hazard, interference or service obstruction that may be caused by equipment (including Equipment), hardware, software, content or connectivity, owned by or under the control of Customer or its End Users or transmitted through the Telefonica Data Network.

**3.2.  Remedy.**  In the event that Customer or its End Users, suppliers, licensors or licensees restrict or interfere with the Telefonica Data Network or the use thereof, Telefonica Data may, after giving Customer reasonable notice, immediately modify, suspend, delay, condition, or cease until such restriction or interference is cured, performance of its obligations under the Transaction Documents, in whole or in part, to the extent reasonably necessary to remedy such restriction or interference.

**3.3.  Liens.**  Customer shall not, directly or indirectly, cause any Telefonica Data property (including the Telefonica Data Network) to become subject to any mechanic's lien, materialman's lien, vendor's lien or any similar lien, whether by operation of law or otherwise. If Customer becomes aware that it has breached its obligations under this Section, it shall promptly notify Telefonica Data in writing, cause such lien to be discharged and released of record without cost to the other, as soon as reasonably possible, and indemnify Telefonica Data against all related Losses.

**4.  PAYMENT TERMS.**

**4.1.  Payment.**  Telefonica Data shall provide the Equipment and perform the Services set forth in the Exhibits in accordance with the provisions of the Transaction Documents and Customer shall pay all recurring, non-recurring and other charges for Equipment and/or Services as may be set forth in the Transaction Documents. Unless otherwise provided for in the attached Exhibits, the fees due pursuant to the Transaction Documents shall be payable in accordance with the payment terms in this Article 4. Telefonica Data shall render invoices for Services rendered to Customer on a monthly basis. Payment shall be due and payable no later than thirty (30) days after the date of the invoice. Customer shall make payments under the Transaction Documents by wire transfer of immediately available funds to the United States account or accounts designated by Telefonica Data. At

...ica Data's discretion, payments to be made pursuant to ...tion Documents may be made by check or draft of immediate ...ds delivered to the address designated in writing by Telefonica ...If payment is not paid when due shall be assessed interest at a ...rate equal to one percent (1.0%) or the maximum rate allowed ...chever is less, from the date the payment was due. If Telefonica ...mences legal proceedings to collect any payment due to it under ...the Transaction Documents, Customer shall be responsible for all ...all reasonable attorneys' fees, court costs and other collection expenses ...ed by Telefonica Data.

    Customer Responsibilities.  Except as specifically provided for in a ...transaction Document, Customer shall have sole responsibility for the ...costs, expenses and deployment of any interconnection, installation and ...esting necessary to use the Equipment and Services provided herein.  In no ...event will the untimely installation or faulty non-operation of Customer's ...Equipment relieve Customer of its obligation to pay charges for the ...Services.  In addition, delays or failures in obtaining payments from End ...Users shall not affect Customer's obligation to make payments hereunder to ...Telefonica Data.  Customer is responsible for amounts it cannot collect ...from End Users.

...3.  Taxes.  All charges to Customer are calculated exclusive of any ...applicable federal, state or local use, excise, value-added, gross receipts, ...sales and privilege taxes, duties, universal service assessments or similar ...liabilities (other than general income or property taxes imposed on ...Telefonica Data) associated with the Services or Equipment, whether ...charged to Telefonica Data, its suppliers or Affiliates, Customer or End ...User ("Additional Charges").  Such Additional Charges shall be paid by ...Customer in addition to all other charges provided for in the Transaction ...Documents, except to the extent Customer provides to Telefonica Data, ...prior to the shipping of Equipment or commencement of Services, as ...applicable, a valid tax exemption certificate for all federal, state and local ...jurisdictions relevant to the Equipment and/or Service.

5.    INTELLECTUAL PROPERTY.  Each Party retains all right, title ...and interest in and to its respective Intellectual Property Rights.  No licenses ...will be deemed to have been granted by either Party to any of its Intellectual ...Property Rights, except as otherwise expressly authorized in the Transaction ...Documents

6.    CONFIDENTIALITY.

6.1.  Confidential Information.  Each Party acknowledges that after ...execution of the Transaction Documents, they may be furnished with, ...receive, or otherwise have access to Confidential Information of the other ...Party.

6.2.  Exclusion.  Confidential Information excludes any particular ...information that the receiving Party can demonstrate:

    (a)   at the time of disclosure, was in the public domain or in the ...possession of the receiving Party;

    (b)   after disclosure, is published or otherwise becomes part of the ...public domain through no fault of the receiving Party;

    (c)   was received after disclosure from a third party who had a lawful ...right to disclose such information to the receiving Party without any ...obligation to restrict its further use or disclosure;

    (d)   was independently developed by the receiving Party without ...reference to Confidential Information of the disclosing Party; or

    (e)   was required to be disclosed to satisfy a legal requirement of a ...competent government body.

6.3.  Obligations.  The following obligations with respect to Confidential ...Information shall survive the expiration or termination of this Agreement ...for a period of three (3) years or such longer period as required by ...regulation, law or court order.

...(a).  Ongoing Obligation.  Each Party's Confidential Information shall ...remain the property of that Party.  Except as may otherwise be required by ...law or expressly authorized herein, neither Party shall disclose the ...confidential information of the other Party to any third party without the ...prior written consent of such other Party.  Each Party shall use at least the ...same degree of care, but in any event no less than a reasonable degree of ...care, to prevent unauthorized disclosure of Confidential Information as it ...employs to avoid unauthorized disclosure of its own Confidential ...Information of a similar nature.  Except as otherwise permitted hereunder, ...the Parties may disclose such information to entities performing services

...quired hereunder where: (i) one of such entity is authorized under the ...Transaction Documents; (ii) such disclosure is necessary or otherwise ...naturally occurs in that entity's scope of responsibility; and (iii) the entity ...agrees in writing to assume the obligations described in this Article.  Any ...disclosure to such entity shall be under the terms and conditions of this ...Article.

    (b)   Remedial Measures for Disclosure.  Each Party shall take ...reasonable steps to ensure that its employees comply with this Article.  In ...the event of any disclosure or loss of, or inability to account for, any ...Confidential information of the disclosing Party, the receiving Party shall ...promptly, and at its own expense notify the disclosing Party in writing, and ...take such actions as may be necessary and cooperate in all reasonable ...respects with the disclosing Party to minimize the violation and any damage ...resulting therefrom.

    (c)   Permitted Disclosures.  Except as otherwise provided herein, ...either Party may disclose the terms and conditions of these Transaction ...Documents to third parties that (i) have expressed a bona fide interest in ...consummating a significant financing, merger or acquisition transaction ...between such third parties and such Party, (ii) have a reasonable ability ...(financial and otherwise) to consummate such transaction, and (iii) have ...executed a nondisclosure agreement that includes within its scope the terms ...and conditions of this Article or substantially similar terms and conditions ...and also includes a procedure to limit the extent of copying and distribution ...of these Transaction Documents.  Each Party shall endeavor to delay the ...disclosure of the terms and conditions of this Agreement until the status of ...discussions concerning such transaction warrants such disclosure.

    (d)   Required Disclosures.  A Party receiving a request under Section ...6.2(e) to disclose Confidential Information shall immediately upon ...receiving such request, and to the extent that it may legally do so, advise the ...disclosing Party promptly and prior to making such disclosure in order that ...the disclosing Party may interpose an objection to such disclosure, take ...action to assure confidential handling of the Confidential information, or ...take such other action as it deems appropriate to protect the Confidential ...Information

6.4.  No Implied Rights.  Nothing contained in this Article shall be ...construed as obligating a Party to disclose its Confidential Information to ...the other, or as granting to or conferring on a Party any express or implied ...right or license to the Confidential Information of the other Party.

7.    TERMINATION.

7.1.  Default.

    (a)   In the event that either Party commits an Event of Default under ...Sections 1.1(i)(i), (iv) or (v), then the other Party may, by giving written ...notice to the defaulting Party, immediately terminate the applicable ...Transaction Document.

    (b)   In the event that either Party commits an Event of Default under ...Sections 1.1(i)(ii) or (iii), then the other Party may, by giving written notice ...to the defaulting Party, terminate the applicable Transaction Document ...upon the expiration of the applicable cure period.

    (c)   In addition to the right to terminate pursuant to subsections (a) ...and (b) above, the non-defaulting party may pursue any legal remedies it ...may have under applicable law or principles of equity relating to such ...breach and subject to the terms of this Section.

7.2.  Insolvency.  Either Party may immediately terminate the Transaction ...Documents if the other Party (a) ceases to do business in the normal course ...for a continuous period of at least thirty (30) Days; (b) becomes or is ...declared insolvent or bankrupt; (c) is the subject of any proceeding related ...to its liquidation or insolvency (whether voluntarily or involuntarily) which ...is not dismissed within ninety (90) Days; (d) makes an assignment for the ...benefit of creditors; (e) experiences a material adverse change in financial ...condition which may reasonably be expected to affect its ability to perform; ...or (f) fails to comply with a written request for reasonable assurance within ...ten (10) Days or otherwise repudiates the Transaction Documents.

7.3.  Effect of Termination.  Termination of the Transaction Documents ...refers to the termination of the Parties' respective commitments and ...obligations from and after the date of termination, but does not relieve the ...Parties of their payment and other obligations incurred prior to the date of ...termination.

7.4.  Termination Assistance Services.  Upon the termination or ...expiration of the Agreement, Telefonica Data agrees to provide Termination ...Assistance Services consisting of continuation of any part or all of the

Page 4

Services ... Customer, for up to eighteen (18) months following the termination or expiration of this Agreement. Termination Assistance Services shall be provided subject to, and in accordance with, the terms and conditions of this Agreement, except for the charges for such Termination Assistance Services, which such charges the Parties will mutually agree upon at the commencement of the Termination Assistance Services. The Parties agree that the charges for such Termination Assistance Services will be in accordance with the pricing principles of SAFA. In the event of termination resulting from an unremedied breach by Customer, Telefonica Data shall be obligated to provide Termination Assistance Services only so long as Customer pays for Services that are part of such Termination Assistance Services monthly in advance of the date the Services are to be provided.

**7.5 Shutdown/Transfer of Data Center.** In the event that during the Term of this Agreement the Telefonica Data data center located at 11300 N.W. 25th Street, Miami, Florida 33172 (the "Data Center") is to be shutdown or transferred to a non-Affiliate of Telefonica Data requiring Customer to move its technology infrastructure located at the Data Center to another location, Telefonica Data agrees (a) to provide Customer with notice of such event as soon as practicable and in any event at least sixty (60) days prior to the shut down or transfer, and (b) pay Customer the lesser of (i) Customer's Migration Costs, as defined below, and (ii) One Million Dollars ($1,000,000). Telefonica Data agrees to pay such amount within thirty (30) days of its receipt of an itemized invoice from Customer, together with supporting documentation, of its Migration Costs. For purposes of this Section, "Migration Costs" means the reasonable migration costs actually incurred by Customer to move its infrastructure to the new location, including, but not limited to, the costs of the physical move of Customer's infrastructure (breakdown, package, transport, delivery and reassembly), the costs of communication links between the Data Center and the new location during the migration period, the costs of professional services to supervise and oversee the migration and the costs of any necessary "swing gear" purchased or leased by Customer in connection with the migration.

**7.6 Wrongful Termination of Transaction Documents by Customer.** In the event Customer wrongfully terminates the Transaction Documents at any time prior to the expiration of the Term, then, in addition to any other damages for which Customer may be liable under the terms of the Transaction Documents, Customer agrees to pay Telefonica Data the product of Five Hundred Thousand Dollars ($500,000) times a fraction, the denominator of which is thirty-four (34) and the numerator of which is thirty-four (34) minus the number of months since the inception of the Term that Customer has paid the undisputed monthly recurring charges under the Transaction Documents, as reimbursement for the capital expenditures made by Telefonica Data to provide Customer the Services. Customer agrees to pay such amount within thirty days of the date of Customer's wrongful termination of the Transaction Documents.

**8. REPRESENTATIONS; WARRANTIES; DISCLAIMERS.**

**8.1 Representations.** Each Party represents and warrants to the other Party that:

(a) it has the requisite corporate power and authority to enter into the Transaction Documents and to carry out the transactions contemplated by the Transaction Documents;

(b) the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated by the Transaction Documents have been duly authorized by the requisite corporate action on its part; and

(c) the Transaction Documents have been duly executed and delivered, and create lawful, valid and legally binding obligations, in accordance with their respective terms.

Additionally, Telefonica Data represents and warrants to Customer that as of the Effective Date Telefonica Data possesses sufficient ownership rights, title, and interests, and/or licenses, and the ability to offer and provide the Services, including without limitation, all intellectual property rights and third party consents, during the Term.

**8.2 Third Party Warranties.** Telefonica Data shall pass through to Customer all warranties covering Equipment and/or Services provided under the Transaction Documents to the extent that Telefonica Data is able pursuant to the agreements under which it obtained the warranties.

**8.3** ... CUSTOMER SHALL NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, WHETHER WRITTEN OR ORAL, TO THIRD PARTIES INCLUDING WITHOUT LIMITATION, ENDORSING OR ON TELEFONICA DATA'S BEHALF THAT ARE NOT EXPRESSLY AUTHORIZED HEREIN OR THAT MATERIALLY DEPART FROM ANY APPLICABLE SERVICE LEVEL COMMITMENT IN ANY TRANSACTION DOCUMENT.

**8.4 Disclaimers.**

(a) EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN A TRANSACTION DOCUMENT, ANY EQUIPMENT OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS ARE PROVIDED "AS IS" AND "AS AVAILABLE", AND NEITHER TELEFONICA DATA NOR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS MAKE ANY WARRANTIES TO CUSTOMER OR TO ANY OTHER THIRD PARTY INCLUDING, WITHOUT LIMITATION, END USER, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT RELATING TO ANYTHING PROVIDED OR USED UNDER THE TRANSACTION DOCUMENTS OR DESCRIBED THEREIN, AND ANY SERVICES, EQUIPMENT, MATERIAL, GOODS, REAL ESTATE OR OTHER TANGIBLE OR INTANGIBLE ASSET THAT IS CONVEYED, HYPOTHECATED, LEASED, SOLD, OR OTHERWISE PROVIDED TO CUSTOMER IN ANY MANNER, OR AS TO ANY OTHER MATTER, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED.

(b) WITHOUT LIMITING THE FOREGOING DISCLAIMER, TELEFONICA DATA FURTHER MAKES NO WARRANTIES, REPRESENTATIONS OR ENDORSEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, REGARDING ANY MERCHANDISE, INFORMATION, PRODUCTS OR SERVICES PROVIDED THROUGH THE INTERNET OR ANY OTHER NETWORK. FURTHERMORE, TELEFONICA DATA HEREBY DISCLAIMS THAT ANY EQUIPMENT, PRODUCTS OR SERVICES PROVIDED UNDER THE TRANSACTION DOCUMENTS WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT CERTAIN RESULTS MAY BE OBTAINED BY ANYONE IN CONNECTION WITH THEIR USE.

**8.5 Use.** Telefonica Data shall provide, and Customer shall use, all Equipment and Services in accordance with all applicable laws and regulations.

**8.6 Provisioning Services.** Telefonica Data may, with the prior consent of Customer, which shall not be unreasonably withheld, conditioned or delayed, provide or perform such Services through Affiliates, subcontractors or authorized agents. Notwithstanding the foregoing, Telefonica Data shall remain liable for the performance of its and its Affiliates', subcontractors' and authorized agents' obligations under the Transaction Documents.

**9. LIABILITY.**

**9.1 General Intent.** Subject to the specific provisions of this Article, it is the intent of the Parties that each shall be liable to the other only for any direct damages incurred by the non-breaking Party as a result of the breaking Party's failure to perform its obligations in the manner required by the Transaction Documents.

**9.2 Liability Restrictions.**

(a) NOTWITHSTANDING ANYTHING IN THE TRANSACTION DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ASSIGNS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, INCLUDING, BY WAY OF EXAMPLE AND NOT LIMITATION, LOSS OF REVENUE, INCOME, PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE, WHETHER SUCH CLAIM IS CHOATE OR INCHOATE, WHETHER BY STATUTE, IN TORT, OR IN CONTRACT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR CONTENT THAT IS TRANSMITTED BY CUSTOMER OR THIRD PARTIES INCLUDING, WITHOUT

(c) IN NO EVENT SHALL TELEFONICA DATA, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR ASSIGNS BE LIABLE FOR ANY DEFECT, ERROR, INTERRUPTION, DELAY, OR ATTENUATION OF SERVICES CAUSED BY OR RESULTING FROM ANY EQUIPMENT NOT OWNED BY TELEFONICA DATA AND USED BY CUSTOMER OR AN END USER.

(d) FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED UNDER ANY TRANSACTION DOCUMENT, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER. CUSTOMER'S REMEDIES SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID UNDER ANY TRANSACTION DOCUMENT ARE LIQUIDATED, CUSTOMER ACKNOWLEDGES THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OBTAINING AN ADEQUATE REMEDY IS OTHERWISE INCONVENIENT, AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS. CUSTOMER CONFIRMS THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THE TRANSACTION DOCUMENTS SATISFY THE ESSENTIAL PURPOSES THEREOF.

(e) EACH PARTY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF (I) ACTUAL DIRECT DAMAGES OR (II) TWO MILLION DOLLARS ($2,000,000).

(f) THE LIMITATION SET FORTH IN SECTION 9.2(e) SHALL NOT APPLY WITH RESPECT TO (I) THIRD PARTY CLAIMS SUBJECT TO INDEMNIFICATION PURSUANT TO THE TRANSACTION DOCUMENTS; (II) FEES DUE AND OWING UNDER THE TRANSACTION DOCUMENTS FOR SERVICES ALREADY RENDERED OR (III) CLAIMS ARISING OUT OF A BREACH OF ANY CONFIDENTIALITY PROVISIONS.

(g) FOR PURPOSES OF THIS SECTION AND SUBJECT TO SECTION 9.2(f), ALL AMOUNTS PAYABLE OR PAID TO THIRD PARTIES IN CONNECTION WITH CLAIMS THAT ARE ELIGIBLE FOR INDEMNIFICATION PURSUANT TO THIS AGREEMENT SHALL BE DEEMED DIRECT DAMAGES.

**9.3    Force Majeure.**

(a) Neither Party shall be liable for any default or delay in the performance of its obligations under the Transaction Documents if and to the extent such default or delay is caused, directly or indirectly, by fire, explosion, cable cuts, vandalism, sabotage, power outage, flood, lightning, earthquake, elements of nature or "acts of God", war, riots, any civil or military authority (by national emergency or acts of third parties), civil disorders, rebellions, revolutions, insurrections, or acts of terrorism, naturally occurring or man-made obstructions to transmissions, provided the existence of such obstruction is beyond the responsible Party's control, lack of or delay in transportation, governmental obstructions to transmissions, governmental codes, ordinances, laws, rules, regulations or restrictions, provided that such default or delay could not have been prevented by reasonable precautions by the Party with the obligation to perform and cannot be reasonably circumvented by the Party with the obligation to perform through the use of alternate sources, workaround plans or other means (a "Force Majeure Event").

(b) In such event, the Party with the obligation to perform shall as soon as practicable give written notice to the other Party specifying the nature and anticipated duration of the Force Majeure Event and outline its recovery plan, if any. The Party with the obligation to perform shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent reasonably practicable without delay.

(c) The other Party may terminate all or any portion of the applicable Transaction Document if a Force Majeure Event continues for forty-five (45) days. In the event of such a termination, the terminating Party shall be obligated to pay for services properly performed up through the date of termination.

**10.    INDEMNIFICATION.**

**10.1    Parties' Obligations.**

(a) **Mutual Obligations.** Each party shall, at its expense, indemnify, defend and hold harmless the other Party and its Affiliates, as well as its officers, directors, employees, managers, contractors, agents, successors, and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of the following:

(i) the death or bodily injury of any agent, employee, customer, business invitee or any other person caused by the tortious conduct of the indemnifying Party;

(ii) the damage, loss or destruction of any real or tangible personal property resulting from the negligence or willful misconduct of the indemnifying Party or from the malfunction or failure of the indemnifying Party's equipment;

(iii) taxes, together with interest and penalties, that are the responsibility of the other Party;

(iv) claims by government regulators or agencies for fines, penalties, sanctions or other remedies arising from or in connection with a Party's failure to perform its responsibilities under this Agreement; and

(v) breach of any representation or warranty set forth in the Transaction Documents.

(b) **Customer's Obligations.** Customer shall, at its expense, indemnify, defend and hold harmless Telefonica Data and its Affiliates, as well as their officers, directors, employees, managers, contractors, agents, successors and assigns, from third party claims for any and all Losses and threatened Losses, arising from, relating to, incurred in connection with, or based on allegations of Customer's use of the Services, Equipment and Products provided under the Transaction Documents including without limitation, such Losses or threatened Losses arising from, related to, incurred in connection with, or based on allegations of any of the following:

(i) any misuse of the Equipment or Services by Customer or an End User;

(ii) any use by Customer or an End User of non-Telefonica Data furnished products or services, facilities, equipment and/or software with any Equipment or Service not recommended or otherwise approved in writing by Telefonica Data; or

(iii) any transmission of content not supplied by Telefonica Data over or through the Telefonica Data Network or system.

**10.2    Intellectual Property Rights.**

(a) **Obligations.** Each Party shall, at its expense, indemnify, defend and hold harmless the other Party, and the other Party's Affiliates, officers, directors, employees, managers, contractors, agents, successors, and assigns, from and against any Losses and threatened Losses arising from, in connection with or based on any allegations arising under the Transaction Documents of infringement or misappropriation of any Intellectual Property Rights of the owning or controlling Party or any third party, except to the extent that any such allegations arise from (i) modification of such products or services, or any component thereof, by the Indemnified Party that is not recommended or otherwise approved by the indemnifying Party; or (ii) use of the products or services by Indemnified Party in combination with deliverables furnished by third parties that is not recommended or otherwise approved by Indemnifying Party, to the extent that any such claim or allegation is directed to such combination.

(b) **Exclusive Liability and Remedy.** If any Service provided under any Transaction Document has become (or in Telefonica Data's reasonable judgment is likely to become) the subject of a third party infringement claim, Telefonica Data may, at its sole discretion and without further liability, do any of the following, which, together with the obligations set forth under Section 10.2(a) above, shall constitute Telefonica Data's sole obligation to Customer hereunder and Customer's exclusive remedy against Telefonica Data:

(i) at Telefonica Data's cost, obtain for Customer the right to continue use of the Service; or

(ii) at Telefonica Data's cost, replace or modify the Service so that it no longer is subject to the third party infringement claim.

**10.3    Procedure.** The Party to be indemnified under Section 10.1 or 10.2 ("Indemnitee") shall promptly notify the indemnifying Party under Section 10.1 or 10.2 ("Indemnitor") in writing of any claim for indemnification.

...Indemnitor shall have sole control of the defense and all ... negotiations with respect to the claim. The Indemnitee ... the right but not the obligation, to participate in the defense ... such claim or action through counsel of its own choosing at ... expense; provided, however, that if the Indemnitor fails to promptly ... the defense of a claim, the Indemnitee may assume the defense ... Indemnitor's cost and expense. The Indemnitee shall cooperate ... execute all documents necessary for the defense of such claim ... Indemnitee shall have the right to approve settlement of any claim ... approval not to be unreasonably withheld or delayed, provided that ... Indemnitee shall not be required to approve any settlement that involves ... admission of liability or wrongful conduct on the part of the Indemnitee ... restricts its ability to conduct its business in any material respect. In the ... event the Parties agree to settle a claim, neither Party shall publicize the ... settlement without first obtaining the written permission of the other Party ... which permission will not be unreasonably withheld or delayed.

## 11   GENERAL.

### 11.1  Binding Nature and Assignment.

(a)   The Transaction Documents shall accrue to the benefit of and be ... binding upon the Parties and any permitted purchaser or any successor ... entity in which either Party has been merged or consolidated or to which ... either Party has sold or transferred all or substantially all of its assets.

(b)   Except as otherwise expressly provided in a Transaction ... Document, neither Party may, or shall have the power to, assign the ... Transaction Documents or delegate such Party's obligations hereunder, in ... whole or in part, without the prior written consent of the other, except that ... either Party may assign its rights and obligations under the Transaction ... Documents without the approval of the other Party to

(i)   an entity that acquires all or substantially all of the assets ... of such Party,

(ii)   to any Affiliate, in which event the assignor shall remain ... liable as a guarantor of the assignee/Affiliate's performance of such Party's ... obligations hereunder, or

(iii)   to a successor in a merger or acquisition, provided that ... such an assignee has the financial, technical and management capacity to ... perform all of the assignor's obligations hereunder.

### 11.2  Notices.

Any notices, requests, demands, and determinations under ... this Agreement (other than routine operational communications) shall be in ... writing and shall be deemed duly given (a) when delivered by hand, (b) one ... (1) Business Day after being transmitted via an express, overnight courier ... with a reliable system for tracking delivery, delivery costs paid (c) when ... sent by confirmed facsimile or email with a copy delivered by another ... means specified in this Section, or (d) on the day an authorized employee of ... the receiving party accepts receipt in writing, when mailed by United States ... mail, registered or certified mail, return receipt requested, postage prepaid, ... to the address listed on the first page of the Master Services Agreement. A ... Party may from time to time change its address or designee for notice ... purposes by giving the other prior written notice of the new address or ... designee and the date upon which it will become effective.

### 11.3  Counterparts.

The Transaction Documents may be executed in ... counterparts, all of which taken together shall constitute one single ... agreement between the Parties.

### 11.4  Relationship of Parties.

The Parties are independent contractors, ... bound to each other only as provided for herein. Neither Party has the ... authority to bind, act on behalf of or represent the other. Nothing in the ... Transaction Documents creates a relationship of partnership, employer and ... employee, principal and agent, master and servant, or franchisor and ... franchisee. Neither Party shall act or fail to act in a way that could ... reasonably cause others to believe that it has authority to act on behalf of the ... other beyond the authority expressly granted herein.

### 11.5  Severability and Modification.

(a)   In the event that any provision of the Transaction Documents ... conflicts with the law under which the Transaction Documents are to be ... construed or if any such provision is held invalid by an arbitrator or a court ... with jurisdiction over the Parties, such provision shall be deemed to be ... modified to reflect as nearly as possible the original intentions of the Parties ... in accordance with applicable law. The remainder of the Transaction ... Documents shall remain in full force and effect.

(b)   If any state or federal body of competent jurisdiction ... that any provision of the Transaction Documents violates any ... rules, policies, or regulations, both Parties shall make reasonable efforts ... promptly bring the Transaction Documents into compliance ... endeavor in their efforts to preserve for both Parties the economic ... as reflected in the Transaction Documents to the maximum extent possible.

### 11.6  Consents and Approval.

Except where expressly provided either ... in the sole discretion of a Party, where agreement, approval, acceptance ... consent, or similar action by either Party is required under the Transaction ... Documents, such action shall not be unreasonably delayed, conditioned or ... withheld. An approval or consent given by a Party under the Transaction ... Documents shall not relieve the other Party from responsibility for ... complying with the requirements of the Transaction Documents, nor shall it ... be construed as a waiver of any rights under the Transaction Documents ... except as and to the extent otherwise expressly provided in such approval or ... consent.

### 11.7  Waiver of Default.

No waiver or discharge hereof shall be valid ... unless in writing and signed by an authorized representative of the Party ... against which such amendment, waiver, or discharge is sought to be ... enforced. A delay or omission by either Party hereto to exercise any right ... or power under the Transaction Documents shall not be construed to be a ... waiver thereof. A waiver by either of the Parties of any of the covenants to ... be performed by the other or any breach thereof shall not be construed to be ... a waiver of any succeeding breach thereof or of any other covenant.

### 11.8  Cumulative Remedies.

Except as otherwise expressly provided, all ... remedies provided for in the Transaction Documents shall be cumulative ... and in addition to and not in lieu of any other remedies available to either ... Party at law, in equity or otherwise.

### 11.9  Survival.

Any provision of the Transaction Documents that ... contemplates performance or observance subsequent to any termination or ... expiration of the Transaction Documents (in whole or in part) shall survive ... any termination or expiration of the Transaction Documents (in whole or in ... part, as applicable) and continue in full force and effect.

### 11.10  Public Disclosures.

Any public use of a Party's name, trademark, ... service mark or trade dress, as well as all media releases, public ... announcements, and public disclosures relating to this Agreement or the ... subject matter of this Agreement, including promotional or marketing ... material, but not including announcements intended solely for internal ... distribution or disclosures to the extent required to meet legal or regulatory ... requirements beyond the reasonable control of the disclosing Party, shall be ... coordinated with and shall be subject to the prior written approval by each ... Party prior to release.

### 11.11  Third Party Beneficiaries.

Except as otherwise provided in the ... Transaction Documents, the Transaction Documents shall not be deemed to ... create any rights in third parties, including End Users, suppliers and ... customers of a Party, or to create any obligations of a Party to any such ... third parties, or to give any right to either Party to enforce this Agreement ... on behalf of a third party.

### 11.12  Governing Law and Prevailing Party.

The Transaction Documents ... and performance under them shall be governed by and construed in ... accordance with the laws of the State of New York, without regard to its ... choice of law principles or the Convention on Contracts for the International ... Sale of Goods. In the event of any dispute between the Parties concerning ... the Transaction Documents, the parties agree that the prevailing Party in any ... such dispute shall be reimbursed for, and the non-prevailing Party shall pay, ... the reasonable attorneys' fees and expenses of the prevailing Party.

### 11.13  Amendment.

The Transaction Documents shall not be modified, ... amended or in any way altered except by an instrument in writing signed by ... both Parties.

### 11.14  Incorporation by Reference and Order of Precedence.

(a)   All Exhibits and Schedules are incorporated by reference into ... this Agreement. Any amendments to this Agreement (including with ... respect to exhibits and schedules) that are agreed upon by the Parties ... subsequent to the Effective Date, shall likewise be incorporated by ... reference into this Agreement.

(b)   Any conflict among or between the documents making up the ... Transaction Documents will be resolved in accordance with the following ... order of precedence (in descending order of precedence):

(i)   the Schedules,

(ii) the Exhibit

(iii) this Agreement

11.15. Export Control. The [illegible] products, including items to be resold [illegible] Confidential Information may be subject to [illegible] government export and/or import laws, rules, policies [illegible] and regulations. The Parties represent and warrant [illegible] comply with all applicable governmental laws, statutes, orders [illegible] administrative orders, procedures, policies, rules, regulations and [illegible] including, without limitation, those related to the export and/or [illegible] of encryption items and technical materials. Each Party shall provide [illegible] other Party with prompt written notice of any export or import restrictions relating to the products and/or Confidential Information.



January 20, 2005

**BY FACSIMILE (781.370.3433),**
**E-MAIL (dean.batten@lycos-inc.com) and**
**Overnight Courier**

Mr. Dean Batten
Director of Operations
Lycos, Inc.
Waltham, MA 02451

     Re:    Breach of Master Services Agreement dated November 2003

Dear Mr. Batten:

     Pursuant to Section 1.1(j)(iv) of the Master Services Agreement ("MSA") executed in November 2003 by and between Telefonica Data USA, Inc. ("TDUSA") and Lycos, Inc. ("Lycos"), TDUSA hereby serves notice that Lycos is in breach of its payment obligations under the terms of Section 4.1 of the MSA for Lycos' failure to pay undisputed charges in the amount of $839,645.82 when due. This amount does not include interest as set forth in this section, which is also due.

     Accordingly, TDUSA hereby demands that Lycos pay the above amount, plus applicable interest, on or before January 27, 2005.

                            Sincerely,

                            David Salway
                            Director of Service Management
                            Enterprise Accounts

cc:    Patrick Hetherton





January 25, 2005

**BY E-MAIL (dean.batten@lycos-inc.com)**

Mr. Dean Batten
Director of Operations
Lycos, Inc.
Waltham, MA 02451

      Re:   Your Letter of January 24, 2005

Dear Mr. Batten:

      I received your letter of January 24, 2005. I am perplexed by your request given that you can read the agreements signed by Lycos and Telefonica and determine the amounts that are due Telefonica. However, as Lycos has repeatedly refused to pay undisputed amount when due, your request does not surprise me. It is just another disingenuous attempt by Lycos to delay paying amounts it owes Telefonica.

      In any event, here is a breakdown of the amounts owed by Lycos for the months of October, November and December 2004 as reflected in the invoices and credit memos previously sent to Lycos:

**October 2004 Charges Due 01-14-05**
**(10/1 through 10/31)**

**Taxable Items:**

| | |
|---|---:|
| Space (3297 sq ft @$27/sq ft): | $89,019.00 |
| Power (64 [208 volt, 30 amp] power whips @ $300/whip) | $19,200.00 |
| Power ( 70 [110 volt, 20 amp] power whips @ $200/whip) | $14,000.00 |
| Bandwidth (364.44 @ $100/mbps) | $36,444.00 |
| Madrid Circuit ($11,000/month) | $11,000.00 |
| Domestic WAN ($31,500/month) | $31,500.00 |
| Akamai | $58,833.33 |
| Two Telephone Lines ($25/line) | $50.00 |
| Total Taxable Items | $260,046.33 |
| | |
| Taxes on Taxable Items (FL Sales/Use Tax:7%) | $18,203.24 |
| | |
| **Non-Taxable Items:** | |
| Professional Services (300 hours @ $56/hour) | $16,800.00 |
| | |
| Total Due | $295,049.57 |



November 2004 Due 01-14-05
(11/1 through 11/30)

Taxable Items:

| | |
|---|---|
| Space (3297 sq ft @ $24.30/sq ft): | $80,117.10 |
| Power (64 [208 volt, 30 amp] power whips @$270/whip) | $17,280.00 |
| Power (70 [110 volt, 20 amp] power whips)@$180/whip) | $12,600.00 |
| Bandwidth (360.91 @ $90/mbps) | $32,481.90 |
| Madrid Circuit ($11,000/month) | $11,000.00 |
| Domestic WAN ($31,500/month) | $31,500.00 |
| Akamai | $47,500.00 |
| Two Telephone Lines ($25/line/month) | $50.00 |
| Install Fiber Optic Patch in SR 1 & 3 per Lycos Request | $494.00 |
| Install Patch Cords between Cabinets and Switches | $546.00 |
| Total Taxable Items | $249,918.83 |
| Taxes on Taxable Items (FL Sales/Use Tax:7%) | $16,349.83 |
| Universal Service Fund Tax | $3,604.50 |

Non-Taxable Items:

| | |
|---|---|
| Professional Services (300 hours @ $56/hour) | $16,800.00 |
| Total Due | $270,323.33 |

December 2004 Due 01-14-05
(12/1 through 12/31)

Taxable Items:

| | |
|---|---|
| Space (3297 sq ft @ $24.30/sq ft): | $80,117.10 |
| Power (64 [208 volt, 30 amp] power whips @$270/whip) | $17,280.00 |
| Power (70 [110 volt, 20 amp] power whips)@$180/whip) | $12,600.00 |
| Bandwidth (414.72* $90/mbps) | $37,324.80 |
| Madrid Circuit ($11,000/month) | $11,000.00 |
| Domestic WAN ($31,500/month) | $31,500.00 |
| Akamai | $47,500.00 |
| Two Telephone Lines ($25/line/month) | $50.00 |
| Total Taxable Items | $237,371.90 |
| Taxes on Taxable Items (FL Sales/Use Tax:7%) | $16,616.03 |
| Universal Service Fund Tax | $3604.50 |

Non-Taxable Items:

| | |
|---|---|
| Professional Services (300 hours @ $56/hour) | |
| | $16,800.00 |
| Total Due | $274,392.43 |

2

**Non-bill of Universal Service Fund Taxes**
**For Period January 1, 2004 through October 31, 2004**
**For Madrid Circuit and Domestic WAN Circuit**
**Detail on Invoice Dated November 27, 2004 and**
**Due December 27, 2004**

**Taxes Owed:**                                    **$66,599.50**

**Total of all charges:**                          **$906,364.84.**

This aggregate total is net of all credits that are reflected in my January 2005 credit memo to you. The reason for the difference between this aggregate total and the $839,645.82 contained in my January 20, 2005 letter is that Telefonica only recently sent you an invoice for the L-5 power whips ($39,200 plus the Florida Sales/Use Tax), so these amounts are not due at this time; I failed to include the Universal Service Fund Tax in my calculations of what was due (although you were invoiced for these amounts); and I gave you credits in the form of price and space reductions for the month October to which you are not entitled in my January 2005 credit memo.

I trust this breakdown substantiates the demand made in my January 20, 2005 letter. If you do not pay the Universal Service Fund Taxes for November and December these taxes will be the subject of another demand letter for payment. I do not need to re-issue the January credit memo as all credits to which you are entitled have been reflected in the above calculations of amounts due. Finally, I will issue you an invoice reversing the credits to which you were not entitled.

Sincerely,

David Salway
Director of Service Management
Enterprise Accounts

3

EXHIBIT B TO LYCOS, INC.'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TELEFONICA DATA USA, INC.,    )    CIVIL NO. 05-20369-HUCK/TURNOFF
                              )
        Plaintiff,            )
                              )
v.                            )    DEFENDANT'S MOTION TO DISMISS, OR
                              )    TRANSFER VENUE AND INCORPORATED
LYCOS, INC.,                  )    MEMORANDUM OF LAW
                              )
        Defendant.            )

        Defendant, Lycos, Inc., moves to dismiss this action based on abstention principles or,

in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a) to the United States

District Court for the District of Massachusetts where a related action filed last year is

pending, Lycos, Inc. v. Telefonica Data USA, Inc., C.A. No. 04-12716-WGY (the

"Massachusetts Action").

        As set forth more fully below, this Court should dismiss this action because:

- the Massachusetts action was filed first and is scheduled for trial this year;

- resolution of the Massachusetts Action is a prerequisite to resolution of the claims in

    this action; and

- the claims asserted by defendant Telefonica Data USA, Inc. ("T-Data") are

    compulsory counterclaims in the Massachusetts Action.

        In the alternative, this Court should transfer venue of this action to Massachusetts

because T-Data could have brought this action in Massachusetts and because both judicial and

the parties' resources so demand.

## FACTUAL AND PROCEDURAL BACKGROUND

1.      In November, 2003, Lycos, Inc. ("Lycos") – a network of globally branded media properties distributed primarily through the World Wide Web – and T-Data entered into a Master Services Agreement (the "MSA") and several exhibits and schedules thereto (collectively, the "Transaction Documents") pursuant to which T-Data agreed to provide certain specialized services for housing and operation of web servers owned by Lycos, as well as connections to the World Wide Web.  *See* Affidavit of Erik Bartenhagen ("Bartenhagen Aff."), filed herewith, Exhibit 1 (Lycos' First Amended Complaint in the Massachusetts Action), at Exh. A.

2.      As part of that agreement, T-Data was required to reduce the prices it charged Lycos for service by ten percent on the anniversary date of the MSA, and to meet on or about the anniversary date to "benchmark" those prices in accordance with the principles of a Strategic Alliance Framework Agreement ("SAFA") dated *January 29, 2003* between two entities that were then related to Lycos and T-Data.  *See* Bartenhagen Aff., Exhibit 1, at Exh. A, ¶¶ 2-3.

3.      In breach of those requirements, T-Data failed to reduce prices by the mandated ten percent until Lycos demanded it do so and failed to meet with Lycos to benchmark prices. Nonetheless, on December 20, 2004, T-Data sent Lycos a letter threatening to terminate the Transaction Documents at 3:00 p.m. EST on December 30, 2004 if Lycos did not pay certain monies that T-Data claimed were due and owing under the Transaction Documents (the

Telefonica v. Lycos
Case No.: 05-20369-HUCK/TURNOFF

"Termination Letter"). *See* Bartenhagen Aff., Exhibit 2 (letter dated December 20, 2004 from T-Data to Dean Batten at Lycos). Termination of the Transaction Documents and suspension of services would have caused the majority of Lycos' internet operations to shut down and would have threatened the viability of Lycos' business.

4.    In response to T-Data's letter, and to ensure that T-Data did not terminate and cease services, Lycos filed an action on December 23, 2004 in Massachusetts state court, seeking, among other things, preliminary and permanent injunctions barring T-Data from suspending, terminating, or otherwise ceasing to provide services. *See* Bartenhagen Aff., Exhibit 3, Count II (Lycos' original Verified Complaint in the Massachusetts Action, without exhibits).

5.    After T-Data removed that action to the United States District Court for the District of Massachusetts, T-Data advised Lycos in writing that it would provide Lycos continuing transitional services if it terminated the MSA, thus resolving the injunctive relief Lycos had sought.

6.    T-Data then moved to dismiss the Massachusetts Action on the basis of personal and subject matter jurisdiction. In response, Lycos filed its First Amended Complaint (the "Amended Complaint") and a memorandum opposing T-Data's motion to dismiss. *See* Bartenhagen Aff., Exhibit 1.

7.    In the Amended Complaint, Lycos seeks a declaration that the principles contained in the January 29, 2003 version of the SAFA, which version is explicitly referenced in Paragraph 2 of the MSA, as opposed to a SAFA dated several weeks later on February 12,

2003, applies to the parties' pricing arrangement. *See* Bartenhagen Aff., Exhibit 1, Count I. This distinction is significant as the former allows Lycos to purchase the services covered by the Transaction Documents from T-Data at the best market price, whereas the latter permits Lycos to purchase those services at the price offered to T-Data's most favored client. Notwithstanding the MSA's plain language, T-Data maintains that the February 12, 2003 version of the SAFA is somehow operative. *See* Bartenhagen Aff., Exhibit 1, at ¶ 19. The Amended Complaint seeks to resolve this dispute.

9.      On January 27, 2005, Lycos paid to T-Data the great majority of the amounts T-Data claimed were owed. Lycos, however, withheld payment of those amounts that are disputed pending a ruling on which SAFA applies. *See* Bartenhagen Aff., Exhibit 4 (letter dated January 27, 2005 from Dean Batten at Lycos to David Salway at T-Data).

10.     Notwithstanding the pendency of the Massachusetts Action and having received the undisputed amounts, T-Data commenced this action in Florida state court on January 28, 2005 (later removed to this Court) (the "Florida Action"), alleging that "Lycos has failed to pay certain outstanding sums invoiced under the Master Services Agreement as they came due." Complaint, ¶ 11. In other words, T-Data is suing to recover in this action amounts that it may or may not be owed depending on the Court's decision in the Massachusetts Action.

11.     On February 9, 2005, the Court in the Massachusetts Action set a trial date for December, 2005. *See* Bartenhagen Aff., Exhibit 5 (Joint Statement and Scheduling Conference Memorandum, as modified and entered by the Court, section IV. Lycos had

proposed a trial in November, 2005; T-Data in January, 2006. The Court decided on
December, 2005.)

## ARGUMENT

I.    **BECAUSE THE MASSACHUSETTS ACTION WAS FILED FIRST AND
T-DATA'S CLAIMS ARE COMPULSORY COUNTERCLAIMS IN THAT
ACTION, THIS COURT SHOULD DISMISS T-DATA'S COMPLAINT.**

A.    **Pursuant to the "First-Filed" Rule, the District of Massachusetts is the
Proper Forum for Resolving the Entire Dispute Between the Parties.**

The Eleventh Circuit follows the "first-filed" rule, which provides that "when parties
have instituted competing or parallel litigation in separate courts, the court initially having
jurisdiction should hear the case." *Supreme Int'l Corp. v. Anheuser-Busch, Inc.*, 972 F.
Supp. 604, 605 (S.D. Fla. 1997) citing *Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 675
F.2d 1169, 1174 (11ᵗʰ Cir. 1982). "The primary purpose of the rule is to conserve judicial
resources and avoid conflicting rulings." *Id.* The "first-filed action is preferred, even if it is
declaratory, unless considerations of judicial and litigant economy, and the just and effective
disposition of disputes, require otherwise." *Id. (citing Serco Serv. Co. v. Kelley Co.*, 51 F.3d
1037, 1039 (Fed. Cir. 1995)).

Here, Lycos filed its complaint against T-Data in Massachusetts state court on
December 23, 2004 because T-Data had threatened to terminate the MSA on December 30,
2004 as a result of Lycos' withholding of amounts T-Data claimed it was owed. T-Data did
not institute this action until more than a month later on January 28, 2004. Because December

23, 2004 is the "relevant benchmark,"[1] Lycos was the first to file. Accordingly, under the "first filed" rule, this action should be dismissed.

Lycos acknowledges that in "compelling circumstances," the Court may depart from this rule when one party, on notice of a potential lawsuit, rushes to court to file a declaratory judgment action in its home forum. *Supreme Int'l Corp.*, 972 F. Supp. at 605; *Allstate Ins. Co. v. Clohessy*, 9 F. Supp.2d 1314, 1316 (M.D. Fla. 1998). Such circumstances do not exist here. T-Data's Termination Letter threatened to terminate the Transaction Documents, not to commence a lawsuit. Lycos sued to protect its business from being shut down, not to establish venue with knowledge that T-Data intended to commence this action.

Moreover, assuming *arguendo* that Lycos did file its action to establish venue, the Court still has discretion to follow the "first filed" rule. *Supreme Int'l Corp.*, 972 F. Supp. at 605. This Court should do so here for the following reasons:

1.    First, a declaration in the Massachusetts Action as to which SAFA applies is a prerequisite to adjudication of this case. That is, until a court declares which SAFA applies, neither party will know how much, if anything, Lycos owes to T-Data;

2.    Second, it would be a waste of judicial and the parties' resources for the parties to participate in discovery in two cases when much of the discovery will be the same; and

3.    Finally, a trial date has already been set in the Massachusetts Action for later this year.

---

[1]    When a case has been removed to federal court, the "date of filing in state court [is] the relevant benchmark to determine which party filed first." *Pollution Prevention Svcs., Inc.*, 1996 U.S. Dist. LEXIS 9351, at *21.

Because the issues are already before the Massachusetts Court, and because a strict schedule in that case has already been established, judicial economy favors dismissing the present action so that these claims can be adjudicated together.

**B.    Because T-Data's Claims are Compulsory Counterclaims In the Massachusetts Action, This Action Should be Dismissed.**

This action should also be dismissed because T-Data's claims are "compulsory counterclaims" in the Massachusetts Action.  Under Rule 13(a) of the Federal Rules of Civil Procedure,

> *[a] pleading shall state as a counterclaim any claim* which at the time of serving the pleading the pleader has against any opposing party, *if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim* and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a) (emphases added).  In fact, the purpose of Rule 13(a) is to prevent exactly what is presented here: this "rule was particularly directed against one who failed to assert a counterclaim in one action and then instituted a second action in which that counterclaim became the basis of the complaint." *Southern Construction Co. v. United States ex rel. Pickard*, 371 U.S. 57, 60 (1962).    Accordingly, when a party such as T-Data commences an action asserting what are compulsory counterclaims in a previously filed action, the second action should be dismissed. *Blue Cross and Blue Shield of Alabama v. Hobbs*, 209 F.R.D. 218, 220 (M.D. Ala. 2002) (courts have "dismissed claims 'in the interests of judicial administration' when they learn that those claims are properly characterized as compulsory counterclaims in another pending action"); *Pumpelly v. Cook*, 106 F.R.D. 238, 238 (D. D.C. 1985) (plaintiff's complaint dismissed without prejudice where claims should have been plead

as compulsory counterclaims to an earlier filed action); *Donaldson, Lufkin & Jenrette, Inc. v. Los Angeles County*, 542 F. Supp. 1317, 1321 (S.D.N.Y. 1982) (same).

The Eleventh Circuit applies a "logical relationship" test to determine whether counterclaims are compulsory. *See Republic Health Corp. v. Lifemark Hospitals of Florida*, 755 F.2d 1453, 1455 (11th Cir. 1985). "There is a logical relationship when 'the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Id.*; *U.S. v. Aronson*, 617 F.2d 119, 121 (11th Cir. 1980). Further, "[w]hen the same contract serves as the basis for both the claims and the counterclaims, the logical relationship standard . . . has been satisfied." Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1410 (2d ed. 1990).

Here, the Massachusetts Action and this action arise out of the "same transaction or occurrence" because they both arise out of the same contract - the MSA. Specifically, Lycos has sought a declaration as to which SAFA applies under the MSA. *See* Bartenhagen Aff., Ex. 1, Count I. To resolve this issue, the Court in Massachusetts must construe the MSA. Similarly, this action arises out of, according to T-Data, Lycos' failure "to pay certain outstanding sums invoiced under the Master Services Agreement as they came due." Complaint, ¶ 11. Thus, these actions arise not only out of the "same transaction or occurrence" -- the MSA -- but also out of the very same subject matter.

Moreover, T-Data has not sued anyone other than Lycos in this action. Thus, there is no issue as to whether the Massachusetts Action "require[s] for its adjudication the presence of

third parties of whom the court cannot acquire jurisdiction." Accordingly, because T-Data's claims asserted in this action are compulsory counterclaims that should have been brought in the Massachusetts Action, this Court should dismiss this action.

## II.   IN THE ALTERNATIVE, THIS COURT SHOULD TRANSFER THIS ACTION TO MASSACHUSETTS.

Under 28 U.S.C. § 1404(a), a party may move to transfer a case for the convenience of the parties, convenience of witnesses, and in the interests of justice. To do so, courts conduct a two-pronged analysis: "[f]irst, the cause can only be transferred to another district where the action might have been brought." *Cordis Corp. v. Siemens-Pacesetter, Inc.*, 682 F. Supp. 1200, 1201 (S.D. Fla. 1987). "An action 'might have been brought' in a proposed transferee court if: (1) the court had jurisdiction over the subject matter of the action; (2) venue is proper there; and (3) the defendant is amenable to process issuing out of the transferee court." *Windmere Corp. v. Remington Products, Inc.*, 617 F. Supp. 8, 10 (S.D. Fla. 1985). "Second, the transfer must be warranted on grounds of convenience and interests of justice." *Cordis*, 682 F. Supp. at 1201. In conducting this inquiry, the relevant factors to be weighed include: "(1) convenience of the parties; (2) convenience of witnesses; (3) relative ease of access to sources of proof; (4) availability of process to compel presence of unwilling witnesses; (5) cost of obtaining presence of witnesses; and (6) public interest." *Miot v. Kechijian*, 830 F. Supp. 1460, 1466 (S.D. Fla. 1993); *see also Republic of Panama v. BCCI Holdings S.A.*, 119 F.3d 935, 952 (11th Cir. 1997); *Jewelmasters, Inc. v. May Dept. Stores Co.*, 840 F. Supp. 893, 895 (S.D. Fla. 1993). Application of the instant facts to the two-

pronged analysis and the above factors demonstrates that this Court should transfer venue to Massachusetts.

### A.    T-Data Could Have Filed This Action in the U.S. District Court for the District of Massachusetts.

Lycos is a Virginia corporation with a principal place of business in Waltham, Massachusetts. T-Data is a Florida corporation with a principal place of business in Miami, Florida. Based on the invoices attached to T-Data's complaint, the amount in controversy exceeds $75,000. Accordingly, the U.S. District Court for the District of Massachusetts has subject matter jurisdiction over the parties under 28 U.S.C. § 1332 because the dispute is between citizens of different states and the amount in controversy exceeds $75,000. In addition, venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(a) because Lycos – the only defendant in this action - resides there. Thus, T-Data could have filed this action in the U.S. District Court for the District of Massachusetts.

### B.    The Balance of Interests Demonstrates that this Court Should Transfer Venue to Massachusetts.

The interests of justice dictate that the parties' dispute can best be resolved via the Massachusetts Action. The Court in Massachusetts has already held a scheduling conference, discovery is about to commence, and trial has been scheduled for later this year. Further, because this Court cannot properly adjudicate T-Data's claims until the Court in Massachusetts decides which SAFA applies, it makes little sense to adjudicate these disputes independently. Separate litigation would be duplicative and a waste of both judicial and the parties' resources, and would threaten inconsi stent rulings.

Moreover, neither the convenience of parties and witnesses, the access to proof, nor the location of relevant evidence is determinative on the issue of convenience. Most of the witnesses who will testify on behalf of Lycos reside in Massachusetts, and none reside in Florida. Specifically, Lycos expects that its primary witness in the Massachusetts Action will be the former general counsel of Lycos, Andrew Feinberg. Mr. Feinberg, who is a resident of Massachusetts, had the most significant role of any Lycos employee in negotiating and drafting the MSA. If the Court in the Massachusetts Action permits the introduction of parol evidence, Lycos' other witnesses will include Brian Lucey, former CFO of Lycos, and Brad Steiner, former Deputy General Counsel of Lycos, both of whom are residents of Massachusetts. Messrs. Lucy and Steiner participated in the only face-to-face negotiating session of the MSA, a session that occurred in Massachusetts. Similarly, Lycos' documentary evidence is maintained in Massachusetts. Accordingly, if T-Data's witnesses and sources of proof are in Florida, the scales are in equipose.

## CONCLUSION

For the foregoing reasons, this Court should grant Lycos' Motion to Dismiss, or, in the

alternative, transfer this action to the U.S. District Court for the District of Massachusetts,

where it can be adjudicated with the action already pending there.

Respectfully submitted,

GUNSTER, YOAKLEY & STEWART, P.A.
Attorneys for LYCOS, INC.
One Biscayne Tower, Suite 3400
Two South Biscayne Boulevard
Miami, FL 33131Telephone: 305-376-6000
Facsimile: 305-376-6010

By:_____
       Clinton R. Losego
       Florida Bar No. 818054
       closego@gunster.com

Of Counsel:
Thomas O. Bean (BBO #548072)
Erik P. Bartenhagen (BBO# 640003)
NUTTER, McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(617) 439-2000

Telefonica v. Lycos
Case No.: 05-20369-HUCK/TURNOFF

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was forwarded via facsimile without exhibit and U.S. mail to Alexander Angueira, Esq., and Christopher L. Barnett, Esq. at Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Attorneys for Plaintiffs, 2200 Museum Tower, 150 West Flagler Street, Miami, FL 33130 on this _22_ day of February, 2005.

By: _____

Clinton R. Losego

MIAMI 406749.1

Gunster, Yoakley & Stewart, P.A.
A Professional Association
Attorneys at Law
Page- 13 -